**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) | Case No. 09-23529 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### NOTICE OF FILING OF THE DISCLOSURE STATEMENT FOR THE FIRST AMENDED PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE READER'S DIGEST ASSOCIATION, INC. AND ITS DEBTOR AFFILIATES

**PLEASE TAKE NOTICE** that on October 9, 2009, The Reader's Digest Association, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "*Debtors*"),[1] filed (i) the *Disclosure Statement for the Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates* [Docket No. 162] (the "*Disclosure Statement*") and (ii) the *Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates* [Docket No. 163] (as may be amended, supplemented or modified, the "*Plan*") with the United States Bankruptcy Court for the Southern District of New York (the "*Court*").[2] On October 21, 2009, the Debtors filed the Debtors' Motion for Entry of an Order (i) Approving the Adequacy of the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570.

[2]    Capitalized terms used but not defined in this notice have the meanings set forth in the Disclosure Statement.

Disclosure Statement; (ii) Fixing Dates and Deadlines Related to Confirmation of the Plan; (iii) Approving Certain Procedures for Soliciting and Tabulating the Votes on, and for Objecting to, the Plan; (iv) Approving the Procedures Related to the Rights Offering and Authorizing the Retention of Financial Balloting Group LLC in Connection Therewith; and (V) Approving the Manner and Form of the Various Notices and Documents Relating Thereto [Docket No. 187] (the "***Solicitation Procedures Motion***").

**PLEASE TAKE FURTHER NOTICE** that the Debtors have amended the Disclosure Statement and the Plan to, among other things, reflect events that have transpired since the filing of the Disclosure Statement and Plan, modify, add or amend certain language on account of comments received from various parties in interest in the Debtors' chapter 11 cases and correct various clerical and typographical errors.  A copy of the revised Disclosure Statement is attached hereto as **Exhibit 1**, and a copy marked against the version filed with the Court on October 9, 2009, is attached as **Exhibit 2**.  The Debtors have filed a copy of the revised Plan, together with a similarly marked copy, with the Court concurrently herewith.   Additional copies of the Disclosure Statement, Plan, Solicitation Procedures Motion or other any other document filed in these chapter 11 cases are available upon request from Kurtzman Carson Consultants LLC by calling (866) 967-0491 or emailing KCC_RDA@kccllc.com, or may be downloaded from http://www.kccllc.net/readers.   You may also obtain copies for a fee via PACER at http://www.nysb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Disclosure Statement and Solicitation Procedures Motion is currently scheduled for **2:00 p.m. prevailing Eastern Time on November 5, 2009**, before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408.  This hearing may be continued by the Court or the Debtors without further notice <u>other than</u> by announcement of same in open court and/or by filing and service, as applicable, of a notice of adjournment.

| | |
|---|---|
| Dated:  November 2, 2009<br>New York, New York | */s/ Nicole L. Greenblatt*<br>James H.M. Sprayregen P.C.<br>Paul M. Basta<br>Nicole L. Greenblatt<br>KIRKLAND & ELLIS LLP<br>601 Lexington Avenue<br>New York, New York  10022-4611<br>Telephone:     (212) 446-4800<br>Facsimile:      (212) 446-4900 |

Counsel to the Debtors and Debtors in Possession

---

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE,
PLEASE CONTACT THE RESTRUCTURING HOTLINE AT (866) 967-0491**

---

## **<u>Exhibit 1</u>**

**Revised Disclosure Statement**

KIRKLAND & ELLIS LLP
James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446–4800
Facsimile: (212) 446–4900
Counsel for the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) | Case No. 09-23529 (RDD) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

**DISCLOSURE STATEMENT FOR THE**
**FIRST AMENDED PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**THE READER'S DIGEST ASSOCIATION, INC. AND ITS DEBTOR AFFILIATES[1]**

---

> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES**
> **OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN**
> **APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING**
> **SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

Dated: November 2, 2009

---

[1]    The Debtors in these chapter 11 cases who are the proponents of the Plan, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is:  1 Reader's Digest Road, Pleasantville, NY 10570.  A schedule of the Debtors, including their jurisdiction of incorporation or formation and their Chapter 11 Case numbers, is attached hereto as **Exhibit B**.

| IMPORTANT INFORMATION FOR YOU TO READ |
| :---: |

**THE DEADLINE TO VOTE ON THE PLAN IS DECEMBER [7] 2009, AT 4:00 P.M. PACIFIC TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICING AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

The Debtors are providing the information in this Disclosure Statement for the Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates to Holders of Claims entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan.  **Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.**

This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax or business advice.  The Debtors urge any Holder of a Claim or Equity Interest to consult with its own advisors with respect to any such legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby.  The Bankruptcy Court's approval of the adequacy of disclosure contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan.  The Debtors have not authorized any entity to give any information about or concerning the plan other than that which is contained in this Disclosure Statement.  The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

The Debtors urge every Holder of a Claim entitled to vote on the Plan to (1) read the entire Disclosure Statement and Plan carefully, (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Section VII of this Disclosure Statement and (3) consult with your own advisors with respect to reviewing this Disclosure Statement, the Plan, all documents attached hereto or filed in connection herewith and the proposed transactions contemplated under the Plan **prior** to deciding whether to vote to accept or reject the Plan.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Debtors' Chapter 11 Cases and certain documents related to the Plan.  Although the Debtors believe that these summaries are fair and accurate, the same are all qualified in their entirety.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other documents referenced herein, the Plan or such other documents will govern for all purposes.  Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management.  The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, such financial information has not been audited.  The Debtors are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted.  Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and parties reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.

This Disclosure Statement or the Plan does not constitute and may not be construed as an admission of fact, liability, stipulation or waiver.  Rather, Holders of Claims and other parties in interest should construe this Disclosure Statement as a statement made in settlement negotiations related to contested matters, adversary proceedings and other pending or threatened litigation or actions.  No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  The Debtors or the reorganized Debtors may seek to investigate, file and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

K&E 15735883.

---

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

---

Neither this Disclosure Statement nor the Plan have been filed with the United States Securities And Exchange Commission (the "*SEC*") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The securities to be issued on or after the effective date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "*Securities Act*") or any securities regulatory authority of any state under any state securities law ("*Blue Sky Law*"). The Debtors are relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt the issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and blue sky law.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate.

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative. The Debtors recommend that potential recipients of any securities issued pursuant to the Plan, including as part of the Rights Offering, consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

---

**QUESTIONS AND ADDITIONAL INFORMATION**

---

If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact Kurtzman Carson Consultants LLC by (i) calling (866) 967–0491, (ii) emailing kcc_rda@kccllc.com or (iii) visiting http://www.kccllc.net/readers.

K&E 15735883.

## TABLE OF CONTENTS

**Page**

I.    EXECUTIVE SUMMARY .............................................................................................................1

    A.    General Structure of the Plan .........................................................................................1

    B.    Treatment of Claims and Interests Under the Plan .........................................................5

    C.    Voting On the Plan .........................................................................................................7

    D.    Additional Plan-Related Documents .............................................................................8

    E.    Confirmation and Consummation of the Plan ...............................................................9

II.    BACKGROUND TO THESE CHAPTER 11 CASES...........................................................11

    A.    Corporate History and Current Structure .....................................................................11

    B.    Current Businesses and Operations...............................................................................12

    C.    Prepetition Funded Indebtedness .................................................................................17

    D.    Events Leading up to the Chapter 11 Filing ................................................................18

III.    CHAPTER 11 CASES.............................................................................................................21

    A.    First Day Motions and Related Relief...........................................................................21

    B.    Other Material Events in These Chapter 11 Cases .......................................................22

    C.    Committee Appointment and Participation ...................................................................23

IV.    SUMMARY OF THE PLAN ...................................................................................................24

    A.    General Basis for the Plan...............................................................................................24

    B.    Treatment of Unclassified Claims.................................................................................24

    C.    Classification and Treatment of Claims and Interests ..................................................26

    D.    Certain Means for Implementation of the Plan ............................................................31

    E.    Post-Emergence Capital Structure.................................................................................32

    F.    Post-Effective Date Corporate Existence .....................................................................35

    G.    Compensation, Pension and Benefit Plans and Related Matters ..................................36

    H.    Rights Offering and Subscription Process.....................................................................39

    I.    Preservation of Certain Rights of Action .....................................................................40

    J.    Treatment of Contracts and Leases ..............................................................................42

    K.    Distributions on Account of Allowed Claims ..............................................................45

    L.    Resolution of Contingent, Unliquidated or Disputed Claims.......................................47

    M.    Settlement, Release, Injunction and Related Provisions ..............................................48

    N.    Modifying, Revoking or Withdrawing the Plan ...........................................................51

**V.**     **VALUATION AND FINANCIAL PROJECTIONS** .................................................................**52**

    A.   Valuation of the Reorganized Debtors ......................................................... 52

    B.   Financial Projections ................................................................................... 53

**VI.**    **CONFIRMATION AND CONSUMMATION OF THE PLAN** ...............................................**55**

    A.   Statutory Requirements for Confirmation of the Plan .................................. 55

    B.   Conditions for Consummation of the Plan ................................................... 58

    C.   Alternatives to Confirmation and Consummation of the Plan ...................... 59

**VII.**   **PLAN-RELATED RISK FACTORS** ......................................................................................**60**

    A.   Risks Relating to Confirmation of the Plan ................................................. 60

    B.   Risks Relating to Recoveries Under the Plan ............................................... 60

    C.   Risks Relating to the Debtors' Businesses ................................................... 62

    D.   Disclosure Statement Disclaimer ................................................................ 63

**VIII.**  **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ..............................**65**

    A.   Brief Overview and Disclosure .................................................................... 65

    B.   Consequences to the Debtors ....................................................................... 66

    C.   Consequences to U.S. Holders of Allowed Claims ...................................... 68

    D.   Consequences to Non-U.S. Holders of Allowed Claims .............................. 72

    E.   Consequences to Rights Offering Participants ............................................. 73

    F.   Withholding and Reporting .......................................................................... 74

**IX.**    **GLOSSARY OF DEFINED TERMS** .....................................................................................**75**

**X.**     **RECOMMENDATION** .......................................................................................................**85**

K&E 15735883.

## EXHIBITS

EXHIBIT A          Plan of Reorganization

EXHIBIT B          Corporate Structure Chart/Schedule of the Debtors

EXHIBIT C          Solicitation Procedures Order [*To Come*]

EXHIBIT D          Reorganized Debtors' Financial Projections

EXHIBIT E          Liquidation Analysis

EXHIBIT F          Restructuring Support Agreement (together with the Restructuring Term Sheet)

EXHIBIT G          Subscription Procedures [*To Come*]

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO
THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

K&E 15735883.

# I.
# EXECUTIVE SUMMARY

The Reader's Digest Association, Inc.,[2] a Delaware corporation with its primary headquarters in Pleasantville, New York, and its affiliates identified on the title page above, as debtors and debtors in possession (collectively, the "***Debtors***"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York on August 24, 2009 (the "***Commencement Date***").  The Debtors' Chapter 11 Cases are jointly administered under lead case number 09-23529 (RDD).

Prior to soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization.

Accordingly, the Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for use in the solicitation of votes to accept the *Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates* (the "***Plan***"), dated October 9, 2009, which the Debtors filed with the Bankruptcy Court concurrently herewith.  A copy of the Plan is also attached hereto as **Exhibit A**.  A hearing to consider Confirmation of the Plan is scheduled to be held in front of the Honorable Robert D. Drain on December [17], 2009, at the Bankruptcy Court, White Plains Division, 300 Quarropas Street, White Plains, NY 10601(more details are set forth in Section I.E herein, entitled "Confirmation and Consummation of the Plan").

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtors as filed with the Bankruptcy Court on October 9, 2009.  Certain provisions of the Plan (and the descriptions and summaries contained herein), remain the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon and may be modified.

In addition, this Disclosure Statement includes information about, without limitation, (i) the procedures by which the Debtors intend to solicit and tabulate votes on the Plan, (ii) the Plan Confirmation process, (iii) a description of the Debtors' businesses, prepetition operations, financial history and the events leading up to the commencement of these Chapter 11 Cases, (iv) the significant events that occurred thus far in these Chapter 11 Cases, (v) certain risk factors to be considered before voting on the Plan and (vi) discussions relating to securities registration and certain tax consequences of the Plan.

*As such, this Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan, and is qualified in its entirety by reference to, and should be read in conjunction with, the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan.*

## A.      GENERAL STRUCTURE OF THE PLAN

### 1.      Purpose and Effect of the Plan

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors.  The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.

---

[2]     All capitalized terms used but not otherwise defined herein shall have the meanings set forth in Section IX herein, titled "Glossary of Defined Terms."  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the "Glossary of Defined Terms" are inconsistent, the definition included in the Glossary of Defined Terms shall control.

K&E 15735883.

As discussed in greater detail in Section I.D herein, entitled "Confirmation and Consummation of the Plan," a bankruptcy court's confirmation of a plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor and any other entities and persons as may be ordered by the bankruptcy court to the terms of the confirmed plan, whether or not such creditor or equity security holder is impaired under or has voted to accept the plan or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising prior to the Plan's Effective Date, substitute the obligations set forth in the Confirmed Plan therefor and terminate all of the rights and interests of equity security holders.  Under the Plan, Claims and Interests are divided into Classes according to their relative seniority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' estates.  Instead, the Plan, although proposed jointly, constitutes a separate Plan for each of the 48 Debtors in these Chapter 11 Cases.[3]  Holders of Allowed Claims against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims in the applicable Class, and will be entitled to their share of assets available for distribution to such Class.

The terms of the Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan and pay certain of their continuing obligations in the ordinary course of the Reorganized Debtors' businesses.

The feasibility of the Plan is premised upon managements' ability to continue the implementation of its strategic business plan (the "***Business Plan***").  The Business Plan and accompanying financial projections are set forth on **Exhibit D**.  Although the Debtors believe the Business Plan and projections are reasonable and appropriate, they include a number of assumptions that may differ from actual results and are subject to a number of risk factors. Importantly, the Business Plan and projections incorporate the Debtors' forecasts of the anticipated operating performance of the Company's foreign subsidiaries worldwide that are not subject to these Chapter 11 Cases.

### 2.      Financial Restructurings Under the Plan

As of the Commencement Date, the Debtors had outstanding debt in the aggregate principal amount of approximately $2,271,200,000, consisting primarily of approximately (a) $1,645,000,000 under their senior secured credit facility (including swap termination obligations and accrued and unpaid interest), (b) $628,200,000 in unsecured senior subordinated notes (including accrued interest); and (c) $2,800,000 in foreign lines of credit and a promissory note.  Additionally, based on invoices in their accounts payable systems and estimated accruals, the Debtors estimate that an aggregate of approximately $115 million was owing and outstanding to the Debtors' trade creditors, including vendors, supplies, service providers and contract counterparties, as of the Commencement Date.

The Reorganized Debtors will emerge with approximately 75% less funded debt, after giving effect to the restructuring transactions contemplated by the Plan, which include the following:

- $150 million of loans outstanding under the Debtors' DIP Facility will be converted to the New First Priority Term Loan (or otherwise paid in full in Cash on the Effective Date) to be issued to the DIP Lenders on the Effective Date pursuant to, and subject to the terms of, the Exit Credit Agreement;

- the Debtors' prepetition Euro Term Loan in the approximate amount of $105.9 million outstanding under the Prepetition Credit Agreement as of the Commencement Date will be reinstated as amended on the terms set forth in the Exit Credit Agreement;

---

[3]    A schedule of the Debtors, including their jurisdiction of incorporation or formation and their chapter 11 case numbers, is set forth on **Exhibit B** hereto.

K&E 15735883.

- $300 million of secured indebtedness under the Prepetition Credit Agreement (other than the Euro Term Loan) will be converted into the New Second Priority Term Loan issued to the Prepetition Lenders on the Effective Date pursuant to the New Second Priority Term Loan Agreement;

- the remaining secured indebtedness outstanding under the Prepetition Credit Agreement and any Adequate Protection Obligations that are not restructured under the New Second Priority Term Loan or part of the Reinstated Euro Term Loan will be converted into 100% of the New Common Stock (subject to dilution by the Management Equity Plan and the Rights Offering) and distributed Pro Rata to the Prepetition Lenders on account of the obligations owed to them under the Prepetition Credit Agreement (other than the Euro Term Loan) and on account of the Adequate Protection Obligations;

- the Debtors' outstanding $600 million Senior Subordinated Notes will be canceled and discharged;

- the General Unsecured Claims of trade creditors with whom the Debtors intend to conduct business post emergence will be paid in full in Cash on the Effective Date or in the ordinary course of business;

- Holders of Other General Unsecured Claims will receive Cash in an amount equal to their Pro Rata share of $3 million; and

- Equity Interests in RDA Holding Co. will be extinguished.

The consummation of the financial restructurings contemplated by the Plan will significantly de-lever the Debtors' capital structure, leaving the Reorganized Debtors with approximately $555 million in funded debt.  With a sustainable capital structure aligned with the Debtors' revised Business Plan, the Reorganized Debtors will be better positioned to compete more effectively in the competitive media and marketing industries.  Specifically, as a result of the proposed restructuring transactions, the Debtors will reduce their annual interest carrying costs by approximately $63 million.  Because borrowings under the Exit Credit Agreement and Second Priority Term Loan may be paid down at any time, the Debtors will be able to take advantage of potential refinancing opportunities, which are likely to be more available as a result of the improved capital structure.

As a result of the restructuring transactions contemplated by the Plan, the Debtors' senior secured lenders under the Prepetition Credit Agreement will own substantially all the New Common Stock in Reorganized Holdings, subject to dilution by shares of the New Common Stock issued in connection with the following:

- **Management Equity Plan**.  The Plan provides that the New Board will grant equity awards in the form of restricted stock, options and/or warrants for 7.5% of the New Common Stock (on a fully diluted basis) to continuing employees and directors of the Reorganized Debtors; _provided_ that such equity grants will not include more than 2.5% in the form of restricted New Common Stock.

- **Rights Offering**.  The Plan provides that any Holder of a Senior Subordinated Note Claim as of the Record Date (defined below) that is an Accredited Investor or Qualified Institutional Buyer[4] (in such capacity, each, an "*Eligible Noteholder*") has the right (a "*Subscription Right*") to purchase (at a share price based on Plan Equity Value) shares of New Common Stock up to, and solely to the extent of, its Pro Rata share (*i.e.*, the ratio, expressed as a percentage, of the principal amount adjusted for unaccrued interest of an Eligible Noteholder's Senior Subordinated Note Claim as of the Record Date to the aggregate amount of Senior Subordinated Note Claims as of the Record Date) of up to $50 million (representing approximately 8% of Plan Equity Value) of the New Common Stock to be issued under the Plan (subject to dilution as described in this Disclosure Statement).  Proceeds from the Rights Offering, if any, will be used for general corporate purposes.  The Rights Offering is further described in Section IV.H herein, entitled "Rights Offering and Subscription Process."  **All Holders of Senior Subordinated Notes should refer to the procedures for subscribing to the Rights Offering set forth on Exhibit G hereto for further information about the Rights Offering.**

---

[4]    The term "Accredited Investor" is defined by Rule 501 of Regulation D promulgated under the Securities Act and the term "Qualified Institutional Buyer" is defined by Rule 144A promulgated under the Securities Act.

K&E 15735883.

### 3.    Recovery Analysis

The Plan, which provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, maximizes creditor recoveries, provides for an equitable distribution to the Debtors' stakeholders and protects the jobs of employees.

In developing the Plan, the Debtors gave due consideration to various exit alternatives and engaged in significant discussions and negotiations with representatives and/or professionals of the senior secured lenders under the Prepetition Credit Agreement, whom the Debtors believe will be the primary economic stakeholders in the Reorganized Debtors.  With the assistance of their professional advisors, the Debtors also conducted a careful review of their current operations, prospects as an ongoing business, financial projections and the Business Plan developed by management and estimated recoveries in a liquidation scenario, and concluded that recoveries to the Debtors' stakeholders will be maximized by the Debtors' continued operation as a going concern.

The Debtors believe that their businesses and assets have significant value that would <u>not</u> be realized in a liquidation, either in whole or in substantial part.  Consistent with the valuation, liquidation and other analyses prepared by the Debtors with the assistance of their advisors, the value of the Debtors is substantially greater as a going concern than in a liquidation.

Substantially all of the Debtors' assets are subject to valid and perfected liens held by the DIP Lenders and the Prepetition Lenders, which require payment in full prior to distributions to holders of unsecured claims against the Debtors.  Thus, on a going-concern basis, because the obligations owed by the Debtors to the DIP Lenders and the Prepetition Lenders greatly exceeds the value of the Reorganized Debtors, minimal (if any) distributions would be made to any Holders of Claims against the Debtors other than the DIP Lenders and the Prepetition Lenders absent consummation of the proposed Plan.  Further, as set forth in the attached Liquidation Analysis, outside of the proposed Plan, Holders non-priority unsecured Claims junior to the Claims of the DIP Lenders and Prepetition Lenders would receive <u>no</u> distribution in a liquidation of the Debtors' estates.

The Plan does not allocate all of the distributable value of the Reorganized Debtors to the Prepetition Lenders.  Recognizing that general unsecured creditors are entitled to share in the value of any unencumbered assets, which in this case consists entirely of minority equity interests in the Debtors' first-tier foreign subsidiaries, the Plan is based on an allocation of that value among the various unsecured creditor constituencies.[5]  After taking into account the substantial amount of any unencumbered value allocable to the Prepetition Lenders on account of (a) their unsecured deficiency claims and (b) the unsecured Senior Subordinated Note Claims (which recoveries would be turned over to the Prepetition Lenders pursuant to the subordination provisions of the Senior Subordinated Notes Indenture), the Debtors believe the distributable value remaining for all other non-priority general unsecured claims is minimal (if any).

The Plan, however, contemplates that holders of Other General Unsecured Claims in Class 5 will share in an aggregate recovery of $3 million in Cash.  As a result, pursuant to the Plan, general unsecured creditors in Class 5 stand to recover a premium (in the form of Cash) over what they would otherwise be entitled to receive under a strict waterfall recovery analysis.

The Debtors also believe that any alternative to Confirmation of the Plan, such as an attempt by another party to file a competing plan, would result in significant delays, litigation and additional costs, and could negatively affect value by causing unnecessary uncertainty with the Debtors' key customer and supplier constituencies, which could ultimately lower the recoveries for all Holders of Allowed Claims.

---

**ACCORDINGLY, FOR ALL OF THESE AND THE OTHER REASONS DESCRIBED HEREIN, THE DEBTORS URGE YOU TO TIMELY RETURN YOUR BALLOT ACCEPTING THE PLAN.**

---

[5]    For tax purposes, the Debtors pledged only 65% of the voting stock of their first-tier foreign subsidiaries to secure obligations under the Prepetition Credit Agreement.

K&E 15735883.

**B.     TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not proposing the substantive consolidation of their respective bankruptcy estates. Thus, although the Plan generally applies to all the Debtors, except where otherwise indicated: (a) the Plan constitutes 48 distinct chapter 11 plans, one for each Debtor; (b) for voting purposes, each holder of a Claim in a Voting Class will vote its Claims in such Class by individual Debtor; and (c) the classification scheme set forth in Article IIII of the Plan applies to each Debtor (to the extent there are no Claims in a certain Class against a particular Debtor, that Class will be deemed not to exist for any purpose whatsoever in respect of that Debtor).

**1.     Administrative, DIP Facility and Priority Tax Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims and Priority Tax Claims. Section IV.B herein, entitled "Treatment of Unclassified Claims," explains the treatment of Administrative Claims, DIP Facility Claims and Priority Tax Claims under Article II of the Plan in greater detail; however, in summary, the Plan provides as follows:

- **Allowed Administrative Claims**. Allowed Administrative Claims will be paid in full in Cash (a) to the extent arising in the ordinary course of business, in the ordinary course of business, (b) on or soon after the Effective Date or, if not then due, the date when such Allowed Administrative Claim is due, (c) on or soon after the date an Administrative Claim is Allowed, (d) at a time and on terms agreed upon by such Holder and the Debtors or the Reorganized Debtors or (e) at a time and on terms set forth in an order of the Bankruptcy Court;

- **DIP Facility Claims**. All DIP Facility Claims other than Claims under the DIP Facility that expressly survive the termination thereof will convert into the New First Priority Term Loan pursuant to the Exit Credit Agreement (subject to the terms of the DIP Facility) or be paid off in full and in Cash on the Effective Date; and

- **Priority Tax Claims**. Priority Tax Claims due and payable on or prior to the Effective Date will be satisfied as soon as reasonably practicable after the Effective Date by payment in an amount equal to the amount (a) of the Allowed Priority Tax Claim, (b) agreed to by the Debtors and the Holder of such Allowed Priority Tax Claim or (c) of such Allowed Priority Tax Claim if paid in installment over a period not more than five years after the Commencement Date pursuant to 11 U.S.C. § 1129(a)(9)(C).

**2.     Claims and Interests Classified Under the Plan**

The table below summarizes the classification and treatment of Claims and Interests under the Plan. These summaries are qualified in their entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Interests under the Plan, see Section IV.C herein, entitled "Classification and Treatment of Claims and Interests."

The table below also sets forth the estimated percentage recovery for holders of Claims and Interests in each Class and the Debtors' estimates of the amount of Claims that will ultimately become Allowed in each Class based upon (a) review by the Debtors of their books and records, (b) all Claims scheduled by the Debtors (as modified by the Bankruptcy Court through certain hearings) and (c) consideration of the provisions of the Plan that affect the allowance of certain Claims.

Because each Debtor's Plan contemplates distributions to Holders of Claims in the amount of the estimated percentage recoveries set forth below, the estimated aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE
BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

K&E 15735883.

**SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

| Class | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Percent Recovery | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| **Class 1:** Other Priority Claims | Each Holder of an Allowed Class 1 Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Other Priority Claim against the Debtors becomes an Allowed Other Priority Claim or (iii) such other date as may be ordered by the Bankruptcy Court. | $0-1 million | 100% | 0-19% |
| **Class 2:** Other Secured Claims | In the sole discretion of the applicable Debtor, each Holder of an Allowed Class 2 Claim shall receive one of the following treatments: (i) payment in full in Cash, including the payment of any interest required pursuant to section 506(b) of the Bankruptcy Code; (ii) delivery of the collateral securing such Allowed Class 2 Other Secured Claim; or (iii) other treatment that renders such Allowed Other Secured Claim Unimpaired. | $0 | 100% | 100% |
| **Class 3:** Prepetition Credit Agreement Claims | Holders of Allowed Prepetition Credit Agreement Claims and Adequate Protection Claims shall receive (i) the Reinstated Euro Term Loan; (ii) the New Second Priority Term Loan; and (iii) 100 % of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution by shares issued in connection with the Management Equity Plan and Rights Offering). Notwithstanding the foregoing, however, (a) the Euro Term Lenders as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive their Pro Rata share of the Reinstated Euro Term Loan on account of their exposure under the Euro Term Loan and (b) the Revolving Lenders, U.S. Term Lenders and Holders of Swap Claims as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive their Pro Rata share of the New Second Priority Term Loan and New Common Stock on account of their exposures under the Revolver Loan, U.S. Term Loan and Swap Claims, respectively (capitalized terms used but not defined in this paragraph have the meanings set forth in the Prepetition Credit Agreement). | $1.645 million[6] | 53-63% | 18–23% |
| **Class 4:** Unsecured Claims Related to Operations | Each Holder of an Allowed Unsecured Ongoing Operations Claim will be paid in full in Cash (i) on the Effective Date or as soon as reasonably practicable thereafter or (ii) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Unsecured Ongoing Operations Claim or in accordance with the course of practice between the Debtors and such Holder with respect to such Allowed Unsecured Ongoing Operations Claim. *Holders of Allowed Unsecured Ongoing Operations Claims are not entitled to postpetition interest, late fees or penalties on account of such Claims.* | $20-25 million | 100% | 0% |
| **Class 5:** Other General Unsecured Claims | Each Holder of an Allowed Other General Unsecured Claim shall receive Cash in an amount equal to their Pro Rata share of $3 million. | $110-120 million | 2.5–2.7% | 0% |
| **Class 6:** Senior Subordinated Note Claims | Holders of Senior Subordinated Note Claims shall not receive or retain any interest or property under the Plan on account of such Senior Subordinated Note Claims. The treatment of the Senior Subordinated Note Claims is in accordance with and gives effect to the provisions of section 510(a) of the Bankruptcy Code. *Eligible Noteholders shall be entitled to participate in the Rights Offering.* | $628 million | 0% | 0% |

---

[6]   The aggregate claim amount included for the Prepetition Lenders in Class 3 includes all claims of the Prepetition Lenders arising under the Prepetition Credit Agreement. Pursuant to the Restructuring Support Agreement, the Prepetition Lenders have agreed to receive the treatment provided in Class 3 on account of all Prepetition Credit Agreement Claims, including both their secured and unsecured deficiency Claims. For the avoidance of doubt, the Prepetition Lenders are not waiving their unsecured deficiency Claims; rather, the Plan treats such Claims in Class 3, taking into account the appropriate recoveries allocable to such Claims.

K&E 15735883.

**SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

| Class | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Percent Recovery | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| **Class 7:** Section 510(b) Claims | Holders of Class 7 Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims, which shall be discharged on the Effective Date. | $0 | 0% | 0% |
| **Class 8:** Equity Interests | There will be no distribution to the Holders of Class 8 Equity Interests, which will be deemed cancelled and of no further force and effect, whether surrendered for cancellation or otherwise, on the Effective Date. | $0 | 0% | 0% |
| **Class 9:** Intercompany Interests | Intercompany Interests shall be reinstated on the Effective Date. | $0 | N/A | N/A |
| **Class 10:** Intercompany Claims | To preserve the Debtors' corporate structure, Intercompany Claims may be reinstated as of the Effective Date or, at the Debtors' or Reorganized Debtors' option, cancelled or compromised, and no distribution will be made on account of Intercompany Claims under the Plan. | $70 million | N/A | N/A |

## C.    VOTING ON THE PLAN

On [November 5], 2009, the Bankruptcy Court entered the Solicitation Procedures Order by which the Bankruptcy Court approved, among other things, procedures and documents for the solicitation of acceptances on the Plan, certain key dates and deadlines relating to the voting and Confirmation and procedures for tabulating votes.

---

**THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS IS A SUMMARY**.
PLEASE REFER TO THE SOLICITATION PROCEDURES ORDER ATTACHED AS **EXHIBIT C**
FOR THE COMPREHENSIVE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS.

---

### 1.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. As shown in the table below, the Debtors **are** soliciting votes to accept the Plan only from Holders of Claims in Classes 3, 4 and 5 (the "*Voting Classes*") because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from (a) Holders of Unimpaired Claims in Classes 1, 2 and 10 or Holders of Intercompany Interests in Class 9 because such parties are conclusively presumed to have accepted the Plan or (b) Holders of Claims in Classes 6 and 7 or Holders of Equity Interests in Class 8 because such parties are conclusively presumed to have rejected the Plan. The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class) under the Plan:

**SUMMARY OF STATUS AND VOTING RIGHTS**

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Unsecured Claims Related to Operations | Impaired | Entitled to Vote |
| 5 | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Senior Subordinated Note Claims | Impaired | Deemed to Reject |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests | Impaired | Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 10 | Intercompany Claims | Unimpaired | Deemed to Accept |

K&E 15735883.

2.      **Voting Record Date**

**The Voting Record Date is 5:00 p.m. prevailing Eastern Standard Time on [November 5], 2009**.  This means that it will be determined (a) which Holders of Claims in Classes 3, 4 and 5 are entitled to vote to accept or reject the Plan and (b) whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim by the Voting Record Date.

3.      **Voting on the Plan**

**The Voting Deadline is 4:00 p.m. prevailing Pacific Time on [December 7], 2009**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that each Ballot is *actually* *received* on or before the Voting Deadline by the Noticing and Claims Agent at this address:

<div align="center">

**Reader's Digest Balloting Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, California  90245**

</div>

4.      **Ballots Not Counted**

**The following Ballots will not be counted toward Confirmation of the Plan:**  (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or transmitted by facsimile or other electronic means; (b) any Ballot cast by an entity that is not entitled to vote on the Plan; (c) any Ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (d) any Ballot cast for a Claim that is subject to an objection pending as of the Record Date (unless temporarily allowed in accordance with the Solicitation Procedures Order); (e) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Noticing and Claims Agent), the Indenture Trustee or the Debtors' financial or legal advisors; (e) any unsigned Ballot; or (f) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan.

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS THE DEADLINE IS EXTENDED BY THE DEBTORS.**

**D.      ADDITIONAL PLAN-RELATED DOCUMENTS**

1.      **Filing the Plan Supplement**

The Debtors will file the Plan Supplement with the Bankruptcy Court no fewer than five (5) days prior to the Voting Deadline.  The Noticing and Claims Agent will serve the 2002 List and Master List with a courtesy notice that will inform parties that the Plan Supplement was filed, list the information included therein and explain how copies of the Plan Supplement may be obtained.  The Plan Supplement will include, without limitation:

- the forms of the Exit Credit Agreement and New Second Priority Term Loan Agreement;

- the Registration Rights Agreement and the Shareholders Agreement;

- the amended and restated organizational documents for Reorganized Holdings (and, if applicable, for other Reorganized Debtors);

- the forms of the Enterprise Value Maximization Plan and Variable Compensation Plan;

- the form of the Management Equity Plan; and

- the list of the Compensation and Benefit Programs to be rejected and/or assumed.

K&E 15735883.

2.       **Filing the Contract/Lease Schedule**

The Debtors will file a schedule or schedules, as necessary, listing the Executory Contracts and Unexpired Leases the Debtors intend to assume and those the Debtors intend to reject pursuant to Article V of the Plan (the "***Contract/Lease Schedule***") with the Bankruptcy Court at least twenty (20) days prior to the Confirmation Hearing. The Contract/Lease Schedule will include (a) the name of the non-debtor counterparty, (b) the legal description of the contract or lease to be assumed or rejected and (c) in the case of assumption, the proposed Cure, if any.

On or as soon as practicably thereafter, with the assistance of the Noticing and Claims Agent, the Debtors will serve the Contract/Lease Schedule and notice of filing upon each non-debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption or rejection of their respective Executory Contract or Unexpired Lease and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.

Objections, if any, to the proposed assumption and/or Cure or rejection by the Debtors of any Executory Contract or Unexpired Lease listed on the Contract/Lease Schedule, must be filed with the Bankruptcy Court and served so as to be *actually received* by the Debtors prior to the Confirmation Hearing on or before a date to be determined, but that in any event is consistent with the provisions of the Debtors' Case Management Order.

Any counterparty to any Executory Contract or Unexpired Lease who fails to timely file and serve an objection in accordance with same will be deemed to have consented to the assumption or rejection of their respective Executory Contract or Unexpired Lease by the Debtors in accordance with Article V of the Plan.

E.       **CONFIRMATION AND CONSUMMATION OF THE PLAN**

1.       **Plan Objection Deadline**

**The Plan Objection Deadline is 4:00 p.m. prevailing Eastern Time on [December 13], 2009**.  This means that written objections to Confirmation of the Plan, if any, which conform to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served so as to be *actually received* on or before the Plan Objection Deadline by:

- Counsel to the Debtors:  Kirkland & Ellis LLP, Attn:  Paul M. Basta and Nicole L. Greenblatt, 601 Lexington Avenue, New York, New York  10022;

- Special Counsel to the Debtors:  Curtis, Mallet-Prevost, Colt & Mosle LLP, Attn:  Steven J. Reisman, 101 Park Avenue, New York, New York  10178;

- Counsel to the DIP Agent and Prepetition Agent:  Simpson Thacher & Bartlett LLP, Attn:  Sandeep Qusba, 425 Lexington Avenue New York, New York 10017-3954;

- U.S. Trustee:  Office of the United States Trustee for the Southern District of New York, Attn:  Andrea B. Schwartz, Whitehall Street, 21st Floor, New York, New York 10004; and

- Counsel to the Creditors' Committee:  Otterbourg, Steindler, Houston & Rosen, P.C., Attn:  Scott L. Hazan and David M. Posner, 230 Park Avenue, New York, New York  10169.

2.       **Confirmation Hearing**

**The Confirmation Hearing is on [December 17], 2009, at [10:00] a.m. prevailing Eastern Time.**  The Confirmation Hearing will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the Hon. Charles L. Brieant Jr. Federal Building and Courthouse, Room 116, 300 Quarropas Street, White Plains, NY 10601-4140.

At least twenty-five (25) days prior to the Voting Deadline, the Debtors will serve all known and potential creditors and equity holders of the Debtors with the Confirmation Hearing Notice, which will contain, without

limitation, (a) instructions for objecting to Confirmation of the Plan, including all dates and deadlines relevant thereto, (b) all information relating to the logistics of the Confirmation Hearing, including the date, time and location thereof, (c) a description of the procedures for the temporary allowance of claims for voting purposes and (d) disclosure with respect to the release and other provisions in Article IX of the Plan.  Around the same time, the Debtors will publish the Confirmation Hearing Notice in the national editions of *The Wall Street Journal* and *USA Today*.  The notice of the Confirmation Hearing will also be posted on the Debtors' restructuring website (http://www.kccllc.net/readers).

**The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.**

3.          **Effect of Confirmation and Consummation of the Plan**

Following Confirmation, subject to Article VIII of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article IX will become effective.  As such, it is important to read the provisions contained in Article IX of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.

**The Releasing Party Release set forth in Article IX.F. of the Plan provides that Holders of Claims who vote to <u>accept</u> the Plan <u>are</u> bound by the Releasing Party Release and Holders of Claims who vote to <u>reject</u> the Plan are <u>not</u> bound by the Releasing Party Release.**

---

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

---

K&E 15735883.

## II.
## BACKGROUND TO THESE CHAPTER 11 CASES

**A.    CORPORATE HISTORY AND CURRENT STRUCTURE**

Founded in 1922, Reader's Digest is the parent company for each of the Debtors in these Chapter 11 Cases (other than RDA Holding Co., its parent company) and certain direct and indirect foreign Affiliates which are not debtors in these Chapter 11 Cases (collectively, the "***Company***").  Headquartered in Pleasantville, New York since 1939, the Company has over 3,000 employees worldwide and achieves annual sales of approximately $2.2 billion.  The Company's early business strategy focused on developing product lines and growing market share, including internationally.  In February 1990, Reader's Digest went public, offering shares of its common stock on The New York Stock Exchange for the first time.  The Company's current corporate structure has since developed through organic growth and a series of acquisitions and other corporate transactions.

In May 2002, seeking to increase its presence with targeted customers and increase product offerings, Reader's Digest acquired Reiman Publications LLC, a leading publisher of lifestyle, cooking and nostalgia magazines and books based in Greendale, Wisconsin.  Prior to the acquisition, Reiman published 12 bi-monthly magazines with circulation of 16 million subscribers, seven of which were among the top 100 in the United States in circulation (the largest, *Taste of Home*, today is the nation's top-selling food magazine).

In March 2006, to further expand its market presence and grow its brand, Reader's Digest acquired Allrecipes.com, a leading independent food and social networking website based in Seattle, Washington.  Allrecipes.com is a social website that features recipes created, reviewed and rated by home cooks for food and entertaining enthusiasts.

In March 2007, an investor group led by affiliates of Ripplewood Holdings LLC ("***Ripplewood***") acquired all of the outstanding common equity of Reader's Digest (the "***Acquisition***").  Participants in the investor group included C.V. Starr & Co., GoldenTree Asset Management, L.P., GSO Capital Partners, J. Rothschild Group (Guernsey) Ltd., Merrill Lynch Capital Corporation and Solar Capital LLC or their respective affiliates.  As a result of the Acquisition, Reader's Digest and its majority-owned subsidiaries became privately owned by RDA Holding Co. ("***RDA Holding***"), a Delaware corporation.[7]  As part of the Acquisition, RDA Holding acquired WRC Media Inc., a leading publisher of supplementary educational materials for the school, library and home markets under the well-known brand of "Weekly Reader" among others, and acquired Direct Holdings U.S. Corp., a leading global direct marketer of Time Life brand products.[8]  Both WRC Media Inc. and Direct Holdings U.S. Corp. were entities affiliated with Ripplewood.

In the first half of fiscal 2009, Reader's Digest sold several underperforming businesses:  (i) Taste of Home Entertaining, Inc.; (ii) QSP, Inc. and Quality Service Programs, Inc. and their affiliated subsidiaries in the United States and Canada; and (iii) the principal operating assets of Books are Fun, Ltd.

After giving effect to the transactions described above, the following generally depicts the Company's current corporate structure:[9]

---

[7]    In addition to its common stock, RDA Holding also issued two series of preferred stock.

[8]    In 2008, Reader's Digest integrated WRC Media into its Schools & Educational Services business segment and Direct Holdings into its International business segment (Reader's Digest's business segments are discussed below).

[9]    A detailed organizational chart depicting the corporate structure of the Debtors is attached hereto as **Exhibit B**.



## B.    CURRENT BUSINESSES AND OPERATIONS

The Debtors and their Affiliates market and sell products under 29 brands through extensive distribution channels to a highly-diversified global customer base—including end-user consumers, advertisers, merchants and school and educational customers—located in more than 75 countries around the world.  The Company's global businesses are organized across three business segments:  International, United States and School and Educational Services.  Reader's Digest and its domestic affiliates—the Debtors in these Chapter 11 Cases—principally conduct the Company's domestic business operations under the United States and School and Educational Services business segments.[10]

### 1.    International Businesses and Operations

Reader's Digest holds certain assets and conducts certain operations through certain direct and indirect foreign affiliates which are not debtors in these Chapter 11 Cases.  The International segment is organized across three primary regions,  Europe, Canada & Latin America, and Asia Pacific.  With a strong global footprint, the Company is positioned to grow by leveraging its leading brands and services into existing and new markets.  In the past few years, the Company has launched new businesses giving it entry into more than 15 new markets, including the launch of new editions of Reader's Digest magazine in China, Romania, Serbia, Slovenia and Croatia.  In addition, local Allrecipes sites have been launched in eight new countries in the past 12 months including  United Kingdom and Ireland, Australia and New Zealand, France, Germany, Japan and People's Republic of China, with many more in development.  Reader's Digest is a truly global company with a  business model that allows the company to develop content, create products in certain countries and accelerate rollout across all regions with appropriate local adaptation.   This global business model coupled with the company's formula for quickly dispersing best practices around the world results in significant marketing, editorial, and creative efficiencies.

---

[10]    Although the operations of Debtor Direct Holdings U.S. Corp. ("**Direct Holdings**'') and its subsidiaries are included within the International segment for financial reporting purposes, they are described herein under U.S. Business operations.  With the exception of Direct Holdings IP LLC, a bankruptcy-remote entity wholly-owned by Direct Holdings, Direct Holdings and its domestic subsidiaries are Debtors.

K&E 15735883.

Notwithstanding the current world-wide economic conditions, the Debtors' foreign businesses, as a whole, remain profitable and competitive, and generate positive cash flow, collectively contributing approximately 60% of global revenues.[11]  The Debtors' foreign operations are not included in these Chapter 11 Cases.  To minimize disruption to their international businesses and maintain the cash flow and earnings contributions of the international operations, however, the Debtors are permitted to provide their foreign affiliates with working capital support from the proceeds of the debtor-in-possession financing in an amount not to exceed $50 million — a key feature of the comprehensive restructuring solution reached with the Debtors' lenders.

    **2.**        **U.S. Businesses and Operations**

The Debtors and their predecessors have been at the forefront of the highly-competitive media and direct marketing industry for more than 80 years and, as a result, have engendered strong brand loyalty among their customers and established substantial credibility among distributors, marketing partners and competitors.  The Debtors also recognize that the traditional publishing supply chain is evolving, in some cases rapidly, to keep pace with the digitalization of popular culture.  As more and more consumers access media through digital channels, the Debtors' online presence has grown commensurately.  With 65 branded websites and strategic allegiances with leading Internet destinations, the Debtors believe they are uniquely able to capitalize on their iconic heritage and trusted brands, and leverage their media and marketing expertise to expand into multi-platform brands in the medium that best suits the "networked generation."

Through expanded digital investments and the development of new mobile, video and multimedia applications, including rolling out a new suite of products under the "Reader's Digest Version" banner, the Debtors are well-positioned to satisfy the growing consumer preference for on-demand, easily digestible content in a flexible format (*e.g.*, accessible, quick-hit content delivered through new media channels such as social networks, blogs and tags) and expand market penetration and grow brand equity in a new, younger consumer market.

The Debtors operate with an affinity-based focus, meaning, the Debtors market their portfolio of content assets around business divisions based on consumer affinity interests.  By organizing around branded-content communities, the Debtors leverage their leading businesses and brands into growth opportunities to better serve their consumers, many of whom seek information and entertainment by interacting with the Debtors' editors, advertisers and other consumers with similar interests.  Importantly, the Debtors are able to market multi-platform content portfolios and advertising packages to advertisers, which allows the Debtors to promote advertising growth across flagship *Reader's Digest* magazine and other key titles, including *Every Day with Rachael Ray* and *Taste of Home*, and build and grow the Debtors' digital assets.

Generally, the U.S. businesses roll up into four consumer affinity divisions:  RD Community, Food & Entertaining, Home & Garden and Health & Wellness.  Schools & Educational Services is a small division that serves the education market.  The Debtors' Direct Holdings subsidiaries operate a stand-alone direct response and retail marketing business for music, books and other products.

    (a)        <u>Affinity Divisions</u>

The Debtors within the Reader's Digest Community affinity primarily market (i) magazines, including flagship *Reader's Digest* and its brand extensions, adult and children's trade books and reading series including Select Editions, (ii) home entertainment products, including recorded music collections, and (iii) websites, including readersdigest.com.

---

[11]    Including the Direct Holdings business, which has historically been reported in the International segment for external reporting purposes, total revenues for this segment is approximately 65% of global revenues.

The Debtors within the Food & Entertaining affinity have the leading market share in the food magazine publishing market through *Taste of Home* (the largest paid circulation U.S. food magazine) and the award-winning magazine, *Every Day with Rachael Ray*. In addition to websites related to each of the foregoing, the Debtors also market Allrecipes.com, the largest food website and the leading social networking food site in the United States. The Debtors within this affinity also market cooking events and cooking schools, and publish cookbooks under the Taste of Home franchise and annual book programs that are marketed on an advanced consent basis (where customers agree to receive future annual editions unless they indicate otherwise). To complement the Debtors' philosophy (*i.e.*, building communities of interest around each brand by focusing on the positive aspects of people and their lifestyles and encouraging reader involvement) and enhance their brand equity, reader loyalty and editorial capability, the Debtors in this affinity division also publish annual book editions based on editorial content derived from reader-generated material published in magazines during that year.

The Debtors within the Home & Garden affinity publish several leading magazine brands in the home and garden space, including The *Family Handyman*, *Birds & Blooms*, *Reminisce* and *Country*, as well as bookazines and home and garden related books and also offer catalog merchandise and travel tours.

The Debtors within the Health & Wellness affinity publish books and magazines on health and wellness topics, including Food Cures, Magic Foods for Better Blood Sugar, 759 Secrets for Beating Diabetes and Mind Stretchers. Products originated in this division continue to sell strongly for the Debtors' book businesses around the world, both in direct mail and in retail, fueling growth for other divisions.

(b)    School & Educational Services Businesses

The Debtors within the School & Educational Services segment (primarily WRC Media, Inc. and its subsidiaries) publish and market educational resources to schools, teachers and students, under the Weekly Reader and CompassLearning brands. Weekly Reader's product portfolio includes elementary and secondary magazines, books, workbooks, teacher resource materials and non-fiction reference books, as well as certain custom publishing products produced with the support of corporate sponsors and non-profit organizations and distributed to the educational community at no cost. CompassLearning publishes digital supplemental education materials and produces comprehensive digital educational assessment, curriculum, reporting and management tools aligned to local, state and national standards for use by pre-K through grade 12 students. Since 1990, over 13,000 schools in nearly 3,000 U.S. school districts have purchased CompassLearning products.

(c)    Direct Holdings and Related Businesses

Direct Holdings markets and retails music and video products under the Time Life trademark and trade name pursuant to a license agreement with Time Warner Inc. and Time Inc.[12] The music products sold by Direct Holdings primarily consist of content licensed through major record companies. Similarly, video products sold by Direct Holdings are licensed from various third-party licensors. Direct Holdings utilizes multiple channels to market its product, including long-form (typically 30 minute "infomercials") and short-form (two minutes or less) television advertising and the Internet. Direct Holdings' product fulfillment is outsourced. The Debtors also sell other non-published products through similar direct response television and Internet channels outside of the Direct Holdings unit. Most recently, this business has had tremendous success with the "AB Circle Pro" fitness product, which contributed approximately $21.5 million in net revenues in the last quarter of fiscal year 2009.

---

[12]    Prior to the commencement of these Chapter 11 Cases, the Debtors reached agreement with Time Warner Inc. and Time Inc. on the terms of an amended licensing agreement, which, among other things, assures that the Debtors maintain the rights to the license (and associated value) throughout the restructuring process and post-emergence. On October 7, 2009, the Bankruptcy Court entered an order approving the Debtors' assumption of the licensing agreement, as amended [Docket No. 155].

3.    **Global Supply Chain**

The Debtors market and sell their products through extensive distribution channels to a highly-diversified global customer base. To retain and grow that customer base (and attract corresponding advertising dollars), the Debtors must be able to procure goods and services at competitive prices and fulfill, produce and distribute their products timely and accurately. This necessitates carefully-choreographed, highly-integrated stages of development, production and delivery realized through a synchronization of the numerous third-party suppliers, vendors and service providers within the Debtors' global supply chain network.

Over the past several years, the Debtors have focused on realizing significant cost and revenue synergies among product affinities, including through infrastructure and distribution channels. Specifically, the Debtors have analyzed company-wide infrastructure to identify additional cost reduction opportunities within their supply chain and maintenance, repair and operations functions, and have been developing and implementing various operational initiatives aimed at maximizing supply chain and production efficiencies by eliminating unused capacities and right-sizing their work force.

Given the logistical challenges associated with the Debtors' supply chain network, particularly in light of the increasingly global nature of the Debtors' businesses, the Debtors outsource to unaffiliated third parties certain key business processes, including production, fulfillment, customer care, information technology and distribution functions. To realize synergies from their outsourcing partnerships and the year-over-year productivity improvement motivating this extensive investment, the Debtors have expended significant time and resources to develop working relationships with these vendors that the Debtors must preserve to maintain competitive operations.

Outsourcing enables the Debtors to capitalize on the relationships, resources and technological strengths of high-volume vendors to achieve cost structure efficiencies without capital investment or budget increases. As a result, the Debtors are able to create, produce and deliver higher-service products at lower cost points relative to the marketplace, facilitating competitive operations that better position the Debtors to take advantage of top-line growth potential. Outsourcing also improves supply chain visibility, which allows the Debtors to better respond to market changes. This is especially important in a downturn economy under tighter budgets, when supply chain savings can offset volatility in production costs to help meet performance objectives.

Notwithstanding the benefits of their outsourcing arrangements, outsourcing also inevitably limits the Debtors' ability to exercise direct control over outsourced operations, including their finished products, which increases the Debtors' exposure to supply chain interruptions and other external factors. This, combined with the inherent nature of the media and marketing industry—a dynamic and time-sensitive global marketplace driven largely by vacillating consumer preferences and influenced, sometimes significantly, by macroeconomic factors—requires the Debtors achieve the cooperation of their key vendors, service providers and outsourcing partners to ensure a dependable, accountable yet flexible supply chain.

4.    **Debtors' Employees, Management and Directors**

(a)    <u>Employees</u>

The Debtors employ approximately 1,500 employees, of whom approximately 1,454 are full-time employees (regularly scheduled to work a minimum of 35, 37.5 or 40 hours per week, depending on location) and approximately 46 are part-time employees. None of the Debtors' employees are unionized and none are party to any collective bargaining agreement. In addition, each year, the Debtors supplement their workforce by utilizing temporary employees and approximately 2,000 independent contractors that are vital to the creative content of the Debtors' businesses. These independent contractors include individuals who perform creative services on a freelance basis with respect to the creation of the Debtors' products and promotional materials, including, without limitation, writers, photographers, artists, researchers and editors.

15

       (b)     <u>Management</u>

The Debtors' current senior management team has both deep-rooted and recent experience at the Debtors' businesses, and averages over 20 years of experience in the publishing industry. The following individuals comprise the Debtors' senior management team as of November 1, 2009 (all positions shown are with Reader's Digest or its Debtor Affiliates unless otherwise indicated). Executive officers are elected by the board of directors and serve at its pleasure. The compensation for the fiscal year ended June 30, 2008, for certain members of the Debtors' management is set forth in the Annual Report on Form 10-K for the fiscal year ended June 30, 2008, a copy of which can be obtained from the SEC's EDGAR system website (http://www.sec.gov/edgar.shtml) and the Debtors' investor relations website (http://phx.corporate-ir.net/phoenix.zhtml?c=71092&p=irol-IRhome).

- Mary G. Berner, President and Chief Executive Officer

- Tom Williams, Senior Vice President, Chief Financial Officer

- Andrea Newborn, Senior Vice President, General Counsel and Secretary

- Albert L. Perruzza, Senior Vice President, Global Operations, IT & Business Redesign

- Todd McCarty, Senior Vice President, Global Human Resources

- Amy J. Radin, Senior Vice President, Chief Marketing Officer and CEO, Direct Holdings

- Suzanne M. Grimes, President, U.S. Affiliates

- Eva Dillon, President, Reader's Digest Community

- Alyce C. Alston, President, Emerging Businesses

- Dawn M. Zier, President, RD Europe

- Michael A. Brennan, Senior Vice President, Corporate Strategy

- Susana D'Emic, Vice President, Corporate Controller

- Peggy Northrop, Vice President, Global Editor-in-Chief of Reader's Digest

- William Adler, Vice President, Global Communications

       (c)     <u>Board of Directors</u>

The following persons comprise the current board of directors of Reader's Digest:

- *Mary G. Berner, Director and Chief Executive Officer.* Mary G. Berner has served as the Chief Executive Officer and Director since March 2007. From November 1999 until January 2006, Ms. Berner led Fairchild Publications, Inc., first as President and CEO and then as President of Fairchild and an officer of Condé Nast when Fairchild became a division of Condé Nast Publications, Inc. in September 2005. Ms. Berner also serves as a director of the Reader's Digest Foundation, a charitable institution founded by Reader's Digest.

- *Don Leclair, Director.* Mr. Leclair has served as Director since July 2009. Mr. Leclair retired from Ford Motor Company in 2008, where he served in various financial roles, most recently as Chief Financial Officer from August 2003 to November 2008. Prior to holding the Chief Financial Officer position, Mr. Leclair served as Ford's Corporate Controller from November 2001 to July 2003, and as the Controller of its North American Automotive Operations from October 2000 to October 2001.

- *Paula Gavin, Director.* Ms. Gavin has served as Director since July 2009. Ms. Gavin has served as the President of National Urban Fellows, Inc. since June 2007. Previously, Ms. Gavin was the Chief Executive Officer for the New York City Center for Charter School Excellence, a nonprofit organization that promotes the development of charter schools. Prior to that, Ms. Gavin served as the President and Chief Executive Officer of the YMCA of Greater New York from 1990-2004. Prior to

K&E 15735883.

her position with the YMCA, Ms. Gavin held multiple executive positions with AT&T, before being named Vice President of Network Operations.

## C.    PREPETITION FUNDED INDEBTEDNESS

As of the Commencement Date, the Debtors had outstanding debt in the aggregate principal amount of approximately $2,271,200,000, consisting primarily of approximately (a) $1,640,100,000 under their senior secured credit facility (including swap termination obligations and accrued and unpaid interest), (b) $628,200,000 in unsecured senior subordinated notes (including accrued interest); and (c) $2,800,000 in foreign lines of credit and a promissory note. Additionally, the Debtors estimate that, based on their accounts payable systems and estimated accruals, an aggregate of approximately $115 million was owing and outstanding to vendors, supplies, contract counterparties and other general trade creditors as of the Commencement Date.

### 1.    Prepetition Credit Agreement

The Debtors' principal prepetition funded debt obligations arise under that certain Credit Agreement dated as of March 2, 2007 (the "*Prepetition Credit Agreement*"), by and among Holdings, Reader's Digest and certain of its affiliates, as borrowers, JPMorgan Chase Bank N.A., as agent (in such capacity, the "*Prepetition Agent*") and the lenders from time to time party thereto (collectively with the Prepetition Agent, the "*Prepetition Lenders*"). The Prepetition Credit Agreement provides for: (i) a six year, $300 million revolving line of credit (including a $50 million letter of credit subfacility and a $30 million swing-line subfacility), approximately $293.7 million of which remains outstanding; (ii) a seven year, $1.31 billion U.S. term loan, approximately $1.18 billion of which remains outstanding; and (iii) a $100.0 million term loan (the "*Euro Term Loan*"), borrowed in an equivalent amount of Euros, to RD German Holdings GmbH (a non-debtor German Affiliate), which was converted to approximately U.S. $105.9 million on the Commencement Date, all of which remains outstanding.

All obligations under the Prepetition Credit Agreement (the "*Prepetition Obligations*") are guaranteed by RDA Holding Co. and substantially all of its direct and indirect domestic subsidiaries (the "*Prepetition Guarantors*"), all of which are Debtors in these Chapter 11 Cases. The Prepetition Obligations, and the guarantees thereof, are also secured by substantially all of the tangible and intangible assets of Reader's Digest and the Prepetition Guarantors and, subject to certain customary exceptions, 65% of the voting equity interests of the first tier foreign non-Debtor subsidiaries of Reader's Digest. As of August 21, 2009, the Debtors held approximately $90 million in global Cash that constituted Cash Collateral.[13]

The Euro Term Loan is guaranteed by certain of the Debtors and RD German Holdings GmbH and substantially all of its subsidiaries and, subject to certain customary exceptions, is secured by a pledge of all of the stock and assets of those subsidiaries. In connection with the negotiations surrounding the DIP Facility and the Restructuring Support Agreement, the Prepetition Agent and certain Prepetition Lenders holding in excess of 50% of the Prepetition Obligations (in such capacity, the "*Required Lenders*") executed a Waiver and Amendment dated August 17, 2009, pursuant to which the Required Lenders agreed to modify certain provisions of the Prepetition Credit Agreement to avoid acceleration of the Euro Term Loan upon the commencement of these Chapter 11 Cases, in exchange for, among other things, an increase in the interest rates charged under the Prepetition Credit Agreement for the Euro Term Loan.[14]

To reduce interest rate volatility and comply with the interest rate provisions of the Prepetition Credit Agreement, on April 19, 2007 the Debtors entered into certain interest rate swap agreements with aggregate notional value of $750,000,000 (the "*Hedge Agreements*"). Under the Hedge Agreements, the Debtors receive floating-rate interest payments that offset the LIBOR component of the interest due on some of their floating-rate debt, and make

---

[13]    The Company has significant working capital requirements and requires minimum operating levels of "trapped Cash" of approximately $55-60 million globally. As a result, only approximately $30 million in Cash was available to the U.S. Debtors as of the Commencement Date, which fell in the midst of the Debtors' largest seasonal need for working capital. In preparation for the fall mailing season (Labor Day through winter holidays), the Debtors incur significant promotional costs in the period from July 1 through September 30.

[14]    The August 17, 2009 Waiver and Amendment increased the applicable margin on the Euro Term Loan to 2.5% (for base rate loans) and 3.5% (for Eurocurrency loans), and added a LIBOR floor of 3.5%.

K&E 15735883.

fixed-rate interest payments over the term of the agreements.  The obligations under the Hedge Agreements are secured by the liens granted to the Prepetition Agent under the Collateral Documents (as defined in the Prepetition Credit Agreement).   The Debtors estimate that the value of swap termination costs arising under the Hedge Agreements is approximately $48.6 million as of the Commencement Date.

### 2.        Senior Subordinated Notes

Prior to the Commencement Date, Reader's Digest issued $600.0 million in unregistered 9% Senior Subordinated Notes due 2017 through a private placement (as the same were exchanged in 2008 for an equal amount of registered 9% Senior Subordinated Notes due 2017, the "**Senior Subordinated Notes**").  The Senior Subordinated Notes are governed by that certain Indenture dated as of March 2, 2007, by and among Reader's Digest, as issuer, certain of the other Debtors, as guarantors, and The Bank of New York, as trustee (the "**Senior Subordinated Indenture**").

The Senior Subordinated Notes bear interest at the rate of 9% *per annum*, payable semi-annually in arrears on February 15 and August 15 of each year.  The Debtors, with the consultation of their advisors, did not make the bi-annual interest payment due on August 17, 2009.  Under the Senior Subordinated Indenture, the Debtors are afforded a 30-day grace period before the holders of the Senior Subordinated Notes are able to exercise default-related rights and remedies.

The Senior Subordinated Notes Indenture provides that the right of payment under the Senior Subordinated Notes is expressly subordinated to prior payment in full of the Debtors' Prepetition Obligations, and that the Prepetition Lenders are entitled to enforce this subordination provision.  Further, the Notes Indenture provides that the Prepetition Obligations must be satisfied in full before holders of the Senior Subordinated Notes may receive any distributions in these Chapter 11 Cases on account of the Senior Subordinated Notes (except for certain permitted junior securities), and that the holders of the Notes will pay to the Prepetition Lenders any distributions received in these Chapter 11 Cases that do not comply with the above.[15]

## D.        EVENTS LEADING UP TO THE CHAPTER 11 FILING

### 1.        Adverse Impact of the Global Economic Crisis

The Debtors, like many of their competitors, suppliers and ancillary businesses within the media and marketing industry, have been affected by the recent and unexpected economic downturn.  Because product sales in this marketplace are generally proportionate to consumer discretionary spending activity, macroeconomic conditions that impact consumer demand – *e.g.*, interest rates, unemployment levels, consumer confidence and credit availability – affect the Debtors' sales volume commensurately.  Although the Debtors have fared well relative to their competitors, reductions in advertising and consumer spending has softened the Debtors' financial performance. Significant increases in fuel prices have also resulted in higher postal and delivery costs.

---

[15]    Specifically, the Notes Indenture provides, in pertinent part, that "the payment of all Obligations owing in respect of the Notes is subordinated in right of payment, to the extent and in the manner provided in this Article 10, to the prior payment in full of all existing and future Senior Indebtedness of the Issuer [including the Prepetition Obligations] and that the subordination is for the benefit of and enforceable by the holders of such Senior Indebtedness."  Notes Indenture, § 10.1.  Additionally, the Indenture provides:

Upon any payment or distribution of the assets of the Issuer to creditors upon a total or partial liquidation or a total or partial dissolution of the Issuer or in a reorganization of or similar proceeding relating to the Issuer or its property: (i) the holders of Senior Indebtedness of the Issuer shall be entitled to receive payment in full in Cash of such Senior Indebtedness before Holders shall be entitled to receive any payment; and (ii) until the Senior Indebtedness of the Issuer is paid in full in Cash, any payment or distribution to which Holders of the Notes would be entitled but for the subordination provisions of this Indenture shall be made to holders of such Senior Indebtedness as their interests may appear, except that Holders of Notes may receive Permitted Junior Securities; and (iii) if a distribution is made to Holders of the Notes that, due to the subordination provisions, should not have been made to them, such Holders of the Notes are required to hold it in trust for the holders of Senior Indebtedness of the Issuer and pay it over to them as their interests may appear.

*See* Senior Subordinated Notes Indenture, at § 10.2.

K&E 15735883.

### 2.    Prepetition Restructuring Efforts

In early 2009, the Debtors developed a "recession plan" and put in place certain cost saving initiatives and other strategic action items to manage the business for Cash, increase profitability and optimize the cost structure of the business.  These initiatives included reducing corporate overhead, a planned global workforce reduction, suspension of matching contributions to the U.S. 401(k) retirement plan and consolidating various operations.

Despite these efforts, the Debtors have struggled to weather the economic storm constrained by the substantial debt on their balance sheet and associated debt service obligations.  In February 2009, the Debtors made the last payment of interest on their Senior Subordinated Notes amidst simultaneous pressure from certain suppliers, many of whom are also suffering from the ongoing downturn and economic crisis (including working through their own restructuring issues).  At around the same time, certain of the Debtors' international credit facilities and lines of credit were withdrawn, which also contributed to the Debtors' declining liquidity position prior to the Commencement Date.

Recognizing the need to address their highly leveraged capital structure, in February 2009, the Debtors retained Miller Buckfire & Co., LLC ("***Miller Buckfire***") as financial advisor and investment banker, to, among other things, investigate sources of debt or equity capital necessary to support the Debtors' Cash needs, and to explore the Debtors' restructuring options and help develop a comprehensive restructuring plan.

Shortly thereafter, the Debtors also retained AlixPartners to, among other things, assist the Debtors in managing their liquidity, establish visibility over daily receipts and disbursements forecasts and tighten control of their global Cash management system.  The Debtors also tasked AlixPartners with assisting the Debtors in developing a revised, bottom-up, five-year business plan to form the basis for an appropriate restructuring or recapitalization transaction.  In connection with developing the business plan, Reader's Digest and AlixPartners have identified certain cost saving initiatives designed to improve the cash EBITDA and free cash flow generation of Reader's Digest.  These initiatives include a combination of high impact cost reductions and organizational streamlining and include, among other things, real estate consolidation, reduction in information technology spend and product utility improvements.

### 3.    Restructuring Support Agreement

In March 2009, the Prepetition Agent organized a steering committee of certain Prepetition Lenders (in such capacity, collectively, the "***Steering Committee***") to engage in discussions with the Debtors.  The Prepetition Agent retained financial and legal advisors and began conducting significant diligence relating to the Debtors' business plan and growth prospects.  Soon thereafter, the Debtors and the Steering Committee began discussions in earnest regarding a restructuring of the Prepetition Obligations.

While negotiating with the Steering Committee regarding a restructuring of the Prepetition Obligations, the Debtors also considered other potential restructuring alternatives, but ultimately determined that a consensual transaction with the Debtors' prepetition secured lenders to significantly reduce debt was in the best long-term interest of the Debtors.  As discussions progressed and the Debtors' liquidity position weakened, the Debtors began discussions in earnest with the Steering Committee regarding the incremental financing the Debtors would need in the event the Debtors were required to commence Chapter 11 Cases.

The Debtors and their advisors ultimately concluded that they would require $150 million in financing and would need immediate access, with little or no delay, to the Cash Collateral and at least $100 million in debtor-in-possession ("***DIP***") financing to avoid immediate and irreparable harm to their estates, minimize disruption to their businesses caused by the commencement of these cases and instill confidence in their customers and suppliers.  Importantly, the Commencement Date coincided with the Debtors' largest seasonal working capital need, given the significant promotional spend required in advance of the fall mailing season (Labor Day through the holiday season).

Although the Debtors, with the assistance of Miller Buckfire, solicited indications of interest from other sources, the Debtors' ability to obtain postpetition financing from alternative parties was complicated by several factors, including the Debtors' substantial amount of secured debt and lack of any significant unencumbered assets, the economic challenges facing the media, publishing and direct marketing industry, and the challenging debtor in

K&E 15735883.

possession financing market in general.  Third party lenders unanimously indicated that they would require that the liens securing any postpetition financing prime (*i.e.*, be senior in priority to) existing liens on the Debtors' assets. The Debtors concluded, based on their discussions with the Prepetition Agent and Steering Committee, that the Prepetition Lenders were unlikely to consent to a third party postpetition financing secured by liens on the Debtors' assets senior to their own.

Further, the Debtors and their advisors concluded that the value of the Debtors' encumbered assets relative to the amount of their senior secured debt, and the Debtors' lack of any significant unencumbered assets, made the outcome of a non-consensual priming of the Prepetition Lenders' liens highly uncertain.  In the Debtors' case, obtaining postpetition financing was further complicated by the need to address the potential acceleration of the Euro Term Loan upon a bankruptcy filing.  Absent a waiver and amendment, which could only be provided by the Debtors' Prepetition Lenders, the Debtors would have required additional funds of approximately $105.9 million to refinance the Euro Term Loan.

In light of the lack of practicable alternative sources of financing, and the costs and risks of a priming fight with the Prepetition Lenders, the Debtors and their advisors focused their efforts on negotiating a postpetition financing package with the Steering Committee on terms favorable to the Debtors, including obtaining the Waiver and Amendment to address a potential acceleration of the Euro Term Loan and receiving the right to convert any postpetition financing into an exit financing facility to provide the Debtors with the funding needed to emerge from, and to operate after their emergence from, chapter 11.

After weeks of extensive good-faith, arm's-length negotiations, the Debtors and the Steering Committee reached agreement on the terms of a more comprehensive restructuring solution, which includes (i) agreement on a significant de-leveraging of Reader's Digest's balance sheet to be implemented through a pre-arranged chapter 11 process; (ii) committed debtor-in-possession financing of up to $150 million at market terms to provide necessary liquidity through the restructuring process (including to foreign operations), which loan is convertible to exit financing on pre-negotiated terms; (iii) agreement on a sustainable exit capital structure that leaves approximately $555 million in total debt on the balance sheet, with the substantive terms of the exit financing arrangements agreed; and (iv) a waiver of any acceleration related to the Euro Term Loan facility (as a result of the commencement of these chapter 11 cases) to provide continued stability in Europe during this process.

On August 17, 2009, Reader's Digest announced that it had reached an agreement in principle with, among other parties, Prepetition Lenders holding over 80% of the Prepetition Credit Agreement Claims (the "***Consenting Lenders***") on the terms of a financial restructuring, evidenced by the Restructuring Support Agreement attached as **Exhibit F** hereto.  Pursuant to the Restructuring Support Agreement, the Consenting Lenders agreed to, among other things, vote in favor of the Plan and all parties agreed to take necessary and appropriate actions consistent with their respective obligations and use reasonable best efforts to facilitate, the solicitation, Confirmation and Consummation of the Plan and the transactions contemplated thereby.

K&E 15735883.

<div align="center">

**III.**
**CHAPTER 11 CASES**

</div>

**A.        FIRST DAY MOTIONS AND RELATED RELIEF**

On or around the Commencement Date, in addition to filing voluntary petitions for relief, the Debtors also filed a number of motions (the "***Preliminary Motions***") with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers, provide access to much needed working capital and allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases. At preliminary hearings conducted on August 25, 2009 (the "***First Day Hearing***") and September 17, 2009, the Bankruptcy Court entered several orders approving the Preliminary Motions.

**1.        Procedural Motions**

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" orders, by which the Bankruptcy Court (a) approved the joint administration of the Debtors' Chapter 11 Cases, (b) authorized the Debtors to prepare a list of creditors and file a consolidated list of their 50 largest unsecured creditors and (c) approved an extension of time to file their Schedules.

**2.        Stabilizing Operations**

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, revenue and profits, and facilitate a stabilization of their businesses and effectuate a smooth transition into operating as debtors in possession, the Debtors sought and obtained orders authorizing them to:

- maintain and administer customer programs and honor their obligations arising under or relating to those customer programs;

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage, including performance under their self-insurance programs, and enter into new insurance policies, if necessary;

- maintain their existing cash management systems; and

- remit and pay certain taxes and fees.

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their business and to ensure continued deliveries on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay the prepetition claims of certain vendors and third-party service providers who the Debtors believed were essential to the ongoing operation of their business. Importantly, the Debtors were able to condition payments of these prepetition claims on the execution by the recipient supplier or service provider of a trade agreement, which, among other things, included certain provisions to ensure that the Debtors would receive customary trade terms throughout the pendency of these Chapter 11 Cases. The Debtors' ability to pay the Claims of these vendors and service providers was critical to maintaining their ongoing business operations at the early stages of their Chapter 11 Cases.

K&E 15735883.

3.        **Postpetition Financing and Use of Cash Collateral**

At the First Day Hearing, the Court authorized the Debtors to (a) enter into the DIP Facility and access $100 million upon entry of the interim DIP Order, (b) use Cash Collateral on the terms set forth in the interim DIP Order and (c) cash collateralize prepetition letters of credit and cause the issuance and cash collateralization of supplemental or new letters of credit.  On October 5, 2009, the Court entered the Final DIP Order authorizing the Debtors to, among other things, access the full amount of the DIP Facility and use Cash Collateral on a final basis pursuant to the terms of the Final DIP Order.

The proceeds of the DIP Facility, the use of Cash Collateral and access to letters of credit have allowed the Debtors to, among other things, continue their businesses in an orderly manner, maintain valuable relationships with vendors, suppliers, customers and employees, pay certain interest, fees and expenses owing under the DIP Credit Agreement, satisfy their adequate protection obligations and support working capital, general corporate and overall operational needs—all of which were necessary to preserve and maintain the going-concern value of the Debtors' business and, ultimately, help ensure a successful reorganization.  Additionally, funds drawn from the DIP Facility have also been used to fund certain working capital needs of the non-debtor Affiliates, including $10 million in proceeds sent to non-debtor Affiliates to support the Debtors' foreign operations.

4.        **Employment and Compensation of Professional Advisors**

With authorization from the Bankruptcy Court, the Debtors retained the following professional advisors to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:  (a) Kirkland & Ellis LLP, as restructuring counsel; (b) Miller Buckfire & Co., LLC, as investment banker and financial advisor; (c) AlixPartners, LLP, as restructuring advisor; (d) Curtis, Mallet-Prevost, Colt & Mosle LLP, as conflicts counsel; (e) Ernst & Young LLP, as auditor and tax advisor; and (f) Kurtzman Carson Consultants LLC, as the Noticing and Claims Agent.

The Debtors also sought and obtained orders approving and establishing procedures for the retention and compensation of certain professionals utilized in the ordinary course of the Debtors' business and the interim compensation and reimbursement of Retained Professionals.

B.      **OTHER MATERIAL EVENTS IN THESE CHAPTER 11 CASES**

1.        **Schedules and Statements**

On September 24, 2009, each of the Debtors filed Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "*Schedules*") with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.

2.        **Claims Bar Date**

On October 7, 2009, the Bankruptcy Court entered an order (the "***Bar Date Order***") establishing November 16, 2009, at 5:00 p.m. prevailing Pacific Time, as the deadline by which all persons and entities must file and serve proofs of claim asserting claims that arose on or prior to the Commencement Date, including claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code against the Debtors in these Chapter 11 Cases (the "***Claims Bar Date***").  Additionally, the Claims Bar Date Order establishes February 20, 2010, at 5:00 p.m. prevailing Pacific Time, as the deadline by which all governmental units must file and serve proofs of claim asserting prepetition claims against any of the Debtors in these Chapter 11 Cases (the "***Government Bar Date***").

A deadline by which Claims asserting administrative expense priority must be filed with the Bankruptcy Court has not been established as of the date of this Disclosure Statement (with the exception of claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code, which must be filed on or before the Claims Bar Date). Instead, the Debtors are requesting that the Bankruptcy Court fix such a date as part of the Confirmation of the Plan (as discussed in Section IV.B.1(a) herein, entitled "Requests for Payment of Administrative Claims").

K&E 15735883.

3.        **Executory Contracts and Unexpired Leases**

In connection with their restructuring efforts, the Debtors are attempting to enhance the competitiveness of their global operations, which, among other things, has involved a careful and comprehensive evaluation of all aspects of the Debtors' supply chain.  The Debtors intend to utilize the tools afforded a chapter 11 debtor to achieve the necessary cost savings and operational effectiveness envisioned in their revised strategic business plan, including modifying or, in some cases eliminating, burdensome or underutilized agreements and leases.

As such, the Debtors have been diligently engaged in extensive discussions with contract parties regarding the contributions such parties are making to the restructuring process and to the post-emergence businesses.  To that end, as of the undersigned date, the Debtors have filed a motion with the Court seeking authority to assume certain executory contracts, which is set to be considered at the next regularly scheduled omnibus hearing.  In addition, the Debtors have also been evaluating their real property leases.  To date, the Debtors have rejected several real property leases for locations the Debtors had vacated prior to the Commencement Date in connection with their prepetition restructuring efforts from which the Debtors did not realize financial value.

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtors have to assume or reject unexpired leases of nonresidential real property is also scheduled to expire on December 22, 2009, unless extended by order of the Bankruptcy Court.  To that end, the Debtors intend to file a motion with the Bankruptcy Court requesting authority to extend this deadline through the earlier to occur of the Effective Date and March 22, 2010 (ninety (90) days from December 22, 2009).

C.    **COMMITTEE APPOINTMENT AND PARTICIPATION**

1.        **Appointment of the Creditors' Committee**

On August 31, 2009, the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  On October 9, 2009, the U.S. Trustee appointed four additional members of the Creditors' Committee.  As of the date hereof, the Creditors' Committee Members include (a) The Bank of New York Mellon, (b) Wilfrid Aubrey LLC, (c) Thomas M. Kenney, (d) RR Donnelley & Sons Company, (e) Madison Paper Company (ALSIP Location), (f) Williams Lea, Inc., (g) New Page Corporation, (h) Michael John Bohane, (i) Peter Davenport, (j) Ross Jones and (k) HCL Technologies, Ltd.

With authorization from the Bankruptcy Court, the Debtors retained the following professional advisors to assist the Creditors' Committee in carrying out their duties and to represent their interests in the Chapter 11 Cases: (a) Otterbourg, Steindler, Houston & Rosen, P.C., as counsel; (b) BDO Seidman, LLP, as financial advisor; and (c) Trenwith Securities, LLC, as investment banker.

2.        **Participation in The Chapter 11 Cases**

Since the formation of the Creditors' Committee, the Debtors have worked cooperatively with the Creditors' Committee and its professionals to educate the Creditors' Committee about the Debtors' businesses and operations, prospects and financial condition.  In addition to providing customary diligence information, the Debtors and the Creditors' Committee and each of their professionals have engaged  in meaningful exchanges relating to the Debtors' DIP budget and revised long-term business plan, as well as payment of certain prepetition obligations under the applicable Preliminary Orders.  Most importantly, the Debtors and the Creditors' Committee, and their respective professionals, have engaged in, and will continue to engage in, arm's-length discussions and negotiations regarding valuation, distributable value available for all unsecured creditors and allocation of such recovery value under the Plan.

3.        **Meeting of Creditors**

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on October 2, 2009.  In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors appear at such meeting of creditors for the purpose of being examined the U.S. Trustee and other attending parties in interest), one representative of the Debtors as well as counsel to the Debtors attended the meeting and answered questions posed by the U.S. Trustee and other parties in interest present at the meeting.

K&E 15735883.

# IV.
## SUMMARY OF THE PLAN

THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD **NOT** BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.    THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION IV AND THE PLAN (INCLUDING ATTACHMENTS) THE LATTER SHALL GOVERN.

## A.    GENERAL BASIS FOR THE PLAN

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan, though proposed jointly, constitutes a separate chapter 11 plan of reorganization proposed by each Debtor. Therefore, the classifications set forth in Article III of the Plan shall be deemed to apply separately with respect to each plan proposed by each Debtor, except that Class 9 Equity Interests shall be deemed to apply only to the plan proposed by RDA Holding Co.

The terms of the Debtors' Plans are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan and pay their continuing obligations in the ordinary course of their businesses.  Under the Plan, Claims against and Interests in the Debtors are divided into separate Classes according to their relative seniority, legal nature and other criteria, and the Plan proposes recoveries for Holders of Claims against and Interests in the Debtors in such Classes, if any.

## B.    TREATMENT OF UNCLASSIFIED CLAIMS

Pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims and Priority Tax Claims.

### 1.    Administrative Claims

Administrative Claims are the actual and necessary costs and expenses of the Chapter 11 Cases that are Allowed under and in accordance with sections 330, 365, 503(b), 507(a)(1), 507(a)(2) and 507(b) of the Bankruptcy Code.  *Allowed Administrative Claims do not include Claims filed after the applicable deadline set forth in the Confirmation Order* (except as otherwise provided by a separate order of the Bankruptcy Court).  By way of example only, such expenses include the actual and necessary expenses of operating the Debtors' businesses during the pendency of the Chapter 11 Cases, including amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases.  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense and will be paid in accordance with Article XIII of the Plan.

The Plan provides that, subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if an Administrative Claim is Allowed after the Effective Date, on the date such

Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court. Notwithstanding the foregoing, the Plan also provides that Allowed Administrative Claims that arise in the ordinary course of the Debtors' or Reorganized Debtors' businesses shall be paid in full in Cash in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

<div style="text-align:center">(a)    Requests for Payment of Administrative Claims</div>

All requests for payment of an Administrative Claim that accrued on or before the Effective Date that were not otherwise paid in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than sixty (60) days from the Effective Date (the "***Administrative Claim Bar Date***"). A notice setting forth the Administrative Claim Bar Date will be filed on the Bankruptcy Court's docket and posted on the Debtors' restructuring website at http://www.kccllc.net/readers. Further notice of the Administrative Claim Bar Date will be provided as may be directed by the Bankruptcy Court. No request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors may also choose to object to any Administrative Claim no later than ninety (90) days from the Administrative Claim Bar Date, subject to extensions by the Bankruptcy Court or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

**Any requests for payment of Administrative Claims that are not properly filed and served by the Administrative Claim Bar Date shall not appear on the Claims Register maintained by the Noticing and Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.**

<div style="text-align:center">(b)    Payment of Professional Compensation and Reimbursement Claims</div>

The Plan provides that all final requests for Professional Compensation and Reimbursement Claims shall be filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court.

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation (net of any unapplied retainer amounts) prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional. Such estimate, however, will not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Effective Date shall comprise the "Professional Fee Reserve Amount."

<div style="text-align:center">(c)    Payment of Statutory Fees</div>

The Plan includes within the definition of "Administrative Claims," all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911 1930, and provides that all fees payable pursuant to 28 U.S.C.§ 1930, as determined by the Bankruptcy Court at a hearing pursuant to section 11238 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

K&E 15735883.

### 2. DIP Facility Claims

The Plan provides that all DIP Facility Claims other than Claims under the DIP Facility that expressly survive the termination thereof will (i) subject to the terms of the DIP Facility, convert into the New First Priority Term Loan pursuant to the Exit Credit Agreement or (ii) be paid off in full in Cash on the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all such DIP Facility Claims.

### 3. Priority Tax Claims

The Plan provides that each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of, and in full and final satisfaction, settlement, release and discharge of and in exchange for, such Claim:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) Cash in an amount agreed to by the applicable Debtor or Reorganized Debtor, as applicable, and such Holder (although such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date); or (c) at the option of the Debtors, Cash in an aggregate amount of such Allowed Priority Claim payable in installment payments over a period not more than five years after the Commencement Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

The Plan further provides that any Allowed Priority Tax Claim not due and owing on or before the Effective Date will be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## C. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

In accordance with section 1122 of the Bankruptcy Code, the Plan places Claims and Interests into one of the ten (10) Classes listed in the table below, together with the respective status and voting rights of each Class:

| Class | Description of Claims and Interests | Status | Voting Rights |
|-------|-------------------------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired – Deemed to Accept | Not Voting |
| 2 | Other Secured Claims | Unimpaired – Deemed to Accept | Not Voting |
| 3 | Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Unsecured Claims Related to Operations | Impaired | Entitled to Vote |
| 5 | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Senior Subordinated Note Claims | Impaired – Deemed to Reject | Not Voting |
| 7 | Section 510(b) Claims | Impaired – Deemed to Reject | Not Voting |
| 8 | Equity Interests | Impaired – Deemed to Reject | Not Voting |
| 9 | Intercompany Interests | Unimpaired – Deemed to Accept | Not Voting |
| 10 | Intercompany Claims | Unimpaired – Deemed to Accept | Not Voting |

Generally speaking, the Debtors first placed Claims and Interests into Classes based on a classification scheme consistent with their capital structure (*i.e.*, debt is classified separately from equity, secured debt is classified separately from unsecured debt, Intercompany Claims are classified separately from Claims involving third parties, and so on).  The classification scheme also gives effect to the subordination provisions in the Notes Indenture and the impact on the relative priority of claims (discussed in more detail under the heading "Class 6 – Senior Subordinated Note Claims" below).

The proposed classification scheme also recognizes that affording the Claims of certain creditors essential to the Reorganized Debtors' businesses and operations different treatment than Claims of creditors that would provide minimal value or no net benefit to the Reorganized Debtors going forward is critically important to preserve goodwill post-emergence and ensure the Debtors' long-term economic viability.  Indeed, this was the principal factor behind the Prepetition Lenders' agreement to gift critical trade creditors a portion of the recovery owing on account of the Prepetition Lenders' secured position under the Prepetition Credit Agreement, which funds are neither assets of the Debtors nor property of the Estates (discussed in more detail under the heading "Class 4 – Unsecured Ongoing Operations Claims" below).

K&E 15735883.

If the Plan is Confirmed by the Bankruptcy Court and Consummated, (i) Claims in certain Classes will be reinstated, modified or otherwise treated so as to receive distributions equal to the full amount of such Claims, (ii) Claims in certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims and (iii) Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests.

**1.    Class 1 – Other Priority Claims**

The Plan defines an "Other Priority Claim" as any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

The Plan provides that each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as reasonably practicable after (a) the Effective Date, (b) the date on which such Other Priority Claim against the Debtors becomes an Allowed Other Priority Claim or (c) such other date as may be ordered by the Bankruptcy Court, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Priority Claim against the Debtors (except to the extent that a Holder of an Allowed Other Priority Claim against the Debtors agrees to less favorable treatment).

Other Priority Claims are Unimpaired, and Holders of such Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan. The Debtors have estimated that the aggregate amount of Allowed Other Priority Claims payable under the Plan will be less than $1.0 million.

**2.    Class 2 – Other Secured Claims**

The Plan defines an "Other Secured Claim" as any secured Claim against the Debtors not specifically described in the Plan (and excluding DIP Facility Claims and the Prepetition Credit Agreement Claims).

The Plan provides that Holders of Allowed Other Secured Claims shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (a) payment in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, on or as reasonably practicable after the Effective Date on or as reasonably practicable after the Effective Date, the date on which such Other Secured Claim against the Debtors becomes an Allowed Other Secured Claim or such other date as may be ordered by the Bankruptcy Court, (b) delivery of the collateral securing any such Allowed Other Secured Claim; or (c) treatment in any other manner that shall render such Allowed Other Secured Claim Unimpaired, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Secured Claim against the Debtors (except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to less favorable treatment).

Other Secured Claims are Unimpaired, and Holders of such Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan. To the best of the Debtors' knowledge, information and belief, insofar as they have been able to ascertain after reasonable inquiry, the Debtors are not aware of any Allowed Other Secured Claims that would be payable under the Plan; to the extent any Other Secured Claims are asserted and Allowed, the Debtors believe that the aggregate amount of such Claims would be *de minimis*.

**3.    Class 3 – Prepetition Credit Agreement Claims**

The Plan defines "Prepetition Credit Agreement Claims" as all Claims arising out of the Prepetition Credit Agreement (including Adequate Protection Claims and secured Claims based upon hedging arrangements with certain of the Prepetition Lenders or their affiliates), which claims are deemed Allowed in an aggregate amount equal to $1,645,000,000.

The Plan provides that each Holder of an Allowed Prepetition Credit Agreement Claim shall receive their Pro Rata share of each of (a) the Reinstated Euro Term Loan, (b) the New Second Priority Term Loan and (c) 100% of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution by the Rights Offering and the Management Equity Plan), in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Prepetition Credit Agreement Claim against the Debtors.

27

Notwithstanding the foregoing paragraph, the Plan provides that the Euro Term Lenders (as defined in the Prepetition Credit Agreement) as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive their Pro Rata share of the Reinstated Euro Term Loan on account of their exposure under the Euro Term Loan (as defined in the Prepetition Credit Agreement).

Additionally, the Revolving Lenders, U.S. Term Lenders (each as defined in the Prepetition Credit Agreement) and Holders of Swap Claims as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive their Pro Rata share of the New Second Priority Term Loan and (c) 100% of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution by the Rights Offering and the Management Equity Plan) on account of their exposures under the Revolver Loan, U.S. Loan (each as defined in the Prepetition Credit Agreement) and Swap Claims.  Under the Plan, the Letters of Credit shall continue to be treated in accordance with the provisions in paragraph 13(c) of the Final DIP Order.

Prepetition Credit Agreement Claims are Impaired, and Holders of such Class 3 Claims are entitled to vote to accept or reject the Plan.

**4.      Class 4 – Unsecured Ongoing Operations Claims**

The Plan defines an "Unsecured Ongoing Operations Claim" as a general unsecured Claim directly relating to and arising solely from the receipt of goods and services by the Debtors held by Entities with whom the Debtors are conducting business, and have determined they will continue to conduct business with as of the Effective Date. The Debtors' determination regarding which creditors will be placed in Class 4 (and Class 5) will be reflected on the Ballots sent to creditors with this solicitation package, if applicable.  Such determination is based upon the Debtors' considered business judgment as necessary to ensure competitive, going-forward operations upon emergence.  In accordance with the Solicitation Procedures Order, within five (5) days from the date of entry of the Solicitation Procedures Order, the Noticing and Claims Agent will distribute a solicitation package containing, among other things, a customized Ballot reflecting the scheduled amount of each Holder's Unsecured Ongoing Operations Claim for voting purposes.

The Plan provides that each Holder of an Allowed Unsecured Ongoing Operations Claim will be paid in full in Cash (a) on the Effective Date or as soon as reasonably practicable thereafter or (b) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Unsecured Ongoing Operations Claim or in accordance with the historical course of dealings between the Debtors and such Holder with respect to such Allowed Unsecured Ongoing Operations Claim, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Unsecured Ongoing Operations Claim against the Debtors (except to the extent that a Holder of an Allowed Unsecured Ongoing Operations Claim against the Debtors agrees to less favorable treatment). However, Holders of Unsecured Ongoing Operations Claims are not entitled to postpetition interest, late fees or other penalties on account of such Claims.

Holders of Allowed Unsecured Ongoing Operations Claims who received any payments from the Debtors during the Chapter 11 Cases pursuant to any order of the Bankruptcy Court shall not be excluded from receiving distributions under the Plan on account of such Claims unless such Claims were fully satisfied by any prior payments from the Debtors or otherwise waived by agreement of the parties.  The Debtors reserve all rights to challenge the legal basis and amount of any asserted Unsecured Ongoing Operations Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.

Unsecured Ongoing Operations Claims are Impaired, and Holders of such Class 4 Claims are entitled to vote to accept or reject the Plan.  The Debtors estimate that the aggregate amount of Unsecured Ongoing Operations Claims payable under the Plan will be in the range of $20–25 million.  Claims payable in Class 4 do not include cure payments required to assume Executory Contracts with Entities with whom the Debtors are conducting business and have determined they will continue to conduct business with, as of the Effective Date, which cure payments (estimated to be approximately $50-55 million) will be made in accordance with the provisions of Article VI of the Plan.  (A more detailed description of the Plan's treatment of Executory Contracts is set forth in Article IV.J herein, entitled "Treatment of Contracts and Leases.")

K&E 15735883.

**5.      Class 5 – Other General Unsecured Claims**

The Claims in Class 5 consist of Holders of general unsecured Claims against the Debtors, including, without limitation: (a) vendors with whom the Debtors have determined they will not continue to do business as of the Effective Date; (b) landlords with prepetition rent and/or Claims based on rejection of Unexpired Leases, prepetition litigation and/or related claims; (c) parties to Executory Contracts or Unexpired Leases with the Debtors that are being rejected; (d) Holders of claims arising from the rejection or termination of the Debtors' unfunded, non-qualified retirement plans or deferred compensation arrangements, which include (i) the Excess Benefit Retirement Plan, (ii) the Executive Retirement Plan, (iii) the Executive Cash Balance Plan, (iv) the 1988 Supplemental Employee Retirement Plan and related agreements, (v) the Director and Roving Editors Plan and/or related agreements or arrangements, (vi) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor; (e) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto; and (f) Holders of Other General Unsecured Claims not otherwise included in Class 3, 4 or Class 6, including, without limitation, unsecured, non-priority claims for severance arising as a result of prepetition termination of employment.  *For the avoidance of doubt*, the unsecured deficiency claims of the Prepetition Lenders (included in Class 3), the Unsecured Ongoing Operations Claims (Class 4) and the Senior Subordinated Note Claims (Class 6) are <u>not</u> included in Class 5 Other General Unsecured Claim Claims.

The Plan provides that each Holder of an Allowed Other General Unsecured Claim shall receive its Pro Rata share of the Other General Unsecured Claims Distribution (which is $3 million in Cash) in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other General Unsecured Claim against the Debtors (except to the extent that a Holder of an Allowed Other General Unsecured Claim against the Debtors agrees to less favorable treatment).

Other General Unsecured Claims are Impaired, and Holders of such Class 5 Claims are entitled to vote to accept or reject the Plan.   The Debtors have estimated that the aggregate amount of Allowed Other General Unsecured Claims payable under the Plan will be between $110-120 million.  As discussed in Section I.A.3 herein, entitled "Recovery Analysis," the aggregate recovery for Holders of Allowed Class 5 Claims is $3 million. Accordingly, the Debtors estimate individual Holders of Allowed Other General Unsecured Claims are expected to recover approximately 2.5% to 2.7% of the amount of their Allowed Other General Unsecured Claim.

**6.      Class 6 – Senior Subordinated Note Claims**

The Plan defines a "Senior Subordinated Note Claim" as any Claim derived from or based upon the Senior Subordinated Notes Indenture.  On the Effective Date, Senior Subordinated Note Claims shall be deemed Allowed in the aggregate amount of $628.2 million.

The treatment of the Senior Subordinated Note Claims under the Plan is in accordance with and gives effect to the provisions of section 510(a) of the Bankruptcy Code.  Specifically, Holders of Senior Subordinated Note Claims will not actually receive or retain any interest or property under the Plan on account of their Senior Subordinated Note Claims because the recovery otherwise allocable to such Holders must be turned over to the Prepetition Lenders pursuant to, and in accordance with, the terms and conditions of the Senior Subordinated Notes Indenture (the subordination provision of the Senior Subordinated Notes Indenture is summarized in Section II.C.2 herein, entitled "Senior Subordinated Notes").

Senior Subordinated Note Claims are Impaired, and Holders of such Class 6 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

---

*Eligible Noteholders are entitled to participate in the Rights Offering.*  The Rights Offering and process by which Eligible Noteholders may exercise Subscription Rights is summarized in Section IV.H herein, entitled "Rights Offering and Subscription Procedures."  However, for detailed instructions relating to same, please refer to the Subscription Procedures attached hereto as **Exhibit G**.

---

K&E 15735883.

**7.       Class 7 – Section 510(b) Claims**

The Plan defines a "Section 510(b) Claim" as any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

To the best of the Debtors' knowledge, information and belief, insofar as they have been able to ascertain after reasonable inquiry, the Debtors are not aware of any Section 510(b) Claims that could be properly asserted in these Chapter 11 Cases against any of the Estates. Out of an abundance of caution, however, the Plan provides that all Section 510(b) Claims shall be discharged on the Effective Date. The Plan further provides that Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims.

Section 510(b) Claims are Impaired, and Holders of Class 7 Claims, if any, are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims, if any, are not entitled to vote to accept or reject the Plan.

**8.       Class 8 – Equity Interests**

The Plan defines an "Equity Interest" as any issued or unissued share of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including section 510(b) Claims (excluding Intercompany Interests). The Plan provides that Holders of RDA Holding Co. Equity Interests shall not receive any distribution account of such RDA Holding Co. Equity Interests. On the Effective Date, all RDA Holding Co. Equity Interests shall be discharged, cancelled, released and extinguished.

Equity Interests are Impaired, and Holders of such Class 8 Equity Interests are conclusively deemed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code. Therefore, Holders of RDA Holding Co. Equity Interests are not entitled to vote to accept or reject the Plan.

**9.       Class 9 – Intercompany Interests**

The Plan defines an "Intercompany Interest" as any Equity Interest in a Debtor held by another Debtor. Intercompany Interests are Unimpaired. The Plan provides that Intercompany Interests shall be reinstated on the Effective Date. Intercompany Interests are Unimpaired, and Holders of such Class 9 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

**10.      Class 10 – Intercompany Claims**

The Plan defines an "Intercompany Claim" as any Claim held by a Debtor against another Debtor or any Claim held by an affiliate of a Debtor against a Debtor. To preserve the Debtors' corporate structure, the Plan provides that Intercompany Claims may (a) be reinstated as of the Effective Date or (b) at the Debtors' or Reorganized Debtors' option, be cancelled or compromised, and no distribution will be made on account of such Claims. The Debtors estimate that the aggregate amount of Allowed Intercompany Claims was approximately $90 million as of the Commencement Date.

Intercompany Claims are Unimpaired, and Holders of Class 10 Intercompany Claims, by virtue of their status as a Debtor or an Affiliate of a Debtor, are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

K&E 15735883.

**D.       CERTAIN MEANS FOR IMPLEMENTATION OF THE PLAN**

**1.       General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlements of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

**2.       Restructuring Transactions**

The Plan provides that, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Reorganized Debtors determine are necessary or appropriate.

**3.       Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or in any agreement, instrument or other document relating thereto, on or after the Effective Date, all property of each Estate (including, without limitation, Causes of Action) and any property acquired including by any of the Debtors pursuant hereto shall vest in each respective Reorganized Debtor, free and clear of all liens, Claims, charges or other encumbrances.  Except as may be provided in the Plan, on and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**4.       Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors**

All Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be funded with Cash on hand.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.  However, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

**5.       Exemption from Certain Transfer Taxes and Recording Fees**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (a) the issuance, distribution, transfer or exchange of any debt, securities or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment or recording of any lease or sublease; or (d) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and

K&E 15735883.

recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 6.     Effectuating Documents and Further Transactions

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.  The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.  Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

### 7.     Cancellation of Agreements, Senior Subordinated Notes and Equity Interests

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Credit Agreement, the Senior Subordinated Notes Indenture and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; except that:

a.     the Prepetition Credit Agreement shall continue in effect solely for the purpose of: (i) allowing Holders of the Prepetition Credit Agreement Claims to receive the distributions provided for hereunder; (ii) allowing the Prepetition Agent to receive distributions from the Debtors and to make further distributions to the Holders of Prepetition Credit Agreement Claims on account of such Claims, as set forth in Article VI.A of the Plan; and (iii) preserving the Prepetition Agent's right to indemnification from the Debtors pursuant and subject to the terms of the Prepetition Credit Agreement in respect of any Claim or Cause of Action asserted against the Prepetition Agent; _provided_ that any Claim or right to payment on account of such indemnification shall be an unsecured Claim and shall not be secured in any of the assets of the Debtors, Reorganized Debtors or their Affiliates; and

b.     the foregoing shall not effect the cancellation of shares issued pursuant to the Plan nor any other shares held by one Debtor in the capital of another Debtor; _provided_, _further_, that, to the extent provided in the Exit Credit Agreement and the New Second Priority Term Loan Agreement, the guarantees of and Liens securing obligations under the Prepetition Credit Agreement shall not be cancelled and shall guarantee or secure obligations under and as set forth in the Exit Credit Agreement and the New Second Priority Term Loan Agreement and only such obligations.

## E.     POST-EMERGENCE CAPITAL STRUCTURE

The consummation of the financial restructurings contemplated by the Plan will significantly de-lever the Debtors' capital structure, leaving the Reorganized Debtors with approximately $555 million in funded debt. Specifically, the Reorganized Debtors' capital structure upon their emergence from chapter 11 is summarized below.

K&E 15735883.

1.    **Funded Indebtedness**

On the Effective Date, the Reorganized Debtors will be authorized to execute and deliver the Exit Credit Agreement and the New Second Priority Term Loan Agreement (substantially in the forms set forth in the Plan Supplement) and any other documents necessary or appropriate to obtain exit financing and issue the New First Priority Term Loan, Reinstated Euro Term Loan and Second Priority Term Loan (and the Confirmation Order will constitute an order of the Bankruptcy Court approving entry into same).   The Exit Credit Agreement and New Second Priority Term Loan Agreement will set forth the terms, conditions and covenants governing the (a) New First Priority Term Loan and the Reinstated Euro Term Loan and (b) New Second Priority Term Loan, respectively.

The lenders under the Exit Credit Agreement and the New Second Priority Term Loan Agreement shall have valid, binding and enforceable liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement.  Other material terms of the such credit agreements are as follows:

|  | **New First Priority Term Loan** | **Reinstated Euro Term Loan** | **New Second Priority Term Loan** |
|---|---|---|---|
| **Facilities:** | $150 million | Approximately $105 million | $300 million |
| **Maturity:** | 3 years from the Effective Date | March 2, 2014 | Not earlier than the later maturity of: (a) the New First Priority Term Loan and (b) the Reinstated Euro Term Loan |
| **Interest:** | L + 1,000 bps with 3.5% LIBOR Floor | L + 550bps Cash + 450 PIK (toggle) with 3.5% LIBOR Floor | L + 550bps Cash + 650bps PIK (toggle) with 3.5% LIBOR Floor |
| **Security** | First priority lien on substantially all of the Debtors' assets | Same as New First Priority Term Loan and liens on foreign assets currently securing the Euro Term Loan | Second priority liens on substantially all of the Debtors' assets |

The proposed Confirmation Order will provide that the guarantees, mortgages, pledges, liens and other security interests granted pursuant to or in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement are granted in good faith as an inducement to the lenders to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the intercreditor agreement and other definitive documentation executed in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement.   Notwithstanding anything to the contrary in the Confirmation Order or the Plan, the Bankruptcy Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement or any rights or remedies related thereto.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

2.    **Reorganized Debtors' Equity Interests**

(a)    <u>New Common Stock</u>

The Plan provides that all Equity Interests will be deemed cancelled and of no further force and effect as of the Effective Date, whether surrendered for cancellation or otherwise.  On the Effective Date, Reorganized Holdings shall issue or reserve for issuance all of the New Common Stock.  The New Common Stock shall represent all of the Equity Interests in Reorganized Holdings as of the Effective Date and shall be issued to Holders of Prepetition Credit Agreement Claims (subject to dilution by the Management Equity Plan or the Rights Offering).  The Plan contemplates the Debtors' emergence from chapter 11 as a privately-held company.

From and after the Effective Date, subject to the right of the stockholders to amend the certificate of incorporation of Reorganized Holdings, Reorganized Holdings shall have one class and one series of New Common

Stock, although the Shareholders Agreement shall provide an option for certain Holders to receive limited voting stock, at their option.  Notwithstanding anything herein or in the Plan otherwise, to the extent necessary to satisfy section 1123(a)(6) of the Bankruptcy Code, Reorganized Holdings shall not issue any non-voting equity securities for so long as section 1123(a)(6) of the Bankruptcy Code is applicable.

The Reorganized Debtors shall not be obligated to list the New Common Stock on a national securities exchange.  Likewise, New Common Stock will be issued without registration under the Securities Act or any similar federal, state or local law, subject to the Registration Rights Agreement.  Except as otherwise provided in the Plan, under section 1145 of the Bankruptcy Code, any and all New Common Stock (other than as part of the Rights Offering) contemplated by the Plan and any and all settlement agreements incorporated in the Plan will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Commission, if any, applicable at the time of any future transfer of such New Common Stock, (ii) any restrictions on the transferability of such New Common Stock and (iii) applicable regulatory approval.

The issuance of the New Common Stock by Reorganized Holdings, including options or other equity awards reserved for the Management Equity Plan, is authorized without the need for further corporate action and all of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully-paid and non-assessable.  For purposes of distribution, the New Common Stock will be deemed to have the Plan Equity Value, regardless of the date of distribution.

(b)        Registration Rights & Shareholders Agreements

Certain Entities receiving New Common Stock pursuant to the Plan shall be entitled to registration rights pursuant to the Registration Rights Agreement.  On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors will deliver the Registration Rights Agreement and the Shareholders Agreement (in substantially the form to be included in the Plan Supplement to be filed with the Bankruptcy Court no fewer than five (5) days prior to the Voting Deadline) to each Entity that is intended to be a party thereto or such agreements shall be deemed to be valid, binding and enforceable in accordance with their respective terms, and each holder of New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings, and the Shareholders Agreement shall provide an option for Prepetition Lenders to receive limited voting stock.

(c)        Important Securities Law Disclosure

The issuance of the New Common Stock (other than as part of the Rights Offering) and shares reserved for issuance under the Management Equity Plan will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Rule 701 promulgated under the Securities Act or a "no sale" under the Securities Act to the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act, and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for Cash.  In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

34

- is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

To the extent persons who receive New Common Stock are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell New Common Stock without registration if they are able to comply with the provisions of Rule 144 under the Securities Act. **You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

> **Notwithstanding anything herein or in the Plan to the contrary, New Common Stock issued to participating Eligible Noteholders in connection with the Rights Offering will be issued under Section 4(2) of the Securities Act. Such New Common Stock will be "restricted securities" and cannot be sold absent registration under, or pursuant to an exemption from, the Securities Act.**

## F.    POST-EFFECTIVE DATE CORPORATE EXISTENCE

### 1.    Organizational Documents

Subject to any restructuring transactions permitted under Article IV of the Plan, the Plan provides that each Debtor shall continue to exist after the Effective Date as a separate corporate entity or limited liability company, with all the powers of a corporation or limited liability company pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents in the case of a limited liability company) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other formation documents in the case of a limited liability company) are amended by or in connection with the Plan or otherwise. Any such amendments are deemed to be authorized pursuant to the Plan without the need for any other approvals, authorizations, actions or consents.

The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan. Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Holdings shall be governed by the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws. From and after the Effective Date, the organizational documents of each of the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code for so long as it is applicable.

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors, officers, employees or agents who were directors, officers, employees or agents of such Debtor at any time prior to the Effective Date, at least to the same extent as the bylaws of each of the respective Debtors on the Commencement Date, against any Claims or Causes of Action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors', officers', employees' or agents' rights; *provided* that, with respect to former officers and directors, the Debtors shall be obligated to indemnify such individuals only to the extent of available coverage under their D&O Liability Insurance Policies (and payable from the proceeds of such D&O Liability Insurance Policies), including the advancing of defense costs prior to final adjudication.

### 2.    Post-Effective Date Governance

#### (a)    Executive Officers

The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with the Debtors' organizational documents and any applicable employment agreements.

K&E 15735883.

    (b)  <u>New Board of Directors</u>

   The New Board shall consist of seven (7) directors. The Prepetition Lenders will identify potential directors through use of a search firm acceptable to the Prepetition Agent (with reasonable fees and expenses to be paid by the Debtors) and shall initially designate all such directors upon consultation with the Debtors' Chief Executive Officer. Certain independent directors may, however, be requested to continue to serve on the New Board. The existing directors of each of the subsidiary Debtors shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

   *The identity of each of the members of the New Board will be disclosed <u>prior to the Confirmation Hearing.</u> Any directors elected pursuant to this section shall be subject to approval of the Bankruptcy Court pursuant to and to the extent necessary to satisfy section 1129(a)(5) of the Bankruptcy Code.*

**G.  COMPENSATION, PENSION AND BENEFIT PLANS AND RELATED MATTERS**

   **1.  Management Compensation Programs**

   The Plan contemplates the adoption of two incentive compensation programs that will provide customary cash-based incentives for continuing employees eligible to participate in such plans: (a) the Variable Compensation Plan and (b) the Enterprise Value Maximization Plan. The Plan also provides for the Management Equity Plan, which will grant equity awards to certain continuing employees and directors of the Reorganized Debtors. Each of the plans are described below. The terms and provisions of the Variable Compensation Plan, the Enterprise Value Maximization Plan and the Management Equity Plan will be set forth in the Plan Supplement filed prior to the Voting Deadline (as discussed in Section I.D herein, entitled "Additional Plan-Related Documents").

    (a)  <u>Variable Compensation Plan</u>

   The Variable Compensation Plan is a broad-based incentive plan designed to incent the delivery of shorter-term financial goals, including, among other things, incremental cash EBITDA for the fiscal year ending June 30, 2010, and provide strong retention value. This plan includes target award opportunities (expressed as a percentage of base salary) established relative to the grade level and criticality of the role of each participant. Awards will be payable in Cash at the end of the fiscal year ending June 30, 2010, and based upon audited results. Subject only to the occurrence of the Effective Date, the Plan provides that the Variable Compensation Plan shall become effective without any further action by the Reorganized Debtors.

    (b)  <u>Enterprise Value Maximization Plan</u>

   The Enterprise Value Maximization Plan is an incremental executive plan designed to incent the delivery of longer-term value creation initiatives though rewarding (a) realization of increasing enterprise value and (b) speed to emergence, to executives with broad enterprise-wide responsibilities or those whom can impact time to emergence, respectively (with certain select participants receiving both). With respect to the former, performance is measured by enterprise-wide cash EBITDA at the end of a one-year performance period (the fiscal year ending in June 30, 2010), and the award is in the form of a Cash payment based on a Pro Rata share of cash EBITDA improvement over approved business plan cash EBITDA. With respect to the latter, the performance measure is based upon enterprise value created from the benefits of a prompt exit from bankruptcy. Those benefits include, among other things, (a) a shorter horizon after which senior and mid-level management will be able to devote full attention to business operations, (b) decreased exposure to trade risk from advertisers and vendors and (c) reduced costs of Retained Professionals. Subject only to the occurrence of the Effective Date, the Plan provides that the Enterprise Value Maximization Plan shall become effective without any further action by the Reorganized Debtors

    (c)  <u>Management Equity Plan</u>

   The Management Equity Plan will provide for the granting of equity awards (up to 2.5% in the form of restricted New Common Stock and 5% in the form of options or warrants) for 7.5% of the New Common Stock (on a fully-diluted basis) to continuing employees of the Reorganized Debtors and members of the New Board. The pricing, vesting and exercise terms of the Management Equity Plan will be determined by the New Board upon

K&E 15735883.

consultation with the Reorganized Debtors' Chief Executive Officer. The New Board will adopt and implement the Management Equity Plan on or as soon as practical after the Effective Date; however, the Debtors reserve the right to amend the Management Equity Plan with the consent of the Prepetition Agent and the Required Consenting Lenders at any time prior to the Effective Date.

**2.        Employee Compensation and Benefits Programs**

For purposes of the Plan, the Reorganized Debtors' obligations under all employment and severance policies, and all compensation and benefit plans, policies and programs and other arrangements (and all amendments and modifications thereto), in each case in place as of the Effective Date, applicable to the Debtors' employees, former employees, retirees and non-employee directors and employees, former employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans (other than the Non-Qualified Retirement Plans), health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans (collectively, the "*Compensation and Benefits Programs*") shall be deemed assumed on the Effective Date pursuant to the provisions of section 365 and 1123 of the Bankruptcy Code, *except* with respect to any Compensation and Benefits Programs that (a) are listed in the Plan Supplement to be rejected or terminated, which includes, without limitation, the 2006 Income Continuation Plan for Senior Management, (b) have previously been rejected or terminated or (c) are the subject of pending rejection procedures or a motion to reject, or have been specifically waived by the beneficiaries of any employee benefit plan or contract as of the date the Confirmation Order is entered by the Bankruptcy Court.

The assumption or continuation of Compensation and Benefits Programs identified in the Plan Supplement shall not be deemed to trigger any applicable change of control, immediate vesting, termination or similar provisions therein (unless a Compensation and Benefits Program counterparty timely objects to the assumption or continuation contemplated by this Section in which case any such Compensation and Benefits Program shall be deemed rejected or discontinued as of immediately prior to the Commencement Date). No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption or continuation.

(a)        Retiree Health Benefits

**The Reorganized Debtors' obligations with respect to the payment of "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) SHALL continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, subject to any contractual rights to terminate or modify such benefits.**

The Reader's Digest Association, Inc. currently maintains a plan that provides post-retirement medical and dental benefits to various groups of former employees (and their spouses and dependents) and is intended to provide post-retirement medical and dental benefits to certain active employees of participating Debtors (and their spouses and dependents) upon such employees' future retirement.

Currently, the plan provides that former employees (and their spouses and dependents) who retired from participating Debtors on or after January 1, 1985 and have not attained age 65 are eligible for Debtor-subsidized retiree medical benefits through 2017 and Debtor-subsidized retiree dental benefits through 2009. For former employees (and their spouses and dependents) who retired from participating Debtors on and after January 1, 1985 and who have attained age 65 or older, the current plan provides for Debtor-subsidized retiree medical coverage through 2012 and Debtor-subsidized retiree dental coverage through 2009.

With respect to former employees (and their spouses and dependents) who retired from participating Debtors prior to January 1, 1985, retiree medical and dental benefits continue to be 100% -subsidized by the Debtors. The Reader's Digest Association, Inc. has reserved its rights to unilaterally amend, modify and terminate its retiree medical and dental plans to the extent consistent with applicable law and the applicable plans.

The Debtors' actuaries have estimated that the accumulated post-retirement benefit obligation for retiree medical and dental benefits as of June 30, 2009, is $18 million.

K&E 15735883.

(b)        Qualified Pension Plan

**The Debtors or the Reorganized Debtors, as applicable, SHALL also continue the Pension Plan in accordance with its terms, and the Debtors or Reorganized Debtors, as applicable, shall satisfy the minimum funding standards and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code, subject to any contractual or statutory rights to terminate or modify such plan.**

The Reader's Digest Association, Inc. sponsors The Reader's Digest Association, Inc. Retirement Plan, (the "***Retirement Plan***"), which is a defined benefit pension plan in which most domestic employees of the Debtors are entitled to participate. Based on information provided by The Reader's Digest Association, Inc, as of June 30, 2009, the estimated projected benefit obligation under the Retirement Plan was $406 million and  the estimated market value of assets was approximately $510 million. **As of the Commencement Date, the Retirement Plan was over-funded and the Debtors do not owe any prepetition amounts on account of this plan.**

To reduce the cash cost of funding severance benefits, prior to the Commencement Date, as part of their prepetition restructuring initiatives, the Debtors amended the Retirement Plan to provide a special pension credit to eligible terminated employees terminated after April 1, 2009, and on or before December 31, 2009.  This amendment effectively transferred the obligation to fund severance benefits from Reader's Digest to the Reader's Digest Retirement Plan. The Debtors expect to amend the Pension Plan to extend the program to include employees terminated through December 31, 2010. As of October 20, 2009, the aggregate amount of severance payments that have been paid from the Retirement Plan is approximately $3.4 million.

(c)        Non-Qualified Retirement Plans

**For the avoidance of doubt, the Debtors SHALL NOT assume any obligations in connection with the Non-Qualified Retirement Plans in connection with the Plan.  Claims arising from the discontinuation, rejection or termination of the Non-Qualified Retirement Plans will be treated as Other General Unsecured Claims.**

As of the Commencement Date, the Debtors provided retirement benefits pursuant to a series of unfunded non-qualified retirement and other deferred compensation arrangements.  As set forth in the Plan, the Non-Qualified Retirement Plans include (i) the Excess Benefit Retirement Plan, (ii) the Executive Retirement Plan, (iii) the Executive Cash Balance Plan, (iv) the 1988 Supplemental Employee Retirement Plan and related agreements, (v) the Director and Roving Editors Plan and/or related agreements or arrangements, and (vi) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor.  The participants in these non-qualified plans generally include former executives, officers and directors of the Debtors as well as certain other former and current employees and freelancers.

As of the Commencement Date, the Debtors estimate their accumulated obligations and/or liability under such non-qualified retirement plans are approximately $82.6 million.  **As a result of the chapter 11 cases the Debtors have ceased making payments in connection with these programs.  These benefits are unsecured claims which are treated as Other General Unsecured Claims in Class 5 under the Plan.**

(d)        Pension Obligations of Certain Foreign Affiliates

Certain of the Debtors' foreign Affiliates sponsor pension plans in their respective jurisdictions.  In certain jurisdictions, the plans are underfunded.  The Debtors do not believe that they have any liability with respect to the pension obligations of their non-debtor foreign Affiliates.  To the extent applicable pension authorities assert Claims or Causes of Action against any of the Debtors for contribution or otherwise with respect to such pension obligations, including any underfunded pension liabilities, the Debtors believe all such Claims would constitute prepetition general unsecured Claims against these Estates subject to discharge under the Plan (and all related provisions set forth in Article IX of the Plan) pursuant to sections 1141 and 524 of the Bankruptcy Code, to the fullest extent provided under applicable nonbankruptcy law.

K&E 15735883.

3.      **Workers' Compensation Programs**

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under all applicable workers' compensation laws in states in which the Reorganized Debtors operate and the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order or approval of the Bankruptcy Court.  Nothing in the Plan, however, shall (a) limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans or (b) be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

**H.      RIGHTS OFFERING AND SUBSCRIPTION PROCESS**

1.      **Exercise of Subscription Rights**

<div style="border: 1px solid black; padding: 4px;">

**THIS IS ONLY A SUMMARY OF THE RIGHTS OFFERING AND SUBSCRIPTION PROCESS. ALL HOLDERS OF SENIOR SUBORDINATED NOTES ARE REFERRED TO THE SUBSCRIPTION PROCEDURES SET FORTH ON <u>EXHIBIT G</u> FOR A COMPLETE DESCRIPTION REGARDING SAME.**

</div>

The Plan provides that any Eligible Noteholder shall have the right to purchase (at a share price based on Plan Equity Value) shares of New Common Stock up to, and solely to the extent of, its Pro Rata share (*i.e.*, the ratio, expressed as a percentage, of the principal amount adjusted for unaccrued interest of an Eligible Noteholder's Senior Subordinated Note Claim as of the Record Date to the aggregate amount of Senior Subordinated Note Claims as of the Record Date) of up to $50 million of the New Common Stock to be issued under the Plan (subject to dilution, as set forth in the Disclosure Statement).  Participating Eligible Noteholders may exercise all or any portion of their Subscription Rights, subject to a minimum subscription amount of $500,000.  **The valid exercise of Subscription Rights shall be irrevocable.**

The Rights Offering will commence on the day upon which Financial Balloting Group LLC ("*FBG*") mails or otherwise makes available to Holders of Senior Subordinated Note Claims a "*Subscription Package*" comprised of the following materials:  (a) a CD-ROM containing this Disclosure Statement (which is being provided solely for purposes of providing information regarding the Debtors, among other things, and not for purposes of voting on the Plan); (b) the notice of the Confirmation Hearing; and (iii) the form to exercise Subscription Rights (the "*Subscription Form*"), together with  detailed instructions for the proper completion, due execution and timely delivery of Subscription Forms and for payment of the purchase price.

To exercise Subscription Rights, Eligible Noteholders <u>must</u> (i) return a duly-completed Subscription Form to FBG <u>and</u> (ii) pay to FBG, by wire transfer in immediately available funds, an amount equal to the full subscription purchase price for the number of shares of the New Common Stock elected to be purchased by each Eligible Noteholder (calculated according to the formula set forth in the Subscription Form, the "*Subscription Purchase Price*"), so that both the Subscription Form and payment of the Subscription Purchase Price are *actually received* by FBG by **6:00 p.m. prevailing Eastern Time on December [7], 2009** (the "*Expiration Date*").

2.      **Failure To Timely Subscribe**

If the Rights Offering Agent for any reason does not receive both a duly completed Subscription Form and immediately available funds as set forth above on or before the Subscription Expiration Date from a given Eligible Noteholder of Subscription Rights, then such Eligible Noteholder shall be deemed to have relinquished and waived its right to participate in the Rights Offering.  Any attempt to exercise Subscription Rights after the Subscription Expiration Date shall be null and void and the Debtors shall not be obligated to honor any such purported exercise received by the Rights Offering Agent after the Subscription Expiration Date regardless of when the documents relating to such exercise were sent.  The Debtors may use commercially reasonable efforts to give notice to any holder regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such holder of Subscription Rights and may permit such defect or irregularity to be cured within such time as they may

determine in good faith to be appropriate. However, neither the Debtors nor the Rights Offering Agent will have any obligation to provide such notice or incur any liability for failure to give such notification.

### 3.    Use of Rights Offering Proceeds

Payments made in accordance with the Rights Offering (the "***Rights Offering Funds***") shall be deposited and held in escrow pending the Effective Date in an account or accounts administered by the Rights Offering Agent, which shall:  (a) not constitute property of the Debtors or the Debtors' Estates until the Effective Date; (b) be separate and apart from the Rights Offering Agent's general operating funds and any other funds subject to any lien or any Cash collateral arrangements; and (c) be maintained for the purpose of holding the funds for administration of the Rights Offering until the Effective Date.  The Rights Offering Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by the Debtors or the Reorganized Debtors, as applicable, on the Effective Date and shall not encumber or permit the Rights Offering Funds to be encumbered by any lien or similar encumbrance.  No interest will be paid to entities exercising Subscription Rights on account of amounts paid in connection with such exercise.  Once transferred to the Debtors, proceeds of the Rights Offering will be used for general corporate purposes.

## I.    PRESERVATION OF CERTAIN RIGHTS OF ACTION

### 1.    Overview of Avoidance Actions Generally

Certain transactions may have occurred prior to the Commencement Date that could potentially give rise to Avoidance Actions (including, without limitation, preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or non-bankruptcy law).  Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of Avoidance Actions against the Debtors (or Reorganized Debtors, as applicable) under sections 544, 545, 547 548 and 553 of the Bankruptcy Code will expire on August 24, 2011 (*i.e.*, two years from the Commencement Date).

The Debtors believe that any potential recoveries from Avoidance Actions are uncertain in light of, among other things, the various defenses and arguments that could be asserted.  Likewise, the Liquidation Analysis attached hereto does not reflect any potential recoveries that might be realized by a chapter 7 trustee's potential pursuit of any avoidance actions because the Debtors' believe such claims are highly speculative.  Accordingly, the Debtors have not initiated or pursued any such causes of action because they are not aware, at this time, of any possible Avoidance Actions that could materially increase the recovery of the Debtors' unsecured creditors.

### (a)    Preference Actions

Under sections 547 and 550 of the Bankruptcy Code, a debtor may seek to avoid and recover certain prepetition payments and other transfers made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (i) was made when the debtor was insolvent and (ii) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code where the transfer had not been made.  Transfers made to a creditor that was not an "insider" of the debtor are subject to these provisions generally only if the payment was made within 90 days prior to the debtor's filing of a petition under chapter 11 of the Bankruptcy Code (the "***Preference Period***").

Under section 547 of the Bankruptcy Code, certain defenses, in addition to the solvency of the debtor at the time of the transfer and the lack of preferential effect of the transfer, are available to a creditor from which a preference recovery is sought.  Among other defenses, a debtor may not recover a payment to the extent such creditor subsequently gave new value to the debtor on account of which the debtor did not, among other things, make an otherwise unavoidable transfer to or for the benefit of the creditor.

A debtor may not recover a payment to the extent such payment was part of a substantially contemporaneous exchange between the debtor and the creditor for new value given to the debtor.  Further, a debtor may not recover a payment if such payment was made, and the related obligation was incurred, in the ordinary course of business of both the debtor and the creditor.  The debtor has the initial burden of proof in demonstrating

40

the existence of all the elements of a preference and is presumed to be insolvent during the Preference Period.  The creditor has the initial burden of proof as to the aforementioned defenses.

<div align="center">(b)        Fraudulent Transfer and Conveyance Actions</div>

Generally, a conveyance or transfer is fraudulent if: (i) it was made with the actual intent to hinder, delay or defraud a creditor (*i.e.*, an intentional fraudulent conveyance); or (ii) reasonably equivalent value was not received by the transferee in exchange for the transfer and  the debtor was insolvent at the time of the transfer, was rendered insolvent as a result of the transfer or was left with insufficient capitalization as a result of the transfer (*i.e.*, a constructive fraudulent conveyance).  Two primary sources of fraudulent conveyance law exist in a chapter 11 case:

- The first source of fraudulent conveyance law in a chapter 11 case is section 548 of the Bankruptcy Code, under which a debtor in possession or bankruptcy trustee may avoid fraudulent transfers that were made or incurred on or within one year before the date that a bankruptcy case is filed.

- The second source of fraudulent conveyance law in a chapter 11 case is section 544 of the Bankruptcy Code—the so-called "strong-arm provision"—under which the debtor in possession (or creditors with Bankruptcy Court permission) may have the rights of a creditor under state law to avoid transfers as fraudulent.  State fraudulent conveyance laws generally have statutes of limitations longer than one year and are applicable in a bankruptcy proceeding pursuant to section 544 of the Bankruptcy Code if the statute of limitations with respect to a transfer has not expired prior to the filing of the bankruptcy case.  If such statute of limitations has not expired, the debtor in possession (or creditors with Bankruptcy Court permission) may bring the fraudulent conveyance claim within the time period permitted by section 546 of the Bankruptcy Code notwithstanding whether the state statute of limitations period expires prior to such time.

**2.        Retention of Rights To Prosecute Causes of Action**

Subject to the provisions set forth in Article IX of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Commencement Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  Any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, and the Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

Any recovery paid or payable to the Debtors or the Prepetition Lenders from proceeds of any Cause of Action against the Consenting Shareholders (either directly or indirectly or pursuant to the subordination provisions of the Senior Subordinated Notes Indenture) shall be payable to such Consenting Shareholders and if any of such parties receive any recovery on account of such Cause of Action, they shall hold the proceeds of any payment thereof in trust for the Consenting Shareholders and shall promptly transfer such proceeds or payment, as the case may be, to the Consenting Shareholders.

K&E 15735883.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**

**J.      TREATMENT OF CONTRACTS AND LEASES**

**1.      Assumption of Executory Contracts and Unexpired Leases Generally**

Subject to the provisions in the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date except any Executory Contract or Unexpired Lease (a) previously assumed or rejected by the Debtors during these Chapter 11 Cases, (b) identified on the Contract/Lease Schedule (which will be filed with the Bankruptcy Court on the Contract/Lease Schedule Date) as an Executory Contract or Unexpired Lease designated for rejection, (c) which is the subject of a separate motion or notice to reject filed by the Debtors and pending as of the Confirmation Hearing.

The Plan provides that entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated in the Plan, by separate motion or otherwise, all assumptions or rejections of such Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each such Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party prior to the Effective Date, shall re-vest in, and be fully enforceable by, the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or order of the Bankruptcy Court.

Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified on the Contract/Lease Schedule in their discretion prior to the Effective Date on proper notice to the non-debtor Entity party thereto.

**2.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any provisions or terms of the Debtors' Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, solely by Cure or by an agreed-upon waiver of Cure on or as soon as reasonably practicable after the Effective Date.

The Debtors will file the Contract/Lease Schedule(s) with the Bankruptcy Court at least twenty (20) days prior to the Confirmation Hearing. The Contract/Lease Schedule will include (a) the name of the non-debtor counterparty, (b) the legal description of the contract or lease to be assumed or rejected and (c) in the case of assumption, the proposed Cure, if any. On or as soon as practicably thereafter, with the assistance of the Noticing and Claims Agent, the Debtors will serve the Contract/Lease Schedule and notice of filing upon each non-debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption or rejection of their respective Executory Contract or Unexpired Lease and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.

Objections, if any, to the proposed assumption and/or Cure or rejection by the Debtors of any Executory Contract or Unexpired Lease listed on the Contract/Lease Schedule, must be filed with the Bankruptcy Court and served so as to be _actually received_ by the Debtors prior to the Confirmation Hearing on or before a date to be determined, but that in any event is consistent with the provisions of the Debtors' Case Management Order. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure will be deemed to have assented to such matters, and any subsequent or additional requests for Cure, other payments or assurances of future performance shall be disallowed, automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be

K&E 15735883.

deemed fully satisfied, released and discharged, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary.

Nothing shall prevent the applicable Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

In the event of a dispute regarding (1) the amount of any payments to Cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the applicable Debtor or Reorganized Debtor, and the counterparty to the Executory Contract or Unexpired Lease.

If an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it on proper notice to the non-debtor Entity party thereto, which non-debtor Entity parties shall then be entitled to file Proofs of Claim asserting Claims arising from the rejection thereof, if applicable, in accordance with the terms of the Plan and the Claims Bar Date Order entered by the Bankruptcy Court in these Chapter 11 Cases.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, except any Executory Contract with a state or local franchise authority, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest (or payments relating to such change in control) or composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to or upon the effective date of assumption.

Except as provided elsewhere in the Plan, any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

**The Debtors or Reorganized Debtors, as applicable, reserve the right, either to reject or nullify, the assumption of any Executory Contract or Unexpired Lease no later than thirty (30) days after entry of any Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.**

### 3.        Contracts and Leases Entered Into After the Commencement Date

Contracts and leases entered into after the Commencement Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### 4.        Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise must be filed by Holders of such Claims with the Noticing and Claims Agent no later than thirty (30) days after the later of (a) the Effective Date or (b) the effective date of earlier rejection for such Holders to be entitled to receive distributions under the Plan on account of such Claims. Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease will be provided with notice of the Confirmation Hearing, which will, among other things, inform such Entities how they may vote on the Plan pursuant to, and as described in greater detail in, the Solicitation Procedures Order.

K&E 15735883.

Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

5.        **Indemnification and Reimbursement Obligations**

On and from the Effective Date, and except as prohibited by applicable law or subject to the limitations set forth in the Plan, the Reorganized Debtors shall assume all indemnification obligations currently in place, whether in the bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts or other agreements for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', managers', and employees' respective Affiliates (collectively, the "***Indemnified Parties***") to the extent set forth in Article V.F. Each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, such Indemnified Parties to the extent provided in Article IV.E of the Plan.

Without limiting the foregoing and except as prohibited by applicable law, the Debtors shall indemnify and hold harmless each of the Indemnified Parties for all costs, expenses, loss, damage or liability incurred by any such Indemnified Party arising from or related in any way to any and all Causes of Action whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, including any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those related in any way to:

- any action or omission of any such Indemnified Party with respect to any indebtedness of or any Equity Interest in the Debtors (including any action or omission of any such Indemnified Party with respect to the acquisition, holding, voting or disposition of any such investment);

- any action or omission of any such Indemnified Party in such Indemnified Party's capacity as an officer, director, member, employee, partner or agent of, or advisor to any Debtor;

- any disclosure made or not made by any Indemnified Party to any current or former Holder of any such indebtedness of or any such Equity Interest in the Debtors;

- any consideration paid to any such Indemnified Party by any of the Debtors in respect of any services provided by any such Indemnified Party to any Debtor; and

- any action taken or not taken in connection with the Chapter 11 Cases or the Plan.

In the event that any such Indemnified Party becomes involved in any action, proceeding or investigation brought by or against any Indemnified Party, as a result of matters to which the foregoing "Indemnification" may relate, the Reorganized Debtors shall promptly reimburse any such Indemnified Party for its reasonable and documented legal and other expenses (including advancing the costs of any investigation and preparation prior to final adjudication) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof.

Notwithstanding anything in the Plan to the contrary, with respect to former officers and directors, the Debtors' obligation to indemnify such individuals shall be limited to the extent of available coverage under their D&O Liability Insurance Policies (and payable from the proceeds of such D&O Liability Insurance Policies), including advancing the costs of any investigation and preparation prior to final adjudication as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof.

K&E 15735883.

6.       **D&O Insurance Policies and Agreements**

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of same effective as of the Effective Date.  Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy" in effect on the Commencement Date) with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

K.       **DISTRIBUTIONS ON ACCOUNT OF ALLOWED CLAIMS**

1.       **Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date.  Payments on account of General Unsecured Claims Allowed as of the Effective Date shall commence on the Effective Date.

2.       **Claims Allowed After the Effective Date**

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims.

3.       **Other General Unsecured Claims Escrow Account**

On or as reasonably practicable after the Effective Date, $3 million shall be deposited into an escrow account separate and apart from the Debtors' general operating funds to be maintained in trust for the benefit of Holders of Allowed Class 5 Other General Unsecured Claims.  Distributions from this account to Holders of Allowed Class 5 Other General Unsecured Claims shall be made in accordance with the provisions governing distribution set forth in Article VI of the Plan.  To the extent the account is an interest bearing account, Holders of Allowed Class 5 Claims will share ratably in any accrued interest.

Upon payment in full of all Allowed Class 5 Other General Unsecured Claims, all funds remaining in the escrow account, if any, and all interest and/or other similar earnings therefrom, if any, shall be paid over to, vest in and become the property of the Reorganized Debtors in accordance with applicable non-bankruptcy law.

4.       **Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on or as soon as reasonably after the date that such a Claim becomes an Allowed Claim), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Distributions on account of Other General Unsecured Claims that become Allowed Claims before the Effective Date shall be paid on the Effective Date.

K&E 15735883.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VI of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 5.   Setoffs

The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.

**Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided in the Plan.**

### 6.   Claims Paid or Payable by Third Parties

(a)   Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan; *provided, that* if the Debtors become aware of the payment by a third party, the Debtors or Reorganized Debtors, as applicable, will send a notice of wrongful payment to such party requesting return of any excess payments and advising the recipient of the provisions of the Plan requiring turnover of excess estate funds.

The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

(b)   Claims Payable by Insurers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

K&E 15735883.

(c)       Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## L.       RESOLUTION OF CONTINGENT, UNLIQUIDATED OR DISPUTED CLAIMS

### 1.       Allowance of Claims

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

### 2.       Prosecution of Objections to Claims

Any objections to Claims shall be filed no later than the Claims Objection Bar Date.  With respect to all Tort Claims, an objection is deemed to have been filed timely, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date.  Each such Tort Claim shall remain a Disputed Claim unless and until it becomes an Allowed Claim.  After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date until the Claims Objection Bar Date, the Reorganized Debtors, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.

### 3.       Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 4.       Disallowance of Claims

All Claims of any Entity from which property is sought by the Debtors or the Reorganized Debtors under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable

K&E 15735883.

to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

Except as otherwise agreed, any and all proofs of claim filed after the applicable claims bar date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late proof of claim is deemed timely filed by a Bankruptcy Court order on or before the later of (1) the Confirmation Hearing and (2) forty-five (45) days after the applicable Claims Bar Date.

On or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

## M.   SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1.   Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

### 2.   Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.  No Holder of a Senior Subordinated Note Claim shall receive any distribution on account of such Senior Subordinated Note Claim, and all Senior Subordinated Note Claims shall be extinguished.

### 3.   Discharge of Claims and Termination of Equity Interests

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the reorganized Debtors), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Commencement Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by the employees of the Debtors prior to the Commencement Date and arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or

502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.

Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.

### 4.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

### 5.    Debtor Release

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission or the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, or upon any other act or omission, transaction, or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary in the Plan, the foregoing "Debtor Release" shall not operate to waive or release any Causes of Action of any Debtor: (1) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan, including, without limitation, the Exit Credit Agreement, New Second Priority Term Loan Agreement or the Shareholders Agreement or documents, agreements or instruments executed in connection therewith or (2) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.**

Entry of the Confirmation Order Shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good faith settlement and

compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Reorganized Debtors asserting any claim released by the Debtor Release against any of the Released Parties.

**6.       Releasing Party Release**

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission or the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, or upon any other act or omission, transaction, or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.**

Notwithstanding anything contained in the Plan to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order Shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the consensual Releasing Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Releasing Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the Releasing Party Release against any of the Released Parties.

Notwithstanding anything in the Plan, no Person shall be discharged, released, or relieved from any liability with respect to the Pension Plan as a result of the Chapter 11 Cases or the Plan, nor shall the PBGC, the Pension Plan or any other Person be enjoined or precluded from enforcing any liability with respect to the Pension Plan as a result of the Chapter 11 Cases, the provisions of the Plan or confirmation of the Plan.

**7.       Consideration Provided by the Released Parties**

Each of the Released Parties afforded value to the Debtors and aided in the reorganization process and have provided or will provide good and valuable consideration in exchange for the release provisions set forth in the Plan. Indeed, each of the provisions set forth in Article IX of the Plan were a critical component of, and gating item for, the Debtors' ability to achieve a prearranged plan of reorganization that provides maximum recovery value to the Debtors' creditors and affords the Reorganized Debtors the opportunity to restructure their businesses to compete effectively post-emergence.  Accordingly, the Debtors believe that the release provisions of the Plan are appropriate.

K&E 15735883.

**8.      Exculpation**

Upon and effective as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring consultants and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code , including section 1125(e) of the Bankruptcy Code.  Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan supplement or related documents, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, including, without limitation, the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; formulating, negotiating, preparing, disseminating, implementing and/or effecting the Restructuring Support Agreement, the DIP Credit Agreement, the Disclosure Statement and the Plan (including the Plan Supplement and any related contract, instrument, release or other agreement or document created or entered into in connection therewith); the solicitation of votes for the Plan and the pursuit of Confirmation and Consummation of the Plan; the administration of the Plan and/or the property to be distributed under the Plan; the offer and issuance of any securities under the Plan, including pursuant to the Rights Offering; and or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors.  In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its respective duties under, pursuant to or in connection with, the Plan.

Notwithstanding anything in the Plan to the contrary, nothing in the foregoing "Exculpation" shall (1) exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages or ultra vires acts as determined by a Final Order or (2) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

**9.      Injunction**

The satisfaction, release and discharge pursuant to this Article IX of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or  provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

## N.      MODIFYING, REVOKING OR WITHDRAWING THE PLAN

Subject to the limitations contained in the Plan and the Restructuring Support Agreement, and in accordance with the Restructuring Support Agreement: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.  Subject to the Restructuring Support Agreement and conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

K&E 15735883.

**V.**
**VALUATION AND FINANCIAL PROJECTIONS**

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS.  THE VALUE OF THE NEW COMMON STOCK DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE.

**A.     VALUATION OF THE REORGANIZED DEBTORS**

        In connection with developing the Plan, the Debtors directed Miller Buckfire to estimate the Reorganized Debtors' going-concern value.  In preparing the estimated total enterprise value range, Miller Buckfire:  (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (iii) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Debtors; (iv) considered certain economic and industry information relevant to the Debtors' operating businesses; (v) reviewed certain analyses prepared by other firms retained by the Debtors; and (vi) conducted such other analyses as Miller Buckfire deemed appropriate.

        Although Miller Buckfire conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans, Miller Buckfire relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and publicly available information.  No independent evaluations or appraisals of the Debtors' assets were sought or were obtained in connection therewith.

        In performing its analysis, Miller Buckfire applied two commonly-accepted valuation methodologies: (i) the discounted cash flow methodology and (ii) the comparable public companies trading multiples methodology.  The comparable companies trading multiples methodology involved identifying a group of publicly-traded companies whose businesses, operating characteristics and geographic footprints are generally similar to the Debtors'.  Miller Buckfire then developed a range of valuation multiples to apply to the Debtors' financial projections to derive a range of implied enterprise values for the Reorganized Debtors.  The discounted cash flow methodology involved deriving the unlevered free cash flows that the Reorganized Debtors would generate assuming the financial projections were realized.  To determine the Reorganized Debtors' enterprise value range, these cash flows and an estimated enterprise value at the end of the projection period were discounted to an assumed Emergence Date of December 31, 2009, using the Reorganized Debtors' estimated weighted average cost of capital.

        Miller Buckfire estimates the total enterprise value of the Reorganized Debtors to be between approximately $900 million and $1,050 million, as of an assumed Effective Date of December 31, 2009.  The range of total equity value, which takes into account the total enterprise value less estimated net debt outstanding as of an assumed Effective Date of December 31, 2009, was estimated by Miller Buckfire to be between approximately $475 million and $625 million.

        This valuation is based upon information available to, and analyses undertaken by, Miller Buckfire as of October 1, 2009, and reflects, among other factors discussed below, the Debtors' income statements and balance sheets, current financial market conditions and the inherent uncertainty today as to the achievement of the Debtors' financial projections prepared by the Debtors with the assistance of AlixPartners.

        This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, achieving the forecasts reflected in the financial projections, the amount of available Cash, market conditions and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.

52

Additionally, an estimate of total enterprise value is not entirely mathematical but, rather, involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business.

Further, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates; conditions in the financial markets; the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of the post reorganization market trading value. Such trading value may be materially different from the total enterprise value ranges associated with Miller Buckfire's valuation analysis. Indeed, there can be no assurance that any trading market will develop for the New Common Stock. Furthermore, in the event that the actual distributions in these Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, impaired classes Claims holders actual recoveries could be significantly higher or lower than estimated by the Debtors.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of their businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a businesses.

Because valuation estimates are inherently subject to uncertainties, neither the Debtors, Miller Buckfire, nor any other person assumes responsibility for their accuracy, but the Debtors believe the estimates have been prepared in good faith based on reasonable assumptions.

## B.    FINANCIAL PROJECTIONS

As discussed in Section VI.A herein, entitled "Statutory Requirements for Confirmation of the Plan," the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies the "feasibility" standard, the Debtors, with the assistance of AlixPartners, prepared the financial projections for the years of 2010 through 2014 set forth on **Exhibit D** (the "*Financial Projections*"). In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly de-leveraged capital structure, the Reorganized Debtors will be viable. The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Debtors including, without limitation, an increased risk of inability to meet sales forecasts and higher reorganization expenses. Additionally, the estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control.

K&E 15735883.

Because future events and circumstances may differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be greater or less, perhaps materially, than those contained in the Financial Projections.

**No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance.**

**The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out. The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.**

K&E 15735883.

**VI.**
**CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan (*discussed in more detail in Section VI.A below*).

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code (*discussed in more detail in Section VI.A below*).

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the Clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in each of the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is converted or dismissed, whichever occurs first.

1.        **Best Interests of Creditors Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must:  (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's Chapter 11 Cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for:  (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the Cash amount that would be available for satisfaction of Claims (other than Secured Claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation. Such Cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the Debtors' business and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the Liquidation Analysis attached hereto as **Exhibit E**, the Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class with a greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. In addition, distributions in chapter 7 cases may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors. Thus, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

2.        **Feasibility Requirements**

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of, or the need for further financial reorganization, of the debtor unless the plan contemplates such liquidation or reorganization. As mentioned above, the Debtors have analyzed their ability to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses. As demonstrated by their Financial Projections, the Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code because (a) Confirmation is not likely to be followed by liquidation of the Reorganized Debtors or (b) the need for further financial reorganization of the Reorganized Debtors. The Financial Projections, together with the assumptions on which they are based, are attached hereto as **Exhibit D**.

In general, as illustrated by the Financial Projections, the Debtors believe that with the significantly de-leveraged capital structure provided under the Plan, the Reorganized Debtors should have sufficient cash flow and availability to pay and service their debt obligations and to fund operations. The Debtors believe that Confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

K&E 15735883.

3.    **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

Claims in Classes 1, 2, 9 and 10 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

Claims in Classes 3, 4 and 5 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed <u>without</u> application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described directly below.  As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

4.    **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

(a)    <u>No Unfair Discrimination</u>

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.  Accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

(b)    <u>Fair and Equitable</u>

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

- <u>Secured Claims</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- <u>Unsecured Claims</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either:  (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- <u>Equity Interests</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o   the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; <u>or</u>

  o   if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the deemed rejection by Classes 6, 7 and 8.  To the extent that any of the Voting Classes vote to reject the Plan, the Debtors further reserve the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) to modify the Plan in accordance with Article XII.A of the Plan.

Notwithstanding the deemed rejection by Classes 6, 7 and 8 (or any Class that votes to reject the Plan, if applicable) the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  <u>First</u>, no Class of equal priority is receiving more favorable treatment from any of the Debtors, their assets or the Estates under the Plan than the treatment afforded Holders of Claims and Equity Interests in Classes 6, 7 and 8 (for a more detailed discussion of the Plan's treatment of Claims and Interests, see Section IV.C herein, entitled "Classification and Treatment of Claims and Interests").  <u>Second</u>, no Class that is junior to Classes 6, 7 or 8 will receive or retain any property on account of the Claims or Interests in such class.  Thus, the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 6, 7 and 8 are satisfied such that the Plan may be Confirmed over the deemed rejection thereof.

Accordingly, the Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan, including Classes 6, 7 and 8, satisfy the foregoing requirements for nonconsensual Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## B.    CONDITIONS FOR CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date so long as certain conditions precedent are satisfied or waived in accordance with the Article VIII.B of the Plan, including:

- the Bankruptcy Court shall have approved the Disclosure Statement in a manner acceptable to the Debtors, the Prepetition Agent and the Required Consenting Lenders;

- the Plan and Plan Supplement shall be acceptable to the Debtors, the Prepetition Agent and Required Consenting Lenders;

K&E 15735883.

- the Confirmation Order shall have been entered and become a Final Order in a form and in substance reasonably satisfactory to the Debtors, the Prepetition Agent and Required Consenting Lenders;

- all documents and agreements necessary to implement the Plan shall have been tendered for delivery and effected or executed; and

- all actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

## C.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    Liquidation Under Chapter 7 of the Bankruptcy Code

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims is set forth in Section VI.A herein, titled "Statutory Requirements for Confirmation of the Plan."  In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation.  The Debtors believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

### 2.    Filing of an Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets.  During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserves their business and allows creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.  In any liquidation, creditors would be paid their distribution in Cash, whereas, under the Plan, some creditors will receive a part of their distribution in New Common Stock (if issued).

K&E 15735883.

# VII.
## PLAN-RELATED RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY EACH OF THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  WHILE NUMEROUS, THESE RISK FACTORS SHOULD NOT BE CONSTRUED AS THE ONLY RISKS RELATING TO THE DEBTORS' BUSINESSES AND/OR THE PLAN.

The following provides a summary of various important considerations and risk factors associated with the Plan.  However, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims in Voting Classes should read and carefully consider the factors set forth below and all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.  In addition, Holders of Claims in Voting Classes should also review the detailed discussion of the various risks and other factors associated with the Debtors' businesses and operations generally set forth under the section entitled "Risk Factors" in Reader's Digest's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, and Reader's Digest's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2009, copies of which can be obtained from the Debtors' investor relations website (http://phx.corporate-ir.net/phoenix.zhtml?c=71092&p=irol-IRhome) or the SEC's EDGAR system website (http://www.sec.gov/edgar.shtml).

## A.    RISKS RELATING TO CONFIRMATION OF THE PLAN

### 1.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan, and there can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will Confirm the Plan.  Moreover, Confirmation of the Plan is subject to the conditions set forth in Article VIII.A of the Plan, which may not be achieved.  Finally, although the Debtors believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 2.    The Restructuring Support Agreement May Terminate.

The parties to the Restructuring Support Agreement have agreed to support the Plan provided certain conditions are met.  To the extent that the terms or conditions of the Restructuring Support Agreement are not satisfied, or to the extent events of termination arise under the Restructuring Support Agreement, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents.  Any such loss of support could adversely affect the Debtors' ability to Confirm and Consummate the Plan.

## B.    RISKS RELATING TO RECOVERIES UNDER THE PLAN

### 1.    The Recovery to Holders of Allowed Claims Can Not be Stated With Absolute Certainty.

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, without limitation, their ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the Debtors are unable to control. Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

K&E 15735883.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will <u>not</u> be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  Also, because the liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.

The Claims estimates set forth herein are based on various assumptions.  The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect.  Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan.  Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control, including, without limitation, (a) the successful reorganization of the Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections, (d) the Debtors' ability to maintain adequate liquidity to fund operations and (e) the assumption that capital and equity markets remain consistent with current conditions.

The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to Holders of such Allowed Claims under the Plan, in some instances adversely.  Also, the estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders the subordination of any Allowed Claims to other Allowed Claims, whether the Debtors object to the amount or classification of any Claim, whether the Debtors satisfy the requisite conditions to enter into the Exit Credit Agreement or New Second Priority Term Loan Agreement or whether, subject to the terms and conditions of the Plan, the Debtors are required to modify certain terms or conditions of the Plan in order to Confirm the Plan.  The occurrence of contingencies that could affect distributions available to Holders of Allowed Claims under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

**2.        The Value of New Common Stock Can Not be Stated With Absolute Certainty.**

On the Effective Date, 100% of the New Common Stock will be issued to the Prepetition Lenders on account of their Prepetition Credit Agreement Claims and 7.5% of the New Common Stock (on a fully-diluted basis) will be reserved for issuance (whether as restricted stock, options or warrants) in connection with the Management Equity Plan to be granted at the discretion of the New Board.  If the New Board distributes such equity interests, or warrants or options to acquire such equity interests, pursuant to the Management Equity Plan, it is contemplated that such distributions will dilute the New Common Stock issued to the Prepetition Lenders on account of Claims under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan, including in connection with the Rights Offering.

It is likewise contemplated that shares of New Common Stock issued to participating Eligible Noteholders in connection with the Rights Offering, if any, will dilute the New Common Stock issued to the Prepetition Lenders on account of Allowed Prepetition Credit Agreement Claims under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan.

K&E 15735883.

### C. RISKS RELATING TO THE DEBTORS' BUSINESSES

#### 1. Prolonged Continuation of the Chapter 11 Cases Is Likely To Harm the Debtors' Business.

The prolonged continuation of these Chapter 11 Cases is likely to adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Credit Agreement or otherwise, in order to service their debt and other obligations. It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all. If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

#### 2. The Debtors Are Subject to Restrictive Covenants That Impair Their Business Operations.

The DIP Credit Agreement includes financial covenants that, among other things, require the Debtors to achieve a minimum amount of consolidated EBITDA (as defined in the DIP Credit Agreement) and maintain a minimum amount of liquidity. If the Debtors are unable to achieve the results that are contemplated in their business plan, they may fail to comply with these covenants. Furthermore, the DIP Credit Agreement contains limitations on the Debtors' ability, among other things, to incur additional indebtedness, make capital expenditures, pay dividends, make investments (including acquisitions) or sell assets. If the Debtors fail to comply with the covenants in the DIP Credit Agreement and are unable to obtain a waiver or amendment of the DIP Credit Agreement, an event of default will occur thereunder. The DIP Credit Agreement contains other events of defaults customary for debtor-in-possession financings.

The Exit Credit Agreement and Second Priority Term Loan Agreement may likely include various restrictive covenants. These covenants could restrict the Reorganized Debtors' ability to, among other things: incur additional debt; make certain investments; enter into certain types of transactions with affiliates; limit dividends or other payments by or among the Reorganized Debtors; use assets as security in other transactions; pay dividends on the New Common Stock or repurchase equity interests; sell certain assets or merge with or into other companies; guarantee the debts of others; enter into new lines of business; make capital expenditures; prepay, redeem or exchange the Reorganized Debtors' debt; and form any joint ventures or subsidiary investments.

The Exit Credit Agreement and Second Priority Term Loan Agreement could also contain financial covenants and tests could limit the Reorganized Debtors' ability to react to market conditions, satisfy any extraordinary capital needs or otherwise restrict the Reorganized Debtors' financing and operations, and could require the Reorganized Debtors to periodically meet various financial ratios and tests, including maximum leverage, minimum EBITDA and fixed charge coverage and interest coverage levels. If the Reorganized Debtors fail to comply with such covenants and terms, the Reorganized Debtors would be required to obtain waivers from their lenders to maintain compliance under their exit financing agreements, which, if not obtained, would have a material adverse effect on the Reorganized Debtors' financial condition and future operating performance.

#### 3. The Chapter 11 Cases May Affect the Tax Liability of Reorganized Debtors.

As of June 30, 2009, Reader's Digest had an aggregate amount of net operating loss, capital loss, alternative minimum tax credits and foreign tax credit carryforwards in the United States of approximately $548 million, $0 million, $11 million and $156 million, respectively. In connection with the Debtors' emergence from these Chapter 11 Cases, it is likely that such tax attributes will be significantly reduced due to the cancellation of indebtedness income, with any remaining tax attributes subject to limitation under Sections 382 and 383 of the IRC. A full valuation allowance has been recorded against the deferred tax assets related to these tax attributes in the condensed consolidated balance sheets for the quarterly period ended June 30, 2009, which means that, as of that date, the Debtors have recognized that they will never receive the benefit of certain tax attributes.

K&E 15735883.

**Holders of Claims should carefully review Section VIII herein, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Chapter 11 Cases and treatment of Allowed Claims under the Plan could adversely affect the Reorganized Debtors and such Holders.**

**D.    DISCLOSURE STATEMENT DISCLAIMER**

**1.    No Representations Made Outside this Disclosure Statement Are Authorized.**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.  Except as otherwise provided herein or in the Plan, no representations relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Creditors' Committee and the United States Trustee.

**2.    The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has not been filed with the Commission or any state regulatory authority.  Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.  This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.

The offer of New Common Stock under the Plan has not been registered under the Securities Act or similar state securities or "blue sky" laws.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New Common Stock or any shares reserved for issuance under the Management Equity Plan, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Rule 701 promulgated under the Securities Act or a "no sale" under the Securities Act as described herein.

Notwithstanding anything herein or in the Plan to the contrary, New Common Stock issued to participating Eligible Noteholders in connection with the Rights Offering will be issued under Section 4(2) of the Securities Act.  Such New Common Stock will be "restricted securities" and cannot be sold absent registration under, or pursuant to an exemption from, the Securities Act.

**3.    The Information Herein Was Provided by the Debtors and Relied Upon by Their Advisors.**

The Debtors have used their reasonable business judgment to ensure the accuracy of the information, including financial information, provided in this Disclosure Statement, the Plan and related documents. Nonetheless, the Debtors cannot, and do not, confirm the current accuracy of every statement appearing in this Disclosure Statement.

Statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  **Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.**

The financial information contained in this Disclosure Statement has not been audited.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

K&E 15735883.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### 4.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement.

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 5.      No Admissions Are Made by This Disclosure Statement.

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interest or any other parties in interest. The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

K&E 15735883.

# VIII.
## CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

## A.    BRIEF OVERVIEW AND DISCLOSURE

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain U.S. Holders and Non-U.S. Holders (each as defined below) of claims.  The following summary does not address the U.S. federal income tax consequences to holders of claims who are unimpaired or otherwise entitled to payment in full in Cash under the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "*IRC*"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "*IRS*") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" means a Holder of a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights that is, for U.S. federal income tax purposes, (i) a nonresident alien individual, (ii) a non-U.S. corporation or (iii) a non-U.S. estate or non-U.S. trust.  This summary does not address all aspects of U.S. federal income taxes that may be relevant to Non-U.S. Holders in light of their personal circumstances, and does not deal with federal taxes other than the federal income tax or with non-U.S., state, local or other tax considerations. Special rules, not discussed here, may apply to certain Non-U.S. Holders, including U.S. expatriates, controlled foreign corporations, passive foreign investment companies and corporations that accumulate earnings to avoid U.S. federal income tax. Such Non-U.S. Holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.  In the case of a holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership. If you are a partner of a partnership that is, or will be, a Holder of a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights, then you should consult your own tax advisors.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders in light of their individual circumstances.  This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding, or who will hold, a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights, as part of a hedge, straddle, conversion or constructive sale transaction).  No aspect of state, local, estate, gift or non-U.S. taxation is addressed.

K&E 15735883.

The following discussion assumes that each Holder of a Claim holds its New Common Stock, New First Priority Term Loan, New Second Priority Term Loan, Reinstated Euro Term Loan or Subscription Rights, as applicable, as a "capital asset" within the meaning of Section 1221 of the IRC.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO YOU.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC.   TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.       CONSEQUENCES TO THE DEBTORS**

**1.       Cancellation of Indebtedness and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("***COD Income***") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.   The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.   Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to Section 108 of the IRC.   In general, tax attributes will be reduced in the following order:   (a) net operating losses ("***NOLs***"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.   A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC **,** though it has not been determined whether the Debtors would make this election.   In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that holders of certain Claims will receive shares of the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan and/or Subscription Rights, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock and Subscription Rights, and the issue price of the New First Priority Term Loan, the New Second Priority Term Loan and the Reinstated Euro Term Loan. This value cannot be known with certainty until after the Effective Date.   Following this reduction, the Debtors expect that, subject to the limitations discussed herein and subject to whether the Debtors decide to reduce first the basis in their depreciable assets, they may not have NOL carryforwards remaining after emergence from chapter 11, but will have other significant tax attributes remaining.

K&E 15735883.

The American Recovery and Reinvestment Act of 2009 permits the Debtors to elect to defer the inclusion of COD Income, with the amount of COD Income becoming includible in the income of the electing Debtors ratably over a five-taxable year period beginning in the fifth taxable year after the COD Income arises. The collateral tax consequences of making such election are complex. The Debtors currently are analyzing whether to make the deferral election.

### 2.    Limitation of NOL Carryforwards and Other Tax Attributes

The amount of the Debtors' tax attributes that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by the Debtors in 2009; (b) the fair market value of the New Common Stock and Subscription Rights, and the issue price of the New First Priority Term Loan, the New Second Priority Term Loan and the Reinstated Euro Term Loan; and (c) the amount of COD Income incurred by the Debtors in connection with consummation of the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "***Pre-Change Losses***") that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

### (a)    General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "***Section 382 Limitation***." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (approximately 4.48% for the month of October 2009). If the Company is in a net unrealized built in gain position, the Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Stock, along with the cancellation of existing Equity Interests through the Plan, is expected to cause an ownership change with respect to the Debtors on the Effective Date. As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

K&E 15735883.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "**382(l)(6) Exception**").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of any Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

### 3.    Alternative Minimum Tax

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.

Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

## C.    CONSEQUENCES TO U.S. HOLDERS OF ALLOWED CLAIMS

### 1.    Holders of Allowed Prepetition Credit Agreement Claims

The following discussion assumes that each U.S. Holder of an Allowed Prepetition Credit Agreement Claim holds such Claim as a "capital asset" within the meaning of Section 1221 of the IRC.  Pursuant to the Plan, each U.S. Holder of such Allowed Prepetition Credit Agreement Claim shall receive its Pro Rata share of the New Second Priority Term Loan, the Reinstated Euro Term Loan and the New Common Stock, as further described above.

(a)    Exchange of an Allowed Prepetition Credit Agreement Claim for New Common Stock

Whether a U.S. Holder of an Allowed Prepetition Credit Agreement Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock depends on whether (i) the exchange qualifies as an exchange described in Section 351 of the IRC (each, a "**Section 351 Exchange**"), (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Prepetition Credit Agreement Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Prepetition Credit Agreement Claim and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

K&E 15735883.

      (i)        *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for New Common Stock is Treated as a Section 351 Exchange*

The exchange of a U.S. Holder's Prepetition Credit Agreement Claim for New Common Stock is expected to be treated as a Section 351 Exchange, in which case a U.S. Holder of a surrendered Allowed Prepetition Credit Agreement Claim will recognize gain, but not loss, on the exchange. Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of property other than stock treated as received in the exchange, and (b) ordinary interest income to the extent that the New Common Stock is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Prepetition Credit Agreement Claim (see "Accrued Interest" discussion below). In such case, a U.S. Holder's tax basis in its New Common Stock should be equal to the tax basis of the obligation constituting the Allowed Prepetition Credit Agreement Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of property other than stock treated as received in the exchange), and a U.S. Holder's holding period for its New Common Stock should include the holding period for the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim; *provided*, *however*, to the extent that any New Common Stock is treated as received in satisfaction of accrued but untaxed interest the tax basis of such New Common Stock should equal the amount of such accrued but untaxed interest, and the holding period for such New Common Stock should not include the holding period of the debt instrument constituting the surrendered Allowed Prepetition Credit Agreement Claim (*see* "Accrued Interest" discussion below).

      (ii)      *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for New Common Stock is Not Treated as a Section 351 Exchange*

If the exchange of an Allowed Prepetition Credit Agreement Claim for New Common Stock is not treated as a Section 351 Exchange, then a U.S. Holder of such a Claim should be treated as exchanging its Allowed Prepetition Credit Agreement Claim for New Common Stock in a fully taxable exchange. A U.S. Holder of an Allowed Prepetition Credit Agreement Claim who is subject to this treatment should recognize gain or loss equal to the difference (positive or negative) between (a) the fair market value of the shares of New Common Stock it receives in the exchange that is not allocable to accrued interest and (b) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim treated as exchanged for New Common Stock. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Prepetition Credit Agreement Claim exchanged for New Common Stock were held for more than one year. To the extent that a portion of the New Common Stock is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income. See "Accrued Interest" below. A U.S. Holder's tax basis in the shares of New Common Stock received on the Effective Date should equal the fair market value of the shares of New Common Stock as of the Effective Date. A U.S. Holder's holding period for the New Common Stock received on the Effective Date should begin on the day following the Effective Date.

      (iii)      *Accrued Interest*

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.

Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

<p style="text-align:center">(iv)    <i>Market Discount</i></p>

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

<p style="text-align:center">(b)    <u>Exchange of an Allowed Prepetition Credit Agreement Claim for New Second Priority Term Loan or Reinstated Euro Term Loan</u></p>

Whether a U.S. Holder of an Allowed Prepetition Credit Agreement Claim recognizes gain or loss as a result of the exchange of its Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan depends on whether (i) the exchange qualifies as a tax-free recapitalization (which in turn depends on whether the debt underlying the Allowed Prepetition Credit Agreement Claim surrendered for the New Second Priority Term Loan or the Reinstated Euro Term Loan is treated as a "security" for the reorganization provisions of the IRC (see "Treatment of a Debt Instrument as a 'Security'" below)), (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Prepetition Credit Agreement Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Prepetition Credit Agreement Claim and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

<p style="text-align:center">(i)    <i>Treatment of a Debt Instrument as a "Security"</i></p>

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U. S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.  Each U.S. Holder of an Allowed Prepetition Credit Agreement  Claim should consult with its own tax advisor to determine whether or not the debt underlying its Allowed Prepetition Credit Agreement Claim is a "security" for U.S. federal income tax purposes.

<p style="text-align:center">70</p>

> (ii)     *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is Treated as a Reorganization*

If a debt instrument constituting a surrendered Allowed Prepetition Credit Agreement Claim and the New Second Priority Term Loan or the Reinstated Euro Term Loan, as applicable, received in exchange therefor are each treated as a "security" for U.S. federal income tax purposes, the exchange of such Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is expected to qualify as a recapitalization, and therefore a reorganization, under the IRC.  If the exchange qualifies as a reorganization, the U.S. Holder of a surrendered Allowed Prepetition Credit Agreement Claim will recognize gain, but not loss, on the exchange.  Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of "other property" (*i.e.*, property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) treated as received in the exchange, and (b) ordinary interest income to the extent that the New Second Priority Term Loan or the Reinstated Euro Term Loan is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Prepetition Credit Agreement Claim (*see* "Accrued Interest" discussion above).

In such case, a U.S. Holder's tax basis in its New Second Priority Term Loan or its Reinstated Euro Term Loan should be equal to the tax basis of the obligation constituting the Allowed Prepetition Credit Agreement Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" treated as received in the exchange), and a U.S. Holder's holding period for its New Second Priority Term Loan or its Reinstated Euro Term Loan should include the holding period for the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim; *provided*, *however*, to the extent that the New Second Priority Term Loan or the Reinstated Euro Term Loan is treated as received in satisfaction of accrued but untaxed interest the tax basis of such New Second Priority Term Loan or Reinstated Euro Term Loan should equal the amount of such accrued but untaxed interest, and the holding period for such New Second Priority Term Loan or Reinstated Euro Term Loan should not include the holding period of the debt instrument constituting the surrendered Allowed Prepetition Credit Agreement Claim (*see* "Accrued Interest" discussion above).

> (iii)    *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is Not Treated* as *a Reorganization*

If the exchange of an Allowed Prepetition Credit Agreement Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is not treated as a Reorganization, then a U.S. Holder of such a Claim should be treated as exchanging its Allowed Prepetition Credit Agreement Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan in a fully taxable exchange.  A U.S. Holder of an Allowed Prepetition Credit Agreement Claim who is subject to this treatment should recognize gain or loss equal to the difference (positive or negative) between (a) the issue price of the New Second Priority Term Loan or the Reinstated Euro Term Loan it receives in the exchange that is not allocable to accrued interest and (b) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim treated as exchanged for the New Second Priority Term Loan or the Reinstated Euro Term Loan.  Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Prepetition Credit Agreement Claim exchanged for the New Second Priority Term Loan or the Reinstated Euro Term Loan were held for more than one year.  To the extent that a portion of the New Second Priority Term Loan or the Reinstated Euro Term Loan is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income (*see* "Accrued Interest" above).  A U.S. Holder's tax basis in the shares of the New Second Priority Term Loan or the Reinstated Euro Term Loan received on the Effective Date should equal the issue price of the New Second Priority Term Loan or the Reinstated Euro Term Loan as of the Effective Date.  A U.S. Holder's holding period for the New Second Priority Term Loan or the Reinstated Euro Term Loan received on the Effective Date should begin on the day following the Effective Date.

K&E 15735883.

<div align="center">(iv)  *Issue Price of a Debt Instrument*</div>

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a U.S. Holder or the property surrendered under the Plan are traded on an "established securities market" at any time during the 60-day period ending thirty (30) days after the Effective Date. In general, a debt instrument (or the stock or securities exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying non-U.S. securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) in certain situations the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).

  **2.**   **Holders of Allowed Other General Unsecured Claims**

Pursuant to the Plan, each U.S. Holder of an Allowed Other General Unsecured Claim shall receive their Pro Rata share of the Other General Unsecured Claims Distribution, as further described above. Such exchange should be treated as a taxable exchange under Section 1001 of the IRC. The U.S. Holder should recognize capital gain or loss equal to the difference between (i) the Cash received and (ii) the U.S. Holder's adjusted tax basis in its claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described above) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Other General Unsecured Claim were held for more than one year. To the extent that a portion of the Allowed Other General Unsecured Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income. See "Accrued Interest" above.

**D.**   **CONSEQUENCES TO NON-U.S. HOLDERS OF ALLOWED CLAIMS**

Any gain or interest income realized by a Non-U.S. Holder on the exchange of its claim generally will be exempt from U.S. federal income or withholding tax, provided that:

- such Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the total combined voting power of all classes of the voting stock of RDA Holding, is not a controlled foreign corporation related, directly or indirectly, to RDA Holding through stock ownership, and is not a bank receiving interest described in Section 881(c)(3)(A) of the IRC;

- the statement requirement set forth in Section 871(h) or Section 881(c) of the IRC has been fulfilled with respect to the beneficial owner, as discussed below;

- such Non-U.S. Holder is not an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; and

- such gain or interest income is not effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States.

The statement requirement referred to in the preceding paragraph will generally be fulfilled if the beneficial owner of the property or Cash received on the exchange certifies on IRS Form W-8BEN (or such successor form as the IRS designates) under penalties of perjury that it is not a U.S. person and provides its name and address. The Non-U.S. Holder must provide the form to the Debtors or their paying agent, or in the case of a note held through a securities clearing organization, bank or other financial institution holding customers' securities in the ordinary course of its trade or business, to such organization, bank or other financial institution, which must in turn provide to the Debtors or their paying agent a statement that it has received the form and furnish a copy thereof; *provided*, that a non-U.S. financial institution will fulfill this requirement by filing IRS Form W-8IMY if it has entered into an agreement with the IRS to be treated as a qualified intermediary. These forms must be periodically updated.

<div align="center">72</div>

If a Non-U.S. Holder is engaged in a trade or business in the United States, and if any gain or interest income realized on the exchange of its claim is effectively connected with the conduct of such trade or business, the Non-U.S. Holder, although exempt from the withholding tax discussed in the preceding paragraphs, will generally be subject to regular U.S. federal income tax on such gain or interest income in the same manner as if it were a U.S. Holder. In lieu of the certificate described in the preceding paragraph, such a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates), in the manner described above, in order to claim an exemption from withholding tax. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

## E.    CONSEQUENCES TO RIGHTS OFFERING PARTICIPANTS

The following discussion assumes that each U.S. Holder of an Allowed Senior Subordinated Note Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the IRC. Pursuant to the Plan, each Allowed Senior Subordinated Note Claim will be cancelled without any distribution, as further described above. Certain Holders of an Allowed Senior Subordinated Note Claim will receive Subscription Rights. Section 165(g) of the IRC permits a "worthless security deduction" for any security that is a capital asset that becomes worthless within the taxable year. Thus, depending in the case of U.S. Holders of Allowed Senior Subordinated Note Claims that receive Subscription Rights on whether the issuance of a Subscription Right is treated as a distribution of an independent piece of property and other factors, U.S. Holders of an Allowed Senior Subordinated Note Claim may be entitled to worthless security deductions. The rules governing the timing, amount and character (ordinary or capital) of worthless security deductions place considerable emphasis on the facts and circumstances of the holder, the issuer, and the instrument with respect to which the deduction is claimed; U.S. Holders are therefore urged to consult their tax advisors with respect to their ability to take such a deduction.

The tax treatment of receipt of Subscription Rights by a U.S. Holder of an Allowed Senior Subordinated Note Claim is unclear. The issuance of, and the exercise of or failure to exercise, the Subscription Rights could be treated as an independent transaction for U.S. federal income tax purposes and not as a transaction that is integrated with any of the exchanges described herein. If so treated, a U.S. Holder that exercises a Subscription Right could be treated as directly exchanging the subscription price for the New Common Stock allocable to such Subscription Right in an exchange in which such U.S. Holder recognizes no gain or loss. Such U.S. Holder would then have a tax basis in the New Common Stock received upon exercise of the Subscription Rights equal to the subscription price paid therefor. In light of the fact that the Subscription Rights are non-transferable and must be exercised, if at all, only at emergence, the Debtors intend to treat the issuance and exercise or failure to exercise the Subscription Rights as an independent transaction not integrated with the distributions under the Plan for U.S. federal income tax purposes.

If the issuance of the Subscription Rights is treated as a distribution of an independent piece of property under the Plan, whether a U.S. Holder of an Allowed Senior Subordinated Note Claim recognizes gain or loss as a result of receipt of Subscription Rights depends on whether (i) the exchange qualifies as a tax-free recapitalization (which in turn depends on whether each of the debt underlying the Allowed Senior Subordinated Note Claim (see "Treatment of a Debt Instrument as a 'Security'" above) and the Subscription Right (by reason of its being a right to acquire New Common Stock or otherwise) is treated as a "security" for the reorganization provisions of the IRC), (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Senior Subordinated Note Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Senior Subordinated Note Claim and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

If the distribution of the Subscription Rights to a U.S. Holder of an Allowed Senior Subordinated Note Claim is treated as a taxable exchange, then each such U.S. Holder will recognize gain or loss in an amount equal to the difference (positive or negative) between (i) the fair market value of the Subscription Rights received by such U.S. Holder under the Plan, and (ii) the U.S. Holder's tax basis in its Allowed Senior Subordinated Note Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described above) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Senior Subordinated Note Claim were held for more than one year. To the extent that a portion of the Allowed Senior Subordinated Note Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income (see "Accrued Interest" above).

K&E 15735883.

The aggregate tax basis of the Subscription Rights received would be the fair market value of the Subscription Rights on the date of the exchange, and the holding period for the Subscription Rights would begin on the day after the exchange. If a U.S. Holder of an Allowed Senior Subordinated Note Claim allows a Subscription Right received under the Plan to expire, it should recognize capital loss equal to its basis (if any) in such expiring Subscription Rights.

If both a Subscription Right and the debt underlying the Allowed Senior Subordinated Note Claim are treated as a "security" for U.S. federal income tax purposes, the receipt of such Subscription Right should qualify as a recapitalization, and therefore a reorganization, under the IRC. If the exchange qualifies as a reorganization, the U.S. Holder of a surrendered Allowed Senior Subordinated Note Claim will recognize gain, but not loss, on the exchange. Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed above, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of "other property" (i.e., property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) treated as received in the exchange, and (b) ordinary interest income to the extent that the Subscription Right is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Senior Subordinated Note Claim (see "Accrued Interest" discussion above).

In such case, a U.S. Holder's tax basis in its Subscription Right should be equal to the tax basis of the obligation constituting the Allowed Senior Subordinated Note Claim treated as surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" treated as received in the exchange), and a U.S. Holder's holding period for its Subscription Right should include the holding period for the obligation constituting the surrendered Allowed Senior Subordinated Note Claim; provided, however, to the extent that the Subscription Right is treated as received in satisfaction of accrued but untaxed interest the tax basis of such Subscription Right should equal the amount of such accrued but untaxed interest, and the holding period for such Subscription Right should not include the holding period of the debt instrument constituting the surrendered Allowed Senior Subordinated Note Claim.

## F.    WITHHOLDING AND REPORTING

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a claim. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. Additionally, backup withholding of taxes, currently at a rate of 28%, will apply to such payments if a U.S. Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

K&E 15735883.

# IX.
## GLOSSARY OF DEFINED TERMS

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with the terms of such document or exhibit and subject to the Restructuring Support Agreement; (d) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof" and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (f) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

1.      "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, Allowed success fees and Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and Allowed under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Cases, or that are awardable and allowable under section 503(b)(3)(F) of the Bankruptcy Code for the Creditors' Committee, that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses or Creditors' Committee Member's expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

2.      "*Adequate Protection Claims*" shall have the meaning ascribed to "Section 507(b) Claims" as defined in paragraph 13(b) of the Final DIP Order.

3.      "*Administrative Claim*" means a Claim (other than the Adequate Protection Claims and DIP Facility Claims) that has been timely filed, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Accrued Professional Compensation (to the extent Allowed by the Bankruptcy Court); and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911 1930. Administrative Claims do not include DIP Facility Claims, which are separately treated under the Plan.

4.      "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

5.      "*Allowed*" means, with respect to Claims: (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date or which, pursuant to the Bankruptcy Code or a Final Order is not required to be filed; (b) any Claim that is listed in the Schedules as of the Effective Date as neither contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan; *provided*, *however,* that with respect to any Claim described in clause (a) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within

the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

6.    "*Amended and Restated Bylaws*" means the bylaws of Reorganized Holdings, substantially in the form included in the Plan Supplement.

7.    "*Amended and Restated Certificate of Incorporation*" means the certificates of incorporation of the Reorganized Debtors, substantially in the form included in the Plan Supplement.

8.    "*Avoidance Actions*" means any and all claims and causes of action which any of the Debtors, the debtors in possession, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.    "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

10.    "*Bankruptcy Code*" means Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

11.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

12.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

13.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

14.    "*Case Management Order*" means that certain Order Establishing Certain Notice, Case Management and Administrative Procedures, entered by the Bankruptcy Court on September 17, 2009 [Docket No. 92], as may be amended from time to time.

15.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

16.    "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date.

17.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

18.    "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

K&E 15735883.

19.     "*Claims Bar Date*" means, as applicable, (a) 5:00 p.m. prevailing Pacific Time on November 16, 2009, (b) the Governmental Bar Date or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims, pursuant to the Claims Bar Date Order.

20.     "*Claims Bar Date Order*" means that certain Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving Procedures for Filing Proofs of Claim and (III) Approving Notice Thereof, entered by the Bankruptcy Court on October 7, 2009 [Docket No. 154], as may be amended from time to time.

21.     "*Claims Objection Bar Date*" means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims, as the same may be modified or extended from time to time by the Bankruptcy Court or on motion of a party in interest approved by the Bankruptcy Court.

22.     "*Claims Register*" means the official register of Claims maintained by the Noticing and Claims Agent.

23.     "*Class*" means a category of Holders of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

24.     "*Commencement Date*" means August 24, 2009, the date on which the Debtors commenced the Chapter 11 Cases.

25.     "*Commission*" means the United States Securities and Exchange Commission.

26.     "*Compensation and Benefits Programs*" means all employment and severance policies, and all compensation and benefit plans, policies and programs and other arrangements (and all amendments and modifications thereto), in each case in place as of the Effective Date, applicable to the Debtors' employees, former employees, retirees and non-employee directors and employees, former employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans (other than the Non-Qualified Retirement Plans), health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans.

27.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article VIII.A of the Plan having been:  (a) satisfied; or (b) waived pursuant to Article VIII.B of the Plan.

28.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

29.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

30.     "*Confirmation Order*" means the order, in form and in substance reasonably satisfactory to the Debtors, the Prepetition Agent and the Required Consenting Lenders, of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

31.     "*Consenting Lenders*" means those Prepetition Lenders party to the Restructuring Support Agreement.

32.     "*Consenting Shareholders*" means those Holders of Equity Interests party to the Restructuring Support Agreement.

33.     "*Consummation*" means the occurrence of the Effective Date.

34.     "*Contract/Lease Schedule Date*" means the latest date by which the Debtors shall file their list of Executory Contracts and Unexpired Leases to be rejected pursuant to the Plan, which date shall be no fewer than twenty (20) days prior to the Confirmation Hearing.

K&E 15735883.

35. "*Creditors' Committee*" means the official committee of unsecured creditors of the Debtors appointed by the Office of the United States Trustee for the Southern District of New York in the Chapter 11 Cases on August 31, 2009, pursuant to section 1102 of the Bankruptcy Code, comprising the Creditors' Committee Members, as may be reconstituted from time to time.

36. "*Creditors' Committee Members*" means the members of the Creditors' Committee, as may be reconstituted from time to time, namely:  (a) The Bank of New York Mellon; (b) Wilfrid Aubrey LLC; (c) Thomas M. Kenney; (d) RR Donnelley & Sons Company; (e) Madison Paper Company (ALSIP Location); (f) Williams Lea, Inc.; (g) New Page Corporation; (h) Michael John Bohane; (i) Peter Davenport; (j) Ross Jones; and (k) HCL Technologies, Ltd.

37. "*Cure*" means the payment of Cash by the applicable Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the Executory Contract or Unexpired Lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under sections 365 and 1123 of the Bankruptcy Code.

38. "*Debtor*" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

39. "*Debtors in Possession*" means, collectively, the Debtors, as debtors in possession in these Chapter 11 Cases.

40. "*DIP Agent*" means JPMorgan Chase Bank, N.A., in its capacity as syndication agent, administrative agent and collateral agent pursuant to the DIP Facility.

41. "*DIP Facility*" means that certain $150 million Credit and Guarantee Agreement, dated as of August 26, 2009, among The Reader's Digest Association, Inc., as borrower, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc., as guarantors, the DIP Agent, J.P. Morgan Securities Inc., as sole lead arranger and sole bookrunner, General Electric Capital Corporation, as senior managing agent, and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced.

42. "*DIP Facility Claim*" means any Claim arising under or related to the DIP Facility.

43. "*DIP Lenders*" means the DIP Agent and the banks, financial institutions and other lenders party to the DIP Facility from time to time.

44. "*Disclosure Statement*" means this *Disclosure Statement for the Proposed Joint Plan of Reorganization of  The Reader's Digest Association, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, the Solicitation Procedures Order and any other applicable law, and which is reasonably satisfactory to the Prepetition Agent and the Required Consenting Lenders in all material respects.

45. "*Disputed Claim*" means, with respect to any Claim, any Claim that is not yet Allowed.

46. "*Distribution Agent*" means any Entity or Entities chosen by the Debtors, which Entities may include, without limitation, the Noticing and Claims Agent, to make or to facilitate distributions required by the Plan.

47. "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

48. "*D&O Liability Insurance Policies*" means all insurance policies for directors and officers' liability maintained by the Debtors as of the Commencement Date.

K&E 15735883.

49.    "*DTC*" means Depository Trust Company.

50.    "*Effective Date*" means the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIIIA of the Plan have been: (i) satisfied; or (ii) waived pursuant to Article VIII.B of the Plan.

51.    "*Eligible Noteholder*" means any Holder of Senior Subordinated Notes that is an "Accredited Investor" within the meaning defined in Rule 501 of Regulation D promulgated under the Securities Act or a "Qualified Institutional Buyer" within the meaning defined in Rule 144A promulgated under the Securities Act.

52.    "*Enterprise Value Maximization Plan*" means that certain post-Effective Date director and officer compensation program to be approved and implemented by the New Board as set forth in Article IV of the Plan, substantially in the form set forth in the Plan Supplement.

53.    "*Entity*" has the meaning set forth at section 101(15) of the Bankruptcy Code.

54.    "*Equity Interest*" means any issued or unissued share of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date; *provided, however,* that Equity Interest does not include any Intercompany Interest.

55.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

56.    "*Exculpated Parties*" means, collectively, the Reorganized Debtors and the Released Parties.

57.    "*Exculpation*" means the exculpation provision set forth in Article IX.G of the Plan.

58.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

59.    "*Exit Credit Agreement*" means an agreement substantially in the form set forth in the Plan Supplement on account of (a)(i) the New First Priority Term Loan or (ii) an alternative exit-financing facility provided that the DIP Facility is paid in full in Cash on the Effective Date and (b) the Reinstated Euro Term Loan.

60.    "*Final DIP Order*" means that certain Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral and (III) Granting Adequate Protection to Prepetition Secured Lenders, entered by the Bankruptcy Court on October 7, 2009 [Docket No. 152], as may be amended from time to time in accordance with the terms thereof and the DIP Facility.

61.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

62.    "*GAAP*" means generally accepted accounting principles.

63.    "*Governmental Bar Date*" means 5:00 p.m. prevailing Pacific Time on February 20, 2010, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

K&E 15735883.

64.      "*Holder*" means an Entity holding a Claim against or an Interest in any of the Debtors.

65.      "*Impaired*" means any impaired Claim or Interest in an Impaired Class within the meaning of section 1124 of the Bankruptcy Code.

66.      "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

67.      "*Indemnification Obligation*" means a Debtor's obligation under an Executory Contract assumed in the Chapter 11 Cases or otherwise to indemnify directors, officers, employees or agents of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacitates, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificate of incorporations, certificates of formation, bylaws, similar corporate documents and applicable law, as in effect as of the Effective Date.

68.      "*Indenture Trustee*" means The Bank of New York Mellon as indenture trustee with respect to the Senior Subordinated Notes.

69.      "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than  thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

70.      "*Intercompany Claim*" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor.

71.      "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor.

72.      "*Interest*" means, collectively, Equity Interests and Intercompany Interests.

73.      "*Interim Compensation Order*" means that certain Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, entered by the Bankruptcy Court on September 17, 2009 [Docket No. 90], as may be amended from time to time, including by an order entered by the Bankruptcy Court approving the retention of a specific Retained Professional.

74.      "*Letters of Credit*" means the letters of credit referenced in paragraph 13(c) of the Final DIP Order.

75.      "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of New York, as applicable to all cases in the Southern District of New York governed by the Bankruptcy Code.

76.      "*Management Equity Plan*" means that certain post-Effective Date director and officer compensation program to be approved and implemented by the New Board as set forth in Article IV of the Plan, substantially in the form set forth in the Plan Supplement.  Equity awards in the form of restricted stock, options or warrants for 7.5% of the New Common Stock to be issued under the Plan will be allocated to the  Management Equity Plan (on a fully-diluted basis); *provided* that such equity grant shall not include more than 2.5% in the form of restricted New Common Stock.

77.      "*New Board*" means the initial board of directors of Reorganized Holdings and Reorganized RDA, which shall initially be mirror boards.

78.      "*New Common Stock*" means the common equity in Reorganized Holdings to be authorized, issued or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect common equity of Reorganized Holdings.

79.      "*New First Priority Term Loan*" means the first priority term loan facility to be converted from the DIP Facility in an amount equal to the aggregate amount, up to a maximum amount of $150 million, of loans outstanding under the DIP Facility on the date of conversion, to be issued on the Effective Date pursuant to the Exit Credit Agreement on terms consistent with those set forth on Annex 1 to the Restructuring Term Sheet.

K&E 15735883.

80.    "*New Second Priority Term Loan*" means that certain $300 million second priority term loan facility having a maturity not earlier than the latest to occur of the maturity of the New First Priority Term Loan and the maturity of the Reinstated Euro Term Loan, to be issued on the Effective Date pursuant to the New Second Priority Term Loan Agreement on terms consistent with those set forth on Annex 1 to the Restructuring Term Sheet.

81.    "*New Second Priority Term Loan Agreement*" means that certain $300 million second lien term loan agreement among The Reader's Digest Association, Inc., as borrower, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc., as guarantors, and the Holders of Prepetition Credit Agreement Claims, substantially in the form of the agreement set forth in the Plan Supplement.

82.    "*Non-Qualified Retirement Plans*" means, collectively, the Debtors' unfunded, non-qualified retirement plans or deferred compensation arrangements, including, but not limited to, the plans or arrangements known as:  (a) the Excess Benefit Retirement Plan; (b) the Executive Retirement Plan; (c) the Executive Cash Balance Plan; (d) the 1988 Supplemental Employee Retirement Plan and related agreements; (e) the Director and Roving Editors Plan and/or related agreements or arrangements; and (f) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor.

83.    "*Noticing and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice, claims and balloting agent for the Debtors, pursuant to that certain Order Authorizing and Approving the Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent, entered by the Bankruptcy Court on August 28, 2009 [Docket No. 44], as may be amended from time to time.

84.    "*Other General Unsecured Claim*" means any unsecured Claim, other than Unsecured Ongoing Operations Claims and Senior Subordinated Note Claims, against one or more of the Debtors including, but not limited to (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which a Debtor is a party, (b) claims arising from the rejection or termination of the Debtors' Non-Qualified Retirement Plans and (b) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto.

85.    "*Other General Unsecured Claims Distribution*" means $3 million.

86.    "*Ordinary Course Professionals Order*" means that certain Order Authorizing the Debtors' Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business Nunc Pro Tunc to the Commencement Date, entered by the Bankruptcy Court on September 17, 2009 [Docket No. 89], as may be amended from time to time.

87.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or Claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

88.    "*Other Secured Claim*" means any secured Claim against the Debtors not specifically described in the Plan, *provided*, *however*, that Other Secured Claims shall not include DIP Facility Claims and Prepetition Credit Agreement Claims.

89.    "*Pension Plan*" means The Reader's Digest Association, Inc. Retirement Plan, which is a defined benefit pension plan.

90.    "*Periodic Distribution Date*" means the first day of the month immediately following the month in which a Claim becomes Allowed, when distributions shall be made to Holders of any such then-Allowed Claims.

91.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

92.    "*Plan*" means the *Proposed Joint Plan of Reorganization of The Reader's Digest Associations, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* dated October 9, 2009, as may have been and may further be amended, supplemented or modified from time to time in accordance with its terms, including,

without limitation, by the Plan Supplement, which is incorporated in the Plan by reference, subject to the terms of the Restructuring Support Agreement.

93.    "*Plan Equity Value*" means between $475 million and $625 million.

94.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to be filed on the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, comprising, without limitation, the following documents: (a) the form of the Exit Credit Agreement; (b) the form of the New Second Priority Term Loan Agreement; (c) the list of the Compensation and Benefit Programs to be rejected and/or assumed; (d) the Registration Rights Agreement (e) the Shareholders Agreement; (f) the Amended and Restated Certificate of Incorporation; (g) the Amended and Restated Bylaws; and (h) the forms of the Enterprise Value Maximization Plan and the Variable Compensation Plan.

95.    "*Plan Supplement Filing Date*" means the date that is five (5) days prior to the Voting Deadline.

96.    "*Prepetition Agent*" means JP Morgan Chase Bank, N.A., in its capacity as administrative and collateral agent pursuant to the Prepetition Credit Agreement.

97.    "*Prepetition Credit Agreement*" means that certain Credit Agreement dated as of March 2, 2007, among The Reader's Digest Association, Inc., certain of its subsidiaries, the Prepetition Agent and the Prepetition Lenders party thereto, as amended, supplemented or otherwise modified.

98.    "*Prepetition Credit Agreement Claims*" means all claims arising under or in connection with the Prepetition Credit Agreement and/or the Prepetition Loan Documents, including, without limitation, all Adequate Protection Claims.

99.    "*Prepetition Lenders*" means those lenders party to the Prepetition Credit Agreement from time to time and their affiliates holding Swap Claims.

100.    "*Prepetition Loan Documents*" means each of the documents, agreements and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Prepetition Credit Agreement.

101.    "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

102.    "*Proof of Claim*" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

103.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

104.    "*Record Date*" means 5:00 p.m. prevailing Eastern Time on [November 5], 2009.

105.    "*Registration Rights Agreement*" means a registration rights agreement substantially in the form set forth in the Plan Supplement obligating the Reorganized Debtors to register for resale certain shares of New Common Stock under the Securities Act in accordance with the terms set forth in such agreement, which shall be in form and substance satisfactory to the Required Consenting Lenders in all material respects.

106.    "*Reinstated Euro Term Loan*" means that certain Euro denominated term loan facility incurred pursuant to the terms of the Prepetition Credit Agreement as amended as of the Commencement Date and as such term loan will be further amended and restated on the terms set forth in, and forming part of, the Exit Credit Agreement and subject to the Restructuring Support Agreement.

107.    "*Released Parties*" means, collectively, (a) the Debtors and the Debtors' current and former officers and directors, (b) the Prepetition Agent and the Prepetition Lenders, (c) the DIP Agent and the DIP Lenders,

(d) the Creditors' Committee and the Creditors' Committee Members, (e) the Consenting Shareholders and (f) with respect to each of the Persons named in (a) — (e) above, such Entity's directors, officers, shareholders, partners, members, employees, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, accountants, and other professionals or representatives when acting in any such capacities and (g) with respect to each of the Entities named in (a) — (f) above, each in their respective capacities set forth in such clause.

108.    "*Releasing Parties*" means, collectively, (a) the Prepetition Agent and the Prepetition Lenders, (b) the DIP Agent and the DIP Lenders, (c) the Consenting Shareholders and (d) each Holder of a Claim or Equity Interest that affirmatively votes in favor of this Plan.

109.    "*Reorganized Debtors*" means the Debtors, in each case, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

110.    "*Reorganized Holdings*" means RDA Holding, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

111.    "*Reorganized RDA*" means The Reader's Digest Association, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

112.    "*Required Consenting Lenders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

113.    "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of August 17, 2009, among the Debtors, the Consenting Lenders and the Consenting Shareholders, as amended, supplemented or otherwise modified from time to time subject to the terms thereof.

114.    "*Restructuring Term Sheet*" means the term sheet annexed as <u>Exhibit A</u> to the Restructuring Support Agreement.

115.    "*Retained Professional*" means any Entity: (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

116.    "*Rights Offering*" means that certain rights offering by Reorganized Holdings pursuant to which Eligible Noteholders shall have the right to purchase up to $50 million of New Common Stock at Plan Equity Value, which shall represent approximately 8% of the New Common Stock (subject to dilution by the Management Equity Plan).

117.    "*Schedules*" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the Debtors on September 24, 2009, pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

118.    "*Section 510(b) Claim*" means any Claim against the Debtors arising from the rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

119.    "*Securities Act*" means the United States Securities Act of 1933, as amended.

120.    "*Senior Subordinated Note Claim*" means any Claim derived from or based upon the Senior Subordinated Notes Indenture.

121.    "*Senior Subordinated Notes*" means the 9% Senior Subordinated Notes due 2017, issued by The Reader's Digest Association, Inc. and guaranteed by RDA Holding Co. and each direct and indirect, existing and

K&E 15735883.

future domestic subsidiary of The Reader's Digest Association, Inc. pursuant to the Senior Subordinated Notes Indenture.

122.    "*Senior Subordinated Notes Indenture*" means that certain Indenture, dated as of March 2, 2007, among The Reader's Digest Association, Inc., as issuer, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc. as guarantors, and the Indenture Trustee.

123.    "*Shareholders Agreement*" means the stockholders' agreement with respect to the New Common Stock as set forth in the Plan Supplement, which shall be in material form and substance satisfactory to the Required Consenting Lenders and shall include an option for Holders to hold limited voting securities.

124.    "*Solicitation Procedures Order*" means that certain Order Approving the Debtors' Disclosure Statement and Relief Related Thereto, entered by the Bankruptcy Court on [November 5], 2009, as may be amended from time to time, and which shall be in form and substance satisfactory to the Prepetition Agent and the Required Consenting Lenders.

125.    "*Subscription Procedures*" means those procedures set forth on **Exhibit G** hereto.

126.    "*Swap Claims*" means those secured Claims arising from hedging arrangements under, or in connection with, the Prepetition Credit Agreement with certain of the Prepetition Lenders or their Affiliates.

127.    "*Tort Claim*" means any Claim that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to protection of human health, safety or the environment.

128.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

129.    "*Unimpaired*" means any unimpaired Claim or Interest in an Unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

130.    "*Unimpaired Class*" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

131.    "*Unsecured Ongoing Operations Claims*" means all general unsecured Claims directly relating to and arising solely from the receipt of goods and services by the Debtors arising with and held by Persons with whom the Debtors are conducting, and will continue to conduct, business as of the Effective Date; *provided*, *however*, that Unsecured Ongoing Operations Claims shall not include Administrative Claims.

132.    "*Variable Compensation Plan*" means that certain post-Effective Date director and officer variable compensation plan to be approved and implemented by the New Board as set forth in Article IV of the Plan, substantially in the form set forth in the Plan Supplement.

133.    "*Voting Classes*" means, collectively, Classes 3, 4 and 5.

134.    "*Voting Deadline*" means 4:00 p.m. prevailing Pacific Time on [December 7], 2009.

K&E 15735883.

# X.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

/s Thomas A. Williams

The Reader's Digest Association, Inc.
(for itself and on behalf of each of the Debtors)

By:        Thomas A. Williams

Title:      Senior Vice President and
            Chief Financial Officer

Dated:    November 2, 2009

Prepared by:

**KIRKLAND & ELLIS LLP**
James H. M. Sprayregen, P.C.
Paul M. Basta
Nicole L. Greenblatt
601 Lexington Avenue
New York, New York 10022–4611
Telephone:        (212) 446–4800
Facsimile:         (212) 446–4900

Counsel for the Debtors and Debtors in Possession

K&E 15735883.

**<u>Exhibit 2</u>**

**Disclosure Statement Redline**

KIRKLAND & ELLIS LLP
James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446–4800
Facsimile: (212) 446–4900
Counsel for the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) | Case No. 09-23529 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

**DISCLOSURE STATEMENT FOR THE**
**FIRST AMENDED PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**THE READER'S DIGEST ASSOCIATION, INC. AND ITS DEBTOR AFFILIATES[1]**

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

Dated:  ~~October 9,~~**November 2,** 2009

---

[1]    The Debtors in these chapter 11 cases who are the proponents of the Plan, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is: 1 Reader's Digest Road, Pleasantville, NY 10570. A schedule of the Debtors, including their jurisdiction of incorporation or formation and their Chapter 11 Case numbers, is attached hereto as **Exhibit B**.

| IMPORTANT INFORMATION FOR YOU TO READ |
| --- |

**THE DEADLINE TO VOTE ON THE PLAN IS [ ~~DECEMBER~~ [7] 2009, AT [ ~~]4:00 P.M.~~
~~EASTERN~~PACIFIC TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE
NOTIC~~E~~ING AND CLAIMS AGENT ~~ON OR~~ BEFORE THE VOTING DEADLINE AS DESCRIBED
HEREIN.**

The Debtors are providing the information in this Disclosure Statement for the Proposed Joint
Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates to
Holders of Claims entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. **Nothing
in this Disclosure Statement may be relied upon or used by any entity for any other purpose.**

This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax or
business advice. The Debtors urge any Holder of a Claim or Equity Interest to consult with its own advisors
with respect to any such legal, financial, securities, tax or business advice in reviewing this Disclosure
Statement, the Plan and each of the proposed transactions contemplated thereby. The Bankruptcy Court's
approval of the adequacy of disclosure contained in this Disclosure Statement does not constitute the
Bankruptcy Court's approval of the merits of the Plan. The Debtors have not authorized any entity to give
any information about or concerning the plan other than that which is contained in this Disclosure Statement.
The Debtors have not authorized any representations concerning the Debtors or the value of their property
other than as set forth in this Disclosure Statement.

The Debtors urge every Holder of a Claim entitled to vote on the Plan to (1) read the entire
Disclosure Statement and Plan carefully, (2) consider all of the information in this Disclosure Statement,
including, importantly, the risk factors described in Section VII of this Disclosure Statement and (3) consult
with your own advisors with respect to reviewing this Disclosure Statement, the Plan, all documents attached
hereto or filed in connection herewith and the proposed transactions contemplated under the Plan **prior** to
deciding whether to vote to accept or reject the Plan.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the
Debtors' Chapter 11 Cases and certain documents related to the Plan. Although the Debtors believe that
these summaries and Plan are fair and accurate, the same are all qualified in their entirety. In the event of any
inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions
of the Plan or other documents referenced herein, the Plan or such other documents will govern for all
purposes. Except where otherwise specifically noted, factual information contained in this Disclosure
Statement has been provided by the Debtors' management. The Debtors do not represent or warrant that the
information contained herein or attached hereto is without any material inaccuracy or omission.

Although the Debtors have used their reasonable business judgment to ensure the accuracy of the
financial information contained in, or incorporated by reference into, this Disclosure Statement, such
financial information has not been audited. The Debtors are generally making the statements and providing
the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless
otherwise specifically noted. Although the Debtors may subsequently update the information in this
Disclosure Statement, the Debtors have no affirmative duty to do so, and parties reviewing this Disclosure
Statement should not infer that, at the time of their review, the facts set forth herein have not changed since
this Disclosure Statement was filed.

This Disclosure Statement or the Plan does not constitute and may not be construed as an admission
of fact, liability, stipulation or waiver. Rather, Holders of Claims and other parties in interest should
construe this Disclosure Statement as a statement made in settlement negotiations related to contested
matters, adversary proceedings and other pending or threatened litigation or actions. No reliance should be
placed on the fact that a particular litigation Claim or projected objection to a particular Claim is, or is not,
identified in this Disclosure Statement. The Debtors or the reorganized Debtors may seek to investigate, file

and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

---

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

---

Neither this Disclosure Statement nor the Plan have been filed with the United States Securities And Exchange Commission (the "*SEC*") or any state authority.  The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan.  Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws.  The securities to be issued on or after the effective date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "*Securities Act*") or any securities regulatory authority of any state under any state securities law ("*Blue Sky Law*").  The Debtors are relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt the issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and blue sky law.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Any analyses, estimates or recovery projections may or may not turn out to be accurate.

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative.  The Debtors recommend that potential recipients of any securities issued pursuant to the Plan, including as part of the Rights Offering, consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

---

**QUESTIONS AND ADDITIONAL INFORMATION**

---

If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact Kurtzman Carson Consultants LLC by (i) calling (866) 967–0491, (ii) emailing kcc_rda@kccllc.com or (iii) visiting http://www.kccllc.net/readers.

## TABLE OF CONTENTS

**Page**

I.   EXECUTIVE SUMMARY ...................................................................................... 1~~1~~

    A.   General Structure of the Plan .................................................................................. ~~i~~1

    B.   Treatment of Claims and Interests Under the Plan ................................................. ~~iv~~5

    C.   Voting On the Plan .................................................................................................. ~~vii~~7

    D.   Additional Plan-Related Documents ....................................................................... ~~viii~~8

    E.   Confirmation and Consummation of the Plan ......................................................... ~~ix~~9

II.  BACKGROUND TO THESE CHAPTER 11 CASES ...................................................... 1~~1~~11

    A.   Corporate History and Current Structure ............................................................... ~~1~~11

    B.   Current Businesses and Operations ......................................................................... ~~2~~12

    C.   Prepetition Funded Indebtedness ............................................................................ ~~7~~17

    D.   Events Leading up to the Chapter 11 Filing ........................................................... ~~8~~18

III. CHAPTER 11 CASES .......................................................................................... ~~11~~21

    A.   First Day Motions and Related Relief ..................................................................... ~~11~~21

    B.   Other Material Events in These Chapter 11 Cases .................................................. ~~12~~22

    C.   Committee Appointment and Participation .............................................................. ~~13~~23

IV.  SUMMARY OF THE PLAN .................................................................................. ~~14~~24

    A.   General Basis for the Plan ....................................................................................... ~~14~~24

    B.   Treatment of Unclassified Claims ........................................................................... ~~14~~24

    C.   Classification and Treatment of Claims and Interests ............................................. ~~16~~26

    D.   Certain Means for Implementation of the Plan ....................................................... ~~19~~31

    E.   Post-Emergence Capital Structure ........................................................................... ~~21~~32

    F.   Post-Effective Date Corporate Existence ................................................................ ~~24~~35

    G.   Compensation, Pension and Benefit ~~p~~Plans and Related Matters ....................... ~~25~~36

    H.   Rights Offering and Subscription Process ............................................................... ~~27~~39

    I.   Preservation of Certain Rights of Action ................................................................ ~~28~~40

    J.   Treatment of Contracts and Leases ......................................................................... ~~29~~42

    K.   Distributions on Account of Allowed Claims ......................................................... ~~32~~45

    L.   Resolution of Contingent, Unliquidated or Disputed Claims .................................. ~~34~~47

    M.   Settlement, Release, Injunction and Related Provisions ......................................... ~~35~~48

    N.   Modifying, Revoking or Withdrawing the Plan ...................................................... ~~38~~51

K&E ~~15673799~~15735883.

V.      VALUATION AND FINANCIAL PROJECTIONS ........................................................ ~~39~~52

        A.   Valuation of the Reorganized Debtors ............................................................ ~~39~~52

        B.   Financial Projections ...................................................................................... ~~40~~53

VI.     CONFIRMATION AND CONSUMMATION OF THE PLAN ....................................... ~~42~~55

        A.   Statutory Requirements for Confirmation of the Plan .................................... ~~42~~55

        B.   Conditions for Consummation of the Plan ...................................................... ~~45~~58

        C.   Alternatives to Confirmation and Consummation of the Plan ......................... ~~46~~59

VII.    PLAN-RELATED RISK FACTORS ............................................................................ ~~47~~60

        A.   Risks Relating to Confirmation of the Plan .................................................... ~~47~~60

        B.   Risks Relating to Recoveries Under the Plan .................................................. ~~47~~60

        C.   Risks Relating to the Debtors' Businesses ...................................................... ~~48~~62

        D.   Disclosure Statement Disclaimer .................................................................... ~~50~~63

VIII.   CERTAIN U.S. FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN ......................... ~~52~~65

        A.   Brief Overview and Disclosure ....................................................................... ~~52~~65

        B.   Consequences to the Debtors .......................................................................... ~~53~~66

        C.   Consequences to U.S. Holders of Allowed Claims ......................................... ~~55~~68

        D.   Consequences to Non-U.S. Holders of Allowed Claims .................................. ~~59~~72

        E.   Consequences to Rights Offering Participants ................................................ ~~60~~73

        F.   Withholding and Reporting ............................................................................. ~~61~~74

IX.     GLOSSARY OF DEFINED TERMS ........................................................................... ~~62~~75

X.      RECOMMENDATION .............................................................................................. ~~72~~85

K&E ~~15673799~~ 15735883.

## EXHIBITS

EXHIBIT A        Plan of Reorganization

EXHIBIT B        Corporate Structure Chart/Schedule of the Debtors

EXHIBIT C        Solicitation ~~and Voting~~ Procedures **Order** [*To Come*]

EXHIBIT D        Reorganized Debtors' Financial Projections

EXHIBIT E        Liquidation Analysis

EXHIBIT F        Restructuring Support Agreement (together with the Restructuring Term Sheet)

EXHIBIT G        Subscription Procedures  [*To Come*]

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO
THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

---

K&E ~~15673799~~ 15735883.

# I.
# EXECUTIVE SUMMARY

The Reader's Digest Association, Inc.,[2] a Delaware corporation with its primary headquarters in Pleasantville, New York, and its affiliates identified on the title page above, as debtors and debtors in possession (collectively, the "***Debtors***"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York on August 24, 2009 (the "***Commencement Date***").  The Debtors' Chapter 11 Cases are jointly administered under lead case number 09-23529 (RDD).

Prior to soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization.

Accordingly, the Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for use in the solicitation of votes to accept the *Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates* (the "***Plan***"), dated October 9, 2009, which the Debtors filed with the Bankruptcy Court concurrently herewith.  A copy of the Plan is also attached hereto as **Exhibit A**.  A hearing to consider Confirmation of the Plan is scheduled to be held in front of the Honorable Robert D. Drain on [——December [17], 2009**2009,** at the Bankruptcy Court**, White Plains Division, 300 Quarropas Street, White Plains, NY 10601(more details are set forth in Section I.E herein, entitled "Confirmation and Consummation of the Plan")**.

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtors as filed with the Bankruptcy Court on October 9, 2009.  Certain provisions of the Plan (and the descriptions and summaries contained herein), remain the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon and may be modified.

In addition, this Disclosure Statement includes information about, without limitation, (i) the procedures by which the Debtors intend to solicit and tabulate votes on the Plan, (ii) the Plan Confirmation process, (iii) a description of the Debtors' businesses, prepetition operations, financial history and the events leading up to the commencement of these Chapter 11 Cases, (iv) the significant events that occurred thus far in these Chapter 11 Cases, (v) certain risk factors to be considered before voting on the Plan and (vi) discussions relating to securities registration and certain tax consequences of the Plan.

*As such, this Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan, and is qualified in its entirety by reference to, and should be read in conjunction with, the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan.*

## A.    GENERAL STRUCTURE OF THE PLAN

### 1.    Purpose and Effect of the Plan

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors.  The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.

---

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in Section IX herein, titled "Glossary of Defined Terms."  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the "Glossary of Defined Terms" are inconsistent, the definition included in the Glossary of Defined Terms shall control.

As discussed in greater detail in Section I.D herein, entitled "~~Effect of~~ Confirmation and Consummation of the Plan," a bankruptcy court's confirmation of a plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor and any other entities and persons as may be ordered by the bankruptcy court to the terms of the confirmed plan, whether or not such creditor or equity security holder is impaired under or has voted to accept the plan or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising prior to the Plan's Effective Date, substitute the obligations set forth in the Confirmed Plan therefor and terminate all of the rights and interests of equity security holders.  Under the Plan, Claims and Interests are divided into Classes according to their relative seniority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' estates.  Instead, the Plan, although proposed jointly, constitutes a separate Plan for each of the 48 Debtors in these Chapter 11 Cases. ~~A schedule of the Debtors, including their jurisdiction of incorporation or formation and their chapter 11 case numbers, is set forth on Exhibit B hereto.~~ [3]  **Holders of Allowed Claims against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims in the applicable Class, and will be entitled to their share of assets available for distribution to such Class.**

The terms of the Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan and pay certain of their continuing obligations in the ordinary course of the Reorganized Debtors' businesses.

The feasibility of the Plan is premised upon managements' ability to continue the implementation of its strategic business plan (the "**Business Plan**").  The Business Plan and accompanying financial projections are set forth on **Exhibit D**.  Although the Debtors believe the Business Plan and projections are reasonable and appropriate, they include a number of assumptions that may differ from actual results and are subject to a number of risk factors. Importantly, the Business Plan and projections incorporate the Debtors' forecasts of the anticipated operating performance of the Company's foreign subsidiaries worldwide that are not subject to these Chapter 11 Cases.

2.    **Financial Restructurings Under the Plan**

As of the Commencement Date, the Debtors had outstanding debt in the aggregate principal amount of approximately $2,271,200,000, consisting primarily of approximately (a) $1,645,000,000 under their senior secured credit facility (including swap termination obligations and accrued and unpaid interest), (b) $628,200,000 in unsecured senior subordinated notes (including accrued interest); and (c) $2,800,000 in foreign lines of credit and a promissory note.  Additionally, **based on invoices in their accounts payable systems and estimated accruals,** the Debtors estimate that an aggregate of approximately $[~~115~~] million was owing and outstanding to ~~their~~**the Debtors'** trade creditors**, including vendors, supplies, service providers and contract counterparties,** as of the Commencement Date.

The Reorganized Debtors will emerge with approximately 75% less funded debt**,** after giving effect to the restructuring transactions contemplated by the Plan, which include the following:

- $150 million of loans outstanding under the Debtors' DIP Facility will be converted to the New First Priority Term Loan (or otherwise paid in full in Cash on the Effective Date) to be issued to the DIP Lenders on the Effective Date pursuant to, and subject to the terms of, the Exit Credit Agreement;

- the Debtors' prepetition Euro Term Loan in the approximate amount of $105.9 million outstanding under the Prepetition Credit Agreement as of the Commencement Date will be reinstated as amended on the terms set forth in the Exit Credit Agreement;

---

[3]    **A schedule of the Debtors, including their jurisdiction of incorporation or formation and their chapter 11 case numbers, is set forth on Exhibit B hereto.**

- $300 million of secured indebtedness under the Prepetition Credit Agreement (other than the Euro Term Loan) will be converted into the New Second Priority Term Loan issued to the Prepetition Lenders on the Effective Date pursuant to the New Second Priority Term Loan Agreement;

- the remaining secured indebtedness outstanding under the Prepetition Credit Agreement and any Adequate Protection Obligations that are not restructured under the New Second Priority Term Loan or part of the Reinstated Euro Term Loan will be converted into 100% of the New Common Stock (subject to dilution by the Management Equity Plan and the Rights Offering) and distributed Pro Rata to the Prepetition Lenders on account of the obligations owed to them under the Prepetition Credit Agreement (other than the Euro Term Loan) and on account of the Adequate Protection Obligations;

- the Debtors' outstanding $600 million Senior Subordinated Notes will be canceled and discharged;

- the General Unsecured Claims of trade creditors with whom the Debtors intend to conduct business post emergence will be paid in full in Cash on the Effective Date or in the ordinary course of business;

- Holders of Other General Unsecured Claims will receive Cash in an amount equal to their Pro Rata share of $3 million; and

- Equity Interests in RDA Holding Co. will be extinguished.

The consummation of the financial restructurings contemplated by the Plan will significantly de-lever the Debtors' capital structure, leaving the Reorganized Debtors with approximately $555 million in funded debt. With a sustainable capital structure aligned with the Debtors' revised Business Plan, the Reorganized Debtors will be better positioned to compete more effectively in the competitive media and marketing industries**. Specifically, as a result of the proposed restructuring transactions, the Debtors will reduce their annual interest carrying costs by approximately $63 million. Because borrowings under the** *Exit Credit Agreement and Second Priority Term Loan* **may be paid down at any time, the Debtors will be able to take advantage of potential refinancing opportunities, which are likely to be more available as a result of the improved capital structure**.

As a result of the restructuring transactions contemplated by the Plan, the Debtors' senior secured lenders under the Prepetition Credit Agreement will own substantially all the New Common Stock in Reorganized Holdings, subject to dilution by shares of the New Common Stock issued in connection with the following:

- **Management Equity Plan**. The Plan provides that the New Board will grant equity awards in the form of restricted stock, options and/or warrants for 7.5% of the New Common Stock (on a fully diluted basis) to continuing employees and directors of the Reorganized Debtors; *provided* that such equity grants will not include more than 2.5% in the form of restricted New Common Stock.

- **Rights Offering**. The Plan provides that ~~Holders~~**any Holder** of ~~a~~ Senior Subordinated ~~Notes that are "Accredited Investors," as defined in Rule 501 of Regulation D promulgated under the Securities Act and "Qualified Institutional Buyers," as defined in Rule 144A promulgated under the Securities Act (~~**Note Claim as of the Record Date (defined below) that is an Accredited Investor or Qualified Institutional Buyer**[4] **(in such capacity,** each, an "*Eligible Noteholder*") ~~shall have the right to participate in a Rights Offering of~~ *New Common Stock to be issued under the Plan* ~~on or soon after the Effective Date. Eligible Noteholders that participate in the Rights Offering will be able to purchase up to $[50-100] million (of no more than [10-20]%) of New Common Stock Pro Rata based on~~ **has the right (a "*Subscription Right*") to purchase (at a share price based on Plan Equity Value) shares of New Common Stock up to, and solely to the extent of, its Pro Rata share (*i.e.*, the ratio, expressed as a percentage, of** the principal amount **adjusted for unaccrued interest of an Eligible Noteholder's Senior Subordinated Note Claim as of the Record Date to the aggregate amount** of Senior Subordinated Note Claims ~~held by such Eligible Noteholder~~**as of the Record Date) of up to**

---

[4]    The term "Accredited Investor" is defined by Rule 501 of Regulation D promulgated under the Securities Act and the term "Qualified Institutional Buyer" is defined by Rule 144A promulgated under the Securities Act.

**$50 million (representing approximately 8% of Plan Equity Value) of the** *New Common Stock to be issued under the Plan* **(subject to dilution as described in this Disclosure Statement)**.  Proceeds from the Rights Offering, if any, will be used for general corporate purposes.  **The Rights Offering is further described in Section IV.H herein, entitled "Rights Offering and Subscription Process." All Holders of Senior Subordinated Notes should refer to the procedures for subscribing to the Rights Offering set forth on Exhibit G hereto for further information about the Rights Offering.**

3.        **Recovery Analysis**

The Plan, which provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, maximizes creditor recoveries, provides for an equitable distribution to the Debtors' stakeholders and protects the jobs of employees.

In developing the Plan, the Debtors gave due consideration to various exit alternatives and engaged in significant discussions and negotiations with representatives and/or professionals of the senior secured lenders under the Prepetition Credit Agreement, whom the Debtors believe will be the primary economic stakeholders in the Reorganized Debtors.  With the assistance of their professional advisors, the Debtors also conducted a careful review of their current operations, prospects as an ongoing business, financial projections and the Business Plan developed by management and estimated recoveries in a liquidation scenario, and concluded that recoveries to the Debtors' stakeholders will be maximized by the Debtors' continued operation as a going concern.

The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  Consistent with the valuation, liquidation and other analyses prepared by the Debtors with the assistance of their advisors, the value of the Debtors is substantially greater as a going concern than in a liquidation.

Substantially all of the Debtors' assets are subject to valid and perfected liens held by the DIP Lenders and the Prepetition Lenders, which require payment in full prior to distributions to holders of unsecured claims against the Debtors.  Thus, on a going-concern basis, because the obligations owed by the Debtors to the DIP Lenders and the Prepetition Lenders greatly exceeds the value of the Reorganized Debtors, minimal (if any) distributions would be made to any Holders of Claims against the Debtors other than the DIP Lenders and the Prepetition Lenders absent consummation of the proposed Plan.  Further, as set forth in the attached Liquidation Analysis, outside of the proposed Plan, Holders non-priority unsecured Claims junior to the Claims of the DIP Lenders and Prepetition Lenders would receive no distribution in a liquidation of the Debtors' estates.

The Plan does not allocate all of the distributable value of the Reorganized Debtors to the Prepetition Lenders.  Recognizing that general unsecured creditors are entitled to share in the value of any unencumbered assets, which in this case consists entirely of minority equity interests in the Debtors' first-tier foreign subsidiaries, the Plan is based on an allocation of that value among the various unsecured creditor constituencies.[35]  After taking into account the substantial amount of any unencumbered value allocable to the Prepetition Lenders on account of (i**a**) their unsecured deficiency claims and (ii**b**) the unsecured Senior Subordinated Note Claims (which recoveries would be turned over to the Prepetition Lenders pursuant to the subordination provisions of the Senior Subordinated Notes Indenture), the Debtors believe the distributable value remaining for all other non-priority general unsecured claims is minimal (if any).

The Plan, however, contemplates that holders of Other General Unsecured Claims in Class 5 will share in an aggregate recovery of $3 million in Cash.  As a result, pursuant to the Plan, general unsecured creditors in Class 5 stand to recover a premium (in the form of Cash) over what they would otherwise be entitled to receive under a strict waterfall recovery analysis.

The Debtors also believe that any alternative to Confirmation of the Plan, such as an attempt by another party to file a competing plan, would result in significant delays, litigation and additional costs, and could negatively

---

[35]    For tax purposes, the Debtors pledged only 65% of the voting stock of their first-tier foreign subsidiaries to secure obligations under the Prepetition Credit Agreement.

affect value by causing unnecessary uncertainty with the Debtors' key customer and supplier constituencies, which could ultimately lower the recoveries for all Holders of Allowed Claims.

> **ACCORDINGLY, FOR ALL OF THESE AND THE OTHER REASONS DESCRIBED HEREIN, THE DEBTORS URGE YOU TO TIMELY RETURN YOUR BALLOT ACCEPTING THE PLAN.**

## B.    TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not proposing the substantive consolidation of their respective bankruptcy estates.  Thus, although the Plan generally applies to all the Debtors, except where otherwise indicated:  (a) the Plan constitutes 48 distinct chapter 11 plans, one for each Debtor; (b) for voting purposes, each holder of a Claim in a Voting Class will vote its Claims in such Class by individual Debtors; and (c) the classification scheme set forth in Article IIII of the Plan applies to each Debtor (to the extent there are no Claims in a certain Class against a particular Debtor, that Class will be deemed not to exist for any purpose whatsoever in respect of that Debtor).

### 1.    Administrative, DIP Facility and Priority Tax Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims and Priority Tax Claims.  Section IV of this Disclosure Statement,**herein, entitled "Treatment of Unclassified Claims,"** explains the treatment of Administrative Claims, DIP Facility Claims and Priority Tax Claims under Article II of the Plan in greater detail; however, in summary, the Plan provides as follows:

- **Allowed Administrative Claims**.  Allowed Administrative Claims will be paid in full in Cash (a) to the extent arising in the ordinary course of business, in the ordinary course of business, (b) on or soon after the Effective Date or, if not then due, the date when such Allowed Administrative Claim is due, (c) on or soon after the date an Administrative Claim is Allowed, (d) at a time and on terms agreed upon by such Holder and the Debtors or the Reorganized Debtors or (e) at a time and on terms set forth in an order of the Bankruptcy Court;

- **DIP Facility Claims**.  All DIP Facility Claims other than Claims under the DIP Facility that expressly survive the termination thereof will convert into the New First Priority Term Loan pursuant to the Exit Credit Agreement (subject to the terms of the DIP Facility) or be paid off in full and in Cash on the Effective Date; and

- **Priority Tax Claims**.  Priority Tax Claims due and payable on or prior to the Effective Date will be satisfied as soon as reasonably practicable after the Effective Date by payment in an amount equal to the amount (a) of the Allowed Priority Tax Claim, (b) agreed to by the Debtors and the Holder of such Allowed Priority Tax Claim or (c) of such Allowed Priority Tax Claim if paid in installment over a period not more than five years after the Commencement Date pursuant to 11 U.S.C. § 1129(a)(9)(C).

### 2.    Claims and Equity Interests Classified Under the Plan

The table below summarizes the classification and treatment of Claims and Interests under the Plan.  These summaries are qualified in their entirety by reference to the provisions of the Plan.  For a more detailed description of the terms**treatment of Claims** and provisions of**Interests under** the Plan, see Section IV.**C** herein**, entitled "Classification and Treatment of Claims and Interests."**

The table below also sets forth the estimated percentage recovery for holders of Claims and Interests in each Class and the Debtors' estimates of the amount of Claims that will ultimately become Allowed in each Class based upon (a) review by the Debtors of their books and records, (b) all Claims scheduled by the Debtors (as modified by the Bankruptcy Court through certain hearings) and (c) consideration of the provisions of the Plan that affect the allowance of certain Claims.

Because each Debtor's Plan contemplates distributions to Holders of Claims in the amount of the estimated percentage recoveries set forth below, the estimated aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

| Class | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Percent Recovery — Plan | Liquidation |
|---|---|---|---|---|
| **Class 1:** Other Priority Claims | Each Holder of an Allowed Class 1 Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Other Priority Claim against the Debtors becomes an Allowed Other Priority Claim or (iii) such other date as may be ordered by the Bankruptcy Court. | **$0-1 million** | 100% | [0- 19]% |
| **Class 2:** Other Secured Claims | In the sole discretion of the applicable Debtor, each Holder of an Allowed Class 2 Claim shall receive one of the following treatments: (i) payment in full in Cash, including the payment of any interest required pursuant to section 506(b) of the Bankruptcy Code; (ii) delivery of the collateral securing such Allowed Class 2 Other Secured Claim; or (iii) other treatment that renders such Allowed Other Secured Claim Unimpaired. | **$0** | 100% | [100]% |
| **Class 3:** Prepetition Credit Agreement Claims | Holders of Allowed Prepetition Credit Agreement Claims and Adequate Protection Claims shall receive (i) the Reinstated Euro Term Loan; (ii) the New Second Priority Term Loan; and (iii) 100 % of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution by shares issued in connection with the Management Equity Plan and Rights Offering). <br><br>Notwithstanding the foregoing, however, (a) the Euro Term Lenders as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive their Pro Rata share of the Reinstated Euro Term Loan on account of their exposure under the Euro Term Loan and (b) the Revolving Lenders, U.S. Term Lenders and Holders of Swap Claims as of the Distribution Record Date shall be the only Prepetition Lenders entitled to receive their Pro Rata share of the New Second Priority Term Loan and New Common Stock on account of their exposures under the Revolver Loan, U.S. Term Loan and Swap Claims, respectively (capitalized terms used but not defined in this paragraph have the meanings set forth in the Prepetition Credit Agreement). | **$1.645 million[6]** | [53% — 63%] | [13% — [17]18-23%] |
| **Class 4:** Unsecured Claims Related to Operations | Each Holder of an Allowed Unsecured Ongoing Operations Claim will be paid in full in Cash (i) on the Effective Date or as soon as reasonably practicable thereafter or (ii) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Unsecured Ongoing Operations Claim or in accordance with the course of practice between the Debtors and such Holder with respect to such Allowed Unsecured Ongoing Operations Claim. *Holders of Allowed Unsecured Ongoing Operations Claims are not entitled to postpetition interest, late fees or penalties on account of such Claims.* | **$20-25 million** | approx. 100% | [0]% |
| **Class 5:** | Each Holder of an Allowed Other General Unsecured Claim shall receive Cash in an amount equal to their Pro Rata share of $3 million. | **$110-120 million** | [2.5% — 2.7%] | [0]% |

---

**[6]**    **The aggregate claim amount included for the Prepetition Lenders in Class 3 includes all claims of the Prepetition Lenders arising under the Prepetition Credit Agreement.  Pursuant to the Restructuring Support Agreement, the Prepetition Lenders have agreed to receive the treatment provided in Class 3 on account of all Prepetition Credit Agreement Claims, including both their secured and unsecured deficiency Claims.  For the avoidance of doubt, the Prepetition Lenders are not waiving their unsecured deficiency Claims; rather, the Plan treats such Claims in Class 3, taking into account the appropriate recoveries allocable to such Claims.**

**SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES**

| Class | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated % Percent Recovery | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| **Other General Unsecured Claims** | | | | |
| **Class 6:**<br><br>**Senior Subordinated Note Claims** | Holders of Senior Subordinated Note Claims shall not receive or retain any interest or property under the Plan on account of such Senior Subordinated Note Claims.  The treatment of the Senior Subordinated Note Claims is in accordance with and gives effect to the provisions of section 510(a) of the Bankruptcy Code.<br><br>*Eligible Noteholders shall be entitled to participate in the Rights Offering.* | **$628 million** | 0% | 0% |
| **Class 7:**<br><br>**Section 510(b) Claims** | Holders of Class 7 Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims, which shall be discharged on the Effective Date. | **$0** | 0% | 0% |
| **Class 8:**<br><br>**Equity Interests** | There will be no distribution to the Holders of Class 8 Equity Interests, which will be deemed cancelled and of no further force and effect, whether surrendered for cancellation or otherwise, on the Effective Date. | **$0** | 0% | 0% |
| **Class 9:**<br><br>**Intercompany Interests** | Intercompany Interests shall be reinstated on the Effective Date. | **$0** | N/A | N/A |
| **Class 10:**<br><br>**Intercompany Claims** | To preserve the Debtors' corporate structure, Intercompany Claims may be reinstated as of the Effective Date or, at the Debtors' or Reorganized Debtors' option, cancelled or compromised, and no distribution will be made on account of Intercompany Claims under the Plan. | **$70 million** | N/A | N/A |

K&E ~~15673799~~ **15735883.**

## C.    VOTING ON THE PLAN

On [———November 5], 2009, the Bankruptcy Court entered an order (the "*Disclosure Statement Order*") approving, among other things, the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures (the "*Solicitation and Voting Procedures*") and establishing the deadline for filing objections to the Plan and scheduling the Confirmation Hearing**the Solicitation Procedures Order by which the Bankruptcy Court approved, among other things, procedures and documents for the solicitation of acceptances on the Plan, certain key dates and deadlines relating to the voting and Confirmation and procedures for tabulating votes**.

> **THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS IS ~~ONLY~~ A SUMMARY**.
> PLEASE REFER TO THE SOLICITATION ~~AND VOTING~~ PROCEDURES **ORDER** ATTACHED AS
> **EXHIBIT C** ~~HERETO~~
> FOR THE COMPREHENSIVE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS.

### 1.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan.  As shown in the table below, the Debtors **are** soliciting votes to accept the Plan only from Holders of Claims in Classes 3, 4 and 5 (the "*Voting Classes*") because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from (a) Holders of Unimpaired Claims in Classes 1, 2 and 10 or Holders of Intercompany Interests in Class 9 because such parties are conclusively presumed to have accepted the Plan or (b) Holders of Claims in Classes 6 and 7 or Holders of Equity Interests in Class 8 because such parties are conclusively presumed to have rejected the Plan.  The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class) under the Plan:

**SUMMARY OF STATUS AND VOTING RIGHTS**

| Class | Claim/Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition Credit Agreement ~~Secured~~ Claims | Impaired | Entitled to Vote |
| 4 | Unsecured Claims Related to Operations | Impaired | Entitled to Vote |
| 5 | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Senior Subordinated Note Claims | Impaired | Deemed to Reject |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests | Impaired | Deemed to Reject |
| 9 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 10 | Intercompany Claims | Unimpaired | Deemed to Accept |

### 2.    Voting Record Date

**The Voting Record Date is 5:00 p.m. prevailing Eastern Standard Time on [——], 2009**, which is the date on which**November 5], 2009.  This means that** it will be determined **(a)** which Holders of Claims in Classes 3, 4 and 5 are entitled to vote to accept or reject the Plan and **(b)** whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim **by the Voting Record Date**.

### 3.    Voting on the Plan

**The Voting Deadline is [——]4:00 p.m. prevailing Pacific Time on [——December 7], 2009**.  In order to be counted as votes to accept or reject the Plan, <u>all</u> Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that each Ballot is *actually* *received* on or before the Voting Deadline by the Noticing and Claims Agent at this address:

**Reader's Digest Balloting Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, California  90245**

4.      **Ballots Not Counted**

**The following Ballots will not be counted toward Confirmation of the Plan:**  (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or transmitted by facsimile or other electronic means; (b) any Ballot cast by an entity that is not entitled to vote on the Plan; (c) any Ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (d) any Ballot cast for a Claim that is subject to an objection pending as of the Record Date (unless temporarily allowed in accordance with the Solicitation ~~and Voting~~ Procedures **Order**); (e) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Noticing and Claims Agent), the Indenture Trustee or the Debtors' financial or legal advisors; (e) any unsigned Ballot; or (f) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan.

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS THE DEADLINE IS EXTENDED BY THE DEBTORS.**

D.      **ADDITIONAL PLAN-RELATED DOCUMENTS**

1.      **Filing the Plan Supplement**

The Debtors will file the Plan Supplement with the Bankruptcy Court **no fewer than five (5) days** prior to the Voting Deadline.  The Noticing and Claims Agent will serve the 2002 List and Master List with a courtesy notice that will inform parties that the Plan Supplement was filed, list the information included therein and explain how copies of the Plan Supplement may be obtained.  The Plan Supplement will include, without limitation:

- the forms of the Exit Credit Agreement and New Second Priority Term Loan Agreement;

- the Registration Rights Agreement and the Shareholders Agreement;

- the amended and restated organizational documents for Reorganized Holdings (and, if applicable, for other Reorganized Debtors);

- the forms of the Enterprise Value Maximization Plan and Variable Compensation Plan;

- the form of the Management Equity Plan; and

- the list of the Compensation and Benefit Programs to be rejected and/or assumed.

2.      **Filing the Contract/Lease Schedule**

The Debtors will file a schedule or schedules, as necessary, listing the Executory Contracts and Unexpired Leases the Debtors intend to assume and those the Debtors intend to reject pursuant to Article V of the Plan  (the "*Contract/Lease Schedule*") with the Bankruptcy Court at least ~~[25]~~**twenty (20)** days prior to the Confirmation Hearing.  The Contract/Lease Schedule will include (a) the name of the non-debtor counterparty, (b) the legal description of the contract or lease to be assumed or rejected and (c) in the case of assumption, the proposed Cure, if any.

On or as soon as practicably thereafter, with the assistance of the Noticing and Claims Agent, the Debtors will serve the Contract/Lease Schedule and notice of filing upon each non-debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption or rejection of their respective Executory Contract or Unexpired Lease and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.

Objections, if any, to the proposed assumption and/or Cure or rejection by the Debtors of any Executory Contract or Unexpired Lease listed on the Contract/Lease Schedule, must be filed with the Bankruptcy Court and served so as to be *actually received* by the Debtors prior to the Confirmation Hearing on or before a date to be determined, but that in any event is consistent with the provisions of the Debtors' Case Management Order.

Any counterparty to any Executory Contract or Unexpired Lease who fails to timely file and serve an objection in accordance with same will be deemed to have consented to the assumption or rejection of their respective Executory Contract or Unexpired Lease by the Debtors in accordance with Article V of the Plan.

**E.    CONFIRMATION AND CONSUMMATION OF THE PLAN**

    **1.    Plan Objection Deadline**

**The Plan Objection Deadline is [——]4:00 p.m. prevailing Eastern Time on [——December 13], 2009**. This means that written objections to Confirmation of the Plan, if any, which conform to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served so as to be *actually received* on or before the Plan Objection Deadline by:

- Counsel to the Debtors:  Kirkland & Ellis LLP, Attn:  Paul M. Basta and Nicole L. Greenblatt, 601 Lexington Avenue, New York, New York  10022;

- Special Counsel to the Debtors:  Curtis, Mallet-Prevost, Colt & Mosle LLP, Attn:  Steven J. Reisman, 101 Park Avenue, New York, New York  10178;

- Counsel to the DIP Agent and Prepetition Agent:  Simpson Thacher & Bartlett LLP, Attn:  Sandeep Qusba, 425 Lexington Avenue New York, New York 10017-3954;

- U.S. Trustee:  Office of the United States Trustee for the Southern District of New York, Attn:  Andrea B. Schwartz, Whitehall Street, 21st Floor, New York, New York 10004; and

- Counsel to the Creditors' Committee:  Otterbourg, Steindler, Houston & Rosen, P.C., Attn:  Scott L. Hazan and David M. Posner, 230 Park Avenue, New York, New York  10169.

    **2.    Confirmation Hearing**

**The Confirmation Hearing ~~will commence~~is on [December 17], 2009, at [——10:00] a.m. prevailing Eastern Time ~~on [——], 2009 (the "~~.  The** Confirmation Hearing *Date*~~")~~**will be held** before the Honorable Robert D. Drain, United States Bankruptcy Judge, ~~in the United States Bankruptcy Court for the Southern District of New York [location to come].~~ **at the Hon. Charles L. Brieant Jr. Federal Building and Courthouse, Room 116, 300 Quarropas Street, White Plains, NY 10601-4140.**

At least **twenty-five (**25**)** days prior to the Voting Deadline, the Debtors will ~~(a)~~ serve ~~the Confirmation Hearing Notice upon~~ all known **and potential** creditors **and equity holders** of the Debtors ~~at least 25 days prior to~~**with** the Confirmation Hearing ~~Date and (b)~~**Notice, which will contain, without limitation, (a) instructions for** *objecting to Confirmation of the Plan, including* **all dates and deadlines relevant thereto, (b) all information relating to the logistics of the Confirmation Hearing, including** *the date, time and location* **thereof, (c) a description of the procedures for the temporary allowance of claims for voting purposes and (d) disclosure with respect to the release and other provisions in Article IX of the Plan.  Around the same time, the Debtors will** publish the Confirmation Hearing Notice in the national editions of *The Wall Street Journal* and *USA Today*~~, which will contain, among other things, details regarding voting on and *objecting to Confirmation of the Plan, including* the Voting and Plan Objection Deadlines, and *the date, time and location* of the Confirmation Hearing~~. The **notice of the** Confirmation Hearing ~~Notice~~ will also be posted on the Debtors' restructuring website (http://www.kccllc.net/readers).

**The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.**

    **3.**      **Effect of Confirmation and Consummation of the Plan**

      Following Confirmation, subject to Article VIII of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article IX will become effective.  As such, it is important to read the provisions contained in Article IX of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the Debtors so that you cast your vote accordingly.

      **The Releasing Party Release set forth in Article IX.F. of the Plan provides that Holders of Claims who vote to <u>accept</u> the Plan <u>are</u> bound by the Releasing Party Release and Holders of Claims who vote to <u>reject</u> the Plan are <u>not</u> bound by the Releasing Party Release.**

---

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

---

## II.
## BACKGROUND TO THESE CHAPTER 11 CASES

### A.    CORPORATE HISTORY AND CURRENT STRUCTURE

Founded in 1922, Reader's Digest is the parent company for each of the Debtors in these Chapter 11 Cases (other than RDA Holding ~~(defined herein)~~**Co.**, its parent company) and certain direct and indirect foreign Affiliates which are not debtors in these Chapter 11 Cases (collectively, the "***Company***").  Headquartered in Pleasantville, New York since 1939, the Company has over 3,000 employees worldwide and achieves annual sales of approximately $2.2 billion.  The Company's early business strategy focused on developing product lines and growing market share, including internationally.  In February 1990, Reader's Digest went public, offering shares of its common stock on The New York Stock Exchange for the first time.  The Company's current corporate structure has since developed through organic growth and a series of acquisitions and other corporate transactions.

In May 2002, seeking to increase its presence with targeted customers and increase product offerings, Reader's Digest acquired Reiman Publications LLC, a leading publisher of lifestyle, cooking and nostalgia magazines and books based in Greendale, Wisconsin.  Prior to the acquisition, Reiman published 12 bi-monthly magazines with circulation of 16 million subscribers, seven of which were among the top 100 in the United States in circulation (the largest, *Taste of Home*, today is the nation's top-selling food magazine).

In March 2006, to further expand its market presence and grow its brand, Reader's Digest acquired Allrecipes.com, a leading independent food and social networking website based in Seattle, Washington.  Allrecipes.com is a social website that features recipes created, reviewed and rated by home cooks for food and entertaining enthusiasts.

In March 2007, an investor group led by affiliates of Ripplewood Holdings LLC ("***Ripplewood***") acquired all of the outstanding common equity of Reader's Digest (the "***Acquisition***").  Participants in the investor group included C.V. Starr & Co., GoldenTree Asset Management, L.P., GSO Capital Partners, J. Rothschild Group (Guernsey) Ltd., Merrill Lynch Capital Corporation and Solar Capital LLC or their respective affiliates.  As a result of the Acquisition, Reader's Digest and its majority-owned subsidiaries became privately owned by RDA Holding Co. ("***RDA Holding***"), a Delaware corporation.[47]  As part of the Acquisition, RDA Holding acquired WRC Media Inc., a leading publisher of supplementary educational materials for the school, library and home markets under the well-known brand of "Weekly Reader" among others, and acquired Direct Holdings U.S. Corp., a leading global direct marketer of Time Life brand products.[58]  Both WRC Media Inc. and Direct Holdings U.S. Corp. were entities affiliated with Ripplewood.

In the first half of fiscal 2009, Reader's Digest sold several underperforming businesses: (i) Taste of Home Entertaining, Inc.; (ii) QSP, Inc. and Quality Service Programs, Inc. and their affiliated subsidiaries in the United States and Canada; and (iii) the principal operating assets of Books are Fun, Ltd.

After giving effect to the transactions described above, the following generally depicts the Company's current corporate structure:[69]

---

[47]    In addition to its common stock, RDA Holding also issued two series of preferred stock.

[58]    In 2008, Reader's Digest integrated WRC Media into its Schools & Educational Services business segment and Direct Holdings into its International business segment (Reader's Digest's business segments are discussed below).

[69]    A detailed organizational chart depicting the corporate structure of the Debtors is attached hereto as **Exhibit B**.



## B.    CURRENT BUSINESSES AND OPERATIONS

The Debtors and their Affiliates market and sell products under 29 brands through extensive distribution channels to a highly-diversified global customer base—including end-user consumers, advertisers, merchants and school and educational customers—located in more than 75 countries around the world.  The Company's global businesses are organized across three business segments:  International, United States and School and Educational Services.  Reader's Digest and its domestic affiliates—the Debtors in these Chapter 11 Cases—principally conduct the Company's domestic business operations under the United States and School and Educational Services business segments.[7][10]

### 1.    International Businesses and Operations

Reader's Digest holds certain assets and conducts certain operations through certain direct and indirect foreign affiliates which are not debtors in these Chapter 11 Cases.  The International segment is organized across three primary regions,  Europe, Canada & Latin America, and Asia Pacific.  With a strong global footprint, the Company is positioned to grow by leveraging its leading brands and services into existing and new markets.  In the past few years, the Company has launched new businesses giving it entry into more than 15 new markets, including the launch of new editions of Reader's Digest magazine in China, Romania, Serbia, Slovenia and Croatia.  In addition, local Allrecipes sites have been launched in eight new countries in the past 12 months including  United Kingdom and Ireland, Australia and New Zealand, France, Germany, Japan and People's Republic of China, with many more in development.  Reader's Digest is a truly global company with a  business model that allows the company to develop content, create products in certain countries and accelerate rollout across all regions with appropriate local adaptation.   This global business model coupled with the company's formula for quickly dispersing best practices around the world results in significant marketing, editorial, and creative efficiencies.

---

[7][10]    Although the operations of Debtor Direct Holdings U.S. Corp. ("*Direct Holdings*'') and its subsidiaries are included within the International segment for financial reporting purposes, they are described herein under U.S. Business operations.  With the exception of Direct Holdings IP LLC, a bankruptcy-remote entity wholly-owned by Direct Holdings, Direct Holdings and its domestic subsidiaries are Debtors.

Notwithstanding the current world-wide economic conditions, the Debtors' foreign businesses, as a whole, remain profitable and competitive, and generate positive cash flow, collectively contributing approximately 60% of global revenues.[8][11]   The Debtors' foreign operations are not included in these Chapter 11 Cases.   To minimize disruption to their international businesses and maintain the cash flow and earnings contributions of the international operations, however, the Debtors are permitted to provide their foreign affiliates with working capital support from the proceeds of the debtor-in-possession financing in an amount not to exceed $50 million — a key feature of the comprehensive restructuring solution reached with the Debtors' lenders.

**2.      U.S. Businesses and Operations**

The Debtors and their predecessors have been at the forefront of the highly-competitive media and direct marketing industry for more than 80 years and, as a result, have engendered strong brand loyalty among their customers and established substantial credibility among distributors, marketing partners and competitors.   The Debtors also recognize that the traditional publishing supply chain is evolving, in some cases rapidly, to keep pace with the digitalization of popular culture.   As more and more consumers access media through digital channels, the Debtors' online presence has grown commensurate.   With 65 branded websites and strategic allegiances with leading Internet destinations, the Debtors believe they are uniquely able to capitalize on their iconic heritage and trusted brands, and leverage their media and marketing expertise to expand into multi-platform brands in the medium that best suits the "networked generation."

Through expanded digital investments and the development of new mobile, video and multimedia applications, including rolling out a new suite of products under the "Reader's Digest Version" banner, the Debtors are well-positioned to satisfy the growing consumer preference for on-demand, easily digestible content in a flexible format (*e.g.*, accessible, quick-hit content delivered through new media channels such as social networks, blogs and tags) and expand market penetration and grow brand equity in a new, younger consumer market.

The Debtors operate with an affinity-based focus, meaning, the Debtors market their portfolio of content assets around business divisions based on consumer affinity interests.   By organizing around branded-content communities, the Debtors leverage their leading businesses and brands into growth opportunities to better serve their consumers, many of whom seek information and entertainment by interacting with the Debtors' editors, advertisers and other consumers with similar interests.   Importantly, the Debtors are able to market multi-platform content portfolios and advertising packages to advertisers, which allows the Debtors to promote advertising growth across flagship *Reader's Digest* magazine and other key titles, including *Every Day with Rachael Ray* and *Taste of Home*, and build and grow the Debtors' digital assets.

Generally, the U.S. businesses roll up into four consumer affinity divisions:  RD Community, Food & Entertaining, Home & Garden and Health & Wellness.   Schools & Educational Services is a small division that serves the education market.   The Debtors' Direct Holdings subsidiaries operate a stand-alone direct response and retail marketing business for music, books and other products.

(a)      <u>Affinity Divisions</u>

The Debtors within the Reader's Digest Community affinity primarily market (i) magazines, including flagship *Reader's Digest* and its brand extensions, adult and children's trade books and reading series including Select Editions, (ii) home entertainment products, including recorded music collections, and (iii) websites, including readersdigest.com.

---

[8][11]   Including the Direct Holdings business, which has historically been reported in the International segment for external reporting purposes, total revenues for this segment is approximately 65% of global revenues.

The Debtors within the Food & Entertaining affinity have the leading market share in the food magazine publishing market through *Taste of Home* (the largest paid circulation U.S. food magazine) and the award-winning magazine, *Every Day with Rachael Ray*. In addition to websites related to each of the foregoing, the Debtors also market Allrecipes.com, the largest food website and the leading social networking food site in the United States. The Debtors within this affinity also market cooking events and cooking schools, and publish cookbooks under the Taste of Home franchise and annual book programs that are marketed on an advanced consent basis (where customers agree to receive future annual editions unless they indicate otherwise). To complement the Debtors' philosophy (*i.e.*, building communities of interest around each brand by focusing on the positive aspects of people and their lifestyles and encouraging reader involvement) and enhance their brand equity, reader loyalty and editorial capability, the Debtors in this affinity division also publish annual book editions based on editorial content derived from reader-generated material published in magazines during that year.

The Debtors within the Home & Garden affinity publish several leading magazine brands in the home and garden space, including The *Family Handyman*, *Birds & Blooms*, *Reminisce* and *Country*, as well as bookazines and home and garden related books and also offer catalog merchandise and travel tours.

The Debtors within the Health & Wellness affinity publish books and magazines on heath and wellness topics, including Food Cures, Magic Foods for Better Blood Sugar, 759 Secrets for Beating Diabetes and Mind Stretchers. Products originated in this division continue to sell strongly for the Debtors' book businesses around the world, both in direct mail and in retail, fueling growth for other divisions.

<div align="center">(b)    <u>School & Educational Services Businesses</u></div>

The Debtors within the School & Educational Services segment (primarily WRC Media, Inc. and its subsidiaries) publish and market educational resources to schools, teachers and students, under the Weekly Reader and CompassLearning brands. Weekly Reader's product portfolio includes elementary and secondary magazines, books, workbooks, teacher resource materials and non-fiction reference books, as well as certain custom publishing products produced with the support of corporate sponsors and non-profit organizations and distributed to the educational community at no cost. CompassLearning publishes digital supplemental education materials and produces comprehensive digital educational assessment, curriculum, reporting and management tools aligned to local, state and national standards for use by pre-K through grade 12 students. Since 1990, over 13,000 schools in nearly 3,000 U.S. school districts have purchased CompassLearning products.

<div align="center">(c)    <u>Direct Holdings and Related Businesses</u></div>

Direct Holdings markets and retails music and video products under the Time Life trademark and trade name pursuant to a license agreement with Time Warner Inc. and Time Inc.[9][12] The music products sold by Direct Holdings primarily consist of content licensed through major record companies. Similarly, video products sold by Direct Holdings are licensed from various third-party licensors. Direct Holdings utilizes multiple channels to market its product, including long-form (typically 30 minute "infomercials") and short-form (two minutes or less) television advertising and the Internet. Direct Holdings' product fulfillment is outsourced. The Debtors also sell other non-published products through similar direct response television and Internet channels outside of the Direct Holdings unit. Most recently, this business has had tremendous success with the "AB Circle Pro" fitness product, which contributed approximately $21.5 million in net revenues in the last quarter of fiscal year 2009.

---

[9][12] Prior to the commencement of these Chapter 11 Cases, the Debtors reached agreement with Time Warner Inc. and Time Inc. on the terms of an amended licensing agreement, which, among other things, assures that the Debtors maintain the rights to the license (and associated value) throughout the restructuring process and post-emergence. On October 7, 2009, the Bankruptcy Court entered an order approving the Debtors' assumption of the licensing agreement, as amended [Docket No. 155].

<div align="center">15</div>

3.    **Global Supply Chain**

The Debtors market and sell their products through extensive distribution channels to a highly-diversified global customer base. To retain and grow that customer base (and attract corresponding advertising dollars), the Debtors must be able to procure goods and services at competitive prices and fulfill, produce and distribute their products timely and accurately. This necessitates carefully-choreographed, highly-integrated stages of development, production and delivery realized through a synchronization of the numerous third-party suppliers, vendors and service providers within the Debtors' global supply chain network.

Over the past several years, the Debtors have focused on realizing significant cost and revenue synergies among product affinities, including through infrastructure and distribution channels. Specifically, the Debtors have analyzed company-wide infrastructure to identify additional cost reduction opportunities within their supply chain and maintenance, repair and operations functions, and have been developing and implementing various operational initiatives aimed at maximizing supply chain and production efficiencies by eliminating unused capacities and right-sizing their work force.

Given the logistical challenges associated with the Debtors' supply chain network, particularly in light of the increasingly global nature of the Debtors' businesses, the Debtors outsource to unaffiliated third parties certain key business processes, including production, fulfillment, customer care, information technology and distribution functions. To realize synergies from their outsourcing partnerships and the year-over-year productivity improvement motivating this extensive investment, the Debtors have expended significant time and resources to develop working relationships with these vendors that the Debtors must preserve to maintain competitive operations.

Outsourcing enables the Debtors to capitalize on the relationships, resources and technological strengths of high-volume vendors to achieve cost structure efficiencies without capital investment or budget increases. As a result, the Debtors are able to create, produce and deliver higher-service products at lower cost points relative to the marketplace, facilitating competitive operations that better position the Debtors to take advantage of top-line growth potential. Outsourcing also improves supply chain visibility, which allows the Debtors to better respond to market changes. This is especially important in a downturn economy under tighter budgets, when supply chain savings can offset volatility in production costs to help meet performance objectives.

Notwithstanding the benefits of their outsourcing arrangements, outsourcing also inevitably limits the Debtors' ability to exercise direct control over outsourced operations, including their finished products, which increases the Debtors' exposure to supply chain interruptions and other external factors. This, combined with the inherent nature of the media and marketing industry—a dynamic and time-sensitive global marketplace driven largely by vacillating consumer preferences and influenced, sometimes significantly, by macroeconomic factors—requires the Debtors achieve the cooperation of their key vendors, service providers and outsourcing partners to ensure a dependable, accountable yet flexible supply chain.

4.    **Debtors' Employees, Management and Directors**

(a)    Employees

The Debtors employ approximately 1,500 employees, of whom approximately 1,454 are full-time employees (regularly scheduled to work a minimum of 35, 37.5 or 40 hours per week, depending on location) and approximately 46 are part-time employees. None of the Debtors' employees are unionized and none are party to any collective bargaining agreement. In addition, each year, the Debtors supplement their workforce by utilizing temporary employees and approximately 2,000 independent contractors that are vital to the creative content of the Debtors' businesses. These independent contractors include individuals who perform creative services on a freelance basis with respect to the creation of the Debtors' products and promotional materials, including, without limitation, writers, photographers, artists, researchers and editors.

    (b)    <u>Management</u>

The Debtors' current senior management team has both deep-rooted and recent experience at the Debtors' businesses, and averages over 20 years of experience in the publishing industry. The following individuals comprise the Debtors' senior management team as of ~~October~~**November** 1, 2009 (all positions shown are with Reader's Digest or its Debtor Affiliates unless otherwise indicated). Executive officers are elected by the board of directors and serve at its pleasure. The compensation for the ~~last~~ fiscal year **ended June 30, 2008,** for certain members of the Debtors' management is set forth in the ~~Debtors'~~ Annual Report on Form 10-K for the fiscal year ended June 30, 2008, a copy of which can be obtained from the *SEC's EDGAR system website (http://www.sec.gov/edgar.shtml)* **and the** Debtors' investor relations website (http://phx.corporate-ir.net/phoenix.zhtml?c=71092&p=irol-IRhome~~) or the *SEC's EDGAR system website (http://www.sec.gov/edgar.shtml*~~).

- Mary G. Berner, President and Chief Executive Officer
- Tom Williams, Senior Vice President, Chief Financial Officer
- Andrea Newborn, Senior Vice President, General Counsel and Secretary
- Albert L. Perruzza, Senior Vice President, Global Operations, IT & Business Redesign
- Todd McCarty, Senior Vice President, Global Human Resources
- Amy J. Radin, Senior Vice President, Chief Marketing Officer *and CEO, Direct Holdings*
- Suzanne M. Grimes, President, ~~*Reader's Digest Community*~~**U.S. Affiliates**
- Eva Dillon, President ~~and Group Publisher~~**,** *Reader's Digest Community*
- Alyce C. Alston, President, Emerging Businesses
- Dawn M. Zier, President, ~~Global Consumer Marketing and President~~ *~~and CEO, Direct Holdings~~***RD Europe**
- **Michael A. Brennan, Senior Vice President, Corporate Strategy**
- Susana D'Emic, Vice President, Corporate Controller
- Peggy Northrop, Vice President, Global Editor-in-Chief of Reader's Digest
- William Adler, Vice President, Global Communications

    (c)    <u>Board of Directors</u>

The following persons comprise the current board of directors of Reader's Digest:

- *Mary G. Berner, Director and Chief Executive Officer.* Mary G. Berner has served as the Chief Executive Officer and Director since March 2007. From November 1999 until January 2006, Ms. Berner led Fairchild Publications, Inc., first as President and CEO and then as President of Fairchild and an officer of Condé Nast when Fairchild became a division of Condé Nast Publications, Inc. in September 2005. Ms. Berner also serves as a director of the Reader's Digest Foundation, a charitable institution founded by Reader's Digest.

- *Don Leclair, Director.* Mr. Leclair has served as Director since July 2009. Mr. Leclair retired from Ford Motor Company in 2008, where he served in various financial roles, most recently as Chief Financial Officer from August 2003 to November 2008. Prior to holding the Chief Financial Officer position, Mr. Leclair served as Ford's Corporate Controller from November 2001 to July 2003, and as the Controller of its North American Automotive Operations from October 2000 to October 2001.

- *Paula Gavin, Director.* Ms. Gavin has served as Director since July 2009. Ms. Gavin has served as the President of National Urban Fellows, Inc. since June 2007. Previously, Ms. Gavin was the Chief Executive Officer for the New York City Center for Charter School Excellence, a nonprofit organization that promotes the development of charter schools. Prior to that, Ms. Gavin served as the

President and Chief Executive Officer of the YMCA of Greater New York from 1990-2004. Prior to her position with the YMCA, Ms. Gavin held multiple executive positions with AT&T, before being named Vice President of Network Operations.

## C.   PREPETITION FUNDED INDEBTEDNESS

As of the Commencement Date, the Debtors had outstanding debt in the aggregate principal amount of approximately $2,271,200,000, consisting primarily of approximately (a) $1,640,100,000 under their senior secured credit facility (including swap termination obligations and accrued and unpaid interest), (b) $628,200,000 in unsecured senior subordinated notes (including accrued interest); and (c) $2,800,000 in foreign lines of credit and a promissory note. Additionally, the Debtors estimate that**, based on their accounts payable systems and estimated accruals,** an aggregate of approximately $~~[115]~~ million was owing and outstanding to ~~their~~**vendors, supplies, contract counterparties and other general** trade creditors as of the Commencement Date.

### 1.   Prepetition Credit Agreement

The Debtors' principal prepetition funded debt obligations arise under that certain Credit Agreement dated as of March 2, 2007 (the "***Prepetition Credit Agreement***"), by and among Holdings, Reader's Digest and certain of its affiliates, as borrowers, JPMorgan Chase Bank N.A., as agent (in such capacity, the "***Prepetition Agent***") and the lenders from time to time party thereto (collectively with the Prepetition Agent, the "***Prepetition Lenders***"). The Prepetition Credit Agreement provides for: (i) a six year, $300 million revolving line of credit (including a $50 million letter of credit subfacility and a $30 million swing-line subfacility), approximately $293.7 million of which remains outstanding; (ii) a seven year, $1.31 billion U.S. term loan, approximately $1.18 billion of which remains outstanding; and (iii) a $100.0 million term loan (the "***Euro Term Loan***"), borrowed in an equivalent amount of Euros, to RD German Holdings GmbH (a non-debtor German Affiliate), which was converted to approximately U.S. $105.9 million on the Commencement Date, all of which remains outstanding.

All obligations under the Prepetition Credit Agreement (the "***Prepetition Obligations***") are guaranteed by RDA Holding Co. and substantially all of its direct and indirect domestic subsidiaries (the "***Prepetition Guarantors***"), all of which are Debtors in these Chapter 11 Cases. The Prepetition Obligations, and the guarantees thereof, are also secured by substantially all of the tangible and intangible assets of Reader's Digest and the Prepetition Guarantors and, subject to certain customary exceptions, 65% of the voting equity interests of the first tier foreign non-Debtor subsidiaries of Reader's Digest. As of August 21, 2009, the Debtors held approximately $90 million in global Cash that constituted Cash Collateral.[~~10~~13]

The Euro Term Loan is guaranteed by certain of the Debtors and RD German Holdings GmbH and substantially all of its subsidiaries and, subject to certain customary exceptions, is secured by a pledge of all of the stock and assets of those subsidiaries. In connection with the negotiations surrounding the DIP Facility and the Restructuring Support Agreement, the Prepetition Agent and certain Prepetition Lenders holding in excess of 50% of the Prepetition Obligations (in such capacity, the "***Required Lenders***") executed a Waiver and Amendment dated August 17, 2009, pursuant to which the Required Lenders agreed to modify certain provisions of the Prepetition Credit Agreement to avoid acceleration of the Euro Term Loan upon the commencement of these Chapter 11 Cases, in exchange for, among other things, an increase in the interest rates charged under the Prepetition Credit Agreement for the Euro Term Loan.[~~11~~14]

To reduce interest rate volatility and comply with the interest rate provisions of the Prepetition Credit Agreement, on April 19, 2007 the Debtors entered into certain interest rate swap agreements with aggregate notional value of $750,000,000 (the "***Hedge Agreements***"). Under the Hedge Agreements, the Debtors receive floating-rate

---

[~~10~~13]   The Company has significant working capital requirements and requires minimum operating levels of "trapped Cash" of approximately $55-60 million globally. As a result, only approximately $30 million in Cash was available to the U.S. Debtors as of the Commencement Date, which fell in the midst of the Debtors' largest seasonal need for working capital. In preparation for the fall mailing season (Labor Day through winter holidays), the Debtors incur significant promotional costs in the period from July 1 through September 30.

[~~11~~14]   The August 17, 2009 Waiver and Amendment increased the applicable margin on the Euro Term Loan to 2.5% (for base rate loans) and 3.5% (for Eurocurrency loans), and added a LIBOR floor of 3.5%.

interest payments that offset the LIBOR component of the interest due on some of their floating-rate debt, and make fixed-rate interest payments over the term of the agreements.  The obligations under the Hedge Agreements are secured by the liens granted to the Prepetition Agent under the Collateral Documents (as defined in the Prepetition Credit Agreement).  The Debtors estimate that the value of swap termination costs arising under the Hedge Agreements is approximately $48.6 million as of the Commencement Date.

### 2.    Senior Subordinated Notes

Prior to the Commencement Date, Reader's Digest issued $600.0 million in unregistered 9% Senior Subordinated Notes due 2017 through a private placement (as the same were exchanged in 2008 for an equal amount of registered 9% Senior Subordinated Notes due 2017, the "**Senior Subordinated Notes**").  The Senior Subordinated Notes are governed by that certain Indenture dated as of March 2, 2007, by and among Reader's Digest, as issuer, certain of the other Debtors, as guarantors, and The Bank of New York, as trustee (the "**Senior Subordinated Indenture**").

The Senior Subordinated Notes bear interest at the rate of 9% *per annum*, payable semi-annually in arrears on February 15 and August 15 of each year.  The Debtors, with the consultation of their advisors, did not make the bi-annual interest payment due on August 17, 2009.  Under the Senior Subordinated Indenture, the Debtors are afforded a 30-day grace period before the holders of the Senior Subordinated Notes are able to exercise default-related rights and remedies.

The Senior Subordinated Notes Indenture provides that the right of payment under the Senior Subordinated Notes is expressly subordinated to prior payment in full of the Debtors' Prepetition Obligations, and that the Prepetition Lenders are entitled to enforce this subordination provision.  Further, the Notes Indenture provides that the Prepetition Obligations must be satisfied in full before holders of the Senior Subordinated Notes may receive any distributions in these Chapter 11 Cases on account of the Senior Subordinated Notes (except for certain permitted junior securities), and that the holders of the Notes will pay to the Prepetition Lenders any distributions received in these Chapter 11 Cases that do not comply with the above.[~~14~~15]

## D.    EVENTS LEADING UP TO THE CHAPTER 11 FILING

### 1.    Adverse Impact of the Global Economic Crisis

The Debtors, like many of their competitors, suppliers and ancillary businesses within the media and marketing industry, have been affected by the recent and unexpected economic downturn.  Because product sales in this marketplace are generally proportionate to consumer discretionary spending activity, macroeconomic conditions that impact consumer demand – *e.g.*, interest rates, unemployment levels, consumer confidence and credit availability – affect the Debtors' sales volume commensurately.  Although the Debtors have fared well relative to their competitors, reductions in advertising and consumer spending has softened the Debtors' financial performance. Significant increases in fuel prices have also resulted in higher postal and delivery costs.

---

[~~14~~15]  Specifically, the Notes Indenture provides, in pertinent part, that "the payment of all Obligations owing in respect of the Notes is subordinated in right of payment, to the extent and in the manner provided in this Article 10, to the prior payment in full of all existing and future Senior Indebtedness of the Issuer [including the Prepetition Obligations] and that the subordination is for the benefit of and enforceable by the holders of such Senior Indebtedness."  Notes Indenture, § 10.1.  Additionally, the Indenture provides:

> Upon any payment or distribution of the assets of the Issuer to creditors upon a total or partial liquidation or a total or partial dissolution of the Issuer or in a reorganization of or similar proceeding relating to the Issuer or its property: (i) the holders of Senior Indebtedness of the Issuer shall be entitled to receive payment in full in Cash of such Senior Indebtedness before Holders shall be entitled to receive any payment; and (ii) until the Senior Indebtedness of the Issuer is paid in full in Cash, any payment or distribution to which Holders of the Notes would be entitled but for the subordination provisions of this Indenture shall be made to holders of such Senior Indebtedness as their interests may appear, except that Holders of Notes may receive Permitted Junior Securities; and (iii) if a distribution is made to Holders of the Notes that, due to the subordination provisions, should not have been made to them, such Holders of the Notes are required to hold it in trust for the holders of Senior Indebtedness of the Issuer and pay it over to them as their interests may appear.

*See* **Senior Subordinated** Notes Indenture, at § 10.2.

K&E ~~15673799~~ **15735883.**

### 2.        Prepetition Restructuring Efforts

In early 2009, the Debtors developed a "recession plan" and put in place certain cost saving initiatives and other strategic action items to manage the business for Cash, increase profitability and optimize the cost structure of the business.  These initiatives included reducing corporate overhead, a planned global workforce reduction, suspension of matching contributions to the U.S. 401(k) retirement plan and consolidating various operations.

Despite these efforts, the Debtors have struggled to weather the economic storm constrained by the substantial debt on their balance sheet and associated debt service obligations.  In February 2009, the Debtors made the last payment of interest on their Senior Subordinated Notes amidst simultaneous pressure from certain suppliers, many of whom are also suffering from the ongoing downturn and economic crisis (including working through their own restructuring issues).  At around the same time, certain of the Debtors' international credit facilities and lines of credit were withdrawn, which also contributed to the Debtors' declining liquidity position prior to the Commencement Date.

Recognizing the need to address their highly leveraged capital structure, in February 2009, the Debtors retained Miller Buckfire & Co., LLC ("**Miller Buckfire**") as financial advisor and investment banker, to, among other things, investigate sources of debt or equity capital necessary to support the Debtors' Cash needs, and to explore the Debtors' restructuring options and help develop a comprehensive restructuring plan.

Shortly thereafter, the Debtors also retained AlixPartners to, among other things, assist the Debtors in managing their liquidity, establish visibility over daily receipts and disbursements forecasts and tighten control of their global Cash management system.  The Debtors also tasked AlixPartners with assisting the Debtors in developing a revised, bottom-up, five-year business plan to form the basis for an appropriate restructuring or recapitalization transaction.  In connection with developing the business plan, Reader's Digest and AlixPartners have identified certain cost saving initiatives designed to improve the cash EBITDA and free cash flow generation of Reader's Digest.  These initiatives include a combination of high impact cost reductions and organizational streamlining and include, among other things, real estate consolidation, reduction in information technology spend and product utility improvements.

### 3.        Restructuring Support Agreement

In March 2009, the Prepetition Agent organized a steering committee of certain Prepetition Lenders (in such capacity, collectively, the "**Steering Committee**") to engage in discussions with the Debtors.  The Prepetition Agent retained financial and legal advisors and began conducting significant diligence relating to the Debtors' business plan and growth prospects.  Soon thereafter, the Debtors and the Steering Committee began discussions in earnest regarding a restructuring of the Prepetition Obligations.

While negotiating with the Steering Committee regarding a restructuring of the Prepetition Obligations, the Debtors also considered other potential restructuring alternatives, but ultimately determined that a consensual transaction with the Debtors' prepetition secured lenders to significantly reduce debt was in the best long-term interest of the Debtors.  As discussions progressed and the Debtors' liquidity position weakened, the Debtors began discussions in earnest with the Steering Committee regarding the incremental financing the Debtors would need in the event the Debtors were required to commence Chapter 11 Cases.

The Debtors and their advisors ultimately concluded that they would require $150 million in financing and would need immediate access, with little or no delay, to the Cash Collateral and at least $100 million in debtor-in-possession ("**DIP**") financing to avoid immediate and irreparable harm to their estates, minimize disruption to their businesses caused by the commencement of these cases and instill confidence in their customers and suppliers.  Importantly, the Commencement Date coincided with the Debtors' largest seasonal working capital need, given the significant promotional spend required in advance of the fall mailing season (Labor Day through the holiday season).

Although the Debtors, with the assistance of Miller Buckfire, solicited indications of interest from other sources, the Debtors' ability to obtain postpetition financing from alternative parties was complicated by several factors, including the Debtors' substantial amount of secured debt and lack of any significant unencumbered assets, the economic challenges facing the media, publishing and direct marketing industry, and the challenging debtor in

possession financing market in general.  Third party lenders unanimously indicated that they would require that the liens securing any postpetition financing prime (*i.e.*, be senior in priority to) existing liens on the Debtors' assets. The Debtors concluded, based on their discussions with the Prepetition Agent and Steering Committee, that the Prepetition Lenders were unlikely to consent to a third party postpetition financing secured by liens on the Debtors' assets senior to their own.

Further, the Debtors and their advisors concluded that the value of the Debtors' encumbered assets relative to the amount of their senior secured debt, and the Debtors' lack of any significant unencumbered assets, made the outcome of a non-consensual priming of the Prepetition Lenders' liens highly uncertain.  In the Debtors' case, obtaining postpetition financing was further complicated by the need to address the potential acceleration of the Euro Term Loan upon a bankruptcy filing.  Absent a waiver and amendment, which could only be provided by the Debtors' Prepetition Lenders, the Debtors would have required additional funds of approximately $105.9 million to refinance the Euro Term Loan.

In light of the lack of practicable alternative sources of financing, and the costs and risks of a priming fight with the Prepetition Lenders, the Debtors and their advisors focused their efforts on negotiating a postpetition financing package with the Steering Committee on terms favorable to the Debtors, including obtaining the Waiver and Amendment to address a potential acceleration of the Euro Term Loan and receiving the right to convert any postpetition financing into an exit financing facility to provide the Debtors with the funding needed to emerge from, and to operate after their emergence from, chapter 11.

After weeks of extensive good-faith, arm's-length negotiations, the Debtors and the Steering Committee reached agreement on the terms of a more comprehensive restructuring solution, which includes (i) agreement on a significant de-leveraging of Reader's Digest's balance sheet to be implemented through a pre-arranged chapter 11 process; (ii) committed debtor-in-possession financing of up to $150 million at market terms to provide necessary liquidity through the restructuring process (including to foreign operations), which loan is convertible to exit financing on pre-negotiated terms; (iii) agreement on a sustainable exit capital structure that leaves approximately $555 million in total debt on the balance sheet, with the substantive terms of the exit financing arrangements agreed; and (iv) a waiver of any acceleration related to the Euro Term Loan facility (as a result of the commencement of these chapter 11 cases) to provide continued stability in Europe during this process.

On August 17, 2009, Reader's Digest announced that it had reached an agreement in principle with**, among other parties,** Prepetition Lenders holding over 80% of the Prepetition Credit Agreement Claims (the "***Consenting Lenders***") on the terms of a financial restructuring, evidenced by the Restructuring Support Agreement attached as **Exhibit F** hereto.  Pursuant to the Restructuring Support Agreement, the Consenting Lenders agreed to, among other things, vote in favor of the Plan and all parties agreed to take necessary and appropriate actions consistent with their respective obligations and use reasonable best efforts to facilitate, the solicitation, Confirmation and Consummation of the Plan and the transactions contemplated thereby.

### III.
### CHAPTER 11 CASES

**A.    FIRST DAY MOTIONS AND RELATED RELIEF**

On or around the Commencement Date, in addition to filing voluntary petitions for relief, the Debtors also filed a number of motions (the "***Preliminary Motions***") with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers, provide access to much needed working capital and allow the Debtors to retain certain advisors to assist them with the administration of the Chapter 11 Cases. At preliminary hearings conducted on August 25, 2009 (the "***First Day Hearing***") and September 17, 2009, the Bankruptcy Court entered several orders approving the Preliminary Motions.

**1.    Procedural Motions**

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" orders, by which the Bankruptcy Court (a) approved the joint administration of the Debtors' Chapter 11 Cases, (b) authorized the Debtors to prepare a list of creditors and file a consolidated list of their 50 largest unsecured creditors and (c) approved an extension of time to file their Schedules.

**2.    Stabilizing Operations**

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, customer relationships, revenue and profits, and facilitate a stabilization of their businesses and effectuate a smooth transition into operating as debtors in possession, the Debtors sought and obtained orders authorizing them to:

- maintain and administer customer programs and honor their obligations arising under or relating to those customer programs;

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage, including performance under their self-insurance programs, and enter into new insurance policies, if necessary;

- maintain their existing cash management systems; and

- remit and pay certain taxes and fees.

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their business and to ensure continued deliveries on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay the prepetition claims of certain vendors and third-party service providers who the Debtors believed were essential to the ongoing operation of their business. Importantly, the Debtors were able to condition payments of these prepetition claims on the execution by the recipient supplier or service provider of a trade agreement, which, among other things, included certain provisions to ensure that the Debtors would receive customary trade terms throughout the pendency of these Chapter 11 Cases. The Debtors' ability to pay the Claims of these vendors and service providers was critical to maintaining their ongoing business operations at the early stages of their Chapter 11 Cases.

K&E 15673799 15735883.

### 3.     Postpetition Financing and Use of Cash Collateral

At the First Day Hearing, the Court authorized the Debtors to (1**a**) enter into the DIP Facility and access $100 million upon entry of the interim DIP Order, (2**b**) use Cash Collateral on the terms set forth in the interim DIP Order and (3**c**) cash collateralize prepetition letters of credit and cause the issuance and cash collateralization of supplemental or new letters of credit.  On October 5, 2009, the Court entered the Final DIP Order authorizing the Debtors to, among other things, access the full amount of the DIP Facility and use Cash Collateral on a final basis pursuant to the terms of the Final DIP Order.

The proceeds of the DIP Facility, the use of Cash Collateral and access to letters of credit have allowed the Debtors to, among other things, continue their businesses in an orderly manner, maintain valuable relationships with vendors, suppliers, customers and employees, pay certain interest, fees and expenses owing under the DIP Credit Agreement, satisfy their adequate protection obligations and support working capital, general corporate and overall operational needs—all of which were necessary to preserve and maintain the going-concern value of the Debtors' business and, ultimately, help ensure a successful reorganization.  Additionally, funds drawn from the DIP Facility have also been used to fund certain working capital needs of the non-debtor Affiliates, including $[10 million] in proceeds sent to non-debtor Affiliates to support the Debtors' foreign operations.

### 4.     Employment and Compensation of Professional Advisors

With authorization from the Bankruptcy Court, the Debtors retained the following professional advisors to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:  (a) Kirkland & Ellis LLP, as restructuring counsel; (b) Miller Buckfire **& Co., LLC**, as investment banker and financial advisor; (c) AlixPartners, LLP, as restructuring advisor; (d) Curtis, Mallet-Prevost, Colt & Mosle LLP, as conflicts counsel; (e) Ernst & Young LLP, as auditor and tax advisor; and (f) Kurtzman Carson Consultants LLC, as the Noticing and Claims Agent.

The Debtors also sought and obtained orders approving and establishing procedures for the retention and compensation of certain professionals utilized in the ordinary course of the Debtors' business and the interim compensation and reimbursement of Retained Professionals.

## B.     OTHER MATERIAL EVENTS IN THESE CHAPTER 11 CASES

### 1.     Schedules and Statements

On September 24, 2009, each of the Debtors filed Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "***Schedules***") with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.

### 2.     Claims Bar Date

On October 7, 2009, the Bankruptcy Court entered an order (the "***Bar Date Order***") establishing November 16, 2009, at 4~~5~~:~~30~~**00** p.m. prevailing Pacific Time, as the deadline by which all persons and entities must file and serve proofs of claim asserting claims that arose on or prior to the Commencement Date, including claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code against the Debtors in these Chapter 11 Cases (the "***Claims Bar Date***").  Additionally, the Claims Bar Date Order establishes February ~~10,~~**20,** 2010, at 4~~5~~:~~30~~**00** p.m. prevailing Pacific Time, as the deadline by which all governmental units must file and serve proofs of claim asserting prepetition claims against any of the Debtors in these Chapter 11 Cases (the "***Government Bar Date***").

A deadline by which Claims asserting administrative expense priority must be filed with the Bankruptcy Court has not been established as of the date of this Disclosure Statement (with the exception of claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code, which must be filed on or before the Claims Bar Date). Instead, the Debtors are requesting that the Bankruptcy Court fix such a date as part of the Confirmation of the Plan (as discussed in Section IV.B.**1(a)** herein, ~~titled "Summary of the Plan~~**entitled "Requests for Payment of Administrative Claims**").

3.      **Executory Contracts and Unexpired Leases**

In connection with their restructuring efforts, the Debtors are attempting to enhance the competitiveness of their global operations, which, among other things, has involved a careful and comprehensive evaluation of all aspects of the Debtors' supply chain.  The Debtors intend to utilize the tools afforded a chapter 11 debtor to achieve the necessary cost savings and operational effectiveness envisioned in their revised strategic business plan, including modifying or, in some cases eliminating, burdensome or underutilized agreements and leases.

As such, the Debtors have been diligently engaged in extensive discussions with contract parties regarding the contributions such parties are making to the restructuring process and to the post-emergence businesses.  To that end, as of the undersigned date, the Debtors have filed a motion with the Court seeking authority to assume certain executory contracts, which is set to be considered at the next regularly scheduled omnibus hearing.  In addition, the Debtors have also been evaluating their real property leases.  To date, the Debtors have rejected several real property leases for locations the Debtors had vacated prior to the Commencement Date in connection with their prepetition restructuring efforts from which the Debtors did not realize financial value.

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtors have to assume or reject unexpired leases of nonresidential real property is also scheduled to expire on December 22, 2009, unless extended by order of the Bankruptcy Court.  To that end, the Debtors intend to file a motion with the Bankruptcy Court requesting authority to extend this deadline through the earlier to occur of the Effective Date and March 22, 2010 (**ninety (**90) days from December 22, 2009).

C.      **COMMITTEE APPOINTMENT AND PARTICIPATION**

1.      **Appointment of the Creditors' Committee**

On August 31, 2009, the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  On October 9, 2009, the U.S. Trustee appointed four additional members of the Creditors' Committee.  As of the date hereof, the Creditors' Committee Members include (a) The Bank of New York Mellon, (b) Wilfrid Aubrey LLC, (c) Thomas M. Kenney, (d) RR Donnelley & Sons Company, (e) Madison Paper Company (ALSIP Location), (f) Williams Lea, Inc., (g) New Page Corporation, (h) Michael John Bohane, (i) Peter Davenport, (j) Ross Jones and (k) HCL Technologies, Ltd.

~~The~~**With authorization from the Bankruptcy Court, the Debtors retained the following professional advisors to assist the** Creditors' Committee ~~retained~~**in carrying out their duties and to represent their interests in the Chapter 11 Cases:  (a)** Otterbourg, Steindler, Houston & Rosen, P.C., as counsel~~,~~**; (b)** BDO Seidman, LLP, as financial advisor~~,~~**; and (c)** Trenwith Securities, LLC, as investment banker.

2.      **Participation in The Chapter 11 Cases**

Since the formation of the Creditors' Committee, the Debtors have worked cooperatively with the Creditors' Committee and its professionals to educate the Creditors' Committee about the Debtors' businesses and operations, prospects and financial condition.  In addition to providing customary diligence information, the Debtors and the Creditors' Committee and each of their professionals have engaged  in meaningful exchanges relating to the Debtors' DIP budget and revised long-term business plan, as well as payment of certain prepetition obligations under the applicable Preliminary Orders.  Most importantly, the Debtors and the Creditors' Committee, and their respective professionals, have engaged in, and will continue to engage in, arm's-length discussions and negotiations regarding valuation, distributable value available for all unsecured creditors and allocation of such recovery value under the Plan.

3.      **Meeting of Creditors**

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on October 2, 2009.  In accordance with Bankruptcy Rule 9001(5) (which requires, at a minimum, that one representative of the Debtors appear at such meeting of creditors for the purpose of being examined the U.S. Trustee and other attending parties in interest), one representative of the Debtors as well as counsel to the Debtors attended the meeting and answered questions posed by the U.S. Trustee and other parties in interest present at the meeting.

<div align="center">

**IV.**
**SUMMARY OF THE PLAN**

</div>

THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD **NOT** BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION IV AND THE PLAN (INCLUDING ATTACHMENTS) THE LATTER SHALL GOVERN.

**A.      GENERAL BASIS FOR THE PLAN**

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan, though proposed jointly, constitutes a separate chapter 11 plan of reorganization proposed by each Debtor. Therefore, the classifications set forth in Article III of the Plan shall be deemed to apply separately with respect to each plan proposed by each Debtor, except that Class 9 Equity Interests shall be deemed to apply only to the plan proposed by RDA Holding Co.

The terms of the Debtors' Plans are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into separate Classes according to their relative seniority**, legal nature** and other criteria, and the Plan proposes recoveries for Holders of Claims against and Interests in the Debtors in such Classes, if any.

**B.      TREATMENT OF UNCLASSIFIED CLAIMS**

Pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims and Priority Tax Claims.

**1.      Administrative Claims**

Administrative Claims are the actual and necessary costs and expenses of the Chapter 11 Cases that are Allowed under and in accordance with sections 330, 365, 503(b), 507(a)(1), 507(a)(2) and 507(b) of the Bankruptcy Code. *Allowed Administrative Claims do not include Claims filed after the applicable deadline set forth in the Confirmation Order* (except as otherwise provided by a separate order of the Bankruptcy Court). By way of example only, such expenses include the actual and necessary expenses of operating the Debtors' businesses during the pendency of the Chapter 11 Cases, including amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense and will be paid in accordance with Article XIII of the Plan.

The Plan provides that, subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if an Administrative Claim is Allowed after the Effective Date, on the date such

Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court.   Notwithstanding the foregoing, the Plan also provides that Allowed Administrative Claims that arise in the ordinary course of the Debtors' or Reorganized Debtors' businesses shall be paid in full in Cash in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

(a)    Requests for Payment of Administrative Claims

All requests for payment of an Administrative Claim that accrued on or before the Effective Date that were not otherwise paid in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than [sixty (60]) days from the Effective Date (the "**Administrative Claim Bar Date**").   A notice setting forth the Administrative Claim Bar Date will be filed on the Bankruptcy Court's docket and posted on the Debtors' restructuring website at http://www.kccllc.net/readers.   Further notice of the Administrative Claim Bar Date will be provided as may be directed by the Bankruptcy Court.   No request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.   The Debtors may also choose to object to any Administrative Claim in the [180] day period followingno later than ninety (90) days from the Administrative Claim Bar Date, subject to extensions by the Bankruptcy Court or on motion of a party in interest approved by the Bankruptcy Court.   Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed allowed in the amount requested.   In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

**Any requests for payment of Administrative Claims that are not properly filed and served by the Administrative Claim Bar Date shall not appear on the Claims Register maintained by the Noticing and Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.**

(b)    Payment of Professional Compensation and Reimbursement Claims

The Plan provides that all final requests for Professional Compensation and Reimbursement Claims shall be filed no later than **forty-five (**45) days after the Effective Date.   After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court.

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation (net of any unapplied retainer amounts) prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date.   If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional.   Such estimate, however, will not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional.   The total amount so estimated as of the Effective Date shall comprise the "Professional Fee Reserve Amount."

(c)    **Payment of Statutory Fees**

**The Plan includes within the definition of "Administrative Claims," all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911 1930, and provides that all fees payable pursuant to 28 U.S.C.§ 1930, as determined by the Bankruptcy Court at a hearing pursuant to section 11238 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.**

K&E 15673799 **15735883.**

2.      **DIP Facility Claims**

The Plan provides that all DIP Facility Claims other than Claims under the DIP Facility that expressly survive the termination thereof will (i) subject to the terms of the DIP Facility, convert into the New First Priority Term Loan pursuant to the Exit Credit Agreement or (ii) be paid off in full in Cash on the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all such DIP Facility Claims.

3.      **Priority Tax Claims**

The Plan provides that each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of, and in full and final satisfaction, settlement, release and discharge of and in exchange for, such Claim:  (1a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2b) Cash in an amount agreed to by the applicable Debtor or Reorganized Debtor, as applicable, and such Holder (although such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date); or (3c) at the option of the Debtors, Cash in an aggregate amount of such Allowed Priority Claim payable in installment payments over a period not more than five years after the Commencement Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

The Plan further provides that any Allowed Priority Tax Claim not due and owing on or before the Effective Date will be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

C.      **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

**In accordance with section 1122 of the Bankruptcy Code, the Plan places Claims and Interests into one of the ten (10) Classes listed in the table below, together with the respective status and voting rights of each Class:**

| Class | Description of Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| **1** | **Other Priority Claims** | **Unimpaired – Deemed to Accept** | **Not Voting** |
| **2** | **Other Secured Claims** | **Unimpaired – Deemed to Accept** | **Not Voting** |
| **3** | **Prepetition Credit Agreement Claims** | **Impaired** | **Entitled to Vote** |
| **4** | **Unsecured Claims Related to Operations** | **Impaired** | **Entitled to Vote** |
| **5** | **Other General Unsecured Claims** | **Impaired** | **Entitled to Vote** |
| **6** | **Senior Subordinated Note Claims** | **Impaired – Deemed to Reject** | **Not Voting** |
| **7** | **Section 510(b) Claims** | **Impaired – Deemed to Reject** | **Not Voting** |
| **8** | **Equity Interests** | **Impaired – Deemed to Reject** | **Not Voting** |
| **9** | **Intercompany Interests** | **Unimpaired – Deemed to Accept** | **Not Voting** |
| **10** | **Intercompany Claims** | **Unimpaired – Deemed to Accept** | **Not Voting** |

**Generally speaking, the Debtors first placed Claims and Interests into Classes based on a classification scheme consistent with their capital structure (*i.e.*, debt is classified separately from equity, secured debt is classified separately from unsecured debt, Intercompany Claims are classified separately from Claims involving third parties, and so on).  The classification scheme also gives effect to the subordination provisions in the Notes Indenture and the impact on the relative priority of claims (discussed in more detail under the heading "Class 6 – Senior Subordinated Note Claims" below).**

**The proposed classification scheme also recognizes that affording the Claims of certain creditors essential to the Reorganized Debtors' businesses and operations different treatment than Claims of creditors that would provide minimal value or no net benefit to the Reorganized Debtors going forward is critically important to preserve goodwill post-emergence and ensure the Debtors' long-term economic viability. Indeed, this was the principal factor behind the Prepetition Lenders' agreement to gift critical trade creditors a portion of the recovery owing on account of the Prepetition Lenders' secured position under the Prepetition Credit Agreement, which funds are neither assets of the Debtors nor property of the Estates (discussed in more detail under the heading "Class 4 – Unsecured Ongoing Operations Claims" below).**

K&E 15673799.15735883.

If the Plan is e**C**onfirmed by the Bankruptcy Court and e**C**onsummated, (i) ~~the~~ Claims in certain Classes will be reinstated ~~or~~**,** modified and**or otherwise treated so as to** receive distributions equal to the full amount of such Claims, (ii) ~~the~~ Claims in certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims and (iii) ~~the~~ Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests.

1.    **Class 1 – Other Priority Claims**

The Plan defines an "Other Priority Claim" as any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

The Plan provides that each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as reasonably practicable after (a) the Effective Date, (b) the date on which such Other Priority Claim against the Debtors becomes an Allowed Other Priority Claim or (c) such other date as may be ordered by the Bankruptcy Court, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Priority Claim against the Debtors (except to the extent that a Holder of an Allowed Other Priority Claim against the Debtors agrees to less favorable treatment).

Other Priority Claims are Unimpaired, and Holders of such Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.  The Debtors have estimated that the aggregate amount of Allowed Other Priority Claims payable under the Plan will be ~~approximately $[____]~~**less than $1.0 million**.

2.    **Class 2 – Other Secured Claims**

The Plan defines an "Other Secured Claim" as any secured Claim against the Debtors not specifically described in the Plan (and excluding DIP Facility Claims and the Prepetition Credit Agreement Claims).

The Plan provides that Holders of Allowed Other Secured Claims shall receive one of the following treatments, in the sole discretion of the applicable Debtor:  (a) payment in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, on or as reasonably practicable after the Effective Date on or as reasonably practicable after the Effective Date, the date on which such Other Secured Claim against the Debtors becomes an Allowed Other Secured Claim or such other date as may be ordered by the Bankruptcy Court, (b) delivery of the collateral securing any such Allowed Other Secured Claim; or (c) treatment in any other manner that shall render such Allowed Other Secured Claim Unimpaired, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Secured Claim against the Debtors (except to the extent that a Holder of an Allowed Other Secured Claim against the Debtors agrees to less favorable treatment).

Other Secured Claims are Unimpaired, and Holders of such Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.  ~~The Debtors have estimated~~ *that the aggregate amount of* **To the best of the Debtors' knowledge, information and belief, insofar as they have been able to ascertain after reasonable inquiry, the Debtors are not aware of any** Allowed Other Secured Claims **that would be** payable under the Plan ~~will be approximately $[____]~~**; to the extent any Other Secured Claims are asserted and Allowed, the Debtors believe** *that the aggregate amount of* **such Claims would be** *de minimis*.

3.    **Class 3 – Prepetition Credit Agreement Claims**

The Plan defines "Prepetition Credit Agreement Claims" as all Claims arising out of the Prepetition Credit Agreement (including Adequate Protection Claims and secured Claims based upon hedging arrangements with certain of the Prepetition Lenders or their affiliates), which claims are deemed Allowed in an aggregate amount equal to $~~[1,645,000,000]~~**1,645,000,000.**

The Plan provides that each Holder of an Allowed Prepetition Credit Agreement Claim shall receive their Pro Rata share of each of (a) the Reinstated Euro Term Loan, (b) the New Second Priority Term Loan and (c) 100% of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution by the Rights

Offering and the Management Equity Plan), in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Prepetition Credit Agreement Claim against the Debtors.

Notwithstanding the foregoing paragraph, the Plan provides that the Euro Term Lenders (as defined in the Prepetition Credit Agreement) as of the Distribution Record Date shall be the <u>only</u> Prepetition Lenders entitled to receive their Pro Rata share of the Reinstated Euro Term Loan on account of their exposure under the Euro Term Loan (as defined in the Prepetition Credit Agreement).

Additionally, the Revolving Lenders, U.S. Term Lenders (each as defined in the Prepetition Credit Agreement) and Holders of Swap Claims as of the Distribution Record Date shall be the <u>only</u> Prepetition Lenders entitled to receive their Pro Rata share of the New Second Priority Term Loan and (c) 100% of the New Common Stock issued and outstanding as of the Effective Date (subject to dilution by the Rights Offering and the Management Equity Plan) on account of their exposures under the Revolver Loan, U.S. Loan (each as defined in the Prepetition Credit Agreement) and Swap Claims.  Under the Plan, the Letters of Credit shall continue to be treated in accordance with the provisions in paragraph 13(c) of the Final DIP Order.

Prepetition Credit Agreement Claims are Impaired, and Holders of such Class 3 Claims are entitled to vote to accept or reject the Plan.

4.        **Class 4 – Unsecured Ongoing Operations Claims**

The Plan defines an "Unsecured Ongoing Operations Claim" as a general unsecured Claim directly relating to and arising solely from the receipt of goods and services by the Debtors held by ~~Persons~~**Entities** with whom the Debtors are conducting business, and have determined they will continue to conduct business with as of the Effective Date ~~(excluding any Administrative Claims)~~**,  The Debtors' determination regarding which creditors will be placed in Class 4 (and Class 5) will be reflected on the Ballots sent to creditors with this solicitation package, if applicable.  Such determination is based upon the Debtors' considered business judgment as necessary to ensure competitive, going-forward operations upon emergence.  In accordance with the Solicitation Procedures Order, within five (5) days from the date of entry of the Solicitation Procedures Order, the Noticing and Claims Agent will distribute a solicitation package containing, among other things, a customized Ballot reflecting the scheduled amount of each Holder's Unsecured Ongoing Operations Claim for voting purposes**.

The Plan provides that each Holder of an Allowed Unsecured Ongoing Operations Claim will be paid in full in Cash (a) on the Effective Date or as soon as reasonably practicable thereafter or (b) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Unsecured Ongoing Operations Claim or in accordance with the **historical** course of ~~practice~~**dealings** between the Debtors and such Holder with respect to such Allowed Unsecured Ongoing Operations Claim, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Unsecured Ongoing Operations Claim against the Debtors (except to the extent that a Holder of an Allowed Unsecured Ongoing Operations Claim against the Debtors agrees to less favorable treatment).  *However*, Holders of Unsecured Ongoing Operations Claims are not entitled to postpetition interest, late fees or other penalties on account of such Claims.

Holders of Allowed Unsecured Ongoing Operations Claims who received any payments from the Debtors during the Chapter 11 Cases pursuant to any order of the Bankruptcy Court shall not be excluded from receiving distributions under the Plan on account of such Claims <u>unless</u> such Claims were fully satisfied by any prior payments from the Debtors or otherwise waived **by agreement of the parties**.  The Debtors reserve all rights to challenge the legal basis and amount of any asserted Unsecured Ongoing Operations Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.

29

K&E ~~15673799~~**15735883.**

Unsecured Ongoing Operations Claims are Impaired, and Holders of such Class 4 Claims are entitled to vote to accept or reject the Plan.  The Debtors ~~have estimated~~**estimate** that the aggregate amount of ~~Allowed~~ Unsecured Ongoing Operations Claims payable under the Plan will be in the range of $~~[35–45] million (net of the total estimated amount of~~**20–25 million.  Claims payable in Class 4 do not include** ~~c~~**C**ure payments required to assume Executory Contracts with ~~Persons~~**Entities with** whom the Debtors are conducting business~~,~~ and have determined they will continue to conduct business with, as of the Effective Date~~)~~**., which cure payments (estimated to be approximately $50-55 million) will be made in accordance with the provisions of Article VI of the Plan.  (A more detailed description of the Plan's treatment of Executory Contracts is set forth in Article IV.J herein, entitled "Treatment of Contracts and Leases.")**

5.      **Class 5 – Other General Unsecured Claims**

The Claims in Class 5 consist of Holders of general unsecured Claims against the Debtors, including, without limitation:  (a) vendors with whom the Debtors have determined they will not continue to do business as of the Effective Date; (b) landlords with prepetition rent and/or Claims based on rejection of Unexpired Leases, prepetition litigation and/or related claims; (c) parties to Executory Contracts or Unexpired Leases with the Debtors that are being rejected; (d) Holders of claims arising from the rejection or termination of the Debtors' unfunded, non-qualified retirement plans or deferred compensation arrangements, which include (i) the Excess Benefit Retirement Plan, (ii) the Executive Retirement Plan, (iii) the Executive Cash Balance Plan, (iv) the 1988 Supplemental Employee Retirement Plan and related agreements, (v) the Director and Roving Editors Plan and/or related agreements or arrangements, (vi) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor; (e) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto; and (f) Holders of Other General Unsecured Claims not otherwise included in Class ~~4 or Class 6.~~**3, 4 or Class 6, including, without limitation, unsecured, non-priority claims for severance arising as a result of prepetition termination of employment.  For the avoidance of doubt, the unsecured deficiency claims of the Prepetition Lenders (included in Class 3), the Unsecured Ongoing Operations Claims (Class 4) and the Senior Subordinated Note Claims (Class 6) are not included in Class 5 Other General Unsecured Claim Claims.**

The Plan provides that each Holder of an Allowed Other General Unsecured Claim shall receive ~~their~~**its** Pro Rata share of the Other General Unsecured Claims Distribution (which is $3 million in Cash) in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other General Unsecured Claim against the Debtors (except to the extent that a Holder of an Allowed Other General Unsecured Claim against the Debtors agrees to less favorable treatment).

Other General Unsecured Claims are Impaired, and Holders of such Class 5 Claims are entitled to vote to accept or reject the Plan.  The Debtors have estimated that the aggregate amount of Allowed Other General Unsecured Claims payable under the Plan will be ~~approximately~~**between** $~~[~~110~~–~~**–**120 million~~]~~~~. As a result~~**.  As discussed in Section I.A.3 herein, entitled "Recovery Analysis," the aggregate recovery for Holders of Allowed Class 5 Claims is $3 million.  Accordingly**, the Debtors estimate individual Holders of Allowed Other General Unsecured Claims are expected to recover approximately ~~[~~2.5% to 2.7%~~]~~ of the amount of their Allowed Other General Unsecured Claim.

6.      **Class 6 – Senior Subordinated Note Claims**

The Plan defines a "Senior Subordinated Note Claim" as any Claim derived from or based upon the Senior Subordinated Notes Indenture.  On the Effective Date, Senior Subordinated Note Claims shall be deemed Allowed in the aggregate amount of $~~[628.2] million.  The Plan provides that~~ *Holders of Senior Subordinated Note Claims shall not receive or retain any interest or property under the Plan on account of* such *Senior Subordinated Note Claims.* **million.**

The treatment of the Senior Subordinated Note Claims under the Plan is in accordance with and gives effect to the provisions of section 510(a) of the Bankruptcy Code**.  Specifically,** *Holders of Senior Subordinated Note Claims* **will not actually** *receive or retain any interest or property under the Plan on account of* **their** *Senior Subordinated Note Claims* **because the recovery otherwise allocable to such Holders must be turned over to the Prepetition Lenders pursuant to, and in accordance with, the terms and conditions of the Senior**

**Subordinated Notes Indenture (the subordination provision of the Senior Subordinated Notes Indenture is summarized in Section II.C.2 herein, entitled "Senior Subordinated Notes")**.

Senior Subordinated Note Claims are Impaired, and Holders of such Class 6 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

> *Eligible Noteholders are entitled to participate in the Rights Offering.* **The Rights Offering and process by which Eligible Noteholders may exercise Subscription Rights is summarized in Section IV.H herein, entitled "Rights Offering and Subscription Procedures." However, for detailed instructions relating to same, please refer to the Subscription Procedures attached hereto as Exhibit G.**

**7.       Class 7 – Section 510(b) Claims**

The Plan defines a "Section 510(b) Claim" as any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim. ~~The Plan~~

**To the best of the Debtors' knowledge, information and belief, insofar as they have been able to ascertain after reasonable inquiry, the Debtors are not aware of any Section 510(b) Claims that could be properly asserted in these Chapter 11 Cases against any of the Estates. Out of an abundance of caution, however, the Plan provides that** *all Section 510(b) Claims shall be discharged* **on the Effective Date. The Plan further** provides that Holders of Section 510(b) Claims shall not receive any distribution on account of such 510(b) Claims. ~~On the Effective Date,~~ *all Section 510(b) Claims shall be discharged*.

Section 510(b) Claims are Impaired, and Holders of ~~such~~ Class 7 Claims**, if any,** are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims**, if any,** are not entitled to vote to accept or reject the Plan.

**8.       Class 8 – Equity Interests**

The Plan defines an "Equity Interest" as any issued or unissued share of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including section 510(b) Claims (excluding Intercompany Interests). The Plan provides that Holders of RDA Holding Co. Equity Interests shall not receive any distribution account of such RDA Holding Co. Equity Interests. On the Effective Date, all RDA Holding Co. Equity Interests shall be discharged, cancelled, released and extinguished.

Equity Interests are Impaired, and Holders of such Class 8 Equity Interests are conclusively deemed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code. Therefore, Holders of RDA Holding Co. Equity Interests are not entitled to vote to accept or reject the Plan.

**9.       Class 9 – Intercompany Interests**

The Plan defines an "Intercompany Interest" as any Equity Interest in a Debtor held by another Debtor. Intercompany Interests are Unimpaired. The Plan provides that Intercompany Interests shall be reinstated on the Effective Date. Intercompany Interests are Unimpaired, and Holders of such Class 9 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

**10.      Class 10 – Intercompany Claims**

The Plan defines an "Intercompany Claim" as any Claim held by a Debtor against another Debtor or any Claim held by an affiliate of a Debtor against a Debtor. To preserve the Debtors' corporate structure, the Plan provides that Intercompany Claims may (a) be reinstated as of the Effective Date or (b) at the Debtors' or

Reorganized Debtors' option, be cancelled or compromised, and no distribution will be made on account of such Claims.  **The Debtors estimate that the aggregate amount of Allowed Intercompany Claims was approximately $90 million as of the Commencement Date.**

Intercompany Claims are Unimpaired, and Holders of Class 10 Intercompany Claims, by virtue of their status as a Debtor or an Affiliate of a Debtor, are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

**D.      CERTAIN MEANS FOR IMPLEMENTATION OF THE PLAN**

**1.      General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlements of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

**2.      Restructuring Transactions**

The Plan provides that, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Reorganized Debtors determine are necessary or appropriate.

**3.      Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or in any agreement, instrument or other document relating thereto, on or after the Effective Date, all property of each Estate (including, without limitation, Causes of Action) and any property acquired including by any of the Debtors pursuant hereto shall vest in each respective Reorganized Debtor, free and clear of all liens, Claims, charges or other encumbrances.  Except as may be provided ~~herein~~**in the Plan**, on and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**4.      Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors**

All Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be funded with Cash on hand.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.  However, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth ~~herein~~**in the Plan**, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

**5.      Exemption from Certain Transfer Taxes and Recording Fees**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (a) the issuance, distribution, transfer or exchange of any debt, securities~~,~~ or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or

the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

6.        **Effectuating Documents and Further Transactions**

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.  The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.  Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

7.        **Cancellation of Agreements, Senior Subordinated Notes and Equity Interests**

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Credit Agreement, the Senior Subordinated Notes Indenture and any other certificate, equity security, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors and their Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating or pertaining to any agreements, indentures, certificates of designation, by-laws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; except that:

a.        the Prepetition Credit Agreement shall continue in effect solely for the purpose of: (i) allowing Holders of the Prepetition Credit Agreement Claims to receive the distributions provided for hereunder; (ii) allowing the Prepetition Agent to receive distributions from the Debtors and to make further distributions to the Holders of Prepetition Credit Agreement Claims on account of such Claims, as set forth in Article VI.A of the Plan; and (iii) preserving the Prepetition Agent's right to indemnification from the Debtors pursuant and subject to the terms of the Prepetition Credit Agreement in respect of any Claim or Cause of Action asserted against the Prepetition Agent; _provided_ that any Claim or right to payment on account of such indemnification shall be an unsecured Claim and shall not be secured in any of the assets of the Debtors, Reorganized Debtors or their Affiliates; and

b.        the foregoing shall not effect the cancellation of shares issued pursuant to the Plan nor any other shares held by one Debtor in the capital of another Debtor; _provided_, _further_, that, to the extent provided in the Exit Credit Agreement and the New Second Priority Term Loan Agreement, the

33

guarantees of and Liens securing obligations under the Prepetition Credit Agreement shall not be cancelled and shall guarantee or secure obligations under and as set forth in the Exit Credit Agreement and the New Second Priority Term Loan Agreement and only such obligations.

### E.   POST-EMERGENCE CAPITAL STRUCTURE

The consummation of the financial restructurings contemplated by the Plan will significantly de-lever the Debtors' capital structure, leaving the Reorganized Debtors with approximately $555 million in funded debt. Specifically, the Reorganized Debtors' capital structure upon their emergence from chapter 11 is summarized below.

### 1.   Funded Indebtedness

On the Effective Date, the Reorganized Debtors will be authorized to execute and deliver the Exit Credit Agreement and the New Second Priority Term Loan Agreement (substantially in the forms set forth in the Plan Supplement) and any other documents necessary or appropriate to obtain exit financing and issue the New First Priority Term Loan, Reinstated Euro Term Loan and Second Priority Term Loan (and the Confirmation Order will constitute an order of the Bankruptcy Court approving entry into same). The Exit Credit Agreement and New Second Priority Term Loan Agreement will set forth the terms, conditions and covenants governing the (a) New First Priority Term Loan and the Reinstated Euro Term Loan and (b) New Second Priority Term Loan, respectively.

The lenders under the Exit Credit Agreement and the New Second Priority Term Loan Agreement shall have valid, binding and enforceable liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement. The other**Other** material terms of the ~~Exit Credit Agreement and New~~ ~~Second Priority Term Loan~~ ~~Agreement~~**such credit agreements** are as follows:

| | New First Priority Term Loan | Reinstated Euro Term Loan | New Second Priority Term Loan |
|---|---|---|---|
| **Facilities:** | $150 million | Approximately $105 million | $300 million |
| **Maturity:** | 3 years from the Effective Date | March 2, 2014 | Not earlier than the later maturity of:<br>● **(a)** the New First Priority Term Loan and<br>● **(b)** the Reinstated Euro Term Loan |
| **Interest:** | L + 1,000 bps with 3.5% LIBOR Floor | L + 550bps Cash + 450 PIK (toggle) with 3.5% LIBOR Floor | L + 550bps Cash + 650bps PIK (toggle) with 3.5% LIBOR Floor |
| **Security** | First priority lien on substantially all of the Debtors' assets | Same as New First Priority Term Loan and liens on foreign assets currently securing the Euro Term Loan | Second priority liens on substantially all of the Debtors' assets |

The **proposed Confirmation Order will provide that the** guarantees, mortgages, pledges, liens and other security interests granted pursuant to or in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement are granted in good faith as an inducement to the lenders to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the intercreditor agreement and other definitive documentation executed in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement. Notwithstanding anything to the contrary in the Confirmation Order or the Plan, the Bankruptcy Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the Exit Credit Agreement and the New Second Priority Term Loan Agreement or any rights or remedies related thereto.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

K&E ~~15673799~~ **15735883.**

2.    **Reorganized Debtors' Equity Interests**

(a)    <u>New Common Stock</u>

The Plan provides that all Equity Interests will be deemed cancelled and of no further force and effect as of the Effective Date, whether surrendered for cancellation or otherwise.  On the Effective Date, Reorganized Holdings shall issue or reserve for issuance all of the New Common Stock.  The New Common Stock shall represent all of the Equity Interests in Reorganized Holdings as of the Effective Date and shall be issued to Holders of Prepetition Credit Agreement Claims (subject to dilution by the Management Equity Plan or the Rights Offering).  The Plan contemplates the Debtors' emergence from chapter 11 as a privately-held company.

From and after the Effective Date, subject to the right of the stockholders to amend the certificate of incorporation of Reorganized Holdings, Reorganized Holdings shall have one class and one series of New Common Stock, although the Shareholders Agreement shall provide an option for **certain** Holders to receive limited voting stock. ~~Reorganized Holdings will comply with~~**, at their option.  Notwithstanding anything herein or in the Plan otherwise, to the extent necessary to satisfy section 1123(a)(6) of the Bankruptcy Code, Reorganized Holdings shall not issue any non-voting equity securities for so long as** section 1123(a)(6) of the Bankruptcy Code ~~to the extent~~**is** applicable.

The Reorganized Debtors shall not be obligated to list the New Common Stock on a national securities exchange.  Likewise, ~~the~~ New Common Stock will be issued without registration under the Securities Act or any similar federal, state or local law, subject to the Registration Rights Agreement.  Except as otherwise provided in the Plan, under section 1145 of the Bankruptcy Code, any and all New Common Stock (other than as part of the Rights Offering) contemplated by the Plan and any and all settlement agreements incorporated in the Plan will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Commission, if any, applicable at the time of any future transfer of such New Common Stock, (ii) any restrictions on the transferability of such New Common Stock and (iii) applicable regulatory approval.

The issuance of the New Common Stock by Reorganized Holdings, including options or other equity awards reserved for the Management Equity Plan, is authorized without the need for further corporate action and all of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully-paid and non-assessable.  For purposes of distribution, the New Common Stock will be deemed to have the Plan Equity Value, regardless of the date of distribution.

(b)    <u>Registration Rights & Shareholders Agreements</u>

Certain ~~holders of the~~**Entities receiving** New Common Stock **pursuant to the Plan** shall be entitled to registration rights pursuant to the Registration Rights Agreement.  On or **as** soon **as reasonably practicable** after the Effective Date, the Reorganized Debtors ~~and certain holders of New Common Stock shall enter into and~~**will** deliver the Registration Rights Agreement and the Shareholders Agreement ~~to each entity~~**(in substantially the form to be included in the Plan Supplement to be filed with the Bankruptcy Court no fewer than five (5) days prior to the Voting Deadline) to each Entity** that is intended to be a party thereto or such agreements shall be deemed to be valid, binding and enforceable in accordance with their respective terms, and each holder of New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings, and the Shareholders Agreement shall provide an option for Prepetition Lenders to receive limited voting stock.

(c)    <u>Important Securities Law Disclosure</u>

The issuance of the New Common Stock (other than as part of the Rights Offering) and shares reserved for issuance under the Management Equity Plan will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Rule 701 promulgated under the Securities Act or a "no sale" under the Securities Act to the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act, and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for Cash.  In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

To the extent persons who receive New Common Stock are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Those persons would, however, be permitted to sell New Common Stock without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.  **You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

---

**Notwithstanding anything herein or in the Plan to the contrary, New Common Stock issued to participating Eligible Noteholders in connection with the Rights Offering will be issued under Section 4(2) of the Securities Act.   Such New Common Stock will be "restricted securities" and cannot be sold absent registration under, or pursuant to an exemption from, the Securities Act.**

---

**F.       POST-EFFECTIVE DATE CORPORATE EXISTENCE**

**1.       Organizational Documents**

Subject to any restructuring transactions permitted under Article IV of the Plan, the Plan provides that each Debtor shall continue to exist after the Effective Date as a separate corporate entity or limited liability company, with all the powers of a corporation or limited liability company pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents in the case of a limited liability company) in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws (or other formation documents in the case of a limited liability company) are amended by or in connection with the Plan or otherwise.  Any such amendments are deemed to be authorized pursuant to the Plan without the need for any other approvals, authorizations, actions or consents.

The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.  Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Holdings shall be governed by the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws.  From and after the Effective Date, the organizational documents of each of the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code for so long as it is applicable.

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors, officers, employees or agents who were directors, officers, employees or agents of such Debtor, at any time prior to the Effective Date, at least to the same extent as the bylaws of each of the respective Debtors on the Commencement Date, against any eClaims or Causes of Action, whether direct or derivative, liquidated or unliquidated, fixed or

contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors', officers', employees' or agents' rights; *provided* that, with respect to former officers and directors, the Debtors shall be obligated to indemnify such individuals only to the extent of available coverage under their D&O Liability Insurance Policies (and payable from the proceeds of such D&O Liability Insurance Policies), including the advancing of defense costs prior to final adjudication.

### 2. Post-Effective Date Governance

(a)    Executive Officers

The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the board of directors to remove or replace them in accordance with the Debtors' organizational documents and any applicable employment agreements.

(b)    New Board of Directors

The New Board shall consist of [seven (7]) directors.  The Prepetition Lenders will identify potential directors through use of a search firm acceptable to the Prepetition Agent (with reasonable fees and expenses to be paid by the Debtors) and shall initially designate all such directors upon consultation with the Debtors' Chief Executive Officer.  Certain independent directors may, however, be requested to continue to serve on the New Board.  The existing directors of each of the subsidiary Debtors shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

*The identity of each of the members of the New Board will be disclosed <u>prior to the Confirmation Hearing</u> and any  <u>Any</u> directors elected pursuant to this section shall be subject to approval of the Bankruptcy Court pursuant to <u>and to the extent necessary to satisfy</u> section 1129(a)(5) of the Bankruptcy Code.*

## G.    COMPENSATION, PENSION AND BENEFIT PLANS AND RELATED MATTERS

### 1. Management Compensation Programs

The Plan contemplates the adoption of two incentive compensation programs that will provide customary cash-based incentives for continuing employees eligible to participate in such plans:  (a) the Variable Compensation Plan and (b) the Enterprise Value Maximization Plan.  The Plan also provides for the Management Equity Plan, which will grant equity awards to certain continuing employees and directors of the Reorganized Debtors.  Each of the plans are described below.  The terms and provisions of the Variable Compensation Plan, the Enterprise Value Maximization Plan and the Management Equity Plan will be set forth in the Plan Supplement filed prior to the Voting Deadline (as discussed in Section I.D **herein,** entitled, "**Additional Plan-Related** Documents to be Filed in Connection With the Plan").

(a)    Variable Compensation Plan

The Variable Compensation Plan is a broad-based incentive plan designed to incent the delivery of shorter-term financial goals, including, among other things, incremental cash EBITDA for the fiscal year ending June 30, 2010, and provide strong retention value.  This plan includes target award opportunities (expressed as a percentage of base salary) established relative to the grade level and criticality of the role of each participant.  Awards will be payable in Cash at the end of the fiscal year ending June 30, 2010, and based upon audited results.  Subject only to the occurrence of the Effective Date, the Plan provides that the Variable Compensation Plan shall become effective without any further action by the Reorganized Debtors.

(b)    Enterprise Value Maximization Plan

The Enterprise Value Maximization Plan is an incremental executive plan designed to incent the delivery of longer-term value creation initiatives though rewarding (a) realization of increasing enterprise value and (b) speed to

emergence, to executives with broad enterprise-wide responsibilities or those whom can impact time to emergence, respectively (with certain select participants receiving both). With respect to the former, performance is measured by enterprise-wide cash EBITDA at the end of a one-year performance period (the fiscal year ending in June 30, 2010), and the award is in the form of a Cash payment based on a Pro Rata share of cash EBITDA improvement over approved business plan cash EBITDA. With respect to the latter, the performance measure is based upon enterprise value created from the benefits of a prompt exit from bankruptcy. Those benefits include, among other things, (a) a shorter horizon after which senior and mid-level management will be able to devote full attention to business operations, (b) decreased exposure to trade risk from advertisers and vendors and (c) reduced costs of Retained Professionals. Subject only to the occurrence of the Effective Date, the Plan provides that the Enterprise Value Maximization Plan shall become effective without any further action by the Reorganized Debtors

<p style="text-align:center">(c)    <u>Management Equity Plan</u></p>

The Management Equity Plan will provide for the granting of equity awards (up to 2.5% in the form of restricted New Common Stock and 5% in the form of options or warrants) for 7.5% of the New Common Stock (on a fully-diluted basis) to continuing employees of the Reorganized Debtors and members of the New Board. The pricing, vesting and exercise terms of the Management Equity Plan will be determined by the New Board upon consultation with the Reorganized Debtors' Chief Executive Officer. The New Board will adopt and implement the Management Equity Plan on or as soon as practical after the Effective Date; however, the Debtors reserve the right to amend the Management Equity Plan with the consent of the Prepetition Agent and the Required Consenting Lenders at any time prior to the Effective Date.

**2.    Employee Compensation and Benefits Programs**

For purposes of the Plan, the Reorganized Debtors' obligations under all employment and severance policies, and all compensation and benefit plans, policies and programs and other arrangements (and all amendments and modifications thereto), in each case in place as of the Effective Date, applicable to the Debtors' employees, former employees, retirees and non-employee directors and employees, former employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans (other than the Non-Qualified Retirement Plans), health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans (collectively, the "***Compensation and Benefits Programs***") shall be deemed assumed on the Effective Date pursuant to the provisions of section 365 and 1123 of the Bankruptcy Code, *except* with respect to any Compensation and Benefits Programs that (a) are listed in the Plan Supplement to be rejected or terminated, which includes, without limitation, the 2006 Income Continuation Plan for Senior Management., (b) have previously been rejected or terminated or (c) are the subject of pending rejection procedures or a motion to reject, or have been specifically waived by the beneficiaries of any employee benefit plan or contract as of the date the Confirmation Order is entered by the Bankruptcy Court.

The assumption or continuation of Compensation and Benefits Programs identified in the Plan Supplement shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein (unless a Compensation and Benefits Program counterparty timely objects to the assumption or continuation contemplated by this Section in which case any such Compensation and Benefits Program shall be deemed rejected or discontinued as of immediately prior to the Commencement Date). No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption or continuation.

<p style="text-align:center">(a)    <u>Retiree Health Benefits</u></p>

**The Reorganized Debtors' obligations with respect to the payment of "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) SHALL continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, subject to any contractual rights to terminate or modify such benefits.**

The Reader's Digest Association, Inc. currently maintains a plan that provides post-retirement medical and dental benefits to various groups of former employees (and their spouses and dependents) and is intended to provide post-retirement medical and dental benefits to certain active employees of participating Debtors (and their spouses and dependents) upon such employees' future retirement.

K&E 15673799 15735883.

Currently, the plan provides that former employees (and their spouses and dependents) who retired from participating Debtors on or after January 1, 1985 and have not attained age 65 are eligible for Debtor-subsidized retiree medical benefits through 2017 and Debtor-subsidized retiree dental benefits through 2009.  For former employees (and their spouses and dependents) who retired from participating Debtors on and after January 1, 1985 and who have attained age 65 or older, the current plan provides for Debtor-subsidized retiree medical coverage through 2012 and Debtor-subsidized retiree dental coverage through 2009.

With respect to former employees (and their spouses and dependents) who retired from participating Debtors prior to January 1, 1985, retiree medical and dental benefits continue to be 100% -subsidized by the Debtors.  The Reader's Digest Association, Inc. has reserved its rights to unilaterally amend, modify and terminate its retiree medical and dental plans to the extent consistent with applicable law **and the applicable plans**.

The Debtors' actuaries have estimated that the accumulated post-retirement benefit obligation for retiree medical and dental benefits as of June 30, 2009, is $18 million.

<p style="text-align:center">(b)      Qualified Pension Plan</p>

**The Debtors or the Reorganized Debtors, as applicable, SHALL also continue the Pension Plan in accordance with its terms, and the Debtors or Reorganized Debtors, as applicable, shall satisfy the minimum funding standards and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code, subject to any contractual or statutory rights to terminate or modify such plan.**

The Reader's Digest Association, Inc. sponsors The Reader's Digest Association, Inc. Retirement Plan, (the "***Retirement Plan***"), which is a defined benefit pension plan in which most domestic employees of the Debtors are entitled to participate.  Based on information provided by The Reader's Digest Association, Inc, as of June 30, 2009, the estimated projected benefit obligation under the Retirement Plan was $406 million and  the estimated market value of assets was approximately $~~509~~**510** million.  **As of the Commencement Date, the Retirement Plan was over-funded and the Debtors do not owe any prepetition amounts on account of this plan.**

To reduce the ~~C~~cash cost of funding severance benefits, prior to the Commencement Date, as part of their prepetition restructuring initiatives, the Debtors amended the ~~Reader's Digest~~ Retirement Plan to provide a special pension credit to eligible terminated ~~E~~employees terminated after April 1, 2009, and on or before December 31, 2009.  This amendment effectively transferred the obligation to fund severance benefits from Reader's Digest to the Reader's Digest Retirement Plan. The Debtors expect to amend the Pension Plan to extend the program to include employees terminated through December 31, 2010.  **As of October 20, 2009, the aggregate amount of severance payments that have been paid from the Retirement Plan is approximately $3.4 million.**

<p style="text-align:center">(c)      Non-Qualified Retirement Plans</p>

**For the avoidance of doubt, the Debtors SHALL NOT assume any obligations in connection with the Non-Qualified Retirement Plans in connection with the Plan.  Claims arising from the discontinuation, rejection or termination of the Non-Qualified Retirement Plans will be treated as Other General Unsecured Claims.**

~~Finally, as~~**As** of the Commencement Date, the Debtors provided retirement benefits pursuant to a series of unfunded non-qualified retirement and other deferred compensation arrangements.  As set forth in the Plan, the Non-Qualified Retirement Plans include (i) the Excess Benefit Retirement Plan, (ii) the Executive Retirement Plan, (iii) the Executive Cash Balance Plan, (iv) the 1988 Supplemental Employee Retirement Plan and related agreements, (v) the Director and Roving Editors Plan and/or related agreements or arrangements, and (vi) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor.   The participants in these non-qualified plans generally include former executives, officers and directors of the Debtors as well as certain other former and current employees and freelancers.

As of the Commencement Date, the Debtors estimate their accumulated obligations and/or liability under such non-qualified retirement plans are approximately $~~[80]~~**82.6** million.  **As a result of the chapter 11 cases the Debtors have ceased making payments in connection with these programs.  These benefits are unsecured claims which are treated as Other General Unsecured Claims in Class 5 under the Plan.**

**(d)**     **Pension Obligations of Certain Foreign Affiliates**

    **Certain of the Debtors' foreign Affiliates sponsor pension plans in their respective jurisdictions. In certain jurisdictions, the plans are underfunded. The Debtors do not believe that they have any liability with respect to the pension obligations of their non-debtor foreign Affiliates. To the extent applicable pension authorities assert Claims or Causes of Action against any of the Debtors for contribution or otherwise with respect to such pension obligations, including any underfunded pension liabilities, the Debtors believe all such Claims would constitute prepetition general unsecured Claims against these Estates subject to discharge under the Plan (and all related provisions set forth in Article IX of the Plan) pursuant to sections 1141 and 524 of the Bankruptcy Code, to the fullest extent provided under applicable nonbankruptcy law.**

    **3.**     **Workers' Compensation Programs**

    As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under all applicable workers' compensation laws in states in which the Reorganized Debtors operate and the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order or approval of the Bankruptcy Court. Nothing in the Plan, however, shall (a) limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans or (b) be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

**H.**     **RIGHTS OFFERING AND SUBSCRIPTION PROCESS**

    **1.**     **Exercise of Subscription Rights**

> **THIS IS ONLY A SUMMARY OF THE RIGHTS OFFERING AND SUBSCRIPTION PROCESS. ALL HOLDERS OF SENIOR SUBORDINATED NOTES ARE REFERRED TO THE SUBSCRIPTION PROCEDURES SET FORTH ON <u>EXHIBIT G</u> FOR A COMPLETE DESCRIPTION REGARDING SAME.**

    The Plan provides ~~for a Rights Offering that will commence on [____], 2009.~~ **that any** Eligible Noteholder~~s~~ shall have the right (a "***Subscription Right***") ~~to purchase up to an aggregate of $[50 100]~~ *million of the New Common Stock* ~~on a Pro Rata basis, based on the~~**to purchase (at a share price based on Plan Equity Value) shares of New Common Stock up to, and solely to the extent of, its Pro Rata share (*i.e.*, the ratio, expressed as a percentage, of the principal amount adjusted for unaccrued interest of an Eligible Noteholder's Senior Subordinated Note Claim as of the Record Date to the aggregate** amount of Senior Subordinated Note Claims ~~held by a participating Eligible Noteholder compared to the aggregate amount of all Senior Subordinated Note Claims~~**as of the Record Date) of up to $50** *million of the New Common Stock* **to be issued under the Plan (subject to dilution, as set forth in the Disclosure Statement)**. Participating Eligible Noteholders may exercise all or any portion of ~~its~~**their** Subscription Rights~~.~~**, subject to a minimum subscription amount of $500,000. The valid exercise of Subscription Rights shall be irrevocable.**

    ~~On the commencement date of the~~**The** Rights Offering~~.~~ **will commence on the day upon which** Financial Balloting Group LLC ~~(the "***Rights Offering Agent***"), will mail a subscription form (each, a "***Subscription Form***") and accompanying~~**"*FBG*") mails or otherwise makes available to Holders of Senior Subordinated Note Claims a "*Subscription Package*" comprised of the following materials: (a) a CD-ROM containing this Disclosure Statement (which is being provided solely for purposes of providing information regarding the Debtors, among other things, and not for purposes of voting on the Plan); (b) the notice of the Confirmation Hearing; and (iii) the form to exercise Subscription Rights (the "*Subscription Form*"), together with detailed** instructions for the proper completion, due execution and timely delivery of ~~such~~ Subscription ~~Form, as well as instructions~~**Forms and** for payment~~, to each Eligible Noteholder~~ **of the purchase price**.

    To ~~participate in the~~**exercise Subscription** Rights~~Offering~~, each Eligible Noteholder must affirmatively elect to exercise its Subscription Rights on or before [____] (the "***Subscription Expiration Date***") by

returning**Noteholders must (i) return** a duly-completed Subscription Form ~~together with payment of the appropriate~~**to FBG and (ii) pay to FBG, by wire transfer in immediately available funds, an amount equal to the full** subscription purchase price ~~as set forth in and pursuant to with the instructions that accompany~~**for the number of shares of the New Common Stock elected to be purchased by each Eligible Noteholder (calculated according to the formula set forth in** the Subscription Form ~~so both~~**, the "*Subscription Purchase Price*"), so that both the Subscription Form and payment of the Subscription Purchase Price** are *actually* *received* by ~~the Rights Offering Agent on or before the Subscription Expiration Date in accordance with the attached Subscription Procedures.   The Subscription Rights are not transferable.~~**FBG by 6:00 p.m. prevailing Eastern Time on December [7], 2009 (the "*Expiration Date*").**

2.    **Failure To Timely Subscribe**

If the Rights Offering Agent for any reason does not receive both a duly completed Subscription Form and immediately available funds as set forth above on or before the Subscription Expiration Date from a given Eligible Noteholder of Subscription Rights, then such Eligible Noteholder shall be deemed to have relinquished and waived its right to participate in the Rights Offering.  Any attempt to exercise Subscription Rights after the Subscription Expiration Date shall be null and void and the Debtors shall not be obligated to honor any such purported exercise received by the Rights Offering Agent after the Subscription Expiration Date regardless of when the documents relating to such exercise were sent.  The Debtors may use commercially reasonable efforts to give notice to any holder regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such holder of Subscription Rights and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate.  However, neither the Debtors nor the Rights Offering Agent will have any obligation to provide such notice or incur any liability for failure to give such notification.

3.    **Use of Rights Offering Proceeds**

Payments made in accordance with the Rights Offering (the "*Rights Offering Funds*") shall be deposited and held in escrow pending the Effective Date in an account or accounts administered by the Rights Offering Agent, which shall:  (a) not constitute property of the Debtors or the Debtors' Estates until the Effective Date; (b) be separate and apart from the Rights Offering Agent's general operating funds and any other funds subject to any lien or any Cash collateral arrangements; and (c) be maintained for the purpose of holding the funds for administration of the Rights Offering until the Effective Date.  The Rights Offering Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by the Debtors or the Reorganized Debtors, as applicable, on the Effective Date and shall not encumber or permit the Rights Offering Funds to be encumbered by any lien or similar encumbrance.  No interest will be paid to entities exercising Subscription Rights on account of amounts paid in connection with such exercise**.  Once transferred to the Debtors, proceeds of the Rights Offering will be used for general corporate purposes**.

I.    **PRESERVATION OF CERTAIN RIGHTS OF ACTION**

1.    **Overview of Avoidance Actions Generally**

**Certain transactions may have occurred prior to the Commencement Date that could potentially give rise to Avoidance Actions (including, without limitation, preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or non-bankruptcy law).  Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of Avoidance Actions against the Debtors (or Reorganized Debtors, as applicable) under sections 544, 545, 547 548 and 553 of the Bankruptcy Code will expire on August 24, 2011 (*i.e.*, two years from the Commencement Date).**

**The Debtors believe that any potential recoveries from Avoidance Actions are uncertain in light of, among other things, the various defenses and arguments that could be asserted.  Likewise, the Liquidation Analysis attached hereto does not reflect any potential recoveries that might be realized by a chapter 7 trustee's potential pursuit of any avoidance actions because the Debtors' believe such claims are highly speculative.  Accordingly, the Debtors have not initiated or pursued any such causes of action because they**

are not aware, at this time, of any possible Avoidance Actions that could materially increase the recovery of the Debtors' unsecured creditors.

### (a)    Preference Actions

Under sections 547 and 550 of the Bankruptcy Code, a debtor may seek to avoid and recover certain prepetition payments and other transfers made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (i) was made when the debtor was insolvent and (ii) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code where the transfer had not been made.  Transfers made to a creditor that was not an "insider" of the debtor are subject to these provisions generally only if the payment was made within 90 days prior to the debtor's filing of a petition under chapter 11 of the Bankruptcy Code (the "*Preference Period*").

Under section 547 of the Bankruptcy Code, certain defenses, in addition to the solvency of the debtor at the time of the transfer and the lack of preferential effect of the transfer, are available to a creditor from which a preference recovery is sought.  Among other defenses, a debtor may not recover a payment to the extent such creditor subsequently gave new value to the debtor on account of which the debtor did not, among other things, make an otherwise unavoidable transfer to or for the benefit of the creditor.

A debtor may not recover a payment to the extent such payment was part of a substantially contemporaneous exchange between the debtor and the creditor for new value given to the debtor.  Further, a debtor may not recover a payment if such payment was made, and the related obligation was incurred, in the ordinary course of business of both the debtor and the creditor.  The debtor has the initial burden of proof in demonstrating the existence of all the elements of a preference and is presumed to be insolvent during the Preference Period.  The creditor has the initial burden of proof as to the aforementioned defenses.

### (b)    Fraudulent Transfer and Conveyance Actions

Generally, a conveyance or transfer is fraudulent if: (i) it was made with the actual intent to hinder, delay or defraud a creditor (*i.e.*, an intentional fraudulent conveyance); or (ii) reasonably equivalent value was not received by the transferee in exchange for the transfer and the debtor was insolvent at the time of the transfer, was rendered insolvent as a result of the transfer or was left with insufficient capitalization as a result of the transfer (*i.e.*, a constructive fraudulent conveyance).  Two primary sources of fraudulent conveyance law exist in a chapter 11 case:

- The first source of fraudulent conveyance law in a chapter 11 case is section 548 of the Bankruptcy Code, under which a debtor in possession or bankruptcy trustee may avoid fraudulent transfers that were made or incurred on or within one year before the date that a bankruptcy case is filed.

- The second source of fraudulent conveyance law in a chapter 11 case is section 544 of the Bankruptcy Code—the so-called "strong-arm provision"—under which the debtor in possession (or creditors with Bankruptcy Court permission) may have the rights of a creditor under state law to avoid transfers as fraudulent.  State fraudulent conveyance laws generally have statutes of limitations longer than one year and are applicable in a bankruptcy proceeding pursuant to section 544 of the Bankruptcy Code if the statute of limitations with respect to a transfer has not expired prior to the filing of the bankruptcy case.  If such statute of limitations has not expired, the debtor in possession (or creditors with Bankruptcy Court permission) may bring the fraudulent conveyance claim within the time period permitted by section 546 of the Bankruptcy Code notwithstanding whether the state statute of limitations period expires prior to such time.

### 2.    Retention of Rights To Prosecute Causes of Action

In**Subject to the provisions set forth in Article IX of the Plan, in** accordance with section 1123(b) of the Bankruptcy Code but subject to the releases set forth in Article IX.E of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Commencement Date, and the Reorganized Debtors' rights to commence, prosecute, or

K&E 15673799.15735883.

settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. ~~The reorganized~~ **or** *the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan*. **Any** *Causes of Action that a Debtor may hold against any* **Entity shall vest in the applicable Reorganized Debtor, and the Reorganized** Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

Unless any Causes of Action against ~~a Person~~**an Entity** are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

K&E ~~15673799~~ **15735883.**

~~No Person *may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.*~~

Subject to the releases set forth in Article IX of the Plan, the Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding ~~*the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person shall vest in the applicable Reorganized Debtor.*~~ The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

~~Further, any~~**Any** recovery paid or payable to the Debtors or the Prepetition Lenders from proceeds of any Cause of Action against the Consenting Shareholders (either directly or indirectly or pursuant to the subordination provisions of the Senior Subordinated Notes Indenture) shall be payable to such Consenting Shareholders and if any of such parties receive any recovery on account of such Cause of Action, they shall hold the proceeds of any payment thereof in trust for the Consenting Shareholders and shall promptly transfer such proceeds or payment, as the case may be, to the Consenting Shareholders.

**No Entity *may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.***

## J.    TREATMENT OF CONTRACTS AND LEASES

### 1.    Assumption of Executory Contracts and Unexpired Leases Generally

Subject to the provisions ~~herein~~**in the Plan**, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date ~~unless such~~**except any** Executory Contract or Unexpired Lease~~: (1~~**a**~~) was~~**previously** assumed or rejected ~~previously~~ by the Debtors~~; (2) is~~ **during these Chapter 11 Cases, (b)** identified on the ~~list of Executory Contracts and Unexpired Leases to be rejected filed pursuant to the Plan Supplement, which such list shall be filed on or before~~**Contract/Lease Schedule (which will be filed with the Bankruptcy Court on** the Contract/Lease Schedule Date~~ and shall not be modified by the Debtors after the Contract/Lease Schedule Date; (3)~~**) as an Executory Contract or Unexpired Lease designated for rejection, (c) which** is the subject of a separate motion or notice to reject filed by the Debtors ~~on or before the Contract/Lease Schedule Date; *provided* that the Debtors shall not file any separate motions or notices to reject Executory Contracts or Unexpired Leases after the Contract/Lease Schedule Date if the Plan is still pending or has been consummated; or (4) previously expired or terminated pursuant to its own terms~~**and pending as of the Confirmation Hearing**.

~~Entry~~**The Plan provides that entry** of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases ~~as set forth in the Plan, all~~ pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated **in the Plan, by separate motion or otherwise**, all assumptions or rejections of such Executory Contracts and Unexpired Leases ~~in~~**pursuant to** the Plan are effective as of the Effective Date. Each such Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party prior to the Effective Date, shall ~~revest~~**re-vest** in~~,~~ and be fully enforceable by~~,~~ the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or order of the Bankruptcy Court.

Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified ~~in~~

44

~~the Plan Supplement~~**on the Contract/Lease Schedule in their discretion prior to the Effective Date on proper notice to the non-debtor Entity party thereto**.

**2.**      **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any provisions or terms of the Debtors' Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, solely by Cure or by an agreed-upon waiver of Cure on or as soon as reasonably practicable after the Effective Date.

The Debtors will file the Contract/Lease Schedule(s) with the Bankruptcy Court at least [25]twenty (20) days prior to the Confirmation Hearing. The Contract/Lease Schedule will include (a) the name of the non-debtor counterparty, (b) the legal description of the contract or lease to be assumed or rejected and (c) in the case of assumption, the proposed Cure, if any. On or as soon as practicably thereafter, with the assistance of the Noticing and Claims Agent, the Debtors will serve the Contract/Lease Schedule and notice of filing upon each non-debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption or rejection of their respective Executory Contract or Unexpired Lease and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.

Objections, if any, to the proposed assumption and/or Cure or rejection by the Debtors of any Executory Contract or Unexpired Lease listed on the Contract/Lease Schedule, must be filed with the Bankruptcy Court and served so as to be *actually received* by the Debtors prior to the Confirmation Hearing on or before a date to be determined, but that in any event is consistent with the provisions of the Debtors' Case Management Order. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or Cure will be deemed to have assented to such matters (except that the Cure Objection Deadline shall not apply to any franchise or Executory Contract with a state or local franchise authority), and any subsequent or additional requests for Cure, other payments or assurances of future performance shall be disallowed, automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released and discharged, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary.

Nothing shall prevent the applicable Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

In the event of a dispute regarding (1) the amount of any payments to Cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the applicable Debtor or Reorganized Debtor, and the counterparty to the Executory Contract or Unexpired Lease.

If an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it **on proper notice to the non-debtor Entity party thereto, which non-debtor Entity parties shall then be entitled to file Proofs of Claim asserting Claims arising from the rejection thereof, if applicable, in accordance with the terms of the Plan and the Claims Bar Date Order entered by the Bankruptcy Court in these Chapter 11 Cases**.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, except any Executory Contract with a state or local franchise authority, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest (or payments relating to such change in control) or composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to or upon the effective date of assumption.

Except as provided elsewhere herein**in the Plan**, any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

**The Debtors or Reorganized Debtors, as applicable, reserve the right, either to reject or nullify, the assumption of any Executory Contract or Unexpired Lease no later than thirty (30) days after entry of any Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.**

46

### 3. Contracts and Leases Entered Into After the Commencement Date

Contracts and leases entered into after the Commencement Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### 4. Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise must be filed by Holders of such Claims with the ~~Notice,~~**Noticing and** Claims ~~and Solicitation~~ Agent no later than thirty **(30)** days after the later of (a) the Effective Date or (b) the effective date of earlier rejection for such Holders to be entitled to receive distributions under the Plan on account of such Claims~~; *provided* that any such Claims for earlier rejected contracts or leases must be filed by no later than 20 calendar days prior to the Voting Deadline for the Holder of such Claim to be entitled to vote on the Plan.~~**. Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease will be provided with notice of the Confirmation Hearing, which will, among other things, inform such Entities how they may vote on the Plan pursuant to, and as described in greater detail in, the Solicitation Procedures Order.**

47

Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

5.        **Indemnification and Reimbursement Obligations**

On and from the Effective Date, and except as prohibited by applicable law or subject to the limitations set forth ~~herein~~**in the Plan**, the Reorganized Debtors shall assume all indemnification obligations currently in place, whether in the bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts or other agreements for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', managers', and employees' respective Affiliates (collectively, the "***Indemnified Parties***") **to the extent set forth in Article V.F**.  Each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, such Indemnified Parties to the extent provided in Article ~~VI~~**IV.E** of the Plan.

Without limiting the foregoing and except as prohibited by applicable law, the Debtors shall indemnify and hold harmless each of the Indemnified Parties for all costs, expenses, loss, damage or liability incurred by any such Indemnified Party arising from or related in any way to any and all Causes of Action whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, including any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those related in any way to:

- any action or omission of any such Indemnified Party with respect to any indebtedness of or any Equity Interest in the Debtors (including any action or omission of any such Indemnified Party with respect to the acquisition, holding, voting or disposition of any such investment);

- any action or omission of any such Indemnified Party in such Indemnified Party's capacity as an officer, director, member, employee, partner or agent of, or advisor to any Debtor;

- any disclosure made or not made by any Indemnified Party to any current or former Holder of any such indebtedness of or any such Equity Interest in the Debtors;

- any consideration paid to any such Indemnified Party by any of the Debtors in respect of any services provided by any such Indemnified Party to any Debtor; and

- any action taken or not taken in connection with the Chapter 11 Cases or the Plan.

In the event that any such Indemnified Party becomes involved in any action, proceeding or investigation brought by or against any Indemnified Party, as a result of matters to which the foregoing "Indemnification" may relate, the Reorganized Debtors shall promptly reimburse any such Indemnified Party for its reasonable and documented legal and other expenses (including advancing the costs of any investigation and preparation prior to final adjudication) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof.

Notwithstanding anything ~~herein~~**in the Plan** to the contrary, with respect to former officers and directors, the Debtors' obligation to indemnify such individuals shall be limited to the extent of available coverage under their D&O Liability Insurance Policies (and payable from the proceeds of such D&O Liability Insurance Policies), including advancing the costs of any investigation and preparation prior to final adjudication as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof.

48

6.      **D&O Insurance Policies and Agreements**

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of same **effective as of the Effective Date**.  Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy" in effect on the Commencement Date) with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

K.      **DISTRIBUTIONS ON ACCOUNT OF ALLOWED CLAIMS**

1.      **Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date; *provided*, *however*, that payments, **Payments** on account of General Unsecured Claims ~~that become~~ Allowed ~~Claims on or before~~**as of** the Effective Date shall commence on the Effective Date.

2.      **Claims Allowed After the Effective Date**

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims.

3.      **Other General Unsecured Claims Escrow Account**

**On or as reasonably practicable after the Effective Date, $3 million shall be deposited into an escrow account separate and apart from the Debtors' general operating funds to be maintained in trust for the benefit of Holders of Allowed Class 5 Other General Unsecured Claims.  Distributions from this account to Holders of Allowed Class 5 Other General Unsecured Claims shall be made in accordance with the provisions governing distribution set forth in Article VI of the Plan.  To the extent the account is an interest bearing account, Holders of Allowed Class 5 Claims will share ratably in any accrued interest.**

**Upon payment in full of all Allowed Class 5 Other General Unsecured Claims, all funds remaining in the escrow account, if any, and all interest and/or other similar earnings therefrom, if any, shall be paid over to, vest in and become the property of the Reorganized Debtors in accordance with applicable non-bankruptcy law.**

**4.**      ~~3.~~ **Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on or as soon as reasonably after the date that such a Claim becomes an Allowed Claim), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that

49

the Plan provides for Allowed Claims in the applicable Class.  **Distributions on account of Other General Unsecured Claims that become Allowed Claims before the Effective Date shall be paid on the Effective Date.**

~~Distributions on account of Other General Unsecured Claims that become Allowed Claims before the Effective Date shall be paid on the Effective Date.~~  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VI of the Plan.  Except as otherwise provided ~~herein~~**in the Plan**, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for ~~herein~~**in the Plan**, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**5.**    **4. Setoffs**

The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.

**Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided ~~herein~~in the Plan.**

**6.**    **5. Claims Paid or Payable by Third Parties**

(a)    Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan**; *provided, that* if the Debtors become aware of the payment by a third party, the Debtors or Reorganized Debtors, as applicable, will send a notice of wrongful payment to such party requesting return of any excess payments and advising the recipient of the provisions of the Plan requiring turnover of excess estate funds**.

The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

(b)    Claims Payable by Insurers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such

insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein**in the Plan** constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## L.    RESOLUTION OF CONTINGENT, UNLIQUIDATED OR DISPUTED CLAIMS

### 1.    Allowance of Claims

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

### 2.    Prosecution of Objections to Claims

Any objections to Claims shall be filed no later than the Claims Objection Bar Date.  With respect to all Tort Claims, an objection is deemed to have been filed timely, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date.  Each such Tort Claim shall remain a Disputed Claim unless and until it becomes an Allowed Claim.  After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date until the Claims Objection Bar Date, the Reorganized Debtors, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.

### 3.    Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 4.    Disallowance of Claims

All Claims of any Entity from which property is sought by the Debtors or the Reorganized Debtors under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the

Bankruptcy Code shall be disallowed if the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

Except as otherwise agreed, any and all proofs of claim filed after the applicable claims bar date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late proof of claim is deemed timely filed by a Bankruptcy Court order on or before the later of (1) the Confirmation Hearing and (2) **forty-five** (45) days after the applicable c**C**laims b**B**ar d**D**ate.

On or after the Effective Date, except as otherwise provided ~~herein~~**in the Plan**, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

## M.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1.    Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, ~~Equity~~ Interests~~,~~ and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

### 2.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.  No Holder of a Senior Subordinated Note Claim shall receive any distribution on account of such Senior Subordinated Note Claim, and all Senior Subordinated Note Claims shall be extinguished.

### 3.    Discharge of Claims and Termination of Equity Interests

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the reorganized Debtors), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Commencement Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by the employees of the Debtors prior to the Commencement Date and arise from a termination

of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.

Except as otherwise provided ~~herein~~**in the Plan**, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.

### 4.       Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

### 5.       Debtor Release

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission or the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, or upon any other act or omission, transaction, or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary ~~herein~~in the Plan, the foregoing "Debtor Release" shall not operate to waive or release any Causes of Action of any Debtor: (1) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan, including, without limitation, the Exit Credit Agreement, New Second Priority Term Loan Agreement or the Shareholders Agreement or documents, agreements or instruments executed in connection therewith or (2) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.**

Entry of the Confirmation Order Shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained ~~herein~~ **in the Plan**, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Reorganized Debtors asserting any claim released by the Debtor Release against any of the Released Parties.

### 6.    Releasing Party Release

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including, without limitation, those that any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission or the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents, or upon any other act or omission, transaction, or occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes criminal conduct, willful misconduct or gross negligence.**

Notwithstanding anything contained ~~herein~~ **in the Plan** to the contrary, the foregoing release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order Shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the consensual Releasing Party Release, which includes by reference each of the related provisions and definitions contained ~~herein~~ **in the Plan**, and further, shall constitute the Bankruptcy Court's finding that the Releasing Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the Releasing Party Release against any of the Released Parties.

Notwithstanding anything in the Plan, no Person shall be discharged, released, or relieved from any liability with respect to the Pension Plan as a result of the Chapter 11 Cases or the Plan, nor shall the PBGC, the Pension Plan or any other Person be enjoined or precluded from enforcing any liability with respect to the Pension Plan as a result of the Chapter 11 Cases, the provisions of the Plan or confirmation of the Plan.

### 7.    Consideration Provided by the Released Parties

Each of the Released Parties afforded value to the Debtors and aided in the reorganization process and have provided or will provide good and valuable consideration in exchange for the release provisions set forth in the Plan. Indeed, each of the provisions set forth in Article IX of the Plan were a critical component of, and gating item for, the Debtors' ability to achieve a prearranged plan of reorganization that provides maximum recovery value to the

54

Debtors' creditors and affords the Reorganized Debtors the opportunity to restructure their businesses to compete effectively post-emergence. Accordingly, the Debtors believe that the release provisions of the Plan are appropriate.

**8.      Exculpation**

**Upon and effective as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring consultants and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code , including section 1125(e) of the Bankruptcy Code. Except with respect to any acts or omissions expressly set forth in and preserved by the Plan, the Plan supplement or related documents, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, including, without limitation, the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; formulating, negotiating, preparing, disseminating, implementing and/or effecting the Restructuring Support Agreement, the DIP Credit Agreement, the Disclosure Statement and the Plan (including the Plan Supplement and any related contract, instrument, release or other agreement or document created or entered into in connection therewith); the solicitation of votes for the Plan and the pursuit of Confirmation and Consummation of the Plan; the administration of the Plan and/or the property to be distributed under the Plan; the offer and issuance of any securities under the Plan, including pursuant to the Rights Offering; and or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors. In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its respective duties under, pursuant to or in connection with, the Plan.**

**Notwithstanding anything ~~herein~~in the Plan to the contrary, nothing in the foregoing "Exculpation" shall (1) exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages or ultra vires acts as determined by a Final Order or (2) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).**

**9.      Injunction**

**The satisfaction, release and discharge pursuant to this Article IX of the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

**N.      MODIFYING, REVOKING OR WITHDRAWING THE PLAN**

Subject to the limitations contained in the Plan and the Restructuring Support Agreement, and in accordance with the Restructuring Support Agreement: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019. Subject to the Restructuring Support Agreement and conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a

waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

# V.
# VALUATION AND FINANCIAL PROJECTIONS

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS.  THE VALUE OF THE NEW COMMON STOCK DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE.

## A.    VALUATION OF THE REORGANIZED DEBTORS

In connection with developing the Plan, the Debtors directed Miller Buckfire to estimate the Reorganized Debtors' going-concern value.  In preparing the estimated total enterprise value range, Miller Buckfire:  (i) reviewed certain historical financial information of the Debtors for recent years and interim periods; (ii) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (iii) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Debtors; (iv) considered certain economic and industry information relevant to the Debtors' operating businesses; (v) reviewed certain analyses prepared by other firms retained by the Debtors; and (vi) conducted such other analyses as Miller Buckfire deemed appropriate.

Although Miller Buckfire conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans, Miller Buckfire relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and publicly available information.  No independent evaluations or appraisals of the Debtors' assets were sought or were obtained in connection therewith.

In performing its analysis, Miller Buckfire applied two commonly-accepted valuation methodologies:  (i) the discounted cash flow methodology and (ii) the comparable public companies trading multiples methodology.  The comparable companies trading multiples methodology involved identifying a group of publicly-traded companies whose businesses, operating characteristics and geographic footprints are generally similar to the Debtors'.  Miller Buckfire then developed a range of valuation multiples to apply to the Debtors' financial projections to derive a range of implied enterprise values for the Reorganized Debtors.  The discounted cash flow methodology involved deriving the unlevered free cash flows that the Reorganized Debtors would generate assuming the financial projections were realized.  To determine the Reorganized Debtors' enterprise value range, these cash flows and an estimated enterprise value at the end of the projection period were discounted to an assumed Emergence Date of December 31, 2009, using the Reorganized Debtors' estimated weighted average cost of capital.

Miller Buckfire estimates the total enterprise value of the Reorganized Debtors to be between approximately $900 million and $1,050 million, as of an assumed Effective Date of December 31, 2009.  The range of total equity value, which takes into account the total enterprise value less estimated net debt outstanding as of an assumed Effective Date of December 31, 2009, was estimated by Miller Buckfire to be between approximately $475 million and $625 million.

This valuation is based upon information available to, and analyses undertaken by, Miller Buckfire as of October 1, 2009, and reflects, among other factors discussed below, the Debtors' income statements and balance sheets, current financial market conditions and the inherent uncertainty today as to the achievement of the Debtors' financial projections prepared by the Debtors with the assistance of AlixPartners.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, achieving the forecasts reflected in the financial projections, the amount of available Cash, market conditions and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.

Additionally, an estimate of total enterprise value is not entirely mathematical but, rather, involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business.

Further, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates; conditions in the financial markets; the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of the post reorganization market trading value. Such trading value may be materially different from the total enterprise value ranges associated with Miller Buckfire's valuation analysis. Indeed, there can be no assurance that any trading market will develop for the New Common Stock. Furthermore, in the event that the actual distributions in these Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, impaired classes Claims holders actual recoveries could be significantly higher or lower than estimated by the Debtors.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of their businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a businesses.

Because valuation estimates are inherently subject to uncertainties, neither the Debtors, Miller Buckfire, nor any other person assumes responsibility for their accuracy, but the Debtors believe the estimates have been prepared in good faith based on reasonable assumptions.

## B.    FINANCIAL PROJECTIONS

As ~~further~~ discussed in Section VI.A ~~of this Disclosure Statement~~ **herein, entitled "Statutory Requirements for Confirmation of the Plan,"** the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies the "feasibility" standard, the Debtors, with the assistance of AlixPartners, prepared the financial projections for the years of 2010 through 2014 set forth on **Exhibit D** (the "*Financial Projections*"). In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly de-leveraged capital structure, the Reorganized Debtors will be viable. The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Debtors including, without limitation, an increased risk of inability to meet sales forecasts and higher reorganization expenses. Additionally, the estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies. They also are based on factors such as industry performance, general business,

economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control.

Because future events and circumstances may differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be greater or less, perhaps materially, than those contained in the Financial Projections.

**No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur.   The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future  performance.**

**The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments.  The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out.  The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.**

K&E ~~15673799~~ 15735883.

# VI.
# CONFIRMATION AND CONSUMMATION OF THE PLAN

**A.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment:  (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan (*discussed in more detail in Section VI.A.1 below*).

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code  (*discussed in more detail in Section VI.A.4 below*).

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the Clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in each of the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is converted or dismissed, whichever occurs first.

1.        **Best Interests of Creditors Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the bankruptcy court must:  (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's Chapter 11 Cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for:  (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the Cash amount that would be available for satisfaction of Claims (other than Secured Claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation.  Such Cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the Debtors' business and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the Liquidation Analysis attached hereto as **Exhibit E**, the Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class with a greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.  In addition, distributions in chapter 7 cases may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions.  In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors. Thus, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

2.        **Feasibility Requirements**

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of, or the need for further financial reorganization, of the debtor unless the plan contemplates such liquidation or reorganization.  As mentioned above, the Debtors have analyzed their ability to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses.  As demonstrated by their Financial Projections, the Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code because (a) Confirmation is not likely to be followed by liquidation of the Reorganized Debtors or (b) the need for further financial reorganization of the Reorganized Debtors.  The Financial Projections, together with the assumptions on which they are based, are attached hereto as **Exhibit D**.

In general, as illustrated by the Financial Projections, the Debtors believe that with the significantly de-leveraged capital structure provided under the Plan, the Reorganized Debtors should have sufficient cash flow and availability to pay and service their debt obligations and to fund operations.  The Debtors believe that Confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

K&E ~~15673799~~ 15735883.

3.    **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

Claims in Classes 1, 2, 9 and 10 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

Claims in Classes 3, 4 and 5 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed <u>without</u> application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described ~~herein~~**directly below**. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

4.    **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

(a)    <u>No Unfair Discrimination</u>

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes. Accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

(b)    <u>Fair and Equitable</u>

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

K&E ~~15673799~~**15735883.**

- Secured Claims.  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- Unsecured Claims.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either:  (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- Equity Interests.  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o   the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or

  o   if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the deemed rejection by Classes 6, 7 and 8.  To the extent that any of the Voting Classes vote to reject the Plan, the Debtors further reserve the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) to modify the Plan in accordance with Article XII.A of the Plan.

Notwithstanding the deemed rejection by Classes 6, 7 and 8 (or any Class that votes to reject the Plan, if applicable) the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or ~~Equity~~ Interests.  ~~As to Classes 6, 7 and 8, there is no class~~**First, no Class** of equal priority **is** receiving more favorable treatment ~~and no class that is junior to such a dissenting class~~**from any of the Debtors, their assets or the Estates under the Plan than the treatment afforded Holders of Claims and Equity Interests in Classes 6, 7 and 8 (for a more detailed discussion of the Plan's treatment of Claims and Interests, see Section IV.C herein, entitled "Classification and Treatment of Claims and Interests").  Second, no Class that is junior to Classes 6, 7 or 8** will receive or retain any property on account of the ~~claims or equity interests in such class.  The~~**Claims or Interests in such class.  Thus, the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 6, 7 and 8 are satisfied such that the Plan may be Confirmed over the deemed rejection thereof.**

**Accordingly, the** Debtors believe that the Plan and the treatment of all Classes of Claims and ~~Equity~~ Interests under the Plan **, including Classes 6, 7 and 8,** satisfy the foregoing requirements for nonconsensual Confirmation of the Plan **pursuant to section 1129(b) of the Bankruptcy Code**.

## B.     CONDITIONS FOR CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date so long as certain conditions precedent are satisfied or waived in accordance with the Article VIII.B of the Plan, including:

- the Bankruptcy Court shall have approved the Disclosure Statement in a manner acceptable to the Debtors, the Prepetition Agent and the Required Consenting Lenders;

- the Plan and Plan Supplement shall be acceptable to the Debtors, the Prepetition Agent and Required Consenting Lenders;

- the Confirmation Order shall have been entered and become a Final Order in a form and in substance reasonably satisfactory to the Debtors, the Prepetition Agent and Required Consenting Lenders;

- all documents and agreements necessary to implement the Plan shall have been tendered for delivery and effected or executed; and

- all actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

## C.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    Liquidation Under Chapter 7 of the Bankruptcy Code

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims is set forth in Section [——]VI.A herein, titled "Statutory Requirements for Confirmation of the Plan."  In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation.  The Debtors believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

### 2.    Filing of an Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets.  During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserves their business and allows creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.  In any liquidation, creditors would be paid their distribution in Cash, whereas, under the Plan, some creditors will receive a part of their distribution in New Common Stock (if issued).

# VII.
## PLAN-RELATED RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY EACH OF THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  WHILE NUMEROUS, THESE RISK FACTORS SHOULD NOT BE CONSTRUED AS THE ONLY RISKS RELATING TO THE DEBTORS' BUSINESSES AND/OR THE PLAN.

The following provides a summary of various important considerations and risk factors associated with the Plan.  However, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims in Voting Classes should read and carefully consider the factors set forth below and all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.  In addition, Holders of Claims in Voting Classes should also review the detailed discussion of the various risks and other factors associated with the Debtors' businesses and operations generally set forth under the section entitled "Risk Factors" in Reader's Digest's Annual Report on Form 10-K for the fiscal year ended June 30, 2008, and Reader's Digest's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2009, copies of which can be obtained from the Debtors' investor relations website (http://phx.corporate-ir.net/phoenix.zhtml?c=71092&p=irol-IRhome) or the SEC's EDGAR system website (http://www.sec.gov/edgar.shtml).

## A.    RISKS RELATING TO CONFIRMATION OF THE PLAN

### 1.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan, and there can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will Confirm the Plan.  Moreover, Confirmation of the Plan is subject to the conditions set forth in Article VIII.A of the Plan, which may not be achieved.  Finally, although the Debtors believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 2.    The Restructuring Support Agreement May Terminate.

The parties to the Restructuring Support Agreement have agreed to support the Plan provided certain conditions are met.  To the extent that the terms or conditions of the Restructuring Support Agreement are not satisfied, or to the extent events of termination arise under the Restructuring Support Agreement, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents.  Any such loss of support could adversely affect the Debtors' ability to Confirm and Consummate the Plan.

## B.    RISKS RELATING TO RECOVERIES UNDER THE PLAN

### 1.    The Recovery to Holders of Allowed Claims Can Not be Stated With Absolute Certainty.

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, without limitation, their ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the Debtors are unable to control.  Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will <u>not</u> be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Also, because the liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control, including, without limitation, (a) the successful reorganization of the Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections, (d) the Debtors' ability to maintain adequate liquidity to fund operations and (e) the assumption that capital and equity markets remain consistent with current conditions.

The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to Holders of such Allowed Claims under the Plan, in some instances adversely. Also, the estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders the subordination of any Allowed Claims to other Allowed Claims, whether the Debtors object to the amount or classification of any Claim, whether the Debtors satisfy the requisite conditions to enter into the Exit Credit Agreement or New Second Priority Term Loan Agreement or whether, subject to the terms and conditions of the Plan, the Debtors are required to modify certain terms or conditions of the Plan in order to Confirm the Plan. The occurrence of contingencies that could affect distributions available to Holders of Allowed Claims under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

2.     **The Value of New Common Stock Can Not be Stated With Absolute Certainty.**

On the Effective Date, 100% of the New Common Stock will be issued to the Prepetition Lenders on account of their Prepetition Credit Agreement Claims and 7.5% of the New Common Stock (on a fully-diluted basis) will be reserved for issuance (whether as restricted stock, options or warrants) in connection with the Management Equity Plan to be granted at the discretion of the New Board. If the New Board distributes such equity interests, or warrants or options to acquire such equity interests, pursuant to the Management Equity Plan, it is contemplated that such distributions will dilute the New Common Stock issued to the Prepetition Lenders on account of Claims under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan, including in connection with the Rights Offering.

It is likewise contemplated that shares of New Common Stock issued to participating Eligible Noteholders in connection with the Rights Offering, if any, will dilute the New Common Stock issued to the Prepetition Lenders on account of Allowed Prepetition Credit Agreement Claims under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan.

K&E 15673799 15735883.

## C.    RISKS RELATING TO THE DEBTORS' BUSINESSES

### 1.    Prolonged Continuation of the Chapter 11 Cases Is Likely To Harm the Debtors' Business.

The prolonged continuation of these Chapter 11 Cases is likely to adversely affect the Debtors' business and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business.  In addition, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Credit Agreement or otherwise, in order to service their debt and other obligations.  It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all.  If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

### 2.    The Debtors Are Subject to Restrictive Covenants That Impair Their Business Operations.

The DIP Credit Agreement includes financial covenants that, among other things, require the Debtors to achieve a minimum amount of consolidated EBITDA (as defined in the DIP Credit Agreement) and maintain a minimum amount of liquidity. If the Debtors are unable to achieve the results that are contemplated in their business plan, they may fail to comply with these covenants.  Furthermore, the DIP Credit Agreement contains limitations on the Debtors' ability, among other things, to incur additional indebtedness, make capital expenditures, pay dividends, make investments (including acquisitions) or sell assets. If the Debtors fail to comply with the covenants in the DIP Credit Agreement and are unable to obtain a waiver or amendment of the DIP Credit Agreement, an event of default will occur thereunder. The DIP Credit Agreement contains other events of defaults customary for debtor-in-possession financings.

The Exit Credit Agreement and Second Priority Term Loan Agreement may likely include various restrictive covenants.  These covenants could restrict the Reorganized Debtors' ability to, among other things:  incur additional debt; make certain investments; enter into certain types of transactions with affiliates; limit dividends or other payments by or among the Reorganized Debtors; use assets as security in other transactions; pay dividends on the New Common Stock or repurchase equity interests; sell certain assets or merge with or into other companies; guarantee the debts of others; enter into new lines of business; make capital expenditures; prepay, redeem or exchange the Reorganized Debtors' debt; and form any joint ventures or subsidiary investments.

The Exit Credit Agreement and Second Priority Term Loan Agreement could also contain financial covenants and tests could limit the Reorganized Debtors' ability to react to market conditions, satisfy any extraordinary capital needs or otherwise restrict the Reorganized Debtors' financing and operations, and could require the Reorganized Debtors to periodically meet various financial ratios and tests, including maximum leverage, minimum EBITDA and fixed charge coverage and interest coverage levels.  If the Reorganized Debtors fail to comply with such covenants and terms, the Reorganized Debtors would be required to obtain waivers from their lenders to maintain compliance under their exit financing agreements, which, if not obtained, would have a material adverse effect on the Reorganized Debtors' financial condition and future operating performance.

### 3.    The Chapter 11 Cases May Affect the Tax Liability of Reorganized Debtors.

As of June 30, 2009, Reader's Digest had an aggregate amount of net operating loss, capital loss, alternative minimum tax credits and foreign tax credit carryforwards in the United States of approximately $548 million, $0 million, $11 million and $156 million, respectively.  In connection with the Debtors' emergence from these Chapter 11 Cases, it is likely that such tax attributes will be significantly reduced due to the cancellation of indebtedness income, with any remaining tax attributes subject to limitation under Sections 382 and 383 of the IRC. A full valuation allowance has been recorded against the deferred tax assets related to these tax attributes in the condensed consolidated balance sheets for the quarterly period ended June 30, ~~2009.~~**2009, which means that, as of that date, the Debtors have recognized that they will never receive the benefit of certain tax attributes.**

Holders of Claims should carefully review Section VIII herein, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Chapter 11 Cases and treatment of Allowed Claims under the Plan could adversely affect the Reorganized Debtors and such Holders.

K&E ~~15673799~~ **15735883.**

D.     **DISCLOSURE STATEMENT DISCLAIMER**

1.     **No Representations Made Outside this Disclosure Statement Are Authorized.**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.  Except as otherwise provided herein or in the Plan, no representations relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Creditors' Committee and the United States Trustee.

2.     **The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has not been filed with the Commission or any state regulatory authority.  Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.  This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and **Bankruptcy** Rule 3016(b) ~~of the Federal Rules of Bankruptcy Procedure~~ and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.

The offer of New Common Stock under the Plan has not been registered under the Securities Act or similar state securities or "blue sky" laws.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable ~~nonbankruptcy~~**non-bankruptcy** law, the issuance of the New Common Stock or any shares reserved for issuance under the Management Equity Plan, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Rule 701 promulgated under the Securities Act or a "no sale" under the Securities Act as described herein.

**Notwithstanding anything herein or in the Plan to the contrary, New Common Stock issued to participating Eligible Noteholders in connection with the Rights Offering will be issued under Section 4(2) of the Securities Act.  Such New Common Stock will be "restricted securities" and cannot be sold absent registration under, or pursuant to an exemption from, the Securities Act.**

3.     **The Information Herein Was Provided by the Debtors and Relied Upon by Their Advisors.**

**The Debtors have used their reasonable business judgment to ensure the accuracy of the information, including financial information, provided in this Disclosure Statement, the Plan and related documents.  Nonetheless, the Debtors** *cannot, and do not, confirm the current accuracy of* **every statement** *appearing in this Disclosure Statement.*

**Statements** *contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.*  **Although *the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.***

*The financial information contained in this Disclosure Statement has not been audited.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.*  **While** *the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

~~The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.~~  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless ~~cannot, and do not, confirm the current accuracy of~~ all statements ~~appearing in this Disclosure Statement.~~  Further, although ~~the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.~~

~~The financial information contained in this Disclosure Statement has not been audited.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.~~  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while ~~the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.~~

**4.**      **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

This Disclosure Statement is not legal advice to you.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**5.**      **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interest or any other parties in interest.  The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

K&E ~~15673799~~ **15735883.**

## VIII.
## CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

**A.   BRIEF OVERVIEW AND DISCLOSURE**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain U.S. Holders and Non-U.S. Holders (each as defined below) of claims.  The following summary does not address the U.S. federal income tax consequences to holders of claims who are unimpaired or otherwise entitled to payment in full in Cash under the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "*IRC*"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "*IRS*") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or otherwise treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" means a Holder of a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights that is, for U.S. federal income tax purposes, (i) a nonresident alien individual, (ii) a non-U.S. corporation or (iii) a non-U.S. estate or non-U.S. trust.  This summary does not address all aspects of U.S. federal income taxes that may be relevant to Non-U.S. Holders in light of their personal circumstances, and does not deal with federal taxes other than the federal income tax or with non-U.S., state, local or other tax considerations. Special rules, not discussed here, may apply to certain Non-U.S. Holders, including U.S. expatriates, controlled foreign corporations, passive foreign investment companies and corporations that accumulate earnings to avoid U.S. federal income tax. Such Non-U.S. Holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.  In the case of a holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership. If you are a partner of a partnership that is, or will be, a Holder of a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights, then you should consult your own tax advisors.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders in light of their individual circumstances.  This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding, or who will hold, a Claim, the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan or Subscription Rights, as part of a hedge, straddle, conversion or constructive sale transaction).  No aspect of state, local, estate, gift or non-U.S. taxation is addressed.

The following discussion assumes that each Holder of a Claim holds its New Common Stock, New First Priority Term Loan, New Second Priority Term Loan, Reinstated Euro Term Loan or Subscription Rights, as applicable, as a "capital asset" within the meaning of Section 1221 of the IRC.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO YOU.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.     CONSEQUENCES TO THE DEBTORS**

**1.     Cancellation of Indebtedness and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to Section 108 of the IRC.  In general, tax attributes will be reduced in the following order:  (a) net operating losses ("**NOLs**"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC **,** though it has not been determined whether the Debtors would make this election.  In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that holders of certain Claims will receive shares of the New Common Stock, the New First Priority Term Loan, the New Second Priority Term Loan, the Reinstated Euro Term Loan and/or Subscription Rights, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock and Subscription Rights, and the issue price of the New First Priority Term Loan, the New Second Priority Term Loan and the Reinstated Euro Term Loan. This value cannot be known with certainty until after the Effective Date.  Following this reduction, the Debtors expect that, subject to the limitations discussed herein and subject to whether the Debtors decide to reduce first the basis in their depreciable assets, they may not have NOL carryforwards remaining after emergence from chapter 11, but will have other significant tax attributes remaining.

The American Recovery and Reinvestment Act of 2009 permits the Debtors to elect to defer the inclusion of COD Income, with the amount of COD Income becoming includible in the income of the electing Debtors ratably over a five-taxable year period beginning in the fifth taxable year after the COD Income arises. The collateral tax consequences of making such election are complex. The Debtors currently are analyzing whether to make the deferral election.

### 2.    Limitation of NOL Carryforwards and Other Tax Attributes

The amount of the Debtors' tax attributes that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by the Debtors in 2009; (b) the fair market value of the New Common Stock and Subscription Rights, and the issue price of the New First Priority Term Loan, the New Second Priority Term Loan and the Reinstated Euro Term Loan; and (c) the amount of COD Income incurred by the Debtors in connection with consummation of the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "***Pre-Change Losses***") that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

### (a)    General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "***Section 382 Limitation***." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (approximately 4.48% for the month of October 2009). If the Company is in a net unrealized built in gain position, the Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Stock, along with the cancellation of existing Equity Interests through the Plan, is expected to cause an ownership change with respect to the Debtors on the Effective Date. As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

K&E ~~15673799~~ 15735883.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of any Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

3.        **Alternative Minimum Tax**

In general, an alternative minimum tax ("***AMT***") is imposed on a corporation's alternative minimum taxable income ("***AMTI***") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.

Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

## C.        CONSEQUENCES TO U.S. HOLDERS OF ALLOWED CLAIMS

1.        **Holders of Allowed Prepetition Credit Agreement Claims**

The following discussion assumes that each U.S. Holder of an Allowed Prepetition Credit Agreement Claim holds such Claim as a "capital asset" within the meaning of Section 1221 of the IRC. Pursuant to the Plan, each U.S. Holder of such Allowed Prepetition Credit Agreement Claim shall receive its Pro Rata share of the New Second Priority Term Loan, the Reinstated Euro Term Loan and the New Common Stock, as further described above.

(a)        Exchange of an Allowed Prepetition Credit Agreement Claim for New Common Stock

Whether a U.S. Holder of an Allowed Prepetition Credit Agreement Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock depends on whether (i) the exchange qualifies as an exchange described in Section 351 of the IRC (each, a "***Section 351 Exchange***"), (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Prepetition Credit Agreement Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Prepetition Credit Agreement Claim and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

**74**

> (i)    *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for New Common Stock is Treated as a Section 351 Exchange*

The exchange of a U.S. Holder's Prepetition Credit Agreement Claim for New Common Stock is expected to be treated as a Section 351 Exchange, in which case a U.S. Holder of a surrendered Allowed Prepetition Credit Agreement Claim will recognize gain, but not loss, on the exchange. Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of property other than stock treated as received in the exchange, and (b) ordinary interest income to the extent that the New Common Stock is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Prepetition Credit Agreement Claim (see "Accrued Interest" discussion below). In such case, a U.S. Holder's tax basis in its New Common Stock should be equal to the tax basis of the obligation constituting the Allowed Prepetition Credit Agreement Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of property other than stock treated as received in the exchange), and a U.S. Holder's holding period for its New Common Stock should include the holding period for the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim; *provided*, *however*, to the extent that any New Common Stock is treated as received in satisfaction of accrued but untaxed interest the tax basis of such New Common Stock should equal the amount of such accrued but untaxed interest, and the holding period for such New Common Stock should not include the holding period of the debt instrument constituting the surrendered Allowed Prepetition Credit Agreement Claim (*see* "Accrued Interest" discussion below).

> (ii)    *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for New Common Stock is Not Treated as a Section 351 Exchange*

If the exchange of an Allowed Prepetition Credit Agreement Claim for New Common Stock is not treated as a Section 351 Exchange, then a U.S. Holder of such a Claim should be treated as exchanging its Allowed Prepetition Credit Agreement Claim for New Common Stock in a fully taxable exchange. A U.S. Holder of an Allowed Prepetition Credit Agreement Claim who is subject to this treatment should recognize gain or loss equal to the difference (positive or negative) between (a) the fair market value of the shares of New Common Stock it receives in the exchange that is not allocable to accrued interest and (b) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim treated as exchanged for New Common Stock. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Prepetition Credit Agreement Claim exchanged for New Common Stock were held for more than one year. To the extent that a portion of the New Common Stock is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income. See "Accrued Interest" below. A U.S. Holder's tax basis in the shares of New Common Stock received on the Effective Date should equal the fair market value of the shares of New Common Stock as of the Effective Date. A U.S. Holder's holding period for the New Common Stock received on the Effective Date should begin on the day following the Effective Date.

> (iii)    *Accrued Interest*

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.

K&E ~~15673799~~ **15735883.**

Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

<div align="center">(iv)     <em>Market Discount</em></div>

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

(b)     <u>Exchange of an Allowed Prepetition Credit Agreement Claim for New Second Priority Term Loan or Reinstated Euro Term Loan</u>

Whether a U.S. Holder of an Allowed Prepetition Credit Agreement Claim recognizes gain or loss as a result of the exchange of its Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan depends on whether (i) the exchange qualifies as a tax-free recapitalization (which in turn depends on whether the debt underlying the Allowed Prepetition Credit Agreement Claim surrendered for the New Second Priority Term Loan or the Reinstated Euro Term Loan is treated as a "security" for the reorganization provisions of the IRC (see "Treatment of a Debt Instrument as a 'Security'" below)), (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Prepetition Credit Agreement Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Prepetition Credit Agreement Claim and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

<div align="center">(i)     <em>Treatment of a Debt Instrument as a "Security"</em></div>

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U. S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. Each U.S. Holder of an Allowed Prepetition Credit Agreement Claim should consult with its own tax advisor to determine whether or not the debt underlying its Allowed Prepetition Credit Agreement Claim is a "security" for U.S. federal income tax purposes.

<div align="center">**76**</div>

     *(ii)*      *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is Treated as a Reorganization*

If a debt instrument constituting a surrendered Allowed Prepetition Credit Agreement Claim and the New Second Priority Term Loan or the Reinstated Euro Term Loan, as applicable, received in exchange therefor are each treated as a "security" for U.S. federal income tax purposes, the exchange of such Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is expected to qualify as a recapitalization, and therefore a reorganization, under the IRC.  If the exchange qualifies as a reorganization, the U.S. Holder of a surrendered Allowed Prepetition Credit Agreement Claim will recognize gain, but not loss, on the exchange.  Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of "other property" (*i.e.*, property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) treated as received in the exchange, and (b) ordinary interest income to the extent that the New Second Priority Term Loan or the Reinstated Euro Term Loan is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Prepetition Credit Agreement Claim (*see* "Accrued Interest" discussion above).

In such case, a U.S. Holder's tax basis in its New Second Priority Term Loan or its Reinstated Euro Term Loan should be equal to the tax basis of the obligation constituting the Allowed Prepetition Credit Agreement Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" treated as received in the exchange), and a U.S. Holder's holding period for its New Second Priority Term Loan or its Reinstated Euro Term Loan should include the holding period for the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim; *provided*, *however*, to the extent that the New Second Priority Term Loan or the Reinstated Euro Term Loan is treated as received in satisfaction of accrued but untaxed interest the tax basis of such New Second Priority Term Loan or Reinstated Euro Term Loan should equal the amount of such accrued but untaxed interest, and the holding period for such New Second Priority Term Loan or Reinstated Euro Term Loan should not include the holding period of the debt instrument constituting the surrendered Allowed Prepetition Credit Agreement Claim (*see* "Accrued Interest" discussion above).

     *(iii)*     *Treatment of a U.S. Holder of an Allowed Prepetition Credit Agreement Claim if the Exchange of its Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is Not Treated as a Reorganization*

If the exchange of an Allowed Prepetition Credit Agreement Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan is not treated as a Reorganization, then a U.S. Holder of such a Claim should be treated as exchanging its Allowed Prepetition Credit Agreement Claim for the New Second Priority Term Loan or the Reinstated Euro Term Loan in a fully taxable exchange.  A U.S. Holder of an Allowed Prepetition Credit Agreement Claim who is subject to this treatment should recognize gain or loss equal to the difference (positive or negative) between (a) the issue price of the New Second Priority Term Loan or the Reinstated Euro Term Loan it receives in the exchange that is not allocable to accrued interest and (b) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Prepetition Credit Agreement Claim treated as exchanged for the New Second Priority Term Loan or the Reinstated Euro Term Loan.  Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Prepetition Credit Agreement Claim exchanged for the New Second Priority Term Loan or the Reinstated Euro Term Loan were held for more than one year.  To the extent that a portion of the New Second Priority Term Loan or the Reinstated Euro Term Loan is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income (*see* "Accrued Interest" above).  A U.S. Holder's tax basis in the shares of the New Second Priority Term Loan or the Reinstated Euro Term Loan received on the Effective Date should equal the issue price of the New Second Priority Term Loan or the Reinstated Euro Term Loan as of the Effective Date.  A U.S. Holder's holding period for the New Second Priority Term Loan or the Reinstated Euro Term Loan received on the Effective Date should begin on the day following the Effective Date.

K&E ~~15673799~~ **15735883.**

*(iv)*        *Issue Price of a Debt Instrument*

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a U.S. Holder or the property surrendered under the Plan are traded on an "established securities market" at any time during the 60-day period ending **thirty (**30**)** days after the Effective Date.  In general, a debt instrument (or the stock or securities exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying non-U.S. securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) in certain situations the price quotations are readily available from dealers, brokers or traders.  The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading.  The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).

**2.        Holders of Allowed Other General Unsecured Claims**

Pursuant to the Plan, each U.S. Holder of an Allowed Other General Unsecured Claim shall receive their Pro Rata share of the Other General Unsecured Claims Distribution, as further described above.  Such exchange should be treated as a taxable exchange under Section 1001 of the IRC.  The U.S. Holder should recognize capital gain or loss equal to the difference between (i) the Cash received and (ii) the U.S. Holder's adjusted tax basis in its claim.  Such gain or loss should be capital in nature (subject to the "market discount" rules described above) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Other General Unsecured Claim were held for more than one year.  To the extent that a portion of the Allowed Other General Unsecured Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income.  See "Accrued Interest" above.

**D.        CONSEQUENCES TO NON-U.S. HOLDERS OF ALLOWED CLAIMS**

Any gain or interest income realized by a Non-U.S. Holder on the exchange of its claim generally will be exempt from U.S. federal income or withholding tax, provided that:

- such Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the total combined voting power of all classes of the voting stock of RDA Holding, is not a controlled foreign corporation related, directly or indirectly, to RDA Holding through stock ownership, and is not a bank receiving interest described in Section 881(c)(3)(A) of the IRC;

- the statement requirement set forth in Section 871(h) or Section 881(c) of the IRC has been fulfilled with respect to the beneficial owner, as discussed below;

- such Non-U.S. Holder is not an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; and

- such gain or interest income is not effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States.

The statement requirement referred to in the preceding paragraph will generally be fulfilled if the beneficial owner of the property or Cash received on the exchange certifies on IRS Form W-8BEN (or such successor form as the IRS designates) under penalties of perjury that it is not a U.S. person and provides its name and address.  The Non-U.S. Holder must provide the form to the Debtors or their paying agent, or in the case of a note held through a securities clearing organization, bank or other financial institution holding customers' securities in the ordinary course of its trade or business, to such organization, bank or other financial institution, which must in turn provide to the Debtors or their paying agent a statement that it has received the form and furnish a copy thereof; *provided*, that a non-U.S. financial institution will fulfill this requirement by filing IRS Form W-8IMY if it has entered into an agreement with the IRS to be treated as a qualified intermediary.  These forms must be periodically updated.

K&E ~~15673799~~ 15735883.

If a Non-U.S. Holder is engaged in a trade or business in the United States, and if any gain or interest income realized on the exchange of its claim is effectively connected with the conduct of such trade or business, the Non-U.S. Holder, although exempt from the withholding tax discussed in the preceding paragraphs, will generally be subject to regular U.S. federal income tax on such gain or interest income in the same manner as if it were a U.S. Holder. In lieu of the certificate described in the preceding paragraph, such a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates), in the manner described above, in order to claim an exemption from withholding tax. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

## E.    CONSEQUENCES TO RIGHTS OFFERING PARTICIPANTS

The following discussion assumes that each U.S. Holder of an Allowed Senior Subordinated Note Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the IRC.  Pursuant to the Plan, each Allowed Senior Subordinated Note Claim will be cancelled without any distribution, as further described above. Certain Holders of an Allowed Senior Subordinated Note Claim will receive Subscription Rights.  Section 165(g) of the IRC permits a "worthless security deduction" for any security that is a capital asset that becomes worthless within the taxable year.  Thus, depending in the case of U.S. Holders of Allowed Senior Subordinated Note Claims that receive Subscription Rights on whether the issuance of a Subscription Right is treated as a distribution of an independent piece of property and other factors, U.S. Holders of an Allowed Senior Subordinated Note Claim may be entitled to worthless security deductions.  The rules governing the timing, amount and character (ordinary or capital) of worthless security deductions place considerable emphasis on the facts and circumstances of the holder, the issuer, and the instrument with respect to which the deduction is claimed; U.S. Holders are therefore urged to consult their tax advisors with respect to their ability to take such a deduction.

The tax treatment of receipt of Subscription Rights by a U.S. Holder of an Allowed Senior Subordinated Note Claim is unclear.  The issuance of, and the exercise of or failure to exercise, the Subscription Rights could be treated as an independent transaction for U.S. federal income tax purposes and not as a transaction that is integrated with any of the exchanges described herein.  If so treated, a U.S. Holder that exercises a Subscription Right could be treated as directly exchanging the subscription price for the New Common Stock allocable to such Subscription Right in an exchange in which such U.S. Holder recognizes no gain or loss.  Such U.S. Holder would then have a tax basis in the New Common Stock received upon exercise of the Subscription Rights equal to the subscription price paid therefor.  In light of the fact that the Subscription Rights are non-transferable and must be exercised, if at all, only at emergence, the Debtors intend to treat the issuance and exercise or failure to exercise the Subscription Rights as an independent transaction not integrated with the distributions under the Plan for U.S. federal income tax purposes.

If the issuance of the Subscription Rights is treated as a distribution of an independent piece of property under the Plan, whether a U.S. Holder of an Allowed Senior Subordinated Note Claim recognizes gain or loss as a result of receipt of Subscription Rights depends on whether (i) the exchange qualifies as a tax-free recapitalization (which in turn depends on whether each of the debt underlying the Allowed Senior Subordinated Note Claim (see "Treatment of a Debt Instrument as a 'Security'" above) and the Subscription Right (by reason of its being a right to acquire New Common Stock or otherwise) is treated as a "security" for the reorganization provisions of the IRC), (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Senior Subordinated Note Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Senior Subordinated Note Claim and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

If the distribution of the Subscription Rights to a U.S. Holder of an Allowed Senior Subordinated Note Claim is treated as a taxable exchange, then each such U.S. Holder will recognize gain or loss in an amount equal to the difference (positive or negative) between (i) the fair market value of the Subscription Rights received by such U.S. Holder under the Plan, and (ii)  the U.S. Holder's tax basis in its Allowed Senior Subordinated Note Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described above) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Senior Subordinated Note Claim were held for more than one year.  To the extent that a portion of the Allowed Senior Subordinated Note Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income  (see "Accrued Interest" above).

**79**

The aggregate tax basis of the Subscription Rights received would be the fair market value of the Subscription Rights on the date of the exchange, and the holding period for the Subscription Rights would begin on the day after the exchange. If a U.S. Holder of an Allowed Senior Subordinated Note Claim allows a Subscription Right received under the Plan to expire, it should recognize capital loss equal to its basis (if any) in such expiring Subscription Rights.

If both a Subscription Right and the debt underlying the Allowed Senior Subordinated Note Claim are treated as a "security" for U.S. federal income tax purposes, the receipt of such Subscription Right should qualify as a recapitalization, and therefore a reorganization, under the IRC. If the exchange qualifies as a reorganization, the U.S. Holder of a surrendered Allowed Senior Subordinated Note Claim will recognize gain, but not loss, on the exchange. Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed above, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of "other property" (i.e., property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) treated as received in the exchange, and (b) ordinary interest income to the extent that the Subscription Right is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Senior Subordinated Note Claim (see "Accrued Interest" discussion above).

In such case, a U.S. Holder's tax basis in its Subscription Right should be equal to the tax basis of the obligation constituting the Allowed Senior Subordinated Note Claim treated as surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" treated as received in the exchange), and a U.S. Holder's holding period for its Subscription Right should include the holding period for the obligation constituting the surrendered Allowed Senior Subordinated Note Claim; provided, however, to the extent that the Subscription Right is treated as received in satisfaction of accrued but untaxed interest the tax basis of such Subscription Right should equal the amount of such accrued but untaxed interest, and the holding period for such Subscription Right should not include the holding period of the debt instrument constituting the surrendered Allowed Senior Subordinated Note Claim.

## F.    WITHHOLDING AND REPORTING

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a claim. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. Additionally, backup withholding of taxes, currently at a rate of 28%, will apply to such payments if a U.S. Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

# IX.
## GLOSSARY OF DEFINED TERMS

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with the terms of such document or exhibit and subject to the Restructuring Support Agreement; (d) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (f) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

1.    "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, Allowed success fees and Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and Allowed under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Cases, or that are awardable and allowable under section 503(b)(3)(F) of the Bankruptcy Code for the Creditors' Committee, that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been filed for any such amount.  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses or Creditors' Committee Member's expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

2.    "*Adequate Protection Claims*" shall have the meaning ascribed to "Section 507(b) Claims" as defined in paragraph 13(b) of the Final DIP Order.

3.    "*Administrative Claim*" means a Claim (other than the Adequate Protection Claims and DIP Facility Claims) that has been timely filed, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Accrued Professional Compensation (to the extent Allowed by the Bankruptcy Court); and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911 1930.  Administrative Claims do not include DIP Facility Claims, which are separately treated under the Plan.

4.    "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

5.    "*Allowed*" means, with respect to Claims:  (a) any Claim, proof of which is timely filed by the applicable Claims Bar Date or which, pursuant to the Bankruptcy Code or a Final Order is not required to be filed; (b) any Claim that is listed in the Schedules as of the Effective Date as neither contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan; *provided*, *however,* that with respect to any Claim described in clause (a) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within

the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

6.      "*Amended and Restated Bylaws*" means the bylaws of Reorganized Holdings, substantially in the form included in the Plan Supplement.

7.      "*Amended and Restated Certificate of Incorporation*" means the certificates of incorporation of the Reorganized Debtors, substantially in the form included in the Plan Supplement.

8.      "*Avoidance Actions*" means any and all claims and causes of action which any of the Debtors, the debtors in possession, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.      "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

10.      "*Bankruptcy Code*" means Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

11.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

12.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

13.      "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

14.      "*Case Management Order*" means that certain Order Establishing Certain Notice, Case Management and Administrative Procedures, entered by the Bankruptcy Court on September 17, 2009 [Docket No. 92]**, as may be amended from time to time**.

15.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

16.      "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date.

17.      "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

18.      "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

K&E ~~15673799~~ 15735883.

19.     "*Claims Bar Date*" means, as applicable, (a) 5:00 p.m. prevailing Pacific Time on November 16, 2009, (b) the Governmental Bar Date or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing such Claims**, pursuant to the Claims Bar Date Order**.

**20.        "*Claims Bar Date Order*" means that certain Order (I) Setting Bar Dates for Filing Proofs of Claim, (II) Approving Procedures for Filing Proofs of Claim and (III) Approving Notice Thereof, entered by the Bankruptcy Court on October 7, 2009 [Docket No. 154], as may be amended from time to time.**

**21.**     ~~20.~~ "*Claims Objection Bar Date*" means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims, as the same may be modified or extended from time to time by the Bankruptcy Court **or on motion of a party in interest approved by the Bankruptcy Court**.

**22.**     ~~21.~~ "*Claims Register*" means the official register of Claims maintained by the ~~Voting~~**Noticing** and Claims Agent.

**23.**     ~~22.~~ "*Class*" means a category of Holders of Claims or ~~Equity~~ Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

**24.**     ~~23.~~ "*Commencement Date*" means August 24, 2009, the date on which the Debtors commenced the Chapter 11 Cases.

**25.**     ~~24.~~ "*Commission*" means the United States Securities and Exchange Commission.

**26.**     ~~25.~~ "*Compensation and Benefits Programs*" means all employment and severance policies, and all compensation and benefit plans, policies and programs and other arrangements (and all amendments and modifications thereto), in each case in place as of the Effective Date, applicable to the Debtors' employees, former employees, retirees and non-employee directors and employees, former employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans (other than the Non-Qualified Retirement Plans), health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans.

**27.**     ~~26.~~ "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article ~~VII~~**VIII.A** of the Plan having been:  (a) satisfied; or (b) waived pursuant to Article ~~VII~~**VIII.B** of the Plan.

**28.**     ~~27.~~ "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

**29.**     ~~28.~~ "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

**30.**     ~~29.~~ "*Confirmation Order*" means the order, in form and in substance reasonably satisfactory to the Debtors, the Prepetition Agent and the Required Consenting Lenders, of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**31.**     ~~30.~~ "*Consenting Lenders*" means those Prepetition Lenders party to the Restructuring Support Agreement.

**32.**     ~~31.~~ "*Consenting Shareholders*" means those Holders of Equity Interests party to the Restructuring Support Agreement.

**33.**     ~~32.~~ "*Consummation*" means the occurrence of the Effective Date.

**34.**     ~~33.~~ "*Contract/Lease Schedule Date*" means the latest date by which the Debtors shall file their list of Executory Contracts and Unexpired Leases to be rejected pursuant to the Plan, which **date** shall be no ~~later~~**fewer** than ~~[__]~~**twenty (20)** days prior to the Confirmation Hearing.

**35.** 34. "*Creditors' Committee*" means the official committee of unsecured creditors of the Debtors appointed by the Office of the United States Trustee for the Southern District of New York in the Chapter 11 Cases on August 31, 2009, pursuant to section 1102 of the Bankruptcy Code, comprising the Creditors' Committee Members and, as **may be** reconstituted from time to time.

**36.** 35. "*Creditors' Committee Members*" means the members of the Creditors' Committee, as may be modified**reconstituted** from time to time, namely:  (a) The Bank of New York Mellon,**;** (b) Wilfrid Aubrey LLC,**;** (c) Thomas M. Kenney,**;** (d) RR Donnelley & Sons Company,**;** (e) Madison Paper Company (ALSIP Location),**;** (f) Williams Lea, Inc.,**;** (g) New Page Corporation,**;** (h) Michael John Bohane,**;** (i) Peter Davenport,**;** (j) Ross Jones**;** and (k) HCL Technologies, Ltd.

**37.** 36. "*Cure*" means the payment of Cash by the applicable Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the Executory Contract or Unexpired Lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under sections 365 and 1123 of the Bankruptcy Code.

37. "*Cure Objection Deadline*" means the deadline for filing requests for payment of Cure, which shall be the later of: (a) thirty (30) days after the Effective Date or (b) thirty (30) days after the assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable Executory Contract or Unexpired Lease.

38. "*Debtor*" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

39. "*Debtors in Possession*" means, collectively, the Debtors, as debtors in possession in these Chapter 11 Cases.

40. "*DIP Agent*" means JPMorgan Chase Bank, N.A., in its capacity as syndication agent, administrative agent and collateral agent pursuant to the DIP Facility.

41. "*DIP Facility*" means that certain $150 million Credit and Guarantee Agreement, dated as of August 26, 2009, among The Reader's Digest Association, Inc., as borrower, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc., as guarantors, the DIP Agent, J.P. Morgan Securities Inc., as sole lead arranger and sole bookrunner, General Electric Capital Corporation, as senior managing agent, and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced.

42. "*DIP Facility Claim*" means any Claim arising under or related to the DIP Facility.

43. "*DIP Lenders*" means the DIP Agent and the banks, financial institutions and other lenders party to the DIP Facility from time to time.

44. "*Disclosure Statement*" means the**is** *Disclosure Statement for the Proposed Joint Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, the Disclosure Statement**Solicitation Procedures** Order and any other applicable law, and which is reasonably satisfactory to the Prepetition Agent and the Required Consenting Lenders in all material respects.

45. "*Disclosure Statement Order*" means that certain *Order Approving the Debtors' Disclosure Statement and Relief Related Thereto, entered by the Bankruptcy Court on* [TO COME], as the order *may be amended from time to time, and which shall be in form and substance satisfactory to the Prepetition Agent and the Required Consenting Lenders.*

K&E 15673799.15735883.

**45.** ~~46.~~ "*Disputed Claim*" means, with respect to any Claim, any Claim that is not yet Allowed.

**46.** ~~47.~~ "*Distribution Agent*" means any Entity or Entities chosen by the Debtors, which Entities may include, without limitation, the ~~Voting~~**Noticing** and Claims Agent, to make or to facilitate distributions required by the Plan.

**47.** ~~48.~~ "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

**48.** ~~49.~~ "*D&O Liability Insurance Policies*" means all insurance policies for directors and officers' liability maintained by the Debtors as of the Commencement Date.

**49.** ~~50.~~ "*DTC*" means Depository Trust Company.

**50.** ~~51.~~ "*Effective Date*" means the day that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article ~~VIIA.~~**VIIIA** of the Plan have been: (i) satisfied; or (ii) waived pursuant to Article VII**I**.B of the Plan.

**51.** ~~52.~~ "*Eligible Noteholder*" means any Holder of Senior Subordinated Notes that is an "Accredited Investor" within the meaning defined in Rule 501 of Regulation D promulgated under the Securities Act or a "Qualified Institutional Buyer" within the meaning defined in Rule 144A promulgated under the Securities Act.

**52.** ~~53.~~ "*Enterprise Value Maximization Plan*" means that certain ~~compensation plan~~**post-Effective Date director and officer compensation program to be approved and implemented by the New Board as set forth in Article IV of the Plan, substantially in the form** set forth in the Plan Supplement ~~to be adopted on the Effective Date~~.

**53.** ~~54.~~ "*Entity*" ~~means an entity as defined in~~**has the meaning set forth at** section 101(15) of the Bankruptcy Code.

**54.** ~~55.~~ "*Equity Interest*" means any issued or unissued share of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date~~, including section 510(b) Claims~~; *provided, however,* that Equity Interest does not include any Intercompany Interest.

**55.** ~~56.~~ "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

**56.** ~~57.~~ "*Exculpated Parties*" means, collectively: ~~(a)~~ **,** the Reorganized Debtors~~; and~~ **(b)** the Released Parties.

**57.** ~~58.~~ "*Exculpation*" means the exculpation provision set forth in Article IX.G of the Plan.

**58.** ~~59.~~ "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**59.** ~~60.~~ "*Exit Credit Agreement*" means an agreement substantially in the form set forth in the Plan Supplement on account of (a)(i) the New First Priority Term Loan or (ii) an alternative exit-financing facility provided that the DIP Facility is paid in full in Cash on the Effective Date and (b) the Reinstated Euro Term Loan.

**60.** ~~61.~~ "*Final DIP Order*" means that certain Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral and (III) Granting Adequate Protection to Prepetition Secured Lenders, entered by the Bankruptcy Court on October 7, 2009 [Docket No. 152], as ~~the order~~ may be amended from time to time in accordance with the terms thereof and the DIP Facility.

**61.** ~~62.~~ "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

**62.** ~~63.~~ "*GAAP*" means generally accepted accounting principles.

**63.** ~~64.~~ "*Governmental Bar Date*" means 4**5**:00 p.m. prevailing Pacific Time on February 20, ~~2010.~~**2010, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.**

**64.** ~~65.~~ "*Holder*" means an Entity holding a Claim **against** or an ~~Equity~~ Interest **in any of the Debtors**.

**65.** ~~66.~~ "*Impaired*" means any **impaired** Claim **or Interest** in an Impaired Class **within the meaning of section 1124 of the Bankruptcy Code**.

**66.** ~~67.~~ "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

**67.** ~~68.~~ "*Indemnification Obligation*" means a Debtor's obligation under an Executory Contract assumed in the Chapter 11 Cases or otherwise to indemnify directors, officers, employees or agents of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacitates, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by such Debtor's respective certificate of incorporations, certificates of formation, bylaws, similar corporate documents and applicable law, as in effect as of the Effective Date.

**68.** ~~69.~~ "*Indenture Trustee*" means The Bank of New York Mellon as indenture trustee with respect to the Senior Subordinated Notes.

**69.** ~~70.~~ "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than  thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

**70.** ~~71.~~ "*Intercompany Claim*" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor.

**71.** ~~72.~~ "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor.

**72.** ~~73.~~ "*Interest*" means, ~~together~~**collectively**, Equity Interests and Intercompany Interests.

**73.** ~~74.~~ "*Interim Compensation Order*" means ~~an order of the Bankruptcy Court allowing Retained Professionals to seek interim compensation in accordance with the procedures approved therein, as the same may be modified by a~~**that certain Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, entered by the Bankruptcy Court on September 17, 2009 [Docket No. 90], as may be amended from time to time, including by an order entered by the** Bankruptcy Court ~~order~~ approving the retention of a specific Retained Professional ~~or otherwise~~.

**74.** ~~75.~~ "*Letters of Credit*" means the letters of credit referenced in paragraph 13(c) of the Final DIP Order.

**75.     "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of New York, as applicable to all cases in the Southern District of New York governed by the Bankruptcy Code.**

76.     "*Management Equity Plan*" means that certain post-Effective Date director and officer compensation program to be approved and implemented by the New Board as set forth in Article IV~~.L~~ of the Plan**, substantially in the form set forth in the Plan Supplement**.  Equity awards in the form of restricted stock, options or warrants for 7.5% of the New Common Stock to be issued under the Plan will be allocated to the Management Equity Plan (on a fully-diluted basis); *provided* that such equity grant shall not include more than 2.5% in the form of restricted New Common Stock.

77.     "*New Board*" means the initial board of directors of Reorganized Holdings and **Reorganized** RDA ~~Inc.~~, which shall initially be mirror boards.

78.     "*New Common Stock*" means the common equity in Reorganized Holdings to be authorized, issued or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect common equity of Reorganized Holdings.

79.     "*New First Priority Term Loan*" means the first priority term loan facility to be converted from the DIP Facility in an amount equal to the aggregate amount, up to a maximum amount of $150 million, of loans outstanding under the DIP Facility on the date of conversion, to be issued on the Effective Date pursuant to the Exit Credit Agreement on terms consistent with those set forth on Annex 1 to the Restructuring Term Sheet.

80.     "*New Second Priority Term Loan*" means that certain $300 million second priority term loan facility having a maturity not earlier than the latest to occur of the maturity of the New First Priority Term Loan and the maturity of the Reinstated Euro Term Loan, to be issued on the Effective Date pursuant to the New Second Priority Term Loan Agreement on terms consistent with those set forth on Annex 1 to the Restructuring Term Sheet.

81.     "*New Second Priority Term Loan Agreement*" means that certain $300 million second lien term loan agreement among The Reader's Digest Association, Inc., as borrower, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc., as guarantors, and the Holders of Prepetition Credit Agreement Claims, substantially in the form of the agreement set forth in the Plan Supplement.

82.     "*Non-Qualified Retirement Plans*" means**, collectively,** the Debtors' unfunded, non-qualified retirement plans or deferred compensation arrangements, including, but not limited to, the plans or arrangements known as **:** (~~i~~**a**) the Excess Benefit Retirement Plan**;** (~~ii~~**b**) the Executive Retirement Plan**;** (~~iii~~**c**) the Executive Cash Balance Plan**;** (~~iv~~**d**) the 1988 Supplemental Employee Retirement Plan and related agreements**;** (~~v~~**e**) the Director and Roving Editors Plan and/or related agreements or arrangements**;** and (~~vi~~**f**) the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor.

83.     "*Noticing and Claims Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice, claims and balloting agent for the Debtors, pursuant to that certain Order Authorizing and Approving the Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent, entered by the Bankruptcy Court on August 28, ~~2009.~~**2009** [Docket No. 44]**, as may be amended from time to time**.

84.     "*Other General Unsecured Claim*" means any unsecured Claim, other than Unsecured Ongoing Operations Claims and Senior Subordinated Note Claims, against one or more of the Debtors including, but not limited to (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which a Debtor is a party, (b) claims arising from the rejection or termination of the Debtors' Non-Qualified Retirement Plans and (b) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto.

85.     "*Other General Unsecured Claims Distribution*" means $3 million.

86.     "*Ordinary Course Professionals Order*" means that certain Order Authorizing the Debtors' Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business Nunc Pro Tunc to

the Commencement Date, entered by the Bankruptcy Court on September 17, 2009 [Docket No. 89], as may be amended, ~~modified or supplemented~~ from time to time.

87.     "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim **or Claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code**.

88.     "*Other Secured Claim*" means any secured Claim against the Debtors not specifically described ~~herein~~**in the Plan**, *provided*, *however*, that Other Secured Claims shall not include DIP Facility Claims and Prepetition Credit Agreement ~~Secured~~ Claims.

89.     "*Pension Plan*" means The Reader's Digest Association, Inc. Retirement Plan, which is a defined benefit pension plan.

90.     "*Periodic Distribution Date*" means the first ~~Business Day that is as soon as reasonably practicable occurring no later than thirty (30) days after the Initial Distribution Date, and for the first eight (8) months thereafter, the first Business Day that is as soon as reasonably practicable occurring no later than thirty (30) days after the immediately preceding Periodic Distribution Date.~~ **day of the month immediately following the month in which a Claim becomes Allowed, when distributions shall be made to Holders of any such then-Allowed Claims.**

91.     "*Person*" ~~means a person as defined~~**has the meaning set forth** in section 101(41) of the Bankruptcy Code.

92.     "*Plan*" means the *Proposed Joint Plan of Reorganization of The Reader's Digest Associations, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* dated ~~[October 9],~~**9,** 2009, as **may have been and may further be** amended, supplemented or modified from time to time **in accordance with its terms**, including, without limitation, **by** the Plan Supplement, which is incorporated ~~herein~~**in the Plan** by reference, subject to the terms of the Restructuring Support Agreement.

93.     "*Plan Equity Value*" means ~~[$    ]~~**between $475 million and $625 million.**

94.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to be filed on the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms ~~hereof and in accordance with~~**of the Plan and the applicable provisions of** the Bankruptcy Code and the Bankruptcy Rules, comprising, without limitation, the following documents: (a) the form of the Exit Credit Agreement; (b) the form of the New Second Priority Term Loan Agreement; (c) the list of the Compensation and Benefit Programs to be rejected and/or assumed; (d) the Registration Rights Agreement (e) the Shareholders Agreement; (f) the Amended and Restated Certificate of Incorporation; (g) the Amended and Restated Bylaws; and (h) the forms of the Enterprise Value Maximization Plan and the Variable Compensation Plan.

95.     "*Plan Supplement Filing Date*" means the date that is five (5) ~~business~~ days prior to the Voting Deadline.

96.     "*Prepetition Agent*" means JP Morgan Chase Bank, N.A., in its capacity as administrative and collateral agent pursuant to the Prepetition Credit Agreement.

97.     "*Prepetition Credit Agreement*" means that certain Credit Agreement dated as of March 2, 2007, among The Reader's Digest Association, Inc., certain of its subsidiaries, the Prepetition Agent and the Prepetition Lenders party thereto, as amended, supplemented or otherwise modified.

98.     "*Prepetition Credit Agreement Claims*" means all claims arising under or in connection with the Prepetition Credit Agreement and/or the Prepetition Loan Documents, including, without limitation, all Adequate Protection Claims.

99.     "*Prepetition Lenders*" means those lenders party to the Prepetition Credit Agreement from time to time and their affiliates holding Swap Claims.

K&E ~~15673799.~~**15735883.**

100.    "*Prepetition Loan Documents*" means each of the documents, agreements and instruments (including, without limitation, all collateral documents) executed and delivered from time to time in connection with the Prepetition Credit Agreement.

101.    "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

102.    "*Proof of Claim*" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

103.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

104.    "*Record Date*" means 5:00 p.m. prevailing Eastern Time on [——**November 5**], 2009.

105.    "*Registration Rights Agreement*" means a registration rights agreement substantially in the form set forth in the Plan Supplement obligating the Reorganized Debtors to register for resale certain shares of New Common Stock under the Securities Act in accordance with the terms set forth in such agreement, which shall be in form and substance satisfactory to the Required Consenting Lenders in all material respects.

106.    "*Reinstated Euro Term Loan*" means that certain Euro denominated term loan facility incurred pursuant to the terms of the Prepetition Credit Agreement as amended as of the Commencement Date and as such term loan will be further amended and restated on the terms set forth in, and forming part of, the Exit Credit Agreement and subject to the Restructuring Support Agreement.

107.    "*Released Parties*" means, collectively, (a) the Debtors and the Debtors' current and former officers and directors, (b) the Prepetition Agent and the Prepetition Lenders, (c) the DIP Agent and the DIP Lenders, (d) the Creditors' Committee and the Creditors' Committee Members, (e) the Consenting Shareholders, and (f) with respect to each of the Persons named in (a) — (e) above, such ~~Person~~**Entity**'s directors, officers, shareholders, partners, members, employees, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, accountants, and other professionals or representatives when acting in any such capacities and (g) with respect to each of the ~~Persons~~**Entities** named in (a) — (f) above, each in their respective capacities set forth in such clause.

108.    "*Releasing Parties*" means, collectively, (a) the Prepetition Agent and the Prepetition Lenders, (b) the DIP Agent and the DIP Lenders, (c) the Consenting Shareholders and (d) each Holder of a Claim or Equity Interest that affirmatively votes in favor of this Plan.

109.    "*Reorganized Debtors*" means the Debtors, in each case, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

110.    "*Reorganized Holdings*" means RDA Holding, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

**111.    "*Reorganized RDA*" means The Reader's Digest Association, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.**

**112.**    ~~111.~~ "*Required Consenting Lenders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

**113.**    ~~112.~~ "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of August 17, 2009, among the Debtors, the Consenting Lenders and the Consenting Shareholders, as amended, supplemented or otherwise modified from time to time subject to the terms thereof.

**114.**    ~~113.~~ "*Restructuring Term Sheet*" means the term sheet annexed as <u>Exhibit A</u> to the Restructuring Support Agreement.

**115.** ~~114.~~ "*Retained Professional*" means any Entity: (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**116.** ~~115.~~ "*Rights Offering*" means that certain rights offering by Reorganized Holdings pursuant to which Eligible Noteholders shall have the right to purchase up to $[50 ~~100~~] million of New Common Stock at Plan Equity Value, which shall represent ~~no more than [10 20]~~**approximately 8**% of the New Common Stock (subject to dilution by the Management Equity Plan).

~~116.   "Subscription Procedures" means those procedures set forth on **Exhibit G** hereto.~~

**117.   "*Schedules*" *mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the Debtors* on September 24, 2009, *pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.*

**118.   "*Section 510(b) Claim*" *means any Claim against the Debtors arising from* the *rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security* or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

**119.   "*Securities Act*" *means the United States Securities Act of 1933, as amended.*

**120.   "*Senior Subordinated Note Claim*" *means any Claim derived from or based upon the Senior Subordinated Notes Indenture.*

**121.** ~~117.~~ "*Senior Subordinated Notes*" means the 9% Senior Subordinated Notes due 2017, issued by The Reader's Digest Association, Inc. and guaranteed by RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc. pursuant to the Senior Subordinated Notes Indenture.

~~118.   "Senior Subordinated Note Claim" means any Claim derived from or based upon the Senior Subordinated Notes Indenture.~~

**122.** ~~119.~~ "*Senior Subordinated Notes Indenture*" means that certain Indenture, dated as of March 2, ~~2007~~**2007**, among The Reader's Digest Association, Inc., as issuer, and RDA Holding Co. and each direct and indirect, existing and future domestic subsidiary of The Reader's Digest Association, Inc. as guarantors, and ~~U.S. Bank National Association, as trustee~~**the Indenture Trustee**.

~~120.   "Schedules" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.~~

~~121.   "Section 510(b) Claim" means any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.~~

~~122.   "Securities Act" means the United States Securities Act of 1933, as amended.~~

123.   "*Shareholders Agreement*" means the stockholders' agreement with respect to the New Common Stock as set forth in the Plan Supplement, which shall be in material form and substance satisfactory to the Required Consenting Lenders and shall include an option for Holders to hold limited voting securities.

K&E ~~15673799.~~**15735883.**

**124.** **"*Solicitation Procedures Order*" means that certain** *Order Approving the Debtors' Disclosure Statement and Relief Related Thereto, entered by the Bankruptcy Court on* **[November 5],** 2009, **as** *may be amended from time to time, and which shall be in form and substance satisfactory to the Prepetition Agent and the Required Consenting Lenders.*

**125.** *"Subscription Procedures" means those procedures set forth on* **Exhibit G hereto.**

**126.** ~~124.~~ "*Swap Claims*" means those secured Claims arising from hedging arrangements under, or in connection with, the Prepetition Credit Agreement with certain of the Prepetition Lenders or their Affiliates.

**127.** ~~125.~~ "*Tort Claim*" means any Claim that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to protection of human health, safety or the environment.

**128.** ~~126.~~ "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**129.** ~~127.~~ "*Unimpaired*" means~~, with respect to a Class of Claims or Equity Interests, a~~ **any unimpaired** Claim or ~~an Equity~~ Interest ~~that is unimpaired~~**in an Unimpaired Class** within the meaning of section 1124 of the Bankruptcy Code.

**130.** ~~128.~~ "*Unimpaired Class*" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

**131.** ~~129.~~ "*Unsecured Ongoing Operations Claims*" means all general unsecured Claims directly relating to and arising solely from the receipt of goods and services by the Debtors arising with and held by Persons with whom the Debtors are conducting, and will continue to conduct, business as of the Effective Date; *provided*, *however*, that Unsecured Ongoing Operations Claims shall not include Administrative Claims.

**132.** ~~130.~~ "*Variable Compensation Plan*" means that certain **post-Effective Date director and officer variable** compensation plan ~~Date~~**to be approved and implemented by the New Board as set forth in Article IV of the Plan, substantially** in the form set forth in the Plan Supplement~~to be adopted as of the Effective Date~~.

**133.** ~~131.~~ "*Voting Classes*" means, collectively, Classes 3, 4 and 5.

**134.** ~~132.~~ "*Voting Deadline*" means ~~[___] at~~ 4:00 p.m. prevailing Pacific Time~~.~~ **on [December 7], 2009.**

K&E ~~15673799~~**15735883.**

# X.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

**/s Thomas A. Williams**

The Reader's Digest Association, Inc.
(for itself and on behalf of each of the Debtors)

By:        Thomas A. Williams

Title:      Senior        Vice        President        and
            Chief Financial Officer

Dated:    ~~October 9,~~**November 2,** 2009

Prepared by:

**KIRKLAND & ELLIS LLP**
James H. M. Sprayregen, P.C.
Paul M. Basta
Nicole L. Greenblatt
601 Lexington Avenue
New York, New York 10022–4611
Telephone:       (212) 446–4800
Facsimile:       (212) 446–4900

Counsel for the Debtors and Debtors in Possession

**92**

K&E ~~15673799~~**15735883.**