James H.M. Sprayregen P.C.
Paul M. Basta
Nicole L. Greenblatt
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | ) Case No. 09-23529 (RDD) |
| | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

**PLAN SUPPLEMENT FOR THE**
**THIRD AMENDED PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF THE READER'S DIGEST ASSOCIATION, INC. AND ITS DEBTOR AFFILIATES[1]**

Dated:   December 11, 2009

---

[1]    The Debtors in these Chapter 11 Cases who are the proponents of the Plan, along with the last four digits of each Debtor's federal tax identification number, are: Alex Inc. (5531); Allrecipes.com, Inc. (3797); Ardee Music Publishing, Inc. (2291); Christmas Angel Productions, Inc. (2729); CompassLearning, Inc. (6535); Direct Entertainment Media Group, Inc. (2306); Direct Holdings Americas Inc. (1045); Direct Holdings Custom Publishing Inc. (7452); Direct Holdings Customer Service, Inc. (9015); Direct Holdings Education Inc. (5535); Direct Holdings Libraries Inc. (7299); Direct Holdings U.S. Corp. (4998); Funk & Wagnalls Yearbook Corp. (3787); Gareth Stevens, Inc. (2742); Home Service Publications, Inc. (9525); Pegasus Asia Investments Inc. (0077); Pegasus Investment, Inc. (4252); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); RD Large Edition, Inc. (1489); RD Publications, Inc. (9115); RD Walking, Inc. (6509); RDA Holding Co. (7045); RDA Sub Co. (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica, S.A. (5836); Reader's Digest Sales and Services, Inc. (2377); Reader's Digest Sub Nine, Inc. (2727); Reader's Digest Young Families, Inc. (6158); Reiman Manufacturing, LLC (8760); Reiman Media Group, Inc. (1192); Retirement Living Publishing Company, Inc. (9118); Saguaro Road Records, Inc. (2310); Taste of Home Media Group, Inc. (1190); Taste of Home Productions, Inc. (1193); The Reader's Digest Association, Inc. (6769); Travel Publications, Inc. (2927); W.A. Publications, LLC (0229); WAPLA, LLC (9272); Weekly Reader Corporation (3780); Weekly Reader Custom Publishing, Inc. (3276); World Almanac Education Group, Inc. (3781); World Wide Country Tours, Inc. (1189); WRC Media, Inc. (6536). The location of the Debtors' corporate headquarters is:  1 Reader's Digest Road, Pleasantville, NY 10570.

[This Page Intentionally Left Blank]

## Overview

The Reader's Digest Association, Inc. and its affiliates identified on the title page above, as debtors and debtors in possession (collectively, the "***Debtors***"), submit this Plan Supplement (this "***Plan Supplement***") in support of confirmation of the Third Amended Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates, which was filed with the Bankruptcy Court on October 9, 2009 [Docket No. 163] (as amended from time to time, the "***Plan***").  Capitalized terms used but not defined herein have the meanings set forth in the Plan.  The documents contained in the Plan Supplement are integral to, part of and incorporated by reference into the Plan.  These documents have not yet been approved by the Bankruptcy Court.  If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

## Contents

The Plan Supplement contains the following documents, as may be amended, modified or supplemented from time to time by the Debtors in accordance with the Plan as set forth below:

Exhibit A:    Form of the Exit Credit Agreement

Exhibit B:    Form of the New Second Priority Term Loan Agreement

Exhibit C:    Form of the New Warrant Agreement

Exhibit D:    Compensation and Benefit Programs to be Assumed or Rejected

Exhibit E:    Form of the Registration Rights Agreement

Exhibit F:    Form of the Shareholders Agreement

Exhibit G:    Form of the Amended and Restated Certificate of Incorporation

Exhibit H:    Form of the Amended and Restated Bylaws

Exhibit I:    Form of the Enterprise Value Maximization Plan

Exhibit J:    Form of the Variable Compensation Plan

---

Certain documents, or portions thereof, contained in the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights to amend, modify or supplement the Plan Supplement, and any of the documents contained therein, in accordance with the terms of the Plan.  To the extent material amendments or modifications are made to any of these documents, the Debtors will file a black line with the Bankruptcy Court prior to the Confirmation Hearing marked to reflect same.

---

[This Page Intentionally Left Blank]

# EXHIBIT A

### Form of the Exit Credit Agreement

Article IV.H of the Plan provides that, on the Effective Date, the Reorganized Debtors will enter into the Exit Credit Agreement, substantially in the form attached hereto, subject to the approval of the Bankruptcy Court and entry of the Confirmation Order.

[This Page Intentionally Left Blank]

STB Draft 12/11/09

CREDIT AGREEMENT

Dated as of [_____], 20[__]

among

[REORGANIZED RDA HOLDING CO.],

[REORGANIZED THE READER'S DIGEST ASSOCIATION, INC.],

RD GERMAN HOLDINGS GMBH,

The Lenders Party Hereto

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and Syndication Agent

J.P. MORGAN SECURITIES INC.,
as Sole Lead Arranger and Sole Bookrunner

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ................................................. 1

Section 1.01    Defined Terms......................................................................... 1
Section 1.02    Other Interpretive Provisions ................................................. 32
Section 1.03    Accounting Terms .................................................................. 33
Section 1.04    Rounding................................................................................ 33
Section 1.05    References to Agreements, Laws, Etc ..................................... 33
Section 1.06    Times of Day.......................................................................... 33
Section 1.07    Timing of Payment of Performance ...................................... 33
Section 1.08    Currency Equivalents Generally............................................. 33
Section 1.09    Change of Currency................................................................ 34

ARTICLE II THE LOANS................................................................................................. 34

Section 2.01    The Loans ............................................................................... 34
Section 2.02    Conversions and Continuations of Loans ............................. 35
Section 2.03    Prepayments........................................................................... 36
Section 2.04    Repayment of Loans .............................................................. 37
Section 2.05    Interest ................................................................................... 37
Section 2.06    Fees........................................................................................ 38
Section 2.07    Computation of Interest and Fees.......................................... 38
Section 2.08    Evidence of Indebtedness ...................................................... 38
Section 2.09    Payments Generally ............................................................... 39
Section 2.10    Sharing of Payments .............................................................. 41
Section 2.11    Intercreditor Agreement ........................................................ 41

ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY............................ 41

Section 3.01    Taxes...................................................................................... 41
Section 3.02    Illegality................................................................................. 43
Section 3.03    Inability to Determine Rates .................................................. 44
Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on
                Eurodollar Rate Loans ........................................................... 44
Section 3.05    Funding Losses....................................................................... 45
Section 3.06    Matters Applicable to All Requests for Compensation .................... 45
Section 3.07    Replacement of Lenders under Certain Circumstances .................. 46
Section 3.08    Survival................................................................................... 47

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS............................................ 47

ARTICLE V REPRESENTATIONS AND WARRANTIES................................................................ 50

Section 5.01    Existence, Qualification and Power; Compliance with Laws .......... 50
Section 5.02    Authorization; No Contravention ........................................... 50
Section 5.03    Governmental Authorization; Other Consents ............................. 50
Section 5.04    Binding Effect ........................................................................ 50
Section 5.05    Financial Statements; No Material Adverse Effect ....................... 51

- i -

Section 5.06    Litigation.................................................................................... 51
Section 5.07    No Default................................................................................. 51
Section 5.08    Ownership of Property; Liens ................................................. 51
Section 5.09    Environmental Compliance...................................................... 52
Section 5.10    Taxes......................................................................................... 52
Section 5.11    ERISA Compliance .................................................................. 53
Section 5.12    Subsidiaries; Equity Interests .................................................. 53
Section 5.13    Margin Regulations; Investment Company Act ........................ 53
Section 5.14    Disclosure ................................................................................. 54
Section 5.15    Intellectual Property; Licenses, Etc ......................................... 54
Section 5.16    Solvency ................................................................................... 54
Section 5.17    Labor Matters ........................................................................... 54
Section 5.18    Collateral................................................................................... 54
Section 5.19    Use of Proceeds ....................................................................... 55
Section 5.20    Regulation H ............................................................................ 55

ARTICLE VI AFFIRMATIVE COVENANTS................................................................... 55

Section 6.01    Financial Statements................................................................ 55
Section 6.02    Certificates; Other Information ................................................ 57
Section 6.03    Update Calls ............................................................................. 58
Section 6.04    Notices ...................................................................................... 59
Section 6.05    Payment of Obligations ........................................................... 59
Section 6.06    Preservation of Existence, Etc................................................. 59
Section 6.07    Maintenance of Properties ....................................................... 59
Section 6.08    Maintenance of Insurance ....................................................... 59
Section 6.09    Compliance with Laws ............................................................. 59
Section 6.10    Inspection Rights; Books and Records; Discussions ............. 60
Section 6.11    Covenant to Guarantee Obligations and Give Security .......... 60
Section 6.12    Compliance with Environmental Laws.................................... 62
Section 6.13    Further Assurances .................................................................. 62
Section 6.14    Deposit Accounts ..................................................................... 63
Section 6.15    Ratings ...................................................................................... 63
Section 6.16    Post-Closing Covenants .......................................................... 63

ARTICLE VII NEGATIVE COVENANTS ........................................................................ 63

Section 7.01    Liens ......................................................................................... 63
Section 7.02    Investments .............................................................................. 66
Section 7.03    Indebtedness............................................................................. 69
Section 7.04    Fundamental Changes.............................................................. 71
Section 7.05    Dispositions .............................................................................. 72
Section 7.06    Restricted Payments ................................................................ 73
Section 7.07    Change in Nature of Business .................................................. 74
Section 7.08    Transactions with Affiliates ...................................................... 74
Section 7.09    Burdensome Agreements ......................................................... 74
Section 7.10    Financial Condition Covenants ................................................ 75
Section 7.11    Sale and Leaseback Transactions .......................................... 75
Section 7.12    Swap Contracts ........................................................................ 76
Section 7.13    Accounting Changes................................................................. 76
Section 7.14    Prepayments, Etc. of Indebtedness ........................................ 76

509600-0292-11211-Active.11784882.7

Section 7.15    Holding Company .................................................................. 76
Section 7.16    Capital Expenditures.............................................................. 76

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES.................................... 77

Section 8.01    Events of Default................................................................... 77
Section 8.02    Remedies Upon Event of Default.......................................... 79
Section 8.03    Application of Funds ............................................................ 79
Section 8.04    CAM Exchange .................................................................... 80

ARTICLE IX ADMINISTRATIVE AGENT AND OTHER AGENTS ................... 81

Section 9.01    Appointment and Authorization of Agents ........................... 81
Section 9.02    Delegation of Duties ............................................................ 81
Section 9.03    Liability of Agents ............................................................... 81
Section 9.04    Reliance by Agents............................................................... 82
Section 9.05    Notice of Default .................................................................. 82
Section 9.06    Credit Decision; Disclosure of Information by Agents ......... 82
Section 9.07    Indemnification of Agents .................................................... 83
Section 9.08    Agents in their Individual Capacities ................................... 83
Section 9.09    Successor Agents.................................................................. 84
Section 9.10    Administrative Agent May File Proofs of Claim ................... 84
Section 9.11    Collateral and Guarantee Matters......................................... 85
Section 9.12    Other Agents; Arranger and Managers.................................. 85
Section 9.13    Appointment of Supplemental Administrative Agents.......... 86

ARTICLE X MISCELLANEOUS.......................................................................... 86

Section 10.01    Amendments, Etc................................................................. 86
Section 10.02    Notices and Other Communications; Facsimile Copies ........ 88
Section 10.03    No Waiver; Cumulative Remedies......................................... 90
Section 10.04    Attorney Costs, Expenses and Taxes..................................... 90
Section 10.05    Indemnification by the Company .......................................... 90
Section 10.06    Payments Set Aside .............................................................. 91
Section 10.07    Successors and Assigns ........................................................ 92
Section 10.08    Confidentiality...................................................................... 95
Section 10.09    Setoff ................................................................................... 96
Section 10.10    Interest Rate Limitation ....................................................... 96
Section 10.11    Counterparts ......................................................................... 96
Section 10.12    Integration ............................................................................ 97
Section 10.13    Survival of Representations and Warranties .......................... 97
Section 10.14    Severability .......................................................................... 97
Section 10.15    Tax Forms ............................................................................ 97
SECTION 10.16    GOVERNING LAW .............................................................. 99
Section 10.17    Submission To Jurisdiction; Waivers ................................... 99
SECTION 10.18    WAIVER OF RIGHT TO TRIAL BY JURY ............................ 99
Section 10.19    Binding Effect ...................................................................... 100
Section 10.20    Lender Action ....................................................................... 100
Section 10.21    USA PATRIOT Act................................................................ 100
Section 10.22    Agent for Service of Process................................................. 100
Section 10.23    German Tax Confirmation .................................................... 100

Section 10.24    Acknowledgements ................................................................................. 102
Section 10.25    Releases of Guarantee and Lien ............................................................. 102

509600-0292-11211-Active.11784882.7

SCHEDULES

| 1.01A | Certain Collateral Documents |
| 1.01B | Mortgaged Properties |
| 1.01C | Designated Non-Debtors |
| 2.01(a) | U.S. Term Loans |
| 2.01(b) | German Term Loans |
| 5.11(c) | Foreign Benefits Matters |
| 5.12 | Subsidiaries and Other Equity Investments |
| 5.18 | Collateral Matters |
| 6.16 | Post-Closing Matters |
| 7.01(b) | Existing Liens |
| 7.02(c) | Permitted Investments |
| 7.02(f) | Existing Investments |
| 7.03(b) | Existing Indebtedness |
| 7.04(e) | Permitted Changes |
| 7.05(i) | Specified Dispositions |
| 7.08 | Transactions with Affiliates |
| 7.09 | Existing Restrictions |

EXHIBITS

*Form of*

| A | Conversion or Continuation Notice |
| B-1 | U.S. Term Note |
| B-2 | German Term Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | Guarantee and Security Agreement |
| F | Opinion of Kirkland & Ellis LLP |
| G | Mortgage |
| H | U.S. Tax Compliance Certificate |
| I | Intercreditor Agreement |
| J | German Guarantee Agreement |

509600-0292-11211-Active.11784882.7

## CREDIT AGREEMENT

This CREDIT AGREEMENT ("**Agreement**") is entered into as of [_____], 20[__], among [RESTRUCTURED RDA HOLDING CO.], a Delaware corporation ("**Holdings**"), [RESTRUCTURED THE READER'S DIGEST ASSOCIATION, INC.], a Delaware corporation (the "**Company**"), RD GERMAN HOLDINGS GMBH (the "**German Borrower**"), JPMORGAN CHASE BANK, N.A., as Administrative Agent and Syndication Agent, and each lender from time to time party hereto (collectively, the "**Lenders**" and each a "**Lender**").

### PRELIMINARY STATEMENTS

On August 24, 2009 (the "**Petition Date**"), Holdings and certain of its Subsidiaries (collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court (such term and other capitalized terms used in these preliminary statements being used with the meanings given to such terms in Section 1.01) initiating the Cases and continued in the possession of their assets and in the management of their businesses pursuant to Bankruptcy Code Sections 1107 and 1108.

On [_____], 20[__], the Bankruptcy Court entered the Confirmation Order confirming the Debtors' [Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated [_____], 2009] (as in effect on the date of confirmation thereof and as thereafter may be amended as provided in this agreement, the "**Reorganization Plan**").

In connection with the confirmation and consummation of the Reorganization Plan, the reorganized Debtors and the German Borrower have requested the Lenders (i) make loans available to the reorganized Debtors and (ii) amend and restate the terms of the Prepetition Euro Term Loans (as defined below), in order to enable the reorganized Debtors and the German Borrower to, among other things, consummate the transactions contemplated by the Reorganization Plan and to pay related fees and expenses, and the Lenders have agreed, subject to the terms and conditions hereof, to enter into this Agreement.

Accordingly, the parties hereto hereby agree as follows:

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"**Administrative Agent**" means JPMorgan Chase Bank, in its capacity as administrative agent under any of the Loan Documents, or any permitted successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth in Section 10.02 or such other address or account as the Administrative Agent may from time to time notify the Company and the Lenders in writing (including by electronic mail or by posting to Intralinks or other similar information transmission systems).

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Syndication Agent and the Supplemental Administrative Agents (if any).

"**Agreement**" has the meaning specified in the introductory paragraph hereto.

"**Alternative Currency**" means Sterling, Euros, Canadian Dollars or Australian Dollars.

"**Applicable Rate**" means a percentage per annum equal to: (a) in the case of the U.S. Term Loans, (i) 9.0% with respect to Base Rate Loans and (ii) 10.0% with respect to Eurodollar Rate Loans and (b) in the case of the German Term Loans, (i) 9.0% with respect to Base Rate Loans and (ii) 10.0% with respect to Eurodollar Rate Loans.

"**Appropriate Lender**" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"**Approved Bank**" has the meaning specified in clause (c) of the definition of "Cash Equivalents".

"**Approved Fund**" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Arranger**" means J.P. Morgan Securities Inc., in its capacity as Sole Lead Arranger and Sole Bookrunner under this Agreement.

"**Assignees**" has the meaning specified in Section 10.07(b).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit D.

"**Attorney Costs**" means and includes all reasonable fees, expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Audited Financial Statements**" means the audited consolidated balance sheets of the Company and its consolidated Subsidiaries as of each of June 30, 2007, June 30, 2008 and June 30, 2009, and the related audited consolidated statements of income, stockholders' equity and cash flows for the Company and its consolidated Subsidiaries for the periods ended on such dates.

- 2 -

"**Australian Dollars**" means the lawful currency of Australia.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§101 et seq.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Cases from time to time.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by JPMorgan Chase Bank as its "prime rate" and (c) the Eurodollar Rate for a Eurodollar Rate Loan of the applicable Class with a one month Interest Period plus 1%. The "prime rate" is a rate set by JPMorgan Chase Bank based upon various factors including JPMorgan Chase Bank costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by JPMorgan Chase Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Board**" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrowers**" means, collectively, the Company and the German Borrower.

"**Borrowing**" means a conversion of DIP Term Loans to U.S. Term Loans pursuant to Section 2.01(a) or a continuation of Prepetition Euro Term Loans as German Term Loans pursuant to Section 2.01(b), as the case may be.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located or in The City of New York; *provided*, that when used in connection with a Eurodollar Rate Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits in Dollars in the London interbank market.

"**CAM**" means the mechanism for the allocation and exchange of interests in Loans under this Agreement and collections thereunder established in Section 8.04.

"**CAM Exchange**" means the exchange of the Lenders' interests provided for in Section 8.04.

"**CAM Exchange Date**" means the date on which any Event of Default referred to in Section 8.01(f) shall occur or the date on which the Company receives written notice from the Administrative Agent that any Event of Default referred to in Section 8.01(g) has occurred.

"**CAM Percentage**" means, as to each Lender, a fraction, expressed as a decimal, of which (a) the numerator shall be the aggregate amount of the Designated Obligations owed to such Lender (whether or not at the time due and payable) immediately prior to the CAM Exchange Date and (b) the denominator shall be the aggregate amount of the Designated Obligations owed to all the Lenders (whether or not at the time due and payable) immediately prior to the CAM Exchange Date.

- 3 -

"**Canadian Dollars**" means the lawful currency of Canada.

"**Capital Expenditures**" means, for any period, with respect to any Person, the aggregate of all expenditures by such Person and its consolidated Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that are required to be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries, but excluding (i) such expenditures that are made with all or any portion of any Net Cash Proceeds arising from Casualty Event or any Disposition which are reinvested, (ii) capitalized interest, (iii) such expenditures for which such Person is reimbursed in cash by a third party (other than any Group Member), (iv) the purchase price of equipment that is purchased during such period to the extent the consideration therefor consists of (x) existing equipment traded in at the time of such purchase or (y) the proceeds of a concurrent sale of existing equipment, in each case in the ordinary course of business, (v) the book value of any asset owned by the Company or any Subsidiary prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such Person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; provided that (x) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made and (y) such book value shall have been included in Capital Expenditures when such asset was originally acquired and (vi) such expenditures made to fund the purchase price for assets acquired as part of a Permitted Acquisition.

"**Capital Lease Obligations**" means, the obligations of a Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Cases**" means the jointly administered chapter 11 cases of the Debtors captioned <u>In re The Reader's Digest Association, Inc.</u>, Case No. 09-23529 (RDD), arising upon the filing by the Debtors of voluntary petitions for relief with the Bankruptcy Court on the Petition Date.

"**Cash Election**" has the meaning specified in Section 2.05(b).

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Company or any Subsidiary:

(a)       Dollars, Euros or other Alternative Currency or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(b)       marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union, having average maturities of not more than 12 months from the date of acquisition thereof; *provided* that the full faith and credit of the United States or a member nation of the European Union is pledged in support thereof;

(c)       time deposits with, or certificates of deposit, overnight bank deposits or bankers' acceptances issued or guaranteed by, or money market deposit accounts issued or offered by, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding

- 4 -

company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development, and is a member of the Federal Reserve System, and (B) has combined capital and surplus of at least $250,000,000 (any such bank in the foregoing clauses (i) or (ii) being an "**Approved Bank**"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)     commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any commercial paper or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)     fully collateralized repurchase agreements entered into by any Person with a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of $250,000,000 for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union;

(f)     securities with average maturities of 12 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(g)     Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(h)     instruments equivalent to those referred to in clauses (a) through (g) above denominated in Euros or other Alternative Currency or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction; and

(i)     Investments in money market investment or similar programs which are registered under the Investment Company Act of 1940 or which are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (h) of this definition.

"**Cash Management Obligations**" means obligations owed by Holdings, the Company or any Subsidiary to any Lender or any Affiliate of a Lender in respect of any overdraft and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds.

"**Casualty Event**" means any event that gives rise to the receipt by Holdings, the Company or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

- 5 -

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as subsequently amended.

"**CERCLIS**" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the U.S. Environmental Protection Agency.

"**Change of Control**" means the earliest to occur of:

(a)    after giving effect to the Reorganization Plan, the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Exchange Act and the rules of the SEC thereunder as in effect on the date hereof), of Equity Interests representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings;

(b)    after giving effect to the Reorganization Plan, the board of directors of Holdings ceasing to consist of a majority of the Continuing Directors; or

(c)    Holdings ceasing to own, directly, all of the outstanding Equity Interests in the Company.

"**Charges**" has the meaning specified in Section 10.10.

"**Class**" (a) when used with respect to Lenders, refers to whether such Lenders are U.S. Term Lenders or German Term Lenders and (b) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are U.S. Term Loans or German Term Loans.

"**Closing Date**" means the first date all the conditions precedent in Article IV are satisfied or waived in accordance with Article IV.

"**Code**" means the U.S. Internal Revenue Code of 1986.

"**Collateral**" means all property of the Loan Parties, now or hereafter acquired, upon which a Lien in favor of the Secured Parties is purported to be created by any Collateral Document.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Article IV(a)(iii) or pursuant to Section 6.11 at such time, duly executed by each Loan Party thereto;

(b)    all Obligations shall have been unconditionally guaranteed (the "**U.S. Guaranty**") by Holdings, the Company (with respect to Obligations of the German Borrower only) and each Subsidiary that is a Domestic Subsidiary (each, a "**U.S. Guarantor**");

(c)    except as set forth in Section 6.16, all Obligations of the German Borrower shall have been unconditionally guaranteed (the "**German Guaranty**" and, together with the U.S. Guaranty, the "**Guaranty**") by each direct parent entity and each Subsidiary of the German Borrower (each, a "**German Guarantor**" and, together with the U.S. Guarantors, the "**Guarantors**") except to the extent such German Guaranty (A) is prohibited or limited by applicable Law, including financial assistance rules, (B) would conflict with the fiduciary duties

- 6 -

of directors of any Subsidiary or (C) could reasonably be expected to result in personal or criminal liability of any director of any Subsidiary;

(d)    except as set forth in Section 6.16, the Obligations and the U.S. Guaranty shall have been secured by a security interest in (i) all the Equity Interests of the Company and (ii) all Equity Interests of each Subsidiary of the Company directly owned by the Company or any U.S. Guarantor, in each case having the priority required by the Collateral Documents; *provided* that pledges of Equity Interests of each Foreign Subsidiary, and of each Domestic Subsidiary substantially all of whose assets consist of Equity Interests of one or more Foreign Subsidiaries, shall be limited to 65% of the issued and outstanding Equity Interests of such Subsidiary at any time;

(e)    except as set forth in Section 6.16, all Obligations of the German Borrower and the German Guaranty shall have been secured by a security interest in all Equity Interests of the German Borrower and each German Guarantor in each case having the priority required by the Collateral Documents except to the extent the granting of such security interest (A) is prohibited or limited by applicable Law, including financial assistance rules, (B) would conflict with the fiduciary duties of directors of any Subsidiary or (C) could reasonably be expected to result in personal or criminal liability of any director of any Subsidiary;

(f)    except to the extent otherwise permitted hereunder or under any Collateral Document, (i) to the extent governed by the Uniform Commercial Code, the execution of the Collateral Documents shall be effective to create a security interest in all Collateral described therein and proceeds thereof, in each case, to the extent constituting Collateral and with the priority required by the Collateral Documents, (ii) except as set forth in Section 6.16, all Obligations of the German Borrower and the German Guaranty shall have been secured by a security interest in, and mortgages on, substantially all material owned tangible and intangible assets of the German Borrower and each German Guarantor, in each case (A) with the priority required by the Collateral Documents, (B) except to the extent the granting of such security interests or mortgages (w) is prohibited or limited by applicable Law, including financial assistance rules, (x) would result in material adverse tax consequences to Holdings and its Subsidiaries, (y) would conflict with the fiduciary duties of directors of any Subsidiary or (z) could reasonably be expected to result in personal or criminal liability of any director of any Subsidiary, and (C) subject to exceptions and limitations consistent with those set forth in the Collateral Documents as in effect on the Closing Date (to the extent appropriate in the applicable jurisdiction), and (iii) except as set forth in Section 6.16, all documents and instruments, including Uniform Commercial Code financing statements and filings made in respect of Intellectual Property constituting Collateral in the United States Patent and Trademark Office and the United States Copyright Office, reasonably requested by the Administrative Agent to be filed, registered or recorded to create the Liens intended to be created by the Collateral Documents and to perfect such Liens to the extent required by, and with the priority required by, the Collateral Documents, shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or recording;

(g)    none of the Collateral shall be subject to any Liens other than Liens permitted by Section 7.01; and

(h)    except as set forth in Section 6.16, the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to any Material Real Property described on Schedule 1.01B hereto or required to be delivered pursuant to Section 6.11 (the "**Mortgaged Properties**") duly executed and delivered by the record owner of such property, (ii) a policy or policies of title

- 7 -

insurance issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a valid Lien on the property described therein, free of any other Liens except as expressly permitted by Section 7.01, together with such endorsements, coinsurance and reinsurance as the Administrative Agent may reasonably request, and (iii) such surveys, abstracts, appraisals, legal opinions and other documents as the Administrative Agent may reasonably request with respect to any such Mortgaged Property.

The foregoing definition shall not require the perfection of pledges of or security interests in, or the obtaining of title insurance or surveys with respect to particular assets (including but not limited to Mortgaged Properties) if and for so long as, in the reasonable judgment of the Administrative Agent, the economic detriment to the Loan Parties of perfecting such pledges or security interests or the cost of perfecting such pledges or security interests in such assets or obtaining title insurance or surveys in respect of such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom. The Administrative Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets (including but not limited to Mortgaged Properties) of the Loan Parties on such date) where it reasonably determines, in consultation with the Company, that perfection or obtaining title insurance cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents as in effect on the Closing Date and, to the extent appropriate in the applicable jurisdiction, as agreed between the Administrative Agent and the Company.

"**Collateral Documents**" means, collectively, the Guarantee and Security Agreement, the Mortgages, Security Agreement Supplements, the German Guarantee Agreement, the German Security Agreements, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent and the Lenders pursuant to Section 6.11 or Section 6.16 and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Committee**" means the statutory unsecured creditors committee appointed in the Cases on August 31, 2009.

"**Company**" has the meaning specified in the introductory paragraph to this Agreement.

"**Compensation Period**" has the meaning specified in Section 2.09(c)(ii).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C.

"**Confirmation Order**" has the meaning specified in Article IV(g).

"**Consolidated EBITDA**" means, for any period, the Consolidated Net Income for such period, plus:

(a)      without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

- 8 -

(i)        total interest expense and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities,

(ii)        taxes and provision for taxes, including taxes based on income, profits or capital of the Company and its Subsidiaries and state, franchise and similar taxes and foreign withholding taxes paid or accrued during such period,

(iii)        depreciation and amortization,

(iv)        Non-Cash Charges,

(v)        (x) any costs, fees, expenses or disbursements of attorneys, auditors, consultants or advisors to the Company and its Subsidiaries and to the Committee, in each case, incurred in connection with the events leading up to and the ongoing administration of and completion of the Cases (until the closing thereof), the Reorganization Plan and the transactions contemplated thereby and any other financial restructuring and the negotiation, execution and documentation of the DIP Credit Agreement, the Second Lien Credit Agreement, this Agreement and any amendments, waivers or other modifications to the Prepetition Credit Agreement or the DIP Credit Agreement, together with any such costs, fees, expenses or disbursements paid to the attorneys, auditors, consultants and advisors of the agents and lenders in connection therewith, and (y) any upfront, arrangement or other fees paid by the Loan Parties in connection with the DIP Credit Agreement, the Second Lien Credit Agreement and this Agreement, and any other financing entered into in connection with the Reorganization Plan and the transactions contemplated thereby,

(vi)        charges, premiums and expenses associated with the discharge of Prepetition Indebtedness,

(vii)        any deductions consisting of subsidiary income attributable to minority interests in Reader's Digest Association Ltd., except to the extent actually paid to a holder of Equity Interests in such Subsidiary (or any designee of such Person) other than the Company and its Subsidiaries (with such payments to be deducted in the period made),

(viii)        transaction costs, fees and expenses payable in connection with the incurrence of Indebtedness permitted under Section 7.03 (in each case whether or not any such incurrence is successful),

(ix)        any costs or expenses incurred by the Company or a Subsidiary pursuant to any management equity plan or stock option plan or other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of Holdings,

(x)        expenses resulting from liability or casualty events,

(xi)        non-cash charges pursuant to SFAS 158,

- 9 -

(xii)     non-cash income or expenses from the continuation of purchase accounting adjustments in connection with the Transaction (as defined in the Prepetition Credit Agreement as in effect on the date hereof),

(xiii)    non-recurring and other one-time costs incurred by the Company or its Subsidiaries in connection with the reorganization of its and its Subsidiaries' business, operations and structure, including, without limitation, relating to the sale or closing of facilities, establishment of telephone hotlines, the hiring of temporary employees, severance, stay bonuses and curtailments or modifications to pension and post-retirement employee benefit plans, asset writedowns or asset disposals (including leased facilities), writedowns for purchase and lease commitments, start up costs for new facilities, writedowns of excess, obsolete or unbalanced inventories, relocation costs, including costs of moving and relocating personnel, equipment, facilities, personal property and inventory, which are not otherwise capitalized and any related promotional costs of exiting products or product lines and other restructuring costs associated with the Cases or the Reorganization Plan (to the extent not otherwise contemplated by the definition of Consolidated EBITDA), in an aggregate amount for all costs included in this clause (xiii) not to exceed (A)(x) $20,000,000 for the period beginning on the Closing Date and ending on December 31, 2010 and (y) $10,000,000 for each calendar year ended thereafter plus (B) the amount of any costs described above incurred in connection with any move of the Company's Canary Wharf operations in an aggregate amount not to exceed $25,000,000 during the term of this Agreement; *provided*, that to the extent that the aggregate amount of all costs included in clause (A) above for any calendar year is less than the maximum amount set forth therein, the amount of such difference may be carried forward to increase the maximum amount of costs permitted by clause (A) above for the next succeeding calendar year (it being understood that such costs in any calendar year shall be counted against the base amount set forth in clause (A) above with respect to such calendar year prior to being counted against any available carried forward amount with respect to such calendar year),

(xiv)    to the extent actually reimbursed, expenses incurred to the extent covered by indemnification provisions in any agreement in connection with a Permitted Acquisition, and

(xv)     foreign exchange losses resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Company and its consolidated Subsidiaries, *less*

(b)     without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)     extraordinary gains and unusual or non-recurring gains,

(ii)    non-cash gains (excluding any ordinary course non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period),

(iii)   gains on asset sales (other than asset sales in the ordinary course of business),

- 10 -

(iv)    any net after-tax income from the early extinguishment of Indebtedness or hedging obligations or other derivative instruments,

(v)    all gains from sales of investments recorded using the equity method,

(vi)    foreign exchange gains resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Company and its consolidated Subsidiaries, and

(vii)    any additions resulting from subsidiary losses attributable to minority interests in Reader's Digest Association Ltd.,

in each case, as determined on a consolidated basis for the Company and its Subsidiaries in accordance with GAAP; *provided* that, to the extent included in Consolidated Net Income,

(i)    there shall be excluded in determining Consolidated EBITDA currency translation gains and losses related to currency measurements of Indebtedness (including the net loss or gain resulting from Swap Contracts for currency exchange risk),

(ii)    there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of Statement of Financial Accounting Standards No. 133,

(iii)    there shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset sold, transferred or otherwise disposed of closed or classified as discontinued operations by the Company or any Subsidiary during such period (each such Person, property, business or asset so sold or disposed of, a "**Sold Entity or Business**"), based on the actual Disposed EBITDA of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer or disposition); and

(iv)    there shall be excluded in determining Consolidated EBITDA for any period any non-cash impact attributable to the Company's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan.

For the purpose of the definition of Consolidated EBITDA, "**Non-Cash Charges**" means (a) non-cash losses on asset sales, disposals or abandonments (other than of current assets), (b) any impairment charge or asset write-off related to intangible assets, long-lived assets, and investments in debt and equity securities pursuant to GAAP, (c) all losses from investments recorded using the equity method, (d) stock-based awards compensation expense, and (e) other non-recurring non-cash charges (*provided* that if any non-cash charges referred to in this clause (e) represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to such extent, and excluding non-cash charges consisting of amortization of a prepaid cash item that was paid in a prior period). Notwithstanding the foregoing, Consolidated EBITDA for the fiscal quarters ending March 31, 2009, June 30, 2009 and September 30, 2009 shall be deemed to be $[17,240,000], $[82,955,000] and $[1,449,000], respectively.

"**Consolidated EBITDA Event**" means that for the period of twelve months most recently ended on or prior to the Interest Period for which the Company makes an Interest Election, Consolidated EBITDA for the Company and its consolidated Subsidiaries shall be less than $160,000,000.

- 11 -

"**Consolidated Fixed Charge Coverage Ratio**" means, for any Test Period, the ratio of (a) Consolidated EBITDA for such Test Period to (b) Consolidated Fixed Charges for such Test Period.

"**Consolidated Fixed Charges**" means, for any Test Period, the sum (without duplication) of (a) Consolidated Interest Expense for such Test Period, (b) the aggregate amount actually paid by the Company and its consolidated Subsidiaries during such Test Period on account of Capital Expenditures other than Capital Expenditures, to the extent financed with any proceeds from Indebtedness (other than any Loans) and (c) scheduled payments made during such Test Period on account of principal of Indebtedness of the Company and its consolidated Subsidiaries (excluding principal payments made in connection with the Prepetition Credit Agreement (other than the Prepetition Euro Term Loans)).

"**Consolidated Interest Expense**" means, for any Test Period, that portion of interest expense (including that attributable to Capital Lease Obligations) of the Company and its consolidated Subsidiaries paid or accrued under GAAP for such Test Period that is currently payable in cash for such Test Period with respect to all outstanding Indebtedness of the Company and its consolidated Subsidiaries determined on a consolidated basis in accordance with GAAP; *provided*, that Consolidated Interest Expense for any Test Period shall exclude (a) any amortization or write-off of deferred financing fees during such Test Period, (b) premiums paid in connection with the discharge of Indebtedness, (c) interest expense in connection with the Senior Subordinated Notes and (d) interest expense in connection with the Prepetition Credit Agreement (other than the Prepetition Euro Term Loans; *provided*, *further*, that Consolidated Interest Expense for any Test Period shall include for the period prior to the Closing Date interest expense in connection with the Facility as if $150,000,000 of U.S. Term Loans had been made on the first day of such Test Period).

"**Consolidated Net Income**" means, for any period, the net income (loss) of the Company and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication, (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Subsidiaries and (b) the income (or deficit) of any Person (other than a Subsidiary of the Company) in which the Company or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by (or such deficit is actually distributed to) the Company or such Subsidiary in the form of dividends or similar distributions.

"**Consolidated Total Debt**" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Company and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with any Permitted Acquisition), required to be reflected as "indebtedness" (or the equivalent thereof) on a consolidated balance sheet of the Company in accordance with GAAP (other than Indebtedness described in clause (b) (other than in respect of drawings thereunder to the extent not reimbursed within two Business Days after the date of such drawing) or (c) of the definition of Indebtedness).

"**Continuing Directors**" means the directors of Holdings on the Closing Date and each other director, if, in each case, such other directors' nomination for election to the board of directors of Holdings is recommended by a majority of the then Continuing Directors.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning specified in the definition of "Affiliate."

- 12 -

"**Conversion or Continuation Notice**" means a notice of (a) a conversion of Loans from one Type to the other, or (b) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A.

"**Debt Issuance**" means the issuance by any Person and its Subsidiaries of any Indebtedness for borrowed money.

"**Debtor**" has the meaning specified in the preliminary statements to this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally (including, in the case of Loan Parties incorporated or organized in England or Wales, administration, administrative receivership, voluntary arrangement and schemes of arrangement).

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.0% per annum; *provided* that with respect to the principal amount of any Eurodollar Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including the Applicable Rate) otherwise applicable to such Loan plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, unless subsequently cured, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless subsequently cured or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"**Designated Non-Debtors**" means the Subsidiaries set forth on Schedule 1.01C.

"**Designated Obligations**" means all obligations of the Borrowers with respect to (a) principal of and interest on the Loans and (b) accrued and unpaid fees under the Loan Documents.

"**DIP Agent**" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent for the lenders under the DIP Credit Agreement.

"**DIP Credit Agreement**" means the Credit and Guarantee Agreement, dated as of August 26, 2009, among Holdings, the Company and certain of the Company's Subsidiaries, the lenders from time to time party thereto, the DIP Agent and the other parties thereto, as amended, supplemented or otherwise modified prior to the date hereof.

"**DIP Facility**" means the term loan facility made available under the DIP Credit Agreement.

"**Disposed EBITDA**" means, with respect to any Sold Entity or Business for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business (determined as if references to the Company and its Subsidiaries in the definition of Consolidated EBITDA were references

- 13 -

to such Sold Entity or Business and its Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale of Equity Interests held in another Person) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith; and, other than for purposes of Section 2.03(b)(ii), shall include any issuance by a Person of any of its Equity Interests to another Person.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) requires the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the latest Maturity Date.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**ECF Percentage**" means 75%; provided that with respect to each fiscal year of the Company, the ECF Percentage shall be 50% in respect of such fiscal year if the Total Leverage Ratio as of the last day of such fiscal year is less than [___]: 1.00.

"**Effective Date**" means the effective date of the Reorganization Plan.

"**Eligible Assignee**" means any Assignee permitted by and consented to in accordance with Section 10.07(b).

"**EMU**" means the economic and monetary union in accordance with the Treaty of Rome 1957, as amended by the Single European Act 1986, the Maastricht Treaty of 1992 and the Amsterdam Treaty of 1998.

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Environmental Laws**" means any and all Laws (including common law) relating to pollution, the protection of the environment, the protection of natural resources, or, to the extent relating to exposure to hazardous substances, the protection of human health or to the release of any pollutants into the environment, including those related to air emissions and discharges to public water or waste treatment systems.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Company, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous

- 14 -

Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with any Loan Party within the meaning of Section 4001 of ERISA.

"**ERISA Event**" means: (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or is in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA); (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (g) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (h) the filing pursuant to Section 412 of the Code or Section 303 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure of any Loan Party or any ERISA Affiliates to make any required contribution to a Multiemployer Plan; or (i) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived.

"**Euro**" and "**€**" means the lawful currency of the Participating Member States introduced in accordance with EMU Legislation.

"**Eurodollar Rate**" means, for any Interest Period with respect to any Eurodollar Rate Loan:

(a)    the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate that appears on the page of the Reuters Screen LIBOR01 Page (or any successor thereto) that displays an average British Bankers Association Interest Settlement Rate for deposits in Dollars (for delivery on the first day of such Interest Period) with a term

- 15 -

equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or, if different, the date on which quotations would customarily be provided by leading banks in the London Interbank Market for deposits of amounts in the relevant currency for delivery on the first day of such Interest Period, or

(b)      if the rate referenced in the preceding clause (a) does not appear on such page or service or such page or service shall not be available, the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate on such other page or other service that displays an average British Bankers Association Interest Settlement Rate for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or, if different, the date on which quotations would customarily be provided by leading banks in the London Interbank Market for deposits of amounts in the relevant currency for delivery on the first day of such Interest Period, or

(c)      if the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum determined by the Administrative Agent as the rate of interest at which deposits in Dollars for delivery on the first day of such Interest Period in Same Day Funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted by JPMorgan Chase Bank and with a term equivalent to such Interest Period would be offered by JPMorgan Chase Bank's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period or, if different, the date on which quotations would customarily be provided by leading banks in the London Interbank Market for deposits of amounts in the relevant currency for delivery on the first day of such Interest Period;

*provided*, that in no event shall the Eurodollar Rate be less than 3.50%.

"**Eurodollar Rate Loan**" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excess Cash Flow**" means, for any period, an amount equal to:

(a)      the sum, without duplication, of:

(i)      Consolidated Net Income for such period,

(ii)      an amount equal to the amount of all non-cash charges (including depreciation and amortization) to the extent deducted in arriving at such Consolidated Net Income,

(iii)      an amount equal to the aggregate net non-cash loss on Dispositions by the Company and its Subsidiaries during such period (other than sales of inventory in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income,

(iv)      decreases in Consolidated Working Capital for such period, and

- 16 -

(v)        consolidated cash receipts in respect of Swap Contracts during such fiscal year to the extent not otherwise included in Consolidated Net Income; and

*minus*

(b)        the sum, without duplication among the clauses below and without duplication of any amounts otherwise deducted in arriving at Consolidated Net Income for such period, of:

(i)        an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income,

(ii)        an amount equal to the aggregate net non-cash gain on Dispositions by the Company and its Subsidiaries during such period (other than sales of inventory in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income,

(iii)        the amount of Capital Expenditures made in cash during such period pursuant to Section 7.16, except to the extent that such Capital Expenditures were financed with the proceeds of any issuance or sale of Equity Interests of Holdings, with the proceeds of any Indebtedness of Holdings, the Company or any Subsidiary, or, to the extent not otherwise included in Consolidated Net Income, with the proceeds of any Disposition of property of or any Casualty Event with respect to property of Holdings, the Company or any Subsidiary,

(iv)        the aggregate amount of all principal payments or prepayments of Indebtedness of the Company and its Subsidiaries (including (A) the principal component of payments in respect of Capital Lease Obligations, (B) the amount of any voluntary prepayment of Loans pursuant to Section 2.03(a), (C) the amount of any mandatory prepayment of Loans pursuant to Section 2.03(b)(ii) to the extent required due to a Disposition that resulted in an increase to Consolidated Net Income and not in excess of the amount of such increase and (D) the amount of any repayment of Loans pursuant to Section 2.04, but excluding all other prepayments of Loans) made during such period (other than in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder), except to the extent that such payments or prepayments were financed with the proceeds of any issuance or sale of Equity Interests of Holdings, with the proceeds of any other Indebtedness of Holdings, the Company or any Subsidiary, or, to the extent not otherwise included in Consolidated Net Income, with the proceeds of any Disposition of property of or any Casualty Event with respect to property of Holdings, the Company or any Subsidiary,

(v)        increases in Consolidated Working Capital for such period,

(vi)        the amount of Permitted Acquisitions made during such period pursuant to Section 7.02, except to the extent that such Permitted Acquisitions were financed with the proceeds of any issuance or sale of Equity Interests of Holdings, with the proceeds of any Indebtedness of Holdings to the extent such proceeds were not applied to reduce the Obligations of the Company or the Subsidiaries, or, to the extent not otherwise included in Consolidated Net Income, with the proceeds of any Disposition of property of or any Casualty Event with respect to property of Holdings, the Company or the Subsidiaries to the extent such proceeds were not applied to reduce the Obligations, and

- 17 -

(vii)     cash expenditures in respect of Swap Contracts during such fiscal year to the extent not deducted in arriving at such Consolidated Net Income.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Exchange Rate**" means on any day with respect to any currency other than Dollars, the rate at which such currency may be exchanged into Dollars, as set forth at approximately 11:00 a.m. (London time) on such day on the Reuters World Currency Page for such currency; in the event that such rate does not appear on any Reuters World Currency Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Company, or, in the absence of such agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m. (New York City time) on such date for the purchase of Dollars for delivery two Business Days later.

"**Excluded Taxes**" has the meaning specified in Section 3.01(f).

"**Facility**" means, collectively, the term loan facilities made available to the Company and the German Borrower pursuant to this Agreement.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to JPMorgan Chase Bank on such day on such transactions as determined by the Administrative Agent.

"**Foreign Benefit Arrangement**" means any employee benefit arrangement mandated by non-U.S. law that is maintained or contributed to by any Loan Party or any ERISA Affiliate.

"**Foreign Jurisdiction Deposit**" means a deposit or Guarantee incurred in the ordinary course of business and required by any Governmental Authority in a foreign jurisdiction as a condition of doing business in such jurisdiction.

"**Foreign Lender**" has the meaning specified in Section 10.15.

"**Foreign Plan**" means each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to U.S. law and is maintained or contributed to by any Loan Party or any ERISA Affiliate.

"**Foreign Subsidiary**" means any direct or indirect Subsidiary of the Company which is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

- 18 -

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, that for purposes of Section 7.10, GAAP shall be determined on the basis of such principles in effect on the date hereof and consistent with those used in the preparation of the most recent audited financial statements of the Company prior to the date hereof.

"**German Borrower**" has the meaning specified in the introductory paragraph to this Agreement.

"**German Loan Party**" means, collectively, the German Borrower and each German Guarantor.

"**German Guarantee Agreement**" means the Amended and Restated Guarantee Agreement executed by the German Borrower and each German Guarantor, substantially in the form of Exhibit J.

"**German Guarantors**" has the meaning specified in the definition of "Collateral and Guarantee Requirement".

"**German Guaranty**" has the meaning specified in the definition of "Collateral and Guarantee Requirement".

"**German Security Agreements**" means the security agreements set forth under the heading "German Security Agreements" on Schedule 1.01A.

"**German Term Lender**" means, at any time, any Lender that at such time has (a) prior to the Closing Date, a Prepetition Euro Term Loan and (b) on and after the Closing Date, a German Term Loan, including any Lender that acquires a German Term Loan pursuant to Section 10.07 after the Closing Date.

"**German Term Loans**" has the meaning specified in Section 2.01(b).  The initial aggregate amount of the German Term Loans as of the Closing Date is $[_____].

"**German Term Note**" means a promissory note of the German Borrower payable to any German Term Lender, in substantially the form of Exhibit B-2 hereto, evidencing the aggregate Indebtedness of the German Borrower to such German Term Lender resulting from the German Term Loans made by such German Term Lender.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Granting Lender**" has the meaning specified in Section 10.07(h).

"**Group Member**" means Holdings, the Company and the Subsidiaries.

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such

- 19 -

Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or monetary other obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantee and Security Agreement**" means, collectively, the [Amended and Restated] Guarantee and Security Agreement executed by Holdings, the Company, the German Borrower and each U.S. Guarantor, substantially in the form of Exhibit E, together with each other security agreement supplement executed and delivered pursuant to Section 6.11.

"**Guarantors**" has the meaning specified in the definition of "Collateral and Guarantee Requirement".

"**Guaranty**" has the meaning specified in the definition of "Collateral and Guarantee Requirement".

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances or wastes or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to or that could give rise to any liability under any Environmental Law.

"**Hedge Bank**" means any Person that is a Lender or an Affiliate of a Lender at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**Holdings Operating Expenses**" means operating costs and expenses incurred by Holdings, which will include, in any event, without limitation, costs and expenses incurred in connection with (in each case to the extent not otherwise prohibited by the Loan Documents and in each case other than interest or dividend payments or expenses related to activities not permitted to be undertaken by Holdings pursuant to Section 7.15) (i) the maintenance of its existence and the ownership of an investment in the Company or the Subsidiaries of the Company, and the exercise of rights and performance of obligations in connection therewith, (ii) the entry into, and exercise of rights and performance of obligations in respect of (A) contracts and agreements with or for the benefit of officers, directors and employees of Holdings, the Company or any Subsidiary relating to their employment or directorships, (B) insurance policies and related contracts and agreements, (C) any equity subscription agreements, registration rights agreements, voting and other stockholder agreements, engagement letters,

509600-0292-11211-Active.11784882.7

underwriting agreements and other agreements in respect of Equity Interests of Holdings or any offering, issuance or sale thereof, and (D) the Loan Documents, (iii) the offering, issuance and sale of Equity Interests of Holdings, (iv) the filing of registration statements, and compliance with applicable reporting and other obligations, under federal, state or other securities laws, (v) the performance of obligations under and compliance by Holdings with its certificate of incorporation and by-laws or any applicable law, ordinance, regulation rule, order, judgment, decree or permit, including, without limitation, as a result of or in connection with the activities of the Company or the Subsidiaries of the Company, (vi) payment of taxes for the benefit of or relating to Holdings, the Company and its Subsidiaries and (vii) other activities incidental or related to the foregoing.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable in the ordinary course of business, (ii) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP, (iii) deferred or equity compensation arrangements payable to directors, officers or employees and (iv) any such obligation to pay royalties or commissions to authors);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all obligations of such Person to purchase, redeem, retire or otherwise acquire for value any Disqualified Equity Interests; and

(h)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included as Indebtedness on a consolidated balance sheet of the Company in accordance with GAAP and (B) in the case of Holdings and its Subsidiaries, exclude (i) customer deposits and advances and interest payable thereon in the ordinary course of business consistent with past practice and in accordance with customary trade terms and other obligations incurred in the ordinary course of business consistent with past practice through credit on an open account basis customarily extended to such Person, (ii) statutory

or other legal requirements to make deposits in connection with sweepstakes or similar contests, or surety bonds or letters of credit posted pursuant to such requirements and (iii) obligations under overdraft arrangements with banks outside the United States incurred in the ordinary course of business consistent with past practice to cover working capital needs.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Information**" has the meaning specified in Section 10.08.

"**Intellectual Property**" has the meaning set forth in the Guarantee and Security Agreement.

"**Intercreditor Agreement**" means the Intercreditor Agreement to be executed and delivered by the Administrative Agent, the Second Lien Agent and the Loan Parties, substantially in the form of Exhibit I, as amended, modified and supplemented from time to time.

"**Interest Election**" means a Cash Election or PIK Election, as applicable.

"**Interest Election Notice**" has the meaning specified in Section 2.05(b).

"**Interest Payment Date**" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date applicable to such Loan; *provided* that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date applicable to such Loan and (c) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"**Interest Period**" means (a), as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one, two, three or six months thereafter, as selected by the relevant Borrower in its Conversion or Continuation Notice; *provided* that:

(i)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(iii)    no Interest Period shall extend beyond the Maturity Date applicable to such Eurodollar Rate Loan; and

- 22 -

(b)        for purposes of Section 2.05(b), as to each Base Rate Loan, initially, the period commencing on the date such Base Rate Loan is disbursed or converted to a Base Rate Loan and ending on the immediately succeeding Interest Payment Date and, thereafter, the period commencing on any Interest Payment Date and ending on the immediately succeeding Interest Payment Date.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person or (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**J.H. Cohn**" means J.H. Cohn, LLP, and any successor thereto.

"**JPMorgan Chase Bank**" means JPMorgan Chase Bank, N.A., and any successor thereto.

"**Junior Financing**" has the meaning specified in Section 7.14.

"**Junior Financing Documentation**" means any documentation governing any Junior Financing.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Company and the Administrative Agent.

"**Lien**" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or preferential arrangement intended to create a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease Obligation having substantially the same economic effect as any of the foregoing).  For the avoidance of doubt, "Lien" shall not include any license or sublicense of Intellectual Property, provided that such license or sublicense is not intended to create a security interest of any kind or nature whatsoever.

"**Liquidity**" means, on any date of determination, the sum, without duplication, of (i) the cash and Cash Equivalents which are not subject to any Liens (other than Liens permitted pursuant to Section 7.01(a), (b), (c), (d), (e), (f), (k), (l), (u) or (bb)) held by the Company and its Subsidiaries on such date plus (ii) the aggregate amount which is available to be drawn under any loan agreements or other lines of credit of the Company and its Subsidiaries on such date (for the avoidance of doubt, after giving

- 23 -

effect to any limitation on borrowing thereunder, including but not limited to the absence of default or other non-compliance with covenants).

"**Loans**" means, collectively, the U.S. Term Loans and the German Term Loans.

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents and (iv) the Intercreditor Agreement.

"**Loan Parties**" means, collectively, each Borrower and each Guarantor.

"**Master Agreement**" has the meaning specified in the definition of "Swap Contract."

"**Material Adverse Effect**" means any event, development or circumstance that, individually or in the aggregate, has had or could reasonably be expected to have a material adverse effect on (a) the business, property, operations or financial condition of Holdings and its Subsidiaries, taken as a whole, in each case, other than such effects attributable to the commencement of the Cases or the existence of prepetition claims and of defaults under such claims to the extent stayed by virtue of the commencement of the Cases or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights and remedies of the Administrative Agent and the Lenders hereunder or thereunder.

"**Material Real Property**" means, on any date, any real property owned by any Loan Party with a fair market value as of such date in excess of $2,500,000.

"**Maturity Date**" means the earlier of (a) (i) with respect to the U.S. Term Loans, the date that is thirty-six (36) months after the Closing Date and (ii) with respect to the German Term Loans, March 2, 2014 and (b) the acceleration of the Loans in accordance with the terms hereof.

"**Maximum Rate**" has the meaning specified in Section 10.10.

"**Moelis**" means Moelis & Company LLC, and any successor thereto.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage**" means, collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Lenders substantially in the form of Exhibit G (with such changes as may be customary to account for local Law matters or as otherwise may be reasonably satisfactory to the Administrative Agent), and any other mortgages executed and delivered pursuant to Section 6.11.

"**Mortgaged Properties**" has the meaning specified in paragraph (h) of the definition of Collateral and Guarantee Requirement.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means:

(a)    with respect to the Disposition of any asset by Holdings, the Company or any Subsidiary or any Casualty Event, an amount equal to (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of Holdings, the Company or any Subsidiary) less (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by a Lien expressly permitted hereunder (and not junior to the Liens securing the Obligations) on the asset subject to such Disposition or Casualty Event and that is required to be repaid (and is repaid) in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents and other than to the extent the holders of such Indebtedness are required to turnover any such proceeds to any or all of the Lenders), (B) the out-of-pocket expenses (including attorneys' fees, investment banking fees, accounting fees and other professional and transactional fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary commissions and fees) actually incurred by Holdings, the Company or such Subsidiary in connection with such Disposition or Casualty Event, (C) taxes paid or reasonably estimated to be actually payable in connection therewith, (D) any reserve for adjustment in accordance with GAAP in respect of (x) the sale price of such asset or assets and (y) any liabilities associated with such asset or assets and retained by Holdings, the Company or any Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, and (E) the Company's reasonable estimate of payments required to be made with respect to unassumed liabilities relating to the assets involved within one year of such Disposition or Casualty Event and it being understood that "Net Cash Proceeds" shall include (i) any cash or Cash Equivalents received upon the Disposition of any non-cash consideration received by Holdings, the Company or any Subsidiary in any such Disposition, (ii) an amount equal to any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in clause (C) or (D) above at the time of such reversal and (iii) an amount equal to any estimated liabilities described in clause (E) above that have not been satisfied in cash within three hundred and sixty-five (365) days after such Disposition or Casualty Event; *provided* that notwithstanding anything to the contrary, (x) no proceeds realized in a single Disposition or series of related Dispositions shall constitute Net Cash Proceeds unless such Net Cash Proceeds shall exceed $1,000,000 and (y) no such proceeds shall constitute Net Cash Proceeds under this clause (a) in any fiscal year until the aggregate amount of all such Net Cash Proceeds in such fiscal year shall exceed $5,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Cash Proceeds under this clause (a)); and

(b)    with respect to the incurrence or issuance of any Indebtedness or Equity Interests by Holdings, the Company or any Subsidiary, an amount equal to (i) the sum of the cash received in connection with such incurrence or issuance less (ii) the attorneys' fees, investment banking fees, accountants' fees, underwriting or other discounts, commissions, costs and other out-of-pocket fees, transfer and similar taxes and other customary out-of-pocket expenses actually incurred by Holdings, the Company or such Subsidiary in connection with such incurrence or issuance.

"**Non-Cash Charges**" has the meaning specified in the definition of the term "Consolidated EBITDA".

"**Non-Consenting Lenders**" has the meaning specified in Section 3.07(c).

"**Note**" means a U.S. Term Note or a German Term Note, as the context may require.

"**Not Otherwise Applied**" means, with reference to any amount of Net Cash Proceeds of any transaction or event or of Excess Cash Flow, that such amount (a) was not required to be applied to prepay the Loans pursuant to Section 2.05(b), and (b) was not previously applied in determining the permissibility of a transaction under the Loan Documents where such permissibility was contingent on receipt of such amount or utilization of such amount for a specified purpose.  The Company shall promptly notify the Administrative Agent of any application of such amount as contemplated by clause (b) above.

"**NPL**" means the National Priorities List under CERCLA.

"**Obligations**" means all (a) monetary obligations of any Loan Party and its Subsidiaries arising under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, (b) monetary obligations of any Loan Party arising under any Secured Hedge Agreement and (c) monetary Cash Management Obligations.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (x) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities, and other amounts payable by any Loan Party or its Subsidiaries under any Loan Document and (y) the obligation of any Loan Party or any of its Subsidiaries to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party or such Subsidiary.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning specified in Section 3.01(b).

"**Outstanding Amount**" means, with respect to the U.S. Term Loans and German Term Loans, on any date, the aggregate principal amount thereof outstanding after giving effect to any borrowings and prepayments or repayments of U.S. Term Loans and German Term Loans, as the case may be, occurring on such date.

"**Participant**" has the meaning specified in Section 10.07(e).

"**Participating Member State**" means each state so described in any EMU Legislation.

"**Patriot Act**" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five (5) plan years.

"**Permitted Acquisition**" has the meaning specified in Section 7.02(i).

"**Permitted Equity Issuance**" means any sale or issuance of any Qualified Equity Interests of Holdings to the extent not prohibited hereunder or any capital contribution made to Holdings in respect of its Qualified Equity Interests.

"**Permitted Holdings Distributions**" means payments, dividends or distributions by the Company to Holdings in order to pay Holdings Operating Expenses.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended, except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of the Indebtedness so modified, refinanced, refunded, renewed or extended, (c) such modification, refinancing, refunding, renewal or extension has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (d) at the time thereof, no Default or Event of Default shall have occurred and be continuing, (e) to the extent such Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations or subordinated in respect of any Collateral, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations and/or subordinated in respect of such Collateral, as the case may be, on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended and (e) the terms and conditions (including, if applicable, as to collateral but excluding as to subordination, interest rate or other pricing terms and redemption or prepayment premium) of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, are not materially less favorable to the Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning specified in the preliminary statements to this Agreement.

- 27 -

"**PIK Election**" has the meaning specified in Section 2.05(b).

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) (other than a Multiemployer Plan, Foreign Plan or Foreign Benefit Arrangement) established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"**Pledged Debt**" has the meaning specified in the Guarantee and Security Agreement.

"**Pledged Equity**" has the meaning specified in the Guarantee and Security Agreement.

"**Prepetition Credit Agreement**" means the Credit Agreement, dated as of March 2, 2007, among Doctor Acquisition Co., RDA Holding Co., the Company, the overseas borrowers party thereto, the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent, as amended, supplemented, waived or otherwise modified from time to time.

"**Prepetition Euro Term Loans**" means the Euro Term Loans (as defined in the Prepetition Credit Agreement as in effect on the date hereof).

"**Pro Forma Balance Sheet**" has the meaning set forth in Section 5.05(a)(ii).

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount equal to the outstanding Loans of such Lender of the applicable Class or Classes at such time and the denominator of which is the amount equal to the aggregate outstanding Loans of the applicable Class or Classes at such time.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Register**" has the meaning specified in Section 10.07(d).

"**Reorganization Plan**" has the meaning specified in the preliminary statements to this Agreement.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the sum of the aggregate Outstanding Amount of all Loans.

"**Requirement of Law**" means, as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, treasurer or controller or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have

been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of Holdings, the Company or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to Holdings or the Company's stockholders, partners or members (or the equivalent Persons thereof).

"**Restructuring Support Agreement**" means the Restructuring Support Agreement, dated as of August 17, 2009, among the Debtors and the Consenting Lenders and Consenting Shareholders specified therein, as amended, supplemented, waived or otherwise modified from time to time.

"**Rollover Amount**" has the meaning set forth in Section 7.16(b).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Lien Agent**" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means the Second Lien Credit Agreement, dated as of [_____], among the Company, Holdings, the lenders party thereto and the Second Lien Agent, as amended, supplemented, waived or otherwise modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"**Second Lien Term Loan Documents**" means the "Loan Documents" as defined in the Second Lien Credit Agreement.

"**Second Lien Term Loans**" means the term loans made pursuant to the Second Lien Credit Agreement.

"**Secured Hedge Agreement**" means any Swap Contract permitted under Article VII that is entered into by and between the Company or any Subsidiary and any Hedge Bank.

"**Secured Parties**" means, collectively, the Administrative Agent, the other Agents, the Lenders, the Hedge Banks, each holder of Cash Management Obligations, any Affiliate of a Lender to which Obligations are owed, the Supplemental Administrative Agent and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.01(b).

"**Securities Act**" means the Securities Act of 1933.

"**Security Agreement Supplement**" has the meaning specified in the Guarantee and Security Agreement.

- 29 -

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they become absolute and matured and (d) such Person is not engaged in any business, as conducted on such date and as proposed to be conducted following such date, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**SPC**" has the meaning specified in Section 10.07(h).

"**Specified Lenders**" means, collectively, the Lenders from time to time comprising the steering committee designated by JPMorgan Chase Bank in connection with this Agreement and the ongoing administration of the Cases; *provided*, that there shall at no time be more than ten Lenders on the steering committee (counting all affiliated Lenders as one for purposes of this proviso).

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the relevant Lender is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Sterling**" means the lawful currency of the United Kingdom.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Company.

"**Supplemental Administrative Agent**" has the meaning specified in Section 9.13 and "Supplemental Administrative Agents" shall have the corresponding meaning.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement,

- 30 -

and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Syndication Agent**" means JPMorgan Chase Bank, N.A., as Syndication Agent under this Agreement.

"**Taxes**" has the meaning specified in Section 3.01(a).

"**Test Period**" means, for any determination under this Agreement, the period of four consecutive fiscal quarters of the Company then last ended.

"**Threshold Amount**" means $15,000,000.

"**Total Leverage Ratio**" means, with respect to any Test Period, the ratio as of the last day of such Test Period of (a) Consolidated Total Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**Unaudited Financial Statements**" means the unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Company and its consolidated Subsidiaries for each subsequent fiscal quarter ended after the fiscal year ended June 30, 2009, in each case for which and to the extent such financial statements are available prior to the Closing Date.

"**Uniform Commercial Code**" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**U.S. Guarantors**" has the meaning specified in the definition of "Collateral and Guarantee Requirement".

"**U.S. Guaranty**" has the meaning specified in the definition of "Collateral and Guarantee Requirement".

"**U.S. Term Lender**" means, at any time, any Lender that at such time has (a) prior to the Closing Date, a DIP Term Loan and (b) on and after the Closing Date, a U.S. Term Loan, including any Lender that acquires a U.S. Term Loan pursuant to Section 10.07 after the Closing Date.

"**U.S. Term Loans**" has the meaning specified in Section 2.01(a).  The initial aggregate amount of the U.S. Term Loans as of the Closing Date is $[_____].

"**U.S. Term Note**" means a promissory note of the Company payable to any U.S. Term Lender, in substantially the form of Exhibit B-1 hereto, evidencing the aggregate Indebtedness of the Company to such U.S. Term Lender resulting from the U.S. Term Loans made by such U.S. Term Lender.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

Section 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)  The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)  (i)  The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(d)  Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

509600-0292-11211-Active.11784882.7

Section 1.03    Accounting Terms.  (a)  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Holdings, the Company or any of their respective Subsidiaries at "fair value", as defined therein.

Section 1.04    Rounding.  Any financial ratios required to be maintained by the Company pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07    Timing of Payment of Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

Section 1.08    Currency Equivalents Generally.  Any amount specified in this Agreement (other than in Articles II, IX, and X) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount to be determined at the rate of exchange quoted by the Reuters World Currency Page for the applicable currency at 11:00 a.m. (London time) on such day (or, in the event such rate does not appear on any Reuters World Currency Page, by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Company, or, in the absence of such agreement, such rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m. (New York City time) on such date for the purchase of Dollars for delivery two Business Days later).  Notwithstanding the foregoing, for purposes of determining compliance with Section 7.01, 7.02 and Section 7.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred; *provided* that, for the avoidance of doubt, the foregoing provisions of this Section 1.08 shall otherwise apply to such

- 33 -

Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

Section 1.09    Change of Currency.  Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Company's consent to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

## ARTICLE II

## THE LOANS

Section 2.01    The Loans.  (a) *The U.S. Term Loans*.  Subject to the terms and conditions hereof, each U.S. Term Lender shall be deemed, on the Closing Date, to have converted its DIP Term Loans outstanding under the DIP Credit Agreement into term loans to the Company hereunder (the "**U.S. Term Loans**") in an amount equal to the amount of such U.S. Term Lender's DIP Term Loans outstanding under the DIP Credit Agreement immediately prior to the Closing Date.  For the avoidance of doubt, the U.S. Term Loans deemed made pursuant to the preceding sentence shall be made without any actual funding.  The amount of U.S. Term Loans of each U.S. Term Lender on the Closing Date shall be equal to the amount reflected on the Register (as defined in the DIP Credit Agreement) on the Closing Date and set forth on Schedule 2.01(a), which amount shall be conclusive absent manifest error.  Each such U.S. Term Loan shall, to the extent such DIP Term Loan was a Eurodollar Rate Loan (as defined in the DIP Credit Agreement) on the Closing Date continue to be a Eurodollar Rate Loan hereunder with the same Interest Period immediately following the Closing Date and, to the extent such DIP Term Loan was a Base Rate Loan (as defined in the DIP Credit Agreement) on the Closing Date, continue to be a Base Rate Loan hereunder immediately following the Closing Date.  After the Closing Date, the U.S. Term Loans may from time to time be Eurodollar Rate Loans or Base Rate Loans, as determined by the Company and notified to the Administrative Agent in accordance with Section 2.02.  Amounts repaid or prepaid on account of the U.S. Term Loans may not be reborrowed.

(b) *The German Term Loans*.  Subject to the terms and conditions hereof, each German Term Lender shall be deemed, on the Closing Date, to have continued its Prepetition Euro Term Loans outstanding under the Prepetition Credit Agreement as term loans to the German Borrower hereunder (the "**German Term Loans**") in an amount equal to the amount of such German Term Lender's Prepetition Euro Term Loans outstanding under the Prepetition Credit Agreement immediately prior to the Closing Date.  For the avoidance of doubt, (i) the German Term Loans continued pursuant to the preceding sentence shall be continued without any actual funding, (ii) as of the Closing Date, the Prepetition Euro Term Loans made and outstanding under the Prepetition Credit Agreement continue to exist and remain outstanding as German Term Loans hereunder subject to the terms and conditions as amended and restated by and under this Agreement and (iii) the Prepetition Euro Term Loans so continued hereunder as German Term Loans have not been novated nor shall be deemed novated or repaid and re-granted or refunded in connection with such continuation under this Agreement.  The amount of German Term Loans of each German Term Lender on the Closing Date shall be equal to the amount reflected on the Register (as defined in the Prepetition Credit Agreement) on the Closing Date and set forth on Schedule 2.01(b), which amount shall be conclusive absent manifest error.  Each such German Term Loan shall, to the extent such Prepetition Euro Term Loan was a Eurodollar Rate Loan (as defined in the Prepetition Credit Agreement) on the Closing Date continue to be a Eurodollar Rate Loan hereunder with the same Interest Period immediately following the Closing Date and, to the extent such Prepetition Euro Term Loan was a Base Rate Loan (as defined in the Prepetition Credit Agreement) on the Closing Date, continue to be a Base Rate Loan hereunder immediately following the Closing Date.  After the Closing Date, the German Term Loans may from time to time be Eurodollar Rate Loans or Base Rate Loans, as

- 34 -

determined by the German Borrower and notified to the Administrative Agent in accordance with Section 2.02.  Amounts repaid or prepaid on account of the German Term Loans may not be reborrowed.

Section 2.02    Conversions and Continuations of Loans.  (a)  Each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the relevant Borrower's notice to the Administrative Agent, which may be given by telephone.  Each such notice must be received by the Administrative Agent not later than (i) 12:30 p.m. (New York time) three (3) Business Days prior to the requested date of any continuation of Eurodollar Rate Loans or any conversion of Base Rate Loans to Eurodollar Rate Loans, and (ii) 12:30 p.m. (New York time) one (1) Business Day prior to the requested date of any conversion of Eurodollar Rate Loans to Base Rate Loans.  Each telephonic notice by the relevant Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Conversion or Continuation Notice, appropriately completed and signed by a Responsible Officer of such Borrower.  Each conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof.  Each conversion to Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof.  Each Conversion or Continuation Notice (whether telephonic or written) shall specify (i) whether the relevant Borrower is requesting a conversion of Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be converted or continued, (iv) the Type of Loans to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto.  If the relevant Borrower fails to give a timely notice requesting a conversion or continuation, then the Loans shall be continued as, or converted to, Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.  If the relevant Borrower requests a conversion to, or continuation of Eurodollar Rate Loans in any such Conversion or Continuation Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(b)  Following receipt of a Conversion or Continuation Notice, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its Pro Rata Share of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the relevant Borrower, the Administrative Agent shall notify each Appropriate Lender of the details of any automatic conversion to Base Rate Loans or continuation described in Section 2.02(a).

(c)  Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan unless the Company pays the amount due, if any, under Section 3.05 in connection therewith.

(d)  The Administrative Agent shall promptly notify the Company and the Appropriate Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate.  The determination of the Eurodollar Rate by the Administrative Agent shall be conclusive in the absence of manifest error.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Company and the Appropriate Lenders of any change in JPMorgan Chase Bank prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)  After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than ten (10) Interest Periods in effect.

(f)  The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

Section 2.03    Prepayments.  (a)  *Optional*.  Any Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; provided that (1) such notice must be received by the Administrative Agent not later than 12:30 p.m. (New York time) (A) three (3) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans; (2) any prepayment of Eurodollar Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid.  The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  If such notice is given by a Borrower, such Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.  Each prepayment of the Loans pursuant to this Section 2.03(a) shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares.

(b)  *Mandatory*. (i) Within ten (10) days after the earlier of (A) the date by which financial statements are required to be delivered pursuant to Section 6.01(a) and (B) the date such financial statements are actually delivered, the Company shall cause to be prepaid an aggregate amount of Loans in an amount equal to the ECF Percentage of Excess Cash Flow, if any, for the fiscal year covered by such financial statements (commencing with the fiscal year ended June 30, 2010).

(ii)    (A) If (x) Holdings, the Company or any Subsidiary Disposes of any property or assets (other than any Disposition of any property or assets permitted by Section 7.05(a), (b), (c), (d), (e), (f), (g), (h) or (m)) or (y) any Casualty Event occurs, which in the aggregate results in the realization or receipt by Holdings, the Company or such Subsidiary of Net Cash Proceeds, the Company shall cause to be prepaid on or prior to the date which is five (5) Business Days after the date of the realization or receipt of such Net Cash Proceeds, Loans in an amount equal to 100% of all Net Cash Proceeds received; *provided* that no such prepayment shall be required pursuant to this Section 2.03(b)(ii)(A) with respect to such portion of such Net Cash Proceeds that the Company shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest in accordance with Section 2.03(b)(ii)(B);

(B)  With respect to any Net Cash Proceeds realized or received with respect to any Disposition that is subject to the prepayment requirements in Section 2.03(b)(ii)(A) or any Casualty Event, at the option of the Company, the Company may reinvest (x) all or any portion of such Net Cash Proceeds received on account of Dispositions or (y) all or any portion of such Net Cash Proceeds received on account of Casualty Events to acquire or repair assets useful in the Company's or a Subsidiary's business (subject to the limitations of this Agreement) within 270 days following receipt of such Net Cash Proceeds or within 360 days following receipt of such Net Cash Proceeds if and to the extent the amount of such applicable Net Cash Proceeds is contractually committed to be reinvested in the Company's or a Subsidiary's business as of the 270th day following receipt thereof; *provided* that an amount equal to any such Net Cash Proceeds shall be applied within five (5) Business Days after such Net Cash Proceeds

- 36 -

cannot be so reinvested or the Company reasonably determines that such Net Cash Proceeds are no longer intended to be so reinvested to the prepayment of the Loans as set forth in this Section 2.03.

(iii)    If Holdings, the Company or any Subsidiary incurs or issues any Indebtedness or Equity Interests (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 7.03 and Equity Interests issued to Holdings, the Company or any Subsidiary in accordance with Section 7.02 (in each case, without prejudice to the restrictions therein)), the Company shall cause to be prepaid Loans in an amount equal to 100% of all Net Cash Proceeds received therefrom, in the case of Indebtedness, and 75% of all Net Cash Proceeds received therefrom, in the case of Equity Interests, in each case on or prior to the date which is five (5) Business Days after the receipt of such Net Cash Proceeds.

(iv)    The Company shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to this Section 2.03(b) at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify each Lender of the contents of the Company's prepayment notice and of such Lender's Pro Rata Share of the prepayment.

(c)    Each prepayment of Loans pursuant to this Section 2.03 shall be applied ratably to the remaining repayments of Loans required pursuant to Section 2.04; and each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares.

(d)    All prepayments under this Section 2.03 shall be made together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

Section 2.04    Repayment of Loans.  (a)  *U.S. Term Loans.*  The Company shall repay to the Administrative Agent for the ratable account of the U.S. Term Lenders (i) on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Closing Date, an aggregate amount equal to $3,750,000 (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.03(c)) and (ii) on the Maturity Date for the U.S. Term Loans, the aggregate principal amount of all U.S. Term Loans outstanding on such date.

(b)  *German Term Loans.*  The German Borrower shall repay to the Administrative Agent for the ratable account of the Euro Term Lenders (i) on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Closing Date, an aggregate amount equal to 0.25% of the aggregate Dollar amount of all German Term Loans outstanding on the Closing Date (as defined in the Prepetition Credit Agreement) (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.03(c)) and (ii) on the Maturity Date for the German Term Loans, the aggregate principal amount of all German Term Loans outstanding on such date.

Section 2.05    Interest.  (a)  Subject to the provisions of Section 2.05(c), (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

- 37 -

(b)  Notwithstanding anything to the contrary contained in this Section 2.05, upon the occurrence and during the continuance of a Consolidated EBITDA Event, a portion of the Applicable Rate on the German Term Loans equal to 4.5% per annum for the succeeding Interest Period shall be paid, at the German Borrower's option, in cash (a "**Cash Election**") or by increasing the principal amount of the outstanding German Term Loans (a "**PIK Election**"), in each case in arrears on the applicable Interest Payment Date.  The German Borrower shall be permitted to make a Cash and/or a PIK Election with respect to all or any portion of the Outstanding Amount of the German Term Loans not less than $[_____].  The German Borrower shall make an Interest Election with respect to each Interest Period by providing prior irrevocable notice of such election (the "**Interest Election Notice**") by no later than 11:00 A.M., New York City time, on the tenth day preceding the beginning of such Interest Period.  Each Interest Election Notice shall include information to the following effect: (1) the relevant Interest Payment Date, (2) whether the German Borrower is making a Cash Election or a PIK Election and (3) if the German Borrower makes a PIK Election, the increase in the principal amount of the German Term Loans to be effective upon the relevant Interest Payment Date as a result of such payment and the principal amount of the German Term Loans outstanding as of such Interest Payment Date after giving effect to such payment.  If the German Borrower shall fail to give timely notice as described above in this paragraph, the German Borrower shall be deemed to have elected to continue with the last Interest Election made for the previous Interest Period.

(c)  If any Event of Default shall have occurred and be continuing, all outstanding Loans and other Obligations under the Loan Documents (whether or not overdue at such time) shall bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(d)  Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Notwithstanding the foregoing, interest accruing pursuant to Section 2.05(c) shall be payable from time to time on demand.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.06    Fees.  The Company shall pay to the Agents such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Company and the applicable Agent).

Section 2.07    Computation of Interest and Fees.  All computations of interest for Base Rate Loans when the Base Rate is determined by JPMorgan Chase Bank's "prime rate" shall be made on the basis of a year of three hundred and sixty-five (365) or three hundred and sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.09(a), bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.  The Administrative Agent shall, upon the reasonable request of the Company, deliver to the Company a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.05(a).

Section 2.08    Evidence of Indebtedness.  (a)  The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury

- 38 -

Regulation Section 5f.103-1(c), as agent for the Borrowers, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Loans made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b) Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.08(a), and by each Lender in its account or accounts pursuant to Section 2.08(a), shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrowers to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrowers under this Agreement and the other Loan Documents.

Section 2.09   Payments Generally. (a) All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. (New York time) shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b) If any payment to be made by any Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurodollar Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c) Unless any Borrower or any Lender has notified the Administrative Agent, prior to the time any payment is required to be made by it to the Administrative Agent hereunder, that such Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that such Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i)      if any Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the

- 39 -

date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the Federal Funds Rate from time to time in effect; and

(ii)      if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the relevant Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the Federal Funds Rate from time to time in effect.  When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the relevant Borrower, and the relevant Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights which the Administrative Agent or any Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the relevant Borrower with respect to any amount owing under this Section 2.09(c) shall be conclusive, absent manifest error.

(d)  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the relevant Borrower by the Administrative Agent because the conditions to the applicable Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)  The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan.

(f)  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)  Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but at the direction of Required Lenders shall, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

- 40 -

Section 2.10     Sharing of Payments.  If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Loans made by it any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans pro rata with each of them; provided that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  Each Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of such Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.10 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 2.10 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.11     Intercreditor Agreement.  Each Lender hereby authorizes and directs the Administrative Agent to enter into the Intercreditor Agreement on its behalf and hereby approves and agrees to be bound by the terms of the Intercreditor Agreement.  Notwithstanding anything to the contrary herein, in the case of any inconsistency between this Agreement and the Intercreditor Agreement, the Intercreditor Agreement shall govern.  The Lenders acknowledge that the Second Lien Term Loans and related obligations are secured by the Collateral (other than the Collateral securing only the German Term Loans), subject to the Intercreditor Agreement.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01     Taxes.  (a)  Except as provided in this Section 3.01, any and all payments by any Borrower to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities (including additions to tax, penalties and interest) with respect thereto, excluding in the case of each Agent and each Lender, (x) taxes imposed on or measured by its net income or overall gross income (including branch profits), and franchise (and similar) taxes imposed on it in lieu of net income taxes, by the jurisdiction (or any political subdivision thereof) under the Laws of which such Agent or such Lender, as the case may be, is organized, managed or controlled or maintains a Lending Office or conducts business in (except to the extent the business is considered to be conducted in such jurisdiction solely as a result of such Agent or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, any Loan Document) or, in the case of Germany, a permanent establishment for tax purposes, and all liabilities (including additions to tax, penalties and interest) with respect thereto and (y) any limited German income tax liability pursuant to § 49 para. 1 no. 5 lit. c) aa) German Income Tax Act

- 41 -

imposed on such Agent or such Lender (including any withholding obligation of the German Borrower on behalf of such Agent or such Lender pursuant to § 50a para. 7 German Income Tax Act) due to the fact that the German Term Loans are secured by German real property or by any rights treated as German real property under German Civil Law, and all liabilities (including additions to tax, penalties and interest) with respect thereto; *provided* that the exclusion set forth in clause (y) above shall be inapplicable for so long as the German Term Loans are secured by German real property or by any rights treated as German real property under German Civil Law the aggregate fair market value of which real property and rights exceeds 10% of the consolidated total assets of the German Borrower and its Subsidiaries. All non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and liabilities described in the immediately preceding sentence are hereinafter referred to as "**Taxes**". If any Borrower shall be required by any Laws to deduct any Taxes or Other Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Borrower shall make such deductions, (iii) such Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), such Borrower shall furnish to such Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor. If such Borrower fails to pay any Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to any Agent or any Lender the required receipts or other required documentary evidence, such Borrower shall indemnify such Agent and such Lender for any incremental taxes, interest or penalties that may become payable by such Agent or such Lender arising out of such failure. Notwithstanding anything to the contrary in this Section 3.01(a), no Borrower shall be required to increase the sum payable under any Loan Document, or to indemnify any Lender or Agent, with respect to Taxes that (i) in the case of a Foreign Lender (other than an assignee pursuant to a request by such Borrower), are United States withholding taxes imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from such Borrower with respect to such withholding taxes or (ii) are withholding taxes that are excluded pursuant to Section 10.15(d).

(b) In addition, each Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes or charges or similar levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (hereinafter referred to as "**Other Taxes**").

(c) Each Borrower agrees to indemnify each Agent and each Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 3.01) paid by such Agent and such Lender and (ii) any liability (including additions to tax, penalties, interest and expenses) arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided such Agent or Lender, as the case may be, provides such Borrower with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts, which statement shall be conclusive absent manifest error. Payment under this Section 3.01(c) shall be made within thirty (30) days after the date such Lender or such Agent makes a demand therefor.

509600-0292-11211-Active.11784882.7

(d)  If any Lender or Agent determines, in its reasonable discretion, that it has received a refund in respect of any Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by any Borrower pursuant to this Section 3.01, it shall promptly remit such refund (but only to the extent of indemnity payments made, or additional amounts paid, by any Borrower under this Section 3.01 with respect to the Taxes or Other Taxes giving rise to such refund plus any interest included in such refund by the relevant taxing authority attributable thereto) to such Borrower, net of all reasonable out-of-pocket expenses of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant taxing authority with respect to such refund); *provided* that such Borrower, upon the request of the Lender or Agent, as the case may be, agrees promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant taxing authority) to such party in the event such party is required to repay such refund to the relevant taxing authority.  Such Lender or Agent, as the case may be, shall, at such Borrower's request, provide such Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (*provided* that such Lender or Agent may delete any information therein that such Lender or Agent deems confidential).  Nothing herein contained shall interfere with the right of a Lender or Agent to arrange its tax affairs in whatever manner it thinks fit or to make available its tax returns or disclose any information relating to its tax affairs or any computations in respect thereof or require any Lender or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(e)  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a) or (c) with respect to such Lender it will, if requested by the Company, use commercially reasonable efforts to designate another Lending Office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the sole judgment exercised in good faith of such Lender, cause such Lender and its Lending Office(s) to suffer no economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.01(e) shall affect or postpone any of the Obligations of any Borrower or the rights of such Lender pursuant to Section 3.01(a) or (c).

(f)  Each Lender shall indemnify the Administrative Agent, within 10 days after demand therefor, for the full amount of any taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges with respect to which the Borrowers are not required to pay additional amounts pursuant to Section 3.01(a) ("**Excluded Taxes**") attributable to such Lender that are payable or paid by the Administrative Agent, and interest, penalties and reasonable expenses arising therefrom or with respect thereto, whether or not such Excluded Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.

Section 3.02    Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Eurodollar Rate, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the relevant Borrowers that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the relevant Borrowers shall upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans.  Upon any such prepayment or conversion, each relevant Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section

- 43 -

3.05.  Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

Section 3.03    <u>Inability to Determine Rates</u>.  If the Required Lenders determine that for any reason adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or that the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and the Interest Period of such Eurodollar Rate Loan, the Administrative Agent will promptly so notify each relevant Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders, which instruction shall be given promptly upon such condition's ceasing to exist) revokes such notice.  Upon receipt of such notice, each relevant Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04    <u>Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loans</u>.  (a)  If any Lender determines (in good faith) that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the date hereof, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining Eurodollar Rate Loans, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Taxes or Other Taxes (as to which Section 3.01 shall govern), (ii) changes in the basis of taxation of overall net income or overall gross income (including branch profits), and franchise (and similar) taxes imposed in lieu of net income taxes, by the United States or any foreign jurisdiction or any political subdivision of either thereof under the Laws of which such Lender is organized or maintains a Lending Office and (iii) reserve requirements contemplated by Section 3.04(c)), then from time to time within ten (10) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Company shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)  If any Lender determines (in good faith) that the introduction of any Law regarding capital adequacy or any change therein or in the interpretation thereof, in each case after the date hereof, or compliance by such Lender or such Lender's holding company therewith, has the effect of reducing the rate of return on the capital of such Lender or such Lender's holding company (or its Lending Office) as a consequence of its obligations hereunder to a level below that which such Lender or such Lender's holding company could have achieved but for such introduction, change or compliance (taking into consideration its policies with respect to capital adequacy, by an amount deemed by such Lender to be material, then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Company shall pay to such Lender such additional amounts as will compensate such Lender or such Lender's holding company for such reduction within ten (10) days after receipt of such demand.

(c)  The Company shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in

- 44 -

good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the funding of the Eurodollar Rate Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Company shall have received at least ten (10) days' prior notice (with a copy to the Administrative Agent, and which notice shall specify the Statutory Reserve Rate, if any, applicable to such Lender) of such additional interest or cost from such Lender.  If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable ten (10) days from receipt of such notice.

(d)  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation, *provided* that the Company shall not be required to compensate a Lender pursuant to Section 3.04(a), (b) or (c) for any such increased cost or reduction incurred more than 180 days prior to the date that such Lender demands, or notifies the Company of its intention to demand, compensation therefor, *provided* further that, if the circumstance giving rise to such increased cost or reduction is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)  If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Company, use commercially reasonable efforts to designate another Lending Office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of any Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d) or any rights of the Company pursuant to Section 3.07.

Section 3.05    Funding Losses.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Company shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of profit) incurred by it as a result of:

(a)  (i) any continuation, conversion, payment or prepayment of any Eurodollar Rate Loan on a day other than the last day of the Interest Period for such Loan or (ii) the CAM Exchange (in each case, whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or

(b)  any failure by any Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurodollar Rate Loan on the date or in the amount notified by such Borrower;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

Section 3.06    Matters Applicable to All Requests for Compensation.  (a)  Any Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Company setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.

(b)  With respect to any Lender's claim for compensation under Section 3.01, 3.02, 3.03 or 3.04, no Borrower shall be required to compensate such Lender for any amount incurred more than 180

- 45 -

days prior to the date that such Lender notifies the relevant Borrowers of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Company under Section 3.04, the Company may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another Eurodollar Rate Loans, or to convert Base Rate Loans into Eurodollar Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)  If the obligation of any Lender to make or continue from one Interest Period to another any Eurodollar Rate Loan, or to convert Base Rate Loans into Eurodollar Rate Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's Eurodollar Rate Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such Eurodollar Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.01, 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)  to the extent that such Lender's Eurodollar Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's Eurodollar Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)  all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurodollar Rate Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into Eurodollar Rate Loans shall remain as Base Rate Loans.

(d)  If any Lender gives notice to the Company (with a copy to the Agent) that the circumstances specified in Section 3.01, 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Eurodollar Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurodollar Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods).

Section 3.07    Replacement of Lenders under Certain Circumstances.  (a)  If at any time (i) any Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make Eurodollar Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Company may, upon prior written notice to the Administrative Agent and such Lender, replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (with the assignment fee to be paid by the Company in such instance), at par, all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Company to find a replacement Lender or other such Person.

(b)  Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's outstanding Loans, and (ii) deliver

- 46 -

any Notes evidencing such Loans to the Company or Administrative Agent.  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's outstanding Loans, (B) all obligations of the Borrowers owing to the assigning Lender relating to the Loans so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such assignment and assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the relevant Borrowers, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.

(c)  In the event that (i) the Company or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 10.01 and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

Section 3.08    Survival.  All of the Borrowers' obligations under this Article III shall survive the repayment of all Obligations hereunder.

## ARTICLE IV

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

The effectiveness of this Agreement is subject to the satisfaction or waiver of the following conditions precedent:

(a)  The Administrative Agent's receipt of the following, each of which shall be originals or facsimiles (followed promptly by originals) or electronic copies (following promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, if any, each in form and substance reasonably satisfactory to the Administrative Agent:

(i)        counterparts of this Agreement, duly executed by each Borrower, the Administrative Agent, the Required Lenders under and as defined in the DIP Credit Agreement and the Required Lenders under and as defined in the Prepetition Credit Agreement;

(ii)        a Note executed by the relevant Borrower in favor of each Lender that has requested a Note at least two Business Days in advance of the Closing Date;

(iii)        each Collateral Document set forth on Schedule 1.01A, duly executed by each Loan Party thereto, together with:

(1)  certificates, if any, representing the Pledged Equity referred to therein, to the extent required therein, accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank; and

(2)  evidence that all other actions, recordings and filings that the Administrative Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

- 47 -

(iv)     the Intercreditor Agreement, duly executed by the Administrative Agent, the Second Lien Agent and each Loan Party party thereto;

(v)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date and with appropriate insertions and attachments, including the certificate of incorporation (or equivalent thereof) of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party and a long form good standing certificate (or equivalent thereof) for each Loan Party from its jurisdiction of organization;

(vi)     opinion from Kirkland & Ellis LLP, special New York counsel to Holdings substantially in the form of Exhibit F;

(vii)     except as set forth in Section 6.16, evidence that all insurance (including title insurance) required to be maintained pursuant to the Loan Documents has been obtained and is in effect and, where applicable, that the Administrative Agent has been named as loss payee or additional insured, as appropriate, under each insurance policy with respect to such liability and property insurance as to which the Administrative Agent shall have reasonably requested to be so named; and

(viii)     a certificate signed by a Responsible Officer of the Company certifying compliance with the conditions set forth in paragraphs (k) and (l) of Article IV.

(b)     The Administrative Agent shall have received the results of recent lien searches (or the equivalent thereof in foreign jurisdictions) conducted in the jurisdictions in which the Loan Parties are organized (to the extent available), and such search shall reveal no liens on any of the assets of the Loan Parties except for liens permitted by Section 7.01 or discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Administrative Agent or arrangements reasonably satisfactory to the Administrative Agent that have been made to have such liens discharged promptly following the Closing Date.

(c)     The Lenders and the Administrative Agent shall have received payment in full in cash of all costs, fees and expenses due and payable (including those required to be paid to such Lenders hereunder and under the DIP Credit Agreement and the Prepetition Credit Agreement) and invoiced before the Closing Date.

(d)     The Lenders shall have received (i) the Audited Financial Statements and Unaudited Financial Statements (ii) the Pro Forma Balance Sheet and (iii) projections through [June 30], 2014, in form reasonably satisfactory to the Administrative Agent, accompanied by a certificate of a Responsible Officer of the Company stating that such projections are based on estimates, information and assumptions believed by management of the Company to be reasonable on the Closing Date and that to his or her best knowledge, such Responsible Officer (not in his or her individual capacity, but solely as a Responsible Officer) has no reason to believe that such projections are incorrect or misleading in any material respect (it being understood and agreed that the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Responsible Officer and that no assurance can be given that any of the projections will be realized, and that such projections are not a guarantee of financial performance and actual results may differ from the projected results and such differences may be material).

509600-0292-11211-Active.11784882.7

(e)  The Administrative Agent shall have received a certificate of a Responsible Officer of the Company, in form and substance reasonably satisfactory to the Administrative Agent, certifying that (i) no Default or Event of Default (as defined in the DIP Credit Agreement) exists and is continuing under the DIP Credit Agreement immediately prior to the termination thereof and (ii) the Company and its Subsidiaries are in compliance with the financial covenants set forth in Sections 7.10 and 7.16 of the DIP Credit Agreement, immediately prior to the termination of the DIP Credit Agreement, in each case to the extent applicable.

(f)  After giving pro forma effect to the Reorganization Plan, the conversion or continuation of the Loans, as applicable, and the borrowing of the Second Lien Loans, on the Closing Date (i) Liquidity of the Company and its Subsidiaries shall not be less than the minimum Liquidity required to be maintained pursuant to Section 7.10(c) of the DIP Credit Agreement as of the end of the last Business Day prior to the Closing Date, and (ii) the aggregate principal amount of the Loans and the Second Lien Term Loans shall not exceed $[_____], and the Company shall have provided to the Administrative Agent reasonably satisfactory support for such calculations, and the Administrative Agent shall have received a certificate of a Responsible Officer of the Company, in form and substance reasonably satisfactory to the Administrative Agent, certifying compliance with the conditions set forth in this paragraph (f).

(g)  The Bankruptcy Court shall have entered an order confirming the Reorganization Plan, which order (the "**Confirmation Order**") (i) shall confirm a Reorganization Plan that is substantially consistent with the Restructuring Support Agreement, which Reorganization Plan has been accepted by Class 3 as designated thereunder, (ii) shall authorize the Facility and (iii) shall be in full force and effect and not have been reversed, modified, amended, stayed or vacated and shall not be subject to a motion to stay or subject to appeal or petition for review, rehearing or certiorari, and the period for appealing the Confirmation Order shall have elapsed.  The Effective Date shall have occurred (and all conditions precedent thereto as set forth in the Confirmation Order shall have been satisfied (or shall be concurrently satisfied) or waived by the Required Lenders).

(h)  The Restructuring Support Agreement shall have been in full force and effect from the execution thereof to the Effective Date.

(i)  The Second Lien Term Loan Documents shall contain terms that conform to the Restructuring Support Agreement and are otherwise reasonably satisfactory to the Administrative Agent, and the Administrative Agent shall have received reasonably satisfactory evidence that the conditions to the effectiveness of the Second Lien Term Loan Documents shall have been (or shall substantially concurrently be) satisfied or waived in accordance with their terms.

(j)  The Administrative Agent shall have received at least three days prior to the Closing Date all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, requested by such Person.

(k)  The representations and warranties of the Company and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects as of the Closing Date; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided, further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such respective dates.

(l)  No Default or Event of Default shall have occurred and be continuing.

- 49 -

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Each Loan Party hereby jointly and severally represents and warrants to the Agents and the Lenders that:

Section 5.01    Existence, Qualification and Power; Compliance with Laws.  Each Loan Party and each of its Subsidiaries (a) is a Person duly organized or formed, validly existing and in good standing (to the extent such concept is applicable in the applicable jurisdiction) under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Confirmation Order and to the terms thereof, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02    Authorization; No Contravention.  Subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Confirmation Order and to the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the transactions contemplated thereby, are within such Loan Party's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) violate the terms of any of such Person's Organization Documents, (b) violate or result in any breach of, or the creation of any Lien under (other than Liens created by the Loan Documents, the Second Lien Term Loan Documents and other Liens permitted by Section 7.01), or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or which is binding upon such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law; except with respect to any violation or breach (but not creation of Liens or payments) referred to in each case of clauses (b) and (c) above, to the extent that such violation or breach could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.03    Governmental Authorization; Other Consents.  Subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Confirmation Order and to the terms thereof, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with (a) the execution, delivery or performance by any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents or (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof, other than filings referred to in Section 5.18) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, in each case of the foregoing, except for the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect.

Section 5.04    Binding Effect.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan

- 50 -

Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 5.05    Financial Statements; No Material Adverse Effect.  (a) (i)  The Audited Financial Statements and the Unaudited Financial Statements fairly present in all material respects the consolidated financial condition of the Company and its consolidated Subsidiaries as of the dates thereof and their consolidated results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein and, in the case of the Unaudited Financial Statements, subject to normal year-end audit adjustments and the absence of footnotes.

(ii)    The unaudited pro forma consolidated balance sheet of the Company and its consolidated Subsidiaries as of [_____], 2009 (including the notes thereto) (the "**Pro Forma Balance Sheet**") has been prepared giving effect (as if such events had occurred on such date) to (i) the occurrence of the Effective Date, (ii) the Second Lien Term Loans deemed made on the Closing Date, (iii) the Loans deemed converted or continued, as applicable, on the Closing Date and the use of proceeds thereof and (iv) the payment of fees and expenses in connection with the foregoing.  The Pro Forma Balance Sheet has been prepared in good faith, based on assumptions believed by the Company to be reasonable as of the date of delivery thereof, and presents fairly in all material respects in accordance with GAAP the pro forma consolidated financial position of the Company and its consolidated Subsidiaries as of [_____], 2009 and their pro forma consolidated results of operations for the periods covered thereby, assuming that the events specified in the preceding sentence had actually occurred at such date.

(b)  Since [_____], 2009, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(c)  The forecasts of consolidated balance sheets, income statements and cash flow statements of the Company and its consolidated Subsidiaries which have been furnished to the Administrative Agent prior to the Closing Date have been prepared in good faith on the basis of assumptions believed by the Company to be reasonable at the time made, it being understood that forecasts are, by their nature, inherently uncertain and actual results may vary from such forecasts and that such variations may be material.

Section 5.06    Litigation.  As of the Closing Date, there are no actions, suits, proceedings, claims, investigations or disputes pending or, to the knowledge of the Company, threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Company or any of its Subsidiaries or against any of their properties or revenues that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07    No Default.  Neither the Company nor any Subsidiary is in default under or with respect to any Contractual Obligation that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

Section 5.08    Ownership of Property; Liens.  Each Loan Party and each of its Subsidiaries has good title to, or valid leasehold interests in, or (in the case of Intellectual Property) a license or other right to use, or easements or other limited property interests in, all its properties and assets material to the ordinary conduct of its business (including all Material Real Property), free and clear of all Liens except

- 51 -

for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01.

Section 5.09    Environmental Compliance. (a)  There are no claims, actions, suits, or proceedings alleging potential liability or responsibility for violation of, or otherwise relating to, any Environmental Law or to Hazardous Materials that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) none of the properties currently or, to the knowledge of the Company, formerly owned, leased or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or, to the knowledge of the Company, is adjacent to any such property; and (ii) Hazardous Materials have not been released, discharged or disposed of by any Person on any property currently or, to the knowledge of the Company, formerly owned, leased or operated by any Loan Party or any of its Subsidiaries and Hazardous Materials have not otherwise been released, discharged or disposed of by any of the Loan Parties and their Subsidiaries at any other location, in each case in a manner that could reasonably be expected to result in Environmental Liability.

(c)  The properties owned, leased or operated by the Company and the Subsidiaries do not contain any Hazardous Materials in amounts or concentrations which (i) constitute a violation of, (ii) require remedial action under, or (iii) could give rise to liability under, Environmental Laws, which violations, remedial actions and liabilities, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(d)  Neither the Company nor any of its Subsidiaries is undertaking, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law, except for such investigation or assessment or remedial or response action that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(e)  All Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, by any Loan Party or any of its Subsidiaries, any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result, individually or in the aggregate, in a Material Adverse Effect.

(f)  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, none of the Loan Parties and their Subsidiaries has contractually assumed any liability or obligation of any other Person under or relating to any Environmental Law.

Section 5.10    Taxes.  The Company and its applicable Subsidiaries have filed all U.S. Federal income and material state and other material tax returns and reports required to be filed, and have paid all U.S. Federal income and material state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which reserves have been provided to the extent required by GAAP.

- 52 -

Section 5.11    ERISA Compliance.  (a)  Except as could not , either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state Laws.

(b)  (i)  Other than the commencement of the Cases, which is a Reportable Event, no ERISA Event has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Pension Plan; (ii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would reasonably be expected to result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (iv) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA; and (v) the present value of all benefit liabilities under each Pension Plan does not exceed the aggregate current value of the assets of such Pension Plan (based on those assumptions used to fund the Pension Plans); except, with respect to each of the foregoing clauses (i) through (v) of this Section 5.11(b), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)  Except as specifically disclosed in Schedule 5.11(c), (i) all employer and employee contributions required by applicable law or by the terms of any Foreign Benefit Arrangement or Foreign Plan have been made, or, if applicable, accrued in accordance with normal accounting practices; (ii) the accrued benefit obligations of each Foreign Plan (based on those assumptions used to fund such Foreign Plan) with respect to all current and former participants do not exceed the assets of such Foreign Plan; (iii) each Foreign Plan that is required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities; and (iv) each such Foreign Benefit Arrangement and Foreign Plan is in compliance (A) with all material provisions of applicable law and all material applicable regulations and published interpretations thereunder with respect to such Foreign Benefit Arrangement or Foreign Plan and (B) with the terms of such plan or arrangement; except, with respect to each of the foregoing clauses (i) through (iv) of this Section 5.11(c), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.12    Subsidiaries; Equity Interests.  As of the Closing Date, neither Holdings nor any Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests owned by the Loan Parties in such Subsidiaries have been validly issued, are fully paid and nonassessable and all Equity Interests owned by Holdings or a Loan Party are owned free and clear of all Liens except (i) those created under the Collateral Documents and (ii) any Lien that is permitted under Section 7.01.  As of the Closing Date, Schedule 5.12 (a) sets forth the name and jurisdiction of each Subsidiary, (b) sets forth the ownership interest of Holdings, the Company and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.13    Margin Regulations; Investment Company Act.  (a)  The Company is not engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)  None of the Company, any Person Controlling the Company, or any Subsidiary is required to be registered as an "investment company" under the Investment Company Act of 1940.

- 53 -

Section 5.14    Disclosure.  No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party to any Agent, any Lender or the Bankruptcy Court, in each case in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected financial information and pro forma financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time made; it being understood that projections are, by their nature, inherently uncertain and such projections may vary from actual results and that such variances may be material.

Section 5.15    Intellectual Property; Licenses, Etc.  Each of the Loan Parties and their Subsidiaries owns, or licenses or possesses the valid right to use, all Intellectual Property that is material to the operation of the business of the Company and its Subsidiaries, taken as a whole, as currently conducted, and, without known conflict with the rights of any Person, except to the extent such conflicts, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  To the best knowledge of the Company, the conduct of the business of the Company and its Subsidiaries, taken as a whole, as currently conducted, does not infringe upon, misappropriate or otherwise violate any Intellectual Property of any Person and, to the knowledge of the Company, no Person infringes upon, misappropriates or otherwise violates any Intellectual Property owned or exclusively licensed by the Company and its Subsidiaries, except in each case of the foregoing as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  No written or, to the knowledge of the Company, oral claim or litigation regarding any Intellectual Property owned or exclusively licensed by any Loan Party or its Subsidiaries is pending or, to the knowledge of the Loan Parties, threatened against any Loan Party or Subsidiary, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.16    Solvency.  On the Closing Date, after giving effect to the Effective Date and the incurrence of all Indebtedness and Obligations being incurred in connection herewith and therewith, the Company and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.17    Labor Matters.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Loan Party pending or, to the knowledge of the Company, threatened; (b) hours worked by and payment made to employees of each Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; and (c) all payments due from any Loan Party on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

Section 5.18    Collateral.  (a)  The Guarantee and Security Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Lenders, legal, valid and enforceable (subject to the effect of Debtor Relief Laws and subject to general principles of equity) security interests in the Collateral described therein and proceeds thereof to the extent governed by the Uniform Commercial Code.  In the case of the Pledged Equity or Pledged Debt described in any of the Collateral Documents, when stock certificates representing such Pledged Equity or promissory notes representing such Pledged Debt are delivered to the Administrative Agent together with the necessary endorsements, and in the case of the other Collateral described in any of the Collateral Documents, when financing statements and other filings specified on Schedule 5.18 in appropriate form are filed in the offices specified on Schedule 5.18, the Guarantee and Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for

- 54 -

their respective Obligations, in each case to the extent a Lien on such Collateral can be perfected by the filing of a financing statement, by filings to be made in respect of Intellectual Property in the United States Patent and Trademark Office and the United States Copyright Office or, in the case of the Pledged Equity and Pledged Debt, by possession or control, in each case prior and superior in right to any other Person (except (x) in the case of Collateral constituting Pledged Equity and Pledged Debt, nonconsensual Liens permitted by Section 7.01 and (y) in the case of Collateral other than Pledged Equity and Pledged Debt, Liens permitted by Section 7.01); provided, however, that additional filings may be required in the United States Patent and Trademark Office and the United States Copyright Office to perfect the security interest in Intellectual Property acquired after the date hereof.

(b)  Each of the Mortgages, when duly executed and delivered, is effective to create in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid and enforceable (subject to the effect of Debtor Relief Laws and subject to general principles of equity) Lien on the Mortgaged Properties described therein and proceeds thereof, and when the Mortgages are filed in the appropriate recording offices, each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Properties and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (except that the security interest created in such real property and the Mortgaged Property may be subject to the Liens permitted by Section 7.01).

Section 5.19    Use of Proceeds.  The proceeds of the U.S. Term Loans shall be used only to replace and refinance the outstanding loans under the DIP Credit Agreement.

Section 5.20    Regulation H.  No Mortgage encumbers improved real property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, as amended.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, each Loan Party shall, and shall cause each of its Subsidiaries to:

Section 6.01    Financial Statements.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)  as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Company (or 120 days after the end of the 2010 fiscal year) beginning with the first fiscal year ending after the Closing Date, a consolidated and consolidating (by region) balance sheet of the Company and its consolidated Subsidiaries as at the end of such fiscal year, and the related consolidated and consolidating (by region) statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all prepared in accordance with GAAP (other than the consolidating financial statements, which shall be substantially in the form delivered to the Administrative Agent prior to the Closing Date), audited (in the case of the consolidated financial statements) and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification or exception arising out of the scope of the audit;

- 55 -

(b)  as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Company (or sixty (60) days after the end of the fiscal quarter first ending after the Closing Date), an unaudited consolidated and consolidating (by region) balance sheet of the Company and its consolidated Subsidiaries as at the end of such fiscal quarter, and the related unaudited (i) consolidated and consolidating (by region) statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) consolidated and consolidating (by region) statements of cash flows for such fiscal quarter and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year for the applicable entities and the corresponding portion of the previous fiscal year for the applicable entities, all certified by a Responsible Officer of the Company as fairly presenting in all material respects the consolidated financial condition, results of operations, stockholders' equity and cash flows of the Company and its consolidated Subsidiaries in accordance with GAAP (other than the consolidating financial statements, which shall be substantially in the form delivered to the Administrative Agent prior to the Closing Date), subject only to normal year-end audit adjustments and the absence of footnotes;

(c)  as soon as available, and in any event no later than thirty (30) days after the end of each fiscal month (or forty-five (45) days after the end of the third, sixth, ninth and twelfth fiscal month in each fiscal year), commencing with the fiscal month ended in [          ], 2009, an unaudited consolidated and consolidating (by region) balance sheet of the Company and its consolidated Subsidiaries as at the end of such fiscal month, and the related unaudited (i) consolidated and consolidating (by region) statements of income or operations for such fiscal month and for the portion of the fiscal year then ended and (ii) consolidated and consolidating (by region) statements of cash flows for such fiscal month and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the previous year, all certified by a Responsible Officer of the Company as being fairly presented in all material respects in accordance with GAAP (other than the consolidating financial statements, which shall be substantially in the form delivered to the Administrative Agent prior to the Closing Date), subject only to normal year-end audit adjustments and the absence of footnotes; and

(d)  as soon as available, and in any event no later than ninety (90) days after the end of each fiscal year of the Company (or 120 days after the end of the 2010 fiscal year) beginning with the fiscal year ending June 30, 2010, a reasonably detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet of the Company and its consolidated Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**"), which Projections shall be certified by a Responsible Officer of the Company as being prepared based upon good faith estimates and assumptions that are believed by such Responsible Officer to be reasonable at the time made and that such Responsible Officer is not aware of (x) any information contained in such Projections which is false or misleading in any material respect or (y) any omission of information which causes such Projections to be false or misleading in any material respect (it being understood and agreed that the Projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Responsible Officer and that no assurance can be given that any of the Projections will be realized, and that the Projections are not a guarantee of financial performance and actual results may differ from the projected results and such differences may be material).

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 6.01 may be satisfied with respect to financial information of the Company and its consolidated Subsidiaries by furnishing (A) the applicable financial statements of Holdings (or any direct or indirect parent of Holdings) or (B) the Company's or Holdings' (or any direct or indirect parent thereof), as applicable, Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to each of

clauses (A) and (B), (i) to the extent such information relates to Holdings (or a parent thereof), such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to Holdings (or such parent), on the one hand, and the information relating to the Company and its consolidated Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification or exception arising out of the scope of the audit.

Section 6.02    Certificates; Other Information.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)  simultaneously with the delivery of the financial statements referred to in Section 6.01(a), a certificate of its independent registered public accounting firm certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default under Section 7.10 or, if any such Default or Event of Default shall exist, stating the nature and status of such event (which certificate may be limited to the extent required by such firm's general accounting and auditing rules, policies or guidelines);

(b)  simultaneously with the delivery of the financial statements referred to in Section 6.01(a), (b) and (c), a duly completed Compliance Certificate signed by a Responsible Officer of the Company;

(c)  simultaneously with the delivery of the financial statements referred to in Section 6.01(a) and (b), a narrative discussion and analysis of the financial condition and results of operations of the Company and its Subsidiaries (including, without limitation, with respect to Dispositions, cost savings, facility closures, litigation, contingent liabilities and other matters as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request) for the applicable period, and for the period from the beginning of the then current fiscal year to the end of such period, in each case, as compared to the portion of the Projections covering such periods;

(d)  promptly after the same are publicly available, copies of all annual, quarterly and current reports and registration statements which the Company or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(e)  promptly after the furnishing thereof, copies of any material requests or material notices received by any Loan Party (other than in the ordinary course of business) or material statements or material reports furnished to any holder of debt securities of any Loan Party or of any of its Subsidiaries in a principal amount greater than the Threshold Amount or to any holder of public or preferred equity securities of any Loan Party and not otherwise required to be furnished to the Lenders pursuant to any other clause of this Section 6.02;

(f)  no later than five (5) Business Days prior to the effectiveness thereof, copies of substantially final drafts of any proposed amendment, supplement, waiver or other modification, and any replacement, with respect to any Second Lien Term Loan Document;

- 57 -

(g)  together with the delivery of each Compliance Certificate pursuant to Section 6.02(b), to the extent not previously disclosed to the Administrative Agent, (i) a description of any change in the name or the jurisdiction of organization of any Loan Party, (ii) a certificate of a Responsible Officer of the Company (A) setting forth any updates to Schedule 6 of the Guarantee and Security Agreement or confirming there has been no change in the information required to be reflected in such Schedule since the date of the Guarantee and Security Agreement or the date of the most recent certificate delivered pursuant to this clause (ii), (B) identifying, based on Collateral owned, and Laws in effect, as of the date of such certificate, all Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral that will be required to be filed of record within the 18 months following the date of such certificate, to the extent necessary and required under the Collateral Documents to protect and perfect the security interests under the Collateral Documents for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period) and (C) setting forth a reasonably detailed calculation of Excess Cash Flow for such fiscal year; *provided*, that the delivery of such certificate is only required at the time of the delivery of each Compliance Certificate required to be delivered in connection with Section 6.01(a) or (b), (iii) a description of any Person that has become a Group Member, in each case, since the date of the most recent list delivered pursuant to this Section 6.02(f) (or, in the case of the first such list so delivered, since the Closing Date) and (iv) a reconciliation of operating income of the Company and its Subsidiaries to Consolidated EBITDA (which reconciliation may be provided as part of the calculations included in the applicable Compliance Certificate); and

(h)  promptly, subject to applicable confidentiality requirements of Group Members, such additional financial or other information as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(d) or (e) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Company posts such documents, or provides a link thereto on the Company's website on the Internet at the website address listed in Section 10.02; (ii) on which such documents are posted on the Company's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); or (iii) such documents are publicly available on the SEC's website pursuant to the SEC's EDGAR system; provided that:  (i) upon written request by the Administrative Agent, the Company shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Company shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Company shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to the Administrative Agent. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

Section 6.03    Update Calls.  At least once per fiscal quarter, at such times as the Company and the Administrative Agent shall agree, the Company shall host a conference call (with a question and answer period) with the chief executive officer and chief financial officer of the Company and such other members of senior management of the Company as the Company deems appropriate and the Administrative Agent and the Lenders and their respective representatives and advisors to discuss the

- 58 -

performance of the business, strategic alternatives and other issues as the Administrative Agent may reasonably request.

Section 6.04    Notices.  Promptly after any Responsible Officer of a Loan Party obtains knowledge thereof, notify the Administrative Agent (for prompt notification to each Lender):

(a) of the occurrence of any Default or Event of Default; and

(b) of any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a written statement of a Responsible Officer of the Company (x) that such notice is being delivered pursuant to Section 6.04(a) or (b) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Company has taken and proposes to take with respect thereto.

Section 6.05    Payment of Obligations.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature (including, but not limited to, all material taxes, fees, assessments, and other governmental charges), except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and any required reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member.

Section 6.06    Preservation of Existence, Etc.  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except (i) in the case of any Subsidiary of the Company, where the failure to perform such obligations, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, or (ii) in a transaction permitted by Section 7.04 or 7.05, and (b) take all reasonable action to maintain all privileges (including its good standing), material rights, material permits, material licenses and material franchises necessary or desirable in the normal conduct of its business, except (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) pursuant to a transaction permitted by Section 7.04 or 7.05.

Section 6.07    Maintenance of Properties.  Except if the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of its properties and equipment material to the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice.

Section 6.08    Maintenance of Insurance.  Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Company and its Subsidiaries) and with deductible levels as are customarily carried under similar circumstances by such other Persons and ensure that the Administrative Agent is an additional insured and/or loss payee under such liability and property insurance as reasonably requested by the Administrative Agent.

Section 6.09    Compliance with Laws.  Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to

- 59 -

comply therewith could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.10    Inspection Rights; Books and Records; Discussions.  (a)  Keep proper books of record and account in which full, true and correct entries in all material respects are made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books of record at any reasonable time upon reasonable notice and to discuss the business, operations, properties and financial and other condition of the Loan Parties with officers and senior managerial employees of the Loan Parties and with their independent certified public accountants, in all cases subject to applicable Law and the terms of any applicable confidentiality agreements not entered into for purposes of obstructing the operation of this Section 6.10; *provided*, that an officer of the Company shall be provided reasonable opportunity to participate in any such discussion with the accountants; *provided*, *further*, that such inspections and discussions shall be coordinated through the Administrative Agent and that in the absence of a continuation of an Event of Default, the Administrative Agent and the Lenders shall not exercise such rights more often than once (1) during any calendar quarter. The Administrative Agent and each Lender agrees to use reasonable efforts to coordinate and manage the exercise its rights under this Section 6.10 so as to minimize the disruption to the business of the Company and its Subsidiaries resulting therefrom.

Section 6.11    Covenant to Guarantee Obligations and Give Security.  At the Company's expense, take all action reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)  upon the formation or acquisition of any new direct or indirect Subsidiary by any Loan Party:

(i)    within (x) thirty (30) days after the formation or acquisition of any such Domestic Subsidiary or such longer period as may be reasonably acceptable to the Administrative Agent if the Loan Parties are diligently pursuing compliance herewith, and (y) forty-five (45) days after the formation or acquisition of any such Foreign Subsidiary or, in the case of this clause (y), such longer period as may be reasonably acceptable to the Administrative Agent:

(A)    cause each such Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement or becomes a Guarantor to furnish to the Administrative Agent a description of the Material Real Property owned by such Subsidiary, in detail reasonably satisfactory to the Administrative Agent;

(B)    cause (x) each such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement or becomes a Guarantor to duly execute and deliver to the Administrative Agent Mortgages, Security Agreement Supplements and other security agreements and documents and to execute, deliver, file and record any such other documents, statements, assignments, instruments, agreements or other papers and take all other actions reasonably requested by the Administrative Agent in order to create a perfected security interest with the priority required by the Collateral Documents in all of its assets required to constitute Collateral under the Loan Documents (including, with respect to Mortgages, the documents listed in Section 6.11(b)), as reasonably requested by and in form and substance reasonably satisfactory to the

- 60 -

Administrative Agent (consistent with the Mortgages, Guarantee and Security Agreement and other security agreements in effect on the Closing Date), and (y) each direct parent of each such Subsidiary (if such parent is a Borrower or is required to be a Guarantor pursuant to the Collateral and Guarantee Requirement or becomes a Guarantor) to duly execute and deliver to the Administrative Agent such Security Agreement Supplements and other security agreements and to execute, deliver, file and record any such other documents, statements, assignments, instruments, agreements or other papers and take all other actions reasonably requested by the Administrative Agent in order to create a perfected security interest with the priority required by the Collateral Documents in any uncertificated Equity Interests of such Subsidiary that are required to constitute Collateral under the Loan Documents, as reasonably requested by the Administrative Agent and in form and substance reasonably satisfactory to the Administrative Agent (consistent with the Guarantee and Security Agreement in effect on the Closing Date);

(C)      (x) cause each such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement or becomes a Guarantor to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and any instruments evidencing the Indebtedness held by such Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Administrative Agent and (y) cause each direct parent of such Subsidiary (if such parent is a Borrower or is required to be a Guarantor pursuant to the Collateral and Guarantee Requirement or becomes a Guarantor) to deliver any and all certificates representing the outstanding Equity Interests (to the extent certificated) of such Subsidiary that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and any instruments evidencing the intercompany Indebtedness issued by such Subsidiary and required to be pledged in accordance with the Collateral Documents, indorsed in blank to the Administrative Agent;

(D)      take and cause such Subsidiary and each direct or indirect parent of such Subsidiary to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, delivery of stock and membership interest certificates, delivery of promissory notes duly endorsed in favor of the Administrative Agent, and the execution, delivery, filing and recording of any such other documents, statements, assignments, instruments, agreements or other papers) may be reasonably requested by the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity;

(E)      cause each such Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement to Guarantee the Obligations; and

- 61 -

(F)      cause each such Subsidiary to deliver to the Administrative Agent copies of its Organization Documents,

(ii)      within thirty (30) days (with respect to any Domestic Subsidiary) or forty-five (45) days (with respect to any Foreign Subsidiary) after the request therefor by the Administrative Agent (or such longer period as may be reasonably acceptable to the Administrative Agent if the Loan Parties are diligently pursuing compliance herewith), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent, the other Agents and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this Section 6.11(a) as the Administrative Agent may reasonably request, and

(iii)      as promptly as practicable after the request therefor by the Administrative Agent, deliver to the Administrative Agent, with respect to each parcel of Material Real Property that is owned by such Subsidiary, any existing title reports, existing surveys or existing environmental assessment reports; and

(b)  after the Closing Date, concurrently with the acquisition of any Material Real Property by any Loan Party and such Material Real Property shall not already be subject to a perfected Lien pursuant to the Collateral and Guarantee Requirement, the Company shall give notice thereof to the Administrative Agent and promptly thereafter shall cause such assets to be subjected to a Lien to the extent and at such times as shall be required by the Collateral and Guarantee Requirement and the Collateral Documents, as the case may be, and will take, or cause the relevant Loan Party to take, such actions and at such times as shall be reasonably requested by the Administrative Agent to grant and perfect or record such Lien, including, as applicable, the actions referred to in Section 6.13(b).

Section 6.12      Compliance with Environmental Laws.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and (c) in each case to the extent required by Environmental Laws, conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws.

Section 6.13      Further Assurances.  (a)  Promptly upon request by the Administrative Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents.

(b)  In the case of any Material Real Property referred to in Section 6.11(b), provide the Administrative Agent with Mortgages with respect to such Material Real Property within sixty (60) days of the acquisition of such real property (or such longer period as may be reasonably acceptable to the Administrative Agent if the Loan Parties are diligently pursuing compliance herewith) together with:

(A)      evidence that counterparts of any such Mortgage has been duly executed, acknowledged and delivered and is in form suitable for filing or recording in all filing or

recording offices that the Administrative Agent may deem reasonably necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Administrative Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees that are due and payable have been paid or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

(B)      fully paid title insurance policies (or the equivalent or other forms available in each applicable jurisdiction) (the "**Mortgage Policies**") in form and substance, with endorsements and in amount, reasonably acceptable to the Administrative Agent (not to exceed the value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Administrative Agent, insuring the Mortgages to be valid and subsisting Liens on the property described therein, free and clear of all defects and encumbrances except for defects in title that do not materially interfere with the Loan Party's ability to conduct business and subject to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Administrative Agent may reasonably request;

(C)      if so requested by the Administrative Agent in its reasonable discretion, opinions of local counsel for the Loan Parties in states in which the real properties are located, with respect to the enforceability and perfection of any such Mortgage and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent; and

(D)      such other evidence that all other actions that the Administrative Agent may reasonably deem necessary or desirable in order to create valid and subsisting Liens on the property described in each such Mortgage has been taken.

Section 6.14    <u>Deposit Accounts</u>.  Maintain at all times all of the cash and Cash Equivalents of Holdings and its Domestic Subsidiaries (other than cash and Cash Equivalents not exceeding $5,000,000 in the aggregate) at an account or accounts (a) with the Administrative Agent or any other financial institution that has entered into a control agreement with respect to such acount(s) in form and substance reasonably satisfactory to the Administrative Agent or (b) at an account the entire balance of which is swept at least once every three (3) Business Days to an account described in clause (a) above.

Section 6.15    <u>Ratings</u>.  Use commercially reasonable efforts to obtain, on or prior to the 30th day after the Closing Date, ratings on the Facility from S&P and Moody's.

Section 6.16    <u>Post-Closing Covenants</u>.  Cause each post-closing matter identified on Schedule 6.16 to be completed on or before the date set forth on Schedule 6.16 for such post-closing matter.

## ARTICLE VII

## <u>NEGATIVE COVENANTS</u>

So long as any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, each Loan Party shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

Section 7.01    <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)  Liens created pursuant to any Loan Document;

509600-0292-11211-Active.11784882.7

(b)  Liens existing on the Closing Date (after giving effect to the occurrence of the Effective Date) and listed on Schedule 7.01(b) and any modifications, replacements, renewals or extensions of the foregoing; *provided* that (x) except as specified on Schedule 7.01(b), the principal amount of Indebtedness secured thereby is not increased (except as a result of changes in the Exchange Rate and except by the amount of premium, penalties, accrued and unpaid interest, fee and expenses associated with any Permitted Refinancing thereof) and (y) such Liens do not at any time extend to or cover any assets other than the assets subject to such Liens on the Closing Date (after giving effect to the occurrence of the Effective Date);

(c)  Liens for taxes, assessments or governmental charges which are not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if reserves with respect thereto are maintained on the books of the applicable Person to the extent required by and in accordance with GAAP;

(d)  statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, workmen, suppliers, construction contractors or other like Liens arising in the ordinary course of business which secure amounts not overdue for a period of more than forty-five (45) days or which are being contested in good faith and by appropriate proceedings diligently conducted, if reserves with respect thereto are maintained on the books of the applicable Person to the extent required by and in accordance with GAAP;

(e)  (i)  Liens, pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) Liens, pledges and deposits in the ordinary course of business securing liability for premiums or reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing insurance to Holdings, the Company or any Subsidiary;

(f)  Liens (including rights of set-off) or deposits (including deposits made to satisfy statutory or other legal obligations in connection with sweepstakes or similar contests and Liens in favor of postal authorities) to secure the performance of bids, trade contracts, governmental contracts, tenders, statutory bonds and leases (other than Indebtedness for borrowed money and Capitalized Lease Obligations), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)  easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar encumbrances and minor title defects affecting real property which, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Company or any Subsidiary or materially detract from the value of the property subject thereto, and zoning, building codes and other land use laws regulating the use or occupancy of the real property or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the business of the Company or any Subsidiary thereon;

(h)  Liens securing judgments, decrees, attachments or awards for the payment of money not constituting an Event of Default under Section 8.01(h);

(i)  Liens securing Indebtedness permitted under Section 7.03(e) or 7.03(s); *provided* that (i) such Liens attach concurrently with or within forty-five (45) days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness,

- 64 -

(iii) with respect to Capitalized Lease Obligations, such Liens do not at any time extend to or cover any assets other than the assets subject to such Capitalized Lease Obligations except that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender and (iv) the principal amount of Indebtedness secured thereby is not increased (except as a result of changes in the Exchange Rate and except by the amount of premiums, penalties, accrued and unpaid interest, fee and expenses associated with any Permitted Refinancing thereof);

(j)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Company or any Subsidiary or (ii) secure any Indebtedness;

(k)  Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)  Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) arising in the ordinary course of business in connection with the maintenance of such accounts and (iii) arising under customary general terms of the account bank in relation to any bank account maintained with such bank and attaching only to such account and the products and proceeds thereof;

(m)  Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02(f), (i)or (l) to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(n)  any interest or title of a lessor under leases entered into by the Company or any of its Subsidiaries in the ordinary course of business and covering only the assets so leased and other assets directly related to such lease, including title and similar documents;

(o)  Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Company or any of its Subsidiaries in the ordinary course of business permitted by this Agreement;

(p)  Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02;

(q)  Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business, consistent with past practice and not for speculative purposes;

(r)  Liens that are contractual rights of set-off or, in the case of clause (i) or (ii) below, other bankers' Liens (i) relating to treasury, depository and cash management services or any automated clearing house transfers of funds in the ordinary course of business and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Holdings, the Company or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings, the Company and the Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Company or any Subsidiary in the ordinary course of business;

- 65 -

(s)  Liens solely on any cash earnest money deposits made by the Company or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(t)  Liens on equipment (including printing presses and data-processing equipment) owned by the Company or any Subsidiary and located on the premises of any supplier, in the ordinary course of business;

(u)  Liens on cash collateral securing letters of credit in an aggregate amount at any one time outstanding not to exceed $25,000,000 (less the amount of cash collateral applied to the reimbursement of any such letters of credit (net of any such amounts returned by the beneficiary thereof in respect thereof));

(v)  deposits in the ordinary course of business securing credit card programs maintained in the ordinary course of business in an amount not to exceed $15,000,000 (plus the amount, up to an additional $20,000,000, of such deposits sought by JPMorgan Chase Bank or its subsidiaries (including Paymentech)) in the aggregate at any one time outstanding.

(w)  utility and other similar deposits made in the ordinary course of business;

(x)  Liens on property or Equity Interests of any non-Loan Party Foreign Subsidiary (other than a Borrower), which property or Equity Interests do not constitute Collateral, securing Indebtedness of such Foreign Subsidiary permitted under Section 7.03;

(y)  Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary, in each case after the date hereof (other than Liens on the Equity Interests of any Person that becomes a Subsidiary); *provided* that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary, (ii) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof), and (iii) the Indebtedness secured thereby is permitted under Section 7.03(h);

(z)  ground leases in respect of real property on which facilities owned or leased by the Company or any of its Subsidiaries are located and other Liens affecting the interest of any landlord (and any underlying landlord) of any real property leased by the Company or any Subsidiary;

(aa) Liens not otherwise permitted by this Section so long as (i) neither (A) the aggregate outstanding principal amount of the obligations secured thereby nor (B) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds, at any one time outstanding, $15,000,000 in the aggregate, and (ii) such Lien does not encumber the Equity Interests of any Subsidiary of Holdings; and

(bb)  Liens securing the obligations under the Second Lien Term Loan Documents and any modifications, replacements, renewals or extensions thereof; *provided*, that (i) such Liens are subordinated pursuant to the Intercreditor Agreement and (ii) such modification, replacement, renewal or extension, as the case may be, is permitted pursuant to Section 7.03(t).

Section 7.02    <u>Investments</u>.  Make or hold any Investments, except:

(a)  Investments in cash and Cash Equivalents;

(b)  loans or advances to officers, directors and employees of Holdings, the Company and the Subsidiaries in the ordinary course of business for reasonable and customary business-related travel,

- 66 -

entertainment, relocation and analogous ordinary business purposes in an aggregate principal amount outstanding for all Group Members not to exceed $3,000,000 at any one time outstanding;

(c)  Investments (i) by any Group Member in the Company or any wholly owned Subsidiary that is a U.S. Guarantor, (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary, (iii) by any German Loan Party in any other German Loan Party; (iv) by any Loan Party in a Foreign Subsidiary in the ordinary course of business in the form of intercompany loans to fund ordinary course foreign operations in an aggregate amount not to exceed $30,000,000 at any one time outstanding (provided that up to $12,000,000 of such Investments may be made in the form of capital contributions instead of intercompany loans, the amount of such capital contributions to reduce Dollar for Dollar the amount of loans permitted by this clause (iv)) and (v) Investments set forth on Schedule 7.02(c) up to the amounts at any one time outstanding and for the purposes set forth thereto.

(d)  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)  Investments (i) resulting from the creation of a Lien permitted under Section 7.01, (ii) resulting from the incurrence of Indebtedness permitted under Section 7.03, (iii) made to effect Dispositions permitted under Section 7.04 or Section 7.05 (other than Section 7.05(d)) or (iv) made to effect Restricted Payments permitted under Section 7.06;

(f)  Investments existing on the date hereof and set forth on Schedule 7.02(f) and any modification, replacement, renewal, reinvestment or extension thereof that does not increase the aggregate amount thereof (except as a result of changes in the Exchange Rate) or as otherwise permitted by this Section 7.02;

(g)  Investments in Swap Contracts permitted under Section 7.03;

(h)  promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 7.05 to the extent not required to be made for cash consideration;

(i)  the purchase or other acquisition of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, or Equity Interests in a Person that, upon the consummation thereof, will be a Subsidiary of the Company (including as a result of a merger or consolidation); *provided* that, with respect to each purchase or other acquisition made pursuant to this Section 7.02(i) (each, a "**Permitted Acquisition**"):

(A)  subject to clause (B) below, each applicable Loan Party and any such newly created or acquired Subsidiary (and, to the extent required under the Collateral and Guarantee Requirement, the Subsidiaries of such created or acquired Subsidiary) shall be a Guarantor and shall have complied with the requirements of and granted the security interests required by Section 6.11 within the times specified therein;

(B)  the aggregate amount of consideration (cash and non-cash (other than the proceeds of Permitted Equity Issuances after the Closing Date Not Otherwise Applied), including (i) the fair market value (on the date of such Permitted Acquisition) of all Equity Interests issued or transferred to the sellers thereof and (ii) all indemnities, earnouts and other contingent payment obligations to, and the aggregate amounts paid or to be paid under noncompete, consulting and other affiliated agreements with, the sellers thereof, all write-downs of property and reserves for

- 67 -

liabilities with respect thereto and all assumptions of debt, liabilities and other obligations in connection therewith; provided that any such liability or future payment pursuant to clause (ii) above that is subject to a contingency shall be considered consideration for a Permitted Acquisition for purposes of this clause (B) only to the extent of the amount of such liability or payment, if any, required under GAAP to be reflected on the face of a consolidated balance sheet of the Company or the reserve, if any, required under GAAP to be established in respect thereof by the Company or any of its Subsidiaries, in each case at the time such Permitted Acquisition is consummated) paid in respect of (x) all Permitted Acquisitions shall not exceed (1) $50,000,000 for the period from the Closing Date to the first anniversary of the Closing Date, (2) $100,000,000 for the period from the Closing Date to the second anniversary of the Closing Date and (3) $150,000,000 for the period from the Closing Date to the Maturity Date (in each case plus the portion of Excess Cash Flow Not Otherwise Applied) and (y) acquisitions of Persons that do not become Loan Parties shall not exceed (1) $25,000,000 for the period from the Closing Date to the first anniversary of the Closing Date, (2) $50,000,000 for the period from the Closing Date to the second anniversary of the Closing Date and (3) $75,000,000 for the period from the Closing Date to the Maturity Date;

(C) (1) immediately before and immediately after giving pro forma effect to any such purchase or other acquisition, no Default or Event of Default shall have occurred and be continuing and (2) immediately after giving effect to such purchase or other acquisition, the Company and the Subsidiaries shall be in compliance with, on a pro forma basis, all of the covenants set forth in Section 7.10, such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or (b) as though such purchase or other acquisition had been consummated as of the first day of the fiscal period covered thereby and evidenced by a certificate from a Responsible Officer of the Company demonstrating such compliance calculation in reasonable detail; and

(D) the Company shall have delivered to the Administrative Agent, on behalf of the Lenders, no later than five (5) Business Days after the date on which any such purchase or other acquisition is consummated, a certificate of a Responsible Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying that all of the requirements set forth in this clause (i) have been satisfied or will be satisfied on or prior to the consummation of such purchase or other acquisition;

(j)    Investments in the ordinary course of business consisting of Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(k)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)    in addition to Investments otherwise expressly permitted by this Section, Investments by the Company or any of its Subsidiaries in an aggregate amount not to exceed $15,000,000 plus the aggregate amount of the proceeds of Permitted Equity Issuances after the Closing Date that have been contributed to the Company as common equity and Not Otherwise Applied and the portion of Excess Cash Flow Not Otherwise Applied;

- 68 -

(m) advances of payroll payments to employees and advances to authors in the ordinary course of business;

(n) existing Investments of a Subsidiary acquired after the Closing Date or of a corporation merged into the Company or merged or consolidated with a Subsidiary in accordance with Section 7.04 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(o) Investments in assets useful in the business of the Company and its Subsidiaries made by the Company or any of its Subsidiaries with the Net Cash Proceeds received in connection with Dispositions or Casualty Events that are not applied to prepay the Loans pursuant to Section 2.03(b)(ii)(B);

(p) Guarantees by Holdings, the Company or any Subsidiary of leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business; and

(q) prepaid expenses and lease, utility, workers' compensation, performance and other similar deposits made in the ordinary course of business.

Section 7.03    <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a) Indebtedness of any Loan Party under the Loan Documents;

(b) (i) Indebtedness outstanding on the Closing Date (after giving effect to the occurrence of the Effective Date) and listed on Schedule 7.03(b) and (ii) any Permitted Refinancing thereof (to the extent (A) such Permitted Refinancing is incurred by the Person who is the obligor of the Indebtedness subject to such Permitted Refinancing or (B) such incurrence is otherwise permitted under this Section 7.03);

(c) Guarantees made in the ordinary course of business by (i) any Group Member in respect of Indebtedness of the Company or any Subsidiary that is a U.S. Guarantor, (ii) any Subsidiary that is not a Loan Party in respect of Indebtedness of any other Subsidiary and (iii) any German Loan Party in respect of Indebtedness of any other German Loan Party, in each case to the extent the Indebtedness being Guaranteed is otherwise permitted hereunder; *provided* that (A) no Guarantee by any Group Member of any Junior Financing shall be permitted unless such Group Member shall have also become a Guarantor hereunder and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Obligations (or the Guarantee thereof, as applicable) on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(d) Indebtedness of the Company or any Subsidiary owing to the Company or any other Subsidiary to the extent constituting an Investment permitted by Section 7.02; *provided* that, all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subordinated to the payment in full of the Obligations;

(e) (i) Attributable Indebtedness and other Indebtedness (including Capitalized Lease Obligations) financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; *provided* that such Indebtedness is incurred concurrently with or within forty-five (45) days after the applicable acquisition, construction, repair, replacement or improvement, and (ii) any Permitted

- 69 -

Refinancing of any Indebtedness set forth in the immediately preceding clause (i); *provided* that the aggregate principal amount of all Indebtedness permitted under this Section 7.03(e) shall not exceed $15,000,000 at any time outstanding plus the amount of any Capital Leases incurred solely as a result of the reclassification of existing operating leases as such due to changes in GAAP;

(f)   Indebtedness in respect of Swap Contracts incurred in the ordinary course of business and not for speculative purposes;

(g)   Indebtedness representing deferred compensation to employees of the Company and its Subsidiaries incurred in the ordinary course of business;

(h)   Indebtedness (excluding Indebtedness incurred pursuant to Section 7.03(i) below) (i) assumed in connection with any Permitted Acquisition (provided such Indebtedness is not incurred in contemplation of such Permitted Acquisition) or incurred to finance a Permitted Acquisition or (ii) consisting of any Permitted Refinancing of the foregoing, in each case so long as both immediately prior and after giving effect thereto, (A) no Default or Event of Default shall be continuing or result therefrom, (B) the Company and its Subsidiaries will be in pro forma compliance with the covenants set forth in Section 7.10, such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or (b) as though such Indebtedness had been assumed or incurred as of the first day of the fiscal period covered thereby and evidenced by a certificate from the Chief Financial Officer of the Company demonstrating such compliance calculation in reasonable detail, (C) the aggregate principal amount of such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof at any time outstanding pursuant to this paragraph (h) shall not exceed (x) $25,000,000 for the period from the Closing Date to the first anniversary of the Closing Date, (y) $50,000,000 for the period from the Closing Date to the second anniversary of the Closing Date and (z) $75,000,000 for the period from the Closing Date to the Maturity Date, and (D) the aggregate principal amount of such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof shall not exceed, with respect to any such Permitted Acquisition, 50% of the aggregate amount of consideration paid in respect thereof;

(i)        unsecured Indebtedness or earn-outs that are owed to the seller incurred in connection with a Permitted Acquisition, provided that such unsecured Indebtedness or earn-outs shall be subordinated and/or restricted in a manner reasonably satisfactory to the Administrative Agent;

(j)   Indebtedness incurred by the Company or any Subsidiary in connection with any Investment or Disposition permitted by this Agreement, in each case constituting customary indemnification obligations or obligations in respect of purchase price or other similar adjustments;

(k)   Indebtedness consisting of obligations of Holdings, the Company or the Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with any Investment expressly permitted hereunder;

(l)   Cash Management Obligations and other Indebtedness of Foreign Subsidiaries in respect of intraday overdraft protections and similar intraday arrangements in each case in connection with deposit accounts incurred in the ordinary course of business in connection with cash management activities in an aggregate amount at any time outstanding (determined when incurred) not to exceed (i) with respect to Foreign Subsidiaries domiciled in Europe, $25,000,000 in the aggregate, (ii) with respect to Foreign Subsidiaries domiciled in Canada or Latin America, $10,000,000 in the aggregate and (iii) with respect to Foreign Subsidiaries domiciled in Asia or Australia, $10,000,000 in the aggregate;

- 70 -

(m) Indebtedness in an aggregate principal amount not to exceed $15,000,000 at any time outstanding (except as a result of changes in the Exchange Rate);

(n)  Indebtedness consisting of (a) the financing of insurance premiums with the providers of such insurance or their affiliates or (b) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o)  Indebtedness incurred by the Company or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; *provided* that any reimbursement obligations in respect thereof are reimbursed within 30 days following the incurrence thereof;

(p)  obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Company or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(q)  Foreign Jurisdiction Deposits;

(r)  Indebtedness of Foreign Subsidiaries in connection with factoring programs entered into in the ordinary course of business on customary market terms and with respect to receivables of, and generated by, Foreign Subsidiaries;

(s)  in connection with leasehold improvements, Indebtedness incurred in connection with the financing thereof in an aggregate amount not to exceed $10,000,000 at any time outstanding;

(t)  (i) Indebtedness under the Second Lien Credit Agreement in an aggregate principal amount not to exceed an amount equal to the sum of (A) $300,000,000 plus (B) interest on the Second Lien Term Loans that is paid-in-kind pursuant to the Second Lien Credit Agreement, (ii) Guarantees of any U.S. Guarantor in respect of such Indebtedness and (iii) any Permitted Refinancing thereof; and

(u)  to the extent constituting Indebtedness, judgments, decrees, attachments or awards not constituting an Event of Default under Section 8.01(h).

Section 7.04    Fundamental Changes.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(a)  (i) any Subsidiary of the Company may merge or be consolidated with the Company (provided that the Company shall be the continuing or surviving Person) or with one or more U.S. Guarantors (provided that the continuing or surviving Person is a U.S. Guarantor or a new Subsidiary which, substantially concurrently with such merger or consolidation, becomes a U.S. Guarantor hereunder), (ii) any Subsidiary that is not a Loan Party may merge or be consolidated with one or more other Subsidiaries that are not Loan Parties and (iii) any German Loan Party may merge or be consolidated with one or more other German Loan Parties (provided that if any party is the German Borrower, the German Borrower shall be the continuing or surviving Person;

(b) (i) any Subsidiary of the Company may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Company or one or more U.S. Guarantors, (ii) any Subsidiary that is not a Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to one or more other Subsidiaries that are not Loan Parties and (iii) any German Loan Party (other than the German Borrower) may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to one or more other German Loan Parties;

(c) a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05, may be completed;

(d) any Subsidiary that is not a Loan Party may liquidate or dissolve or change its legal form if the Company determines in good faith that such action is in the best interests of the Company and its Subsidiaries and is not materially disadvantageous to the interests of the Lenders hereunder; and

(e) such transactions and changes described on Schedule 7.04(e) may be completed.

Section 7.05    <u>Dispositions</u>.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a) Dispositions of obsolete or worn out property, including the abandonment or other Disposition of Intellectual Property that is no longer material to the business of the Company and its Subsidiaries, whether now owned or hereafter acquired, in the ordinary course of business;

(b) Dispositions of inventory in the ordinary course of business;

(c) (i) Dispositions of property by any Group Member to the Company or any U.S. Guarantor, (ii) Dispositions of property by any Subsidiary that is not a Loan Party to the Company or any Subsidiary and (iii) Dispositions of property by any German Loan Party to any other German Loan Party; *provided* that to the extent such transaction constitutes an Investment, such transaction is permitted under Section 7.02;

(d) Dispositions permitted by Sections 7.04 and 7.06 and Liens permitted by Section 7.01;

(e) Dispositions of cash and Cash Equivalents;

(f) (i) Dispositions of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business and (ii) the factoring by Foreign Subsidiaries at maturity or collection of any accounts receivable pursuant to factoring programs entered into in the ordinary course of business on customary market terms and with respect to receivables of, and generated by, Foreign Subsidiaries;

(g) leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business and which do not materially interfere with the business of Holdings, the Company and the Subsidiaries;

(h) transfers of property to the extent subject to Casualty Events;

(i) Dispositions listed on Schedule 7.05(i);

509600-0292-11211-Active.11784882.7

(j)  Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(k)  Dispositions in connection with office move or relocation in the ordinary course of business;

(l)  Dispositions of [art collections][1]; and

(m)  in the case of Holdings, Permitted Equity Issuances;

(n)  Dispositions of property not otherwise permitted under this Section 7.05; *provided* that (i) at the time of such Disposition, no Default or Event of Default shall exist or would result from such Disposition, (ii) the aggregate book value of all property Disposed of in reliance on this Section 7.05(n) shall not exceed $15,000,000 in the aggregate per fiscal year (provided that up to 50% of such amount for each fiscal year may be (A) carried back to the immediately preceding fiscal year, decreasing Dollar for Dollar the amount of Dispositions permitted pursuant to this paragraph (n) in such fiscal year and increasing Dollar for Dollar the amount of Dispositions permitted pursuant to this paragraph (n) in such immediately preceding fiscal year or (B) to the extent unused, carried forward to the immediately succeeding fiscal year), and (iii) not less than 80% of the consideration for such Disposition shall be in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received), other than nonconsensual Liens permitted by Section 7.01 and Liens permitted by Section 7.01(p) and clauses (i) and (ii) of Section 7.01(r);

*provided* that any Disposition of any property pursuant to this Section 7.05 (except pursuant to clauses (c), (d) and (h) and except for Dispositions from any Loan Party to any U.S. Loan Party or any German Loan Party to any other Loan Party) shall be for no less than the fair market value of such property at the time of such Disposition.  To the extent any Collateral is Disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents without further action by the Administrative Agent, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

Section 7.06    Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, except:

(a)  (i) any Subsidiary may make Restricted Payments to the Company or any U.S. Guarantor, (ii) any Subsidiary that is not a Loan Party may make Restricted Payments to the Company and any other Subsidiary, (iii) any German Loan Party may make Restricted Payments to any other German Loan Party and (iv) any Loan Party or its Subsidiary may make Restricted Payments to Holdings the proceeds of which will be used to pay (or to make Restricted Payments to allow any direct or indirect parent of Holdings to pay) the tax liability attributable to such Loan Party or Subsidiary in respect of consolidated, combined, unitary or affiliated tax returns for the relevant jurisdiction of Holdings (or such parent) in an amount not to exceed the taxes that would have been payable by such Loan Party or Subsidiary on a stand alone basis;

(b)  the Company and its Subsidiaries may make Restricted Payments to Holdings consisting of Permitted Holdings Distributions;

---

[1] RDA to provide more information.

(c)    so long as immediately before and after giving effect to any such Restricted Payment, no Default or Event of Default shall have occurred and be continuing or would result therefrom, the Company may make additional Restricted Payments to Holdings the proceeds of which may be utilized by Holdings to make additional Restricted Payments, in an aggregate amount in any fiscal year not to exceed the sum of (i) $5,000,000 plus (ii) the aggregate amount of the proceeds of Permitted Equity Issuances after the Closing Date that have been contributed to the Company as common equity and Not Otherwise Applied plus (iii) the portion of Excess Cash Flow Not Otherwise Applied;

(d)    Holdings, the Company and its Subsidiaries may declare and make dividend payments or other distributions to the extent payable in the Equity Interests (other than Disqualified Equity Interests not otherwise permitted by Section 7.03 or such dividend payments or distributions that would cause a Change of Control) of such Person;

(e)    noncash repurchases of Equity Interests in Holdings, the Company or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants; and

(f)    to the extent constituting Restricted Payments, Holdings, the Company and its Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.04.

Section 7.07    Change in Nature of Business.  Engage in a line of business different from those lines of business conducted by the Company and its Subsidiaries on the date hereof or any business reasonably related, ancillary or complementary thereto.

Section 7.08    Transactions with Affiliates.  Enter into any transaction of any kind with any Affiliate of Holdings, whether or not in the ordinary course of business, other than (a) (i) transactions exclusively among the Company and any U.S. Guarantors or among any U.S. Guarantors, (ii) transactions exclusively among any German Loan Parties, (iii) transactions exclusively among any Subsidiaries that are not Loan Parties and (iv) transactions exclusively among any Group Members that are expressly contemplated by this Agreement to be among such Persons; provided, that in each case such transactions are not otherwise prohibited by this Agreement, (b) transactions in the ordinary course of business that are not otherwise prohibited by this Agreement and that are on fair and reasonable terms no less favorable to Holdings, the Company or such Subsidiary as would be obtainable by Holdings, the Company or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate, (c) any Indebtedness among the Group Members to the extent permitted under Section 7.03(d), Investments of the type permitted by clauses (a), (b) and (c) of Section 7.02 and Restricted Payments permitted by Section 7.06, (d) transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 7.08 and (e) transactions pursuant to the Reorganization Plan.

Section 7.09    Burdensome Agreements.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of (a) any Subsidiary of the Company to make Restricted Payments to the Company or any other Subsidiary, (b) any Subsidiary of the Company to make loans or advances to, or other Investments in, the Company or any other Subsidiary, (c) any Subsidiary of the Company to transfer any of its assets to the Company or any other Subsidiary or (d) any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired; provided that the foregoing shall not apply to Contractual Obligations which (i) (x) arise under the Second Lien Term Loan Documents or exist on the date hereof and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09 hereto or (y) are set forth in any agreement evidencing any permitted amendment, renewal, extension or refinancing of any Contractual Obligation permitted by clause (x) so long as such amendment, renewal,

- 74 -

extension or refinancing is not materially more restrictive than such Contractual Obligation, (ii) arise in connection with any Disposition permitted by Section 7.05 and relate solely to the assets or Person subject to such Disposition, (iii) are customary restrictions in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby entered into in the ordinary course of business and consistent with past practice so long as such restrictions relate only to the assets subject thereto, (iv) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Company or any Subsidiary, (v) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (vi) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business, and (vii) comprise restrictions imposed by a Lien permitted by Section 7.01 restricting the transfer of only the property subject thereto.

Section 7.10    Financial Condition Covenants.

(a) Consolidated Fixed Charge Coverage Ratio.  Permit the Consolidated Fixed Charge Coverage Ratio as at the last day of any Test Period ending on any date set forth below to be less than the ratio set forth below opposite such date:

| Date | Consolidated Fixed Charge Coverage Ratio |
| --- | --- |
| [_____] | [_____] |

(b) Minimum Cumulative Consolidated EBITDA.  Permit the Consolidated EBITDA as at the last day of any Test Period ending on any date set forth below, to be less than the amount set forth below opposite such date:

| Date | Cumulative Consolidated EBITDA |
| --- | --- |
| [_____] | [_____] |

(c) Minimum Liquidity.  Permit Liquidity, as of the last day of any fiscal month, to be less than $[_____].

(d) Total Leverage Ratio.  Permit the Total Leverage Ratio as of the last day of any Test Period ending on any date set forth below to be less than the ratio set forth below opposite such date:

| Date | Total Leverage Ratio |
| --- | --- |
| [_____] | [_____] |

Section 7.11    Sale and Leaseback Transactions.  Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property that has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member other than any such transaction the subject of which is the Loan Parties' property at 5400 South 60th Street, Greendale, Wisconsin.

- 75 -

Section 7.12   Swap Contracts.  Enter into any Swap Contract, except (a) Swap Contracts entered into to hedge or mitigate risks to which the Company or any Subsidiary has actual exposure (other than those in respect of Equity Interests of any Person) and (b) Swap Contracts entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Company or any Subsidiary; *provided*, that in each case such Swap Contracts are not entered into for speculative purposes.

Section 7.13   Accounting Changes.  Make any change in its fiscal year, (i) except as required by GAAP and (ii) except the change to December 31 and any related changes.

Section 7.14   Prepayments, Etc. of Indebtedness.  (a)  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled interest shall be permitted) Second Lien Term Loans or any other Indebtedness that is required to be subordinated to the Obligations pursuant to the terms of the Loan Documents (collectively, "**Junior Financing**") or make any payment in violation of any subordination terms of any Junior Financing Documentation, except the refinancing thereof with the Net Cash Proceeds of any Permitted Refinancing otherwise permitted under Section 7.03.

(b)  Amend, modify or change in any manner materially adverse to the interests of the Lenders (i) any term or condition of any Second Lien Term Loan Document or any other Junior Financing Documentation or (ii) any Organization Document of any Group Member, in any case without the consent of the Administrative Agent.

Section 7.15   Holding Company.  In the case of Holdings, conduct, transact or otherwise engage in any business or operations other than those incidental to (i) its ownership of the Equity Interests in, and its management of, the Company, (ii) the maintenance of its legal existence and its compliance with applicable Laws, (iii) the performance of the Loan Documents and the Second Lien Term Loan Documents, (iv) any public offering of its common stock or any other issuance of its Equity Interests not prohibited by Article VII, and (v) the issuance, acquisition or maintenance of any Indebtedness or Investments, or the making of any Restricted Payments, that Holdings is expressly permitted to enter into or consummate under this Article VII; *provided* that, notwithstanding the foregoing, Holdings shall not own, lease, manage, acquire or otherwise operate any properties or assets (other than the ownership of Equity Interests in, and its management of, the Company, cash and Cash Equivalents and de minimis amounts of other assets incidental to the conduct of its business) or incur any material consensual liabilities (other than liabilities related to its existence and permitted business and activities specified above).

Section 7.16   Capital Expenditures.  (a)  Permit the aggregate amount of Capital Expenditures made during each fiscal year specified below to exceed the amount set forth opposite such fiscal year below:

| Fiscal Year | Capital Expenditure Amount |
|---|---|
| 2010 | [_____] |
| 2011 | [_____] |
| 2012 | [_____] |
| 2013 | [_____] |

509600-0292-11211-Active.11784882.7

2014                            [_____]

; *provided* that the amount of Capital Expenditures permitted to be made in respect of any fiscal year shall be increased by an amount equal to the sum of (x) the aggregate amount of the Net Cash Proceeds of Permitted Equity Issuances after the Closing Date (other than Permitted Equity Issuances made pursuant to Section 8.04) that have been contributed to the Company as common equity and Not Otherwise Applied.

(b)        Notwithstanding anything to the contrary contained in clause (a) above, to the extent that the aggregate amount of Capital Expenditures made by the Company and the Subsidiaries in any fiscal year pursuant to Section 7.16(a) is less than the maximum amount of Capital Expenditures permitted by Section 7.16(a) with respect to such fiscal year, the amount of such difference (the "**Rollover Amount**") may be carried forward and used to make Capital Expenditures in the next succeeding fiscal year; *provided* that Capital Expenditures in any fiscal year shall be counted against the base amount set forth in Section 7.16(a) with respect to such fiscal year prior to being counted against any Rollover Amount available with respect to such fiscal year.

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

Section 8.01        Events of Default.  Any of the following shall constitute an Event of Default:

(a)  *Non-Payment*.  Any Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within three (3) Business Days after the same becomes due, any interest or any other amount payable hereunder or with respect to any other Loan Document; or

(b)  *Specific Covenants*.  Any Group Member fails to perform or observe (or to cause the performance or observance of) any term, covenant or agreement contained in any of Sections 6.04(a), 6.06 (solely with respect to Holdings and the Borrowers) or 6.16 or Article VII or Section [___] or [___] of the Guarantee and Security Agreement (or any comparable provisions of any Non-U.S. Collateral Document); or

(c)  *Other Defaults*.  Any Group Member fails to perform or observe (or to cause the performance or observance of) any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after written notice thereof by the Administrative Agent or the Required Lenders to the Company; or

(d)  *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Company or any other Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)  *Cross-Default*.  Any Group Member (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition contained in any instrument or agreement evidencing, governing, securing or otherwise relating to any such Indebtedness, or any other "default" (or like term) occurs, the effect of which failure or other "default" is to cause, or to permit the holder or holders of such

509600-0292-11211-Active.11784882.7

Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due (automatically or otherwise) prior to its stated maturity (or, in the case of any such Indebtedness constituting a Guarantee, to become payable); *provided*, that this clause (e)(B) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided*, *further*, that this clause (e) shall not apply in respect of (x) any Indebtedness of any Designated Non-Debtor that becomes due or payable, or is capable of becoming due or payable, prior to its stated maturity, or (y) any non-payment in respect of any Indebtedness by any Designated Non-Debtor, in each case to the extent caused by or directly resulting from the institution of any proceeding under any Debtor Relief Law in respect of such Designated Non-Debtor; or

(f)    *Insolvency Proceedings, Etc.*   Any Group Member other than a Designated Non-Debtor institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief approving or ordering any of the foregoing is entered in any such proceeding [(to avoid any doubt, it being understood and agreed that none of the foregoing shall be applicable to commencement of a process relating to *Mandataire ad Hoc* or an appointment of a *Mandataire* pursuant to French laws)][2]; or

(g)    *Inability to Pay Debts*; *Attachment*.   (i)  Any Group Member other than a Designated Non-Debtor becomes generally unable or admits in writing its inability generally or fails generally to pay its debts in excess of the Threshold Amount as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any Group Member, and is not released, vacated or fully bonded within sixty (60) days after its issue or levy; or

(h)    *Judgments*.   (i) One or more judgments or decrees shall be entered against any Group Member involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has not disputed coverage) of an amount exceeding the Threshold Amount, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within thirty (30) days from the entry thereof; or (ii) there shall be rendered against any Group Member a nonmonetary judgment with respect to any event which causes or could reasonably be expected to have a Material Adverse Effect; or

(i)    *ERISA*.   (i)  An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, (iii) any Loan Party or any ERISA Affiliate engages in

---

[2] To be discussed.

509600-0292-11211-Active.11784882.7

any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Pension Plan which could reasonably be expected to result in a Material Adverse Effect, or (iv) other than the matters disclosed in Schedule 5.11(c), any other event or condition shall occur or exist with respect to a Pension Plan, a Foreign Benefit Arrangement or Foreign Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect; or

(j)  *Change of Control.*  There occurs any Change of Control; or

(k)  *Invalidity of Liens*.  Any of the Collateral Documents shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Liens created by any Collateral Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby other than by reason of the release thereof in accordance with the terms thereof; or

(l)  *Invalidity of Guarantees*.  The Guarantees contained in the Collateral Documents shall cease, for any reason, to be in full force and effect or any Loan Party or Affiliate of any Loan Party shall so assert in writing (it being understood and agreed that the discharge of a Guarantor from a Collateral Document in accordance with the terms hereof and thereof shall not be construed as the Guarantee(s) in such Collateral Document ceasing to be in full force and effect); or

(m) *Intercreditor Agreement*.  The Intercreditor Agreement shall cease, for any reason, to be in full force and effect or the Liens securing the obligations under the Second Lien Term Loan Documents shall cease, for any reason, to be validly subordinated to the Liens securing the Obligations, or any Loan Party or any Affiliate of any Loan Party shall assert any of the foregoing, in each case of the foregoing, other than by the express terms under the Intercreditor Agreement; or

(n)  *Junior Financing Documentation*.  Any of the Obligations of the Loan Parties under the Loan Documents for any reason shall cease to be "Senior Indebtedness" (or any comparable term) or "Senior Secured Financing" (or any comparable term) under, and as defined in any Junior Financing Documentation.

Section 8.02    Remedies Upon Event of Default.  If any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall take any or all of the following actions:

(a)  declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; and

(b)  exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an Event of Default specified in Section 8.01(f) with respect to any Borrower, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, without further act of the Administrative Agent or any Lender.

Section 8.03    Application of Funds.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the

proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

> *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

> *Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause *Second* payable to them;

> *Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the holders of such Obligations in proportion to the respective amounts described in this clause *Third* payable to them;

> *Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, and the termination value under Secured Hedge Obligations and Cash Management Obligations, ratably among the holders of such Obligations in proportion to the respective amounts described in this clause *Fourth* held by them;

> *Fifth*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

> *Last*, the balance, if any, after all of the Obligations have been paid in full, to the Company or as otherwise required by Law.

Notwithstanding anything to the contrary in this Agreement, amounts received from any Foreign Subsidiary on account of the Obligations of any Foreign Subsidiary shall be applied solely to the payment of Obligations of Foreign Subsidiaries.

Section 8.04    CAM Exchange. On the CAM Exchange Date, the Lenders shall automatically and without further act be deemed to have exchanged interests in the Designated Obligations such that, in lieu of the interests of each Lender in the Designated Obligations of each Class in which it shall participate as of such date, such Lender shall own an interest equal to such Lender's CAM Percentage in the Designated Obligations of each of the Classes. Each Lender, each person acquiring a participation from any Lender as contemplated by Section 10.07 and each Borrower hereby consents and agrees to the CAM Exchange. Each of the Borrowers and the Lenders agrees from time to time to execute and deliver to the Administrative Agent all such promissory notes and other instruments and documents as the Administrative Agent shall reasonably request to evidence and confirm the respective interests and obligations of the Lenders after giving effect to the CAM Exchange, and each Lender agrees to surrender any promissory notes originally received by it in connection with its Loans hereunder to the Administrative Agent against delivery of any promissory notes so executed and delivered; *provided* that the failure of any Borrower to execute or deliver or of any Lender to accept any such promissory note, instrument or document shall not affect the validity or effectiveness of the CAM Exchange.

509600-0292-11211-Active.11784882.7

## ARTICLE IX

## ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01    Appointment and Authorization of Agents.  (a)  Each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)  The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacities as a Lender and a potential Hedge Bank) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX (including, Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02    Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through agents, employees or attorneys-in-fact and such sub-agents as shall be deemed necessary by the Administrative Agent and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct (as determined in the final non-appealable judgment of a court of competent jurisdiction).

Section 9.03    Liability of Agents.  No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), or (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other

509600-0292-11211-Active.11784882.7

document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

Section 9.04    Reliance by Agents.  (a) Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent.  Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)  For purposes of determining compliance with the conditions specified in Article IV, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 9.05    Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Company referring to this Agreement, describing such Default and stating that such notice is a "notice of default."  The Administrative Agent will notify the Lenders of its receipt of any such notice.  The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII; provided that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 9.06    Credit Decision; Disclosure of Information by Agents.  Each Lender expressly acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into

- 82 -

the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Company and the other Loan Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Company and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 9.07    Indemnification of Agents.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it; *provided* that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Company.  The undertaking in this Section 9.07 shall survive the payment of all Obligations and the resignation of the Administrative Agent.

Section 9.08    Agents in their Individual Capacities.  JPMorgan Chase Bank and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though JPMorgan Chase Bank were not the Administrative Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, JPMorgan Chase Bank or its Affiliates may receive information regarding any Loan Party or its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them.  With respect to its Loans, JPMorgan Chase Bank shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" include JPMorgan Chase Bank in its individual capacity.

Section 9.09    Successor Agents.  The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice to the Lenders and the Company.  If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders.  If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent, the Administrative Agent may appoint, after consulting with the Lenders, a successor agent, which shall be a Lender or a bank with an office in New York, New York or an Affiliate of such Lender or bank.  Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent," shall mean such successor administrative agent and/or supplemental administrative agent, as the case may be, and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated.  After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX and Sections 10.04 and 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement.  If no successor agent has accepted appointment as the Administrative Agent by the date which is thirty (30) days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  Upon the acceptance of any appointment as the Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (a) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (b) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, the Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as the Administrative Agent.

Section 9.10    Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on any Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)  to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.06 and 10.04) allowed in such judicial proceeding; and

(b)  to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative

Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.06 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.11    Collateral and Guarantee Matters.  The Lenders irrevocably agree:

(a)  that any Lien on any property granted to or held by the Administrative Agent under any Loan Document shall be automatically released (i) upon payment in full of all Obligations (other than (x) obligations under Secured Hedge Agreements, (y) Cash Management Obligations and (z) contingent reimbursement and indemnification obligations not yet accrued and payable), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than a Loan Party, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such greater number of Lenders as may be required pursuant to Section 10.01), or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty under the Guarantee and Security Agreement pursuant to clause (c) below;

(b)  (i) to release or subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i) and (ii) that the Administrative Agent is authorized (but not required) to release or subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by any other clause of Section 7.01; and

(c)  that any Guarantor shall be automatically released from its obligations under the Guarantee and Security Agreement if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; *provided* that no such release shall occur if such Guarantor continues to be a guarantor in respect of any Junior Financing.

Upon request by the Administrative Agent at any time, the Required Lenders (or such greater number of Lenders as may be required pursuant to Section 10.01) will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guarantee and Security Agreement pursuant to this Section 9.11.  In each case as specified in this Section 9.11, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the Company's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guarantee and Security Agreement, in each case in accordance with the terms of the Loan Documents and this Section 9.11.

Section 9.12    Other Agents; Arranger and Managers.  None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent," "bookrunner" or "lead arranger" shall have any right, power, obligation, liability, responsibility or duty under this

- 85 -

Agreement other than those applicable to all Lenders as such.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender.  Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

Section 9.13    <u>Appointment of Supplemental Administrative Agents</u>.  (a)  It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Administrative Agent**" and collectively as "**Supplemental Administrative Agents**").

(b)  In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)  Should any instrument in writing from the Company, Holdings or any other Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Company or Holdings, as applicable, shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

## ARTICLE X

## MISCELLANEOUS

Section 10.01    <u>Amendments, Etc</u>.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Company or any other Loan Party therefrom, shall be effective unless in writing

509600-0292-11211-Active.11784882.7

signed by the Required Lenders and the Company or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)  postpone any date scheduled for, or reduce or forgive the amount of, any payment of principal or interest under Section 2.05 or Section 2.06 without the written consent of each Lender directly affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(b)  reduce or forgive the principal of, or the rate of interest specified herein on, any Loan or (subject to clause (i) of the second proviso to this Section 10.01) any fees (including fees set forth in Section 2.06 or other amounts payable hereunder or under any other Loan Document), or extend, postpone or waive the date upon which any fees are to be paid, without the written consent of each Lender directly affected thereby; *provided* that, only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;

(c)  change any provision of this Section 10.01, the definition of "Required Lenders" or "Pro Rata Share", the third sentence of Section 2.09(a), Section 2.10, Section 8.03 or Section 10.07(a)(x) without the written consent of each Lender affected thereby;

(d)  release or subordinate all or substantially all of the Liens or Collateral granted to the Secured Parties under any Loan Document in any transaction or series of related transactions, without the written consent of each Lender; or

(e)  release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

and *provided further* that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (ii) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; and (iii) the consent of Lenders holding more than 50% of any Class of Loans shall be required with respect to any amendment that by its terms adversely affects the rights of such Class in a manner different than such amendment affects other Classes.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the principal of the Loans of such Lender may not be reduced or forgiven without the consent of such Lender (it being understood that any Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders).

Notwithstanding anything to the contrary contained in Section 10.01, guarantees, collateral security documents and related documents executed by Foreign Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Company without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

- 87 -

        Section 10.02    <u>Notices and Other Communications; Facsimile Copies</u>. (a) *General*. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

        (i)    if to any Borrower or the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties:

| | |
|---|---|
| Any Borrower: | The Reader's Digest Association, Inc. |
| | Reader's Digest Road |
| | Pleasantville, NY 10570 |
| | Attention: Treasurer |
| | Telephone number:  914-244-7683 |
| | Facsimile number:  914-244-5904 |
| | Electronic mail address:  william.magill@rd.com |
| | Website address:  www.rd.com |
| | |
| | With copies to (which shall not constitute a notice hereunder): |
| | |
| | Kirkland & Ellis LLP |
| | 601 Lexington Avenue |
| | New York, NY 10022 |
| | Attention:  Leonard Klingbaum |
| | Telephone number:  212-446-4792 |
| | Facsimile number:  212-446-6460 |
| | Electronic mail address: leonard.klingbaum@kirkland.com |
| | |
| The Administrative Agent: | JPMorgan Chase Bank, N.A. |
| | 277 Park Avenue, 8th Floor |
| | New York, NY 10172 |
| | Attention:  Elizabeth A. Kelley |
| | Telephone number:  212-622-4511 |
| | Facsimile number:  212-622-4557 |
| | Electronic mail address: elizabeth.kelley@jpmorgan.com |
| | |
| | With a copy to: |
| | |
| | JPMorgan Chase Loan & Agency Services |
| | 1111 Fannin, Floor 10 |
| | Houston, TX 77002 |
| | Attention:  Maryann T. Bui |
| | Telephone number:  713-750-7932 |
| | Facsimile number:  713-750-2878 |
| | Electronic mail address: maryann.t.bui@jpmchase.com |

        (ii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile

- 88 -

number, electronic mail address or telephone number as shall be designated by such party in a notice to the Company and the Administrative Agent.

All such notices and other communications shall be deemed to be given or made, if given or made during the recipient's normal business hours (and if not, shall be deemed to be given or made on the next succeeding Business Day), upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(d)), when delivered; *provided* that notices and other communications to the Administrative Agent pursuant to Article II shall not be effective until actually received by the Administrative Agent.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)  *Effectiveness of Facsimile Documents and Signatures.*  Loan Documents may be transmitted and/or signed by facsimile or "PDF" (subject to Section 10.02(d)).  The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Agents and the Lenders.

(c)  *Reliance by Agents and Lenders.*  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Conversion or Continuation Notices) purportedly given by or on behalf of any Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrowers shall indemnify each Agent-Related Person and each Lender from all losses, liabilities and related reasonable out-of-pocket costs and expenses resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers in the absence of gross negligence or willful misconduct.  All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

(d)  *Electronic Communications.*  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Articles II and III, if such Lender has notified the Administrative Agent that it is incapable of receiving notices thereunder by electronic communication.  The Administrative Agent or the Borrowers may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.  Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(e)  *Designation by German Borrower.*  The German Borrower hereby designates the Company as its representative and agent on its behalf for the purposes of giving and receiving all notices

- 89 -

(other than Conversion or Continuation Notices) and any other documentation required to be delivered to it pursuant to this Agreement and any other Loan Document by the Administrative Agent or any Lender. The Company hereby accepts such appointment.  The Agents and the Lenders may regard any notice (other than Conversion or Continuation Notices) or other communication pursuant to any Loan Document from the Company as a notice or communication from all Borrowers, and may give any notice or communication required or permitted to be given to the German Borrower hereunder to the Company on behalf of the German Borrower.  The German Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Company shall be deemed for all purposes to have been made by the German Borrower and shall be binding upon and enforceable against the German Borrower to the same extent as if the same had been made directly by the German Borrower.

Section 10.03    No Waiver; Cumulative Remedies.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04    Attorney Costs, Expenses and Taxes.  The Company agrees (a) to pay or reimburse the Administrative Agent, the Syndication Agent, the Arranger and the Specified Lenders for all reasonable documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all (i) Attorney Costs of one lead counsel in each relevant jurisdiction and (ii) costs of Moelis, J.H. Cohn and other advisors to the Administrative Agent, in the case of this clause (ii) accrued through the completion of the transactions contemplated by the Reorganization Plan and (b) to pay or reimburse the Administrative Agent, the Syndication Agent, the Arranger and each Lender for all reasonable documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any negotiations, workouts, restructurings or legal proceedings, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of one lead counsel in each relevant jurisdiction and the fees and disbursements of any financial advisor or third party consultants or appraisers to and of the Administrative Agent).  The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees and taxes related thereto, and other reasonable and out-of-pocket expenses incurred by any Agent.  The agreements in this Section 10.04 shall survive the repayment of all Obligations.  All amounts due under this Section 10.04 shall be paid within ten (10) Business Days of receipt by the Company of an invoice relating thereto setting forth such expenses in reasonable detail.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

Section 10.05    Indemnification by the Company.  Whether or not the transactions contemplated hereby are consummated, the Company shall indemnify and hold harmless each Agent-Related Person, each Lender and their respective Affiliates, and directors, officers, employees, counsel, agents, trustees, investment advisors and attorneys-in-fact of each of the foregoing (collectively, the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments and suits and related reasonable out-of-pocket expenses (including Attorney Costs) of any kind

or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance, administration, amendment, modification or waiver of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Loan or the use or proposed use of the proceeds therefrom, or (c) to the extent relating to or arising from any of the foregoing, any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned, leased or operated by any Group Member, or any Environmental Liability related in any way to any Group Member, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits or expenses are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, any Affiliate of such Indemnitee or any officer, director, employee, advisor, representative or agent of such Indemnitee or any such Affiliate.  No Indemnitee shall be liable to any Group Member for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement.  No Indemnitee shall be liable (whether direct or indirect, in contract, tort or otherwise) to any Group Member except to the extent such liability is found in a non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, any Affiliate of such Indemnitee or any officer, director, employee, advisor, representative or agent of such Indemnitee or any such Affiliate.  No Indemnitee shall have any liability to any Group Member, nor any Group Member to any Indemnitee, for any special, punitive, indirect or consequential damages (including, without limitation, loss of profits, business or anticipated savings) relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date).  All amounts due under this Section 10.05 shall be paid within ten (10) Business Days after demand therefor; provided, however, that such Indemnitee shall promptly refund any amount received under this Section 10.05 to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification or contribution rights with respect to such payment pursuant to the express terms of this Section 10.05.  The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender and the repayment, satisfaction or discharge of all the Obligations.

Section 10.06    Payments Set Aside.  To the extent that any payment by or on behalf of the Company is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.

509600-0292-11211-Active.11784882.7

Section 10.07    Successors and Assigns.    (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (x) neither Holdings nor any Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and (y) no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or Section 10.07(i) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (other than (A) a natural person or (B) Holdings or any of its Subsidiaries or any of their respective Affiliates) ("**Assignees**") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent.

(ii)    Assignments shall be subject to the following additional conditions:

(1)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans of any Class, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 and in increments of $1,000,000 in excess thereof unless the Administrative Agent otherwise consents, *provided* that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(2)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided* that only one such fee shall be payable in the event of simultaneous assignments to or from two or more Approved Funds;

(3)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more Credit Contacts (as defined in the Administrative Questionnaire) to whom all syndicate-level information (which may contain material non-public information about Holdings, the Borrowers, the other Loan Parties and their Affiliates and related parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws; and

(4)  no assignment shall be effective unless and until such assignment is recorded in the Register.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis.

509600-0292-11211-Active.11784882.7

(c)  Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the relevant Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)  The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amounts (and related interest amounts) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, absent manifest error, and the Borrowers, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by any Borrower, the Administrative Agent and, with respect to its own Loans, any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)  Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than (A) a natural person or (B) Holdings or any of its Subsidiaries or any of their respective Affiliates) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that directly affects such Participant.  Subject to Section 10.07(f), the Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c) but shall not be entitled to recover greater amounts under such Sections than the selling Lender would be entitled to recover.  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.10 as though it were a Lender.  Each Lender that sells a participation with respect to a Loan shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Loan (the "**Participant Register**").  The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is

- 93 -

recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)   A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 and 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the relevant Borrower's prior written consent.  A Participant shall not be entitled to the benefits of Section 3.01 unless the relevant Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the relevant Borrower, to comply with Section 10.15 as though it were a Lender.

(g)   Any Lender may at any time, without the consent of the Borrowers or the Administrative Agent, pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)   Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the relevant Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the relevant Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the commitment to lend of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the relevant Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)   Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may, without the consent of the Borrowers or the Administrative Agent, create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents.

509600-0292-11211-Active.11784882.7

Section 10.08    Confidentiality.  Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) on a need to know basis to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, investment advisors and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof); (b) to the extent requested by any Governmental Authority; (c) to the extent  required by applicable Laws or regulations or by any subpoena or similar legal process; (d) to any other party to this Agreement; (e) subject to an agreement for the benefit of the Company containing provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Company), to any pledgee referred to in Section 10.07(g), counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement; (f) with the written consent of the Company; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08; (h) to any Governmental Authority or examiner (including the National Association of Insurance Commissioners or any other similar organization) regulating any Lender; (i) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender); or (j) in connection with the exercise of any remedies hereunder, under any other Loan Document or any legal action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder.  In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents and the Loans.  For the purposes of this Section 10.08, "**Information**" means all information received from any Loan Party relating to any Loan Party or its business, other than any such information that is publicly available to any Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08; provided that, in the case of information received from a Loan Party after the date hereof, such information (i) is clearly identified at the time of delivery as confidential or (ii) is delivered pursuant to Section 6.01, 6.02 or 6.04 hereof.

**EACH LENDER ACKNOWLEDGES THAT INFORMATION FURNISHED TO IT PURSUANT TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING HOLDINGS, THE BORROWERS, THE OTHER LOAN PARTIES AND THEIR AFFILIATES AND RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

**ALL INFORMATION, INCLUDING WAIVERS AND AMENDMENTS, FURNISHED BY HOLDINGS, THE BORROWERS OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT HOLDINGS, THE BORROWERS, THE OTHER LOAN PARTIES AND THEIR AFFILIATES AND RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO HOLDINGS, THE BORROWERS AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS**

509600-0292-11211-Active.11784882.7

**COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

Section 10.09    Setoff.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates is authorized at any time and from time to time, without prior notice to the Company or any other Loan Party, any such notice being waived by the Company (on its own behalf and on behalf of each Loan Party and its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness; *provided* that, in the case of any such deposits or other Indebtedness for the credit or the account of any Foreign Subsidiary, such set off may only be against any Obligations of Foreign Subsidiaries.  Each Lender agrees promptly to notify the Company and the Administrative Agent after any such set off and application made by such Lender; *provided*, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have.  Notwithstanding anything herein or in any other Loan Document to the contrary, in no event shall the assets of any Foreign Subsidiary that is not a Loan Party constitute collateral security for payment of the Obligations of the Company or any Domestic Subsidiary, it being understood that (a) the Equity Interests of any Foreign Subsidiary that is not a Loan Party do not constitute such an asset and (b) the provisions hereof shall not limit, reduce or otherwise diminish in any respect the Company's obligations to make any mandatory prepayment pursuant to Section 2.03(b)(i).

Section 10.10    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment, shall have been received by such Lender.

Section 10.11    Counterparts.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Agents may also require that any such documents and signatures delivered by telecopier be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier.

Section 10.12    Integration.  This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document (except the Intercreditor Agreement), the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.13    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Loan, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.14    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.15    Tax Forms.  (a)  Each Lender and Agent that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a "**Foreign Lender**") shall, to the extent it is legally entitled to do so, deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender or Agent under this Agreement or changes its Lending Office or place of organization (and from time to time thereafter upon the request of the Company or the Administrative Agent), whichever of the following is applicable:

(i)        duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(ii)       duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H to the effect that (A) such Foreign Lender is not (i) a "bank" described in Section 881(c)(3)(A) of the Code, (ii) a "10 percent shareholder" of the applicable Borrower within the meaning of Section 881(c)(3)(B) of the Code or (iii) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (B) the interest payments in question are not effectively connected with the United States trade or business conducted by such Lender (a "**U.S. Tax Compliance Certificate**") and (y) duly completed copies of Internal Revenue Service Form W-8BEN,

(iv)      to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), an Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, U.S. Tax Compliance Certificate, Form W-9, and/or other certification documents from each beneficial owner, as applicable;

- 97 -

provided that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate on behalf of each such beneficial owner, or

(v)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers to determine the withholding or deduction required to be made.

(b)    Each Lender and Agent that is a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a "**United States Lender**") shall deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Lender or Agent becomes a Lender or Agent under this Agreement or changes its Lending Office or place of organization (and from time to time thereafter upon the request of the Company or the Administrative Agent) properly completed copies of Internal Revenue Service Form W-9, certifying that such Lender or Agent, as applicable, is entitled to an exemption from United States backup withholding tax, or any successor form.

(c)    Each Lender and Agent that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which a Borrower is formed or organized, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to such Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by such Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding, or at a reduced rate, provided that such Lender or Agent is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.  Each Lender and Agent shall promptly notify such Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)    No Borrower shall be required to pay any additional amounts under Section 3.01(a) or indemnity with respect to such Taxes under Section 3.01(c) to (A) any Foreign Lender if such Foreign Lender shall have failed to satisfy the provisions of Section 10.15(a), (B) any United States Lender if such United States Lender shall have failed to satisfy the provisions of Section 10.15(b); or (C) any Lender if such Lender shall have failed to satisfy the provisions of Section 10.15(c); *provided*, that (i) if such Lender shall have satisfied the requirement of this Section 10.15, as applicable, on the date such Lender became a Lender or the date a CAM Exchange occurred, or ceased to act for its own account with respect to any payment under any of the Loan Documents, nothing in this Section 10.15 shall relieve any Borrower of its obligation to pay any amounts pursuant to Section 3.01 in the event that, as a result of any change in any applicable Law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender or other Person for the account of which such Lender receives any sums payable under any of the Loan Documents is not subject to withholding or is subject to withholding at a reduced rate and (ii) nothing in this Section 10.15(d) shall relieve any Borrower of its obligation to pay any amounts pursuant to Section 3.01 in the event that the requirements of Section 10.15 have not been satisfied if such Borrower is entitled, under applicable Law, to rely on any applicable forms and statements required to be provided under this Section 10.15 by the Lender that does not act or has ceased to act for its own account under any of the Loan Documents, including in the case of a typical participation, and such Lender has provided such required forms and statements.

- 98 -

(e)  Each Lender agrees that if any form or certification previously delivered by it expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company and the Administrative Agent in writing of its legal inability to do so. Notwithstanding anything to the contrary herein, no Lender or Agent shall be required to deliver any form, certificate or other document pursuant to this Section 10.15 that such Lender or Agent is not legally able to deliver.

(f)  The Administrative Agent may deduct and withhold any taxes required by any Laws to be deducted and withheld from any payment under any of the Loan Documents.

SECTION 10.16    GOVERNING LAW.  THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Section 10.17    Submission To Jurisdiction; Waivers.  (a)  Each Loan Party hereby irrevocably and unconditionally:

(i)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of (i) any State or Federal court of competent jurisdiction sitting in New York County, New York and (ii) appellate courts from any thereof;

(ii)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid at its address set forth in Section 10.02 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(iv)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right of the Administrative Agent or the Lenders to sue in any other jurisdiction; and

(v)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

SECTION 10.18    WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR

509600-0292-11211-Active.11784882.7

A COPY OF THIS SECTION 10.18 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 10.19    Binding Effect.  This Agreement shall become effective upon the satisfaction or waiver of the conditions precedent set forth in Article IV and thereafter shall be binding upon and inure to the benefit of the Borrowers, each Agent and each Lender and their respective permitted successors and assigns, except that no Borrower shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders.

Section 10.20    Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent.  The provision of this Section 10.20 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.21    USA PATRIOT Act.  Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name, address and tax identification numbers of the Loan Parties and other information that will allow such Lender to identify the Loan Parties in accordance with the Act.

Section 10.22    Agent for Service of Process.  The Company agrees that promptly following request by the Administrative Agent it shall cause each Foreign Subsidiary which is a Loan Party to appoint and maintain an agent reasonably satisfactory to the Administrative Agent to receive service of process in New York City on behalf of such Foreign Subsidiary.

Section 10.23    German Tax Confirmation.  (a)  If, at any time after the Closing Date, with respect to interest owed for any period prior to 2008, the German Borrower determines that a confirmation by the Administrative Agent and/or each of the German Term Lenders substantially in the form of the Decree issued by the German Federal Ministry of Finance as of October 20, 2005 (substantially in the form of Exhibit L, the "**Tax Confirmation**") may be required under the decrees to § 8a of the German Corporate Income Tax Act (*Körperschaftsteuergesetz or KStG*) dated July 15, 2004, July 22, 2005, and October 20, 2005 (as in effect on the date hereof, the "**Decrees**") with respect to the German Term Loans, the German Borrower may prepare and deliver to the German Term Lenders (through the Administrative Agent) a complete and accurate draft Tax Confirmation listing all guarantees and security interests securing the claims of the German Term Lenders under the Loan Documents and the Secured Hedge Agreements and provide to the German Term Lenders any further information which may reasonably be required by the Administrative Agent or any German Term Lender to issue the Tax Confirmation (based on the then applicable practice of the German tax authorities), such information to be requested within fifteen (15) Business Days after the delivery of the draft Tax Confirmation by the German Borrower to the German Term Lenders (through the Administrative Agent).

(b)  The Tax Confirmation shall only include factual but not legal statements to be issued by the German Term Lenders.  The Tax Confirmation shall not contain any statement that any German Term Lender is not permitted to issue by law, administrative rule or regulation of the jurisdiction to which the relevant German Term Lender is subject.

- 100 -

(c)  Each German Term Lender (including any Person that becomes a German Term Lender subsequent to the date hereof pursuant to Section 10.07) hereby authorizes the Administrative Agent on behalf of such German Term Lender to issue a Tax Confirmation and provide it to the German Borrower within sixteen (16) Business Days after such German Term Lender's receipt of the following (which receipt shall be deemed to have occurred upon the Administrative Agent's posting of the following to Intralinks or other similar information transmission system):

(i)        the German Borrower's request therefor,

(ii)        a complete and accurate draft of such Tax Confirmation listing all guarantees and security interests pursuant to clause (a) above, and

(iii)        all further information reasonably requested within the period set forth for such request pursuant to clause (a) above to enable the German Term Lenders to complete such Tax Confirmation,

unless such German Term Lender notifies the Administrative Agent within the 15-Business Day period described in clause (a) above that (x) it is prohibited from doing so by law, administrative rule or regulation of the jurisdiction to which such German Term Lender is subject or (y) it has reasonably determined that the factual information provided by the German Borrower is not correct or not complete or, in the view of such German Term Lender (acting in good faith), is misleading or (z) such German Term Lender has not been released from confidentiality obligations to any Loan Party under applicable banking secrecy rules with respect to confidential information with respect to such Loan Party contained in such Tax Confirmation or, to the extent applicable, has not been instructed to disclose any such information by the relevant Loan Party.  Subject to the terms of the preceding sentence, within the 16-Business Day period set forth above, the Administrative Agent acting also on behalf of the German Term Lenders shall issue and provide to the German Borrower the requested Tax Confirmation.

(d)  The Company agrees to pay or reimburse the Administrative Agent and each German Term Lender for all reasonable expenses incurred in connection with any Tax Confirmation in accordance with the principles set forth in Section 10.04, including Attorney Costs.  The Company shall indemnify and hold harmless each Indemnitee from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments and suits and related reasonable expenses (including all reasonable Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with any Tax Confirmation in accordance with the principles set forth in Section 10.05.  The agreements in this clause (d) shall survive the resignation of the Administrative Agent, the replacement of any Lender and repayment, satisfaction or discharge of all other Obligations.

(e)  The German Borrower confirms to the Administrative Agent and each German Term Lender that (i) the German Term Lenders will issue their respective Tax Confirmations exclusively at the request of the German Borrower and solely for the purpose of providing information to the German tax authorities as required pursuant to the Decrees, (ii) the German Term Lenders are not responsible for examining any Borrower's tax position or for achieving any certain tax treatment with respect to any Borrower and (iii) no Loan Party will raise any claims against the Administrative Agent or any German Term Lender based on, or in connection with, any Tax Confirmation and no German Term Lender will have any liability to any Loan Party with respect to any Tax Confirmation (other than, subject to the principles of Section 10.05, for failure to comply with the last sentence of Section 10.23(c)).

(f)  It is the common understanding of the parties hereto that no party is providing any legal and/or tax advice to any other party with respect to this Agreement or, in particular, with respect to

- 101 -

the application of § 8a KStG and the interpretation of § 8a KStG in the Decrees, and that it is the responsibility of each party, in particular each Loan Party, to consult with its own legal/tax advisers.

(g)  Each Loan Party releases each German Term Lender from its duty of confidentiality and/or obligation of bank secrecy (Bankgeheimnis) with regard to the issuance of a Tax Confirmation to the German Borrower and its submission to the German tax authorities.

(h)  If, after the date of this Agreement, changes occur to German tax legislation or its interpretation materially prejudicing the tax treatment of interest payments of the German Borrower, the Administrative Agent and the German Term Lenders agree that they will negotiate in good faith (without any legal obligation to agree) with the Company and the German Borrower to restructure the Collateral securing the German Term Loans to seek to reduce the impact of such materially prejudicial tax treatment while retaining Collateral acceptable to the German Term Lenders.

Section 10.24    Acknowledgements.  Each Loan Party hereby acknowledges that:

(a)  it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)  neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent and Lenders, on one hand, and the Loan Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)  no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Loan Parties and the Lenders.

Section 10.25    Releases of Guarantee and Lien

(a)  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 10.01) to take any action reasonably requested by the Company having the effect of releasing any Collateral or Guarantee Obligations (i) to the extent necessary to permit any Disposition of the applicable Collateral or Guarantor, in each case as permitted by the Loan Documents or that has been consented to in accordance with Section 10.01 or (ii) under the circumstances described in paragraph (b) below.

(b)  Subject to the terms of the Intercreditor Agreement, at such time as the Loans and the other Obligations under the Loan Documents shall have been paid in full, the Collateral shall be automatically released from the Liens created by the Collateral Documents, and the Collateral Documents (other than with respect to the provisions thereof expressly stated to survive termination) shall automatically terminate, all without delivery of any instrument or performance of any act by any Person.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

509600-0292-11211-Active.11784882.7

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**[REORGANIZED RDA HOLDING CO.]**

by

_____
Name:
Title:

**[REORGANIZED THE READER'S DIGEST
ASSOCIATION, INC.]**

by

_____
Name:
Title:

**RD GERMAN HOLDINGS GMBH**

by

_____
Name:
Title:

**JPMORGAN CHASE BANK, N.A.**, as
Administrative Agent and a Lender

by _____

Name:
Title:

# EXHIBIT B

### Form of the New Second Priority Term Loan Agreement

Article IV.H of the Plan provides that, on the Effective Date, the Reorganized Debtors will enter into the New Second Priority Term Loan Agreement, substantially in the form attached hereto, subject to the approval of the Bankruptcy Court and entry of the Confirmation Order.

[This Page Intentionally Left Blank]

STB Draft 12/11/09

SECOND LIEN CREDIT AGREEMENT

Dated as of [_____], 20[__]

among

[REORGANIZED RDA HOLDING CO.],

[REORGANIZED THE READER'S DIGEST ASSOCIATION, INC.],

The Lenders Party Hereto

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

J.P. MORGAN SECURITIES INC.,
as Sole Lead Arranger and Sole Bookrunner

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ................................................. 1

Section 1.01    Defined Terms ................................................................. 1
Section 1.02    Other Interpretive Provisions ...................................... 31
Section 1.03    Accounting Terms ........................................................ 31
Section 1.04    Rounding ...................................................................... 31
Section 1.05    References to Agreements, Laws, Etc .......................... 31
Section 1.06    Times of Day ................................................................ 32
Section 1.07    Timing of Payment of Performance ............................ 32
Section 1.08    Currency Equivalents Generally .................................. 32
Section 1.09    Change of Currency ...................................................... 32

ARTICLE II THE LOANS ......................................................................................... 32

Section 2.01    The Loans ...................................................................... 32
Section 2.02    Conversions and Continuations of Loans ................... 33
Section 2.03    Prepayments ................................................................. 33
Section 2.04    Repayment of Loans ..................................................... 35
Section 2.05    Interest .......................................................................... 35
Section 2.06    Fees ............................................................................... 36
Section 2.07    Computation of Interest and Fees ................................ 36
Section 2.08    Evidence of Indebtedness ............................................ 36
Section 2.09    Payments Generally ..................................................... 37
Section 2.10    Sharing of Payments .................................................... 38
Section 2.11    Intercreditor Agreement .............................................. 39
Section 2.12    No Requirement of Lender Signatures ........................ 39

ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY ............................ 39

Section 3.01    Taxes ............................................................................. 39
Section 3.02    Illegality ....................................................................... 41
Section 3.03    Inability to Determine Rates ........................................ 41
Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on
                Eurodollar Rate Loans ................................................. 41
Section 3.05    Funding Losses ............................................................. 43
Section 3.06    Matters Applicable to All Requests for Compensation ................ 43
Section 3.07    Replacement of Lenders under Certain Circumstances ................ 44
Section 3.08    Survival ......................................................................... 44

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ........................................... 45

ARTICLE V REPRESENTATIONS AND WARRANTIES ................................................................. 47

Section 5.01    Existence, Qualification and Power; Compliance with Laws ................ 47
Section 5.02    Authorization; No Contravention ................................. 47
Section 5.03    Governmental Authorization; Other Consents ............. 47
Section 5.04    Binding Effect ............................................................... 47

- i -

Section 5.05      Financial Statements; No Material Adverse Effect ....................................... 48
Section 5.06      Litigation.................................................................................................... 48
Section 5.07      No Default.................................................................................................. 48
Section 5.08      Ownership of Property; Liens ..................................................................... 48
Section 5.09      Environmental Compliance ........................................................................ 49
Section 5.10      Taxes.......................................................................................................... 49
Section 5.11      ERISA Compliance .................................................................................... 50
Section 5.12      Subsidiaries; Equity Interests .................................................................... 50
Section 5.13      Margin Regulations; Investment Company Act ........................................... 50
Section 5.14      Disclosure .................................................................................................. 51
Section 5.15      Intellectual Property; Licenses, Etc ........................................................... 51
Section 5.16      Solvency .................................................................................................... 51
Section 5.17      Labor Matters ............................................................................................. 51
Section 5.18      Collateral.................................................................................................... 51
Section 5.19      Regulation H .............................................................................................. 52
Section 5.20      Certain Documents ..................................................................................... 52

ARTICLE VI AFFIRMATIVE COVENANTS.................................................................... 52

Section 6.01      Financial Statements.................................................................................. 52
Section 6.02      Certificates; Other Information ................................................................. 54
Section 6.03      Update Calls .............................................................................................. 55
Section 6.04      Notices ...................................................................................................... 56
Section 6.05      Payment of Obligations ............................................................................. 56
Section 6.06      Preservation of Existence, Etc.................................................................... 56
Section 6.07      Maintenance of Properties ......................................................................... 56
Section 6.08      Maintenance of Insurance .......................................................................... 56
Section 6.09      Compliance with Laws ............................................................................... 57
Section 6.10      Inspection Rights; Books and Records; Discussions..................................... 57
Section 6.11      Covenant to Guarantee Obligations and Give Security .................................. 57
Section 6.12      Compliance with Environmental Laws........................................................ 59
Section 6.13      Further Assurances ..................................................................................... 60
Section 6.14      Deposit Accounts ....................................................................................... 61
Section 6.15      Ratings ...................................................................................................... 62
Section 6.16      Post-Closing Covenants ............................................................................. 62

ARTICLE VII NEGATIVE COVENANTS........................................................................ 62

Section 7.01      Liens .......................................................................................................... 62
Section 7.02      Investments ................................................................................................ 65
Section 7.03      Indebtedness............................................................................................... 68
Section 7.04      Fundamental Changes ................................................................................. 70
Section 7.05      Dispositions................................................................................................ 70
Section 7.06      Restricted Payments ................................................................................... 72
Section 7.07      Change in Nature of Business ..................................................................... 72
Section 7.08      Transactions with Affiliates ........................................................................ 72
Section 7.09      Burdensome Agreements ............................................................................ 73
Section 7.10      Financial Condition Covenants ................................................................... 73
Section 7.11      Sale and Leaseback Transactions ................................................................ 74
Section 7.12      Swap Contracts........................................................................................... 74
Section 7.13      Accounting Changes................................................................................... 74

509600-0292-11782-Active.11854677.4

Section 7.14    Prepayments, Etc. of Indebtedness ................................................ 74
Section 7.15    Holding Company ................................................................ 74
Section 7.16    Capital Expenditures................................................................ 75

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES................................................ 75

Section 8.01    Events of Default................................................................ 75
Section 8.02    Remedies Upon Event of Default ................................................ 78
Section 8.03    Application of Funds ................................................................ 78

ARTICLE IX ADMINISTRATIVE AGENT AND OTHER AGENTS................................ 79

Section 9.01    Appointment and Authorization of Agents .................................... 79
Section 9.02    Delegation of Duties................................................................ 79
Section 9.03    Liability of Agents ................................................................ 80
Section 9.04    Reliance by Agents ................................................................ 80
Section 9.05    Notice of Default................................................................ 80
Section 9.06    Credit Decision; Disclosure of Information by Agents ................. 81
Section 9.07    Indemnification of Agents ...................................................... 81
Section 9.08    Agents in their Individual Capacities ........................................ 81
Section 9.09    Successor Agents................................................................ 82
Section 9.10    Administrative Agent May File Proofs of Claim .......................... 82
Section 9.11    Collateral and Guarantee Matters.............................................. 83
Section 9.12    Other Agents; Arranger and Managers .................................... 84
Section 9.13    Appointment of Supplemental Administrative Agents................ 84

ARTICLE X MISCELLANEOUS ................................................................ 85

Section 10.01    Amendments, Etc ................................................................ 85
Section 10.02    Notices and Other Communications; Facsimile Copies ................ 86
Section 10.03    No Waiver; Cumulative Remedies ............................................ 88
Section 10.04    Attorney Costs, Expenses and Taxes........................................ 88
Section 10.05    Indemnification by the Borrower .............................................. 88
Section 10.06    Payments Set Aside ................................................................ 89
Section 10.07    Successors and Assigns .......................................................... 89
Section 10.08    Confidentiality................................................................ 92
Section 10.09    Setoff ................................................................ 93
Section 10.10    Interest Rate Limitation ........................................................ 94
Section 10.11    Counterparts ................................................................ 94
Section 10.12    Integration ................................................................ 94
Section 10.13    Survival of Representations and Warranties ............................ 94
Section 10.14    Severability ................................................................ 95
Section 10.15    Tax Forms ................................................................ 95
SECTION 10.16    GOVERNING LAW ................................................................ 96
Section 10.17    Submission To Jurisdiction; Waivers .................................... 97
SECTION 10.18    WAIVER OF RIGHT TO TRIAL BY JURY .......................... 97
Section 10.19    Binding Effect ................................................................ 97
Section 10.20    Lender Action................................................................ 97
Section 10.21    USA PATRIOT Act................................................................ 98
Section 10.22    Acknowledgements ................................................................ 98
Section 10.23    Releases of Guarantee and Lien .............................................. 98

509600-0292-11782-Active.11854677.4

SCHEDULES

| 1.01A | Certain Collateral Documents |
|-------|------------------------------|
| 1.01B | Mortgaged Properties |
| 1.01C | Designated Non-Debtors |
| 2.01 | Loans |
| 5.11(c) | Foreign Benefits Matters |
| 5.12 | Subsidiaries and Other Equity Investments |
| 5.18 | Collateral Matters |
| 6.16 | Post-Closing Matters |
| 7.01(b) | Existing Liens |
| 7.02(c) | Permitted Investments |
| 7.02(f) | Existing Investments |
| 7.03(b) | Existing Indebtedness |
| 7.04(e) | Permitted Changes |
| 7.05(i) | Specified Dispositions |
| 7.08 | Transactions with Affiliates |
| 7.09 | Existing Restrictions |

EXHIBITS

*Form of*

| A | Conversion or Continuation Notice |
|---|-----------------------------------|
| B | Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | Guarantee and Security Agreement |
| F | Opinion of Kirkland & Ellis LLP |
| G | Mortgage |
| H | U.S. Tax Compliance Certificate |
| I | Intercreditor Agreement |

509600-0292-11782-Active.11854677.4

## CREDIT AGREEMENT

This SECOND LIEN CREDIT AGREEMENT ("**Agreement**") is entered into as of [_____], 20[__], among [RESTRUCTURED RDA HOLDING CO.], a Delaware corporation ("**Holdings**"), [RESTRUCTURED THE READER'S DIGEST ASSOCIATION, INC.], a Delaware corporation (the "**Borrower**"), JPMORGAN CHASE BANK, N.A., as Administrative Agent, and the several banks and other financial institutions or entities from time to time parties to this Agreement (consisting initially of the holders of Prepetition Credit Agreement Claims (as defined below)) (collectively, the "**Lenders**" and each a "**Lender**").

### PRELIMINARY STATEMENTS

On August 24, 2009 (the "**Petition Date**"), Holdings and certain of its Subsidiaries (collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court (such term and other capitalized terms used in these preliminary statements being used with the meanings given to such terms in Section 1.01) initiating the Cases and continued in the possession of their assets and in the management of their businesses pursuant to Bankruptcy Code Sections 1107 and 1108.

On [_____], 20[__], the Bankruptcy Court entered the Confirmation Order confirming the Debtors' [Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated [_____], 2009] (as in effect on the date of confirmation thereof and as thereafter may be amended as provided in this agreement, the "**Reorganization Plan**").

In connection with the confirmation and consummation of the Reorganization Plan, the reorganized Debtors shall issue to the holders of Prepetition Credit Agreement Claims certain second lien term loans, and in partial satisfaction of the Prepetition Credit Agreement Claims, the holders of the Prepetition Credit Agreement Claims shall automatically become parties to this Agreement on the Effective Date.

Accordingly, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"**Administrative Agent**" means JPMorgan Chase Bank, in its capacity as administrative agent under any of the Loan Documents, or any permitted successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth in Section 10.02 or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders in writing (including by electronic mail or by posting to Intralinks or other similar information transmission systems).

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control

with the Person specified.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"**Agents**" means, collectively, the Administrative Agent and the Supplemental Administrative Agents (if any).

"**Agreement**" has the meaning specified in the introductory paragraph hereto.

"**Alternative Currency**" means Sterling, Euros, Canadian Dollars or Australian Dollars.

"**Applicable Rate**" means a percentage per annum equal to (a) 11% with respect to Base Rate Loans and (b) 12% with respect to Eurodollar Rate Loans.

"**Approved Bank**" has the meaning specified in clause (c) of the definition of "Cash Equivalents".

"**Approved Fund**" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Arranger**" means J.P. Morgan Securities Inc., in its capacity as Sole Lead Arranger and Sole Bookrunner under this Agreement.

"**Assignees**" has the meaning specified in Section 10.07(b).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit D.

"**Attorney Costs**" means and includes all reasonable fees, expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Audited Financial Statements**" means the audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as of each of June 30, 2007, June 30, 2008 and June 30, 2009, and the related audited consolidated statements of income, stockholders' equity and cash flows for the Borrower and its consolidated Subsidiaries for the periods ended on such dates.

"**Australian Dollars**" means the lawful currency of Australia.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§101 et seq.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Cases from time to time.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by JPMorgan Chase Bank as its "prime rate" and (c) the Eurodollar Rate for a Eurodollar Rate Loan with a one month Interest Period plus 1%. The "prime rate" is a rate set by JPMorgan Chase Bank based upon various factors including JPMorgan Chase Bank costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by JPMorgan Chase Bank shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Board**" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" has the meaning specified in the introductory paragraph to this Agreement.

"**Borrowing**" means a deemed making of Loans pursuant to Section 2.01.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located or in The City of New York; *provided*, that when used in connection with a Eurodollar Rate Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits in Dollars in the London interbank market.

"**Canadian Dollars**" means the lawful currency of Canada.

"**Capital Expenditures**" means, for any period, with respect to any Person, the aggregate of all expenditures by such Person and its consolidated Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that are required to be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries, but excluding (i) such expenditures that are made with all or any portion of any Net Cash Proceeds arising from Casualty Event or any Disposition which are reinvested, (ii) capitalized interest, (iii) such expenditures for which such Person is reimbursed in cash by a third party (other than any Group Member), (iv) the purchase price of equipment that is purchased during such period to the extent the consideration therefor consists of (x) existing equipment traded in at the time of such purchase or (y) the proceeds of a concurrent sale of existing equipment, in each case in the ordinary course of business, (v) the book value of any asset owned by the Borrower or any Subsidiary prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such Person reusing or beginning to reuse such asset during such period without a corresponding capital expenditure actually having been made in such period; provided that (x) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made and (y) such book value shall have been included in Capital Expenditures when such asset was originally acquired and (vi) such expenditures made to fund the purchase price for assets acquired as part of a Permitted Acquisition.

"**Capital Lease Obligations**" means, the obligations of a Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of

509600-0292-11782-Active.11854677.4

such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Cases**" means the jointly administered chapter 11 cases of the Debtors captioned <u>In re The Reader's Digest Association, Inc.</u>, Case No. 09-23529 (RDD), arising upon the filing by the Debtors of voluntary petitions for relief with the Bankruptcy Court on the Petition Date.

"**Cash Election**" has the meaning specified in Section 2.05(b).

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(a)    Dollars, Euros or other Alternative Currency or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(b)    marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union, having average maturities of not more than 12 months from the date of acquisition thereof; *provided* that the full faith and credit of the United States or a member nation of the European Union is pledged in support thereof;

(c)    time deposits with, or certificates of deposit, overnight bank deposits or bankers' acceptances issued or guaranteed by, or money market deposit accounts issued or offered by, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development, and is a member of the Federal Reserve System, and (B) has combined capital and surplus of at least $250,000,000 (any such bank in the foregoing clauses (i) or (ii) being an "**Approved Bank**"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)    commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any commercial paper or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)    fully collateralized repurchase agreements entered into by any Person with a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of $250,000,000 for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union;

(f)    securities with average maturities of 12 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(g)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(h)    instruments equivalent to those referred to in clauses (a) through (g) above denominated in Euros or other Alternative Currency or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction; and

(i)    Investments in money market investment or similar programs which are registered under the Investment Company Act of 1940 or which are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (h) of this definition.

"**Cash Management Obligations**" means obligations owed by Holdings, the Borrower or any Subsidiary to any "Lender" or any "Affiliate" of a "Lender" under the First Lien Credit Agreement or any Lender or Affiliate of a Lender hereunder in respect of any overdraft and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds; provided that, prior to the First Priority Obligations Payment Date, any "Cash Management Obligations" under the First Lien Credit Agreement shall not be Cash Management Obligations hereunder.

"**Casualty Event**" means any event that gives rise to the receipt by Holdings, the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as subsequently amended.

"**CERCLIS**" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the U.S. Environmental Protection Agency.

"**Change of Control**" means the earliest to occur of:

(a)    after giving effect to the Reorganization Plan, the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Exchange Act and the rules of the SEC thereunder as in effect on the date hereof), of Equity Interests representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings;

(b)    after giving effect to the Reorganization Plan, the board of directors of Holdings ceasing to consist of a majority of the Continuing Directors; or

(c)    Holdings ceasing to own, directly, all of the outstanding Equity Interests in the Borrower.

"**Charges**" has the meaning specified in Section 10.10.

- 5 -

"**Closing Date**" means the first date all the conditions precedent in Article IV are satisfied or waived in accordance with Article IV.

"**Code**" means the U.S. Internal Revenue Code of 1986.

"**Collateral**" means all property of the Loan Parties, now or hereafter acquired, upon which a Lien in favor of the Secured Parties is purported to be created by any Collateral Document.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)      the Administrative Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Article IV(a)(iii) or pursuant to Section 6.11 at such time, duly executed by each Loan Party thereto;

(b)      all Obligations shall have been unconditionally guaranteed (the "**Guaranty**") by Holdings and each Subsidiary that is a Domestic Subsidiary (each, a "**Guarantor**"); provided that, prior to the First Priority Obligations Payment Date, any Subsidiary which is not a "Guarantor" under the First Lien Term Loan Documents shall not be required to be a Guarantor hereunder;

(c)      except as set forth in Section 6.16, the Obligations and the Guaranty shall have been secured by a security interest in (i) all the Equity Interests of the Borrower and (ii) all Equity Interests of each Subsidiary of the Borrower directly owned by the Borrower or any Guarantor, in each case having the priority required by the Collateral Documents; *provided* that pledges of Equity Interests of each Foreign Subsidiary, and of each Domestic Subsidiary substantially all of whose assets consist of Equity Interests of one or more Foreign Subsidiaries, shall be limited to 65% of the issued and outstanding Equity Interests of such Subsidiary at any time;

(d)      except to the extent otherwise permitted hereunder or under any Collateral Document, (i) to the extent governed by the Uniform Commercial Code, the execution of the Collateral Documents shall be effective to create a security interest in all Collateral described therein and proceeds thereof, in each case, to the extent constituting Collateral and with the priority required by the Collateral Documents and (ii) except as set forth in Section 6.16, all documents and instruments, including Uniform Commercial Code financing statements and filings made in respect of Intellectual Property constituting Collateral in the United States Patent and Trademark Office and the United States Copyright Office, reasonably requested by the Administrative Agent to be filed, registered or recorded to create the Liens intended to be created by the Collateral Documents and to perfect such Liens to the extent required by, and with the priority required by, the Collateral Documents, shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or recording;

(e)      none of the Collateral shall be subject to any Liens other than Liens permitted by Section 7.01; and

(f)      except as set forth in Section 6.16, the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to any Material Real Property described on Schedule 1.01B hereto or required to be delivered pursuant to Section 6.11 (the "**Mortgaged Properties**") duly executed and delivered by the record owner of such property, (ii) a policy or policies of title insurance issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a valid Lien on the property described therein, free of any other Liens except as expressly permitted by Section 7.01, together with such endorsements, coinsurance and

- 6 -

reinsurance as the Administrative Agent may reasonably request  and (iii) such surveys, abstracts, appraisals, legal opinions and other documents as the Administrative Agent may reasonably request with respect to any such Mortgaged Property.

The foregoing definition shall not require the perfection of pledges of or security interests in, or the obtaining of title insurance or surveys with respect to particular assets (including but not limited to Mortgaged Properties) if and for so long as, in the reasonable judgment of the Administrative Agent, the economic detriment to the Loan Parties of perfecting such pledges or security interests or the cost of perfecting such pledges or security interests in such assets or obtaining title insurance or surveys in respect of such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom. The Administrative Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets (including but not limited to Mortgaged Properties) of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection or obtaining title insurance cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents as in effect on the Closing Date and, to the extent appropriate in the applicable jurisdiction, as agreed between the Administrative Agent and the Borrower.

"**Collateral Documents**" means, collectively, the Guarantee and Security Agreement, the Mortgages, Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent and the Lenders pursuant to Section 6.11 or Section 6.16 and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Committee**" means the statutory unsecured creditors committee appointed in the Cases on August 31, 2009.

"**Compensation Period**" has the meaning specified in Section 2.09(c)(ii).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C.

"**Confirmation Order**" has the meaning specified in Article IV(g).

"**Consolidated EBITDA**" means, for any period, the Consolidated Net Income for such period, plus:

(a)    without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    total interest expense and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities,

- 7 -

(ii)    taxes and provision for taxes, including taxes based on income, profits or capital of the Borrower and its Subsidiaries and state, franchise and similar taxes and foreign withholding taxes paid or accrued during such period,

(iii)    depreciation and amortization,

(iv)    Non-Cash Charges,

(v)    (x) any costs, fees, expenses or disbursements of attorneys, auditors, consultants or advisors to the Borrower and its Subsidiaries and to the Committee, in each case, incurred in connection with the events leading up to and the ongoing administration of and completion of the Cases (until the closing thereof), the Reorganization Plan and the transactions contemplated thereby and any other financial restructuring and the negotiation, execution and documentation of the DIP Credit Agreement, the First Lien Credit Agreement, this Agreement and any amendments, waivers or other modifications to the Prepetition Credit Agreement or the DIP Credit Agreement, together with any such costs, fees, expenses or disbursements paid to the attorneys, auditors, consultants and advisors of the agents and lenders in connection therewith, and (y) any upfront, arrangement or other fees paid by the Loan Parties in connection with the DIP Credit Agreement, the First Lien Credit Agreement, and this Agreement, and any other financing entered into in connection with the Reorganization Plan and the transactions contemplated thereby.

(vi)    charges, premiums and expenses associated with the discharge of Prepetition Indebtedness,

(vii)    any deductions consisting of subsidiary income attributable to minority interests in Reader's Digest Association Ltd., except to the extent actually paid to a holder of Equity Interests in such Subsidiary (or any designee of such Person) other than the Borrower and its Subsidiaries (with such payments to be deducted in the period made),

(viii)    transaction costs, fees and expenses payable in connection with the incurrence of Indebtedness permitted under Section 7.03 (in each case whether or not any such incurrence is successful),

(ix)    any costs or expenses incurred by the Borrower or a Subsidiary pursuant to any management equity plan or stock option plan or other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of Holdings,

(x)    expenses resulting from liability or casualty events,

(xi)    non-cash charges pursuant to SFAS 158, and

(xii)    non-cash income or expenses from the continuation of purchase accounting adjustments in connection with the Transaction (as defined in the Prepetition Credit Agreement as in effect immediately prior to the effectiveness of the First Lien Credit Agreement), *less*

- 8 -

(xiii)    non-recurring and other one-time costs incurred by the Borrower or its Subsidiaries in connection with the reorganization of its and its Subsidiaries' business, operations and structure, including, without limitation, relating to the sale or closing of facilities, establishment of telephone hotlines, the hiring of temporary employees, severance, stay bonuses and curtailments or modifications to pension and post-retirement employee benefit plans, asset writedowns or asset disposals (including leased facilities), writedowns for purchase and lease commitments, start up costs for new facilities, writedowns of excess, obsolete or unbalanced inventories, relocation costs, including costs of moving and relocating personnel, equipment, facilities, personal property and inventory, which are not otherwise capitalized and any related promotional costs of exiting products or product lines and other restructuring costs associated with the Cases or the Reorganization Plan (to the extent not otherwise contemplated by the definition of Consolidated EBITDA), in an aggregate amount for all costs included in this clause (xiii) not to exceed (A)(x) $20,000,000 for the period beginning on the Closing Date and ending on December 31, 2010 and (y) $10,000,000 for each calendar year ended thereafter plus (B) the amount of any costs described above incurred in connection with any move of the Borrower's Canary Wharf operations in an aggregate amount not to exceed $25,000,000 during the term of this Agreement; provided, that to the extent that the aggregate amount of all costs included in clause (A) above for any calendar year is less than the maximum amount set forth therein, the amount of such difference may be carried forward to increase the maximum amount of costs permitted by clause (A) above for the next succeeding calendar year (it being understood that such costs in any calendar year shall be counted against the base amount set forth in clause (A) above with respect to such calendar year prior to being counted against any available carried forward amount with respect to such calendar year),

(xiv)    to the extent actually reimbursed, expenses incurred to the extent covered by indemnification provisions in any agreement in connection with a Permitted Acquisition, and

(xv)    foreign exchange losses resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its consolidated Subsidiaries,  less

(b)    without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    extraordinary gains and unusual or non-recurring gains,

(ii)    non-cash gains (excluding any ordinary course non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period),

(iii)    gains on asset sales (other than asset sales in the ordinary course of business),

(iv)    any net after-tax income from the early extinguishment of Indebtedness or hedging obligations or other derivative instruments,

(v)    all gains from sales of investments recorded using the equity method,

- 9 -

(vi)    foreign exchange gains resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its consolidated Subsidiaries, and

(vii)    any additions resulting from subsidiary losses attributable to minority interests in Reader's Digest Association Ltd.,

in each case, as determined on a consolidated basis for the Borrower and its Subsidiaries in accordance with GAAP; *provided* that, to the extent included in Consolidated Net Income,

(i)    there shall be excluded in determining Consolidated EBITDA currency translation gains and losses related to currency measurements of Indebtedness (including the net loss or gain resulting from Swap Contracts for currency exchange risk),

(ii)    there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of Statement of Financial Accounting Standards No. 133,

(iii)    there shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset sold, transferred or otherwise disposed of closed or classified as discontinued operations by the Borrower or any Subsidiary during such period (each such Person, property, business or asset so sold or disposed of, a "**Sold Entity or Business**"), based on the actual Disposed EBITDA of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer or disposition), and

(iv)    there shall be excluded in determining Consolidated EBITDA for any period any non-cash impact attributable to the Borrower's adoption of fresh-start accounting in accordance with GAAP upon effectiveness of the Reorganization Plan.

For the purpose of the definition of Consolidated EBITDA, "**Non-Cash Charges**" means (a) non-cash losses on asset sales, disposals or abandonments (other than of current assets), (b) any impairment charge or asset write-off related to intangible assets, long-lived assets, and investments in debt and equity securities pursuant to GAAP, (c) all losses from investments recorded using the equity method, (d) stock-based awards compensation expense, and (e) other non-recurring non-cash charges (*provided* that if any non-cash charges referred to in this clause (e) represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to such extent, and excluding non-cash charges consisting of amortization of a prepaid cash item that was paid in a prior period).  Notwithstanding the foregoing, Consolidated EBITDA for the fiscal quarters ending March 31, 2009, June 30, 2009 and September 30, 2009 shall be deemed to be $[17,240,000], $[82,955,000] and $[1,449,000], respectively.

"**Consolidated EBITDA Event**" means that for the period of twelve months most recently ended on or prior to the Interest Period for which the Borrower makes an Interest Election, Consolidated EBITDA for the Borrower and its consolidated Subsidiaries shall be less than $180,000,000.

"**Consolidated Fixed Charge Coverage Ratio**" means, for any Test Period, the ratio of (a) Consolidated EBITDA for such Test Period to (b) Consolidated Fixed Charges for such Test Period.

- 10 -

"**Consolidated Fixed Charges**" means, for any Test Period, the sum (without duplication) of (a) Consolidated Interest Expense for such Test Period, (b) the aggregate amount actually paid by the Borrower and its consolidated Subsidiaries during such Test Period on account of Capital Expenditures other than Capital Expenditures, to the extent financed with any proceeds from Indebtedness (other than any Loans) and (c) scheduled payments made during such Test Period on account of principal of Indebtedness of the Borrower and its consolidated Subsidiaries (excluding principal payments made in connection with the Prepetition Credit Agreement (other than the Prepetition Euro Term Loans)).

"**Consolidated Interest Expense**" means, for any Test Period, that portion of interest expense (including that attributable to Capital Lease Obligations) of the Borrower and its consolidated Subsidiaries paid or accrued under GAAP for such Test Period that is currently payable in cash for such Test Period with respect to all outstanding Indebtedness of the Borrower and its consolidated Subsidiaries determined on a consolidated basis in accordance with GAAP; *provided*, that Consolidated Interest Expense for any Test Period shall exclude (a) any amortization or write-off of deferred financing fees during such Test Period, (b) premiums paid in connection with the discharge of Indebtedness, (c) interest expense in connection with the Senior Subordinated Notes and (d) interest expense in connection with the Prepetition Credit Agreement (other than the Prepetition Euro Term Loans; *provided*, *further*, that Consolidated Interest Expense for any Test Period shall include for the period prior to the Closing Date interest expense in connection with the First Lien Term Loans as if $150,000,000 of U.S. Term Loans (as defined in the First Lien Credit Agreement) had been made on the first day of such Test Period).

"**Consolidated Net Income**" means, for any period, the net income (loss) of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication, (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Subsidiaries and (b) the income (or deficit) of any Person (other than a Subsidiary of the Borrower) in which the Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by (or such deficit is actually distributed to) the Borrower or such Subsidiary in the form of dividends or similar distributions.

"**Consolidated Total Debt**" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with any Permitted Acquisition), required to be reflected as "indebtedness" (or the equivalent thereof) on a consolidated balance sheet of the Borrower in accordance with GAAP (other than Indebtedness described in clause (b) (other than in respect of drawings thereunder to the extent not reimbursed within two Business Days after the date of such drawing) or (c) of the definition of Indebtedness).

"**Continuing Directors**" means the directors of Holdings on the Closing Date and each other director, if, in each case, such other directors' nomination for election to the board of directors of Holdings is recommended by a majority of the then Continuing Directors.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning specified in the definition of "Affiliate."

509600-0292-11782-Active.11854677.4

"**Conversion or Continuation Notice**" means a notice of (a) a conversion of Loans from one Type to the other, or (b) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A.

"**Debt Issuance**" means the issuance by any Person and its Subsidiaries of any Indebtedness for borrowed money.

"**Debtor**" has the meaning specified in the preliminary statements to this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally (including, in the case of Loan Parties incorporated or organized in England or Wales, administration, administrative receivership, voluntary arrangement and schemes of arrangement).

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.0% per annum; *provided* that with respect to the principal amount of any Eurodollar Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including the Applicable Rate) otherwise applicable to such Loan plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means any Lender that (a) has failed to pay over to the Administrative Agent or any other Lender any amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless subsequently cured or (b) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"**Designated Non-Debtors**" means the Subsidiaries set forth on Schedule 1.01C.

"**Designated Obligations**" means all obligations of the Borrower with respect to (a) principal of and interest on the Loans and (b) accrued and unpaid fees under the Loan Documents.

"**DIP Agent**" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent for the lenders under the DIP Credit Agreement.

"**DIP Credit Agreement**" means the Credit and Guarantee Agreement, dated as of August 26, 2009, among Holdings, the Borrower and certain of the Borrower's Subsidiaries, the lenders from time to time party thereto, the DIP Agent and the other parties thereto, as amended, supplemented or otherwise modified prior to the date hereof.

"**DIP Facility**" means the term loan facility made available under the DIP Credit Agreement.

"**Disposed EBITDA**" means, with respect to any Sold Entity or Business for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business (determined as if references to the Borrower and its Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity or Business and its Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale of Equity Interests held in another Person) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith; and, other than for purposes of Section 2.03(b)(ii), shall include any issuance by a Person of any of its Equity Interests to another Person.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) requires the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**ECF Percentage**" means 75%; provided that with respect to each fiscal year of the Borrower, the ECF Percentage shall be 50% in respect of such fiscal year if the Total Leverage Ratio as of the last day of such fiscal year is less than [___]: 1.00.

"**Effective Date**" means the effective date of the Reorganization Plan.

"**Eligible Assignee**" means any Assignee permitted by and consented to in accordance with Section 10.07(b).

"**EMU**" means the economic and monetary union in accordance with the Treaty of Rome 1957, as amended by the Single European Act 1986, the Maastricht Treaty of 1992 and the Amsterdam Treaty of 1998.

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Environmental Laws**" means any and all Laws (including common law) relating to pollution, the protection of the environment, the protection of natural resources, or, to the extent relating to exposure to hazardous substances, the protection of human health or to the release of any pollutants into the environment, including those related to air emissions and discharges to public water or waste treatment systems.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

- 13 -

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with any Loan Party within the meaning of Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or is in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA); (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (g) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (h) the filing pursuant to Section 412 of the Code or Section 303 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure of any Loan Party or any ERISA Affiliates to make any required contribution to a Multiemployer Plan; or (i) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived.

"**Euro**" and "**€**" means the lawful currency of the Participating Member States introduced in accordance with EMU Legislation.

"**Eurodollar Rate**" means, for any Interest Period with respect to any Eurodollar Rate Loan:

(a)      the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate that appears on the page of the Reuters Screen LIBOR01 Page (or any successor thereto) that displays an average British Bankers Association Interest Settlement Rate for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or, if different, the date on which quotations would customarily be provided by leading banks in the London Interbank Market for

- 14 -

deposits of amounts in the relevant currency for delivery on the first day of such Interest Period, or

(b)        if the rate referenced in the preceding clause (a) does not appear on such page or service or such page or service shall not be available, the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate on such other page or other service that displays an average British Bankers Association Interest Settlement Rate for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or, if different, the date on which quotations would customarily be provided by leading banks in the London Interbank Market for deposits of amounts in the relevant currency for delivery on the first day of such Interest Period, or

(c)        if the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum determined by the Administrative Agent as the rate of interest at which deposits in Dollars for delivery on the first day of such Interest Period in Same Day Funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted by JPMorgan Chase Bank and with a term equivalent to such Interest Period would be offered by JPMorgan Chase Bank's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period or, if different, the date on which quotations would customarily be provided by leading banks in the London Interbank Market for deposits of amounts in the relevant currency for delivery on the first day of such Interest Period;

*provided*, that in no event shall the Eurodollar Rate be less than 3.50%.

"**Eurodollar Rate Loan**" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excess Cash Flow**" means, for any period, an amount equal to:

(a)        the sum, without duplication, of:

(i)        Consolidated Net Income for such period,

(ii)        an amount equal to the amount of all non-cash charges (including depreciation and amortization) to the extent deducted in arriving at such Consolidated Net Income,

(iii)        an amount equal to the aggregate net non-cash loss on Dispositions by the Borrower and its Subsidiaries during such period (other than sales of inventory in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income,

(iv)        decreases in Consolidated Working Capital for such period, and

(v)        consolidated cash receipts in respect of Swap Contracts during such fiscal year to the extent not otherwise included in Consolidated Net Income; and

- 15 -

*minus*

(b)      the sum, without duplication among the clauses below and without duplication of any amounts otherwise deducted in arriving at Consolidated Net Income for such period, of:

(i)      an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income,

(ii)      an amount equal to the aggregate net non-cash gain on Dispositions by the Borrower and its Subsidiaries during such period (other than sales of inventory in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income,

(iii)      the amount of Capital Expenditures made in cash during such period pursuant to Section 7.16, except to the extent that such Capital Expenditures were financed with the proceeds of any issuance or sale of Equity Interests of Holdings, with the proceeds of any Indebtedness of Holdings, the Borrower or any Subsidiary, or, to the extent not otherwise included in Consolidated Net Income, with the proceeds of any Disposition of property of or any Casualty Event with respect to property of Holdings, the Borrower or any Subsidiary,

(iv)      the aggregate amount of all principal payments or prepayments of Indebtedness of the Borrower and its Subsidiaries (including (A) the principal component of payments in respect of Capital Lease Obligations, (B) the amount of any voluntary prepayment of Loans pursuant to Section 2.03(a) and any voluntary prepayment of First Lien Term Loans, (C) the amount of any mandatory prepayment of Loans pursuant to Section 2.03(b)(ii) and any mandatory prepayment of First Lien Term Loans required as a result of any Disposition, in each case to the extent required due to a Disposition that resulted in an increase to Consolidated Net Income and not in excess of the amount of such increase and (D) the amount of any repayment of Loans pursuant to Section 2.04 and any regularly scheduled principal payments of the First Lien Term Loans, but excluding all other prepayments of the Loans and the First Lien Term Loans) made during such period (other than in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder), except to the extent that such payments or prepayments were financed with the proceeds of any issuance or sale of Equity Interests of Holdings, with the proceeds of any other Indebtedness of Holdings, the Borrower or any Subsidiary, or, to the extent not otherwise included in Consolidated Net Income, with the proceeds of any Disposition of property of or any Casualty Event with respect to property of Holdings, the Borrower or any Subsidiary,

(v)      increases in Consolidated Working Capital for such period,

(vi)      the amount of Permitted Acquisitions made during such period pursuant to Section 7.02, except to the extent that such Permitted Acquisitions were financed with the proceeds of any issuance or sale of Equity Interests of Holdings, with the proceeds of any Indebtedness of Holdings to the extent such proceeds were not applied to reduce the Obligations of the Borrower or the Subsidiaries, or, to the extent not otherwise included in Consolidated Net Income, with the proceeds of any Disposition of property of or any Casualty Event with respect to property of Holdings, the Borrower or the Subsidiaries to the extent such proceeds were not applied to reduce the Obligations, and

509600-0292-11782-Active.11854677.4

(vii)    cash expenditures in respect of Swap Contracts during such fiscal year to the extent not deducted in arriving at such Consolidated Net Income.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Exchange Rate**" means on any day with respect to any currency other than Dollars, the rate at which such currency may be exchanged into Dollars, as set forth at approximately 11:00 a.m. (London time) on such day on the Reuters World Currency Page for such currency; in the event that such rate does not appear on any Reuters World Currency Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower, or, in the absence of such agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m. (New York City time) on such date for the purchase of Dollars for delivery two Business Days later.

"**Excluded Taxes**" has the meaning specified in Section 3.01(f).

"**Facility**" means the term loan facility made available to the Borrower pursuant to this Agreement.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to JPMorgan Chase Bank on such day on such transactions as determined by the Administrative Agent.

"**First Lien Agent**" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the First Lien Credit Agreement, together with any of its successors.

"**First Lien Cap Amount**" means $[_____].

"**First Lien Cash Management Obligations**" means the "Cash Management Obligations" as defined in the First Lien Credit Agreement.

"**First Lien Credit Agreement**" means the Credit Agreement, dated as of [_____], among the Borrower, Holdings, the German Borrower party thereto, the lenders party thereto and the First Lien Agent, as amended, supplemented, waived or otherwise modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"**First Lien Obligations**" means the "First Priority Obligations" as defined in the Intercreditor Agreement.

"**First Lien Secured Hedge Agreements**" means the "Secured Hedge Agreements" as defined in the First Lien Credit Agreement.

- 17 -

"**First Lien Term Loan Documents**" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"**First Lien Term Loans**" means the term loans converted or continued, as the case may be, pursuant to the First Lien Credit Agreement.

"**First Priority Obligations Payment Date**" has the meaning specified in the Intercreditor Agreement.

"**Foreign Benefit Arrangement**" means any employee benefit arrangement mandated by non-U.S. law that is maintained or contributed to by any Loan Party or any ERISA Affiliate.

"**Foreign Jurisdiction Deposit**" means a deposit or Guarantee incurred in the ordinary course of business and required by any Governmental Authority in a foreign jurisdiction as a condition of doing business in such jurisdiction.

"**Foreign Lender**" has the meaning specified in Section 10.15.

"**Foreign Plan**" means each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to U.S. law and is maintained or contributed to by any Loan Party or any ERISA Affiliate.

"**Foreign Subsidiary**" means any direct or indirect Subsidiary of the Borrower which is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, that for purposes of Section 7.10, GAAP shall be determined on the basis of such principles in effect on the date hereof and consistent with those used in the preparation of the most recent audited financial statements of the Borrower prior to the date hereof.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Granting Lender**" has the meaning specified in Section 10.07(h).

"**Group Member**" means Holdings, the Borrower and the Subsidiaries.

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or monetary other obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working

- 18 -

capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantee and Security Agreement**" means, collectively, the Second Lien Guarantee and Security Agreement executed by Holdings, the Borrower and each Guarantor, substantially in the form of Exhibit E, together with each other security agreement supplement executed and delivered pursuant to Section 6.11.

"**Guarantors**" has the meaning specified in the definition of "Collateral and Guarantee Requirement".

"**Guaranty**" has the meaning specified in the definition of "Collateral and Guarantee Requirement".

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances or wastes or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to or that could give rise to any liability under any Environmental Law.

"**Hedge Bank**" means any Person that is a "Lender" or an "Affiliate" of a "Lender" under the First Lien Credit Agreement or a Lender or an Affiliate of a Lender hereunder at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto; provided that, prior to the First Priority Obligations Payment Date, any "Hedge Bank" under the First Lien Credit Agreement shall not be a Hedge Bank hereunder.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**Holdings Operating Expenses**" means operating costs and expenses incurred by Holdings, which will include, in any event, without limitation, costs and expenses incurred in connection with (in each case to the extent not otherwise prohibited by the Loan Documents and in each case other than interest or dividend payments or expenses related to activities not permitted to be undertaken by Holdings pursuant to Section 7.15) (i) the maintenance of its existence and the ownership of an investment in the Borrower or the Subsidiaries of the Borrower, and the exercise of rights and performance of obligations in connection therewith, (ii) the entry into, and exercise of rights and performance of obligations in respect of (A) contracts and agreements with or for the benefit of officers, directors and employees of Holdings, the Borrower or any Subsidiary relating to their employment or directorships, (B) insurance policies and related contracts and agreements, (C) any equity subscription agreements, registration rights agreements, voting and other stockholder agreements, engagement letters,

- 19 -

underwriting agreements and other agreements in respect of Equity Interests of Holdings or any offering, issuance or sale thereof, and (D) the Loan Documents, (iii) the offering, issuance and sale of Equity Interests of Holdings, (iv) the filing of registration statements, and compliance with applicable reporting and other obligations, under federal, state or other securities laws, (v) the performance of obligations under and compliance by Holdings with its certificate of incorporation and by-laws or any applicable law, ordinance, regulation rule, order, judgment, decree or permit, including, without limitation, as a result of or in connection with the activities of the Borrower or the Subsidiaries of the Borrower, (vi) payment of taxes for the benefit of or relating to Holdings, the Borrower and its Subsidiaries and (vii) other activities incidental or related to the foregoing.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable in the ordinary course of business, (ii) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP, (iii) deferred or equity compensation arrangements payable to directors, officers or employees and (iv) any such obligation to pay royalties or commissions to authors);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness;

(g)     all obligations of such Person to purchase, redeem, retire or otherwise acquire for value any Disqualified Equity Interests; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included as Indebtedness on a consolidated balance sheet of the Borrower in accordance with GAAP and (B) in the case of Holdings and its Subsidiaries, exclude (i) customer deposits and advances and interest payable thereon in the ordinary course of business consistent with past practice and in accordance with customary trade terms and other obligations incurred in the ordinary course of business consistent with past practice through credit on an open account basis customarily extended to such Person, (ii) statutory

- 20 -

or other legal requirements to make deposits in connection with sweepstakes or similar contests, or surety bonds or letters of credit posted pursuant to such requirements and (iii) obligations under overdraft arrangements with banks outside the United States incurred in the ordinary course of business consistent with past practice to cover working capital needs.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Information**" has the meaning specified in Section 10.08.

"**Intellectual Property**" has the meaning set forth in the Guarantee and Security Agreement.

"**Intercreditor Agreement**" means the Intercreditor Agreement to be executed and delivered by the Administrative Agent, the First Lien Agent and the Loan Parties, substantially in the form of Exhibit I, as amended, modified and supplemented from time to time.

"**Interest Election**" means a Cash Election or PIK Election, as applicable.

"**Interest Election Notice**" has the meaning specified in Section 2.05(b).

"**Interest Payment Date**" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date applicable to such Loan, (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date applicable to such Loan and (c) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"**Interest Period**" means (a), as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date three months thereafter; *provided* that:

(i)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(iii)    no Interest Period shall extend beyond the Maturity Date applicable to such Eurodollar Rate Loan; and

(b)    for purposes of Section 2.05(b), as to each Base Rate Loan, initially, the period commencing on the date such Base Rate Loan is disbursed or converted to a Base Rate Loan and

- 21 -

ending on the immediately succeeding Interest Payment Date and, thereafter, the period commencing on any Interest Payment Date and ending on the immediately succeeding Interest Payment Date.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person or (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**J.H. Cohn**" means J.H. Cohn, LLP, and any successor thereto.

"**JPMorgan Chase Bank**" means JPMorgan Chase Bank, N.A., and any successor thereto.

"**Junior Financing**" has the meaning specified in Section 7.14.

"**Junior Financing Documentation**" means any documentation governing any Junior Financing.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or preferential arrangement intended to create a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease Obligation having substantially the same economic effect as any of the foregoing).  For the avoidance of doubt, "Lien" shall not include any license or sublicense of Intellectual Property, provided that such license or sublicense is not intended to create a security interest of any kind or nature whatsoever.

"**Liquidity**" means, on any date of determination, the sum, without duplication, of (i) the cash and Cash Equivalents which are not subject to any Liens (other than Liens permitted pursuant to Section 7.01(a), (b), (c), (d), (e), (f), (k), (l), (u) or (bb))) held by the Borrower and its Subsidiaries on such date plus (ii) the aggregate amount which is available to be drawn under any loan agreements or other lines of credit of the Borrower and its Subsidiaries on such date (for the avoidance of doubt, after giving effect to any limitation on borrowing thereunder, including but not limited to the absence of default or other non-compliance with covenants).

- 22 -

"**Loans**" has the meaning specified in Section 2.01 and shall include any interest which is paid-in-kind and added to the principal amount of the Loans in accordance with Section 2.05(b).

"**Loan Amount**": as to any Lender, the principal amount of Loans issued to such Lender on the Closing Date set forth under the heading "Loan Amount" opposite such Lender's name on Schedule 2.01. The original aggregate Loan Amount of the Lenders is $300,000,000.

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents and (iv) the Intercreditor Agreement.

"**Loan Parties**" means, collectively, the Borrower and each Guarantor.

"**Master Agreement**" has the meaning specified in the definition of "Swap Contract."

"**Material Adverse Effect**" means any event, development or circumstance that, individually or in the aggregate, has had or could reasonably be expected to have a material adverse effect on (a) the business, property, operations or financial condition of Holdings and its Subsidiaries, taken as a whole, in each case, other than such effects attributable to the commencement of the Cases or the existence of prepetition claims and of defaults under such claims to the extent stayed by virtue of the commencement of the Cases or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights and remedies of the Administrative Agent and the Lenders hereunder or thereunder.

"**Material Real Property**" means, on any date, any real property owned by any Loan Party with a fair market value as of such date in excess of $2,500,000.

"**Maturity Date**" means March 31, 2014.

"**Maximum Rate**" has the meaning specified in Section 10.10.

"**Moelis**" means Moelis & Company LLC, and any successor thereto.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage**" means, collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Lenders substantially in the form of Exhibit G (with such changes as may be customary to account for local Law matters or as otherwise may be reasonably satisfactory to the Administrative Agent), and any other mortgages executed and delivered pursuant to Section 6.11.

"**Mortgaged Properties**" has the meaning specified in paragraph (g) of the definition of Collateral and Guarantee Requirement.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means:

(a)    with respect to the Disposition of any asset by Holdings, the Borrower or any Subsidiary or any Casualty Event, an amount equal to (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of Holdings, the Borrower or any Subsidiary) less (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by a Lien expressly permitted hereunder (and not junior to the Liens securing the Obligations) on the asset subject to such Disposition or Casualty Event and that is required to be repaid (and is repaid) in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents and other than to the extent the holders of such Indebtedness are required to turnover any such proceeds to any or all of the Lenders), (B) the out-of-pocket expenses (including attorneys' fees, investment banking fees, accounting fees and other professional and transactional fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary commissions and fees) actually incurred by Holdings, the Borrower or such Subsidiary in connection with such Disposition or Casualty Event, (C) taxes paid or reasonably estimated to be actually payable in connection therewith, (D) any reserve for adjustment in accordance with GAAP in respect of (x) the sale price of such asset or assets and (y) any liabilities associated with such asset or assets and retained by Holdings, the Borrower or any Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, and (E) the Borrower's reasonable estimate of payments required to be made with respect to unassumed liabilities relating to the assets involved within one year of such Disposition or Casualty Event and it being understood that "Net Cash Proceeds" shall include (i) any cash or Cash Equivalents received upon the Disposition of any non-cash consideration received by Holdings, the Borrower or any Subsidiary in any such Disposition, (ii) an amount equal to any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in clause (C) or (D) above at the time of such reversal and (iii) an amount equal to any estimated liabilities described in clause (E) above that have not been satisfied in cash within three hundred and sixty-five (365) days after such Disposition or Casualty Event; *provided* that notwithstanding anything to the contrary, (x) no proceeds realized in a single Disposition or series of related Dispositions shall constitute Net Cash Proceeds unless such Net Cash Proceeds shall exceed $1,000,000 and (y) no such proceeds shall constitute Net Cash Proceeds under this clause (a) in any fiscal year until the aggregate amount of all such Net Cash Proceeds in such fiscal year shall exceed $5,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Cash Proceeds under this clause (a)); and

(b)    with respect to the incurrence or issuance of any Indebtedness or Equity Interests by Holdings, the Borrower or any Subsidiary, an amount equal to (i) the sum of the cash received in connection with such incurrence or issuance less (ii) the attorneys' fees, investment banking fees, accountants' fees, underwriting or other discounts, commissions, costs and other out-of-pocket fees, transfer and similar taxes and other customary out-of-pocket expenses actually incurred by Holdings, the Borrower or such Subsidiary in connection with such incurrence or issuance.

"**Non-Cash Charges**" has the meaning specified in the definition of the term "Consolidated EBITDA".

509600-0292-11782-Active.11854677.4

"**Non-Consenting Lenders**" has the meaning specified in Section 3.07(c).

"**Note**" means a promissory note of the Borrower payable to any Lender, in substantially the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans of such Lender.

"**Not Otherwise Applied**" means, with reference to any amount of Net Cash Proceeds of any transaction or event or of Excess Cash Flow, that such amount (a) was not required to be applied to prepay the "Loans" under the First Lien Credit Agreement or the Loans pursuant to Section 2.05(b), and (b) was not previously applied in determining the permissibility of a transaction under the "Loan Documents" under the First Lien Credit Agreement or under the Loan Documents hereunder where such permissibility was contingent on receipt of such amount or utilization of such amount for a specified purpose. The Borrower shall promptly notify the Administrative Agent of any application of such amount as contemplated by clause (b) above.

"**NPL**" means the National Priorities List under CERCLA.

"**Obligations**" means all (a) monetary obligations of any Loan Party and its Subsidiaries arising under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, (b) monetary obligations of any Loan Party arising under any Secured Hedge Agreement and (c) monetary Cash Management Obligations. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (x) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities, and other amounts payable by any Loan Party or its Subsidiaries under any Loan Document and (y) the obligation of any Loan Party or any of its Subsidiaries to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party or such Subsidiary.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning specified in Section 3.01(b).

"**Outstanding Amount**" means, with respect to the Loans, on any date, the aggregate principal amount thereof outstanding after giving effect to any deemed making and prepayments or repayments of Loans occurring on such date.

"**Participant**" has the meaning specified in Section 10.07(e).

"**Participating Member State**" means each state so described in any EMU Legislation.

"**Patriot Act**" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five (5) plan years.

"**Permitted Acquisition**" has the meaning specified in Section 7.02(i).

"**Permitted Equity Issuance**" means any sale or issuance of any Qualified Equity Interests of Holdings to the extent not prohibited hereunder or any capital contribution made to Holdings in respect of its Qualified Equity Interests.

"**Permitted Holdings Distributions**" means payments, dividends or distributions by the Borrower to Holdings in order to pay Holdings Operating Expenses.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended, except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of the Indebtedness so modified, refinanced, refunded, renewed or extended, (c) such modification, refinancing, refunding, renewal or extension has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (d) at the time thereof, no Default or Event of Default shall have occurred and be continuing, (e) to the extent such Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations or subordinated in respect of any Collateral, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations and/or subordinated in respect of such Collateral, as the case may be, on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended and (e) the terms and conditions (including, if applicable, as to collateral but excluding as to subordination, interest rate or other pricing terms and redemption or prepayment premium) of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, are not materially less favorable to the Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning specified in the preliminary statements to this Agreement.

"**PIK Election**" has the meaning specified in Section 2.05(b).

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) (other than a Multiemployer Plan, Foreign Plan or Foreign Benefit Arrangement) established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA, any ERISA Affiliate.

"**Pledged Debt**" has the meaning specified in the Guarantee and Security Agreement.

"**Pledged Equity**" has the meaning specified in the Guarantee and Security Agreement.

"**Prepetition Credit Agreement**" means the Credit Agreement, dated as of March 2, 2007, among Doctor Acquisition Co., RDA Holding Co., the Borrower, the overseas borrowers party thereto, the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent, as amended, supplemented, waived or otherwise modified from time to time prior to the effectiveness of the First Lien Credit Agreement.

"**Prepetition Credit Agreement Claims**" has the meaning specified in the Reorganization Plan.

"**Prepetition Euro Term Loans**" means the Euro Term Loans (as defined in the Prepetition Credit Agreement as in effect on the date hereof).

"**Pro Forma Balance Sheet**" has the meaning set forth in Section 5.05(a)(ii).

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount equal to the outstanding Loans of such Lender and the denominator of which is the amount equal to the aggregate outstanding Loans at such time.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Register**" has the meaning specified in Section 10.07(d).

"**Reorganization Plan**" has the meaning specified in the preliminary statements to this Agreement.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the sum of the aggregate Outstanding Amount of all Loans.

"**Requirement of Law**" means, as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

- 27 -

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, treasurer or controller or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of Holdings, the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to Holdings or the Borrower's stockholders, partners or members (or the equivalent Persons thereof).

"**Restructuring Support Agreement**" means the Restructuring Support Agreement, dated as of August 17, 2009, among the Debtors and the Consenting Lenders and Consenting Shareholders specified therein, as amended, supplemented, waived or otherwise modified from time to time.

"**Rollover Amount**" has the meaning set forth in Section 7.16(b).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Hedge Agreement**" means any Swap Contract permitted under Article VII that is entered into by and between the Borrower or any Subsidiary and (i) any "Hedge Bank" under the First Lien Credit Agreement or (ii) any Hedge Bank hereunder, in each case at the time such Secured Hedge Agreement is entered into.  Notwithstanding the foregoing, prior to the First Priority Obligations Payment Date, any Swap Contract that is a "Secured Hedge Agreement" under the First Lien Credit Agreement shall not be a Secured Hedge Agreement hereunder.

"**Secured Parties**" means, collectively, the Administrative Agent, the other Agents, the Lenders, the Hedge Banks, each holder of Cash Management Obligations, any Affiliate of a Lender to which Obligations are owed, the Supplemental Administrative Agent and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.01(b).

"**Securities Act**" means the Securities Act of 1933.

"**Security Agreement Supplement**" has the meaning specified in the Guarantee and Security Agreement.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and

- 28 -

does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they become absolute and matured and (d) such Person is not engaged in any business, as conducted on such date and as proposed to be conducted following such date, for which such Person's property would constitute an unreasonably small capital.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**SPC**" has the meaning specified in Section 10.07(h).

"**Specified Lenders**" means, collectively, the Lenders from time to time comprising the steering committee designated by JPMorgan Chase Bank in connection with this Agreement and the First Lien Credit Agreement and the ongoing administration of the Cases; *provided*, that there shall at no time be more than ten Lenders on the steering committee (counting all affiliated Lenders as one for purposes of this proviso).

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the relevant Lender is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Sterling**" means the lawful currency of the United Kingdom.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Supplemental Administrative Agent**" has the meaning specified in Section 9.13 and "Supplemental Administrative Agents" shall have the corresponding meaning.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other

- 29 -

master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" has the meaning specified in Section 3.01(a).

"**Test Period**" means, for any determination under this Agreement, the period of four consecutive fiscal quarters of the Borrower then last ended.

"**Threshold Amount**" means $18,000,000.

"**Total Leverage Ratio**" means, with respect to any Test Period, the ratio as of the last day of such Test Period of (a) Consolidated Total Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**Unaudited Financial Statements**" means the unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its consolidated Subsidiaries for each subsequent fiscal quarter ended after the fiscal year ended June 30, 2009, in each case for which and to the extent such financial statements are available prior to the Closing Date.

"**Uniform Commercial Code**" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

509600-0292-11782-Active.11854677.4

Section 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)  The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)  (i)  The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(d)  Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03    Accounting Terms.  (a)  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Holdings, the Borrower or any of their respective Subsidiaries at "fair value", as defined therein.

Section 1.04    Rounding.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements,

- 31 -

extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07    Timing of Payment of Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

Section 1.08    Currency Equivalents Generally.  Any amount specified in this Agreement (other than in Articles II, IX, and X) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount to be determined at the rate of exchange quoted by the Reuters World Currency Page for the applicable currency at 11:00 a.m. (London time) on such day (or, in the event such rate does not appear on any Reuters World Currency Page, by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower, or, in the absence of such agreement, such rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m. (New York City time) on such date for the purchase of Dollars for delivery two Business Days later).  Notwithstanding the foregoing, for purposes of determining compliance with Section 7.01, 7.02 and Section 7.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred; *provided* that, for the avoidance of doubt, the foregoing provisions of this Section 1.08 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

Section 1.09    Change of Currency.  Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Borrower's consent to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

## ARTICLE II

## THE LOANS

Section 2.01    The Loans.  Subject to the terms and conditions hereof and to give effect to the Reorganization Plan and provide for the repayment, in part, of the Prepetition Credit Agreement Claims, each Lender listed on Schedule 2.01 shall be deemed, on the Closing Date, to have made term loans (the "**Loans**") to the Borrower hereunder in an amount equal to such Lender's Loan Amount.  For the avoidance of doubt, the Loans deemed made pursuant to the preceding sentence shall be made without any actual funding and shall initially be Eurodollar Rate Loans.  The amount of Loans of each Lender on the Closing Date shall be equal to the amount set forth on Schedule 2.01, which amount shall be conclusive absent manifest error.  After the Closing Date, the Loans may from time to time be Eurodollar Rate Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Section 2.02.  Amounts repaid or prepaid on account of the Loans may not be reborrowed.

Section 2.02    Conversions and Continuations of Loans.  (a)  Each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's notice to the Administrative Agent, which may be given by telephone.  Each such notice must be received by the Administrative Agent not later than (i) 12:30 p.m. (New York time) three (3) Business Days prior to the requested date of any continuation of Eurodollar Rate Loans or any conversion of Base Rate Loans to Eurodollar Rate Loans, and (ii) 12:30 p.m. (New York time) one (1) Business Day prior to the requested date of any conversion of Eurodollar Rate Loans to Base Rate Loans.  Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Conversion or Continuation Notice, appropriately completed and signed by a Responsible Officer of the Borrower.  Each conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof. Each conversion to Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof.  Each Conversion or Continuation Notice (whether telephonic or written) shall specify (i) whether the Borrower is requesting a conversion of Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be converted or continued, (iv) the Type of Loans to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower fails to give a timely notice requesting a conversion or continuation, then the Loans shall be continued as, or converted to, Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.

(b)  Following receipt of a Conversion or Continuation Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation described in Section 2.02(a).

(c)  Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith.

(d)  The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate.  The determination of the Eurodollar Rate by the Administrative Agent shall be conclusive in the absence of manifest error.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in JPMorgan Chase Bank prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)  After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than ten (10) Interest Periods in effect.

(f)  The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

Section 2.03    Prepayments. (a)  *Optional*.  The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; provided that (1) such notice must be received by the Administrative Agent

- 33 -

not later than 12:30 p.m. (New York time) (A) three (3) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans; (2) any prepayment of Eurodollar Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05. Each prepayment of the Loans pursuant to this Section 2.03(a) shall be paid to the Lenders in accordance with their respective Pro Rata Shares.

(b) *Mandatory*. (i) Within ten (10) days after the earlier of (A) the date by which financial statements are required to be delivered pursuant to Section 6.01(a) and (B) the date such financial statements are actually delivered, the Borrower shall cause to be prepaid an aggregate amount of Loans in an amount equal to the ECF Percentage of Excess Cash Flow, if any, for the fiscal year covered by such financial statements (commencing with the fiscal year ended June 30, 2010).

(ii)    (A) If (x) Holdings, the Borrower or any Subsidiary Disposes of any property or assets (other than any Disposition of any property or assets permitted by Section 7.05(a), (b), (c), (d), (e), **Error! Reference source not found.**, (g), (h) or (m)) or (y) any Casualty Event occurs, which in the aggregate results in the realization or receipt by Holdings, the Borrower or such Subsidiary of Net Cash Proceeds, the Borrower shall cause to be prepaid on or prior to the date which is five (5) Business Days after the date of the realization or receipt of such Net Cash Proceeds, Loans in an amount equal to 100% of all Net Cash Proceeds received; *provided* that no such prepayment shall be required pursuant to this Section 2.03(b)(ii)(A) with respect to such portion of such Net Cash Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest in accordance with Section 2.03(b)(ii)(B);

(B) With respect to any Net Cash Proceeds realized or received with respect to any Disposition that is subject to the prepayment requirements in Section 2.03(b)(ii)(A) or any Casualty Event, at the option of the Borrower, the Borrower may reinvest (x) all or any portion of such Net Cash Proceeds received on account of Dispositions or (y) all or any portion of such Net Cash Proceeds received on account of Casualty Events to acquire or repair assets useful in the Borrower's or a Subsidiary's business (subject to the limitations of this Agreement) within 270 days following receipt of such Net Cash Proceeds or within 360 days following receipt of such Net Cash Proceeds if and to the extent the amount of such applicable Net Cash Proceeds is contractually committed to be reinvested in the Borrower's or a Subsidiary's business as of the 270th day following receipt thereof; *provided* that an amount equal to any such Net Cash Proceeds shall be applied within five (5) Business Days after such Net Cash Proceeds cannot be so reinvested or the Borrower reasonably determines that such Net Cash Proceeds are no longer intended to be so reinvested to the prepayment of the Loans as set forth in this Section 2.03.

(iii)    If Holdings, the Borrower or any Subsidiary incurs or issues any Indebtedness or Equity Interests (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 7.03 and Equity Interests issued to Holdings, the Borrower or any Subsidiary in accordance with Section 7.02 (in each case, without prejudice to the restrictions therein)), the Borrower shall cause to be prepaid Loans in an amount equal to 100% of all Net Cash Proceeds received therefrom, in the case of Indebtedness, and 75% of all Net Cash Proceeds received therefrom, in the case of Equity Interests, in

- 34 -

each case on or prior to the date which is five (5) Business Days after the receipt of such Net Cash Proceeds.

(iv)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to this Section 2.03(b) at least three (3) Business Days prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment.

(v)    Notwithstanding anything to the contrary in this Agreement, the amount of any mandatory prepayment of Loans required pursuant to this Section 2.03(b) shall be reduced by the aggregate amount on a Dollar-for-Dollar basis by which the First Lien Term Loans are required to be prepaid in accordance with the First Lien Credit Agreement.

(c)  Each prepayment of Loans pursuant to this Section 2.03 shall be paid to the Lenders in accordance with their respective Pro Rata Shares.

(d)  All prepayments under this Section 2.03 shall be made together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

Section 2.04    Repayment of Loans.  The Loan of each Lender shall mature in a single installment on the Maturity Date.

Section 2.05    Interest.  (a)  Subject to the provisions of Section 2.05(c), (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)  Notwithstanding anything to the contrary contained in this Section 2.05, upon the occurrence and during the continuance of a Consolidated EBITDA Event, a portion of the Applicable Rate on the Loans equal to 6.5% per annum for the succeeding Interest Period shall be paid, at the Borrower's option, in cash (a "**Cash Election**") or by increasing the principal amount of the outstanding Loans (a "**PIK Election**"), in each case in arrears on the applicable Interest Payment Date.  The Borrower shall be permitted to make a Cash and/or a PIK Election with respect to all or any portion of the Outstanding Amount of the Loans not less than $[_____].  The Borrower shall make an Interest Election with respect to each Interest Period by providing prior irrevocable notice of such election (the "**Interest Election Notice**") by no later than 11:00 A.M., New York City time, on the tenth day preceding the beginning of such Interest Period.  Each Interest Election Notice shall include information to the following effect: (1) the relevant Interest Payment Date, (2) whether the Borrower is making a Cash Election or a PIK Election and (3) if the Borrower makes a PIK Election, the increase in the principal amount of the Loans to be effective upon the relevant Interest Payment Date as a result of such payment and the principal amount of the Loans outstanding as of such Interest Payment Date after giving effect to such payment.  If the Borrower shall fail to give timely notice as described above in this paragraph, the Borrower shall be deemed to have elected to continue with the last Interest Election made for the previous Interest Period.

(c)  If any Event of Default shall have occurred and be continuing, all outstanding Loans and other Obligations under the Loan Documents (whether or not overdue at such time) shall bear interest

- 35 -

at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(d)  Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Notwithstanding the foregoing, interest accruing pursuant to Section 2.05(c) shall be payable from time to time on demand. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.06    Fees.  The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

Section 2.07    Computation of Interest and Fees.  All computations of interest for Base Rate Loans when the Base Rate is determined by JPMorgan Chase Bank's "prime rate" shall be made on the basis of a year of three hundred and sixty-five (365) or three hundred and sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.09(a), bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.  The Administrative Agent shall, upon the reasonable request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.05(a).

Section 2.08    Evidence of Indebtedness.  (a)  The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)  Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.08(a), and by each Lender in its account or accounts pursuant to Section 2.08(a), shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is

- 36 -

incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.09    Payments Generally.  (a)  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. (New York time) shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurodollar Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)  Unless the Borrower or any Lender has notified the Administrative Agent, prior to the time any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i)    if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the Federal Funds Rate from time to time in effect; and

(ii)    if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the Federal Funds Rate from time to time in effect.  When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

- 37 -

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.09(c) shall be conclusive, absent manifest error.

(d)  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)  The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan.

(f)  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)  Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but at the direction of Required Lenders shall, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.10    Sharing of Payments.  If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Loans made by it any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans pro rata with each of them; provided that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.10 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender

- 38 -

that purchases a participation pursuant to this Section 2.10 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.11    Intercreditor Agreement.  Each Lender hereby authorizes and directs the Administrative Agent to enter into the Intercreditor Agreement on its behalf and hereby approves and agrees to be bound by the terms of the Intercreditor Agreement (including the subordination of its Liens on the Collateral to the extent provided in the Intercreditor Agreement).  Notwithstanding anything to the contrary herein, in the case of any inconsistency between this Agreement and the Intercreditor Agreement, the Intercreditor Agreement shall govern.  The Lenders acknowledge that the First Lien Term Loans, the First Lien Secured Hedge Agreements, the First Lien Cash Management Obligations and related obligations are secured by the Collateral, subject to the Intercreditor Agreement, and that the First Lien Obligations may be increased from time to time including by amendment.

Section 2.12    No Requirement of Lender Signatures.  Each Lender listed on Schedule 2.01 shall be a party hereto in accordance with the Reorganization Plan and, pursuant to the Reorganization Plan, is bound hereby without the requirement of any Lender to execute a signature page hereto.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01    Taxes.  (a)  Except as provided in this Section 3.01, any and all payments by the Borrower to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities (including additions to tax, penalties and interest) with respect thereto, excluding in the case of each Agent and each Lender, taxes imposed on or measured by its net income or overall gross income (including branch profits), and franchise (and similar) taxes imposed on it in lieu of net income taxes, by the jurisdiction (or any political subdivision thereof) under the Laws of which such Agent or such Lender, as the case may be, is organized, managed or controlled or maintains a Lending Office or conducts business in (except to the extent the business is considered to be conducted in such jurisdiction solely as a result of such Agent or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, any Loan Document) and all liabilities (including additions to tax, penalties and interest) with respect thereto.  All non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and liabilities described in the immediately preceding sentence are hereinafter referred to as "**Taxes**".  If the Borrower shall be required by any Laws to deduct any Taxes or Other Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), the Borrower shall furnish to such Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor.  If the Borrower fails to pay any Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to any Agent or any Lender the required receipts or other required documentary evidence, the Borrower shall indemnify such Agent and such Lender for any incremental taxes, interest or penalties that may become payable by such Agent or such Lender arising

- 39 -

out of such failure.  Notwithstanding anything to the contrary in this Section 3.01(a), the Borrower shall not be required to increase the sum payable under any Loan Document, or to indemnify any Lender or Agent, with respect to Taxes that (i) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower), are United States withholding taxes imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding taxes or (ii) are withholding taxes that are excluded pursuant to Section 10.15(d).

(b)  In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes or charges or similar levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (hereinafter referred to as "**Other Taxes**").

(c)  The Borrower agrees to indemnify each Agent and each Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 3.01) paid by such Agent and such Lender and (ii) any liability (including additions to tax, penalties, interest and expenses) arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided such Agent or Lender, as the case may be, provides the Borrower with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts, which statement shall be conclusive absent manifest error.  Payment under this Section 3.01(c) shall be made within thirty (30) days after the date such Lender or such Agent makes a demand therefor.

(d)  If any Lender or Agent determines, in its reasonable discretion, that it has received a refund in respect of any Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrower pursuant to this Section 3.01, it shall promptly remit such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.01 with respect to the Taxes or Other Taxes giving rise to such refund plus any interest included in such refund by the relevant taxing authority attributable thereto) to the Borrower, net of all reasonable out-of-pocket expenses of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant taxing authority with respect to such refund); *provided* that the Borrower, upon the request of the Lender or Agent, as the case may be, agrees promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant taxing authority) to such party in the event such party is required to repay such refund to the relevant taxing authority.  Such Lender or Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (*provided* that such Lender or Agent may delete any information therein that such Lender or Agent deems confidential).  Nothing herein contained shall interfere with the right of a Lender or Agent to arrange its tax affairs in whatever manner it thinks fit or to make available its tax returns or disclose any information relating to its tax affairs or any computations in respect thereof or require any Lender or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(e)  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a) or (c) with respect to such Lender it will, if requested by the Borrower, use commercially reasonable efforts to designate another Lending Office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the sole judgment exercised in good faith of such

- 40 -

Lender, cause such Lender and its Lending Office(s) to suffer no economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.01(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.01(a) or (c).

(f)   Each Lender shall indemnify the Administrative Agent, within 10 days after demand therefor, for the full amount of any taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges with respect to which the Borrower is not required to pay additional amounts pursuant to Section 3.01(a) ("**Excluded Taxes**") attributable to such Lender that are payable or paid by the Administrative Agent, and interest, penalties and reasonable expenses arising therefrom or with respect thereto, whether or not such Excluded Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.

Section 3.02    Illegality.   If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Eurodollar Rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.   Upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans.   Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.   Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

Section 3.03    Inability to Determine Rates.   If the Required Lenders determine that for any reason adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or that the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and the Interest Period of such Eurodollar Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders, which instruction shall be given promptly upon such condition's ceasing to exist) revokes such notice.   Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loans.   (a)   If any Lender determines (in good faith) that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the date hereof, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining Eurodollar Rate Loans, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Taxes or Other Taxes (as to

- 41 -

which Section 3.01 shall govern), (ii) changes in the basis of taxation of overall net income or overall gross income (including branch profits), and franchise (and similar) taxes imposed in lieu of net income taxes, by the United States or any foreign jurisdiction or any political subdivision of either thereof under the Laws of which such Lender is organized or maintains a Lending Office and (iii) reserve requirements contemplated by Section 3.04(c)), then from time to time within ten (10) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)    If any Lender determines (in good faith) that the introduction of any Law regarding capital adequacy or any change therein or in the interpretation thereof, in each case after the date hereof, or compliance by such Lender or such Lender's holding company therewith, has the effect of reducing the rate of return on the capital of such Lender or such Lender's holding company (or its Lending Office) as a consequence of its obligations hereunder to a level below that which such Lender or such Lender's holding company could have achieved but for such introduction, change or compliance (taking into consideration its policies with respect to capital adequacy, by an amount deemed by such Lender to be material, then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender or such Lender's holding company for such reduction within ten (10) days after receipt of such demand.

(c)    The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the funding of the Eurodollar Rate Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least ten (10) days' prior notice (with a copy to the Administrative Agent, and which notice shall specify the Statutory Reserve Rate, if any, applicable to such Lender) of such additional interest or cost from such Lender. If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable ten (10) days from receipt of such notice.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation, *provided* that the Borrower shall not be required to compensate a Lender pursuant to Section 3.04(a), (b) or (c) for any such increased cost or reduction incurred more than 180 days prior to the date that such Lender demands, or notifies the Borrower of its intention to demand, compensation therefor, *provided* further that, if the circumstance giving rise to such increased cost or reduction is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)    If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Lending Office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic,

legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d) or any rights of the Borrower pursuant to Section 3.07.

Section 3.05    Funding Losses.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense (excluding loss of profit) incurred by it as a result of:

(a)  any continuation, conversion, payment or prepayment of any Eurodollar Rate Loan on a day other than the last day of the Interest Period for such Loan or (in each case, whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise), or

(b)  any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurodollar Rate Loan on the date or in the amount notified by the Borrower;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

Section 3.06    Matters Applicable to All Requests for Compensation.  (a)  Any Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.

(b)  With respect to any Lender's claim for compensation under Section 3.01, 3.02, 3.03 or 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred more than 180 days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another Eurodollar Rate Loans, or to convert Base Rate Loans into Eurodollar Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)  If the obligation of any Lender to make or continue from one Interest Period to another any Eurodollar Rate Loan, or to convert Base Rate Loans into Eurodollar Rate Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's Eurodollar Rate Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such Eurodollar Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.01, 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)    to the extent that such Lender's Eurodollar Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's Eurodollar Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)    all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurodollar Rate Loans shall be made or continued instead as Base Rate Loans,

- 43 -

and all Base Rate Loans of such Lender that would otherwise be converted into Eurodollar Rate Loans shall remain as Base Rate Loans.

(d)  If any Lender gives notice to the Borrower (with a copy to the Agent) that the circumstances specified in Section 3.01, 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Eurodollar Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurodollar Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods).

Section 3.07    Replacement of Lenders under Certain Circumstances.  (a)  If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make Eurodollar Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, upon prior written notice to the Administrative Agent and such Lender, replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (with the assignment fee to be paid by the Borrower in such instance), at par, all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person.

(b)  Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or Administrative Agent.  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such assignment and assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.

(c)  In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 10.01 and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

Section 3.08    Survival.  All of the Borrower's obligations under this Article III shall survive the repayment of all Obligations hereunder.

- 44 -

# ARTICLE IV

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

The effectiveness of this Agreement is subject to the satisfaction or waiver of the following conditions precedent:

(a) The Administrative Agent's receipt of the following, each of which shall be originals or facsimiles (followed promptly by originals) or electronic copies (following promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, if any, each in form and substance reasonably satisfactory to the Administrative Agent:

(i) counterparts of this Agreement, duly executed by Holdings, the Borrower and the Administrative Agent;

(ii) a Note executed by the Borrower in favor of each Lender that has requested a Note at least two Business Days in advance of the Closing Date;

(iii) each Collateral Document set forth on Schedule 1.01A, duly executed by each Loan Party thereto;

(iv) the Intercreditor Agreement, duly executed by the Administrative Agent, the First Lien Agent and each Loan Party party thereto;

(v) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date and with appropriate insertions and attachments, including the certificate of incorporation (or equivalent thereof) of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party and a long form good standing certificate (or equivalent thereof) for each Loan Party from its jurisdiction of organization;

(vi) opinion from Kirkland & Ellis LLP, special New York counsel to Holdings substantially in the form of Exhibit F;

(vii) except as set forth in Section 6.16, evidence that all insurance (including title insurance) required to be maintained pursuant to the Loan Documents and the First Lien Term Loan Documents has been obtained and is in effect and is satisfactory to the Administrative Agent; and

(viii) a certificate signed by a Responsible Officer of the Borrower certifying compliance with the conditions set forth in paragraphs (h) and (i) of Article IV.

(b) The Administrative Agent shall have received the results of recent lien searches (or the equivalent thereof in foreign jurisdictions) conducted in the jurisdictions in which the Loan Parties are organized (to the extent available), and such search shall reveal no liens on any of the assets of the Loan Parties except for liens permitted by Section 7.01 or discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Administrative Agent or arrangements reasonably satisfactory to the Administrative Agent that have been made to have such liens discharged promptly following the Closing Date.

509600-0292-11782-Active.11854677.4

(c)  The Lenders and the Administrative Agent shall have received payment in full in cash of all costs, fees and expenses due and payable (including those required to be paid to such Lenders hereunder and under the DIP Credit Agreement and the Prepetition Credit Agreement) and invoiced before the Closing Date.

(d)  The Lenders shall have received (i) the Audited Financial Statements and Unaudited Financial Statements (ii) the Pro Forma Balance Sheet and (iii) projections through [June 30], 2014, in form reasonably satisfactory to the Administrative Agent, accompanied by a certificate of a Responsible Officer of the Borrower stating that such projections are based on estimates, information and assumptions believed by management of the Borrower to be reasonable on the Closing Date and that to his or her best knowledge, such Responsible Officer (not in his or her individual capacity, but solely as a Responsible Officer) has no reason to believe that such projections are incorrect or misleading in any material respect (it being understood and agreed that the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Responsible Officer and that no assurance can be given that any of the projections will be realized, and that such projections are not a guarantee of financial performance and actual results may differ from the projected results and such differences may be material).

(e)  The First Lien Agent, as bailee for the Secured Parties, shall have received certificates, if any, representing the Pledged Equity referred to therein, to the extent required therein, accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank; and

(f)  the Administrative Agent shall have received satisfactory evidence that all other actions, recordings and filings that the Administrative Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent.

(g)  The Bankruptcy Court shall have entered an order confirming the Reorganization Plan, which order (the "**Confirmation Order**") (i) shall confirm a Reorganization Plan that is substantially consistent with the Restructuring Support Agreement, which Reorganization Plan has been accepted by Class 3 as designated thereunder, (ii) shall authorize the Facility and (iii) shall be in full force and effect and not have been reversed, modified, amended, stayed or vacated and shall not be subject to a motion to stay or subject to appeal or petition for review, rehearing or certiorari, and the period for appealing the Confirmation Order shall have elapsed.  The Effective Date shall have occurred (and all conditions precedent thereto as set forth in the Confirmation Order shall have been satisfied (or shall be concurrently satisfied) or waived by the Required Lenders).

(h)  The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects as of the Closing Date; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided, further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such respective dates.

(i)  No Default or Event of Default shall have occurred and be continuing.

509600-0292-11782-Active.11854677.4

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES**

Each Loan Party hereby jointly and severally represents and warrants to the Agents and the Lenders that:

Section 5.01    Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each of its Subsidiaries (a) is a Person duly organized or formed, validly existing and in good standing (to the extent such concept is applicable in the applicable jurisdiction) under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Confirmation Order and to the terms thereof, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02    Authorization; No Contravention. Subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Confirmation Order and to the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the transactions contemplated thereby, are within such Loan Party's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) violate the terms of any of such Person's Organization Documents, (b) violate or result in any breach of, or the creation of any Lien under (other than Liens created by the Loan Documents, the First Lien Term Loan Documents and other Liens permitted by Section 7.01), or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or which is binding upon such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law; except with respect to any violation or breach (but not creation of Liens or payments) referred to in each case of clauses (b) and (c) above, to the extent that such violation or breach could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.03    Governmental Authorization; Other Consents. Subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Confirmation Order and to the terms thereof, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with (a) the execution, delivery or performance by any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents or (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof, other than filings referred to in Section 5.18) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, in each case of the foregoing, except for the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect.

Section 5.04    Binding Effect. This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto. This Agreement and each other Loan

Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 5.05    Financial Statements; No Material Adverse Effect.  (a)  (i)  The Audited Financial Statements and the Unaudited Financial Statements fairly present in all material respects the consolidated financial condition of the Borrower and its consolidated Subsidiaries as of the dates thereof and their consolidated results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein and, in the case of the Unaudited Financial Statements, subject to normal year-end audit adjustments and the absence of footnotes.



(ii)      The unaudited pro forma consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of [_____], 2009 (including the notes thereto) (the "**Pro Forma Balance Sheet**") has been prepared giving effect (as if such events had occurred on such date) to (i) the occurrence of the Effective Date, (ii) the First Lien Term Loans deemed converted or continued, as applicable on the Closing Date and the use of proceeds thereof, (iii) the Loans deemed made on the Closing Date and (iv) the payment of fees and expenses in connection with the foregoing.  The Pro Forma Balance Sheet has been prepared in good faith, based on assumptions believed by the Borrower to be reasonable as of the date of delivery thereof, and presents fairly in all material respects in accordance with GAAP the pro forma consolidated financial position of the Borrower and its consolidated Subsidiaries as of [_____], 2009 and their pro forma consolidated results of operations for the periods covered thereby, assuming that the events specified in the preceding sentence had actually occurred at such date.

(b)  Since [_____], 2009, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(c)  The forecasts of consolidated balance sheets, income statements and cash flow statements of the Borrower and its consolidated Subsidiaries which have been furnished to the Administrative Agent prior to the Closing Date have been prepared in good faith on the basis of assumptions believed by the Borrower to be reasonable at the time made, it being understood that forecasts are, by their nature, inherently uncertain and actual results may vary from such forecasts and that such variations may be material.

Section 5.06    Litigation.  As of the Closing Date, there are no actions, suits, proceedings, claims, investigations or disputes pending or, to the knowledge of the Borrower, threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any of its Subsidiaries or against any of their properties or revenues that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07    No Default.  Neither the Borrower nor any Subsidiary is in default under or with respect to any Contractual Obligation that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

Section 5.08    Ownership of Property; Liens.  Each Loan Party and each of its Subsidiaries has good title to, or valid leasehold interests in, or (in the case of Intellectual Property) a license or other right to use, or easements or other limited property interests in, all its properties and assets material to the ordinary conduct of its business (including all Material Real Property), free and clear of all Liens except

- 48 -

for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01.

Section 5.09    Environmental Compliance. (a)  There are no claims, actions, suits, or proceedings alleging potential liability or responsibility for violation of, or otherwise relating to, any Environmental Law or to Hazardous Materials that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) none of the properties currently or, to the knowledge of the Borrower, formerly owned, leased or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or, to the knowledge of the Borrower, is adjacent to any such property; and (ii) Hazardous Materials have not been released, discharged or disposed of by any Person on any property currently or, to the knowledge of the Borrower, formerly owned, leased or operated by any Loan Party or any of its Subsidiaries and Hazardous Materials have not otherwise been released, discharged or disposed of by any of the Loan Parties and their Subsidiaries at any other location, in each case in a manner that could reasonably be expected to result in Environmental Liability.

(c)  The properties owned, leased or operated by the Borrower and the Subsidiaries do not contain any Hazardous Materials in amounts or concentrations which (i) constitute a violation of, (ii) require remedial action under, or (iii) could give rise to liability under, Environmental Laws, which violations, remedial actions and liabilities, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(d)  Neither the Borrower nor any of its Subsidiaries is undertaking, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law, except for such investigation or assessment or remedial or response action that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(e)  All Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, by any Loan Party or any of its Subsidiaries, any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result, individually or in the aggregate, in a Material Adverse Effect.

(f)  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, none of the Loan Parties and their Subsidiaries has contractually assumed any liability or obligation of any other Person under or relating to any Environmental Law.

Section 5.10    Taxes.  The Borrower and its applicable Subsidiaries have filed all U.S. Federal income and material state and other material tax returns and reports required to be filed, and have paid all U.S. Federal income and material state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which reserves have been provided to the extent required by GAAP.

Section 5.11    ERISA Compliance.  (a)  Except as could not , either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state Laws.

(b) (i)  Other than the commencement of the Cases, which is a Reportable Event, no ERISA Event has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Pension Plan; (ii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would reasonably be expected to result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (iv) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Sections 4069 or 4212(c) of ERISA; and (v) the present value of all benefit liabilities under each Pension Plan does not exceed the aggregate current value of the assets of such Pension Plan (based on those assumptions used to fund the Pension Plans); except, with respect to each of the foregoing clauses (i) through (v) of this Section 5.11(b), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)  Except as specifically disclosed in Schedule 5.11(c), (i) all employer and employee contributions required by applicable law or by the terms of any Foreign Benefit Arrangement or Foreign Plan have been made, or, if applicable, accrued in accordance with normal accounting practices; (ii) the accrued benefit obligations of each Foreign Plan (based on those assumptions used to fund such Foreign Plan) with respect to all current and former participants do not exceed the assets of such Foreign Plan; (iii) each Foreign Plan that is required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities; and (iv) each such Foreign Benefit Arrangement and Foreign Plan is in compliance (A) with all material provisions of applicable law and all material applicable regulations and published interpretations thereunder with respect to such Foreign Benefit Arrangement or Foreign Plan and (B) with the terms of such plan or arrangement; except, with respect to each of the foregoing clauses (i) through (iv) of this Section 5.11(c), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.12    Subsidiaries; Equity Interests.  As of the Closing Date, neither Holdings nor any Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests owned by the Loan Parties in such Subsidiaries have been validly issued, are fully paid and nonassessable and all Equity Interests owned by Holdings or a Loan Party are owned free and clear of all Liens except (i) those created under the Collateral Documents and (ii) any Lien that is permitted under Section 7.01.  As of the Closing Date, Schedule 5.12 (a) sets forth the name and jurisdiction of each Subsidiary, (b) sets forth the ownership interest of Holdings, the Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.13    Margin Regulations; Investment Company Act.  (a)  The Borrower is not engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)  None of the Borrower, any Person Controlling the Borrower, or any Subsidiary is required to be registered as an "investment company" under the Investment Company Act of 1940.

- 50 -

Section 5.14    Disclosure.  No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party to any Agent, any Lender or the Bankruptcy Court, in each case in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected financial information and pro forma financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time made; it being understood that projections are, by their nature, inherently uncertain and such projections may vary from actual results and that such variances may be material.

Section 5.15    Intellectual Property; Licenses, Etc.  Each of the Loan Parties and their Subsidiaries owns, or licenses or possesses the valid right to use, all Intellectual Property that is material to the operation of the business of the Borrower and its Subsidiaries, taken as a whole, as currently conducted, and, without known conflict with the rights of any Person, except to the extent such conflicts, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  To the best knowledge of the Borrower, the conduct of the business of the Borrower and its Subsidiaries, taken as a whole, as currently conducted, does not infringe upon, misappropriate or otherwise violate any Intellectual Property of any Person and, to the knowledge of the Borrower, no Person infringes upon, misappropriates or otherwise violates any Intellectual Property owned or exclusively licensed by the Borrower and its Subsidiaries, except in each case of the foregoing as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  No written or, to the knowledge of the Borrower, oral claim or litigation regarding any Intellectual Property owned or exclusively licensed by any Loan Party or its Subsidiaries is pending or, to the knowledge of the Loan Parties, threatened against any Loan Party or Subsidiary, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.16    Solvency.  On the Closing Date, after giving effect to the Effective Date and the incurrence of all Indebtedness and Obligations being incurred in connection herewith and therewith, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.17    Labor Matters.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Loan Party pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of each Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with such matters; and (c) all payments due from any Loan Party on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

Section 5.18    Collateral.  (a)  The Guarantee and Security Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Lenders, legal, valid and enforceable (subject to the effect of Debtor Relief Laws and subject to general principles of equity) security interests in the Collateral described therein and proceeds thereof to the extent governed by the Uniform Commercial Code.  In the case of the Pledged Equity or Pledged Debt described in any of the Collateral Documents, when stock certificates representing such Pledged Equity or promissory notes representing such Pledged Debt are delivered to the First Lien Agent, as bailee, together with the necessary endorsements, and in the case of the other Collateral described in any of the Collateral Documents, when financing statements and other filings specified on Schedule 5.18 in appropriate form are filed in the offices specified on Schedule 5.18, the Guarantee and Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as

- 51 -

security for their respective Obligations, in each case to the extent a Lien on such Collateral can be perfected by the filing of a financing statement, by filings to be made in respect of Intellectual Property in the United States Patent and Trademark Office and the United States Copyright Office or, in the case of the Pledged Equity and Pledged Debt, by possession or control, in each case prior and superior in right to any other Person (except (x) in the case of Collateral constituting Pledged Equity and Pledged Debt, nonconsensual Liens permitted by Section 7.01 and the Liens created by the First Lien Term Loan Documents and (y) in the case of Collateral other than Pledged Equity and Pledged Debt, Liens permitted by Section 7.01 and the Liens created by the First Lien Term Loan Documents); provided, however, that additional filings may be required in the United States Patent and Trademark Office and the United States Copyright Office to perfect the security interest in Intellectual Property acquired after the date hereof.

(b)  Each of the Mortgages, when duly executed and delivered, is effective to create in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid and enforceable (subject to the effect of Debtor Relief Laws and subject to general principles of equity) Lien on the Mortgaged Properties described therein and proceeds thereof, and when the Mortgages are filed in the appropriate recording offices, each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Properties and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (except that the security interest created in such real property and the Mortgaged Property may be subject to the Liens permitted by Section 7.01.

Section 5.19    Regulation H.  No Mortgage encumbers improved real property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, as amended.

Section 5.20    Certain Documents.  The Borrower has delivered to the Administrative Agent a complete and correct copy of the First Lien Term Loan Documents, including any amendments, supplements or modifications with respect to any of the foregoing.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, each Loan Party shall, and shall cause each of its Subsidiaries to:

Section 6.01    Financial Statements.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)  as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower (or 120 days after the end of the 2010 fiscal year) beginning with the first fiscal year ending after the Closing Date, a consolidated and consolidating (by region) balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such fiscal year, and the related consolidated and consolidating (by region) statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all prepared in accordance with GAAP (other than the consolidating financial statements, which shall be substantially in the form delivered to the Administrative Agent prior to the Closing Date), audited (in the case of the consolidated financial statements) and accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be

- 52 -

subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification or exception arising out of the scope of the audit;

(b)  as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower (or sixty (60) days after the end of the fiscal quarter first ending after the Closing Date), an unaudited consolidated and consolidating (by region) balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such fiscal quarter, and the related unaudited (i) consolidated and consolidating (by region) statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) consolidated and consolidating (by region) statements of cash flows for such fiscal quarter and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year for the applicable entities and the corresponding portion of the previous fiscal year for the applicable entities, all certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the consolidated financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its consolidated Subsidiaries in accordance with GAAP (other than the consolidating financial statements, which shall be substantially in the form delivered to the Administrative Agent prior to the Closing Date), subject only to normal year-end audit adjustments and the absence of footnotes;

(c)  as soon as available, and in any event no later than thirty (30) days after the end of each fiscal month (or forty-five (45) days after the end of the third, sixth, ninth and twelfth fiscal month in each fiscal year), commencing with the fiscal month ended in [_____], 2009, an unaudited consolidated and consolidating (by region) balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such fiscal month, and the related unaudited (i) consolidated and consolidating (by region) statements of income or operations for such fiscal month and for the portion of the fiscal year then ended and (ii) consolidated and consolidating (by region) statements of cash flows for such fiscal month and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the previous year, all certified by a Responsible Officer of the Borrower as being fairly presented in all material respects in accordance with GAAP (other than the consolidating financial statements, which shall be substantially in the form delivered to the Administrative Agent prior to the Closing Date), subject only to normal year-end audit adjustments and the absence of footnotes; and

(d)  as soon as available, and in any event no later than ninety (90) days after the end of each fiscal year of the Borrower (or 120 days after the end of the 2010 fiscal year) beginning with the fiscal year ending June 30, 2010, a reasonably detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**"), which Projections shall be certified by a Responsible Officer of the Borrower as being prepared based upon good faith estimates and assumptions that are believed by such Responsible Officer to be reasonable at the time made and that such Responsible Officer is not aware of (x) any information contained in such Projections which is false or misleading in any material respect or (y) any omission of information which causes such Projections to be false or misleading in any material respect (it being understood and agreed that the Projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Responsible Officer and that no assurance can be given that any of the Projections will be realized, and that the Projections are not a guarantee of financial performance and actual results may differ from the projected results and such differences may be material).

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 6.01 may be satisfied with respect to financial information of the Borrower and its consolidated

- 53 -

Subsidiaries by furnishing (A) the applicable financial statements of Holdings (or any direct or indirect parent of Holdings) or (B) the Borrower's or Holdings' (or any direct or indirect parent thereof), as applicable, Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to each of clauses (A) and (B), (i) to the extent such information relates to Holdings (or a parent thereof), such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to Holdings (or such parent), on the one hand, and the information relating to the Borrower and its consolidated Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification or exception arising out of the scope of the audit.

Section 6.02    Certificates; Other Information.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)  simultaneously with the delivery of the financial statements referred to in Section 6.01(a), a certificate of its independent registered public accounting firm certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default under Section 7.10 or, if any such Default or Event of Default shall exist, stating the nature and status of such event (which certificate may be limited to the extent required by such firm's general accounting and auditing rules, policies or guidelines);

(b)  simultaneously with the delivery of the financial statements referred to in Section 6.01(a), (b) and (c), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(c)  simultaneously with the delivery of the financial statements referred to in Section 6.01(a) and (b), a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries (including, without limitation, with respect to Dispositions, cost savings, facility closures, litigation, contingent liabilities and other matters as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request) for the applicable period, and for the period from the beginning of the then current fiscal year to the end of such period, in each case, as compared to the portion of the Projections covering such periods;

(d)  promptly after the same are publicly available, copies of all annual, quarterly and current reports and registration statements which the Borrower or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(e)  promptly after the furnishing thereof, copies of any material requests or material notices received by any Loan Party (other than in the ordinary course of business) or material statements or material reports furnished to any holder of debt securities of any Loan Party or of any of its Subsidiaries in a principal amount greater than the Threshold Amount or to any holder of public or preferred equity securities of any Loan Party and not otherwise required to be furnished to the Lenders pursuant to any other clause of this Section 6.02;

509600-0292-11782-Active.11854677.4

(f)   no later than five (5) Business Days prior to the effectiveness thereof, copies of substantially final drafts of any proposed amendment, supplement, waiver or other modification, and any replacement, with respect to any First Lien Term Loan Document;

(g)   together with the delivery of each Compliance Certificate pursuant to Section 6.02(b), to the extent not previously disclosed to the Administrative Agent, (i) a description of any change in the name or the jurisdiction of organization of any Loan Party, (ii) a certificate of a Responsible Officer of the Borrower (A) setting forth any updates to Schedule 6 of the Guarantee and Security Agreement or confirming there has been no change in the information required to be reflected in such Schedule since the date of the Guarantee and Security Agreement or the date of the most recent certificate delivered pursuant to this clause (ii), (B) identifying, based on Collateral owned, and Laws in effect, as of the date of such certificate, all Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral that will be required to be filed of record within the 18 months following the date of such certificate, to the extent necessary and required under the Collateral Documents to protect and perfect the security interests under the Collateral Documents for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period) and (C) setting forth a reasonably detailed calculation of Excess Cash Flow for such fiscal year; *provided*, that the delivery of such certificate is only required at the time of the delivery of each Compliance Certificate required to be delivered in connection with Section 6.01(a) or (b), (iii) a description of any Person that has become a Group Member, in each case, since the date of the most recent list delivered pursuant to this Section 6.02(f) (or, in the case of the first such list so delivered, since the Closing Date) and (iv) a reconciliation of operating income of the Borrower and its Subsidiaries to Consolidated EBITDA (which reconciliation may be provided as part of the calculations included in the applicable Compliance Certificate); and

(h)   promptly, subject to applicable confidentiality requirements of Group Members, such additional financial or other information as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(d) or (e) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed in Section 10.02; (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); or (iii) such documents are publicly available on the SEC's website pursuant to the SEC's EDGAR system; provided that:  (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to the Administrative Agent. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

Section 6.03    Update Calls.  At least once per fiscal quarter, at such times as the Borrower and the Administrative Agent shall agree, the Borrower shall host a conference call (with a question and

- 55 -

answer period) with the chief executive officer and chief financial officer of the Borrower and such other members of senior management of the Borrower as the Borrower deems appropriate and the Administrative Agent and the Lenders and their respective representatives and advisors to discuss the performance of the business, strategic alternatives and other issues as the Administrative Agent may reasonably request.

Section 6.04    Notices.  Promptly after any Responsible Officer of a Loan Party obtains knowledge thereof, notify the Administrative Agent (for prompt notification to each Lender):

(a)  of the occurrence of any Default or Event of Default; and

(b)  of any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to Section 6.04(a) or (b) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.05    Payment of Obligations.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature (including, but not limited to, all material taxes, fees, assessments, and other governmental charges), except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and any required reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member.

Section 6.06    Preservation of Existence, Etc.  (a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except (i) in the case of any Subsidiary of the Borrower, where the failure to perform such obligations, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, or (ii) in a transaction permitted by Section 7.04 or 7.05, and (b) take all reasonable action to maintain all privileges (including its good standing), material rights, material permits, material licenses and material franchises necessary or desirable in the normal conduct of its business, except (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) pursuant to a transaction permitted by Section 7.04 or 7.05.

Section 6.07    Maintenance of Properties.  Except if the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of its properties and equipment material to the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice.

Section 6.08    Maintenance of Insurance.  Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and its Subsidiaries) and with deductible levels as are customarily carried under similar circumstances by such other Persons and ensure that the Administrative Agent is an additional insured and/or loss payee under such liability and property insurance as reasonably requested by the Administrative Agent.

- 56 -

Section 6.09    Compliance with Laws.  Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.10    Inspection Rights; Books and Records; Discussions.  (a)  Keep proper books of record and account in which full, true and correct entries in all material respects are made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books of record at any reasonable time upon reasonable notice and to discuss the business, operations, properties and financial and other condition of the Loan Parties with officers and senior managerial employees of the Loan Parties and with their independent certified public accountants, in all cases subject to applicable Law and the terms of any applicable confidentiality agreements not entered into for purposes of obstructing the operation of this Section 6.10; *provided*, that an officer of the Borrower shall be provided reasonable opportunity to participate in any such discussion with the accountants; *provided*, *further*, that such inspections and discussions shall be coordinated through the Administrative Agent and that in the absence of a continuation of an Event of Default, the Administrative Agent and the Lenders shall not exercise such rights more often than once (1) during any calendar quarter. The Administrative Agent and each Lender agrees to use reasonable efforts to coordinate and manage the exercise its rights under this Section 6.10 so as to minimize the disruption to the business of the Borrower and its Subsidiaries resulting therefrom.

Section 6.11    Covenant to Guarantee Obligations and Give Security.  At the Borrower's expense, take all action reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)  upon the formation or acquisition of any new direct or indirect Subsidiary by any Loan Party:

(i)    within (x) thirty (30) days after the formation or acquisition of any such Domestic Subsidiary or such longer period as may be reasonably acceptable to the Administrative Agent if the Loan Parties are diligently pursuing compliance herewith, and (y) forty-five (45) days after the formation or acquisition of any such Foreign Subsidiary or, in the case of this clause (y), such longer period as may be reasonably acceptable to the Administrative Agent:

(A)    cause each such Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement or becomes a Guarantor to furnish to the Administrative Agent a description of the Material Real Property owned by such Subsidiary, in detail reasonably satisfactory to the Administrative Agent;

(B)    cause (x) each such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement or becomes a Guarantor to duly execute and deliver to the Administrative Agent Mortgages, Security Agreement Supplements and other security agreements and documents and to execute, deliver, file and record any such other documents, statements, assignments, instruments, agreements or other papers and take all other actions reasonably requested by the Administrative Agent in order to create a perfected security interest with the priority required by the Collateral Documents in all of its assets required to constitute Collateral under the Loan Documents (including,

509600-0292-11782-Active.11854677.4

with respect to Mortgages, the documents listed in Section 6.11(b)), as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent (consistent with the Mortgages, Guarantee and Security Agreement and other security agreements in effect on the Closing Date), and (y) each direct parent of each such Subsidiary (if such parent is the Borrower or is required to be a Guarantor pursuant to the Collateral and Guarantee Requirement or becomes a Guarantor) to duly execute and deliver to the Administrative Agent such Security Agreement Supplements and other security agreements and to execute, deliver, file and record any such other documents, statements, assignments, instruments, agreements or other papers and take all other actions reasonably requested by the Administrative Agent in order to create a perfected security interest with the priority required by the Collateral Documents in any uncertificated Equity Interests of such Subsidiary that are required to constitute Collateral under the Loan Documents, as reasonably requested by the Administrative Agent and in form and substance reasonably satisfactory to the Administrative Agent (consistent with the Guarantee and Security Agreement in effect on the Closing Date); provided that notwithstanding the foregoing, prior to the First Lien Obligation Payment Date, this provision shall not apply with respect to any property which has not been included in the "Collateral" under the First Lien Term Loan Documents;

(C)    (x) cause each such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement or becomes a Guarantor to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and any instruments evidencing the Indebtedness held by such Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Administrative Agent (or, prior to the First Lien Obligation Payment Date, to the First Lien Agent, as bailee for the Secured Parties), and (y) cause each direct parent of such Subsidiary (if such parent is the Borrower or is required to be a Guarantor pursuant to the Collateral and Guarantee Requirement or becomes a Guarantor) to deliver any and all certificates representing the outstanding Equity Interests (to the extent certificated) of such Subsidiary that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and any instruments evidencing the intercompany Indebtedness issued by such Subsidiary and required to be pledged in accordance with the Collateral Documents, indorsed in blank to the Administrative Agent (or, prior to the First Lien Obligation Payment Date, to the First Lien Agent, as bailee for the Secured Parties); provided that notwithstanding the foregoing, prior to the First Lien Obligation Payment Date, this provision shall not apply with respect to any property which has not been included in the "Collateral" under the First Lien Term Loan Documents;

(D)    take and cause such Subsidiary and each direct or indirect parent of such Subsidiary to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, delivery of stock and membership interest certificates, delivery of promissory notes duly endorsed in favor of the Administrative Agent, and the execution,

- 58 -

delivery, filing and recording of any such other documents, statements, assignments, instruments, agreements or other papers) may be reasonably requested by the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity;

(E)    (x) prior to the First Priority Obligations Payment Date, cause each of the Borrower's direct or indirect Domestic Subsidiaries which is a "Guarantor" under the First Lien Term Loan Documents to become a Guarantor under the Collateral and Guarantee Requirement to Guarantee the Obligations and (y) after the First Priority Obligations Payment Date, cause each such Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement to Guarantee the Obligations; and

(F)    cause each such Subsidiary to deliver to the Administrative Agent copies of its Organization Documents,

(ii)    within thirty (30) days (with respect to any Domestic Subsidiary) or forty-five (45) days (with respect to any Foreign Subsidiary) after the request therefor by the Administrative Agent (or such longer period as may be reasonably acceptable to the Administrative Agent if the Loan Parties are diligently pursuing compliance herewith), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent, the other Agents and the Lenders, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this Section 6.11(a) as the Administrative Agent may reasonably request, and

(iii)    as promptly as practicable after the request therefor by the Administrative Agent, deliver to the Administrative Agent, with respect to each parcel of Material Real Property that is owned by such Subsidiary, any existing title reports, existing surveys or existing environmental assessment reports; and

(b)  after the Closing Date, concurrently with the acquisition of any Material Real Property by any Loan Party and such Material Real Property shall not already be subject to a perfected Lien pursuant to the Collateral and Guarantee Requirement, the Borrower shall give notice thereof to the Administrative Agent and promptly thereafter shall cause such assets to be subjected to a Lien to the extent and at such times as shall be required by the Collateral and Guarantee Requirement and the Collateral Documents, as the case may be, and will take, or cause the relevant Loan Party to take, such actions and at such times as shall be reasonably requested by the Administrative Agent to grant and perfect or record such Lien, including, as applicable, the actions referred to in Section 6.13(b). Notwithstanding the foregoing, prior to the First Lien Obligations Payment Date, this provision shall not apply with respect to any property which has not been included in the "Collateral" under the First Lien Term Loan Documents.

Section 6.12    Compliance with Environmental Laws.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and (c) in each case to the extent required by Environmental Laws, conduct any investigation,

- 59 -

study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws.

Section 6.13    Further Assurances.  (a)  Promptly upon request by the Administrative Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents.

(b)  (i) Prior to the First Priority Obligations Payment Date, in the case of any Material Real Property referred to in Section 6.11(b), which has been mortgaged under the First Lien Term Loan Documents for which a Mortgage hereunder has not been delivered, provide the Administrative Agent with Mortgages with respect to such Material Real Property as soon as reasonably practicable together with:

(A)    to the extent provided to the First Lien Agent, evidence that counterparts of any such Mortgage has been duly executed, acknowledged and delivered and is in form suitable for filing or recording in all filing or recording offices that the Administrative Agent may deem reasonably necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Administrative Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees that are due and payable have been paid or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

(B)    to the extent provided to the First Lien Agent, fully paid title insurance policies (or the equivalent or other forms available in each applicable jurisdiction) (the "**Mortgage Policies**") with endorsements, issued, coinsured and reinsured by title insurers, insuring the Mortgages to be valid subsisting Liens on the property described therein, free and clear of all defects and encumbrances except for defects in title that do not materially interfere with the Loan Party's ability to conduct business and subject to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Administrative Agent may reasonably request.  Notwithstanding the foregoing, to avoid duplication of title insurance premiums, the requirements of this Section 6.13(b)(B) shall be deemed satisfied if the Title Insurance Borrower either (x) issues a single binding pro forma or marked-up unconditional commitment to issue a mortgagee's title insurance policy (or policies) insuring both the Mortgage in favor of the First Lien Agent and the Mortgage in favor of the Administrative Agent in the aggregate amount of the fair market value of the subject Mortgaged Property, or (y) issues a binding pro forma or marked-up unconditional commitment to issue a mortgagee's title insurance policy (or policies) insuring the Mortgage in favor of the  Administrative Agent in the same amount as the binding pro forma or marked-up unconditional commitment to issue a mortgagee's title insurance policy (or policies) insuring the Mortgage in favor of the First Lien Agent and such binding pro forma or marked-up unconditional commitment to issue a mortgagee's title insurance policy (or policies) contains a so called "pro-tanto" endorsement.  To the extent delivered to the First Lien Agent, the Administrative Agent shall have received evidence reasonably satisfactory to the First Lien Agent that all premiums in respect of each such policy, all charges for mortgage recording tax, and all related expenses, if any, have been paid.

(C)    to the extent provided to the First Lien Agent, opinions of local counsel for the Loan Parties in states in which the real properties are located, with respect to the enforceability and perfection of any such Mortgage and any related fixture filings in form and substance substantially similar to those provided to the First Lien Agent; and

(D)    to the extent provided to the First Lien Agent, such other evidence, that all other actions that the Administrative Agent may reasonably deem necessary or desirable in order to create valid and subsisting Liens on the property described in each such Mortgage has been taken.

(ii) After the First Priority Obligations Payment Date, in the case of any Material Real Property referred to in Section 6.11(b), provide the Administrative Agent with Mortgages with respect to such Material Real Property within sixty (60) days of the acquisition of such real property (or such longer period as may be reasonably acceptable to the Administrative Agent if the Loan Parties are diligently pursuing compliance herewith) together with:

(A)    evidence that counterparts of any such Mortgage has been duly executed, acknowledged and delivered and is in form suitable for filing or recording in all filing or recording offices that the Administrative Agent may deem reasonably necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Administrative Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees that are due and payable have been paid or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

(B)    fully paid title insurance policies (or the equivalent or other forms available in each applicable jurisdiction) (the "**Mortgage Policies**") in form and substance, with endorsements and in amount, reasonably acceptable to the Administrative Agent (not to exceed the value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Administrative Agent, insuring the Mortgages to be valid subsisting Liens on the property described therein, free and clear of all defects and encumbrances except for minor defects in title that do not materially interfere with the Loan Party's ability to conduct business and subject to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Administrative Agent may reasonably request;

(C)    if so requested by the Administrative Agent in its reasonable discretion, opinions of local counsel for the Loan Parties in states in which the real properties are located, with respect to the enforceability and perfection of any such Mortgage and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent; and

(D)    such other evidence that all other actions that the Administrative Agent may reasonably deem necessary or desirable in order to create valid and subsisting Liens on the property described in each such Mortgage has been taken.

Section 6.14    Deposit Accounts.  (a) Prior to the First Priority Obligations Payment Date, maintain at all times all of the cash and Cash Equivalents of Holdings and its Domestic Subsidiaries (other than cash and Cash Equivalents not exceeding $5,000,000 in the aggregate) at an account or accounts (i) with the First Lien Agent or any other financial institution that has entered into a control agreement with respect to such acount(s) in form and substance reasonably satisfactory to the First Lien Agent and the Administrative Agent, (ii) at an account the entire balance of which is swept at least once every three (3) Business Days to an account described in clause (i) above or (iii) at accounts not otherwise allowable under this provision which the lenders under the First Lien Credit Agreement have consented to

be maintained with financial institutions other than the First Lien Agent and not subject to control agreements; and

(b) After the First Priority Obligations Payment Date, maintain at all times all of the cash and Cash Equivalents of Holdings and its Domestic Subsidiaries (other than cash and Cash Equivalents not exceeding $5,000,000 in the aggregate) at an account or accounts  (i) with the Administrative Agent or any other financial institution that has entered into a control agreement with respect to such acount(s) in form and substance reasonably satisfactory to the Administrative Agent or (ii) at an account the entire balance of which is swept at least once every three (3) Business Days to an account described in clause (i) above.

Section 6.15    Ratings.  Use commercially reasonable efforts to obtain, on or prior to the 30th day after the Closing Date, ratings on the Facility from S&P and Moody's.

Section 6.16    Post-Closing Covenants.  Cause each post-closing matter identified on Schedule 6.16 to be completed on or before the date set forth on Schedule 6.16 for such post-closing matter.

## ARTICLE VII

## NEGATIVE COVENANTS

So long as any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, each Loan Party shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

Section 7.01    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)  Liens created pursuant to any Loan Document;

(b)  Liens existing on the Closing Date (after giving effect to the occurrence of the Effective Date) and listed on Schedule 7.01(b) and any modifications, replacements, renewals or extensions of the foregoing; provided that (x) except as specified on Schedule 7.01(b), the principal amount of Indebtedness secured thereby is not increased (except as a result of changes in the Exchange Rate and except by the amount of premium, penalties, accrued and unpaid interest, fee and expenses associated with any Permitted Refinancing thereof) and (y) such Liens do not at any time extend to or cover any assets other than the assets subject to such Liens on the Closing Date (after giving effect to the occurrence of the Effective Date);

(c)  Liens for taxes, assessments or governmental charges which are not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if reserves with respect thereto are maintained on the books of the applicable Person to the extent required by and in accordance with GAAP;

(d)  statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, workmen, suppliers, construction contractors or other like Liens arising in the ordinary course of business which secure amounts not overdue for a period of more than forty-five (45) days or which are being contested in good faith and by appropriate proceedings diligently conducted, if reserves with respect thereto are maintained on the books of the applicable Person to the extent required by and in accordance with GAAP;

509600-0292-11782-Active.11854677.4

(e)  (i)  Liens, pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) Liens, pledges and deposits in the ordinary course of business securing liability for premiums or reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing insurance to Holdings, the Borrower or any Subsidiary;

(f)  Liens (including rights of set-off) or deposits (including deposits made to satisfy statutory or other legal obligations in connection with sweepstakes or similar contests and Liens in favor of postal authorities) to secure the performance of bids, trade contracts, governmental contracts, tenders, statutory bonds and leases (other than Indebtedness for borrowed money and Capitalized Lease Obligations), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)  easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar encumbrances and minor title defects affecting real property which, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower or any Subsidiary or materially detract from the value of the property subject thereto, and zoning, building codes and other land use laws regulating the use or occupancy of the real property or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the business of the Borrower or any Subsidiary thereon;

(h)  Liens securing judgments, decrees, attachments or awards for the payment of money not constituting an Event of Default under Section 8.01(h);

(i)  Liens securing Indebtedness permitted under Section 7.03(e) or 7.03(s); *provided* that (i) such Liens attach concurrently with or within forty-five (45) days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, (iii) with respect to Capitalized Lease Obligations, such Liens do not at any time extend to or cover any assets other than the assets subject to such Capitalized Lease Obligations except that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender and (iv) the principal amount of Indebtedness secured thereby is not increased (except as a result of changes in the Exchange Rate and except by the amount of premiums, penalties, accrued and unpaid interest, fee and expenses associated with any Permitted Refinancing thereof);

(j)  leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower or any Subsidiary or (ii) secure any Indebtedness;

(k)  Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)  Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) arising in the ordinary course of business in connection with the maintenance of such accounts and (iii) arising under customary general terms of the account bank in relation to any bank account maintained with such bank and attaching only to such account and the products and proceeds thereof;

509600-0292-11782-Active.11854677.4

(m) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02(f), (i) or (l) to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(n) any interest or title of a lessor under leases entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and covering only the assets so leased and other assets directly related to such lease, including title and similar documents;

(o) Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business permitted by this Agreement;

(p) Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02;

(q) Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business, consistent with past practice and not for speculative purposes;

(r) Liens that are contractual rights of set-off or, in the case of clause (i) or (ii) below, other bankers' Liens (i) relating to treasury, depository and cash management services or any automated clearing house transfers of funds in the ordinary course of business and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Holdings, the Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings, the Borrower and the Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business;

(s) Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(t) Liens on equipment (including printing presses and data-processing equipment) owned by the Borrower or any Subsidiary and located on the premises of any supplier, in the ordinary course of business;

(u) Liens on cash collateral securing letters of credit in an aggregate amount at any one time outstanding not to exceed $25,000,000 (less the amount of cash collateral applied to the reimbursement of any such letters of credit (net of any such amounts returned by the beneficiary thereof in respect thereof));

(v) deposits in the ordinary course of business securing credit card programs maintained in the ordinary course of business in an amount not to exceed $15,000,000 (plus the amount, up to an additional $20,000,000, of such deposits sought by JPMorgan Chase Bank or its subsidiaries (including Paymentech)) in the aggregate at any one time outstanding;

(w) utility and other similar deposits made in the ordinary course of business;

- 64 -

(x)  Liens on property or Equity Interests of any non-Loan Party Foreign Subsidiary, which property or Equity Interests do not constitute Collateral, securing Indebtedness of such Foreign Subsidiary permitted under Section 7.03;

(y)  Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary, in each case after the date hereof (other than Liens on the Equity Interests of any Person that becomes a Subsidiary); *provided* that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary, (ii) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof), and (iii) the Indebtedness secured thereby is permitted under **Error! Reference source not found.**;

(z)  ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located and other Liens affecting the interest of any landlord (and any underlying landlord) of any real property leased by the Borrower or any Subsidiary;

(aa) Liens not otherwise permitted by this Section so long as (i) neither (A) the aggregate outstanding principal amount of the obligations secured thereby nor (B) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds, at any one time outstanding, $18,000,000 in the aggregate, and (ii) such Lien does not encumber the Equity Interests of any Subsidiary of Holdings; and

(bb)    Liens securing the obligations under the First Lien Term Loan Documents and any modifications, replacements, renewals or extensions thereof.

Section 7.02    <u>Investments</u>.  Make or hold any Investments, except:

(a)  Investments in cash and Cash Equivalents;

(b)  loans or advances to officers, directors and employees of Holdings, the Borrower and the Subsidiaries in the ordinary course of business for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes in an aggregate principal amount outstanding for all Group Members not to exceed $3,000,000 at any one time outstanding;

(c)  Investments (i) by any Group Member in the Borrower or any wholly owned Subsidiary that is a Guarantor and (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary, (iii) by any Loan Party in a Foreign Subsidiary in the ordinary course of business in the form of intercompany loans to fund ordinary course foreign operations in an aggregate amount not to exceed $30,000,000 at any one time outstanding (provided that up to $12,000,000 of such Investments may be made in the form of capital contributions instead of intercompany loans, the amount of such capital contributions to reduce Dollar for Dollar the amount of loans permitted by this clause (iii)) and (iv) Investments set forth on Schedule 7.02(c) up to the amounts at any one time outstanding and for the purposes set forth thereto;

(d)  Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)  Investments (i) resulting from the creation of a Lien permitted under Section 7.01, (ii) resulting from the incurrence of Indebtedness permitted under Section 7.03, (iii) made to effect

- 65 -

Dispositions permitted under Section 7.04 or Section 7.05 (other than Section 7.05(d)) or (iv) made to effect Restricted Payments permitted under Section 7.06;

(f)   Investments existing on the date hereof and set forth on Schedule 7.02(f) and any modification, replacement, renewal, reinvestment or extension thereof that does not increase the aggregate amount thereof (except as a result of changes in the Exchange Rate) or as otherwise permitted by this Section 7.02;

(g)   Investments in Swap Contracts permitted under Section 7.03;

(h)   promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 7.05 to the extent not required to be made for cash consideration;

(i)   the purchase or other acquisition of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, or Equity Interests in a Person that, upon the consummation thereof, will be a Subsidiary of the Borrower (including as a result of a merger or consolidation); *provided* that, with respect to each purchase or other acquisition made pursuant to this Section 7.02(i) (each, a "**Permitted Acquisition**"):

(A)   subject to clause (B) below, each applicable Loan Party and any such newly created or acquired Subsidiary (and, to the extent required under the Collateral and Guarantee Requirement, the Subsidiaries of such created or acquired Subsidiary) shall be a Guarantor and shall have complied with the requirements of and granted the security interests required by Section 6.11 within the times specified therein;

(B)   the aggregate amount of consideration (cash and non-cash (other than the proceeds of Permitted Equity Issuances after the Closing Date Not Otherwise Applied), including (i) the fair market value (on the date of such Permitted Acquisition) of all Equity Interests issued or transferred to the sellers thereof and (ii) all indemnities, earnouts and other contingent payment obligations to, and the aggregate amounts paid or to be paid under noncompete, consulting and other affiliated agreements with, the sellers thereof, all write-downs of property and reserves for liabilities with respect thereto and all assumptions of debt, liabilities and other obligations in connection therewith; provided that any such liability or future payment pursuant to clause (ii) above that is subject to a contingency shall be considered consideration for a Permitted Acquisition for purposes of this clause (B) only to the extent of the amount of such liability or payment, if any, required under GAAP to be reflected on the face of a consolidated balance sheet of the Borrower or the reserve, if any, required under GAAP to be established in respect thereof by the Borrower or any of its Subsidiaries, in each case at the time such Permitted Acquisition is consummated) paid in respect of (x) all Permitted Acquisitions shall not exceed (1) $50,000,000 for the period from the Closing Date to the first anniversary of the Closing Date, (2) $100,000,000 for the period from the Closing Date to the second anniversary of the Closing Date and (3) $150,000,000 for the period from the Closing Date to the Maturity Date (in each case plus the portion of Excess Cash Flow Not Otherwise Applied) and (y) acquisitions of Persons that do not become Loan Parties shall not exceed (1) $25,000,000 for the period from the Closing Date to the first anniversary of the Closing Date, (2) $50,000,000 for the period from the Closing Date to the second anniversary of the Closing Date and (3) $75,000,000 for the period from the Closing Date to the Maturity Date;

(C)   (1) immediately before and immediately after giving pro forma effect to any such purchase or other acquisition, no Default or Event of Default shall have occurred and be continuing and (2) immediately after giving effect to such purchase or other acquisition, the

- 66 -

Borrower and the Subsidiaries shall be in compliance with, on a pro forma basis, all of the covenants set forth in Section 7.10, such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or (b) as though such purchase or other acquisition had been consummated as of the first day of the fiscal period covered thereby and evidenced by a certificate from a Responsible Officer of the Borrower demonstrating such compliance calculation in reasonable detail; and

(D) the Borrower shall have delivered to the Administrative Agent, on behalf of the Lenders, no later than five (5) Business Days after the date on which any such purchase or other acquisition is consummated, a certificate of a Responsible Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying that all of the requirements set forth in this clause (i) have been satisfied or will be satisfied on or prior to the consummation of such purchase or other acquisition;

(j)   Investments in the ordinary course of business consisting of Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(k)   Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)   in addition to Investments otherwise expressly permitted by this Section, Investments by the Borrower or any of its Subsidiaries in an aggregate amount not to exceed $18,000,000 plus the aggregate amount of the proceeds of Permitted Equity Issuances after the Closing Date that have been contributed to the Borrower as common equity and Not Otherwise Applied and the portion of Excess Cash Flow Not Otherwise Applied;

(m) advances of payroll payments to employees and advances to authors in the ordinary course of business;

(n)   existing Investments of a Subsidiary acquired after the Closing Date or of a corporation merged into the Borrower or merged or consolidated with a Subsidiary in accordance with Section 7.04 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(o)   Investments in assets useful in the business of the Borrower and its Subsidiaries made by the Borrower or any of its Subsidiaries with the Net Cash Proceeds received in connection with Dispositions or Casualty Events that are not applied to prepay the Loans pursuant to Section 2.03(b)(ii)(B);

(p)   Guarantees by Holdings, the Borrower or any Subsidiary of leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business; and

(q)   prepaid expenses and lease, utility, workers' compensation, performance and other similar deposits made in the ordinary course of business.

- 67 -

Section 7.03    Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)  Indebtedness of any Loan Party under the Loan Documents;

(b)  (i) Indebtedness outstanding on the Closing Date (after giving effect to the occurrence of the Effective Date) and listed on Schedule 7.03(b) and (ii) any Permitted Refinancing thereof (to the extent (A) such Permitted Refinancing is incurred by the Person who is the obligor of the Indebtedness subject to such Permitted Refinancing or (B) such incurrence is otherwise permitted under this Section 7.03);

(c)  Guarantees made in the ordinary course of business by (i) any Group Member in respect of Indebtedness of the Borrower or any Subsidiary that is a Guarantor and (ii) any Subsidiary that is not a Loan Party in respect of Indebtedness of any other Subsidiary, in each case to the extent the Indebtedness being Guaranteed is otherwise permitted hereunder; *provided* that (A) no Guarantee by any Group Member of any Junior Financing shall be permitted unless such Group Member shall have also become a Guarantor hereunder and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Obligations (or the Guarantee thereof, as applicable) on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(d)  Indebtedness of the Borrower or any Subsidiary owing to the Borrower or any other Subsidiary to the extent constituting an Investment permitted by Section 7.02; *provided* that, all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subordinated to the payment in full of the Obligations;

(e)  (i) Attributable Indebtedness and other Indebtedness (including Capitalized Lease Obligations) financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; *provided* that such Indebtedness is incurred concurrently with or within forty-five (45) days after the applicable acquisition, construction, repair, replacement or improvement, and (ii) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (i); *provided* that the aggregate principal amount of all Indebtedness permitted under this Section 7.03(e) shall not exceed $15,000,000 at any time outstanding plus the amount of any Capital Leases incurred solely as a result of the reclassification of existing operating leases as such due to changes in GAAP;

(f)  Indebtedness in respect of Swap Contracts incurred in the ordinary course of business and not for speculative purposes;

(g)  Indebtedness representing deferred compensation to employees of the Borrower and its Subsidiaries incurred in the ordinary course of business;

(h)  Indebtedness (excluding Indebtedness incurred pursuant to Section 7.03(i) below) (i) assumed in connection with any Permitted Acquisition (provided such Indebtedness is not incurred in contemplation of such Permitted Acquisition) or incurred to finance a Permitted Acquisition or (ii) consisting of any Permitted Refinancing of the foregoing, in each case so long as both immediately prior and after giving effect thereto, (A) no Default or Event of Default shall be continuing or result therefrom, (B) the Borrower and its Subsidiaries will be in pro forma compliance with the covenants set forth in Section 7.10, such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or (b) as though such Indebtedness had been assumed or incurred as of the first day of the fiscal period covered thereby and evidenced by a certificate from the Chief Financial Officer of the Borrower demonstrating such compliance calculation in reasonable detail, (C) the aggregate principal amount of such Indebtedness and

- 68 -

all Indebtedness resulting from any Permitted Refinancing thereof at any time outstanding pursuant to this paragraph (h) shall not exceed (x) $25,000,000 for the period from the Closing Date to the first anniversary of the Closing Date, (y) $50,000,000 for the period from the Closing Date to the second anniversary of the Closing Date and (z) $75,000,000 for the period from the Closing Date to the Maturity Date, and (D) the aggregate principal amount of such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof shall not exceed, with respect to any such Permitted Acquisition, 50% of the aggregate amount of consideration paid in respect thereof;

(i)   unsecured Indebtedness or earn-outs that are owed to the seller incurred in connection with a Permitted Acquisition, provided that such unsecured Indebtedness or earn-outs shall be subordinated and/or restricted in a manner reasonably satisfactory to the Administrative Agent;

(j)   Indebtedness incurred by the Borrower or any Subsidiary in connection with any Investment or Disposition permitted by this Agreement, in each case constituting customary indemnification obligations or obligations in respect of purchase price or other similar adjustments;

(k)   Indebtedness consisting of obligations of Holdings, the Borrower or the Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with any Investment expressly permitted hereunder;

(l)   Cash Management Obligations and other Indebtedness of Foreign Subsidiaries in respect of intraday overdraft protections and similar intraday arrangements in each case in connection with deposit accounts incurred in the ordinary course of business in connection with cash management activities in an aggregate amount at any time outstanding (determined when incurred) not to exceed (i) with respect to Foreign Subsidiaries domiciled in Europe, $25,000,000 in the aggregate, (ii) with respect to Foreign Subsidiaries domiciled in Canada or Latin America, $10,000,000 in the aggregate and (iii) with respect to Foreign Subsidiaries domiciled in Asia or Australia, $10,000,000 in the aggregate;

(m) Indebtedness in an aggregate principal amount not to exceed $18,000,000 at any time outstanding (except as a result of changes in the Exchange Rate);

(n)   Indebtedness consisting of (a) the financing of insurance premiums with the providers of such insurance or their affiliates or (b) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o)   Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; *provided* that any reimbursement obligations in respect thereof are reimbursed within 30 days following the incurrence thereof;

(p)   obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(q)  Foreign Jurisdiction Deposits;

(r)  Indebtedness of Foreign Subsidiaries in connection with factoring programs entered into in the ordinary course of business on customary market terms and with respect to receivables of, and generated by, Foreign Subsidiaries;

(s)  in connection with leasehold improvements, Indebtedness incurred in connection with the financing thereof in an aggregate amount not to exceed $10,000,000 at any time outstanding;

(t)  (i) Indebtedness under the First Lien Credit Agreement in an aggregate principal amount not to exceed the First Lien Cap Amount and other First Lien Obligations (including, without limitation First Lien Secured Hedge Agreements and First Lien Cash Management Obligations), (ii) Guarantees of any Guarantor in respect of such Indebtedness and (iii) any Permitted Refinancing thereof; and

(u)  to the extent constituting Indebtedness, judgments, decrees, attachments or awards not constituting an Event of Default under Section 8.01(h).

Section 7.04    Fundamental Changes.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(a)  (i) any Subsidiary of the Borrower may merge or be consolidated with the Borrower (provided that the Borrower shall be the continuing or surviving Person) or with one or more Guarantors (provided that the continuing or surviving Person is a Guarantor or a new Subsidiary which, substantially concurrently with such merger or consolidation, becomes a Guarantor hereunder) and (ii) any Subsidiary that is not a Loan Party may merge or be consolidated with one or more other Subsidiaries that are not Loan Parties;

(b)  (i) any Subsidiary of the Borrower may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or one or more Guarantors and (ii) any Subsidiary that is not a Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to one or more other Subsidiaries that are not Loan Parties; and

(c)  a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05, may be completed.

(d)  any Subsidiary that is not a Loan Party may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and is not materially disadvantageous to the interests of the Lenders hereunder; and

(e)  such transactions and changes described on Schedule 7.04(e) may be completed.

Section 7.05    Dispositions.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)  Dispositions of obsolete or worn out property, including the abandonment or other Disposition of Intellectual Property that is no longer material to the business of the Borrower and its Subsidiaries, whether now owned or hereafter acquired, in the ordinary course of business;

(b)  Dispositions of inventory in the ordinary course of business;

- 70 -

(c)  (i) Dispositions of property by any Group Member to the Borrower or any Guarantor and (ii) Dispositions of property by any Subsidiary that is not a Loan Party to the Borrower or any Subsidiary; *provided* that to the extent such transaction constitutes an Investment, such transaction is permitted under Section 7.02;

(d)  Dispositions permitted by Sections 7.04 and 7.06 and Liens permitted by Section 7.01;

(e)  Dispositions of cash and Cash Equivalents;

(f)  (i) Dispositions of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business and (ii) the factoring by Foreign Subsidiaries at maturity or collection of any accounts receivable pursuant to factoring programs entered into in the ordinary course of business on customary market terms and with respect to receivables of, and generated by, Foreign Subsidiaries;

(g)  leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business and which do not materially interfere with the business of Holdings, the Borrower and the Subsidiaries;

(h)  transfers of property to the extent subject to Casualty Events;

(i)  Dispositions listed on Schedule 7.05(i);

(j)  Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(k)  Dispositions in connection with office move or relocation in the ordinary course of business;

(l)  Dispositions of [art collections][1]; and

(m)  in the case of Holdings, Permitted Equity Issuances;

(n)  Dispositions of property not otherwise permitted under this Section 7.05; *provided* that (i) at the time of such Disposition, no Default or Event of Default shall exist or would result from such Disposition, (ii) the aggregate book value of all property Disposed of in reliance on this Section 7.05(j) shall not exceed $18,000,000 in the aggregate per fiscal year (provided that up to 50% of such amount for each fiscal year may be (A) carried back to the immediately preceding fiscal year, decreasing Dollar for Dollar the amount of Dispositions permitted pursuant to this paragraph **Error! Reference source not found.** in such fiscal year and increasing Dollar for Dollar the amount of Dispositions permitted pursuant to this paragraph **Error! Reference source not found.** in such immediately preceding fiscal year or (B) to the extent unused, carried forward to the immediately succeeding fiscal year), and (iii) not less than 80% of the consideration for such Disposition shall be in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received), other than nonconsensual Liens permitted by Section 7.01 and Liens permitted by Section 7.01(p) and clauses (i) and (ii) of Section 7.01(r);

---

[1] RDA to provide more information.

*provided* that any Disposition of any property pursuant to this Section 7.05 (except pursuant to clauses (c), (d) and (h) and except for Dispositions from any Loan Party to any Loan Party) shall be for no less than the fair market value of such property at the time of such Disposition.  To the extent any Collateral is Disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents without further action by the Administrative Agent, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

Section 7.06    <u>Restricted Payments</u>.  Declare or make, directly or indirectly, any Restricted Payment, except:

(a)  (i) any Subsidiary may make Restricted Payments to the Borrower or any Guarantor, (ii) any Subsidiary that is not a Loan Party may make Restricted Payments to the Borrower and any other Subsidiary and (iii) any Loan Party or its Subsidiary may make Restricted Payments to Holdings the proceeds of which will be used to pay (or to make Restricted Payments to allow any direct or indirect parent of Holdings to pay) the tax liability attributable to such Loan Party or Subsidiary in respect of consolidated, combined, unitary or affiliated tax returns for the relevant jurisdiction of Holdings (or such parent) in an amount not to exceed the taxes that would have been payable by such Loan Party or Subsidiary on a stand alone basis; and

(b)  the Borrower and its Subsidiaries may make Restricted Payments to Holdings consisting of Permitted Holdings Distributions;

(c)  so long as immediately before and after giving effect to any such Restricted Payment, no Default or Event of Default shall have occurred and be continuing or would result therefrom, the Borrower may make additional Restricted Payments to Holdings the proceeds of which may be utilized by Holdings to make additional Restricted Payments, in an aggregate amount in any fiscal year not to exceed the sum of (i) $6,000,000 plus (ii) the aggregate amount of the proceeds of Permitted Equity Issuances after the Closing Date that have been contributed to the Borrower as common equity and Not Otherwise Applied plus (iii) the portion of Excess Cash Flow Not Otherwise Applied;

(d)  Holdings, the Borrower and its Subsidiaries may declare and make dividend payments or other distributions to the extent payable in the Equity Interests (other than Disqualified Equity Interests not otherwise permitted by Section 7.03 or such dividend payments or distributions that would cause a Change of Control) of such Person;

(e)  noncash repurchases of Equity Interests in Holdings, the Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants; and

(f)  to the extent constituting Restricted Payments, Holdings, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.04.

Section 7.07    <u>Change in Nature of Business</u>.  Engage in a line of business different from those lines of business conducted by the Borrower and its Subsidiaries on the date hereof or any business reasonably related, ancillary or complementary thereto.

Section 7.08    <u>Transactions with Affiliates</u>.  Enter into any transaction of any kind with any Affiliate of Holdings, whether or not in the ordinary course of business, other than (a) (i) transactions exclusively among the Borrower and any Guarantors or among any Guarantors (ii) transactions

- 72 -

exclusively among any Subsidiaries that are not Loan Parties and (iii) transactions exclusively among any Group Members that are expressly contemplated by this Agreement to be among such Persons; *provided*, that in each case such transactions are not otherwise prohibited by this Agreement, (b) transactions in the ordinary course of business that are not otherwise prohibited by this Agreement and that are on fair and reasonable terms no less favorable to Holdings, the Borrower or such Subsidiary as would be obtainable by Holdings, the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate, (c) any Indebtedness among the Group Members to the extent permitted under Section 7.03(d), Investments of the type permitted by clauses (a), (b) and (c) of Section 7.02 and Restricted Payments permitted by Section 7.06, (d) transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 7.08 and (e) transactions pursuant to the Reorganization Plan.

Section 7.09    Burdensome Agreements.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of (a) any Subsidiary of the Borrower to make Restricted Payments to the Borrower or any other Subsidiary, (b) any Subsidiary of the Borrower to make loans or advances to, or other Investments in, the Borrower or any other Subsidiary, (c) any Subsidiary of the Borrower to transfer any of its assets to the Borrower or any other Subsidiary or (d) any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired; *provided* that the foregoing shall not apply to Contractual Obligations which (i) (x) arise under the First Lien Term Loan Documents or exist on the date hereof and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09 hereto or (y) are set forth in any agreement evidencing any permitted amendment, renewal, extension or refinancing of any Contractual Obligation permitted by clause (x) so long as such amendment, renewal, extension or refinancing is not materially more restrictive than such Contractual Obligation, (ii) arise in connection with any Disposition permitted by Section 7.05 and relate solely to the assets or Person subject to such Disposition, (iii) are customary restrictions in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby entered into in the ordinary course of business and consistent with past practice so long as such restrictions relate only to the assets subject thereto, (iv) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary, (v) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (vi) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business, and (vii) comprise restrictions imposed by a Lien permitted by Section 7.01 restricting the transfer of only the property subject thereto.

Section 7.10    Financial Condition Covenants.

(a)  Consolidated Fixed Charge Coverage Ratio.  Permit the Consolidated Fixed Charge Coverage Ratio as at the last day of any Test Period ending on any date set forth below to be less than the ratio set forth below opposite such date:

| Date | Consolidated Fixed Charge Coverage Ratio |
|---|---|
| [_____] | [_____] |

(b)  Minimum Cumulative Consolidated EBITDA.  Permit the Consolidated EBITDA as at the last day of any Test Period ending on any date set forth below, to be less than the amount set forth below opposite such date:

| Date | Cumulative Consolidated EBITDA |
|---|---|
| [_____] | [_____] |

(c) <u>Minimum Liquidity</u>.  Permit Liquidity, as of the last day of any fiscal month, to be less than $[_____].

(d) <u>Total Leverage Ratio</u>.  Permit the Total Leverage Ratio as of the last day of any Test Period ending on any date set forth below to be less than the ratio set forth below opposite such date:

| Date | Total Leverage Ratio |
|---|---|
| [_____] | [_____] |

Section 7.11    <u>Sale and Leaseback Transactions</u>.  Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property that has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member other than any such transaction the subject of which is the Loan Parties' property at 5400 South 60th Street, Greendale, Wisconsin.

Section 7.12    <u>Swap Contracts</u>.  Enter into any Swap Contract, except (a) Swap Contracts entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of any Person) and (b) Swap Contracts entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary; *provided*, that in each case such Swap Contracts are not entered into for speculative purposes.

Section 7.13    <u>Accounting Changes</u>.  Make any change in its fiscal year, (i) except as required by GAAP and (ii) except the change to December 31 and any related changes.

Section 7.14    <u>Prepayments, Etc. of Indebtedness</u>.  (a) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled interest shall be permitted) any Indebtedness that is required to be subordinated to the Obligations pursuant to the terms of the Loan Documents (collectively, "**Junior Financing**") or make any payment in violation of any subordination terms of any Junior Financing Documentation, except the refinancing thereof with the Net Cash Proceeds of any Permitted Refinancing otherwise permitted under Section 7.03.

(b) Amend, modify or change in any manner materially adverse to the interests of the Lenders (i) any term or condition of any First Lien Term Loan Document or any other Junior Financing Documentation or (ii) any Organization Document of any Group Member, in any case without the consent of the Administrative Agent.

Section 7.15    <u>Holding Company</u>.  In the case of Holdings, conduct, transact or otherwise engage in any business or operations other than those incidental to (i) its ownership of the Equity Interests in, and its management of, the Borrower, (ii) the maintenance of its legal existence and its compliance with applicable Laws, (iii) the performance of the Loan Documents and the First Lien Term Loan

- 74 -

Documents, (iv) any public offering of its common stock or any other issuance of its Equity Interests not prohibited by Article VII, and (v) the issuance, acquisition or maintenance of any Indebtedness or Investments, or the making of any Restricted Payments, that Holdings is expressly permitted to enter into or consummate under this Article VII; *provided* that, notwithstanding the foregoing, Holdings shall not own, lease, manage, acquire or otherwise operate any properties or assets (other than the ownership of Equity Interests in, and its management of, the Borrower, cash and Cash Equivalents and de minimis amounts of other assets incidental to the conduct of its business) or incur any material consensual liabilities (other than liabilities related to its existence and permitted business and activities specified above).

Section 7.16    Capital Expenditures.  (a)  Permit the aggregate amount of Capital Expenditures made during each fiscal year specified below to exceed the amount set forth opposite such fiscal year below:

| Fiscal Year | Capital Expenditure Amount |
|:-----------:|:--------------------------:|
| 2010 | [_____] |
| 2011 | [_____] |
| 2012 | [_____] |
| 2013 | [_____] |
| 2014 | [_____] |

; *provided* that the amount of Capital Expenditures permitted to be made in respect of any fiscal year shall be increased by an amount equal to the sum of (x) the aggregate amount of the Net Cash Proceeds of Permitted Equity Issuances after the Closing Date (other than Permitted Equity Issuances made pursuant to Section 9.04) that have been contributed to the Borrower as common equity and Not Otherwise Applied.

(b)    Notwithstanding anything to the contrary contained in clause (a) above, to the extent that the aggregate amount of Capital Expenditures made by the Borrower and the Subsidiaries in any fiscal year pursuant to Section 7.16(a) is less than the maximum amount of Capital Expenditures permitted by Section 7.16(a) with respect to such fiscal year, the amount of such difference (the "**Rollover Amount**") may be carried forward and used to make Capital Expenditures in the next succeeding fiscal year; *provided* that Capital Expenditures in any fiscal year shall be counted against the base amount set forth in Section 7.16(a) with respect to such fiscal year prior to being counted against any Rollover Amount available with respect to such fiscal year.

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

Section 8.01    Events of Default.  Any of the following shall constitute an Event of Default:

(a)  *Non-Payment*.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within three (3) Business Days after the same becomes due, any interest or any other amount payable hereunder or with respect to any other Loan Document; or

(b) *Specific Covenants.*  Any Group Member fails to perform or observe (or to cause the performance or observance of) any term, covenant or agreement contained in any of Sections 6.04(a), 6.06 (solely with respect to Holdings and the Borrower) or 6.16 or Article VII or Section [___] or [___] of the Guarantee and Security Agreement; or

(c) *Other Defaults.*  Any Group Member fails to perform or observe (or to cause the performance or observance of) any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after written notice thereof by the Administrative Agent or the Required Lenders to the Borrower; or

(d) *Representations and Warranties.*  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e) *Cross-Default.*  Any Group Member (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition contained in any instrument or agreement evidencing, governing, securing or otherwise relating to any such Indebtedness, or any other "default" (or like term) occurs, the effect of which failure or other "default" is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due (automatically or otherwise) prior to its stated maturity (or, in the case of any such Indebtedness constituting a Guarantee, to become payable); provided, that any such failure or other default under the First Lien Credit Agreement shall cause an Event of Default under this clause (e)(B) only if such failure or other default, results in Indebtedness under the First Lien Credit Agreement becoming due prior to its stated maturity; provided further that this clause (e)(B) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided*, *further*, that this clause (e) shall not apply in respect of (x) any Indebtedness of any Designated Non-Debtor that becomes due or payable, or is capable of becoming due or payable, prior to its stated maturity, or (y) any non-payment in respect of any Indebtedness by any Designated Non-Debtor, in each case to the extent caused by or directly resulting from the institution of any proceeding under any Debtor Relief Law in respect of such Designated Non-Debtor; or

(f) *Insolvency Proceedings, Etc.*  Any Group Member other than a Designated Non-Debtor institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief approving or ordering any of the foregoing is entered in any such proceeding [(to avoid any doubt, it being understood and agreed that

none of the foregoing shall be applicable to commencement of a process relating to *Mandataire ad Hoc* or an appointment of a *Mandataire* pursuant to French laws)][2]; or

(g) *Inability to Pay Debts*; *Attachment.* (i) Any Group Member other than a Designated Non-Debtor becomes generally unable or admits in writing its inability generally or fails generally to pay its debts in excess of the Threshold Amount as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any Group Member, and is not released, vacated or fully bonded within sixty (60) days after its issue or levy; or

(h) *Judgments.* (i) One or more judgments or decrees shall be entered against any Group Member involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has not disputed coverage) of an amount exceeding the Threshold Amount, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within thirty (30) days from the entry thereof; or (ii) there shall be rendered against any Group Member a nonmonetary judgment with respect to any event which causes or could reasonably be expected to have a Material Adverse Effect; or

(i) *ERISA.* (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, (iii) any Loan Party or any ERISA Affiliate engages in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Pension Plan which could reasonably be expected to result in a Material Adverse Effect, or (iv) other than the matters disclosed in Schedule 5.11(c), any other event or condition shall occur or exist with respect to a Pension Plan, a Foreign Benefit Arrangement or Foreign Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect; or

(j) *Change of Control.* There occurs any Change of Control; or

(k) *Invalidity of Liens.* Any of the Collateral Documents shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Liens created by any Collateral Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby other than by reason of the release thereof in accordance with the terms thereof; or

(l) *Invalidity of Guarantees.* The Guarantees contained in the Collateral Documents shall cease, for any reason, to be in full force and effect or any Loan Party or Affiliate of any Loan Party shall so assert in writing (it being understood and agreed that the discharge of a Guarantor from a Collateral Document in accordance with the terms hereof and thereof shall not be construed as the Guarantee(s) in such Collateral Document ceasing to be in full force and effect); or

(m) *Junior Financing Documentation.* Any of the Obligations of the Loan Parties under the Loan Documents for any reason shall cease to be "Senior Indebtedness" (or any comparable term) or

---

[2] To be discussed.

509600-0292-11782-Active.11854677.4

"Senior Secured Financing" (or any comparable term) under, and as defined in any Junior Financing Documentation.

Section 8.02    Remedies Upon Event of Default. If any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall take any or all of the following actions:

(a)  declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(b)  exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an Event of Default specified in Section 8.01(f) with respect to the Borrower, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, without further act of the Administrative Agent or any Lender.

Section 8.03    Application of Funds. After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause *Second* payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the holders of such Obligations in proportion to the respective amounts described in this clause *Third* payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, and the termination value under Secured Hedge Obligations and Cash Management Obligations, ratably among the holders of such Obligations in proportion to the respective amounts described in this clause *Fourth* held by them;

*Fifth*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

509600-0292-11782-Active.11854677.4

Notwithstanding anything to the contrary in this Agreement, amounts received from any Foreign Subsidiary on account of the Obligations of any Foreign Subsidiary shall be applied solely to the payment of Obligations of Foreign Subsidiaries.

## ARTICLE IX

## ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01    Appointment and Authorization of Agents.  (a)  Pursuant to the Reorganization Plan, the Administrative Agent, on behalf of the Lenders, is empowered and authorized to take action under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Without limiting the foregoing, each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such actions and exercise such powers and perform such duties.  Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)  The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacities as a Lender and a potential Hedge Bank) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX (including, Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02    Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through agents, employees or attorneys-in-fact and such sub-agents as shall be deemed necessary by the Administrative Agent and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct (as determined in the final non-appealable judgment of a court of competent jurisdiction).

- 79 -

Section 9.03    Liability of Agents.  No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), or (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

Section 9.04    Reliance by Agents.  (a) Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent.  Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)  For purposes of determining compliance with the conditions specified in Article IV, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 9.05    Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default." The Administrative Agent will notify the Lenders of its receipt of any such notice.  The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII; provided that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

509600-0292-11782-Active.11854677.4

Section 9.06    Credit Decision; Disclosure of Information by Agents. Each Lender expressly acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 9.07    Indemnification of Agents. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it; *provided* that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower. The undertaking in this Section 9.07 shall survive the payment of all Obligations and the resignation of the Administrative Agent.

Section 9.08    Agents in their Individual Capacities. JPMorgan Chase Bank and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though JPMorgan Chase Bank were not the Administrative Agent hereunder and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, JPMorgan Chase Bank or its Affiliates may receive

- 81 -

information regarding any Loan Party or its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them.  With respect to its Loans, JPMorgan Chase Bank shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" include JPMorgan Chase Bank in its individual capacity.

Section 9.09    Successor Agents.  The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice to the Lenders and the Borrower.  If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders.  If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent, the Administrative Agent may appoint, after consulting with the Lenders, a successor agent, which shall be a Lender or a bank with an office in New York, New York or an Affiliate of such Lender or bank.  Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent," shall mean such successor administrative agent and/or supplemental administrative agent, as the case may be, and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated.  After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX and Sections 10.04 and 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement.  If no successor agent has accepted appointment as the Administrative Agent by the date which is thirty (30) days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  Upon the acceptance of any appointment as the Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (a) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (b) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, the Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as the Administrative Agent.

Section 9.10    Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)  to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all

- 82 -

other amounts due the Lenders and the Administrative Agent under Sections 2.06 and 10.04) allowed in such judicial proceeding; and

(b)  to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.06 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.11    Collateral and Guarantee Matters.  The Lenders irrevocably agree:

(a)  that any Lien on any property granted to or held by the Administrative Agent under any Loan Document shall be automatically released (i) upon payment in full of all Obligations (other than (x) obligations under Secured Hedge Agreements, (y) Cash Management Obligations and (z) contingent reimbursement and indemnification obligations not yet accrued and payable), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than a Loan Party, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such greater number of Lenders as may be required pursuant to Section 10.01), or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty under the Guarantee and Security Agreement pursuant to clause (c) below;

(b)  (i) to release or subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i) and (ii) that the Administrative Agent is authorized (but not required) to release or subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by any other clause of Section 7.01; and

(c)  that any Guarantor shall be automatically released from its obligations under the Guarantee and Security Agreement if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; *provided* that no such release shall occur if such Guarantor continues to be a guarantor in respect of any Junior Financing.

Upon request by the Administrative Agent at any time, the Required Lenders (or such greater number of Lenders as may be required pursuant to Section 10.01) will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guarantee and Security Agreement pursuant to this Section 9.11.  In each case as specified in this Section 9.11, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to

- 83 -

evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guarantee and Security Agreement, in each case in accordance with the terms of the Loan Documents and this Section 9.11.

Section 9.12    Other Agents; Arranger and Managers.    None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent," "bookrunner" or "lead arranger" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such. Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

Section 9.13    Appointment of Supplemental Administrative Agents.    (a)  It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Administrative Agent**" and collectively as "**Supplemental Administrative Agents**").

(b)  In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)  Should any instrument in writing from the Borrower, Holdings or any other Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower or Holdings, as applicable, shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent. In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

- 84 -

# ARTICLE X

# MISCELLANEOUS

Section 10.01    Amendments, Etc.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)  postpone any date scheduled for, or reduce or forgive the amount of, any payment of principal or interest under Section 2.05 or Section 2.06 without the written consent of each Lender directly affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(b)  reduce or forgive the principal of, or the rate of interest specified herein on, any Loan or (subject to clause (i) of the second proviso to this Section 10.01) any fees (including fees set forth in Section 2.06 or other amounts payable hereunder or under any other Loan Document), or extend, postpone or waive the date upon which any fees are to be paid, without the written consent of each Lender directly affected thereby; *provided* that, only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(c)  change any provision of this Section 10.01, the definition of "Required Lenders" or "Pro Rata Share", the third sentence of Section 2.09(a), Section 2.10, Section 8.03 or Section 10.07(a)(x) without the written consent of each Lender affected thereby;

(d)  release or subordinate all or substantially all of the Liens or Collateral granted to the Secured Parties under any Loan Document in any transaction or series of related transactions, without the written consent of each Lender; or

(e)  release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

and *provided further* that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document and (ii) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the principal of the Loans of such Lender may not be reduced or forgiven without the consent of such Lender (it being understood that any Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders).

Notwithstanding anything to the contrary contained in Section 10.01, guarantees, collateral security documents and related documents executed by Foreign Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of

509600-0292-11782-Active.11854677.4

the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

Section 10.02    Notices and Other Communications; Facsimile Copies.  (a) *General*.  Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower or the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties:

| | |
|---|---|
| The Borrower: | The Reader's Digest Association, Inc. |
| | Reader's Digest Road |
| | Pleasantville, NY 10570 |
| | Attention: Treasurer |
| | Telephone number:  914-244-7683 |
| | Facsimile number:  914-244-5904 |
| | Electronic mail address:  william.magill@rd.com |
| | Website address:  www.rd.com |
| | |
| | With copies to (which shall not constitute a notice hereunder): |
| | |
| | Kirkland & Ellis LLP |
| | 601 Lexington Avenue |
| | New York, NY 10022 |
| | Attention:  Leonard Klingbaum |
| | Telephone number:  212-446-4792 |
| | Facsimile number:  212-446-6460 |
| | Electronic mail address: leonard.klingbaum@kirkland.com |
| | |
| The Administrative Agent: | JPMorgan Chase Bank, N.A. |
| | 277 Park Avenue, 8th Floor |
| | New York, NY 10172 |
| | Attention:  Elizabeth A. Kelley |
| | Telephone number:  212-622-4511 |
| | Facsimile number:  212-622-4557 |
| | Electronic mail address: elizabeth.kelley@jpmorgan.com |
| | |
| | With a copy to: |
| | |
| | JPMorgan Chase Loan & Agency Services |
| | 1111 Fannin, Floor 10 |
| | Houston, TX 77002 |
| | Attention:  Maryann T. Bui |
| | Telephone number:  713-750-7932 |

- 86 -

Facsimile number:  713-750-2878
Electronic mail address: maryann.t.bui@jpmchase.com

(ii)      if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower and the Administrative Agent.

All such notices and other communications shall be deemed to be given or made, if given or made during the recipient's normal business hours (and if not, shall be deemed to be given or made on the next succeeding Business Day), upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(d)), when delivered; *provided* that notices and other communications to the Administrative Agent pursuant to Article II shall not be effective until actually received by the Administrative Agent.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)  *Effectiveness of Facsimile Documents and Signatures.*  Loan Documents may be transmitted and/or signed by facsimile or "PDF" (subject to Section 10.02(d)).  The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Agents and the Lenders.

(c)  *Reliance by Agents and Lenders.*  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Conversion or Continuation Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify each Agent-Related Person and each Lender from all losses, liabilities and related reasonable out-of-pocket costs and expenses resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct.  All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

(d)  *Electronic Communications.*  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Articles II and III, if such Lender has notified the Administrative Agent that it is incapable of receiving notices thereunder by electronic communication.  The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.  Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the

- 87 -

foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

Section 10.03   No Waiver; Cumulative Remedies.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04   Attorney Costs, Expenses and Taxes.  The Borrower agrees (a) to pay or reimburse the Administrative Agent, the Syndication Agent, the Arranger and the Specified Lenders for all reasonable documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all (i) Attorney Costs of one lead counsel in each relevant jurisdiction and (ii) costs of Moelis, J.H. Cohn and other advisors to the Administrative Agent, in the case of this clause (ii) accrued through the completion of the transactions contemplated by the Reorganization Plan and (b) to pay or reimburse the Administrative Agent, the Syndication Agent, the Arranger and each Lender for all reasonable documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any negotiations, workouts, restructurings or legal proceedings, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of one lead counsel in each relevant jurisdiction and the fees and disbursements of any financial advisor or third party consultants or appraisers to and of the Administrative Agent).  The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees and taxes related thereto, and other reasonable and out-of-pocket expenses incurred by any Agent.  The agreements in this Section 10.04 shall survive the repayment of all Obligations.  All amounts due under this Section 10.04 shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

Section 10.05   Indemnification by the Borrower.  Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold harmless each Agent-Related Person, each Lender and their respective Affiliates, and directors, officers, employees, counsel, agents, trustees, investment advisors and attorneys-in-fact of each of the foregoing (collectively, the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments and suits and related reasonable out-of-pocket expenses (including Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance, administration, amendment, modification or waiver of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Loan or the use or proposed use of the proceeds therefrom, or (c) to the extent relating to or arising from any of the foregoing, any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned, leased or operated by any Group Member, or any Environmental Liability related in any way to any Group Member, or (d) any actual or prospective claim, litigation, investigation

- 88 -

or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits or expenses are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, any Affiliate of such Indemnitee or any officer, director, employee, advisor, representative or agent of such Indemnitee or any such Affiliate. No Indemnitee shall be liable to any Group Member for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement. No Indemnitee shall be liable (whether direct or indirect, in contract, tort or otherwise) to any Group Member except to the extent such liability is found in a non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, any Affiliate of such Indemnitee or any officer, director, employee, advisor, representative or agent of such Indemnitee or any such Affiliate. No Indemnitee shall have any liability to any Group Member, nor any Group Member to any Indemnitee, for any special, punitive, indirect or consequential damages (including, without limitation, loss of profits, business or anticipated savings) relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date). All amounts due under this Section 10.05 shall be paid within ten (10) Business Days after demand therefor; provided, however, that such Indemnitee shall promptly refund any amount received under this Section 10.05 to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification or contribution rights with respect to such payment pursuant to the express terms of this Section 10.05. The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender and the repayment, satisfaction or discharge of all the Obligations.

Section 10.06    <u>Payments Set Aside</u>.    To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.

Section 10.07    <u>Successors and Assigns</u>.    (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (x) neither Holdings nor the Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and (y) no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or Section 10.07(i) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and

- 89 -

assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (other than (A) a natural person or (B) Holdings or any of its Subsidiaries or any of their respective Affiliates) ("**Assignees**") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent.

(ii)    Assignments shall be subject to the following additional conditions:

(1)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 and in increments of $1,000,000 in excess thereof unless the Administrative Agent otherwise consents, *provided* that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(2)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided* that only one such fee shall be payable in the event of simultaneous assignments to or from two or more Approved Funds;

(3)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more Credit Contacts (as defined in the Administrative Questionnaire) to whom all syndicate-level information (which may contain material non-public information about Holdings, the Borrower, the other Loan Parties and their Affiliates and related parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws; and

(4)    no assignment shall be effective unless and until such assignment is recorded in the Register.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis.

(c)  Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at

- 90 -

its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amounts (and related interest amounts) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, the Administrative Agent and, with respect to its own Loans, any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than (A) a natural person or (B) Holdings or any of its Subsidiaries or any of their respective Affiliates) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that directly affects such Participant.  Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c) but shall not be entitled to recover greater amounts under such Sections than the selling Lender would be entitled to recover.  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.10 as though it were a Lender.  Each Lender that sells a participation with respect to a Loan shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Loan (the "**Participant Register**").  The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 and 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of Section 3.01 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 10.15 as though it were a Lender.

509600-0292-11782-Active.11854677.4

(g)  Any Lender may at any time, without the consent of the Borrower or the Administrative Agent, pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)  Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the commitment to lend of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)  Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may, without the consent of the Borrower or the Administrative Agent, create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents.

Section 10.08   Confidentiality.  Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) on a need to know basis to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, investment advisors and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof); (b) to the extent requested by any Governmental Authority; (c) to the extent  required by applicable Laws or regulations or by any subpoena or similar legal process; (d) to any other party to this Agreement; (e) subject to an agreement for the benefit of the Borrower containing provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), to any pledgee referred to in Section 10.07(g), counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement; (f) with the

written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08; (h) to any Governmental Authority or examiner (including the National Association of Insurance Commissioners or any other similar organization) regulating any Lender; (i) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender); or (j) in connection with the exercise of any remedies hereunder, under any other Loan Document or any legal action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder.  In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents and the Loans.  For the purposes of this Section 10.08, "**Information**" means all information received from any Loan Party relating to any Loan Party or its business, other than any such information that is publicly available to any Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08; provided that, in the case of information received from a Loan Party after the date hereof, such information (i) is clearly identified at the time of delivery as confidential or (ii) is delivered pursuant to Section 6.01, 6.02 or 6.04 hereof.

**EACH LENDER ACKNOWLEDGES THAT INFORMATION FURNISHED TO IT PURSUANT TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING HOLDINGS, THE BORROWER, THE OTHER LOAN PARTIES AND THEIR AFFILIATES AND RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

**ALL INFORMATION, INCLUDING WAIVERS AND AMENDMENTS, FURNISHED BY HOLDINGS, THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT HOLDINGS, THE BORROWER, THE OTHER LOAN PARTIES AND THEIR AFFILIATES AND RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO HOLDINGS, THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

Section 10.09    Setoff.  In addition to any rights and remedies of the Lenders provided by Law, but subject to the Intercreditor Agreement, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates hereunder or under any other Loan Document, now or

- 93 -

hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender; *provided*, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have.  Notwithstanding anything herein or in any other Loan Document to the contrary, in no event shall the assets of any Foreign Subsidiary that is not a Loan Party constitute collateral security for payment of the Obligations of the Borrower or any Domestic Subsidiary, it being understood that (a) the Equity Interests of any Foreign Subsidiary that is not a Loan Party do not constitute such an asset and (b) the provisions hereof shall not limit, reduce or otherwise diminish in any respect the Borrower's obligations to make any mandatory prepayment pursuant to Section 2.03(b)(i).

Section 10.10    <u>Interest Rate Limitation</u>.  Notwithstanding anything to the contrary contained in any Loan Document, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment, shall have been received by such Lender.

Section 10.11    <u>Counterparts</u>.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument; <u>provided</u> that, pursuant to the Reorganization Plan, the Lenders are automatically made parties to this Agreement without executing this Agreement.  Delivery by telecopier of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Agents may also require that any such documents and signatures delivered by telecopier be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier.

Section 10.12    <u>Integration</u>.  The Reorganization Plan, this Agreement and the other Loan Documents comprise the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document (except the Intercreditor Agreement), the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.13    <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such

- 94 -

representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Loan, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.14    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.15    Tax Forms.  (a)  Each Lender and Agent that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a **Foreign Lender**") shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender or Agent under this Agreement or changes its Lending Office or place of organization (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(i)        duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(ii)        duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H to the effect that (A) such Foreign Lender is not (i) a "bank" described in Section 881(c)(3)(A) of the Code, (ii) a "10 percent shareholder" of the applicable Borrower within the meaning of Section 881(c)(3)(B) of the Code or (iii) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (B) the interest payments in question are not effectively connected with the United States trade or business conducted by such Lender (a "**U.S. Tax Compliance Certificate**") and (y) duly completed copies of Internal Revenue Service Form W-8BEN,

(iv)        to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), an Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, U.S. Tax Compliance Certificate, Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate on behalf of each such beneficial owner, or

(v)        any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

(b)  Each Lender and Agent that is a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a "**United States Lender**") shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Lender or Agent becomes a Lender or Agent under this Agreement or changes its

- 95 -

Lending Office or place of organization (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) properly completed copies of Internal Revenue Service Form W-9, certifying that such Lender or Agent, as applicable, is entitled to an exemption from United States backup withholding tax, or any successor form.

(c)  Each Lender and Agent that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrower is formed or organized, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding, or at a reduced rate, provided that such Lender or Agent is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.  Each Lender and Agent shall promptly notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)  The Borrower shall not be required to pay any additional amounts under Section 3.01(a) or indemnity with respect to such Taxes under Section 3.01(c) to (A) any Foreign Lender if such Foreign Lender shall have failed to satisfy the provisions of Section 10.15(a), (B) any United States Lender if such United States Lender shall have failed to satisfy the provisions of Section 10.15(b); or (C) any Lender if such Lender shall have failed to satisfy the provisions of Section 10.15(c); *provided*, that (i) if such Lender shall have satisfied the requirement of this Section 10.15, as applicable, on the date such Lender became a Lender, or ceased to act for its own account with respect to any payment under any of the Loan Documents, nothing in this Section 10.15 shall relieve the Borrower of its obligation to pay any amounts pursuant to Section 3.01 in the event that, as a result of any change in any applicable Law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender or other Person for the account of which such Lender receives any sums payable under any of the Loan Documents is not subject to withholding or is subject to withholding at a reduced rate and (ii) nothing in this Section 10.15(d) shall relieve the Borrower of its obligation to pay any amounts pursuant to Section 3.01 in the event that the requirements of Section 10.15 have not been satisfied if the Borrower is entitled, under applicable Law, to rely on any applicable forms and statements required to be provided under this Section 10.15 by the Lender that does not act or has ceased to act for its own account under any of the Loan Documents, including in the case of a typical participation, and such Lender has provided such required forms and statements.

(e)  Each Lender agrees that if any form or certification previously delivered by it expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.  Notwithstanding anything to the contrary herein, no Lender or Agent shall be required to deliver any form, certificate or other document pursuant to this Section 10.15 that such Lender or Agent is not legally able to deliver.

(f)  The Administrative Agent may deduct and withhold any taxes required by any Laws to be deducted and withheld from any payment under any of the Loan Documents.

SECTION 10.16    <u>GOVERNING LAW</u>.  THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

509600-0292-11782-Active.11854677.4

Section 10.17    <u>Submission To Jurisdiction; Waivers</u>.  (a)  Each Loan Party hereby irrevocably and unconditionally:

(i)        submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of (i) any State or Federal court of competent jurisdiction sitting in New York County, New York and (ii) appellate courts from any thereof;

(ii)        consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)        agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid at its address set forth in Section 10.02 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(iv)        agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right of the Administrative Agent or the Lenders to sue in any other jurisdiction; and

(v)        waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

SECTION 10.18    <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 10.18 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 10.19    <u>Binding Effect</u>.  This Agreement shall become effective upon the satisfaction or waiver of the conditions precedent set forth in Article IV and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender and their respective permitted successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders.

Section 10.20    <u>Lender Action</u>.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute

- 97 -

any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent.  The provision of this Section 10.20 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.21    USA PATRIOT Act.  Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name, address and tax identification numbers of the Loan Parties and other information that will allow such Lender to identify the Loan Parties in accordance with the Act.

Section 10.22    Acknowledgements.  Each Loan Party hereby acknowledges that:

(a)  it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)  neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent and Lenders, on one hand, and the Loan Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)  no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Loan Parties and the Lenders.

Section 10.23    Releases of Guarantee and Lien.

(a)  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 10.01) to take any action reasonably requested by the Borrower having the effect of releasing any Collateral or Guarantee Obligations (i) to the extent necessary to permit any Disposition of the applicable Collateral or Guarantor, in each case as permitted by the Loan Documents or that has been consented to in accordance with Section 10.01 or (ii) under the circumstances described in paragraph (b) below.

(b)  Subject to the terms of the Intercreditor Agreement, at such time as the Loans and the other Obligations under the Loan Documents shall have been paid in full, the Collateral shall be automatically released from the Liens created by the Collateral Documents, and the Collateral Documents (other than with respect to the provisions thereof expressly stated to survive termination) shall automatically terminate, all without delivery of any instrument or performance of any act by any Person.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

509600-0292-11782-Active.11854677.4

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**[REORGANIZED RDA HOLDING CO.]**

by _____

    Name:
    Title:

**[REORGANIZED THE READER'S DIGEST ASSOCIATION, INC.]**

by _____

    Name:
    Title:

**JPMORGAN CHASE BANK, N.A.**, as
Administrative Agent

by

_____
Name:
Title:

[This Page Intentionally Left Blank]

# EXHIBIT C

## Form of the New Warrant Agreement

Article IV.I of the Plan provides that, on the Effective Date, the Reorganized Debtors will issue the New Warrants to the Holders of Claims in Class 6 who have voted to accept the Plan pursuant to the terms of the New Warrant Agreement, substantially in the form attached hereto, subject to the approval of the Bankruptcy Court and entry of the Confirmation Order.

[This Page Intentionally Left Blank]

**DRAFT 12/11/09**

---

WARRANT AGREEMENT


between


RDA HOLDING CO.


and


[• ],
AS WARRANT AGENT


Dated as of [• ]

---

This WARRANT AGREEMENT (the "Agreement") is dated as of [•], between RDA HOLDING CO., a Delaware corporation (the "Company"), and [•], as warrant agent (the "Warrant Agent").

W I T N E S S E T H

WHEREAS, pursuant to the Joint Plan of Reorganization of the Company and certain of its affiliates, as confirmed on [•] by order of the United States Bankruptcy Court for the Southern District of New York, as the same may be amended, modified or supplemented from time to time in accordance with terms thereof (the "Plan"), the Company proposes to issue warrants (the "Warrants") entitling the holders thereof to purchase initially up to an aggregate of [•]$^{1}$ shares of the Company's class A common stock, par value $0.001 per share (the "Common Stock"). The shares of Common Stock issuable pursuant to the Warrants, as adjusted from time to time pursuant to this Agreement, are referred to herein as the "Shares."

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, registration, transfer, exchange, exercise and conversion of the Warrants.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein set forth, the parties hereto agree as follows:

SECTION 1.   Appointment of Warrant Agent.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions hereinafter in this Agreement set forth, and the Warrant Agent hereby accepts such appointment, upon the terms and conditions hereinafter set forth.

SECTION 2.   Issuances.  Subject to the provisions of this Agreement, on the effective date of the Plan pursuant to the terms thereof (the "Effective Date"), the Company will issue and deliver to holders of Senior Subordinated Note Claims (as defined in the Plan) who vote in favor of the Plan Warrants to purchase their pro rata share of initially up to an aggregate of [•] Shares.

SECTION 3.   Form of Warrant Certificates.  The certificates evidencing the Warrants (the "Warrant Certificates") to be delivered pursuant to this Agreement and the Forms of Election to Exercise and of Assignment to be printed on the reverse thereof shall be in substantially in the form set forth in Exhibit A hereto together with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with any law or with any rules made pursuant thereto or with any rules of any securities exchange or as may, consistently herewith, be determined by the officers executing such Warrant Certificates, as evidenced by their execution of the Warrant Certificates.

SECTION 4.   Execution of Warrant Certificates.  Warrant Certificates shall be signed on behalf of the Company by its Chief Executive Officer, its President, a Vice President or its Treasurer (each, an "Officer") and attested by its Secretary or an Assistant Secretary (each, an "Attesting Officer"). Each such signature upon the Warrant Certificates may be in the form of a facsimile signature of any such Officer and Attesting Officer and may be imprinted or otherwise reproduced on the Warrant Certificates

---

$^{1}$ Number of shares to equal up to 6.5% of the New Common Stock, on a fully diluted basis, as of the Effective Date but subject to dilution for awards made pursuant to the Management Equity Plan and subject to reduction to reflect holders of Senior Subordinated Note Claims who do not vote in favor of the Plan.

and for that purpose the Company may adopt and use the facsimile signature of any Officer and Attesting Officer.

If any Officer or Attesting Officer who shall have signed any of the Warrant Certificates shall cease to be an Officer or Attesting Officer before the Warrant Certificates so signed shall have been countersigned by the Warrant Agent or delivered by the Company, such Warrant Certificates nevertheless may be countersigned and delivered as though such Officer or Attesting Officer had not ceased to be an Officer or Attesting Officer, and any Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Warrant Certificate, shall be a proper Officer or Attesting Officer to sign such Warrant Certificate, although at the date of the execution of this Agreement any such person was not such an officer.

SECTION 5.  Registration and Countersignature.  Warrant Certificates shall be countersigned and dated the date of countersignature by the Warrant Agent and shall not be valid for any purpose unless so countersigned.  The Warrants shall be numbered and shall be registered in a register (the "Warrant Register") to be maintained by the Warrant Agent.

The Company and the Warrant Agent may deem and treat the registered holder(s) of a Warrant Certificate as the absolute owner(s) thereof (notwithstanding any notation of ownership or other writing thereon made by anyone), for the purpose of any exercise thereof or any distribution to the holder(s) thereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

SECTION 6.  Transfers and Exchanges.  (a) Subject to Sections 6(b), (e), (f), (g), (h) and (i), the Warrant Agent shall from time to time register the Transfer (as defined below) of any outstanding Warrant Certificates in the Warrant Register, upon surrender of such Warrant Certificates at the Warrant Agent Office (as defined below), duly endorsed, and accompanied by a completed form of assignment, duly signed by the registered holder(s) thereof and the proposed transferee.  Upon any such registration of Transfer, a new Warrant Certificate shall be issued to the transferee.

Warrant Certificates may be exchanged at the option of the holder or holders thereof, when surrendered to the Warrant Agent at its offices or agency maintained in [•] (or at such other offices or agencies as may be designated by the Warrant Agent) (the "Warrant Agent Office") for the purpose of exchanging, Transferring and exercising the Warrants or at the offices of any successor Warrant Agent appointed as provided in Section 17 hereof, without payment of any service charge, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like number of Warrants.

(b) No Warrants or Shares may be sold, exchanged, assigned, encumbered or otherwise Transferred in violation of the Securities Act of 1933, as amended (the "Securities Act"), or state securities laws.  Further, prior to the IPO Date (as defined below), no Transfer of Warrants or Shares shall be permitted if, after giving effect to such Transfer, such Transfer would result in the Company becoming subject to the reporting requirements under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Company and/or the Warrant Agent may require that, as a condition to any transfer, sale, offer, assignment, exchange, distribution, mortgage, pledge, hypothecation or other disposition (each, a "Transfer") of Warrants or Shares that the holder deliver to the Company and the Warrant Agent an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Company, to the effect that such Transfer is made in compliance with the Securities Act and all applicable state securities laws or pursuant to an exempt transaction under the Securities Act and state securities laws.  The provisions of this Section 6(b) shall not apply to the exercise of any Warrant to the extent that

-2-

the Shares issued upon such exercise (and any unexercised portion of the Warrant so exercised) shall be issued to the same registered holder that exercised such Warrant.

(c)  The Warrant Certificates shall bear such legends as the Company shall determine reflecting the restrictions in Section 6(b).

(d)  The Warrant Agent is hereby authorized to countersign, in accordance with the provisions of Section 5 and this Section 6, and deliver the new Warrant Certificates required pursuant to the provisions of this Section 6.

(e)  Any Transfer of Warrants will be subject to the transfer restrictions set forth in the Registration Rights Agreement, dated as of the date hereof (the "Registration Rights Agreement"), among the Company and the holders named therein or bound thereby, in each case as may be amended from time to time.

(f)  Prior to the IPO Date, holders of Warrants may not Transfer less than all of their respective Warrants.  "IPO Date" means the date on which the first public offering of Common Stock registered under the Securities Act is consummated.

(g)  No Transfer of Warrants to any Company Competitor or an Affiliate of any Company Competitor shall be permitted without the prior written consent of the Board of Directors of the Company (the "Board").  "Company Competitor" means any Person that is engaged directly or indirectly in the publishing or the direct marketing industry or any other business that competes with a material line of the business of the Company or its subsidiaries.  Whether a Person is a Company Competitor shall be determined by the Board, acting in good faith.  "Affiliate" (a) shall mean, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with, such Person or any Immediate Family Member of such Person; and (b) shall also include, with respect to any Person who is an individual, a trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only such individual and/or such individual's Immediate Family Members. For purposes of this definition, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  "Immediate Family Member" shall mean, with respect to any Person, a spouse, parent, child, grandchild or sibling of such Person.   "Person" shall mean any individual, corporation, partnership, firm, joint venture, association, joint stock company, trust, unincorporated organization, governmental or regulatory body or subdivision thereof or other entity.

(h)  No Transfer of Warrants shall be permitted unless and until the proposed transferee agrees in writing to become a party to, and be bound to the same extent as the transferor by the terms of, the Stockholders Agreement, dated as of the date hereof (the "Stockholders Agreement"), among the Company and the holders named therein or bound thereby, and the Registration Rights Agreement.  Such transferee must execute a joinder agreement, in form and substance reasonably satisfactory to the Company, evidencing such transferee's agreement to become a party to the Stockholders Agreement and the Registration Rights Agreement and be bound to the same extent as the transferor.

(i)  In the event of any purported Transfer in violation of the provisions of this Agreement or the Registration Rights Agreement, such purported Transfer shall be void and of no effect and the Warrant Agent shall not give effect to such Transfer.

SECTION 7.  <u>Duration and Exercise of Warrants</u>.  (a) The Warrants shall expire on 5:00 p.m. New York City time on the fourth (4th) anniversary of the Effective Date (subject to extension as provided in this Section 7(a), the "<u>Expiration Date</u>"); <u>provided</u>, <u>however</u>, that if, on the fourth (4th) anniversary of the Effective Date, the Company shall be party to a definitive agreement, which, if consummated, would result in a Change of Control or a sale of all or substantially all of the assets of the Company (other than to one or more wholly-owned subsidiaries of the Company), the Company shall give the Warrantholders notice of the execution of such definitive agreement (unless otherwise publicly announced by the Company) and the Expiration Date shall be extended until the date such Change of Control or sale shall be consummated or the date such definitive agreement shall be terminated.  After the Expiration Date, the Warrants will become void and of no value.

(b)  Subject to the provisions of this Agreement, each Warrant shall entitle the holder thereof to purchase from the Company (and the Company shall issue and sell to such holder) initially one fully paid and nonassessable Share at an exercise price equal to $[•] per share (as the same may be hereafter adjusted pursuant to Section 12, the "<u>Exercise Price</u>"); provided that (i) as of the thirty-six (36) month anniversary of the Effective Date, the Exercise Price shall equal $[•] per share; (ii) as of the thirty-nine (39) month anniversary of the Effective Date, the Exercise Price shall equal $[•] per share; (iii) as of the forty-two (42) month anniversary of the Effective Date, the Exercise Price shall equal $[•] per share; and (iv) as of the forty-five (45) month anniversary of the Effective Date, the Exercise Price shall equal $[•] per share (in each case, as the same may be hereafter adjusted pursuant to Section 12).[2]

(c)  Each holder of the Warrants may exercise such holder's right to purchase Shares only after (i) subject to Section 12(b)(ii), where no exercise shall be required, the occurrence of a Change of Control (as defined below), (ii) a sale of all or substantially all of the assets of the Company (other than to one or more wholly-owned subsidiaries of the Company) or (iii) an initial public offering of Common Stock under the Securities Act (each, a "<u>Qualifying Event</u>").  After the occurrence of a Qualifying Event, or prior to the consummation of a Qualifying Event which has been announced but contingent on the consummation thereof, each holder of the Warrants may exercise such holder's right to purchase Shares by depositing on any business day with the Warrant Agent at the Warrant Agent Office the Warrant Certificate evidencing such Warrants, with the Form of Election to Exercise on the reverse thereof duly completed and signed by the registered holder or holders thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, and upon payment of the applicable Exercise Price multiplied by the number of Shares in respect of which such Warrants are being exercised (the "<u>Exercise Amount</u>").  The Exercise Amount may be payable as follows: (i) by payment to the Company by certified or official bank check, or by wire transfer or (ii) after the IPO Date, by surrender to the Company for cancellation of Shares acquired upon exercise of the Warrants, valued at the Market Price (as hereinafter defined), equal to the Exercise Amount.  The term "Market Price" shall mean (x) the average closing price of a share of Common Stock for the ten (10) consecutive trading days immediately preceding the date of exercise of the Warrants as reported on the principal national securities exchange on which the shares of Common Stock are listed or admitted to trading, (y) if not listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices during such ten (10) trading day period in the over-the-counter market as reported in the "pink sheets" published by Pink OTC

---

[2] Exercise Price to equal: [$1.8 billion for the first three years after the Effective Date] [$1.845 billion beginning on the 36 month anniversary of the Effective Date] [$1.89 billion beginning on the 39 month anniversary of the Effective Date] [$1.935 billion beginning on the 42 month anniversary of the Effective Date] [$1.98 billion beginning on the 45 month anniversary of the Effective Date] minus the sum of the face amount owed by the Reorganized Debtors (as defined in the Plan) as of the Effective Date on account of the New First Priority Term Loan, the Reinstated Euro Term Loan and the New Second Priority Term Loan (each as defined in the Plan), divided by (ii) the number of shares of New Common Stock issued to Holders of Allowed Prepetition Credit Agreement Claims and Adequate Protection Claims (each as defined in the Plan) and outstanding as of the Effective Date.

Markets, Inc. (the "Pink Sheets") or any comparable system or (z) in all other cases, then as reasonably determined in good faith by the Board.  The term "Change of Control" shall mean the occurrence of (A) any consolidation or merger of the Company with or into any other entity, or any other corporate reorganization or transaction (including the acquisition of capital stock of the Company), whether or not the Company is a party thereto, in which the stockholders of the Company immediately prior to such consolidation, merger, reorganization or other transaction, own capital stock either (I) representing directly, or indirectly through one or more entities, less than 50% of the economic interests in or voting power of the Company or other surviving entity immediately after such consolidation, merger, reorganization or other transaction or (II) that does not directly, or indirectly through one or more entities, have the power to elect a majority of the entire board of the directors of the Company or other surviving entity immediately after such consolidation, merger, reorganization or other transaction, or (B) any transaction or series of related transactions, whether or not the Company is a party thereto, after giving effect to which in excess of 50% of the Company's voting power is owned by any Person or "group" (as such term is used in Rule 13d-5 under the Exchange Act) (excluding the group created by the Stockholders Agreement); provided that any consolidation or merger effected exclusively to change the domicile of the Company or to form a holding company in which the stockholders of the Company immediately prior to such consolidation or merger own capital stock representing economic interests and voting power with respect to such redomiciled entity or holding company in substantially the same proportions as their ownership of capital stock of the Company shall be excluded from clauses (A) and (B) above.

(d)  If shares of Common Stock are certificated at that time, upon surrender of a Warrant Certificate and payment of the Exercise Amount, the Warrant Agent shall requisition from the Company or the Company's transfer agent, if any (the "Transfer Agent"), for issuance and delivery to or upon the written order of the registered holder of such Warrant Certificate and in such name or names as such registered holder may designate, a certificate for the Shares issuable upon the exercise of the Warrants evidenced by such Warrant Certificate.  In any event, upon receipt of such Warrant Certificate and payment, the Company shall, as promptly as practicable, and in any event within five (5) business days thereafter, cause to be issued to such holder the aggregate number of whole Shares issuable upon such exercise and deliver to such holder written confirmation that such Shares have been duly issued and recorded on the books of the Company as hereinafter provided.  The Shares so issued shall be registered in the name of the holder or, subject to Section 6, such other name as shall be designated in the order delivered by the holder and any Person so designated to be named therein shall be deemed to have become the holder of record of such Shares as of the date of surrender of such Warrant Certificate at the Warrant Agent Office duly executed by the holder thereof and upon payment of the Exercise Amount.

(e)  Prior to the IPO Date, each holder of the Warrants may exercise such holder's right to purchase Shares only in its entirety and partial exercise shall not be permitted, except for exercises in connection with the tag-along and drag-along provisions in Sections 4.5 and 4.6 of the Stockholders Agreement.  After the IPO Date, the Warrants shall be exercisable, at the election of the registered holder thereof, either in their entirety or from time to time for a portion of the number of Warrants initially specified in the Warrant Certificate.  If less than all of the Warrants evidenced by a Warrant Certificate surrendered upon the exercise of Warrants are exercised at any time prior to the Expiration Date, a new Warrant Certificate shall be issued for the remaining number of Warrants evidenced by the Warrant Certificate so surrendered, and the Warrant Agent is hereby authorized to countersign the new Warrant Certificate pursuant to the provisions of Section 5 and this Section 7.  Notwithstanding any provision herein to the contrary, the Company shall not be required to register Shares in the name of any Person who acquired any Warrants or any Shares otherwise than in accordance with this Agreement.

(f)   The Warrant Agent shall account promptly to the Company with respect to Warrants exercised and concurrently pay or deliver to the Company all monies and other consideration received by it in connection with the purchase of Shares through the exercise of Warrants.

SECTION 8.    Cancellation of Warrants.  If the Company or any of its subsidiaries shall purchase or otherwise acquire any Warrants, the Warrant Certificates representing such Warrants shall thereupon be delivered to the Warrant Agent and be cancelled by it and retired.  The Warrant Agent shall cancel all Warrant Certificates surrendered for exchange, substitution, Transfer or exercise in whole or in part (except that, in the case of Transfers and exercises, Warrants are subject to the restrictions provided for in Sections 6 and 7).  Such cancelled Warrant Certificates shall thereafter be disposed of in a manner satisfactory to the Company.

SECTION 9.    Mutilated or Missing Warrant Certificates.  If any of the Warrant Certificates shall be mutilated, lost, stolen or destroyed, the Company shall issue, and the Warrant Agent shall countersign and deliver, in exchange and substitution for and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor and representing an equivalent number of Warrants, but only upon (i) receipt of evidence reasonably satisfactory to the Company and the Warrant Agent of the loss, theft or destruction of such Warrant Certificate and (ii) indemnification by the holder in a reasonable amount and in a reasonable manner, if requested by either the Company or the Warrant Agent, reasonably satisfactory to the Company or the Warrant Agent, as the case may be.

SECTION 10.    Reservation of Shares; Restrictive Legend.  (a) For the purpose of enabling it to satisfy any obligation to issue the Shares, the Company will at all times through the Expiration Date, reserve and keep available out of its aggregate authorized but unissued or treasury shares of Common Stock, the number of Shares deliverable upon the exercise of all outstanding Warrants, and the Company shall authorize and direct the Transfer Agent, if any, to reserve at all times such number of authorized and unissued or treasury shares of Common Stock as shall be required for such purpose.  The Company will keep a copy of this Agreement on file with the Transfer Agent, if any.

The Company covenants that all Shares will, upon issuance in accordance with the terms of this Agreement, be fully paid and nonassessable and free from all taxes, liens, charges and security interests created by or imposed upon the Company with respect to the issuance and holding thereof.

(b)  If shares of Common Stock are certificated, each certificate representing Shares and each certificate representing securities issued upon the Transfer of Common Stock shall be stamped or otherwise imprinted with a legend in the following or a comparable form:

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be transferred in the absence of such registration or an exemption therefrom under such Act."

If shares of Common Stock are certificated, certificates representing shares of Registrable Common Stock (as defined in the Registration Rights Agreement), so long as the Registration Rights Agreement is in effect, shall be stamped or otherwise imprinted with a legend in the following or a comparable form:

"The sale or other disposition of the shares represented by this certificate are subject to the provisions of a Registration Rights Agreement to which the issuer and certain other persons are parties, a copy of which may be

-6-

inspected at the principal office of the issuer or obtained from the issuer without charge."

If shares of Common Stock are certificated, the holder (or its transferee, as applicable) of any restricted shares of Common Stock shall be entitled to receive from the Company, without expense, new securities of like tenor not bearing the legend set forth above when (i) such securities shall have been effectively registered under the Securities Act and disposed of in accordance with a registration statement covering such securities, (ii) such securities shall have been disposed of pursuant to the provisions of Rule 144 or any comparable rule under the Securities Act, or (iii) in the written reasonable opinion of independent counsel for the holder thereof experienced in Securities Act matters, which counsel and opinion shall be reasonably satisfactory to the Company, such restrictions are no longer required in order to insure compliance with the Securities Act.

SECTION 11.  Stock Exchange Listings.  So long as any Warrants remain outstanding, the Company will, after the IPO Date, use commercially reasonable efforts to take all necessary action to have the Shares, immediately upon their issuance upon exercise of the Warrants, (i) listed on each national securities exchange on which the Common Stock is then listed or (ii) if the Common Stock is not then listed on any national securities exchange, listed for quotation on the Pink Sheets or such other over-the-counter quotation system on which the Common Stock may then be listed.

SECTION 12.  Adjustment of Exercise Price and Number of Shares.  The Exercise Price and the number of shares of Common Stock purchasable upon the exercise of the Warrants are subject to adjustment from time to time upon the occurrence of the events enumerated in this Section 12.

(a)  If the Company shall (i) subdivide its outstanding shares of Common Stock, (ii) combine its outstanding shares of Common Stock into a smaller number of shares of Common Stock or (iii) pay a dividend on Common Stock consisting of shares of Common Stock, the number of shares of Common Stock purchasable upon exercise of Warrants immediately prior thereto shall be adjusted so that the holder of the Warrants shall be entitled upon exercise to receive the kind and number of Shares or other securities, property or assets of the Company which such holder would have owned or have been entitled to receive after the happening of any of the events described above, had such Warrants been exercised immediately prior to the happening of such event or any record date with respect thereto.  An adjustment made pursuant to this Section 12(a) shall become effective immediately after the effective date of such event retroactive to the record date, if any, for such event.

(b)  (i)   Except as provided in clause (ii) below, in the event of a Change of Control, the Warrants will thereafter be exercisable into the right to receive the kind and amount of shares of stock or other securities or property (including cash) to which such holder would have been entitled as a result of such Change of Control had the Warrants been exercised immediately prior thereto.  Upon receipt of such consideration, the Warrants will expire and the rights of holders thereof will cease.

(ii)   In the event of a Change of Control and, in connection therewith, the only consideration payable to holders of Common Stock in exchange for their shares is cash, then the holders of the Warrants will thereafter be entitled only to receive cash consideration to which such holder would have been entitled to as a result of such Change of Control had the Warrants had been exercised immediately prior thereto, less the Exercise Amount for such Warrants. Upon receipt of such payment, if any, the Warrants will expire and be cancelled, and the rights of holders thereof will cease.  In the case of any such Change of Control, the Company or the successor company, as the case may be, shall deposit promptly with the Warrant Agent the consideration necessary to pay to the holders of the Warrants the amounts to which they are entitled as described above.  After such consideration and the surrendered Warrant Certificates are received, the Warrant Agent shall make payment to the holders by delivering

such consideration (by check or by wire transfer of same-day funds) in such amount as is appropriate to such Person or Persons as it may be directed in writing by the holders surrendering such Warrants.

(c)  (i)  In the event the Company at any time or from time to time after the date hereof shall issue or sell Additional Shares of Common Stock (as defined below) (including Additional Shares of Common Stock deemed to be issued pursuant to Section 12(c)(ii)), without consideration or for a consideration per share less than the Market Price in effect immediately prior to such issue or sale, then, and in each such case, the number of shares of Common Stock purchasable upon the exercise of the Warrants shall be increased, concurrently with such issue or sale, to an amount determined by multiplying such shares of Common Stock by a fraction,

(A)  the numerator of which shall be the number of shares of Common Stock outstanding immediately after such issue or sale, provided that, for the purposes of this Section 12(c)(i), (1) immediately after any Additional Shares of Common Stock are deemed to have been issued pursuant to Section 12(c)(ii), such Additional Shares of Common Stock shall be deemed to be outstanding for all purposes of this Section 12 and (2) treasury shares shall not be deemed to be outstanding, and

(B)  the denominator of which shall be the sum of (1) the number of shares of Common Stock outstanding immediately prior to such issue or sale and (2) the number of shares of Common Stock for which the aggregate consideration received by the Company on account of such Additional Shares of Common Stock so issued or sold would have been able to purchase at the Market Price.

(ii)  In the event the Company at any time or from time to time after the date hereof shall issue, sell, grant or assume, or shall fix a record date for the determination of holders of any class of securities of the Company entitled to receive, any Options or Convertible Securities (each as defined below) (whether or not the rights thereunder are immediately exercisable), then, and in each such case, the maximum number of Additional Shares of Common Stock (as set forth in the instrument relating thereto, without regard to any provisions contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue, sale or grant or, in case such a record date shall have been fixed, as of the close of business on such record date (or, if the Common Stock trades on an ex-dividend basis, on the date prior to the commencement of ex-dividend trading), provided that such Additional Shares of Common Stock shall not be deemed to have been issued unless the consideration per share (determined pursuant to Section 12(c)(iii)) of such shares would be less than the Market Price in effect on the date of and immediately prior to such issue, sale or grant or immediately prior to the close of business on such record date (or, if the Common Stock trades on an ex-dividend basis, on the date prior to the commencement of ex-dividend trading), as the case may be, and provided, further, that

(A)  whether or not the Additional Shares of Common Stock underlying such Options or Convertible Securities are deemed to be issued, no further adjustment of the number of Shares shall be made upon the subsequent issue or sale of Convertible Securities or shares of Common Stock upon the exercise of such Options or the conversion or exchange of such Convertible Securities;

(B)  if such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any increase or decrease in the consideration payable to the Company, or increase or decrease in the number of Additional Shares of Common Stock issuable, upon the exercise, conversion or exchange thereof (by change of rate or

-8-

otherwise), the number of Shares computed upon the original issue, sale or grant thereof (or upon the occurrence of the record date, or date prior to the commencement of ex-dividend trading, as the case may be, with respect thereto), and any subsequent adjustments based thereon, shall, upon any such increase or decrease becoming effective, be recomputed to reflect such increase or decrease insofar as it affects such Options, or the rights of conversion or exchange under such Convertible Securities, which are outstanding at such time;

(C)     upon the expiration or termination (or purchase by the Company and cancellation or retirement) of any such Options which shall not have been exercised or the expiration of any rights of conversion or exchange under any such Convertible Securities which (or purchase by the Company and cancellation or retirement of any such Convertible Securities the rights of conversion or exchange under which) shall not have been exercised, the number of Shares computed upon the original issue, sale or grant thereof (or upon the occurrence of the record date, or date prior to the commencement of ex-dividend trading, as the case may be, with respect thereto), and any subsequent adjustments based thereon, shall, (if the Company so elects) upon such expiration (or such cancellation or retirement, as the case may be), be recomputed as if:

(1)     in the case of Options for Common Stock or Convertible Securities, the only Additional Shares of Common Stock issued or sold were the Additional Shares of Common Stock, if any, actually issued or sold upon the exercise of such Options or the conversion or exchange of such Convertible Securities and the consideration received therefor was the consideration actually received by the Company for the issue, sale or grant of all such Options, whether or not exercised, plus the consideration actually received by the Company upon such exercise, or for the issue or sale of all such Convertible Securities which were actually converted or exchanged, plus the additional consideration, if any, actually received by the Company upon such conversion or exchange, and

(2)     in the case of Options for Convertible Securities, only the Convertible Securities, if any, actually issued or sold upon the exercise of such Options were issued at the time of the issue or sale or grant of such Options, and the consideration received by the Company for the Additional Shares of Common Stock deemed to have then been issued was the consideration actually received by the Company for the issue, sale or grant of all such Options, whether or not exercised, plus the consideration deemed to have been received by the Company (pursuant to Section 12(c)(iii)) upon the issue or sale of such Convertible Securities with respect to which such Options were actually exercised;

(D)     no readjustment pursuant to subsection (B) or (C) above shall have the effect of decreasing the number of shares of Common Stock by a number in excess of the amount of the adjustment thereof originally made in respect of the issue, sale or grant of such Options or Convertible Securities; and

(E)     in the case of any such Options which expire by their terms not more than thirty (30) days after the date of issue, sale or grant thereof, no adjustment of the number of Shares shall be made until the expiration or exercise of all such Options, whereupon such adjustment shall be made in the manner provided in subsection (C) above.

(iii)     For the purposes of this Section 12(c),

-9-

(A)    the consideration for the issue or sale of any Additional Shares of Common Stock shall, irrespective of the accounting treatment of such consideration:

(1)    insofar as it consists of cash, be computed at the gross amount of cash received by the Company, without deducting any expenses paid or incurred by the Company or any commissions or compensations paid or concessions or discounts allowed to underwriters, dealers or others performing similar services in connection with such issue or sale,

(2)    insofar as it consists of property (including securities) other than cash, be computed at the fair value thereof at the time of such issue or sale, as reasonably determined in good faith by the Board, and

(3)    in case Additional Shares of Common Stock are issued or sold together with other units or securities or other assets of the Company for a consideration which covers both, be the portion of such consideration so received, computed as provided in clauses (1) and (2) above, allocable to such Additional Shares of Common Stock, all as reasonably determined in good faith by the Board; and

(B)    Additional Shares of Common Stock deemed to have been issued pursuant to Section 12(c)(ii), relating to Options and Convertible Securities, shall be deemed to have been issued for a consideration per share of Common Stock determined by dividing:

(1)    the total amount, if any, received and receivable by the Company as consideration for the issue, sale or grant of the Options or Convertible Securities in question, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration to protect against dilution) payable to the Company upon the exercise in full of such Options or the conversion or exchange of such Convertible Securities or, in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, in each case computing such consideration as provided in the foregoing subdivision (A), by

(2)    the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number to protect against dilution) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities.

(iv)    As used in this Section 12(c), the following terms shall have the following meanings:

"Additional Shares of Common Stock" shall mean all shares (including treasury shares) of Common Stock issued or sold (or, pursuant to Section 12(c)(ii), deemed to be issued) by the Company after the date hereof, whether or not subsequently reacquired or retired by the Company, other than

(a)    (i) the Shares, and (ii) such number of additional shares of Common Stock as may become issuable upon the exercise of the Warrants by reason of

-10-

adjustments required pursuant to the anti-dilution provisions applicable to such Warrants as in effect on the date hereof;

(b)  (i) shares of Common Stock granted or to be granted or issued upon the exercise of options granted or to be granted under any management or director equity incentive plan and (ii) such number of additional shares of Common Stock as may become issuable upon the exercise of any such options by reason of adjustments required pursuant to the anti-dilution provisions applicable to such options as in effect on the date hereof; and

(c)  shares of Common Stock issued in connection with the acquisition of assets or businesses by the Company, including in connection with any merger or any exchange of shares.

"Convertible Securities" shall mean any evidences of indebtedness, shares of stock (other than Common Stock) or other securities directly or indirectly convertible into or exchangeable for Additional Shares of Common Stock.

"Options" shall mean any rights, options or warrants to subscribe for, purchase or otherwise acquire either Additional Shares of Common Stock or Convertible Securities.

(d)  Whenever the number of shares of Common Stock purchasable upon the exercise of the Warrants is adjusted as herein provided, the Exercise Price payable upon exercise of such Warrant shall be adjusted by multiplying such Exercise Price immediately prior to such adjustment by a fraction, of which the numerator shall be the number of shares of Common Stock purchasable upon the exercise of such Warrant immediately prior to such adjustment, and of which the denominator shall be the number of shares of Common Stock so purchasable immediately thereafter.

(e)  For the purpose of this Section 12, the term "shares of Common Stock" shall mean (i) the class A common stock, par value $0.001 per share, of the Company, or (ii) any other class of stock resulting from successive changes or reclassification of such shares consisting solely of changes in par value, or from par value to no par value, or from no par value to par value.  If at any time, as a result of an adjustment made pursuant to Section 12(a), the holders of Warrants shall become entitled to purchase any shares of Common Stock, thereafter the number of such other shares so purchasable upon exercise of the Warrants and the applicable exercise price of such shares shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to such shares contained in Section 12(a) through (d), inclusive, above, and the provisions contained in this Agreement with respect to such shares, shall apply on like terms to any such other shares.

(f)  Irrespective of any adjustments in Exercise Price or the number or kind of shares of Common Stock purchasable upon the exercise of the Warrants, Warrants theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated in the Warrants initially issued pursuant to this Agreement.  The Company, however, may at any time in its sole discretion make any change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate, and any Warrant Certificate thereafter issued, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

(g)  Before taking any action that would cause an adjustment pursuant to Section 12 reducing any Exercise Price below the then par value (if any) of the Shares, the Company will take any

-11-

reasonable corporate action that may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and nonassessable Shares at such Exercise Price as so adjusted.

(h)   The adjustments required by the preceding subsections of this Section 12 shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the number of Shares issuable upon the exercise of the Warrants that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made increases or decreases by at least one percent (1%) the number of Shares issuable upon the exercise of the Warrants immediately prior to the making of such adjustment.  Any adjustment representing a change of less than such minimum amount shall be carried forward and made as soon as such adjustment, together with other adjustments required by this Section 12 and not previously made, would result in a minimum adjustment.  For the purpose of any adjustment, any specified event shall be deemed to have occurred at the close of business on the date of its occurrence.  In computing adjustments under this Section 12, fractional interests in Common Stock shall be taken into account to the nearest one-hundredth of a share.

SECTION 13.   Fractional Shares.  The Company shall not be required to issue fractions of Shares or other securities upon exercise of the Warrants, or, to the extent Shares are certificated, to distribute certificates which evidence fractional Shares.  In the event of an adjustment that results in Warrants becoming exercisable for fractional Shares, the number of Shares or other securities subject to such Warrants shall be adjusted upward or downward to the nearest whole number of Shares or other securities.

SECTION 14.   Notices to Warrantholders.  Upon any adjustment of the Exercise Price and the number of shares of Common Stock purchasable upon exercise of each Warrant pursuant to Section 12, the Company, within twenty (20) calendar days thereafter, shall (i) cause to be filed with the Warrant Agent a certificate of a firm of independent public accountants of recognized standing selected by the Company (who may be the regular auditors of the Company) setting forth the event giving rise to such adjustment, such Exercise Price and the number of shares of Common Stock purchasable upon exercise of each Warrant after such adjustment and setting forth in reasonable detail the method of calculation and the facts upon which such adjustment was made, which certificate shall be conclusive evidence of the correctness of the matters set forth therein absent manifest error, and (ii) cause to be given to each of the registered holders of the Warrant Certificates at such holder's address appearing on the Warrant Register, written notice of such adjustments by first-class mail, postage prepaid.  Where appropriate, such notice may be given in advance and included as a part of the notice required to be mailed under the other provisions of this Section 14.

If (i) there shall be a Change of Control or a sale of all or substantially all of the assets of the Company or there shall be a dissolution, liquidation or winding up of the Company (other than in connection with a Change of Control or a sale of all or substantially all of its assets), or (ii) following the occurrence of a Qualifying Event:

(a)   the Company shall declare, make or pay any dividend payable in any securities upon its shares of Common Stock or make any distribution (including, for the avoidance of doubt, a cash dividend) to the holders of its shares of Common Stock, or

(b)   the Company shall offer to the holders of its shares of Common Stock any additional shares of Common Stock or securities convertible into shares of Common Stock or any right to subscribe thereto,

-12-

then the Company shall cause written notice of such event to be filed with the Warrant Agent and shall cause written notice of such event to be given to each of the registered holders of the Warrant Certificates at such holder's address appearing on the Warrant Register, by first-class mail, postage prepaid, such giving of notice to be completed at least twenty (20) calendar days in any case specified in clause (i) above or ten (10) calendar days in any case specified in clause (ii) above, in each case prior to the date fixed as a record date or the date of closing the transfer books for the determination of the stockholders entitled to such dividend, distribution or subscription rights, or for the determination of stockholders entitled to vote on such proposed dissolution, liquidation or winding up.  Such notice shall specify such record date or the date of closing the transfer books, as the case may be.  Failure to give the notice required by this Section 14 or any defect therein shall not affect the legality or validity of any distribution, right, dissolution, liquidation or winding up or the vote upon or any other action taken in connection therewith.

SECTION 15.   Merger, Consolidation or Change of Name of Warrant Agent.  Any corporation into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, or any corporation succeeding to the shareholder services business of the Warrant Agent, shall be the successor to the Warrant Agent hereunder without the execution or filing of any document or any further act on the part of any of the parties hereto, provided that such corporation would be eligible for appointment as a successor Warrant Agent under the provisions of Section 17.  If at the time such successor to the Warrant Agent shall succeed under this Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Agreement.

If at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Agreement.

SECTION 16.   Warrant Agent.  The Warrant Agent undertakes the duties and obligations imposed by this Agreement upon the following terms and conditions, by all of which the Company and the holders of Warrants, by their acceptance thereof, shall be bound:

(a)  The statements contained herein and in the Warrant Certificates shall be taken as statements of the Company, and the Warrant Agent assumes no responsibility for the accuracy of any of the same except such as describe the Warrant Agent or action taken or to be taken by it.  Except as herein otherwise provided, the Warrant Agent assumes no responsibility with respect to the execution, delivery or distribution of the Warrant Certificates.

(b)  The Warrant Agent shall not be responsible for any failure of the Company to comply with any of the covenants contained in this Agreement or in the Warrant Certificates to be complied with by the Company nor shall it at any time be under any duty or responsibility to any holder of a Warrant to make or cause to be made any adjustment in any Exercise Price, in the number of shares of Common Stock issuable upon exercise of any Warrant (except as instructed by the Company), or to

-13-

determine whether any facts exist which may require any such adjustments, or with respect to the nature or extent of or method employed in making any such adjustments when made.

(c)  The Warrant Agent may consult at any time with counsel satisfactory to it (who may be counsel for the Company) and the Warrant Agent shall incur no liability or responsibility to the Company or any holder of any Warrant Certificate in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with the opinion or the advice of such counsel.

(d)  The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of any Warrant Certificate for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.

(e)  The Company agrees to pay to the Warrant Agent reasonable compensation for all services rendered by the Warrant Agent under this Agreement, to reimburse the Warrant Agent upon demand for all expenses, taxes and governmental charges and other charges of any kind and nature incurred by the Warrant Agent in the performance of its duties under this Agreement and to indemnify the Warrant Agent and save it harmless against any and all losses, liabilities and expenses, including judgments, costs and reasonable counsel fees and expenses, for anything done or omitted by the Warrant Agent arising out of or in connection with this Agreement except as a result of its negligence or bad faith.

(f)  The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more registered holders of Warrant Certificates shall furnish the Warrant Agent with reasonable security and indemnity for any costs or expenses which may be incurred.  All rights of action under this Agreement or under any of the Warrants may be enforced by the Warrant Agent without the possession of any of the Warrant Certificates or the production thereof at any trial or other proceeding relative thereto, and any such action, suit or proceeding instituted by the Warrant Agent shall be brought in its name as Warrant Agent, and any recovery or judgment shall be for the ratable benefit of the registered holders of the Warrants, as their respective rights or interests may appear.

(g)  The Warrant Agent, and any stockholder, director, officer or employee thereof, may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though they were not the Warrant Agent under this Agreement, or a stockholder, director, officer or employee of the Warrant Agent, as the case may be.  Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

(h)  The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the provisions hereof.  The Warrant Agent shall not be liable for anything which it may do or refrain from doing in connection with this Agreement except for its own negligence or bad faith.

(i)  The Company agrees that it will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

(j)  The Warrant Agent shall not be under any responsibility in respect of the validity of this Agreement or the execution and delivery hereof (except the due execution hereof by the

-14-

Warrant Agent) or in respect of the validity or execution of any Warrant Certificate (except its countersignature thereof), nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of the Shares to be issued pursuant to this Agreement or any Warrant Certificate or as to whether the Shares will when issued be validly issued, fully paid and nonassessable or as to the Exercise Amount or the number of shares of Common Stock issuable upon exercise of any Warrant.

(k)    The Warrant Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from the Chief Executive Officer, the President, any Vice President, the Treasurer, the Secretary or an Assistant Secretary of the Company, and to apply to such officers for advice or instructions in connection with its duties, and shall not be liable for any action taken or suffered to be taken by it in good faith in accordance with instructions of any such officer or in good faith reliance upon any statement signed by any one of such officers of the Company with respect to any fact or matter (unless other evidence in respect thereof is herein specifically prescribed) which may be deemed to be conclusively proved and established by such signed statement.

SECTION 17.    Change of Warrant Agent.  If the Warrant Agent shall resign (such resignation to become effective not earlier than sixty (60) days after the giving of written notice thereof to the Company and the registered holders of Warrant Certificates) or shall become incapable of acting as Warrant Agent or if the Board shall by resolution remove the Warrant Agent (such removal to become effective not earlier than thirty (30) days after the filing of a certified copy of such resolution with the Warrant Agent and the giving of written notice of such removal to the registered holders of Warrant Certificates), the Company shall appoint a successor to the Warrant Agent.  If the Company shall fail to make such appointment within a period of thirty (30) days after such removal or after it has been so notified in writing of such resignation or incapacity by the Warrant Agent or by the registered holder of a Warrant Certificate (in the case of incapacity), then the registered holder of any Warrant Certificate may apply to any court of competent jurisdiction for the appointment of a successor to the Warrant Agent. Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company.  Any successor Warrant Agent, whether appointed by the Company or by such a court, shall be a bank or trust company, in good standing, incorporated under the laws of any state or of the United States of America.  As soon as practicable after appointment of the successor Warrant Agent, the Company shall cause written notice of the change in the Warrant Agent to be given to each of the registered holders of the Warrant Certificates at such holder's address appearing on the Warrant Register.  After appointment, the successor Warrant Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Warrant Agent without further act or deed.  The former Warrant Agent shall deliver and transfer to the successor Warrant Agent all books and records of the Company and any property at the time held by it hereunder and execute and deliver, at the expense of the Company, any further assurance, conveyance, act or deed necessary for the purpose.  Failure to give any notice provided for in this Section 17 or any defect therein, shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

SECTION 18.    Warrantholder Not Deemed a Stockholder; Warrantholder Deemed a Party to the Stockholders Agreement and the Registration Rights Agreement.

(a)    Nothing contained in this Agreement or in any of the Warrant Certificates shall be construed as conferring upon the holders thereof the right to vote or to receive dividends or to consent or to receive notice as stockholders in respect of the meetings of stockholders for the election of directors of the Company or any other matter, or any rights whatsoever as stockholders of the Company.

-15-

(b)      Notwithstanding anything herein to the contrary, each holder of Warrants is, under the Plan, deemed a party to the Stockholders Agreement and the Registration Rights Agreement and pursuant to the Plan is bound thereby.  The Company may, in its sole discretion, refuse to issue to a holder of a Warrant any shares of Common Stock upon exercise of a Warrant until such holder first delivers to the Company a writing in form and substance satisfactory to the Company acknowledging that such holder is bound by the terms of the Stockholders Agreement as a Stockholder (as such term is defined in the Stockholders Agreement ) and the Registration Rights Agreement as a Holder (as such term is defined in the Registration Rights Agreement).

SECTION 19.   Stock Issuance.  The shares of Common Stock deliverable upon the exercise of Warrants, or any portion thereof, may be either previously authorized but unissued shares or issued shares, which have then been reacquired by the Company.  Such shares shall be fully paid and nonassessable.

SECTION 20.   Notices to Company and Warrant Agent.  All notices, requests or demands authorized by this Agreement to be given or made by the Warrant Agent or by any registered holder of any Warrant Certificate to or on the Company to be effective shall be in writing (including by telecopy), and shall be deemed to have been duly given or made when delivered by hand, or two business days after being delivered to a recognized courier (whose stated terms of delivery are two business days or less to the destination such notice), or five business days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

> The Reader's Digest Association, Inc.
> One Reader's Digest Road
> Pleasantville, New York  10570
> Attention: General Counsel
> Tel: (914) 244-5262
> Fax: (914) 244-5644

with a mandatory copy, which shall not constitute notice, to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York  10022
> Attention:  Joshua Korff and Michael Brosse
> Tel:   (212) 446-4800
> Fax:  (212) 446-6460

If the Company shall fail to maintain such office or agency or shall fail to give such notice of any change in the location thereof, presentation may be made and notices and demands may be served at the Warrant Agent Office.

Any notice pursuant to this Agreement to be given by the Company or by any registered holder of any Warrant Certificate to the Warrant Agent shall be sufficiently given if sent by first-class mail, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

> [• ]
> Tel: [• ]
> Fax: [• ]

-16-

Attention:  [• ]

SECTION 21.    <u>Supplements and Amendments</u>.  The Company and the Warrant Agent may from time to time supplement or amend this Agreement (a) without the approval of any holders of Warrants in order to cure any ambiguity, manifest error or other mistake in this Agreement, or (b) with the prior written consent of holders of the Warrants exercisable for a majority of the shares of Common Stock then issuable upon exercise of the Warrants then outstanding; <u>provided</u> that each amendment or supplement that decreases the Warrant Agent's rights or increases its duties and responsibilities hereunder shall also require the prior written consent of the Warrant Agent.

SECTION 22.    <u>Successors</u>.  Subject to Sections 6(b), (e), (f), (g), (h) and (i), all the covenants and provisions of this Agreement by or for the benefit of the holders of the Warrants, the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

SECTION 23.    <u>Termination</u>.  This Agreement shall terminate on the earlier of the Expiration Date and any date when all Warrants have been exercised.  The provisions of Section 16 shall survive such termination.

SECTION 24.    <u>Governing Law</u>.  This Agreement and each Warrant Certificate issued hereunder shall be deemed to be a contract made under the laws of the State of New York applicable to contracts made and to be performed therein and for all purposes shall be construed in accordance with the laws of such State.

SECTION 25.    <u>Benefits of this Agreement</u>.  Nothing in this Agreement shall be construed to give to any Person other than the Company, the Warrant Agent and the registered holders of the Warrant Certificates any legal or equitable right, remedy or claim under this Agreement, and this Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the registered holders of the Warrant Certificates.

SECTION 26.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

SECTION 27.    <u>Headings</u>.  The headings of sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof and in no way modify or restrict any of the terms or provisions hereof.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Warrant Agreement to be executed and delivered as of the day and year first above written.

RDA HOLDING CO.

By: _____
Name:
Title:

[ • ], as Warrant Agent

By: _____
Name:
Title:

**EXHIBIT A**

[FORM OF FACE OF WARRANT CERTIFICATE]

**VOID AFTER 5:00 P.M., NEW YORK CITY TIME, [• ]**

**THE WARRANTS REPRESENTED BY THIS CERTIFICATE AND ANY SECURITIES ACQUIRED UPON THE EXERCISE OF THE WARRANTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAW AND ARE SUBJECT TO (1) THE WARRANT AGREEMENT (THE "WARRANT AGREEMENT") BETWEEN RDA HOLDING CO. (THE "COMPANY") AND [• ], AS WARRANT AGENT, (2) THE STOCKHOLDERS AGREEMENT (THE "STOCKHOLDERS AGREEMENT") AMONG THE COMPANY AND THE HOLDERS NAMED THEREIN OR BOUND THEREBY AND (3) THE REGISTRATION RIGHTS AGREEMENT (THE "REGISTRATION RIGHTS AGREEMENT") AMONG THE COMPANY AND THE HOLDERS NAMED THEREIN OR BOUND THEREBY, COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY.  NO DIRECT OR INDIRECT TRANSFER, SALE, OFFER, ASSIGNMENT, EXCHANGE, DISTRIBUTION, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE WARRANTS REPRESENTED BY THIS CERTIFICATE AND ANY SECURITIES ACQUIRED UPON THE EXERCISE OF THE WARRANTS MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE WARRANT AGREEMENT, THE STOCKHOLDERS AGREEMENT AND THE REGISTRATION RIGHTS AGREEMENT, AND (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER THE SECURITIES ACT OR (B) IF THE COMPANY HAS BEEN FURNISHED WITH AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH TRANSFER, SALE, OFFER, ASSIGNMENT, EXCHANGE, DISTRIBUTION, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION IS EXEMPT FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT AND THE RULES AND REGULATIONS THEREUNDER AND APPLICABLE STATE SECURITIES LAW.  THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF THE WARRANT AGREEMENT, THE STOCKHOLDERS AGREEMENT AND THE REGISTRATION RIGHTS AGREEMENT."**

No. _____                                              WARRANTS TO PURCHASE _____
                                                    SHARES OF CLASS A COMMON STOCK

**RDA HOLDING CO.**

**WARRANTS TO PURCHASE CLASS A COMMON STOCK**

This Warrant Certificate certifies that _____ or registered assigns, is the registered holder of Warrants (the "Warrants") of RDA Holding Co., a Delaware corporation (the "Company"), to purchase the number of shares (the "Shares") of class A common stock, par value $0.001 per share (the "Common Stock"), of the Company set forth above.  This Warrant expires at 5:00 p.m., New York City time, on the fourth (4th) anniversary of the Effective Date (the "Expiration Date"); provided, however, that if, on the fourth (4th) anniversary of the Effective Date, the Company shall be

A-1

party to a definitive agreement, which, if consummated, would result in a Change of Control or a sale of all or substantially all of the assets of the Company (other than to one or more wholly-owned subsidiaries of the Company), the Company shall give the Warrantholders notice of the execution of such definitive agreement (unless otherwise publicly announced by the Company) and the Expiration Date shall be extended until the date such Change of Control or sale shall be consummated or the date such definitive agreement shall be terminated. This Warrant entitles the holder to purchase from the Company the number of fully paid and nonassessable Shares set forth above at the exercise price (the "Exercise Price") multiplied by the number of Shares set forth above (the "Exercise Amount"). The Exercise Amount may be payable as follows: (i) by payment to the Company by certified or official bank check, or by wire transfer or (ii) after the IPO Date, by surrender to the Company for cancellation of shares of Common Stock newly acquired upon exercise of the Warrants, valued at the Market Price equal to the Exercise Amount. The initial Exercise Price shall be $[• ], which shall be increased to (i) $[• ] on the thirty-six (36) month anniversary of the Effective Date, (ii) $[• ] on the thirty-nine (39) month anniversary of the Effective Date, (iii) $[• ] on the forty-two (42) month anniversary of the Effective Date, and (iv) $[• ] on the forty-five (45) month anniversary of the Effective Date.

Capitalized terms used herein and not defined shall have the respective meanings ascribed to such terms in the Warrant Agreement.

Subject to the terms and conditions set forth herein and in the Warrant Agreement, the Warrants may be exercised by the holder thereof only after (i) the occurrence of a Change of Control, (ii) a sale of all or substantially all of the assets of the Company (other than to one or more wholly-owned subsidiaries of the Company) or (iii) an initial public offering of Common Stock under the Securities Act (each, a "Qualifying Event"). A holder of Warrants may exercise such holder's right to purchase Shares upon the surrender of, during normal business hours on any business day in the period commencing after the occurrence of a Qualifying Event, or prior to the consummation of a Qualifying Event which has been announced but contingent on the consummation thereof, and ending on the Expiration Date, this Warrant Certificate, with the Form of Election to Exercise duly completed and executed by the registered holder or holders thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, and payment of the Exercise Amount at the Warrant Agent Office.

The Exercise Price and the number of shares of Common Stock purchasable upon exercise of the Warrants are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.

No Warrants may be exercised prior to the occurrence of a Qualifying Event or after the Expiration Date. After the Expiration Date, the Warrants will become wholly void and of no value.

Prior to the IPO Date, each holder of the Warrants may exercise such holder's right to purchase Shares only in its entirety and partial exercise shall not be permitted, except for exercises in connection with the tag-along and drag-along provisions in Sections 4.5 and 4.6 of the Stockholders Agreement. After the IPO Date, the Warrants shall be exercisable, at the election of the registered holder thereof, either in their entirety or from time to time for a portion of the number of Warrants initially specified in the Warrant Certificate. In the event that upon any exercise of the Warrants evidenced hereby the number of shares of Common Stock actually purchased shall be less than the total number of shares of Common Stock purchasable upon exercise of the Warrants evidenced hereby, there shall be issued to the holder hereof a new Warrant Certificate evidencing Warrants to purchase the shares of Common Stock not so purchased.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER

PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

   This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

   **IN WITNESS WHEREOF**, the Company has caused this Warrant Certificate to be executed by its duly authorized officers.

   Dated: _____

        RDA HOLDINGS CO.


        By_____
             [Title]

ATTEST:

By_____

Countersigned:

[• ], AS WARRANT AGENT

By_____

[FORM OF REVERSE OF WARRANT CERTIFICATE]

## RDA HOLDING CO.

       The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Warrants to purchase a maximum of _____ shares of Common Stock issued pursuant to a Warrant Agreement, dated as of [• ] (the "Warrant Agreement"), between the Company and [• ], as Warrant Agent (the "Warrant Agent").  The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holder" or "holders" meaning the registered holder or registered holders) of the Warrants.  A copy of the Warrant Agreement may be inspected at the Warrant Agent Office and is available upon written request addressed to the Company.

       Capitalized terms used herein and not defined shall have the respective meanings ascribed to such terms in the Warrant Agreement.

       Warrants may be exercised to purchase shares of Common Stock from the Company upon or after the occurrence of a Qualifying Event through the Expiration Date, at the Exercise Price set forth on the face hereof, subject to adjustment as described in the Warrant Agreement.

       The Company shall not be required to issue fractions of Shares or, to the extent Shares are certificated, to distribute certificates which evidence fractional Shares.  In the event of an adjustment that results in the Warrants becoming exercisable for fractional Shares, the number of Shares subject to such Warrants shall be adjusted upward or downward to the nearest whole number of Shares.

       Warrant Certificates, when surrendered at the Warrant Agent Office or at such other offices or agencies as may be designated by the Warrant Agent or at the offices of any successor Warrant Agent by the registered holder thereof in person or by a legal representative or attorney duly authorized in writing, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing Warrants to purchase in the aggregate a like number of shares of Common Stock.

       No Warrants or Shares may be Transferred in violation of the Securities Act, or state securities laws.  Further, prior to the IPO Date, no Transfer of Warrants or Shares shall be permitted if, after giving effect to such Transfer, such Transfer would result in the Company becoming subject to the reporting requirements under the Exchange Act. The Company and/or the Warrant Agent may require that, as a condition to any Transfer of the Warrants, the holder furnish the Company and the Warrant Agent with an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Company, to the effect that such Transfer is made in compliance with the Securities Act and all applicable state securities laws or pursuant to an exempt transaction under the Securities Act and state securities laws.  The provisions of this paragraph shall not apply to the exercise of Warrants to the extent that the Shares issued upon such exercise (and any unexercised portion of the Warrants so exercised) shall be issued to the same registered holder that exercised such Warrants.

       Any Transfer of the Warrants will be subject to the transfer restrictions set forth in the Warrant Agreement and the Registration Rights Agreement.

       Prior to the IPO Date, holders of Warrants may not Transfer less than all of their respective Warrants.

No Transfer of Warrants to any Company Competitor or an Affiliate of any Company Competitor shall be permitted without the prior written consent of the Board.

No Transfer of Warrants shall be permitted unless and until the proposed transferee agrees in writing to become a party to, and be bound to the same extent as the transferor by the terms of, the Stockholders Agreement and the Registration Rights Agreement.  Such transferee must execute a joinder agreement, in form and substance reasonably satisfactory to the Company, evidencing such transferee's agreement to become a party to the Stockholders Agreement and the Registration Rights Agreement and be bound to the same extent as the transferor.

The Company and the Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

In the event of any conflict or inconsistency between this Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

## FORM OF ELECTION TO EXERCISE

### (TO BE EXECUTED UPON EXERCISE OF THE WARRANTS)

The undersigned hereby irrevocably elects to exercise the right, represented by this Warrant Certificate, to purchase _____ shares of Common Stock and herewith tenders in payment for such shares $_____ [select one of the following] [by certified or official bank check, or by wire transfer] [after the IPO Date, by surrender to the Company for cancellation of shares of Common Stock newly acquired upon exercise of Warrants, valued at the Market Price, equal to the Exercise Amount]. The undersigned requests that a certificate representing the Shares be registered and delivered as follows:

_____
*Name*

_____
*Address*

_____
*Delivery Address (if different)*

If such number of shares of Common Stock is less than the aggregate number of shares of Common Stock purchasable hereunder, the undersigned requests that a new Warrant Certificate representing the balance of such shares shall be registered and delivered as follows:

_____
*Name*

_____
*Address*

_____
*Delivery Address (if different)*

_____
*Social Security or Other Taxpayer*
*Identification Number of Holder*

_____
*Signature*

**FORM OF ASSIGNMENT**

(TO BE EXECUTED BY THE REGISTERED HOLDER IF SUCH
HOLDER DESIRES TO TRANSFER THE WARRANT CERTIFICATE)

      **FOR VALUE RECEIVED**, the undersigned registered holder hereby sells, assigns and transfers unto

_____

Name of Assignee

_____

Address of Assignee

this Warrant Certificate, together with all right, title and interest therein, and does irrevocably constitute and appoint _____ attorney, to transfer the within Warrant Certificate to purchase _____ shares of Common Stock to which the Warrant Certificate relates on the books of the Warrant Agent, with full power of substitution.


_____        _____
*Dated*                                   *Name of Assignor*

                                         _____
                                          *Signature of Assignor*



_____        _____
*Social Security or Other Taxpayer*       *Name of Assignee*
*Identification Number of Assignee*
                                         _____
                                          *Signature of Assignee*

[This Page Intentionally Left Blank]

# EXHIBIT D-1

### Schedule of Compensation and Benefit Programs to Be Assumed

[This Page Intentionally Left Blank]

## Compensation and Benefits Programs to Be Assumed

Pursuant to Article V.C of the *Third Amended Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and its Debtor Affiliates* [Docket No. 317] (as amended from time to time, the "**Plan**"),[1] the Compensation and Benefits Programs shall be deemed to be, and shall be treated as though they are, Executory Contracts, and the Reorganized Debtors' obligations under the Compensation and Benefits Programs shall be deemed assumed on the Effective Date pursuant to the provisions of section 365 and 1123 of the Bankruptcy Code, except for:

(A)    Compensation and Benefits Programs listed in the Compensation and Benefits Programs to Be Rejected, included as **Exhibit D-2** to the Plan Supplement;

(B)    Compensation and Benefits Programs that have previously been rejected or terminated; and

(C)    Compensation and Benefits Programs that, as of the entry of the Confirmation Order, are the subject of pending rejection procedures or a motion to reject, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

The assumption or continuation of Compensation and Benefits Programs pursuant to Article V.C of the Plan shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein (unless a Compensation and Benefits Program counterparty timely objects to the assumption or continuation contemplated by this Section in which case any such Compensation and Benefits Program shall be deemed rejected or discontinued as of immediately prior to the Commencement Date).  No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to Article V.C of the Plan other than those applicable immediately prior to such assumption or continuation.

---

[1]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Plan.

**List of Compensation and Benefits Programs to Be Assumed[2]**

| Plan | Overview |
|---|---|
| Medical Plan | RDA has two self insured, network-based medical programs, as well as an out of area plan for employees who live outside of a network location. RDA also maintains two insured HMO plans in the NY and Seattle areas.<br><br>There is also a prescription drug program offered through the medical program, and RDA participates in a prescription drug purchasing cooperative. |
| Dental Plan | RDA offers a self-insured, network-based dental plan that covers preventive, basic, major and orthodontic services. |
| Vision Plan | This is an employee-pay-all program. |
| Reader's Digest Medical and Dental Plan for Retirees | Former employees of a participating company (i.e. not all subsidiaries are covered) who were active before June 30, 2005, who meet specified requirements including meeting the Rule of 70 (age on the day service terminates plus years of service from age 40 must equal at least 70), are eligible for coverage under one of two plans. |
| Flexible Benefit Plans (including Health Care FSA and Dependant Care FSA) | RDA offers employees a pre-tax health care account. This account is a qualified benefit program under section 125 of the Internal Revenue Code. There is a $5000 annual limit.<br><br>RDA also offers employees a pre-tax dependent care account. This account is a qualified section 125 benefit program. There is a $5000 annual limit. |
| Health Savings Accounts | The plan meets all the qualifications of Health Savings Account plans and is open to those employees who enroll in one of the two network-based medical programs. |
| Workers' Compensation Program | As required by law. |

---

[2]    All capitalized terms used but not otherwise defined in this section shall have the meanings set forth in the Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, Debtors to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Benefits Programs, filed on August 24, 2009 [Docket No. 11].

| Life insurance | The Basic Life Insurance program is a company paid benefit for all employees of RDA.  Amount of coverage is up to $50,000 and is fully paid by RDA.  There is also optional life insurance that can be purchased by employees. |
| --- | --- |
| Business travel accident insurance | The business travel accident insurance program is company-provided. |
| Disability Benefits (including Short-Term Disability and Long-Term Disability) | Short-Term Disability is self-funded by RDA, Aetna is the administrator and the benefit determiner (advice to pay program).<br><br>Long-Term Disability is an insured program with Aetna.  The program is fully paid by RDA. |
| Employee Assistance Program | The Employee Assistance Program  is provided at no cost to employees. This program provides free and confidential assistance to employees and their immediate family members. |
| Auto and Homeowner Insurance Plan | Auto and Homeowner Insurance is available as a payroll deduction program for employees. Both are employee-pay-all programs. |
| Qualified Transportation Benefits | Similar to an Flexible Savings Account the Qualified Transportation Benefits program enables RDA employees to put money aside pre-tax for qualified transportation costs. |
| Gym Membership and Sports Reimbursement | RDA reimburses employees up to $250 per year for certain fees and expenses related to gym membership and sports fees. |
| Flex Net Plan | Flex Net is a perquisite reimbursement program for executives for either $12,500 or $25,000 per year. The program provides for reimbursement of certain specified expenses, including health and personal fitness financial fitness and education.  The program is not open to new participants. |
| Financial Planning (including AYCO Answer Lines) | RDA provides tax and financial planning for executives.<br><br>AYCO Answer Lines provide financial planning services via a phone center to all employees. |
| Hyatt Premier Legal Plan | Group legal provided by Hyatt is available through payroll deduction. This is an employee pay all program. |
| Sales Incentive Plans | Employees engaged in selling activities (e.g. ad sales personnel) participate in various sales incentive programs designed to encourage performance. |

3

| | |
|---|---|
| Severance Program | Severance is paid based on level and length of service, generally with 2 weeks of service for each year of employment with minimum and maximums based on level. |
| Outplacement Services | Career transition services provided to employees who are involuntarily terminated from the company.  Duration of services is based on employee's level. |
| American Express Corporate Cards | American Express Corporate Cards are issued to certain employees to be used for travel, commutation and certain business-related expenses. |
| Gelco | Employee reimbursable expenses are processed utilizing Gelco Expense Management system. |
| Commission Plans | Certain employees who are also sellers earn "commissions" based on amount of product sold at pre-determined goals. |
| Lincoln Center Reimbursement | Benefits of up to $600 per year for performances at Lincoln Center in NYC. |
| 401(k) Plan | Employees can put 1%-75% of eligible compensation into the plan on a pre-tax basis (up to qualified plan limits).   The plan provides ability for the company to match a portion of the employees' contribution (however, the company match was suspended 3/1/09). |
| Reader's Digest Retirement Plan | RDA sponsors a cash balance defined benefit retirement plan for employees of certain employing units.   Retirement benefits are fully paid by the Plan. |
| Relocation | The Company may relocate employees and will reimburse for related costs.  Benefits may included tax planning and visa services when employees are located internationally. |
| Vacation and Leaves of Absence | Vacation and leaves of absence are provided to employees of the Company. Employees are generally required to use vacation time within the year it is earned. Other leaves (personal, family medical, maternity, military, bereavement, jury duty, voting, sick and disability) are permitted by policy and as required by law. |
| Adoption Assistance | Employees are eligible to receive up to $2,000 toward costs of an adoption. |
| Automobile Allowances | Auto allowances are provided to a small group of non-executive sales employees. |

4

Notwithstanding anything to the contrary herein, in the Plan or otherwise, the Reorganized Debtors' obligations with respect to the payment of "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) shall continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, and subject to any contractual rights to terminate or modify such benefits.

The Debtors or the Reorganized Debtors, as applicable, will continue the Pension Plan in accordance with its terms, and the Debtors or Reorganized Debtors, as applicable, shall satisfy the minimum funding standards and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code, subject to any contractual or statutory rights to terminate or modify such plan.

[This Page Intentionally Left Blank]

# EXHIBIT D-2

**Schedule of Compensation and Benefit Programs to Be Rejected**

[This Page Intentionally Left Blank]

**Compensation and Benefits Programs to Be Rejected**

Pursuant to Article V.C of the *Third Amended Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and its Debtor Affiliates* [Docket No. 317] (as amended from time to time, the "***Plan***"),[1] the Compensation and Benefits Programs shall be deemed to be, and shall be treated as though they are, Executory Contracts, and the Reorganized Debtors' obligations under the Compensation and Benefits Programs shall be deemed assumed on the Effective Date pursuant to the provisions of section 365 and 1123 of the Bankruptcy Code, except for:

(A)    The Compensation and Benefits Programs listed herein to be rejected or terminated;

(B)    Compensation and Benefits Programs that have previously been rejected or terminated; and

(C)    Compensation and Benefits Programs that, as of the entry of the Confirmation Order, are the subject of pending rejection procedures or a motion to reject, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

**List of Compensation and Benefits Programs to Be Rejected[2]**

| Plan | Overview |
|---|---|
| The Reader's Digest Association, Inc. Annual Incentive Plan ("AIP") <br><br> The Reader's Digest Management Incentive Compensation Plan ("MIP") | The AIP and MIP were the incentive plans used in prior fiscal years to reward achievement of annual performance objectives. |
| Long-Term Incentive Plan | The LTIP was a medium to long-term incentive program with annual grants for US level 17 or global equivalent executives, typically utilizing 3-year performance objectives. |

---

[1]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Plan.

[2]    All capitalized terms used but not otherwise defined in this section shall have the meanings set forth in the Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, Debtors to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Benefits Programs, filed on August 24, 2009 [Docket No. 11].

| RDA Holding Co. 2007 Omnibus Incentive Plan | The RDA Holding Co. 2007 Omnibus Incentive Compensation Plan governed all stock awards, RSUs, stock options and restricted stock awards prior to the filing of the Chapter 11 Cases. |
|---|---|
| Income Continuation Plan (2006) | Plan provided benefits for employees terminated within 24 months of a change in control, as defined. |
| Tuition Reimbursement | Prior to the Commencement Date, RDA would reimburse employees for tuition fees for certain courses up to a maximum of $5,000 per year upon successful completion of the course. |
| RDA, Inc. Director Compensation Program | The Director Compensation Program provided the level of cash and equity compensation that is paid to the individuals who serve as non-employee directors of The Readers' Digest Association, Inc. |

Any liability of the Debtors for payments associated with any of the Compensation and Benefits Programs identified herein to be rejected pursuant to the Plan, including, without limitation, all equity, LTIP and incentive plan bonus targets referenced in any employment agreements, offer letters or other similar arrangements, shall be deemed rejected or otherwise terminated or eliminated, subject to the right of any current director, officer, employee, consultant or other service provider to participate in any new employment or severance policies, compensation and benefit plans, policies and programs and other arrangements created after the Effective Date.

For the avoidance of doubt, the Debtors are not seeking to assume any obligations in connection with the Non-Qualified Retirement Plans in connection with the Plan. The Non-Qualified Retirement Plans include all of the Debtors' unfunded, non-qualified retirement plans or deferred compensation arrangements, including, but not limited to, the following plans or arrangements:

- the Excess Benefit Retirement Plan;

- the Executive Retirement Plan;

- the Executive Cash Balance Plan;

- the 1988 Supplemental Employee Retirement Plan and related agreements;

- the Director and Roving Editors Plan and/or related agreements or arrangements; and

- the Reader's Digest Deferred Compensation Plan or deferred compensation arrangements provided by any other Debtor.

Claims arising from the discontinuation, rejection or termination of the Non-Qualified Retirement Plans will be treated as Other General Unsecured Claims in Class 5.

2

Notwithstanding anything to the contrary herein, in the Plan or otherwise, the Reorganized Debtors' obligations with respect to the payment of "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) shall continue for the duration of the periods the Debtors have obligated themselves to provide such benefits, if any, and subject to any contractual rights to terminate or modify such benefits.

The Debtors or the Reorganized Debtors, as applicable, will continue the Pension Plan in accordance with its terms, and the Debtors or Reorganized Debtors, as applicable, shall satisfy the minimum funding standards and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code, subject to any contractual or statutory rights to terminate or modify such plan.

[This Page Intentionally Left Blank]

# EXHIBIT E

### Form of the Registration Rights Agreement

Article IV.I of the Plan provides that certain holders of the New Common Stock shall be entitled to registration rights pursuant to the Registration Rights Agreement. On or after the Effective Date, Reorganized Holdings and the Required Consenting Lenders shall enter into and deliver the Registration Rights Agreement, in substantially the form attached hereto, to each Entity that is intended to be a party thereto or such agreements shall be deemed to be valid, binding and enforceable in accordance with their respective terms, subject to the approval of the Bankruptcy Court and entry of the Confirmation Order.

> **PLEASE TAKE NOTICE THAT**, the Plan provides that each Holder of New Common Stock and New Warrants shall be deemed parties to, and shall be bound by, the Registration Rights Agreement, in each case without the need for execution by any party thereto other than Reorganized Holdings, subject to Court approval and entry of the Confirmation Order.

[This Page Intentionally Left Blank]

**DRAFT 12/11/09**

---

**REGISTRATION RIGHTS AGREEMENT**

**by and among**

**RDA HOLDING CO.**

**and**

**THE HOLDERS NAMED HEREIN**

---

Dated as of [• ]

---

# TABLE OF CONTENTS

**Page**

1. Definitions ...................................................................................................... 1

2. Securities Act Shelf Registration on Request. ............................................... 5

    (a)   Shelf Registration ................................................................................ 5

    (b)   Effective Registration Statement ......................................................... 6

3. Securities Act Registration on Request .......................................................... 7

    (a)   Request ................................................................................................. 7

    (b)   Registration of Other Securities .......................................................... 8

    (c)   Registration Statement Form ............................................................... 9

    (d)   Effective Registration Statement ......................................................... 9

    (e)   Selection of Underwriters ................................................................... 10

    (f)   Priority in Requested Registration ..................................................... 10

    (g)   Shelf Registrations .............................................................................. 11

4. Piggyback Registration .................................................................................. 11

5. Expenses ........................................................................................................ 12

6. Registration Procedures ................................................................................. 13

7. Underwritten Offerings .................................................................................. 17

    (a)   Requested Underwritten Offerings ..................................................... 17

    (b)   Piggyback Underwritten Offerings: Priority ....................................... 17

    (c)   Holders of Registrable Common Stock to be Parties to Underwriting
          Agreement ........................................................................................... 19

    (d)   Holdback Agreements ......................................................................... 19

8. Preparation: Reasonable Investigation ......................................................... 20

    (a)   Registration Statements ...................................................................... 20

    (b)   Confidentiality .................................................................................... 21

i

9.   Postponements .................................................................................................. 21

10.   Indemnification ................................................................................................. 22

    (a)   Indemnification by the Company ............................................................ 22

    (b)   Indemnification by the Offerors and Sellers .......................................... 23

    (c)   Notices of Losses, etc. ............................................................................. 24

    (d)   Contribution ............................................................................................. 24

    (e)   Indemnification Payments ....................................................................... 25

11.   Registration Rights to Others .......................................................................... 25

12.   Adjustments Affecting Registrable Common Stock .......................................... 25

13.   Exchange Act Reports ....................................................................................... 25

14.   Rule 144 and Rule 144A ................................................................................... 25

15.   Amendments and Waivers ................................................................................. 26

16.   Nominees for Beneficial Owners ...................................................................... 26

17.   Assignment ......................................................................................................... 26

18.   Calculation of Percentage or Number of Shares of Registrable Common Stock ................. 27

19.   Termination of Registration Rights .................................................................. 27

20.   Miscellaneous .................................................................................................... 27

    (a)   Further Assurances .................................................................................. 27

    (b)   Headings ................................................................................................... 27

    (c)   Conflicting Instructions ........................................................................... 27

    (d)   Remedies ................................................................................................... 28

    (e)   Entire Agreement ..................................................................................... 28

    (f)   Notices ...................................................................................................... 28

    (g)   Governing Law ......................................................................................... 28

    (h)   Severability .............................................................................................. 28

       (i)    Counterparts ......................................................................................................... 28

21.   Director Holders ......................................................................................................... 29

22.   Management Holders ................................................................................................... 29

23.   Transfer Agent ............................................................................................................ 29

SCHEDULES:

SCHEDULE A – CREDITOR HOLDERS
SCHEDULE B – NOTICES

EXHIBIT:

EXHIBIT A – FORM OF SELLING STOCKHOLDER QUESTIONNAIRE

REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT, dated as of [•] (this "Agreement"), is entered into by and among RDA Holding Co., a Delaware corporation (the "Company"), the holders of Registrable Common Stock (as hereinafter defined) who are signatories to this Agreement or who agree to be or otherwise are bound by the terms hereof (the "Holders"), and the Warrantholders (as hereinafter defined).

This Agreement is being entered into in connection with the acquisition of Common Stock (as hereinafter defined) on the date hereof by the creditors of the Company identified on Schedule A hereto (the "Creditor Holders") pursuant to the Plan (as hereinafter defined).

To induce the Creditor Holders to vote in favor of the Plan and to accept the issuance of the Common Stock by the Company under the Plan, the Company has undertaken to register Registrable Common Stock under the Securities Act (as hereinafter defined) and to take certain other actions with respect to the Registrable Common Stock.  This Agreement sets forth the terms and conditions of such undertaking.

In consideration of the premises and the mutual agreements set forth herein, the parties hereto hereby agree as follows:

1.    Definitions.  Unless otherwise defined herein, capitalized terms used herein and in the recitals above shall have the following meanings:

"Affiliate" (a) shall mean, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with, such Person or any Immediate Family Member of such Person; and (b) shall also include, with respect to any Person who is an individual, a trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only such individual and/or such individual's Immediate Family Members.  For purposes of this definition, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble hereto.

"beneficial ownership" (and related terms such as "beneficially owned" or "beneficial owner") has the meaning set forth in Rule 13d-3 under the Exchange Act.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to be closed.

"Commission" means the U.S. Securities and Exchange Commission.

"Common Stock" means the collective reference to Voting Common Stock and Limited Voting Common Stock.

"Company" has the meaning set forth in the preamble hereto.

"Company Indemnitee" has the meaning set forth in Section 10(a) hereof.

"Creditor Holders" has the meaning set forth in the preamble hereto.

"Director Holders" means Holders who are directors of the Company and are not employees of the Company or a Subsidiary of the Company or any Affiliate thereof.

"Effective Date" means the effective date of the Plan pursuant to the terms thereof.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, or any similar or successor statute.

"Expenses" means all expenses incident to the Company's performance of or compliance with its obligations under this Agreement, including, without limitation, all registration, filing, listing, stock exchange and FINRA fees (including, without limitation, all fees and expenses of any "qualified independent underwriter" required by the rules of FINRA), all fees and expenses of complying with state securities or blue sky laws (including, without limitation, the reasonable fees, disbursements and other charges of counsel for the underwriters in connection with blue sky filings), all word processing, duplicating and printing expenses, messenger, telephone and delivery expenses, all rating agency fees, the fees, disbursements and other charges of counsel for the Company and of its independent public accountants, including, without limitation, the expenses incurred in connection with "cold comfort" letters required by or incident to such performance and compliance, the fees and expenses incurred in connection with the listing of the securities to be registered on each securities exchange or national market system on which similar securities issued by the Company are then listed, any fees and disbursements of underwriters customarily paid by issuers or sellers of securities, the reasonable fees, disbursements and other charges of one firm of counsel in each applicable jurisdiction (per registration statement prepared) to the Holders making a request pursuant to Section 2(a), Section 3(a) or Section 4 hereof (selected by the Holders beneficially owning a majority of the shares of Registrable Common Stock covered by such registration), the fees and expenses of any special experts retained by the Company in connection with such registration, and the fees and expenses of other Persons retained by the Company, but excluding underwriting discounts and commissions and applicable transfer taxes, if any, in each case relating to the shares of Registrable Common Stock sold by the Selling Holders, which discounts, commissions and transfer taxes shall be borne by the seller or Selling Holders; provided, that, if the Company shall, in accordance with Section 4 or Section 9 hereof, not register any securities with respect to which it had given written notice of its intention to register to Holders, notwithstanding anything to the contrary in the foregoing, all reasonable out-of-pocket expenses incurred by such requesting Holders in connection with such registration (other than the reasonable fees, disbursements and other charges of counsel other than the one firm of counsel referred to above) shall be deemed to be Expenses.

2

"FINRA" shall mean the Financial Industry Regulatory Authority.

"Holder Indemnitee" has the meaning set forth in Section 10(b) hereof.

"Holders" has the meaning set forth in the preamble hereto.

"Immediate Family Member" shall mean, with respect to any Person, a spouse, parent, child, grandchild or sibling of such Person.

"Initial Shelf" has the meaning set forth in Section 3(a) hereof.

"Initiating Holders" has the meaning set forth in Section 3(a) hereof.

"Initiating Request" has the meaning set forth in Section 3(a) hereof.

"Limited Voting Common Stock" means the class B common stock, par value $0.001 per share, of the Company.

"Loss" and "Losses" have the meanings set forth in Section 10(a) hereof.

"Management Holders" means Holders who are (i) employees or former employees of any of the Company or its Subsidiaries or (ii) Affiliates of employees or former employees of any of the Company or its Subsidiaries.

"Offering Documents" has the meaning set forth in Section 10(a) hereof.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization, governmental or regulatory body or subdivision thereof or other entity.

"Piggyback Requesting Holder" has the meaning set forth in Section 4 hereof.

"Plan" means the Plan of Reorganization confirmed by order dated [•] of the United States Bankruptcy Court for the Southern District of New York in the chapter 11 case commenced by the Company and certain of its Subsidiaries.

"Public Offering" means a public offering and sale of Voting Common Stock pursuant to an effective registration statement under the Securities Act.

"Questionnaire" has the meaning set forth in Section 2(a) hereof.

"Registrable Common Stock" means any share of Voting Common Stock, including any share of Voting Common Stock issued upon the conversion of Limited Voting Common Stock or exercise of Warrants, beneficially owned by the Holders or their respective Affiliates from time to time, provided, however, that a share of Voting Common Stock will cease to be Registrable Common Stock after it has been sold under a registration statement effected pursuant hereto (or, in the case of a Management Holder, the issuance to the Management Holder of Voting Common Stock that was registered under a registration statement on Form S-8 which includes a resale prospectus on Form S-3) or pursuant to Rule 144 promulgated under the

Securities Act after a Public Offering.  For the avoidance of doubt, Limited Voting Common Stock or Warrants shall not be deemed to be Registrable Common Stock.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, or any similar or successor statute.

"Selling Holders" means the Holders requesting to be registered pursuant hereto.

"Shelf Filing Date" has the meaning set forth in Section 2(a) hereof.

"Shelf Registration" has the meaning set forth in Section 2(a) hereof.

"Shelf Registration Statement" has the meaning set forth in Section 2(a) hereof.

"Shelf Requesting Holders" means (i) after the initial Public Offering of the Company (or a successor entity), one (1) or more Holders (other than Management Holders, who shall have no request rights under Section 2(a)), which, together with their Affiliates, beneficially own at least twenty percent (20%) of the shares of Registrable Common Stock outstanding on the Shelf Request Date (excluding shares held by Management Holders) or (ii) on or after the second anniversary of the Effective Date (but prior to the initial Public Offering of the Company (or a successor entity)), one (1) or more Holders (other than Management Holders, who shall have no request rights under Section 2(a)), which, together with their Affiliates, beneficially own at least a majority of the shares of Registrable Common Stock outstanding on the Shelf Request Date (excluding shares held by Management Holders).

"Shelf Request Date" has the meaning set forth in Section 2(a) hereof.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which fifty percent (50%) or more of the total voting power of shares of capital stock entitled (without regard to the occurrence of any contingency) to vote generally in the election of directors, managers or trustees thereof, or fifty percent (50%) or more of the equity interest therein, is at the time owned or controlled, directly or indirectly, by any Person or one or more of the other Subsidiaries of such Person or a combination thereof.

"Transfer" means any direct or indirect transfer, sale, offer, assignment, exchange, distribution, mortgage, pledge, hypothecation or other disposition.  "Transferor" and "Transferee" have correlative meanings.

"Voting Common Stock" means the class A common stock, par value $0.001 per share, of the Company.

"Warrant Agreement" means the Warrant Agreement, dated as of the date hereof, between the Company and [• ], as warrant agent.

"Warrantholders" shall mean the holders of the Warrants.

4

"Warrants" means warrants, issued pursuant to the Plan and governed by the Warrant Agreement, that are exercisable for Voting Common Stock.

2.   Securities Act Shelf Registration on Request.

(a)   Shelf Registration.  Shelf Requesting Holders may request that the Company file one shelf registration statement (as may be amended or supplemented from time to time, a "Shelf Registration Statement") under this Section 2(a) pursuant to Rule 415 promulgated under the Securities Act (a "Shelf Registration") providing for the sale by the Shelf Requesting Holders of any or all of the Registrable Common Stock beneficially owned by such Shelf Requesting Holders (the date of such request, the "Shelf Request Date") and any or all of the Registrable Common Stock beneficially owned by other Holders who comply with the requirements of this Section 2(a).  Shelf Requesting Holders may make such request at any time after the earlier to occur of (i) the completion of an initial Public Offering of the Company (or a successor entity) or (ii) the second anniversary of the Effective Date.  The Company shall (i) use its reasonable best efforts to file, at the earliest practicable date, such Shelf Registration Statement under the Securities Act (the "Shelf Filing Date") and (ii) use its reasonable best efforts to have such Shelf Registration Statement thereafter declared effective by the Commission at the earliest practicable date, but in any event not later than sixty (60) days after the Shelf Filing Date or, if a Shelf Registration Statement is reviewed by the staff of the Commission, not later than ninety (90) days after the Shelf Filing Date; provided, that following the closing date of an initial Public Offering, the Company shall not be required to file a Shelf Registration Statement pursuant to this Section 2(a) until a period of one hundred eighty (180) days shall have elapsed from such closing date.  Subject to Section 9(b), the Company agrees to use its reasonable best efforts to keep the Shelf Registration Statement continuously effective under Rule 415 of the Securities Act until the earliest to occur of (i) the second anniversary of the date such Shelf Registration Statement initially is declared effective by the Commission (plus a number of Business Days equal to the number of Business Days, if any, that the Shelf Registration Statement is not kept effective (including any days for which the use of the prospectus is suspended pursuant to Section 9(b)) after the initial date of its effectiveness and prior to the second anniversary thereof), (ii) the day after the date on which all of the Registrable Common Stock covered by the Shelf Registration Statement has been sold pursuant to the Shelf Registration Statement or (iii) the first date on which there shall cease to be any Registrable Common Stock covered by such Shelf Registration Statement.  The Company further agrees, if necessary, to supplement or amend the Shelf Registration Statement, if required by the rules, regulations or instructions applicable to the registration form used by the Company for such Shelf Registration or by the Securities Act or by any other rules and regulations thereunder for shelf registration, and the Company agrees to furnish to the Holders whose Registrable Common Stock is included in such Shelf Registration Statement copies of any such supplement or amendment promptly after its being issued or filed with the Commission.

Notwithstanding any other provision hereof, no Holder's Registrable Common Stock shall be included in the Shelf Registration Statement unless and until such Holder furnishes to the Company a fully completed notice and questionnaire substantially in the form attached hereto as Exhibit A (the "Questionnaire") and such other information in writing as the Company may reasonably request in writing for use in connection with the Shelf Registration Statement and any related application to be filed with or under state securities laws.  At least

5

thirty (30) days prior to the filing of the Shelf Registration Statement, the Company will provide to the Holders (including Management Holders) notice of its intention to file the Shelf Registration Statement, the form of Questionnaire and such other information the Company may reasonably request to be provided by the Holders.  In order to be named as a selling stockholder in the Shelf Registration Statement at the time of effectiveness of the Shelf Registration Statement and to include in the Shelf Registration Statement all Registrable Common Stock requested to be included for sale by the Holder, each Holder must no later than twenty (20) days following receipt of notice sent by the Company as set forth in the previous sentence, furnish to the Company in writing the completed Questionnaire and such other information reasonably requested by the Company and the Company will include information in the completed Questionnaire and such other information, if any, in the Shelf Registration Statement, as necessary and in a manner so that upon effectiveness of the Shelf Registration Statement, the Holder will be permitted to deliver the Shelf Registration Statement to purchasers of the Holder's Registrable Common Stock.  From and after the date that the Shelf Registration Statement becomes effective, upon receipt of a completed Questionnaire and such other information that the Company may reasonably request in writing, if any, the Company shall (i) as promptly as practicable after the date on which the Questionnaire is delivered, and in any event within the later of (x) fifteen (15) Business Days after receipt of such Questionnaire or (y) fifteen (15) Business Days after the expiration of any suspension pursuant to Section 9(b) in effect when the Questionnaire is delivered, file any amendments or supplements to the Shelf Registration Statement necessary for such Holder to be named as a selling stockholder and to include in the Shelf Registration Statement all Registrable Common Stock requested to be included for sale by such Holder or, if not permitted to name such Holder as a selling stockholder by supplement, file any necessary post-effective amendment to the Shelf Registration Statement or prepare and, if required by applicable law, file any amendment or supplement to any document so that such Holder is named as a selling stockholder, and use its reasonable best efforts to cause such post-effective amendment to be declared effective as promptly as practicable; <u>provided</u> that the Company shall not be obligated to file more than one (1) post-effective amendment in any ninety (90) day period.

     (b) <u>Effective Registration Statement</u>.  A Shelf Registration pursuant to Section 2(a) hereof shall not be deemed to have been effected

     (i)     unless a registration statement with respect thereto has been declared effective by the Commission and remains effective in compliance with the provisions of the Securities Act and the laws of any state or other jurisdiction applicable to the disposition of Registrable Common Stock covered by such registration statement until such time as all of such Registrable Common Stock have been disposed of in accordance with such registration statement or there shall cease to be any Registrable Common Stock covered by such registration statement (provided that such period need not exceed the applicable period provided for in Section 2(a)), or

     (ii)     if, after it has become effective, such registration statement is subject to any stop order, injunction or other order or requirement of the Commission or other governmental or regulatory agency or court preventing the sale of securities under such registration statement for any reason (other than a violation of applicable law solely by any Holder) and has not thereafter become effective.

6

3.  <u>Securities Act Registration on Request</u>.

(a)  <u>Request</u>.  At any time and from time to time (i) after the expiration (in accordance with Section 2(a) above) or cessation of effectiveness of the initial Shelf Registration Statement, if any, filed by the Company pursuant to Section 2(a) hereof (the "<u>Initial Shelf</u>") or (ii) at any time after the earlier to occur of (x) if the Initial Shelf has not been filed, the completion of an initial Public Offering of the Company (or a successor entity) and (y) if the Initial Shelf has not been filed and the Company has not yet completed an initial Public Offering, the second anniversary of the Effective Date and, in each case, prior to the termination of the Company's obligations hereunder pursuant to and in accordance with the terms of Section 19 hereof, one (1) or more Holders (other than Management Holders, who shall have no request rights under this Section 3(a)) (the "<u>Initiating Holders</u>") may make a written request (the "<u>Initiating Request</u>") to the Company for the registration with the Commission under the Securities Act (on Form S-3, or, if Form S-3 is not then available to the Company, Form S-1 or any other applicable form) of all or part of such Initiating Holders' Registrable Common Stock; <u>provided</u>, <u>however</u>, that (a) in the case of clause (i) above, such request shall be made by one (1) or more Holders (other than Management Holders), together with their Affiliates, beneficially owning at least fifteen percent (15%) of the then outstanding shares of Registrable Common Stock (excluding shares held by Management Holders), (b) in the case of clause (ii)(x) above, such request shall be made by one (1) or more Holders (other than Management Holders), together with their Affiliates, beneficially owning at least twenty percent (20%) of the then outstanding shares of Registrable Common Stock (excluding shares held by Management Holders) and (c) in the case of clause (ii)(y) above, such request shall be made by one (1) or more Holders (other than Management Holders), together with the Affiliates, beneficially owning at least a majority of the then outstanding shares of Registrable Common Stock (excluding shares held by Management Holders) (provided that subsequent Initiating Requests pursuant to this Section 3(a) shall be made by one (1) or more Holders (other than Management Holders), together with their Affiliates, beneficially owning at least fifteen percent (15%) of the then outstanding shares of Registrable Common Stock (excluding shares held by Management Holders)), which request, in each case in this Section 3(a), shall specify the number of shares of Registrable Common Stock to be disposed of by such Holders and the proposed plan of distribution therefor.  Upon the receipt of any Initiating Request for registration pursuant to this Section 3(a), the Company promptly shall notify in writing all other Holders (including Management Holders) of the receipt of such request and will use its reasonable best efforts to effect, at the earliest practicable date, such registration under the Securities Act, including a Shelf Registration, if applicable, of

(i)  the Registrable Common Stock which the Company has been so requested to register by such Initiating Holder or Holders, and

(ii)  all other Registrable Common Stock which the Company has been requested to register by any other Holders by written request given to the Company within twenty (20) days after the giving of written notice by the Company to such other Holders of the Initiating Request (or ten (10) days if the Company states in such written notice or gives telephonic notice to the relevant Holders, with written confirmation to follow promptly thereafter, stating that (1) such registration will be on Form S-3 (or, if

Form S-3 is not then available to the Company, Form S-1 or any other applicable form) and (2) such shorter period of time is required because of a planned filing date),

all to the extent necessary to permit the disposition (in accordance with Section 3(c) hereof) of the Registrable Common Stock to be so registered; provided, that,

> (A)    the Company shall not be required to effect more than a total of an aggregate of six (6) registrations pursuant to Section 2(a) or this Section 3(a) for all Holders (other than the Initial Shelf and other than the initial registration statement filed in accordance with Section 3(a)(ii)),

> (B)    if the intended method of distribution is an underwritten Public Offering, the Company shall not be required to effect such registration pursuant to this Section 3(a) unless such underwriting shall be conducted on a "firm commitment" basis,

> (C)    if the Company shall have previously effected a registration pursuant to Section 2 or this Section 3(a), the Company shall not be required to effect any registration pursuant to this Section 3(a) until a period of one hundred eighty (180) days shall have elapsed from the date on which the previous such registration ceased to be effective,

> (D)    any Holder whose Registrable Common Stock was to be included in any such registration pursuant to this Section 3(a), by written notice to the Company, may withdraw such request, and the Company shall not effect such registration in the event that the Holders (excluding Management Holders) that have not elected to withdraw beneficially own, in the aggregate, less than the percentage of the shares of Registrable Common Stock required to initiate a request under this Section 3(a) (provided, that if such registration is not effected for such reason, it shall still count as one of the six registrations under clause (A) above unless the withdrawing Holders reimburse the Company for all Expenses incurred),

> (E)    the Company shall not be required to effect any registration to be effected pursuant to this Section 3(a) unless (1) the expected sale price of the shares of Registrable Common Stock to be included thereunder is at least $15,000,000 (or, if such registration is for the initial Public Offering, then $50,000,000) and (2) at least fifteen percent (15%) of the shares of Registrable Common Stock outstanding at the time of such request are to be included in such registration, and

> (F)    a Shelf Registration effected under this Section 3(a) shall comply with the procedures set forth in the second paragraph of Section 2(a).

(b) Registration of Other Securities.  Whenever the Company shall effect a registration pursuant to Section 3(a) hereof, no securities other than (i) Registrable Common Stock and (ii) subject to Section 3(f), Voting Common Stock to be sold by the Company for its own account, shall be included among the securities covered by such registration unless the

Selling Holders (excluding Management Holders) beneficially owning not less than a majority of the shares of Registrable Common Stock to be covered by such registration (excluding shares of Registrable Common Stock held by Management Holders) shall have consented in writing to the inclusion of such other securities.

(c)  Registration Statement Form.  Except as provided in Section 3(a), registrations under Section 3(a) hereof shall be on such appropriate registration statement form prescribed by the Commission under the Securities Act as shall be selected by the Company and as shall permit the disposition of the Registrable Common Stock pursuant to an underwritten offering unless the Selling Holders (excluding Management Holders) beneficially owning at least a majority of the shares of Registrable Common Stock requested to be included in such registration statement (excluding shares of Registrable Common Stock held by Management Holders) determine otherwise, in which case pursuant to the method of distribution determined by such Selling Holders.  The Company agrees to include in any such registration statement filed pursuant to Section 3(a) hereof all information with respect to the Selling Holders or the distributions of securities thereunder which the Selling Holders (excluding Management Holders) beneficially owning at least a majority of shares of the Registrable Common Stock covered by such registration statement (excluding shares of Registrable Common Stock held by Management Holders) effected pursuant hereto, upon advice of counsel, shall reasonably request.

(d)  Effective Registration Statement.  A registration requested pursuant to Section 3(a) hereof shall not be deemed to have been effected

(i)  unless a registration statement with respect thereto has been declared effective by the Commission and remains effective in compliance with the provisions of the Securities Act and the laws of any state or other jurisdiction applicable to the disposition of Registrable Common Stock covered by such registration statement until such time as all of such Registrable Common Stock have been disposed of in accordance with such registration statement or there shall cease to be any Registrable Common Stock covered by such registration statement, provided, that, except with respect to any Shelf Registration, such period need not exceed ninety (90) days (plus a number of Business Days equal to the number of Business Days, if any, that the registration statement is not kept effective (including any days for which the use of the prospectus is suspended pursuant to Section 9(b)) after the initial date of its effectiveness and prior to the expiration of such ninety (90) day period), and, provided, further, that with respect to any Shelf Registration, such period need not extend beyond the period provided for in Section 3(g) hereof,

(ii)  if, after it has become effective, such registration is subject to any stop order, injunction or other order or requirement of the Commission or other governmental or regulatory agency or court for any reason other than a violation of applicable law solely by any Selling Holder (excluding Management Holders) and has not thereafter become effective, or

(iii)  if, in the case of an underwritten offering, the conditions to closing specified in an underwriting agreement to which the Company is a party are not satisfied

9

or waived other than by reason of any breach or failure by any Selling Holder (excluding Management Holders).

The Holders to be included in a registration statement pursuant to Section 3(a) (excluding Management Holders) may at any time withdraw such request for registration in accordance with Section 3(a)(ii)(D); provided that any Initiating Holder who withdraws such request shall not be permitted to be an Initiating Holder during the twelve-month period following such withdrawal.

(e) Selection of Underwriters.  The underwriter or underwriters of each underwritten offering, if any, of the Registrable Common Stock to be registered pursuant to Section 2(a) or Section 3(a) hereof shall be mutually selected by the Selling Holders (excluding Management Holders) beneficially owning at least a majority of the shares of Registrable Common Stock to be registered (excluding shares held by Management Holders) and the Company.  In the case of any offering or registration initiated by the Company for its own account or any other offering not effected pursuant to Section 2(a) or Section 3(a) hereof, including any offering pursuant to which the Holders shall have piggyback rights pursuant to Section 4 hereof, the Company shall select a nationally recognized underwriter (or underwriters) for such offering in its sole discretion; provided that, the Company shall not identify any Holder or subsequent purchaser of Registrable Common Stock as an underwriter in any public disclosure with the Commission or any trading market without the prior written consent of such Holder or subsequent purchaser. If the Company is required by law to identify any such party as an underwriter in any public disclosure or filing with the Commission or any trading market, it must notify such party in advance and such party shall have the option, in its sole discretion, to consent to such identification as an underwriter within five (5) Business Days or such party shall be deemed to have consented to have its Registrable Common Stock removed from the applicable registration statement.

(f) Priority in Requested Registration.  If a registration requested pursuant to Section 2(a) or Section 3(a) hereof involves an underwritten Public Offering, and the managing underwriter of such underwritten offering shall advise the Company in writing (with a copy to each Selling Holder requesting that Registrable Common Stock be included in such registration statement) that, in its opinion, the number of shares of Registrable Common Stock requested to be included in such registration exceeds the number of such securities that can be sold in such offering within a price range stated to such managing underwriter by Selling Holders (excluding Management Holders) beneficially owning at least a majority of the shares of Registrable Common Stock requested to be included in such registration (excluding shares held by Management Holders) to be acceptable to such Selling Holders (such writing to state the basis of such opinion and the approximate number of securities which the managing underwriter believes may be included in such offering without such effect), then the Company shall include in such registration, to the extent of the number of shares which the Company is so advised the managing underwriter believes can be sold in such offering, (i) first, all Registrable Common Stock requested to be registered pursuant to Section 2(a) or Section 3(a), pro rata among the Selling Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Selling Holders, (ii) second, if additional shares may be sold based on the opinion of the managing underwriter, then securities that the Company proposed to issue and sell for its own account and (iii) third, other securities, if any; provided, however, that if such

10

registration is in connection with the initial Public Offering, the allocation shall be as follows: (i) first, all Registrable Common Stock (excluding shares held by Management Holders) requested to be registered pursuant to Section 2(a) or Section 3(a), pro rata among the Selling Holders (excluding Management Holders) on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Selling Holders, (ii) second, if additional shares may be sold based on the opinion of the managing underwriter, shares of Registrable Common Stock beneficially owned by Management Holders, pro rata among the Management Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Management Holders, (iii) third, securities that the Company proposed to issue and sell for its own account and (iv) fourth, other securities, if any.

(g) Shelf Registrations.  If one or more demands made pursuant to Section 3(a) hereof are for a Shelf Registration, the period for which the Shelf Registration Statement in connection with the first Shelf Registration requested pursuant to Section 3(a) must remain effective need not extend beyond one (1) year from the date on which such Shelf Registration Statement initially was declared effective by the Commission and the period for which any subsequent Shelf Registration Statement in connection with the subsequent Shelf Registration requested pursuant to Section 3(a) must remain effective need not extend beyond nine (9) months from the date on which such Shelf Registration Statement initially was declared effective by the Commission (plus, in each case, a number of Business Days equal to the number of Business Days, if any, that the Shelf Registration Statement is not kept effective (including any days for which the use of the prospectus is suspended pursuant to Section 9(b)) after the initial date of its effectiveness and prior to such first-year or nine-month, as the case may be, anniversary thereof).Piggyback Registration.  If the Company, at any time after the initial Public Offering and when a Shelf Registration Statement covering all outstanding shares of Registrable Common Stock is not effective, proposes to register Voting Common Stock under the Securities Act by registration on any forms (other than Form S-4 or S-8 or any successor or similar form(s)), whether or not pursuant to registration rights granted to other holders of its securities and whether or not for sale for its own account, it shall give prompt written notice to all of the Holders (including Management Holders) of its intention to do so and of such Holders' rights under this Section 4, which notice, in any event, shall be given at least thirty (30) days prior to such proposed registration.  Upon the written request of any Holder receiving notice of such proposed registration (a "Piggyback Requesting Holder") made within twenty (20) days after the receipt of any such notice (or ten (10) days if the Company states in such written notice or gives telephonic notice to the relevant Holders, with written confirmation to follow promptly thereafter, stating that (i) such registration will be on Form S-3 (or, if Form S-3 is not then available to the Company, Form S-1 or any other applicable form) and (ii) such shorter period of time is required because of a planned filing date), which request shall specify the Registrable Common Stock intended to be disposed of by such Piggyback Requesting Holder and the minimum offering price per share at which the Holder is willing to sell its Registrable Common Stock, the Company shall, subject to Section 7(b) hereof, effect the registration under the Securities Act of all Registrable Common Stock which the Company has been so requested to register by the Piggyback Requesting Holders thereof; provided that,

(A)    prior to the effective date of the registration statement filed in connection with such registration or, in the case of a Shelf Registration Statement, prior to the delivery of a preliminary prospectus related to such

offering, and, in any event, promptly following receipt of notification by the Company from the managing underwriter (if an underwritten offering) of a range of prices at which such securities are likely to be sold, the Company shall so advise each Piggyback Requesting Holder of such price, and if such price is below the minimum price which shall be acceptable to such Piggyback Requesting Holder, such Piggyback Requesting Holder shall then have the right irrevocably to withdraw its request to have its Registrable Common Stock included in such registration statement, by delivery of written notice of such withdrawal to the Company within five (5) Business Days of its being advised of such price, without prejudice to the rights of any such Holder or Holders to include Registrable Common Stock in any future registration (or registrations) pursuant to this Section 4 or to cause such registration to be effected as a registration under Section 3(a) hereof, as the case may be;

(B)    if at any time after giving written notice of its intention to register the offer for sale of any securities and prior to the effective date of the registration statement filed in connection with such registration or, in the case of a Shelf Registration Statement, prior to the consummation of such offering, the Company shall determine for any reason not to register or to delay registration of such securities, the Company may, at its election, give written notice of such determination to each Piggyback Requesting Holder and (i) in the case of a determination not to register, the Company shall be relieved of its obligation to register any Registrable Common Stock in connection with such registration (but not from any obligation of the Company to pay the Expenses in connection therewith), without prejudice, however, to the rights of any Holder to include Registrable Common Stock in any future registration (or registrations) pursuant to this Section 4 or, if applicable, to cause such registration to be effected as a registration under Section 3(a) hereof, as the case may be, and (ii) in the case of a determination to delay registering, shall be permitted to delay registering any Registrable Common Stock, for the same period as the delay in registering such other securities; and

(C)    if such registration was initiated by the Company for its own account and involves an underwritten offering, each Piggyback Requesting Holder shall sell its Registrable Common Stock on the same terms and conditions as those that apply to the Company, and the underwriters of each such underwritten offering shall be a nationally recognized underwriter (or underwriters) selected by the Company in its sole discretion.

No registration effected under this Section 4 shall relieve the Company of its obligation to effect any registration upon request under Section 3(a) hereof and no registration effected pursuant to this Section 4 shall be deemed to have been effected pursuant to Section 3(a) hereof.

5.    Expenses.  Except as provided in the last paragraph of Section 6, the Company shall pay all Expenses in connection with any registration initiated pursuant to Sections 2(a), 3(a) or 4 hereof, whether or not such registration shall become effective and whether or not all or any

portion of the Registrable Common Stock originally requested to be included in such registration are ultimately included in such registration.

6. <u>Registration Procedures</u>.  If and whenever the Company is required to effect any registration under the Securities Act as provided in Sections 2(a), 3(a) and 4 hereof, the Company shall, as expeditiously as possible:

(a)    prepare and file with the Commission (promptly and, in the case of any registration pursuant to Section 3(a), in any event on or before the date that is (i) ninety (90) days after the date of any Initiating Request or (ii) if, as of such ninetieth (90th) day, the Company does not have the audited financial statements required to be included in the registration statement, thirty (30) days after the receipt by the Company from its independent public accountants of such audited financial statements, which the Company shall use its reasonable best efforts to obtain as promptly as practicable) the requisite registration statement to effect such registration and thereafter use its reasonable best efforts to cause such registration statement to become and remain effective; <u>provided</u>, <u>however</u>, that the Company may discontinue any registration of its securities that are not shares of Registrable Common Stock (and, pursuant to, and under the circumstances specified in, Sections 4 and 9(b) hereof, its securities that are shares of Registrable Common Stock) at any time prior to the effective date of the registration statement relating thereto;

(b)    prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Common Stock covered by such registration statement until such time as all of such Registrable Common Stock has been disposed of in accordance with the method of disposition set forth in such registration statement; <u>provided</u>, <u>that</u>, except with respect to any Shelf Registration, such period need not extend beyond ninety (90) days after the effective date of the registration statement (plus a number of Business Days equal to the number of Business Days, if any, that the registration statement is not kept effective (including any days for which the use of the prospectus is suspended pursuant to Section 9(b)) after the initial date of its effectiveness and prior to the expiration of such 90-day period); and <u>provided</u>, <u>further</u>, that with respect to the Initial Shelf, such period need not extend beyond the applicable period provided for in Section 2(a) hereof and, with respect to any Shelf Registration other than the Initial Shelf, such period need not exceed the applicable period provided for in Section 3(g) hereof;

(c)    furnish to each seller of Registrable Common Stock covered by such registration statement and their representatives designated pursuant to Section 8(a), if any, and each underwriter, if any, such number of copies of such drafts and final conformed versions of such registration statement and of each such amendment and supplement thereto (in each case including all exhibits and any documents incorporated by reference), such number of copies of such drafts and final versions of the prospectus contained in such registration statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424 under the Securities

13

Act, in conformity with the requirements of the Securities Act, and such other documents, including without limitation notification of whether such registration statement or amendment or supplement thereto will be reviewed by the Commission or any other regulatory authority, as the sellers of a majority of the Registrable Common Stock covered by such registration statement or any underwriter may reasonably request in writing; provided, that all drafts of such registration statement or amendment or supplement thereto shall be furnished to each seller of Registrable Common Stock covered by such registration statement and their representatives designated pursuant to Section 8(a) whether or not so requested;

(d)    use its reasonable best efforts (i) to register or qualify all Registrable Common Stock and other securities, if any, covered by such registration statement under such other securities or blue sky laws of such states or other jurisdictions of the United States of America as the Selling Holders covered by such registration statement shall reasonably request in writing, (ii) to keep such registration or qualification in effect for so long as such registration statement remains in effect and (iii) to take any other action that may be necessary or reasonably advisable to enable such sellers to consummate the disposition in such jurisdictions of the securities to be sold by such sellers, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this subsection (d) be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

(e)    use its reasonable best efforts to cause all Registrable Common Stock covered by such registration statement to be registered with or approved by such other federal or state governmental agencies or authorities as may be necessary upon the advice of counsel to the Company or counsel to the seller of Registrable Common Stock or Selling Holders to enable the seller or sellers thereof to consummate the disposition of such Registrable Common Stock;

(f)    use its reasonable best efforts to obtain and, if obtained, furnish to each seller of Registrable Common Stock, and each such seller's underwriters, if any, a signed

(i)    opinion of counsel for the Company, dated the effective date of such registration statement (and, if such registration involves an underwritten offering, dated the date of the closing under the underwriting agreement and addressed to the underwriters), reasonably satisfactory (based on the customary form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such seller, and

(ii)    "cold comfort" letter, dated the effective date of such registration statement (and, if such registration involves an underwritten offering, dated the date of the closing under the underwriting agreement and addressed to the underwriters) and signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, reasonably satisfactory (based on the customary form and substance of "cold comfort"

14

letters of issuers' independent public accountant customarily given in such an offering) in form and substance to such seller,

in each case, covering substantially the same matters with respect to such registration statement (and the prospectus included therein) and, in the case of the accountants' comfort letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' comfort letters delivered to underwriters in such types of offerings of securities;

(g)    notify each seller of Registrable Common Stock and other securities covered by such registration statement, if any, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made and for which the Company chooses to suspend the use of the registration statement and prospectus pursuant to Section 9(b), and, in accordance with Section 9(b), at the written request of any such seller of Registrable Common Stock, promptly prepare and furnish to it a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made;

(h)    use its reasonable best efforts to obtain the withdrawal of any order suspending the effectiveness of a registration statement relating to the Registrable Common Stock at the earliest possible moment;

(i)    otherwise comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering, and make available to its stockholders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first full calendar month after the effective date of such registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder, and furnish to each seller of Registrable Common Stock and to the managing underwriter, if any, at least ten (10) days prior to the filing thereof (or such shorter time period reasonably necessary in light of applicable legal requirements) a copy of any amendment or supplement to such registration statement or prospectus;

(j)    use its reasonable best efforts to cause all Registrable Common Stock covered by a registration statement (i) to be listed on a national securities exchange on which similar securities issued by the Company are then listed, if the listing of such Registrable Common Stock is then permitted under the rules of such exchange, or (ii) if

15

the Company is not required pursuant to clause (i) above to list Registrable Common Stock on a specific national securities exchange, use its reasonable best efforts to list the Registrable Common Stock on a national securities exchange and, without limiting the generality of the foregoing, use its reasonable best efforts to arrange for at least two (2) market makers to register with FINRA as such with respect to such Registrable Common Stock;

(k)     provide a transfer agent and registrar for the Registrable Common Stock covered by a registration statement no later than the effective date thereof;

(l)     enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the Holders beneficially owning a majority of the shares of Registrable Common Stock covered by such registration statement shall reasonably request in order to expedite or facilitate the disposition of such Registrable Common Stock, including customary indemnification;

(m)     if requested by the managing underwriter(s) or the Holders beneficially owning a majority of the shares of Registrable Common Stock being sold in connection with an underwritten offering, promptly incorporate in a prospectus supplement or post-effective amendment such information provided to the Company in writing as the managing underwriter(s) and the Holders of a majority of the Registrable Common Stock being sold agree should be included therein relating to the plan of distribution with respect to such Registrable Common Stock, including without limitation, information with respect to the number of shares of Registrable Common Stock being sold to such underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the underwritten offering of the Registrable Common Stock to be sold in such offering, and make all required filings of such prospectus supplement or post-effective amendment as soon as notified of the matters to be incorporated in such prospectus supplement or post-effective amendment; and

(n)     cooperate with the Selling Holders and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Common Stock to be sold and not bearing any restrictive legends, and enable such Registrable Common Stock to be in such share amounts and registered in such names as the managing underwriter(s) or, if none, the Selling Holders beneficially owning a majority of the shares of Registrable Common Stock being offered for sale, may request at least three (3) Business Days prior to any sale of Registrable Common Stock to the underwriters.

As a condition to the obligations of the Company to complete any registration pursuant to this Agreement with respect to the Registrable Common Stock of a Holder, such Holder must furnish to the Company in writing such information regarding itself, the Registrable Common Stock held by it and the intended methods of disposition of the Registrable Common Stock held by it as is necessary to effect the registration of such Holders' Registrable Common Stock and is requested in writing by the Company.  Except as otherwise required by Section 2(a), at least thirty (30) days prior to the first anticipated filing date of a registration statement for any registration under this Agreement, the Company will notify in writing each Holder of the

information referred to in the preceding sentence which the Company is requesting from that Holder whether or not such Holder has elected to have any of its Registrable Common Stock included in the registration statement.  If, within ten (10) days prior to the anticipated filing date, the Company has not received the requested information from a Holder, then the Company may file the registration statement without including Registrable Common Stock of that Holder, if, in the opinion of the Company's counsel, such information is required to be included in such registration statement.

Each Holder agrees that as of the date that a final prospectus is made available to it for distribution to prospective purchasers of Registrable Common Stock it shall cease to distribute copies of any preliminary prospectus prepared in connection with the offer and sale of such Registrable Common Stock.  Each Holder further agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in subsection (g) of this Section 6 and a suspension of the use of the registration statement and prospectus pursuant to Section 9(b), such Holder shall forthwith discontinue such Holder's disposition of Registrable Common Stock pursuant to the registration statement and prospectus relating to such Registrable Common Stock until such Holder's receipt of the copies of the supplemented or amended prospectus contemplated by subsection (g) of this Section 6 and, if so directed by the Company, shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies, then in such Holder's possession of the prospectus relating to such Registrable Common Stock at the time of receipt of such notice.  If any event of the kind described in subsection (g) of this Section 6 occurs and such event is the fault solely of a Holder (or Holders), such Holder (or Holders) shall pay all Expenses attributable to the preparation, filing and delivery of any supplemented or amended prospectus contemplated by subsection (g) of this Section 6.

7.  Underwritten Offerings.

(a)  Requested Underwritten Offerings.  If requested by the underwriters in connection with a request for a registration (that is not a Shelf Registration) under Section 3 hereof or any underwritten "takedown" of securities under a Shelf Registration Statement filed pursuant to Section 2(a) or Section 3, the Company shall enter into a firm commitment underwriting agreement with such underwriters for such offering, such agreement to be reasonably satisfactory in substance and form to the Company, a majority of the Selling Holders whose Registrable Common Stock is to be included in such registration and the underwriters and to contain such representations and warranties by the Company and the Selling Holders and such other terms as are customary in agreements of that type, including, without limitation, indemnification and contribution to the effect and to the extent provided in Section 10 hereof.

(b)  Piggyback Underwritten Offerings: Priority.

(i)  If the Company proposes to register any of its securities under the Securities Act for its own account as contemplated by Section 4 hereof and such securities are to be distributed by or through one or more underwriters, and if the managing underwriter of such underwritten offering shall advise the Company in writing (with a copy to the Piggyback Requesting Holders) that if all the Registrable Common Stock requested to be included in such registration were so included, in its opinion, the number and type of securities proposed to be included in such registration would exceed

17

the number and type of securities which the managing underwriter believes could be sold in such offering within a price range acceptable to the Company (such writing to state the basis of such opinion and the approximate number and type of securities which the managing underwriter believes may be included in such offering without such effect), then the Company shall include in such registration pursuant to Section 4, to the extent of the number of securities which the Company is so advised the managing underwriter believes can be sold in such offering, (i) first, securities that the Company proposes to issue and sell for its own account, (ii) second, Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 4 hereof, pro rata among the Piggyback Requesting Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Piggyback Requesting Holders and (iii) third, other securities, if any; provided, however, that if such registration is in connection with the initial Public Offering, the allocation shall be as follows: (i) first, securities that the Company proposes to issue and sell for its own account, (ii) second, Registrable Common Stock (excluding shares held by Management Holders) requested to be registered by Piggyback Requesting Holders (excluding Management Holders) pursuant to Section 4 hereof, pro rata among the Piggyback Requesting Holders (excluding Management Holders) on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Piggyback Requesting Holders (excluding Management Holders), (iii) third, shares of Registrable Common Stock beneficially owned by Management Holders requested to be registered by such Management Holders, pro rata among the Management Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Management Holders, and (iv) fourth, other securities, if any.

(ii)    In the case of any other registration contemplated by Section 4 involving an underwritten Public Offering, if the managing underwriter of such underwritten offering shall advise the Company in writing (with a copy to the Piggyback Requesting Holders) that if all Registrable Common Stock requested to be included in such registration were so included, in its opinion, the number and type of securities proposed to be included in such registration would exceed the number and type of securities which the managing underwriter believes could be sold in such offering within a price range stated to such managing underwriter by Selling Holders beneficially owning at least a majority of the shares of Registrable Common Stock requested to be included in such registration to be acceptable to such Selling Holders (such writing to state the basis of such opinion and the approximate number and type of securities which the managing underwriter believes may be included in such offering without such effect), then the Company shall include in such registration pursuant to Section 4, to the extent of the number of securities which the Company is so advised the managing underwriter believes can be sold in such offering, (i) first, Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 4 hereof, pro rata among the Piggyback Requesting Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Piggyback Requesting Holders, (ii) second, securities that the Company proposed to issue and sell for its own account and (iii) third, other securities, if any; provided, however, that if such registration is in connection with the initial Public Offering, the allocation shall be as follows: (i) first, Registrable Common Stock (excluding shares held by Management Holders) requested to

18

be registered by Piggyback Requesting Holders (excluding Management Holders) pursuant to Section 4 hereof, pro rata among the Piggyback Requesting Holders (excluding Management Holders) on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Piggyback Requesting Holders (excluding Management Holders), (ii) second, shares of Registrable Common Stock beneficially owned by Management Holders requested to be registered by such Management Holders, pro rata among the Management Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Management Holders, (iii) third, securities that the Company proposed to issue and sell for its own account and (iv) fourth, other securities, if any.

Any Selling Holder may withdraw its request to have all or any portion of its Registrable Common Stock included in any such offering by notice to the Company within ten (10) Business Days after receipt of a copy of a notice from the managing underwriter pursuant to this Section 7(b).

(c) Holders of Registrable Common Stock to be Parties to Underwriting Agreement. The Holders of Registrable Common Stock to be distributed by underwriters in an underwritten offering contemplated by subsections (a) or (b) of this Section 7 shall be parties to the underwriting agreement between the Company and such underwriters and any such Holder, at its option, may reasonably require that any or all of the representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such underwriters shall also be made to and for the benefit of such Holders (except to the extent any such provision contradicts the terms of this Agreement) and that any or all of the conditions precedent to the obligations of such underwriters under such underwriting agreement be conditions precedent to the obligations of such Holders. No such Holder shall be required to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding such Holder, such Holder's Registrable Common Stock and such Holder's intended method of distribution.

(d) Holdback Agreements. Each Holder agrees, unless otherwise agreed to by the managing underwriter for any underwritten offering pursuant to this Agreement, not to effect any sale or distribution of any equity securities of the Company or securities convertible into or exchangeable or exercisable for equity securities of the Company, including any sale under Rule 144 under the Securities Act, (i) during the ten (10) days prior to the initial Public Offering and for one hundred eighty (180) days after the initial Public Offering or such shorter period of time acceptable to the managing underwriter of the initial Public Offering, if any, except as part of the initial Public Offering or to the extent that such Holder is prohibited by applicable law from agreeing to withhold securities from sale or is acting in its capacity as a fiduciary or an investment advisor or (ii) following the initial Public Offering, during the ten (10) days prior to the date on which an underwritten registration of Registrable Common Stocks pursuant to Section 2(a), 3 or 4 hereof has become effective and until the earlier of (a) the date on which all shares of Registrable Common Stock to be sold pursuant to such underwritten registration has been sold by the underwriters and (b) ninety (90) days after the effective date of such underwritten registration or such shorter period of time acceptable to the managing underwriter of such underwritten offering, if any, except as part of such underwritten registration or to the extent that such Holder is prohibited by applicable law from agreeing to withhold securities from

sale or is acting in its capacity as a fiduciary or an investment adviser. Without limiting the scope of the term "fiduciary," a Holder shall be deemed to be acting as a fiduciary or an investment adviser if its actions or the securities proposed to be sold are subject to the Employee Retirement Income Security Act of 1974, as amended, the Investment Company Act of 1940, as amended, or the Investment Advisers Act of 1940, as amended, or if such securities are held in a separate account under applicable insurance law or regulation.

The Company agrees (i) not to effect any sale or distribution of any equity securities of the Company, or securities convertible into or exchangeable or exercisable for equity securities of the Company (except pursuant to registrations on Form S-4 or Form S-8 or any successor thereto), (a) during the ten (10) days prior to the initial Public Offering and for one hundred eighty (180) days after the initial Public Offering or such shorter period of time acceptable to the managing underwriter of the initial Public Offering, if any, except as part of the initial Public Offering or (b) following the initial Public Offering, during the ten (10) days prior to the date on which an underwritten registration of Registrable Common Stock pursuant to Section 2(a), 3 or 4 hereof has become effective and until the earlier of (1) the date on which all shares of Registrable Common Stock to be sold pursuant to such underwritten registration has been sold by the underwriters and (2) ninety (90) days after the effective date of such underwritten registration or such shorter period of time approved in writing by the managing underwriter of such underwritten offering, if any, except as part of such underwritten registration, and (ii) to cause each holder of any equity securities, or securities convertible into or exchangeable or exercisable for equity securities, in each case, acquired from the Company at any time on or after the date of this Agreement (other than in a Public Offering or sale under Rule 144 promulgated under the Securities Act), to agree not to effect any sale or distribution of such securities during the applicable period (or such shorter period of time approved in writing by the managing underwriter of such underwritten offering, if any).

8.   Preparation: Reasonable Investigation.

(a) Registration Statements.  In connection with the preparation and filing of each registration statement under the Securities Act pursuant to this Agreement, the Company shall (i) give representatives (designated to the Company in writing) of each Holder or group of Holders beneficially owning at least fifteen percent (15%) of the shares of Registrable Common Stock registered under such registration statement, the underwriters, if any, and one firm of counsel, one firm of accountants and one firm of other agents retained on behalf of all underwriters and one firm of counsel, one firm of accountants and one firm of other agents retained by Holders (excluding Management Holders) beneficially owning a majority of the shares of Registrable Common Stock covered by such registration statement (excluding shares held by Management Holders) on behalf of all Holders of Registrable Common Stock registered under such registration statement, the reasonable opportunity to participate in the preparation of such registration statement, each prospectus included therein or filed with the Commission, and each amendment thereof or supplement thereto, (ii) upon reasonable advance notice to the Company, give each of them such reasonable access to all financial and other records, corporate documents and properties of the Company and its Subsidiaries, as shall be necessary, in the reasonable opinion of such Holders' and such underwriters' counsel, to conduct a reasonable due diligence investigation for purposes of the Securities Act, and (iii) upon reasonable advance notice to the Company, provide such reasonable opportunities to discuss the business of the Company with its

officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of such Holders' and such underwriters' counsel, to conduct a reasonable due diligence investigation for purposes of the Securities Act.

(b) Confidentiality. Each Holder shall maintain the confidentiality of any confidential information received from or otherwise made available by the Company to such Holder in its capacity as such. Information that (i) is or becomes available to a Holder from a public source other than as a result of a disclosure by such Holder or any of its Affiliates, (ii) is disclosed to a Holder by a third-party source who the Holder reasonably believes is not bound by an obligation of confidentiality to the Company or (iii) is or becomes required to be disclosed by a Holder by law, including by court order, shall not be deemed to be confidential information for purposes of this Agreement. The Holders shall not grant access, and the Company shall not be required to grant access, to information under this Section 8 to any Person who will not agree to maintain the confidentiality (to the same extent a Holder is required to maintain confidentiality) of any confidential information received from or otherwise made available to it by the Company or the Holders under this Agreement.

9. Postponements.

(a) Without limiting any other rights of the Holders under this Agreement, if the Company shall fail to file any registration statement to be filed pursuant to a request for registration under Section 2(a) or under Section 3(a) hereof, (i) any Holder whose Registrable Common Stock was to be included in such registration shall have the right to withdraw such request and (ii) the Holders requesting registration shall have the right to withdraw such request to file a registration statement if and only if the Holders (excluding Management Holders) that have not elected to withdraw beneficially own, in the aggregate, less than the percentage of shares of Registrable Common Stock required to initiate a request under Section 2(a) or under Section 3(a), as the case may be. Any withdrawal shall be made by giving written notice to the Company within twenty (20) days after the Shelf Filing Date, or, in the case of a request pursuant to Section 3(a) hereof, the date on which a registration statement would otherwise have been required to have been filed with the Commission under clause (i) of Section 6 (a) hereof (i.e., twenty (20) days after the date that is ninety (90) days after the date of the relevant Initiating Request, or, if, as of such ninetieth day, the Company does not have the audited financial statements required to be included in the registration statement, thirty (30) days after the receipt by the Company from its independent public accountants of such audited financial statements). In the event of a withdrawal described in clause (ii) of this Section 9(a), the request for registration shall not be counted for purposes of determining the number of registrations to which Holders are entitled pursuant to Section 2(a) or 3(a) hereof, as the case may be. The Company shall pay all Expenses incurred in connection with any withdrawal described in clauses (i) and (ii) of this Section 9(a).

(b) The Company shall not be obligated to file any registration statement, or file any amendment or supplement to any registration statement, and may suspend the registration process and/or any Selling Holder's ability to use a prospectus, at any time (but not to exceed one time in any twelve- (12) month period) when the Company, in the good faith judgment of its Board of Directors, reasonably believes that (i) the continuation of the registration process

21

thereof at the time requested would adversely affect a pending or proposed material financing or a material acquisition, merger, recapitalization, consolidation, reorganization or similar transaction, or negotiations, discussions or pending proposals with respect thereto or (ii) the registration statement and any prospectus would, in the Company's judgment, contain a material misstatement of fact or omission as a result of an event that has occurred or is continuing.  The filing of a registration statement, or any amendment or supplement thereto, by the Company cannot be deferred, and the Selling Holders' rights to make sales pursuant to an effective registration statement cannot be suspended, pursuant to the provisions of the preceding sentence, (x) in the case of clause (i) above, for more than ten days after the abandonment or consummation of any of the proposals or transactions set forth in such clause (i), (y) in the case of clause (ii) above, following such time as the Company no longer believes, in its judgment, that the registration statement and any prospectus would contain a material misstatement of fact or omission as a result of an event that has occurred or is continuing; provided that the Company will use its reasonable best efforts to update the disclosure in such registration statement and prospectus (whether by amendment or by incorporation by reference) as soon as practicable such that the registration statement and prospectus will not contain a material misstatement of fact or omission, or (z) in any event, in the case of either clause (i) or clause (ii) above, for more than one hundred twenty (120) days after the date of the Board of Directors' determination; provided that the Company may not suspend any Selling Holder's ability to use a prospectus pursuant to this Section 9(b) (including but not limited to as set forth in Section 6(g)) for more than an aggregate of one hundred twenty (120) days in any three hundred sixty five- (365) day period. The Company shall give notice to the Selling Holders that the registration process has been suspended and upon notice duly given pursuant to Section 20(f) hereof, each Selling Holder agrees not to sell any Registrable Common Stock pursuant to any registration statement until such Selling Holder's receipt of copies of the supplemented or amended prospectus, or until it is advised in writing by the Company that the prospectus may be used, and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in such prospectus. The Company shall not specify the nature of the event giving rise to a suspension in any notice to the Selling Holders of the existence of such a suspension. If the Company suspends the Selling Holders' rights to make sales pursuant hereto, the applicable registration period shall be extended by the number of days of such suspension.

     10.  <u>Indemnification</u>.

     (a) <u>Indemnification by the Company</u>.  In connection with any registration statement filed by the Company pursuant to Section 2(a), 3(a) or 4 hereof, to the fullest extent permitted by law the Company shall, and hereby agrees to, indemnify and hold harmless, each Holder and seller of any Registrable Common Stock covered by such registration statement and each other Person who participates as an underwriter in the offering or sale of such securities and each other Person, if any, who controls (within the meaning of the Exchange Act) such Holder or seller or any such underwriter, and their respective stockholders, directors, officers, employees, partners, agents and Affiliates (each, a "<u>Company Indemnitee</u>" for purposes of this Section 10(a)), against any losses, claims, damages, liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof and whether or not such indemnified party is a party thereto), joint or several, and expenses, including, without limitation, the reasonable fees, disbursements and other charges of legal counsel and reasonable costs of investigation, to which such Company Indemnitee may become subject under the Securities Act or otherwise

22

(collectively, a "Loss" or "Losses"), insofar as such Losses arise out of, are based upon or relate to (i) any breach of any representation or warranty made by the Company in this Agreement or any other certificate, instrument or document contemplated hereby, (ii) any breach of any covenant, agreement or obligation of the Company contained in this Agreement or any other certificate, instrument or document contemplated hereby, or (iii) any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which such securities were registered or otherwise offered or sold under the Securities Act or otherwise, any preliminary prospectus, final prospectus or summary prospectus related thereto, or any amendment or supplement thereto (or in any document incorporated by reference in any of the foregoing) (collectively, "Offering Documents"), or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the light of the circumstances in which they were made not misleading or any violation by the Company of any federal or state law, rule or regulation applicable to the Company and relating to action required of or inaction by the Company in connection with any such registration; provided that, the Company shall not be liable to any Company Indemnitee in any such case to the extent that any such Loss arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such Offering Documents in reliance upon and in conformity with information furnished to the Company in a writing duly executed by such Company Indemnitee specifically stating that it is expressly for use therein. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Company Indemnitee and shall survive the transfer of such securities by such Company Indemnitee.

(b) Indemnification by the Offerors and Sellers. In connection with any registration statement filed by the Company pursuant to Section 2(a), 3(a) or 4 hereof in which a Holder has registered for sale Registrable Common Stock, each such Holder or seller of Registrable Common Stock shall, and hereby agrees to, on a several and not joint basis, indemnify and hold harmless to the fullest extent permitted by law the Company and each of its directors, officers, employees, agents, partners, stockholders, Affiliates and each other Person, if any, who controls (within the meaning of the Exchange Act) the Company and each other seller and such seller's employees, directors, officers, stockholders, partners, agents and Affiliates (each, a "Holder Indemnitee" for purposes of this Section 10(b)), against all Losses insofar as such Losses arise out of, are based upon or relate to any untrue statement or alleged untrue statement of a material fact contained in any Offering Documents or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the light of circumstances in which they were made not misleading, but only to the extent that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with information furnished to the Company in a writing duly executed by such Holder or seller of Registrable Common Stock expressly for use therein; provided, however, that the liability of such indemnifying party under this Section 10(b) shall be limited to the amount of the net proceeds received by such indemnifying party in the sale of Registrable Common Stock giving rise to such liability. Such indemnity shall remain in full force and effect, regardless of any investigation made by or on behalf of the Holder Indemnitee and shall survive the transfer of such securities by such indemnifying party.

(c) <u>Notices of Losses, etc.</u>  Promptly after receipt by an indemnified party of written notice of the commencement of any action or proceeding involving a Loss referred to in the preceding subsections of this Section 10, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the commencement of such action; <u>provided</u>, <u>however</u>, that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under the preceding subsections of this Section 10, except to the extent that the indemnifying party is materially and actually prejudiced by such failure to give notice.  In case any such action is brought against an indemnified party, the indemnifying party shall be entitled to participate in and, unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist in respect of such Loss, to assume and control the defense thereof, in each case at its own expense, jointly with any other indemnifying party similarly notified, to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party, and after its assumption of the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof other than reasonable costs of investigation, unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties arises in respect of such claim after the assumption of the defense thereof.  No indemnifying party shall be liable for any settlement of any such action or proceeding effected without its written consent, which shall not be unreasonably withheld.  No indemnifying party shall, without the consent of the indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect of such Loss or which requires action on the part of such indemnified party or otherwise subjects the indemnified party to any obligation or restriction to which it would not otherwise be subject.

(d) <u>Contribution</u>.  If the indemnification provided for in this Section 10 shall for any reason be unavailable to an indemnified party under subsection (a) or (b) of this Section 10 in respect of any Loss, then, in lieu of the amount paid or payable under subsection (a) or (b) of this Section 10, the indemnified party and the indemnifying party under subsection (a) or (b) of this Section 10 shall contribute to the aggregate Losses (including legal or other expenses reasonably incurred in connection with investigating the same) (i) in such proportion as is appropriate to reflect the relative fault of the Company and the prospective Selling Holders covered by the registration statement which resulted in such Loss or action in respect thereof, with respect to the statements, omissions or action which resulted in such Loss or action in respect thereof, as well as any other relevant equitable considerations, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company, on the one hand, and such prospective sellers, on the other hand, from their sale of Registrable Common Stock; <u>provided</u> that, for purposes of this clause (ii), the relative benefits received by the prospective sellers shall be deemed not to exceed the amount received by such sellers.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  The obligations, if any, of the Selling Holders to contribute as provided in this subsection (d) are several in proportion to the relative value of their respective Registrable Common Stock covered by such registration statement and not joint.  In addition, no Person shall be obligated to

24

contribute hereunder any amounts in payment for any settlement of any action or Loss effected without such Person's consent, which shall not be unreasonably withheld.

(e) <u>Indemnification Payments</u>.  The indemnification and contribution required by this Section 10 shall be made by periodic payments of the amount thereof during the course of any investigation or defense, as and when any Loss is incurred and is due and payable.

11.   <u>Registration Rights to Others</u>.

If the Company shall at any time hereafter provide to any holder of any securities of the Company rights with respect to the registration of such securities under the Securities Act or the Exchange Act, such rights shall not be in conflict with or adversely affect any of the rights provided to the Holders in, or conflict (in a manner that adversely affects Holders) with any other provisions included in, this Agreement.

12.   <u>Adjustments Affecting Registrable Common Stock</u>.

Without the written consent of Holders (excluding Management Holders) of a majority of the outstanding shares of Registrable Common Stock (excluding shares held by Management Holders), the Company shall not effect or permit to occur any combination, subdivision or reclassification of Registrable Common Stock that would materially adversely affect the ability of the Holders to include such Registrable Common Stock in any registration of its securities under the Securities Act contemplated by this Agreement or the marketability of such Registrable Common Stock under any such registration or other offering.

13.   <u>Exchange Act Reports</u>.

So long as any Holder beneficially owns Registrable Common Stock, the Company shall timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date of the first registration statement filed pursuant to this Agreement pursuant to Section 13(a) or Section 15(d) of the Exchange Act.  After the initial Public Offering, so long as any Holder beneficially owns Registrable Common Stock, if the Company is not required to file reports pursuant to Section 13(a) or Section 15(d) of the Exchange Act, it will prepare and make publicly available in accordance with Rule 144(c) promulgated under the Securities Act annual and quarterly financial statements, together with a  discussion and analysis of such financial statements in form and substance similar to those that would otherwise be required to be included in reports required by Section 13(a) or Section 15(d) of the Exchange Act, as well as any other information required thereby, in the time period that such filings would have been required to have been made under the Exchange Act.

14.   <u>Rule 144 and Rule 144A</u>.

If the Company has a class of equity securities registered under the Exchange Act, the Company shall take all actions reasonably necessary to enable Holders to sell Registrable Common Stock without registration under the Securities Act to the maximum extent permitted by the exemptions provided by (a) Rule 144 under the Securities Act, as such Rule may be amended from time to time, (b) Rule 144A under the Securities Act, as such Rule may be

amended from time to time, or (c) any similar rules or regulations hereafter adopted by the Commission, including, without limiting the generality of the foregoing, filing on a timely basis all reports required to be filed under the Exchange Act.  Upon the written request of any Holder, the Company shall deliver to such Holder a written statement as to whether it has complied with such requirements.

15. <u>Amendments and Waivers</u>.

Any provision of this Agreement may be amended, modified or waived if, but only if, the written consent to such amendment, modification or waiver has been obtained from the Company and (i) except as provided in clause (ii) below, from the Holder or Holders (excluding Management Holders) of at least two-thirds of the shares of Registrable Common Stock (excluding shares held by Management Holders) affected by such amendment, modification or waiver, (ii) in the case of any amendment, modification or waiver of any provision of Section 5, 9 or 10 hereof which is adverse to the Holders or this Section 15 or reducing the number of requests for registration to which Holders are entitled under Section 3 or 4 hereof, from each Holder adversely affected, and (iii) in the case of any other amendment, modification or waiver of any provision of this Agreement which adversely affects any right and/or obligation under this Agreement of any Holder, from each Holder so affected. Notwithstanding the foregoing, the Company may from time to time add additional Holders as parties to this Agreement. In order to become a party to this Agreement, such additional party must execute a joinder agreement, in form and substance satisfactory to the Company, evidencing such party's agreement to be bound hereby as a Holder, and upon the Company's receipt of any such additional Holder's executed joinder agreement, such additional Holder shall be deemed to be a party hereto and bound hereby.

16. <u>Nominees for Beneficial Owners</u>.

In the event that any Registrable Common Stock is held by a nominee for the beneficial owner thereof, the beneficial owner thereof may, at its election in writing delivered to the Company, be treated as the Holder of such Registrable Common Stock for purposes of any request or other action by any Holder or Holders pursuant to this Agreement or any determination of the number or percentage of shares of Registrable Common Stock held by any Holder or Holders contemplated by this Agreement.  If the beneficial owner of any Registrable Common Stock so elects, the Company may require assurances reasonably satisfactory to it of such owner's beneficial ownership of such Registrable Common Stock.

17. <u>Assignment</u>.

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.  Any Holder or Warrantholder may assign its rights and obligations under this Agreement to any Transferee of its Registrable Common Stock or Warrants, respectively (so long as the Transfer complies with under applicable law, the Stockholders Agreement, dated as of even date herewith (the "<u>Stockholders Agreement</u>"), by and among the Company and the holders named therein or bound thereby, and the Warrant Agreement, as applicable), <u>provided</u> that such Transferee shall agree in writing prior to the assignment to be bound by this Agreement as if it were an original

party hereto, whereupon such Transferee shall for all purposes be deemed to be a Holder (and, in the case of a Transferee of a Management Holder, or a Transferee thereof, a Management Holder) under this Agreement. Except as provided above or otherwise permitted by this Agreement, neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any Holder without the prior written consent of the other parties hereto. The Company may not assign this Agreement or any right, remedy, obligation or liability arising hereunder or by reason hereof without the consent of the Holders (excluding Management Holders) beneficially owning a majority of the outstanding shares of Registrable Common Stock.

18.    Calculation of Percentage or Number of Shares of Registrable Common Stock.

For purposes of this Agreement, all references to a percentage or number of shares of Registrable Common Stock or Common Stock shall be calculated based upon the number of shares of Registrable Common Stock or Common Stock, as the case may be, outstanding at the time such calculation is made and shall exclude any Registrable Common Stock or Common Stock, as the case may be, beneficially owned by the Company or any Subsidiary of the Company. For the purposes of calculating any percentage or number of shares of Registrable Common Stock or Common Stock as contemplated by the previous sentence, the terms "Holder", "Initiating Holder", "Management Holder", "Director Holder" and "Creditor Holder" shall include all Affiliates thereof (other than the Company and its Subsidiaries) beneficially owning any shares of Registrable Common Stock or Common Stock.

19.    Termination of Registration Rights. This Agreement, including, without limitation, the Company's obligations under Sections 2(a), 3(a) and 4 hereof to register Voting Common Stock for sale under the Securities Act shall terminate on the earlier of (i) the first date on which no shares of Registrable Common Stock are outstanding or (ii) the first date on which less than ten percent (10%) of the aggregate number of shares of Common Stock issued pursuant to the Plan are collectively held by the Creditor Holders and their Affiliates. Notwithstanding any termination of this Agreement pursuant to this Section 19, the parties' rights and obligations under Section 5 and Section 10 hereof shall continue in full force and effect.

20.    Miscellaneous.

(a) Further Assurances. The Company shall execute such documents and other papers and perform such further acts as may be reasonably required or advisable to carry out the provisions of this Agreement and the transactions contemplated hereby.

(b) Headings. The headings in this Agreement are for convenience of reference only and shall not control or affect the meaning or construction of any provisions hereof.

(c) Conflicting Instructions. A Person is deemed to be a Holder whenever such Person owns of record Registrable Common Stock. If the Company receives conflicting instructions, notices or elections from two or more Persons with respect to the same Registrable Common Stock, the Company will act upon the basis of instructions, notice or election received from the registered owner of such Registrable Common Stock.

27

(d) <u>Remedies</u>. Each Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Company agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Agreement and the Company hereby agrees to waive the defense in any action for specific performance that a remedy at law would be adequate.

(e) <u>Entire Agreement</u>. This Agreement, the Stockholders Agreement and the Warrant Agreement constitute the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and there are no restrictions, promises, representations, warranties, covenants, or undertakings with respect to the subject matter hereof, other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties hereto with respect to the subject matter hereof.

(f) <u>Notices</u>. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or two (2) Business Days after being delivered to a recognized courier (whose stated terms of delivery are two (2) Business Days or less to the destination of such notice), or five (5) calendar days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as set forth on Schedule B hereto to the parties hereto, or to such other address as may be hereafter notified by the respective parties hereto.

(g) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

(h) <u>Severability</u>. Notwithstanding any provision of this Agreement, neither the Company nor any other party hereto shall be required to take any action which would be in violation of any applicable federal or state securities law. The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or the validity, legality or enforceability of this Agreement, including any such provision, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

(i) <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same Agreement.

21.   <u>Director Holders</u>.  Each Director Holder has executed this Agreement and is bound hereby.  After the date hereof, the Company shall not issue any Registrable Common Stock to any person who is, or who would thereupon become, a Director Holder, or to any Affiliate thereof, unless he or she first delivers to the Company a joinder agreement, in form and substance satisfactory to the Company, acknowledging that he or she is bound by the terms hereof as a Director Holder.

22.   <u>Management Holders</u>.  Each Management Holder has executed this Agreement and is bound hereby.  After the date hereof, the Company shall not issue any Registrable Common Stock to any person who is, or who would thereupon become, a Management Holder, or to any Affiliate thereof, unless he or she first delivers to the Company a joinder agreement, in form and substance satisfactory to the Company, acknowledging that he or she is bound by the terms hereof as a Management Holder.

23.   <u>Transfer Agent</u>. The Company shall serve as transfer agent with respect to transfers of shares of Common Stock until such time as it retains a third party transfer agent to manage such responsibilities.

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

RDA HOLDING CO.

By: _____
　　　Name:
　　　Title:

CREDITOR HOLDERS IDENTIFIED ON <u>SCHEDULE A</u> AND WARRANTHOLDERS ARE DEEMED TO BE PARTIES TO THIS AGREEMENT PURSUANT TO THE PLAN

<u>MANAGEMENT HOLDERS:</u>
(Each of the undersigned signing individually, and not on
behalf of any other Management Holder)


By: _____

     Name:

[SIGNATURE PAGE TO REGISTRATION RIGHTS AGREEMENT]

<u>DIRECTOR  HOLDERS:</u>
(Each of the undersigned signing individually, and not on behalf of any other Director Holder)

By: _____

     Name:

[SIGNATURE PAGE TO REGISTRATION RIGHTS AGREEMENT]

**SCHEDULE A**

| Creditor Holders |
|---|
|  |
|  |
|  |
|  |

**SCHEDULE B**

<u>NOTICES</u>

If to the Company, to:

The Reader's Digest Association, Inc.
One Reader's Digest Road
Pleasantville, New York  10570
Attention: General Counsel
Tel: (914) 244-5262
Fax: (914) 244-5644

with a mandatory copy, which shall not constitute notice, to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Attention:  Joshua Korff and Michael Brosse
Tel:   (212) 446-4800
Fax:  (212) 446-6460

If to the Holders, to:

such Holder, at such Holder's address or to such Holder's telephone or telecopy number
reflected in the Company's books and records.

With respect to First Lien Lenders and their Permitted Transferees (as such terms are defined in
the Stockholders Agreement),
with a mandatory copy, which shall not constitute notice, to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention:  Brian M. Stadler
Fax:     (212) 455-2502

**EXHIBIT A**

**FORM OF SELLING STOCKHOLDER QUESTIONNAIRE**

The undersigned beneficial owner (the "Selling Stockholder") of shares of class A common stock, par value $0.001 per share (the "Registrable Common Stock"), of RDA Holding Co. (the "Company"), hereby gives notice to the Company of its intention to sell or otherwise dispose of Registrable Common Stock beneficially owned by it and listed below in Item 3 (unless otherwise specified under Item 3) pursuant to the Shelf Registration Statement. The undersigned, by signing and returning this Selling Stockholder Questionnaire, understands that it will be bound by the terms and conditions of this Selling Stockholder Questionnaire and the Registration Rights Agreement, dated as of [• ], among the Company and the Holders named therein (the "Registration Rights Agreement"). Capitalized terms used and not defined herein shall have the meaning ascribed to them in the Registration Rights Agreement.

In accordance with the Registration Rights Agreement, Selling Stockholders that do not complete this Selling Stockholder Questionnaire and deliver it to the Company as provided below will not be named selling stockholders in the prospectus and therefore will not be permitted to sell any Registrable Common Stock pursuant to the Shelf Registration Statement.

Pursuant to the Registration Rights Agreement, the undersigned has agreed to indemnify and hold harmless the Company's directors, the Company's officers and each person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act from and against certain losses arising in connection with statements concerning the undersigned made in the Shelf Registration Statement or the related prospectus in reliance upon the information provided in this Selling Stockholder Questionnaire. The undersigned hereby acknowledges its obligations under the Registration Rights Agreement to indemnify and hold harmless certain persons set forth therein.

Certain legal consequences arise from being named a selling stockholder in the Shelf Registration Statement and the related prospectus. Accordingly, holders and beneficial owners are advised to consult their own securities law counsel regarding the consequences of being named or not named as a selling stockholder in the Shelf Registration Statement and the related prospectus.

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate and complete:

(1)  (a)  Full Legal Name of Selling Stockholder:
_____

(b)  Full Legal Name of Registered Holder (if not the same as (a) above) through which Registrable Common Stock listed in (3) below is held:
_____

(c)  Full Legal Name of DTC Participant  (if applicable and if not the same as (b) above) through which Registrable Common Stock listed in (3) below is held:
_____

(2)  Address for Notices to Selling Stockholder:

A-1

_____

_____

Telephone (including area code):_____

Fax (including area code):_____

Contact Person:_____

(3)  Beneficial Ownership of Registrable Common Stock:

_____

    (a)  Type and Principal Amount/Number of Registrable Common Stock beneficially owned:

_____

    (b)  CUSIP No(s). of such Registrable Common Stock beneficially owned:

_____

(4)  Beneficial Ownership of Other Securities of the Company Owned by the Selling Stockholder: *Except as set forth below in this Item (4), the undersigned is not the beneficial or registered owner of any securities of the Company other than the Registrable Common Stock listed above in Item (3).*

    (a)  Type and Amount of Other Securities beneficially owned by the Selling Stockholder:

_____

    (b)  CUSIP No(s). of such Other Securities beneficially owned:

_____

(5)  Relationship with the Company: *Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (5% or more) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.*

State any exceptions here:_____

(6)  Is the Selling Stockholder a registered broker-dealer?

Yes   ··

No   ··

If "Yes", please answer subsection (a) and subsection (b):

    (a)  Did the Selling Stockholder acquire the Registrable Common Stock as compensation for underwriting/broker-dealer activities to the Company?

        Yes   ··

        No   ··

    (b)  If you answered "No" to question 6(a), please explain your reason for acquiring the Registrable Common Stock:

_____

(7)  Is the Selling Stockholder an affiliate of a registered broker-dealer?

Yes   ··

No   ··

If "Yes", please identify the registered broker-dealer(s), describe the nature of the affiliation(s) and answer subsection (a) and subsection (b):

_____

    (a)  Did the Selling Stockholder purchase the Registrable Common Stock in the ordinary course of business (if no, please explain)?

        Yes   ··

        No   ··    Explain: _____

    (b)  Did the Selling Stockholder have an agreement or understanding, directly or

A-2

indirectly, with any person to distribute the Registrable Common Stock at the same time the Registrable Common Stock were originally purchased (if yes, please explain)?

        Yes    ¨       Explain: _____

        No    ¨

(8)      Is the Selling Stockholder a non-public entity?

Yes    ¨

No    ¨

If "Yes", please answer subsection (a):

      (a)   Identify the natural person or persons that have voting or investment control over the Registrable Common Stock that the non-public entity owns:

      _____

      _____

(9)      Plan of Distribution:

*Except as set forth below, the undersigned Selling Stockholder (including its donees and pledgees) intends to distribute the Registrable Common Stock listed above in Item (3) pursuant to the Shelf Registration Statement only as follows (if at all): Such Registrable Common Stock may be sold from time to time directly by the undersigned Selling Stockholder or, alternatively, in accordance with the Registration Rights Agreement, through underwriters, broker-dealers or agents. If the Registrable Common Stock is sold through underwriters or broker-dealers, the Selling Stockholders will be responsible for underwriting discounts or commissions or agent commissions. Such Registrable Common Stock may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of sale, at varying prices determined at the time of sale, or at negotiated prices. Such sales may be effected in transactions (which may involve cross or block transactions) (i) on any national securities exchange or quotation service on which the Registrable Common Stock may be listed or quoted at the time of sale, (ii) in the over-the-counter market, (iii) in transactions otherwise than on such exchanges or services or in the over-the-counter market, or (iv) through the writing of options. In connection with sales of the Registrable Common Stock or otherwise, the undersigned Selling Stockholder may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the Registrable Common Stock in the course of hedging positions they assume. The undersigned Selling Stockholder may also sell Registrable Common Stock short and deliver Registrable Common Stock to close out short positions, or loan or pledge Registrable Common Stock to broker-dealers that in turn may sell such securities.*

State any exceptions here:_____

       The undersigned Selling Stockholder acknowledges that it understands its obligations to comply with the provisions of the Exchange Act, and the rules thereunder relating to stock manipulation, particularly Regulation M thereunder (or any successor rules or regulations), in connection with any offering of Registrable Common Stock pursuant to the Shelf Registration Agreement. The undersigned agrees that neither it nor any person acting on its behalf will engage in any transaction in violation of such provisions.

       In the event the undersigned transfers all or any portion of the Registrable Common Stock listed in Item (3) above after the date on which such information is provided to the Company other than pursuant to the Shelf Registration Statement, the undersigned agrees to notify the transferee(s) at the time of the transfer of its rights and obligations under this Selling Stockholder Questionnaire and the Registration Rights Agreement.

In accordance with the undersigned's obligation under the Registration Rights Agreement to provide such information as may be required by law or by the staff of the Commission for inclusion in the Shelf Registration Statement, the undersigned agrees to promptly notify the Company of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof at any time while the Shelf Registration Statement remains effective. All notices hereunder and pursuant to the Registration Rights Agreement shall be made in writing, by hand-delivery, first-class mail, or air courier guaranteeing overnight delivery to the address set forth below.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to Items (1) through (9) above and the inclusion of such information in the Shelf Registration Statement and the related prospectus.  The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Shelf Registration Statement and the related prospectus.

By signing below, the undersigned agrees that if the Company notifies the undersigned in accordance with and pursuant to the Registration Rights Agreement that Shelf Registration Statement is not available, the undersigned will in accordance with and pursuant to the Registration Rights Agreement suspend use of the prospectus until notice from the Company that the prospectus is again available.

Once this Selling Stockholder Questionnaire is executed by the undersigned and received by the Company, the terms of this Selling Stockholder Questionnaire, and the representations, warranties and agreements contained herein, shall be binding on, shall inure to the benefit of and shall be enforceable by the respective successors, heirs, personal representatives and assigns of the Company and the undersigned with respect to the Registrable Common Stock beneficially owned by the undersigned and listed in Item (3) above.  This Selling Stockholder Questionnaire shall be governed in all respects by the laws of the State of New York.

IN WITNESS WHEREOF, the undersigned, by authority duly given, has caused this Selling Stockholder Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Dated:_____

_____
Beneficial Owner

By:_____
Name:_____
Title:_____

PLEASE RETURN THE COMPLETED AND EXECUTED
SELLING STOCKHOLDER QUESTIONNAIRE TO THE COMPANY AT:

A-4

The Reader's Digest Association, Inc.
One Reader's Digest Road
Pleasantville, New York  10570
Attention: General Counsel
Tel: (914) 244-5262
Fax: (914) 244-5644

# EXHIBIT F

### Form of the Shareholders Agreement

Article IV.I of the Plan provides that, on or after the Effective Date, Reorganized Holdings and the Required Consenting Lenders shall enter into and deliver the Shareholders Agreement, in substantially the form attached hereto, to each Entity that is intended to be a party thereto or such agreements shall be deemed to be valid, binding and enforceable in accordance with their respective terms, subject to the approval of the Bankruptcy Court and entry of the Confirmation Order.

**PLEASE TAKE NOTICE THAT**, the Plan provides that each Holder of New Common Stock and New Warrants shall be deemed parties to, and shall be bound by, the Shareholders Agreement, in each case without the need for execution by any party thereto other than Reorganized Holdings, subject to Court approval and entry of the Confirmation Order.

[This Page Intentionally Left Blank]

**DRAFT 12/11/09**

STOCKHOLDERS AGREEMENT


dated as of [• ]


among


RDA HOLDING CO.


and


THE HOLDERS NAMED HEREIN OR BOUND HEREBY

# TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS................................................................................................ 1

    1.1  Defined Terms. ........................................................................................................ 1

    1.2  Other Definitional Provisions; Interpretation. ......................................................... 5

SECTION 2. CORPORATE GOVERNANCE .................................................................... 6

    2.1  Board of Directors................................................................................................... 6

    2.2  Certificate of Incorporation and By-Laws.............................................................. 7

    2.3  Election of Common Stock ..................................................................................... 7

    2.4  Conversion of Common Stock................................................................................. 8

    2.5  Limited Voting Common Stock............................................................................... 8

SECTION 3. INFORMATION REQUIREMENTS ............................................................ 9

    3.1  Financial Reports .................................................................................................... 9

    3.2  Annual Budgets..................................................................................................... 10

    3.3  Access; Updated Calls; Annual Meeting............................................................... 10

    3.4  Confidentiality ...................................................................................................... 11

    3.5  Environmental Reports.......................................................................................... 11

SECTION 4. TRANSFERS AND ISSUANCES ................................................................ 12

    4.1  Limitations on Transfer ........................................................................................ 12

    4.2  Transfers to Affiliates........................................................................................... 13

    4.3  Effect of Void Transfers ....................................................................................... 13

    4.4  Legend on Securities ............................................................................................ 13

    4.5  Tag-Along Rights.................................................................................................. 14

    4.6  Drag-Along Rights................................................................................................ 17

    4.7  Participation Rights............................................................................................... 19

SECTION 5. MISCELLANEOUS...................................................................................... 20

    5.1  Additional Securities Subject to Agreement ......................................................... 20

    5.2  Termination .......................................................................................................... 21

    5.3  Injunctive Relief................................................................................................... 21

    5.4  Other Stockholders Agreements ........................................................................... 21

    5.5  Amendments ......................................................................................................... 21

    5.6  Successors, Assigns and Transferees .................................................................... 22

i

5.7    Notices ............................................................................................................ 22

5.8    Integration ....................................................................................................... 22

5.9    Severability ..................................................................................................... 22

5.10    Counterparts ................................................................................................... 23

5.11    Governing Law, Etc. ...................................................................................... 23

5.12    Management Stockholders ............................................................................. 23

5.13    Director Stockholders .................................................................................... 23

5.14    Lender Relationship ....................................................................................... 24

This STOCKHOLDERS AGREEMENT, dated as of [•], is entered into by and among RDA Holding Co. (the "Company"), the creditors of the Company identified on Schedule A hereto (the "Creditor Stockholders"), the Management Stockholders (as defined below), the Director Stockholders (as defined below), any other stockholder that may become a party to this Agreement after the date hereof and pursuant to the terms hereof (collectively with the Creditor Stockholders, the Management Stockholders and the Director Stockholders, the "Stockholders") and the Warrantholders (as defined below).

W I T N E S S E T H:

WHEREAS, the Company, the Stockholders and the Warrantholders are entering into this Agreement pursuant to the terms of the Plan (as defined below) to set forth certain agreements with respect to the Company and its Subsidiaries and their respective ownership of Common Stock (as defined below) issued pursuant to the Plan.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

SECTION 1.  DEFINITIONS

1.1  Defined Terms. As used in this Agreement, terms defined in the preamble shall have their respective assigned meanings, and the following capitalized terms shall have the meanings ascribed to them below:

"Accredited Investor" shall mean an "Accredited Investor," as such term is defined in Regulation D promulgated under the Securities Act, or any successor rule then in effect.

"Affiliate" (a) shall mean, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with, such Person or any Immediate Family Member of such Person; and (b) shall also include, with respect to any Person who is an individual, a trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only such individual and/or such individual's Immediate Family Members.  For purposes of this definition, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall mean this Stockholders Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"beneficially own" shall have the meaning set forth in Rule 13d-3 under the Exchange Act.

"Board" shall have the meaning set forth in Section 2.1(a).

"Business Day" shall mean a day other than a Saturday, Sunday, federal or New York State holiday or other day on which commercial banks in New York City are authorized or required by law to close.

"Change of Control" shall mean the occurrence of (a) any consolidation or merger of the Company with or into any other entity, or any other corporate reorganization or transaction (including the acquisition of capital stock of the Company), whether or not the Company is a party thereto, in which the stockholders of the Company immediately prior to such consolidation, merger, reorganization or other transaction, own capital stock either (i) representing directly, or indirectly through one or more entities, less than 50% of the economic interests in or voting power of the Company or other surviving entity immediately after such consolidation, merger, reorganization or other transaction or (ii) does not directly, or indirectly through one or more entities, have the power to elect a majority of the entire board of the directors of the Company or other surviving entity immediately after such consolidation, merger, reorganization or other transaction, or (b) any transaction or series of related transactions, whether or not the Company is a party thereto, after giving effect to which in excess of 50% of the Company's voting power is owned by any Person or "group" (as such term is used in Rule 13d-5 under the Exchange Act) (excluding the group created by this Agreement); provided that any consolidation or merger effected exclusively to change the domicile of the Company or to form a holding company in which the stockholders of the Company immediately prior to such consolidation or merger own capital stock representing economic interests and voting power with respect to such redomiciled entity or holding company in substantially the same proportions as their ownership of capital stock of the Company shall be excluded from clauses (a) and (b) above.

"Common Stock" shall mean the collective reference to Voting Common Stock and Limited Voting Common Stock.

"Common Stock Equivalents" shall mean any warrants, rights, options or other securities exchangeable or exercisable for, or convertible into, Common Stock, including the Warrants.

"Company" shall have the meaning set forth in the preamble hereto.

"Company Competitor" shall mean any Person that is engaged directly or indirectly in the publishing or the direct marketing industry or any other business that competes with a material line of the business of the Company or its Subsidiaries. Whether a Person is a Company Competitor shall be determined by the Board, acting in good faith.

"Conversion Request" shall have the meaning set forth in Section 2.4(a).

"Creditor Stockholders" shall have the meaning set forth in the preamble.

"DGCL" shall have the meaning set forth in Section 5.11.

"Director" and "Directors" shall have the meanings set forth in Section 2.1(a).

2

"Director Stockholder" shall mean Directors who hold Equity Interests and are not employees of the Company or its Subsidiaries.

"Drag-Along Notice" shall have the meaning set forth in Section 4.6(a).

"Drag-Along Transaction" shall have the meaning set forth in Section 4.6(a).

"Effective Date" shall mean the effective date of the Plan pursuant to the terms thereof.

"EHS" shall have the meaning set forth in Section 3.5(a).

"Eligible Stockholder" shall mean each Stockholder (other than Management Stockholders and Director Stockholders); provided that such Stockholder and its Affiliates beneficially own an aggregate number of shares of Common Stock representing at least one percent (1%) of the then outstanding shares of Common Stock.

"Equity Interests" shall mean Common Stock, Common Stock Equivalents or any other equity securities of the Company, or securities exchangeable or exercisable for, or convertible into, such other equity securities of the Company.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

"Governmental Authority" shall mean any government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Immediate Family Member" shall mean, with respect to any Person, a spouse, parent, child, grandchild or sibling of such Person.

"Independent Directors" shall have the meaning set forth in Section 2.1(b)(ii).

"Issuance" shall have the meaning set forth in Section 4.7(a).

"Limited Voting Common Stock" shall mean the class B common stock, par value $0.001 per share, of the Company.

"Limited Voting Stockholder" shall mean any holder of shares of Limited Voting Common Stock; provided, however, that any reference to a Limited Voting Stockholder shall be made exclusively with respect to the shares of Limited Voting Common Stock held by such Person.

"Majority Stockholders" shall have the meaning set forth in Section 2.1(d).

"Management Director" shall have the meaning set forth in Section 2.1(b)(i).

3

"Management Stockholders" shall mean employees (and their Affiliates) or former employees (and their Affiliates) of the Company or its Subsidiaries who hold Equity Interests.

"Other Agreements" shall have the meaning set forth in Section 5.8.

"Other Capital Stock" shall have the meaning set forth in Section 4.7(a)(ii).

"Other Capital Stock Equivalents" shall have the meaning set forth in Section 4.7(a)(ii).

"Permitted Transferee" shall mean any Person to whom a Stockholder (including any Person who becomes a "Stockholder" in accordance with Section 5.6 and the other terms of this Agreement) Transfers Equity Interests in accordance with the terms of this Agreement.

"Person" shall mean any individual, corporation, partnership, limited liability company, trust, joint stock company, business trust, unincorporated association, joint venture, Governmental Authority or other entity of any nature whatsoever.

"Plan" shall mean the Plan of Reorganization confirmed by order dated [• ] of the United States Bankruptcy Court for the Southern District of New York in the chapter 11 case commenced by the Company and certain of its Subsidiaries.

"Prepetition Credit Agreement" shall mean that certain Credit Agreement dated as of March 2, 2007 among The Reader's Digest Association, Inc., certain of its Subsidiaries, JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent and the Prepetition Lenders party thereto, as amended, supplemented or otherwise modified.

"Prepetition Lenders" shall mean those lenders party to the Prepetition Credit Agreement from time to time and their Affiliates holding Swap Claims.

"Pro Rata Share" shall have the meaning set forth in Section 4.5(a).

"Public Offering" shall mean a public offering and sale of Voting Common Stock pursuant to an effective registration statement under the Securities Act.

"Purchasing Holder" shall have the meaning set forth in Section 4.7(d).

"Registration Rights Agreement" shall mean that certain Registration Rights Agreement dated as of the date hereof among the Company and the holders named therein.

"Right" shall have the meaning set forth in Section 4.7(a).

"SEC" shall mean the U.S. Securities and Exchange Commission.

4

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

"Selling Stockholder(s)" shall have the meaning set forth in Section 4.6(a).

"Sharing Percentage" means, with respect to each holder of Common Stock (or group of holders of Common Stock), the fraction (expressed as a percentage), the numerator of which is the number of shares of Common Stock owned by such holder and the denominator of which is the sum of the total number of shares of Common Stock owned by all holders (or the relevant holders if the calculation is made with respect to a specified group of holders).

"Stockholders" shall have the meaning set forth in the preamble hereto.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which fifty percent (50%) or more of the total voting power of shares of capital stock entitled (without regard to the occurrence of any contingency) to vote generally in the election of directors, managers or trustees thereof, or fifty percent (50%) or more of the equity interest therein, is at the time owned or controlled, directly or indirectly, by any Person or one or more of the other Subsidiaries of such Person or a combination thereof.

"Swap Claims" shall mean those secured Claims (as defined in the Plan) arising from hedging arrangements under, or in connection with, the Prepetition Credit Agreement with certain of the Prepetition Lenders or their Affiliates.

"Tagging Stockholder" shall have the meaning set forth in Section 4.5(a).

"Third Party" shall have the meaning set forth in Section 4.6(a).

"Transfer" shall mean any direct or indirect transfer, sale, offer, assignment, exchange, distribution, mortgage, pledge, hypothecation or other disposition. "Transferor" and "Transferee" have correlative meanings.

"Transferring Stockholder" shall have the meaning set forth in Section 4.5(a).

"Voting Common Stock" shall mean the class A common stock, par value $0.001 per share, of the Company.

"Warrant Agreement" means the Warrant Agreement, dated as of the date hereof, between the Company and [• ], as warrant agent.

"Warrantholders" shall mean the holders of the Warrants.

"Warrants" means warrants, issued pursuant to the Plan and governed by the Warrant Agreement, that are exercisable for Voting Common Stock.

1.2  Other Definitional Provisions; Interpretation.

5

(a)      The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Subsection and Schedule references are to this Agreement unless otherwise specified.

(b)      The headings in this Agreement are included for convenience of reference only and shall not limit or otherwise affect the meaning or interpretation of this Agreement.

(c)      The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)      The words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation".

(e)      References to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto.

(f)      References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(g)      Except as otherwise set forth herein, schedules to this Agreement are a material part hereof and shall be treated as if fully incorporated into the body of the Agreement and shall be included in the definition of "Agreement".

(h)      Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified and shall be counted from the day immediately following the date from which such number of days are to be counted.

SECTION 2.   CORPORATE GOVERNANCE

2.1  Board of Directors.

(a)      The parties agree to cause the Board of Directors of the Company (the "Board") initially to consist of up to eleven (11) directors (individually, a "Director" and, collectively, the "Directors"), subject to future increase or decrease in accordance with this Agreement and the Company's by-laws.

(b)      Each Stockholder agrees that such Stockholder will vote all of the Voting Common Stock beneficially owned or held of record by such Stockholder so as to elect and, subject to Section 2.1(d) below, to continue in office:

(i)      the Chief Executive Officer of the Company (the "Management Director"); and

(ii)      up to ten (10) Directors who will be subject to the reasonable approval of the steering committee of the Prepetition Lenders and identified in a notice filed with the bankruptcy court by the Company pursuant to Section

6

1129(a)(5) of the Bankruptcy Code prior to the confirmation hearing on the Plan (the "Independent Directors"). The Independent Directors (A) shall not (x) be employees or consultants of the Company or any Subsidiary of the Company or have been employees or consultants of the Company or any Subsidiary of the Company during the three (3) year period preceding their becoming members of the Board or (y) employees of any Prepetition Lender or any Permitted Transferee thereof and (B) shall have the qualifications necessary, with respect to experience and educational background, to serve as Directors of the Company.

(c)    The Company agrees to include the Management Director and the Independent Directors as the slate of nominees recommended by the Board to the stockholders of the Company and to use its best efforts to cause the election of each such nominee to the Board.

(d)    If any of the Independent Directors ceases to serve as a member of the Board (whether by reason of death, resignation, removal or otherwise), the holders of a majority of the outstanding shares of Voting Common Stock (the "Majority Stockholders") shall be entitled to designate a successor Director to fill the vacancy created thereby, provided that such successor Director shall meet the requirements set forth in clauses (A) and (B) of Section 2.1(b)(ii). Each Stockholder agrees that such Stockholder will vote all of the Voting Common Stock beneficially owned or held of record by such Stockholder so as to elect any such successor Director.

(e)    The parties agree that any Independent Director may be removed, with or without cause, by the Majority Stockholders.

(f)    The initial Chairman of the Board shall be selected among the Independent Directors by the steering committee of the Prepetition Lenders and identified in a notice filed with the bankruptcy court by the Company pursuant to Section 1129(a)(5) of the Bankruptcy Code prior to the confirmation hearing on the Plan. Thereafter, the Chairman of the Board shall be selected by a majority of the Independent Directors.

2.2    Certificate of Incorporation and By-Laws. The Company and the Stockholders shall take or cause to be taken all lawful action necessary to ensure at all times that the certificates of incorporation and by-laws (or equivalent governing documents) of the Company and its Subsidiaries, as the same may be amended from time to time in accordance with the terms hereof and thereof, are not, at any time, inconsistent with the provisions of this Agreement.

2.3    Election of Common Stock. Upon the written request of any intended recipient of Common Stock prior to the Effective Date, on the Effective Date, the Company shall issue a number of shares of Limited Voting Common Stock to such recipient equal to, and in lieu of, the number of shares of Voting Common Stock that would have been issued to such recipient on the Effective Date. Limited Voting Common Stock shall have the same economic rights as Voting Common Stock. After the Effective Date, Limited Voting Common Stock shall be convertible into Voting Common Stock (and vice versa) at the request of the holder thereof in accordance with Section 2.4, which request shall be made at the sole and absolute discretion of such holder and shall not be subject to any rights of consent or approval of any other Person,

7

including the Company.  For the avoidance of doubt, Limited Voting Common Stock and Voting Common Stock shall receive identical consideration in a Change of Control transaction.

2.4    <u>Conversion of Common Stock</u>.

(a)    At any time and from time to time, any Stockholder may convert all or any of its shares of Limited Voting Common Stock into an identical number of shares of Voting Common Stock (and vice versa) by delivering to the Company (a) written notice of its desire for such conversion and (b) if certificated, the certificate or certificates representing the Limited Voting Common Stock (or Voting Common Stock, as the case may be) to be converted (a "<u>Conversion Request</u>").  Except as otherwise provided herein, each conversion shall be deemed to have been effected as of the close of business on the date the Company receives a Conversion Request.  If a conversion of Common Stock is to be made in connection with a Public Offering, a Change of Control (including a Drag-Along Transaction) or any other transaction affecting the Company, the conversion may, at the election of the Stockholder, be conditioned upon the consummation of such transaction, in which case such conversion shall not be deemed to be effective until such transaction has been consummated.

(b)    As soon as possible after a conversion has been effected (but in any event within five (5) Business Days after the Company receives a Conversion Request), and only if Common Stock is certificated, the Company shall deliver to the converting Stockholder, at such Stockholder's request:

(i)    a certificate representing the number of shares of Voting Common Stock or Limited Voting Common Stock, as the case may be, issuable by reason of such conversion; and

(ii)    a certificate representing the remaining number of shares of Voting Common Stock or Limited Voting Common Stock, as the case may be, if the converting Stockholder elected to convert less than all of such Stockholder's Voting Common Stock or Limited Voting Common Stock, as the case may be.

(c)    In connection with the issuance of any shares of Voting Common Stock upon conversion of Limited Voting Common Stock (or Limited Voting Common Stock upon conversion of Voting Common Stock), the Company shall take all such actions as are necessary in order to ensure that the Common Stock issuable upon such conversion shall be duly and validly issued, fully paid and nonassessable, free and clear of all taxes, liens, charges and encumbrances with respect to the issuance thereof other than restrictions of applicable securities laws or contained in this Agreement or the Registration Rights Agreement.

(d)    For the purpose of enabling the Company to satisfy any obligation to issue Voting Common Stock upon the conversion of Limited Voting Common Stock, the Company agrees to reserve and keep available at all times out of its aggregate authorized but unissued or treasury shares of Voting Common Stock the number of shares of Voting Common Stock issuable upon the conversion of all outstanding shares of Limited Voting Common Stock.

2.5    <u>Limited Voting Common Stock</u>.  Unless otherwise expressly set forth herein, no Limited Voting Stockholder shall be entitled to vote any shares of Limited Voting Common

8

Stock with respect to any matters submitted to a vote of the Stockholders.  Notwithstanding the foregoing, if and only if any of the following actions are submitted to a vote of the Stockholders, each share of Limited Voting Common Stock shall be entitled to vote with the Voting Common Stock, with each share of Common Stock having one vote and voting together as a single class:

(a)    the retention or dismissal of outside auditors of the Company or any of its Subsidiaries;

(b)    any distributions to Stockholders in respect of their Common Stock or Common Stock Equivalents, or other distributions made in accordance with the terms of this Agreement;

(c)    any recapitalization, merger, business combination, consolidation, disposal of assets, exchange or other similar reorganization involving the Company or any of its Subsidiaries;

(d)    any amendment to the certificate of incorporation or by-laws of the Company;

(e)    other than in connection with the (x) issuance of shares of Common Stock upon the exercise of the Warrants or of options granted under a management equity plan or similar plan or (y) grant of options pursuant to and in accordance with such plans, any authorization or issuance of Equity Interests in the Company or any of its Subsidiaries;

(f)    any redemption, purchase or other acquisition by the Company of any of its capital stock (except for purchases from employees upon termination of employment); and

(g)    the commencement of any dissolution, liquidation or winding-up of the affairs of the Company or any of its Subsidiaries.

SECTION 3.    INFORMATION REQUIREMENTS

3.1    Financial Reports.  Until the Company becomes subject to the reporting requirements of the Exchange Act, the Company shall provide each of the Stockholders, other than any Management Stockholder or Director Stockholder, and Warrantholders with (1) if the Company is required to provide to its (or its Subsidiaries') senior lenders or holders of debt securities annual, quarterly and monthly financial reports, then such reports (at the same time as provided to such senior lenders or holders of debt securities, as applicable); provided that the Company shall not be required to provide monthly financial reports to the Warrantholders and the Company shall provide financial reports to the Stockholders with the information referenced in the last sentence of this Section 3.1, whether or not required to be provided to such senior lenders or holders of debt securities or (2) if not so required, then:

(a)    as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Company (or one hundred twenty (120) days after the end of the first fiscal year ending after the date of this Agreement), a consolidated balance sheet of the Company and its Subsidiaries as of the end of such year, and consolidated statements of income and cash flows of the Company and its Subsidiaries for the year then ended prepared in conformity with

9

generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted therein, and setting forth in each case in comparative form the figures for the previous fiscal year, together with an auditor's report thereon of a firm of established national reputation and including a management discussion and analysis of financial condition and results of operations that would be required to be contained in a filing with the SEC on Form 10-K, or any successor or comparable form; and

(b)      as soon as available and in any event within forty-five (45) days after the end of each of the first three quarters of each fiscal year of the Company, consolidated balance sheets of the Company and its Subsidiaries as of the end of such period, and consolidated statements of income and cash flows of the Company and its Subsidiaries for the period then ended prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted therein, and subject to the absence of footnotes and to year-end adjustments, and setting forth in each case in comparative form the figures for the corresponding period of the previous fiscal year, and including, for each such quarter, a management discussion and analysis of financial condition and results of operations that would be required to be contained in a filing with the SEC on Form 10-Q, or any successor or comparable form.

The annual and quarterly financial reports provided to the Stockholders under this Section 3.1 shall include (x) with the consolidated balance sheets and consolidated statements of income and cash flows for each period presented, a comparison of actual results to the Company's budgeted results for such period and (y) in the management discussion and analysis of financial condition and results of operations for each period presented, discussion comparing actual results for such period to the Company's budgeted results for such period.

3.2  Annual Budgets.  Upon and to the extent of a prior written request therefor, the Company shall provide each of the Eligible Stockholders with annual budgets (in the form prepared by the Company for the Company's or its Subsidiaries' senior lenders or holders of debt securities, if applicable, and, if not, then in such form as the Company has prepared for the Board); provided that such Eligible Stockholder is not a Company Competitor or an Affiliate of a Company Competitor.

3.3  Access; Updated Calls; Annual Meeting.

(a)      The Company shall, and shall cause its Subsidiaries and the officers, directors, employees, auditors and agents of the Company and its Subsidiaries to, (i) afford each of the Eligible Stockholders reasonable access at all reasonable times after reasonable notice to the properties, offices and other facilities, and books and records of the Company and its Subsidiaries and (ii) afford each of the Eligible Stockholders the opportunity to discuss the affairs, finances and accounts of the Company and its Subsidiaries with the Chief Executive Officer and Chief Financial Officer of the Company from time to time as each such Eligible Stockholder may reasonably request, and such discussion will include such other senior executives of the Company or its Subsidiaries that the Chief Executive Officer determines is reasonably necessary to adequately respond to reasonable inquiries of such Eligible Stockholder; provided that such Eligible Stockholder is not a Company Competitor or an Affiliate of a Company Competitor.

(b)    At least once per fiscal quarter, promptly following the Company's provision of financial reports required by Section 3.1, the Company shall host a conference call (with a question and answer period) with the Chief Financial Officer of the Company and such other members of senior management of the Company as the Company deems appropriate and the Stockholders to discuss the performance of the business, strategic alternatives and other issues as the Eligible Stockholders may reasonably request.  No Stockholder who is a Company Competitor or an Affiliate of a Company Competitor shall be permitted to participate in the calls or receive the information contemplated by the last sentence of Section 3.1.

(c)    The Company shall hold an annual meeting of stockholders in accordance with the procedures set forth in the Company's by-laws.

3.4    <u>Confidentiality</u>.  Each Stockholder and Warrantholder agrees to maintain as confidential all Information (as defined below) provided to such Stockholder and Warrantholder by the Company and its Affiliates for a period of the earlier of (i) five (5) years following receipt thereof and (ii) two (2) years following termination of this Agreement, except that such Stockholder or Warrantholder may disclose such Information (a) to Persons employed or engaged by such Stockholder or Warrantholder who need to know such Information that have agreed to comply with the covenant contained in this Section 3.4; (b) in connection with any Transfer or proposed Transfer of Equity Interests to any *bona fide*  and permitted proposed Transferee that has agreed to comply with the covenant contained in this Section 3.4 (and any such *bona fide* proposed Transferee may disclose such Information to Persons employed or engaged by it as described in clause (a) of this Section 3.4); (c) as requested or required by any Governmental Authority or reasonably believed by such Stockholder or Warrantholder to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of such Stockholder's or Warrantholder's counsel, is required by law; (e) in connection with the exercise of any right or remedy under this Agreement or in connection with any action, claim, lawsuit, demand, investigation or proceeding to which such Stockholder or Warrantholder is a party before any Governmental Authority or before any arbitrator or panel of arbitrators; or (f) that becomes publicly available through no fault of such Stockholder or Warrantholder or any other Person to whom such Stockholder or Warrantholder provided such Information.  Each Stockholder and Warrantholder shall be responsible and liable for any violation of this Section 3.4 by any Person described in clause (a) or (b) of this Section 3.4. "<u>Information</u>" means all information received from or on behalf of the Company or any of its Subsidiaries relating to the Company or any of its Subsidiaries or any of their respective businesses, other than any such information that is publicly available, or was known to such Stockholder or Warrantholder from a source other than the Company or its Subsidiaries, prior to disclosure by or on behalf of the Company or any of its Subsidiaries other than as a result of a breach of this Section 3.4.

3.5    <u>Environmental Reports</u>.  The Company agrees:

(a)    at regular intervals, but no less frequently than every twelve months, to provide to the Board a written report describing the compliance of the Company and its Subsidiaries with its environmental, health and safety ("<u>EHS</u>") policies and applicable EHS laws, and implement such improvements and corrections as may be necessary or appropriate, after consultation with outside counsel and the Board, to maintain conformance with such policies and

laws; <u>provided</u> that the Company will provide the Board with an updated report within 60 days of any event or the discovery of any facts that would result in a material change from the information contained in a prior report provided to the Board; and

(b)    to comply with all applicable statutes, laws, ordinances, rules, orders and regulations concerning EHS, except where the failure to so comply could not reasonably be expected to have a material adverse effect on the condition (financial or otherwise), results of operations, business, or properties, collectively, of the Company and its Subsidiaries.

SECTION 4.    TRANSFERS AND ISSUANCES

4.1    Limitations on Transfer.

(a)    Each Stockholder hereby agrees that no Transfer of Equity Interests shall occur in any manner that violates the provisions of this Agreement, the Registration Rights Agreement or any applicable federal or state securities laws.

(b)    Each Stockholder hereby agrees that, except for Transfers pursuant to Section 4.2, 4.5 or 4.6 or Transfers effected pursuant to an effective registration statement filed under the Securities Act, no Transfer of Equity Interests shall occur unless the Company has been furnished, after it has made a written request to that effect, with an opinion in form and substance reasonably satisfactory to the Company from counsel reasonably satisfactory to the Company that such Transfer may be made without registration under Section 5 under the Securities Act and any applicable state securities laws; provided, however, that this Section 4.1(b) shall not apply to (x) Transfers of Equity Interests by a Stockholder (or Stockholders) who (i) beneficially owns less than ten percent (10%) of the shares of Common Stock then outstanding; (ii) is not an "Affiliate" (as such term is defined in Rule 405 under the Securities Act) of the Company, and (iii) has furnished the Company with a certificate, in form and substance reasonably satisfactory to the Company, signed by an authorized officer of the Stockholder effecting such Transfer, to the effect that the requirements of clauses (i) and (ii) of this proviso are satisfied and that the Stockholder making such Transfer did not receive the securities proposed to be Transferred with a view to a subsequent distribution, (y) Transfers of Equity Interests by a Stockholder who has furnished the Company with a certificate, in form and substance reasonably satisfactory to the Company, signed by an authorized officer of the Stockholder effecting such Transfer, to the effect that the Transfer is being made in compliance with Rule 144 under the Securities Act or (z) Transfers of Equity Interests to the Company pursuant to the repurchase provisions of any management equity plan or agreement or independent director equity plan or agreement.

(c)    Each Stockholder hereby agrees that, except for Transfers in connection with clause (z) of Section 4.1(b), no Transfer of Equity Interests shall be permitted unless and until the proposed Transferee agrees in writing to become a party to, and be bound to the same extent as its Transferor by the terms of, this Agreement pursuant to the provisions of Section 5.6 hereof.

(d)    Notwithstanding any other provisions of this Agreement to the contrary, prior to a Public Offering, no Transfer of Equity Interests shall be permitted if, after giving effect

12

to such Transfer, and after giving effect to the conversion, exercise or exchange of all Common Stock Equivalents (other than the Warrants), such Transfer would result in the Company becoming subject to the reporting requirements of the Exchange Act.

(e)    Each Stockholder hereby agrees that, except for Transfers pursuant to Section 4.6 hereof, no Transfer of Equity Interests to any Company Competitor or an Affiliate of any Company Competitor shall be permitted without the prior written consent of the Board.

4.2    <u>Transfers to Affiliates</u>.  Notwithstanding any other provision of this Agreement to the contrary, but subject to Sections 4.1(c), (d) and (e) hereof, each Stockholder and its Affiliates shall be permitted to Transfer from time to time any or all of the Equity Interests beneficially owned by it to any of its Affiliates.  Notwithstanding anything else in this Agreement to the contrary, if any Transfer of Equity Interests to Affiliates permitted hereunder is not permitted under any of the Other Agreements applicable to such Equity Interests, then such Transfer to Affiliates shall not be permitted hereunder.

4.3    <u>Effect of Void Transfers</u>.  In the event of any purported Transfer of Equity Interests in violation of the provisions of this Agreement, such purported Transfer shall be void and of no effect, and the Company shall not give effect to such Transfer nor shall it cause any third party transfer agent to effect such Transfer, to the extent it appoints one.

4.4    <u>Legend on Securities</u>.

(a)    Unless and until the Board shall determine otherwise, shares of Common Stock shall be uncertificated and recorded in the books and records of the Company.  If at any time the Board shall determine to certificate shares of Common Stock issued to any Stockholder or any additional Equity Interests that become subject to this Agreement pursuant to Section 5.1 (except for (i) unexercised options issued pursuant to any management equity plan or agreement or independent director equity plan or agreement, which shall bear the legend set forth in Section 4.4(b) below, and (ii) Warrants, which shall bear the legend set forth in the Warrant Agreement) shall bear the following legend on the face thereof; <u>provided</u>, <u>however</u>, that certificates representing Equity Interests not subject to the Registration Rights Agreement, shall make no reference to the Registration Rights Agreement:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAW AND ARE SUBJECT TO (A) A STOCKHOLDERS AGREEMENT AMONG RDA HOLDING CO. (THE "<u>COMPANY</u>") AND THE STOCKHOLDERS PARTIES THERETO, AND (B) A REGISTRATION RIGHTS AGREEMENT AMONG THE COMPANY AND CERTAIN HOLDERS OF REGISTRABLE COMMON STOCK (AS THAT TERM IS DEFINED IN THE REGISTRATION RIGHTS AGREEMENT), COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY.  NO DIRECT OR INDIRECT TRANSFER, SALE, OFFER, ASSIGNMENT, EXCHANGE, DISTRIBUTION, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH STOCKHOLDERS

AGREEMENT AND REGISTRATION RIGHTS AGREEMENT AND (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) IF THE COMPANY HAS BEEN FURNISHED EITHER WITH AN OPINION IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE COMPANY FROM COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH TRANSFER, SALE, OFFER, ASSIGNMENT, EXCHANGE, DISTRIBUTION, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION MAY BE MADE WITHOUT REGISTRATION UNDER SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS THEREUNDER AND APPLICABLE STATE SECURITIES LAWS OR WITH THE CERTIFICATE SPECIFIED IN SECTION 4.1(B) OF SUCH STOCKHOLDERS AGREEMENT, IF APPLICABLE. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT AND REGISTRATION RIGHTS AGREEMENT."

(b)     Each unexercised option that is certificated and issued pursuant to any management equity plan or agreement or independent director equity plan or agreement shall bear the following legend:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAW AND ARE SUBJECT TO A STOCKHOLDERS AGREEMENT AMONG RDA HOLDING CO. (THE "COMPANY") AND THE OTHER STOCKHOLDERS PARTIES THERETO AND A STOCK OPTION AGREEMENT, COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY. NO DIRECT OR INDIRECT TRANSFER, SALE, OFFER, ASSIGNMENT, EXCHANGE, DISTRIBUTION, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT AND STOCK OPTION AGREEMENT. THE HOLDER OF THIS OPTION, BY ACCEPTANCE HEREOF, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT AND STOCK OPTION AGREEMENT, INCLUDING RESTRICTIONS RELATING TO THE EXERCISE OF ANY VOTING RIGHTS GRANTED BY THE SECURITIES. "

4.5  Tag-Along Rights.

(a)     With respect to any proposed Transfer or Transfers (other than a mortgage, pledge or hypothecation or Transfer pursuant to Section 4.2) in one transaction or a series of related transactions, individually or in the aggregate, of ten percent (10%) or more of the then outstanding shares of Common Stock by any Stockholder, or two (2) or more Stockholders acting in concert with respect to such Transfer, provided that such Stockholder or Stockholders and their respective Affiliates collectively own prior to such proposed Transfer twenty-five percent (25%) or more of the then outstanding shares of Common Stock (in such capacity, a "Transferring Stockholder"), the Transferring Stockholder shall have the obligation,

14

and (i) each other Stockholder, other than Management Stockholders and Director Stockholders, and (ii) each Warrantholder (but a Warrantholder shall only have tag-along rights pursuant to this Section 4.5 with respect to the Common Stock issuable upon exercise of its Warrants (rather than the Warrants themselves) and only if the Transfer would result in a Change of Control) shall have the right but not the obligation, to request the proposed Transferee to purchase from each Stockholder and Warrantholder exercising such right (each, a "Tagging Stockholder") that number of shares of Common Stock requested to be included by such Tagging Stockholder; provided that if the proposed Transferee is unwilling to purchase all of the Common Stock that the Tagging Stockholders have requested to be acquired by the proposed Transferee, then each Tagging Stockholder shall have the right to sell or otherwise Transfer to the Transferee a number of such Tagging Stockholder's shares of Common Stock equal to the product of (x) the number of shares of Common Stock beneficially owned by such Tagging Stockholder (excluding shares subject to a Transfer restriction referred to in the last sentence of this Section 4.5(a)) multiplied by (y) the percentage of the number of shares of Common Stock that the Transferring Stockholder is proposing to sell relative to the total number of shares of Common Stock held by such Transferring Stockholder (excluding shares subject to a Transfer restriction referred to in the last sentence of this Section 4.5(a)) (the amounts in this clause (y), their "Pro Rata Share"). If the proposed Transferee is unwilling to purchase all of the shares of Common Stock proposed to be Transferred by all Tagging Stockholders (determined in accordance with the first sentence of this Section 4.5(a)), then the Transferring Stockholder and each Tagging Stockholder shall reduce, on a pro rata basis based on their respective Sharing Percentages of the shares of Common Stock held by the Transferring Stockholder and the Tagging Stockholders, the Pro Rata Share of the shares of Common Stock that each otherwise would have Transferred so as to permit the Transferring Stockholder and each Tagging Stockholder to sell the number of shares of Common Stock that the proposed Transferee is willing to purchase.  Each Tagging Stockholder shall Transfer its shares of Common Stock at the same price per share and upon the same terms and conditions (including time of payment, form of consideration or option to elect form of consideration) as to be paid and given to the Transferring Stockholder.  In order to be entitled to exercise its right to sell shares of Common Stock to the proposed Transferee pursuant to this Section 4.5, a Tagging Stockholder must agree to make to the proposed Transferee the same representations, warranties, covenants, indemnities and agreements as the Transferring Stockholder agrees to make in connection with the proposed Transfer of the shares of Common Stock of the Transferring Stockholder (except that in the case of representations and warranties pertaining specifically to the Transferring Stockholder, a Tagging Stockholder shall make the comparable representations and warranties pertaining specifically to itself, and except that no Tagging Stockholder shall have to make representations and warranties with respect to the Company, and except that, in the case of covenants or agreements capable of performance only by certain Stockholders, such covenants or agreements shall be made only by such certain Stockholders).  All representations, warranties, covenants, agreements and indemnities made by the Transferring Stockholder and the Tagging Stockholders pertaining specifically to themselves shall be made by each of them severally and not jointly; provided that each of the Transferring Stockholder and each Tagging Stockholder shall be severally (but not jointly) liable for breaches of representations, warranties, covenants and agreements of or, in the case of representations and warranties pertaining to the Company and its Subsidiaries and for indemnification obligations arising out of or relating to any such breach or otherwise pertaining to the Company and its Subsidiaries, on a *pro rata* basis (based on the number of shares of Common Stock Transferred

15

by each Transferring Stockholder and each Tagging Stockholder), such liability of each such Stockholder not to exceed the proceeds actually received by such Stockholder.  Subject to the next sentence, any Tagging Stockholder that is a holder of Limited Voting Common Stock or Common Stock Equivalents (including Warrants) and wishes to participate in a sale of Common Stock pursuant to this Section 4.5(a) shall convert into or exercise or exchange such number of shares of Limited Voting Common Stock or Common Stock Equivalents for Voting Common Stock as may be acquired therefor on or prior to the closing date of such Transfer, <u>provided</u> that any such conversion, exercise or exchange may be conditioned on the closing of such Transfer, in which case such conversion, exercise or exchange shall not be effective until such Transfer has been consummated.  Notwithstanding anything in this Section 4.5 to the contrary, if any Transfer of Common Stock or Common Stock Equivalents pursuant to this Section 4.5 is not permitted under an Other Agreement or the Warrant Agreement, then such Transfer shall not be permitted hereunder.

(b)     The Transferring Stockholder shall give written notice to all other Stockholders (and, to the extent the Transfer would result in a Change of Control, all Warrantholders) of each proposed Transfer giving rise to the rights of the Tagging Stockholders set forth in the first sentence of Section 4.5(a) at least thirty (30) days prior to the consummation of such Transfer, setting forth the name of the Transferring Stockholder, the number of shares of Common Stock proposed to be so Transferred, the name and address of the proposed Transferee, the proposed amount and form of consideration and other terms and conditions offered by the proposed Transferee, and a representation that the proposed Transferee has been informed of the tag-along rights provided for in this Section 4.5 and has agreed to purchase shares of Common Stock from any Tagging Stockholder or Tagging Stockholders in accordance with the terms hereof.  Any notice required by the Transferring Stockholder under this Section 4.5 to be given to the other Stockholders and Warrantholders may, at the election of the Transferring Stockholder, be given to the Company which shall, on behalf of the Transferring Stockholder, give such notice to the other Stockholder and Warrantholders.  The tag-along rights provided by this Section 4.5 must be exercised by each Tagging Stockholder within twenty (20) days following receipt of the notice required by the preceding sentence, by delivery of a written notice to the Transferring Stockholder indicating such Tagging Stockholder's election to exercise its rights pursuant to Section 4.5 and specifying the number of shares of Common Stock it elects to sell.  If the proposed Transferee fails to purchase shares of Common Stock from any Tagging Stockholder that has properly exercised its tag-along rights, then the Transferring Stockholder shall not be permitted to make the proposed Transfer, and any such attempted Transfer shall be void and of no effect, as provided in Section 4.3 hereof.

(c)     If any of the Tagging Stockholders exercise their rights under Section 4.5(a), the closing of the purchase of the Common Stock with respect to which such rights have been exercised shall take place concurrently with the closing of the sale of the Transferring Stockholder's Common Stock.  No Transfer shall occur pursuant to this Section 4.5 unless the Transferee shall agree to become a party to, and be bound to the same extent as its Transferor by the terms of, this Agreement pursuant to the provisions of Section 5.6.

(d)     Any Transfer pursuant to this Section 4.5 shall occur within ninety (90) days of delivery of the notice from the Transferring Stockholder to the other Stockholders (and Warrantholders, if applicable) and at a price of not more than the maximum per share price set

16

forth in the notice and otherwise on terms and conditions in the aggregate not more favorable to the Transferring Stockholder and the Tagging Stockholders than were set forth in the notice.  If, at the end of such ninety (90) day period, the Transferring Stockholder and the Tagging Stockholders have not completed the sale or other disposition of the Common Stock of the Transferring Stockholder and the Tagging Stockholders in accordance with the terms and conditions of the proposed Transfer, all the restrictions on Transfer contained in this Agreement with respect to Common Stock owned by the Transferring Stockholder and the Tagging Stockholders shall again be in effect.

        4.6  <u>Drag-Along Rights</u>.

        (a)      If any Stockholder, or two (2) or more Stockholders acting in concert with respect to the Transfer of their shares of Common Stock, and such Stockholder's or Stockholders' respective Affiliates  (the "<u>Selling Stockholder(s)</u>") that collectively own at least a majority of the then outstanding shares of Common Stock receives an offer from a third party (excluding the Company and its Subsidiaries and Affiliates of such Stockholder or Stockholders) (a "<u>Third Party</u>") to purchase all (or no less than 90% if the remaining shares are to be re-invested in a "roll-over" transaction with the consent of the Third Party) of the outstanding shares of Common Stock (whether pursuant to a sale of stock, a merger or otherwise), and such offer is accepted by the Selling Stockholder(s) (the "<u>Drag-Along Transaction</u>"), then each Stockholder and Warrantholder hereby agrees that, if requested to do so by such Selling Stockholder(s) pursuant to a Drag-Along Notice, it will Transfer all of its shares of Common Stock (or, in the case of Warrantholders, all shares of Common Stock issuable upon exercise of its Warrants) to such Third Party at the same price per share and upon the same terms and conditions (including time of payment, form of consideration or option to elect form of consideration) so accepted by the Selling Stockholder(s), including making the same representations, warranties, covenants, indemnities and agreements that the Selling Stockholder(s) agrees to make (except that, in the case of representations and warranties pertaining specifically to the Selling Stockholder(s), each other Stockholder and Warrantholder shall make the comparable representations and warranties pertaining specifically to itself, and except that no Stockholder or Warrantholder shall have to make representations and warranties with respect to the Company, and except that, in the case of covenants or agreements capable of performance only by certain Stockholders or Warrantholders, such covenants or agreements shall be made only by such certain Stockholders or Warrantholders, as the case may be).  All representations, warranties, covenants, agreements and indemnities made by the Stockholders and Warrantholders pertaining specifically to themselves shall be made by each of them severally and not jointly; <u>provided</u> that each Stockholder and Warrantholder shall be severally (but not jointly) liable for breaches of representations, warranties, covenants and agreements of or, in the case of representations and warranties pertaining to the Company and its Subsidiaries and for indemnification obligations arising out of or relating to any such breach or otherwise pertaining to the Company and its Subsidiaries, on a *pro rata* basis (based on the number of shares of Common Stock sold by each Selling Stockholder and each of the other Stockholders and Warrantholders), such liability of each such Stockholder or Warrantholder not to exceed such Stockholder's or Warrantholder's *pro rata* portion of the proceeds of the sale actually paid to all Stockholders and Warrantholders; <u>provided</u> <u>further</u> that no such Stockholder or Warrantholder shall be required to enter into a non-competition covenant.  If the Selling Stockholder(s) accepts such Drag-Along Transaction and desires that the other Stockholders and

Warrantholders Transfer their shares of Common Stock (or shares of Common Stock issuable upon exercise of the Warrants) in the Drag-Along Transaction, such Selling Stockholder(s) shall give written notice to all other Stockholders and Warrantholders of the proposed Drag-Along Transaction ("Drag-Along Notice") at least thirty (30) days prior to the proposed consummation of such Drag-Along Transaction, which Drag-Along Notice shall specify the name and address of the Third Party, the form and amount of consideration to be paid to the Stockholders and Warrantholders and any other material terms and conditions of the Drag-Along Transaction. The Drag-Along Notice may, at the election of the Selling Stockholder(s), be given to the Company which shall, on behalf of the Selling Stockholder(s), give such notice to the other Stockholder and Warrantholders.

(b)    Subject to the next sentence, if requested to do so by the Selling Stockholder(s), any Stockholder that is a holder of Limited Voting Common Stock or Common Stock Equivalents and any Warrantholder shall convert, exercise or exchange such Limited Voting Common Stock or Common Stock Equivalents (including Warrants) into or for Voting Common Stock in accordance with their terms on or prior to the closing date of such Drag-Along Transaction, provided that any such conversion, exercise or exchange may be conditioned on the closing of such Drag-Along Transaction, in which case such conversion, exercise or exchange shall not be effective until such Drag-Along Transaction has been consummated. Notwithstanding anything in this Section 4.6 to the contrary, (i) in the event a Stockholder that holds Common Stock Equivalents (other than options to acquire shares of Voting Common Stock granted under any management equity plan or agreement or independent director equity plan or agreement, which are governed by clause (ii) below) or a Warrantholder is required to Transfer such Common Stock Equivalents in a Drag-Along Transaction, such Stockholder or Warrantholder shall not be required to convert, exercise or exchange any such Common Stock Equivalent if and to the extent that the applicable conversion, exercise or exchange price of such Common Stock Equivalent is equal to or greater than the value of the consideration to be received by Stockholders and Warrantholders in the Drag-Along Transaction giving rise to drag-along rights under this Section 4.6 and, in lieu of such conversion, exercise or exchange, at the election of such holder of Common Stock Equivalents or Warrantholder, any such Common Stock Equivalents shall instead be cancelled and forfeited; (ii) in connection with any Drag-Along Transaction, the treatment of options to acquire shares of Voting Common Stock granted under any management equity plan or agreement or independent director equity plan or agreement shall be governed by the terms of such plans or agreements and (iii) if any Transfer of Common Stock or Common Stock Equivalents of the Company pursuant to this Section 4.6 is not permitted under an Other Agreement or the Warrant Agreement, then such Transfer shall not be permitted or required hereunder.

(c)    Any Drag-Along Transaction pursuant to this Section 4.6 shall occur within one hundred eighty (180) days of delivery of the Drag-Along Notice to the other Stockholders and the Warrantholders.  If, at the end of such one hundred eighty (180) day period, the Selling Stockholder(s), the other Stockholders and the Warrantholders have not completed the sale or other disposition of the Common Stock (and Common Stock issuable upon exercise of the Warrants) of the Selling Stockholder(s), the other Stockholders and the Warrantholders in accordance with the terms and conditions of the proposed Drag-Along Transaction, all the restrictions on Transfer contained in this Agreement with respect to Common Stock owned by the Selling Stockholder(s) and the other Stockholders shall again be in effect.

4.7  <u>Participation Rights</u>.

(a)    The Company shall not issue additional Equity Interests (an "<u>Issuance</u>") to any Person unless, prior to such issuance, the Company notifies each Eligible Stockholder in writing of the proposed Issuance and grants to each Eligible Stockholder (subject to compliance with Section 4.7(c) below), the right (the "<u>Right</u>") to subscribe for and purchase, in whole or in part, at the same price and upon the same terms and conditions (including, if such additional Equity Interests are issued as a unit together with other securities, the purchase of such unit, but the Right shall not apply separately to any component of such unit) as set forth in the notice of such Issuance, a portion of such additional Equity Interests proposed to be issued in the Issuance up to:

(i)    in the case of an Issuance in which shares of Common Stock or Common Stock Equivalents are to be issued, such that immediately after giving effect to the Issuance and exercise of the Right (including, for purposes of this calculation, the issuance of shares of Common Stock upon conversion, exchange or exercise of any Common Stock Equivalent issued in the Issuance or subject to the Right), the shares of Common Stock and Common Stock Equivalents beneficially owned by such Stockholder and its Affiliates (rounded to the nearest whole share) shall represent the same percentage of the aggregate number of shares of Common Stock and Common Stock Equivalents outstanding as was beneficially owned by such Stockholder and its Affiliates immediately prior to the Issuance; and

(ii)    in the case of an Issuance in which (A) equity securities of the Company other than Common Stock or Common Stock Equivalents ("<u>Other Capital Stock</u>") or (B) any securities exchangeable or exercisable for, or convertible into, such Other Capital Stock ("<u>Other Capital Stock Equivalents</u>") are to be issued, equal to the percentage of shares of Common Stock and Common Stock Equivalents that was beneficially owned by such Stockholder and its Affiliates immediately prior to the Issuance.

(b)    If any Eligible Stockholder elects not to exercise its Right pursuant to Section 4.7 in full with respect to the Issuance of additional Equity Interests, then the other Eligible Stockholders may elect to subscribe for and purchase their *pro rata* share of such Equity Interests that such Eligible Stockholder elected not to participate in and such other Eligible Stockholders shall receive the relevant number of newly issued Equity Interests that the non-electing Eligible Stockholder would have received had such non-electing Eligible Stockholder elected to participate in full.

(c)    The Right may be exercised by each Eligible Stockholder provided that the Eligible Stockholder exercising the Right must (i) be an Accredited Investor and (ii) deliver written notice to the Company of such exercise of the Right which is received by the Company within twenty (20) Business Days after the date on which the Eligible Stockholder receives notice from the Company of the proposed Issuance (which date shall be specified in the notice from the Company of the proposed Issuance).  The closing of the purchase and sale pursuant to the exercise of the Right shall occur on the date scheduled by the Company for the Issuance,

19

which may not be earlier than ten (10) Business Days and no later than sixty (60) Business Days after the Company receives notice of the exercise of the Right.  Notwithstanding the foregoing, the Right shall not apply to any Issuance (i) made as consideration for the payment of the purchase price of assets acquired by the Company or any of its Subsidiaries, including any Issuance in connection with a merger, exchange offer, joint venture, license transaction or exchange of shares, or to any lender in connection with any loans made to the Company or any of its Subsidiaries, (ii) (A) of options granted to directors, officers or employees of the Company or its Subsidiaries, or Issuance of Common Stock upon exercise of such options, (B) otherwise in accordance with the terms of a stock option plan or other equity-based compensation plan of the Company or its Subsidiaries that has been approved by the Board and, in the case of each of the foregoing clauses (ii)(A) and (ii)(B), of the Equity Interests issued upon the exchange, exercise or conversion of such Equity Interests or (C) of Equity Interests upon exercise of the Warrants, (iii) of Equity Interests issued as dividends or distributions to holders of Common Stock, generally, on a *pro rata* basis, or in connection with a stock split, (iv) of Other Capital Stock or Other Capital Stock Equivalents issued as dividends or distributions to holders of Other Capital Stock or Other Capital Stock Equivalents, generally, on a *pro rata* basis, or (v) pursuant to the exchange, exercise or conversion of any Equity Interest that is either (A) outstanding on the date hereof or (B) outstanding after the date hereof so long as the Eligible Stockholders have had an opportunity to exercise the Right granted to such Eligible Stockholders in this Section 4.7 with respect to the underlying Equity Interest, or such Equity Interest was issued pursuant to clause (i), (ii), (iii) or (iv) of this sentence.

(d)      Nothing in this Section 4.7 shall be deemed to prevent any Person from purchasing for cash or the Company from issuing any additional Equity Interests without first complying with the provisions of this Section 4.7 if, in connection with such purchase, (i) the Board has determined in good faith that (A) the Company needs a prompt cash investment, (B) no alternative financing on terms as favorable to the Company in the aggregate than such purchase is available on an as timely basis, and (C) the delay caused by compliance with the provisions of this Section 4.7 in connection with such investment would be reasonably likely to adversely affect the Company, (ii) the Person making such purchase (for purposes of this Section 4.7, the "Purchasing Holder") or the Company gives prompt notice to the Eligible Stockholders as of such date of the Purchasing Holder's investment, which notice shall describe in reasonable detail the additional Equity Interests being purchased by the Purchasing Holder and the purchase price thereof, and (iii) the Purchasing Holder or the Company enables the Eligible Stockholders to effectively exercise their respective rights under this Section 4.7 with respect to their purchase of a *pro rata* share of the additional Equity Interests issued to the Purchasing Holder as promptly as practicable following the initial prompt cash investment after such purchase by the Purchasing Holder on the terms specified in Section 4.7(a).

SECTION 5.  MISCELLANEOUS

5.1  Additional Securities Subject to Agreement.  Each Stockholder and Warrantholder agrees that any other Equity Interests which it shall hereafter acquire by means of a stock split, stock dividend, distribution, exercise of warrants (including the Warrants) or options, purchase or otherwise shall be subject to the provisions of this Agreement to the same extent as if held on the date hereof.

5.2  <u>Termination</u>.  Except as provided in Section 3.4, this Agreement shall terminate upon the first to occur of (a) Change of Control (including in connection with a Drag-Along Transaction), (b) the sale of all or substantially all of the assets of the Company (other than to a Subsidiary or an Affiliate of the Company), (c) the liquidation of the Company or (d) a Public Offering.

5.3  <u>Injunctive Relief</u>.  The Stockholders, the Warrantholders and the Company acknowledge and agree that a violation of any of the terms of this Agreement will cause the other parties irreparable injury for which adequate remedy at law is not available.  Accordingly, it is agreed that each of the Company, the Stockholders and the Warrantholders shall be entitled to seek an injunction, restraining order or other equitable relief to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof in any federal or state court of competent jurisdiction in the Southern District of New York, in addition to any other remedy to which it may be entitled at law or equity, without the posting of any bond.

5.4  <u>Other Stockholders Agreements</u>.  None of the Stockholders or the Warrantholders shall enter into any agreement or other arrangement of any kind with any Person with respect to Equity Interests which is inconsistent with the provisions of this Agreement or which would reasonably be considered to impair its ability to comply with this Agreement.

5.5  <u>Amendments</u>.  This Agreement may be amended only by a written instrument signed by (a) the Company and (b) Stockholders beneficially owning a majority of the then outstanding shares of Common Stock beneficially owned by all Stockholders; <u>provided</u>, <u>however</u>, that no such amendment shall materially adversely change the rights or obligations of any Stockholder or Warrantholder disproportionately generally *vis a vis* other Stockholders or Warrantholders party to this Agreement without the written approval of such disproportionately affected Stockholder or Warrantholder; <u>provided</u> <u>further</u> that (i) Limited Voting Stockholders beneficially owning a majority of the then outstanding shares of Limited Voting Common Stock beneficially owned by all Limited Voting Stockholders shall be required to approve any amendment affecting the specific rights or obligations of the Limited Voting Stockholders that does not similarly affect the rights or obligations of the holders of Voting Common Stock and (ii) no such amendment shall, without the prior written approval of each Limited Voting Stockholder, terminate, modify or waive a Limited Voting Stockholder's rights or obligations in respect of the conversion of Limited Voting Common Stock into Voting Common Stock; and <u>provided</u> <u>further</u> that no such amendment shall, without the prior written approval of Stockholders beneficially owning at least 66 2/3% of the then outstanding shares of Common Stock beneficially owned by all Stockholders, terminate, modify or waive a Stockholder's rights or obligations in respect of (i) participation in Issuances pursuant to Section 4.7, (ii) dispositions pursuant to Section 4.5 or (iii) dispositions pursuant to Section 4.6.  Notwithstanding the foregoing, the Company may from time to time add additional holders of shares of Common Stock as parties to this Agreement. In order to become a party to this Agreement, such Person must execute a joinder agreement, in form and substance satisfactory to the Company, evidencing such Person's agreement to become a party hereto and to be bound hereby as a Stockholder, and upon the Company's receipt of any such Person's executed joinder agreement, such Person shall be deemed to be a party hereto and bound hereby.

5.6  <u>Successors, Assigns and Transferees</u>.  The provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their Permitted Transferees and their respective successors, each of which Permitted Transferees and successors must execute a joinder agreement, in form and substance reasonably satisfactory to the Company, evidencing such Person's agreement to become a party hereto and be bound hereby as a Stockholder to the same extent as its Transferor or predecessor, <u>provided</u> that no Stockholder may assign to any Permitted Transferee any of its rights or obligations hereunder other than in connection with a Transfer to such Permitted Transferee of Equity Interests in accordance with the provisions of this Agreement.  The provisions of this Agreement shall also be binding upon and inure to the benefit of Transferees of Warrants, <u>provided</u> that the applicable Transfer shall be made in accordance with the Warrant Agreement, including the provision therein relating to such Transferee executing a joinder agreement, in form and substance reasonably satisfactory to the Company, evidencing such Transferee's agreement to become a party hereto and be bound hereby as a Warrantholder to the same extent as its Transferor or predecessor. Any purported assignment in violation of this provision shall be null and void *ab initio*.

5.7  <u>Notices</u>.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or two Business Days after being delivered to a recognized courier (whose stated terms of delivery are two Business Days or less to the destination of such notice), or five calendar days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as set forth on Schedule B hereto to the parties hereto, or to such other address as may be hereafter notified by the respective parties hereto; <u>provided</u>, that for purposes of delivering documents pursuant to Sections 3.1 and 3.2, the Company may post such documents on a secure website (which shall initially be Intralinks and thereafter may be a secure website maintained by a comparable provider) and make such documents available to the Stockholders entitled to receive such documents by providing such Stockholders with the information necessary to access such website (which information shall be provided by the Company each time documents are so delivered); <u>provided</u>, <u>further</u>, that delivery by posting documents on a secure website shall not apply to any Stockholder if such Stockholder has notified the Company that it elects not to receive information by such method.

5.8  <u>Integration</u>.  This Agreement, the Registration Rights Agreement and, in the case of a Management Stockholder or a Director Stockholder, all option, subscription, restricted stock, employment and other agreements entered into by such Management Stockholder or Director Stockholder and any of the Company and its Subsidiaries (the "<u>Other Agreements</u>"), and in the case of the Warrantholders, the Warrant Agreement, contain the entire understanding of the parties with respect to the subject matter hereof and thereof.  There are no agreements, representations, warranties, covenants or undertakings with respect to the subject matter hereof and thereof other than those expressly set forth herein and therein.  This Agreement and the Other Agreements supersede all prior agreements and understandings between the parties with respect to such subject matter hereof and thereof.

5.9  <u>Severability</u>.  If one or more of the provisions, paragraphs, words, clauses, phrases or sentences contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and

22

enforceability of any such provision, paragraph, word, clause, phrase or sentence in every other respect and of the remaining provisions, paragraphs, words, clauses, phrases or sentences hereof shall not be in any way impaired, it being intended that all rights, powers and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

5.10 <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, and by different parties on separate counterparts each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

5.11 <u>Governing Law, Etc.</u>  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed therein, except for matters directly within the purview of the General Corporation Law of the State of Delaware (the "<u>DGCL</u>"), which shall be governed by the DGCL.  The parties executing this Agreement hereby (i) agree to submit to the exclusive jurisdiction of the federal and state courts located in the Southern District of New York in any action or proceeding arising out of or relating to this Agreement, (ii) waive any objection to the laying of venue of any actions or proceedings brought in any such court and any claim that such actions or proceedings have been brought in an inconvenient forum, and (iii) agree that service of any process, summons, notice or document by U.S. registered mail to the address for such party specified in Section 5.7 shall be effective service of process for any action or proceeding in New York with respect to any matter specified above.

5.12 <u>Management Stockholders</u>.  Each Management Stockholder on the date hereof has executed this Agreement and is bound hereby.  After the date hereof, the Company shall not issue, and shall cause its Subsidiaries not to issue, any Equity Interests to an employee of the Company or any of its Subsidiaries, including any Affiliate of such employee, unless he or she first delivers to the Company a joinder agreement, in form and substance satisfactory to the Company, agreeing that he or she is bound by the terms hereof as a Management Stockholder.

5.13 <u>Director Stockholders</u>.  Each Director Stockholder on the date hereof has executed this Agreement and is bound hereby.  After the date hereof, the Company shall not issue, and shall cause its Subsidiaries not to issue, any Equity Interests to a Director until such Director first delivers to the Company a joinder agreement, in form and substance satisfactory to the Company, acknowledging that such Director is bound by the terms hereof as a Director Stockholder.

5.14  <u>Lender Relationship</u>.  Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of any lender or any of its Affiliates in their capacity as lenders to the Company or any of its Affiliates pursuant to any agreement under which the Company or such Affiliate has borrowed money. Without limiting the generality of the foregoing, no such Person, in exercising its rights as a lender, including making its decision on whether to foreclose on any collateral security, will have any duty to consider (a) its status as a direct or indirect stockholder of the Company and its Subsidiaries, (b) the interests of the Company or any of its Affiliates or (c) any duty it may have to any other direct or indirect stockholder of the Company and its Subsidiaries, except as may be required under the applicable loan documents.

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement or caused this Agreement to be executed on its behalf as of the date first written above.

RDA HOLDING CO.


By:_____
    Name:
    Title:

CREDITOR STOCKHOLDERS IDENTIFIED ON
<u>SCHEDULE A</u> AND WARRANTHOLDERS ARE
DEEMED TO BE PARTIES TO THIS
AGREEMENT PURSUANT TO THE PLAN

MANAGEMENT STOCKHOLDERS
(Each of the undersigned signing individually, and
not on behalf of any other Management
Stockholder)

By: _____
     Name:

DIRECTOR STOCKHOLDERS
(Each of the undersigned signing individually, and
not on behalf of any other Director Stockholder)


By: _____
    Name:

SCHEDULE A

| **Creditor Stockholders** |
|---|
| |
| |

SCHEDULE B

## NOTICES

If to the Company, to:

The Reader's Digest Association, Inc.
One Reader's Digest Road
Pleasantville, New York  10570
Attention: General Counsel
Tel: (914) 244-5262
Fax: (914) 244-5644

with a mandatory copy, which shall not constitute notice, to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Attention:  Joshua Korff and Michael Brosse
Tel:   (212) 446-4800
Fax:  (212) 446-6460

If to the Stockholders or Warrantholders, to:

Such Stockholder or Warrantholder (as the case may be), at such Stockholder's or
Warrantholder's address (as the case may be) or to such Stockholder's or Warrantholder's (as the
case may be) telecopy number reflected in the Company's books and records.

With respect to Prepetition Lenders and their Permitted Transferees,
with a mandatory copy, which shall not constitute notice, to:

Simpson Thacher & Bartlett LLP
Attention:  Brian M. Stadler
425 Lexington Avenue
New York, New York  10017
Fax:  (212) 455-2502

[This Page Intentionally Left Blank]

# EXHIBIT G

### Form of the Amended and Restated Certificate of Incorporation

Article IV.K of the Plan provides that, subject to Article IV.E of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.  Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Holdings shall be governed by the Amended and Restated Certificate of Incorporation, substantially in the form attached hereto, subject to Court approval and entry of the Confirmation Order.

[This Page Intentionally Left Blank]

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**OF**

**RDA HOLDING CO.**

RDA Holding Co., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

1.   That the name of the Corporation is RDA Holding Co.

2.   That the Corporation was originally incorporated under the name "Doctor Acquisition Holding Co." and the original Certificate of Incorporation of the Corporation was filed in the office of the Secretary of State of the State of Delaware on the 24th day of October, 2006.

3.   That this Amended and Restated Certificate of Incorporation amends and restates the Certificate of Incorporation of the Corporation.

4.   On August 24, 2009, The Reader's Digest Association, Inc. and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 09-23529 (RDD)).  This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware (the "DGCL"), pursuant to the authority granted to the Corporation under Section 303 of the DGCL to put into effect and carry out the Joint Plan of Reorganization pursuant to Chapter 11 of the United States Bankruptcy Code of The Reader's Digest Association, Inc., *et al.*, as confirmed on [_____], 20[  ] by order (the "Order") of the Bankruptcy Court (the "Plan").  Provision for the filing of this Amended and Restated Certificate of Incorporation is contained in the Plan as confirmed by the Order.

5.   This Amended and Restated Certificate of Incorporation has been duly executed and acknowledged by an officer of the Corporation designated by the Order in accordance with the provisions of Sections 242, 245 and 303 of the DGCL.

6.   That the text of the Certificate of Incorporation is hereby restated and amended in its entirety to read in full as follows:

<u>ARTICLE ONE</u>

The name of the corporation is RDA HOLDING CO. (hereinafter called the "Corporation").

ARTICLE TWO

The address of the Corporation's registered office in the state of Delaware is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in the City of Wilmington, County of New Castle.  The name of its registered agent at such address is Corporation Service Company.

ARTICLE THREE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

ARTICLE FOUR

A.    AUTHORIZED CAPITAL STOCK

The total number of shares of capital stock which the Corporation has authority to issue is [_____] shares, consisting of:

1.    [_____] shares of Class A Common Stock, $0.001 par value (the "Class A Common Stock"); and

2.    [_____] shares of Class B Common Stock, $0.001 par value (the "Class B Common Stock", together with the Class A Common Stock, the "Common Stock").

The number of authorized shares of Class A Common Stock and the number of authorized shares of Class B Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the Class A Common Stock and the Class B Common Stock, voting together as a single class, irrespective of the provisions of Section 242(b)(2) of the DGCL.

B.    COMMON STOCK

Except as otherwise provided in this Section B or as required by applicable law, all shares of Common Stock shall be identical in all respects and shall entitle the holders thereof to the same rights and privileges, subject to the same qualifications, limitations and restrictions.

1.    Voting Rights.

(a)    The holders of Common Stock shall be entitled to one vote per share and shall vote together as a single class, except that holders of Class B Common Stock shall have no right to vote any shares of Class B Common Stock with respect to any matter submitted to a vote of the holders of Common Stock other than as expressly provided in Section B.1(b) of this Article Four.  Notwithstanding the foregoing, holders of Class B Common Stock shall be entitled to a separate class vote on any amendment or modification of any specific rights or obligations of the holders of Class B Common Stock that does not similarly affect the rights or obligations of the holders of Class A Common Stock.

2

(b)    If and only if any of the following actions are submitted to a vote of the holders of Common Stock, each share of Class B Common Stock shall be entitled to vote with the Class A Common Stock, with each share of Common Stock having one vote and voting together as a single class:

1.    the retention or dismissal of outside auditors of the Corporation or any of its Subsidiaries;

2.    any distributions to holders of Common Stock in respect of their Common Stock or Common Stock Equivalents, or other distributions made in accordance with the terms of the Stockholders Agreement;

3.    any recapitalization, merger, business combination, consolidation, disposal of assets, exchange or other similar reorganization involving the Corporation or any of its Subsidiaries;

4.    any amendment to the certificate of incorporation or by-laws of the Company;

5.    other than in connection with the (x) issuance of shares of Common Stock upon the exercise of the Warrants or of options granted under a management equity plan or similar plan or (y) grant of options pursuant to and in accordance with such plans, any authorization or issuance of Equity Interests in the Corporation or any of its Subsidiaries;

6.    any redemption, purchase or other acquisition by the Corporation of any of its capital stock (except for purchases from employees upon termination of employment); and

7.    the commencement of any dissolution, liquidation or winding-up of the affairs of the Corporation or any of its Subsidiaries.

For the avoidance of doubt, shares of Class B Common Stock shall not be entitled to vote on any matter relating to the Board of Directors.

2.    <u>Conversion Rights</u>.

(a)    At any time and from time to time, any holder of Common Stock may convert all or any of its shares of Class B Common Stock into an identical number of shares of Class A Common Stock (and vice versa) by delivering to the Corporation (a) written notice of its desire for such conversion and (b) if certificated, the certificate or certificates representing the Class B Common Stock (or Class A Common Stock, as the case may be) to be converted (a "Conversion Request"). Except as otherwise provided herein, each conversion shall be deemed to have been effected as of the close of business on the date the Corporation receives a Conversion Request. If a conversion of Common Stock is to be made in connection with a Public Offering, a Change of Control (including a Drag-Along Transaction) or any other transaction affecting the Corporation, the conversion may, at the election of the holder thereof, be conditioned upon the consummation of such transaction, in which case such conversion shall not be deemed to be effective until such transaction has been consummated.

3

(b)    As soon as possible after a conversion has been effected (but in any event within five (5) Business Days after the Corporation receives a Conversion Request), and only if Common Stock is certificated, the Corporation shall deliver to the converting holder, at such holder's request:

1.    a certificate representing the number of shares of Class A Common Stock or Class B Common Stock, as the case may be, issuable by reason of such conversion; and

2.    a certificate representing the remaining number of shares of Class A Common Stock or Class B Common Stock, as the case may be, if the converting holder elected to convert less than all of such holder's Class A Common Stock or Class B Common Stock, as the case may be.

(c)    In connection with the issuance of any shares of Class A Common Stock upon conversion of Class B Common Stock (or Class B Common Stock upon conversion of Class A Common Stock), the Corporation shall take all such actions as are necessary in order to ensure that the Common Stock issuable upon such conversion shall be duly and validly issued, fully paid and nonassessable, free and clear of all taxes, liens, charges and encumbrances with respect to the issuance thereof other than restrictions of applicable securities laws or contained in the Stockholders Agreement or the Registration Rights Agreement.

(d)    For the purpose of enabling the Corporation to satisfy any obligation to issue Class A Common Stock upon the conversion of Class B Common Stock, the Corporation shall reserve and keep available at all times out of its aggregate authorized but unissued or treasury shares of Class A Common Stock the number of shares of Class A Common Stock issuable upon the conversion of all outstanding shares of Class B Common Stock.

3.    <u>Dividends</u>.  As and when dividends are declared or paid thereon, whether in cash, property or securities of the Corporation, the holders of Common Stock shall be entitled to participate in such dividends ratably on a per share basis; provided, that if dividends are declared which are payable in shares of Common Stock, dividends shall be declared which are payable at the same rate on all classes of Common Stock and dividends payable in shares of Class A Common Stock shall be payable to holders of Class A Common Stock and dividends payable in shares of Class B Common Stock shall be payable to holders of Class B Common Stock.

4.    <u>Liquidation</u>.  The holders of Common Stock shall be entitled to participate ratably on a per share basis in all distributions to the holders of Common Stock in any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, after payment or provision for payment of the Corporation's debts.  A merger or consolidation of the Corporation with any other corporation or other entity, or a sale or conveyance of all or any part of the assets of the Corporation (which shall not in fact result in the liquidation of the Corporation and the distribution of assets to its stockholders) shall not be deemed to be a voluntary or involuntary liquidation, dissolution or winding up of the Corporation within the meaning of this Section B.4 of this Article Four.

5.    <u>Notices</u>.  All notices referred to herein shall be in writing, and shall be deemed to have been duly given or made when delivered by hand, or two Business Days after being

4

delivered to a recognized courier (whose stated terms of delivery are two Business Days or less to the destination of such notice), or five calendar days after being deposited in the mail, postage prepaid, addressed (i) to the Corporation at its principal executive offices and (ii) to any stockholder at such holder's address as it appears in the stock records of the Corporation (unless otherwise specified in a written notice to the Corporation by such holder).

C.    NON-VOTING EQUITY SECURITIES

The Corporation shall not issue any class of non-voting equity securities unless and solely to the extent permitted by section 1123(a)(6) of the United States Bankruptcy Code (the "Bankruptcy Code") as in effect on the date of filing this Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware; provided, however, that this Section C of this Article Four (i) will have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code; (ii) will have such force and effect, if any, only for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation; and (iii) in all events may be amended or eliminated in accordance with applicable law from time to time in effect.

ARTICLE FIVE

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived any improper personal benefit.  If in the future the DGCL is amended or modified to authorize corporate action further eliminating or limiting the personal liability of directors, then the provisions of this Article Five shall be deemed to be automatically amended or modified to provide for the elimination or limitation of the personal liability of the directors of the Corporation to such greater extent.  Any repeal or modification of the foregoing paragraph by the stockholders of the Corporation or otherwise shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

ARTICLE SIX

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors of the Corporation (the "Board of Directors").  The Board of Directors may exercise all such authority and powers of the Corporation and do all such lawful acts and things as are not by statute or this Amended and Restated Certificate of Incorporation directed or required to be exercised or done by the stockholders.  Unless and except to the extent that the by-laws of the Corporation shall so require, the election of directors need not be by written ballot.

ARTICLE SEVEN

The Board of Directors shall have the power to adopt, amend, alter or repeal the by-laws of the Corporation, provided, that the by-laws may not be amended, altered or repealed

5

or new by-laws adopted to the extent inconsistent with the Stockholders Agreement. The fact that the power to adopt, amend, alter or repeal the by-laws has been conferred upon the Board of Directors shall not divest the stockholders of the powers to make new by-laws or amend, alter or repeal any by-laws adopted by them or otherwise, subject to the proviso in the preceding sentence.

ARTICLE EIGHT

The Corporation expressly elects not to be governed by Section 203 of the DGCL.

ARTICLE NINE

To the fullest extent permitted by the DGCL, the Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are presented to any of its stockholders or any of their respective Affiliates. Without limiting the generality of the foregoing, the Corporation specifically renounces any rights the Corporation might have in any business venture or business opportunity of any stockholder or any of their respective Affiliates, and no stockholder or any of their respective Affiliates shall have any obligation to offer any interest in any such business venture or business opportunity to the Corporation or otherwise account to the Corporation in respect of any such business ventures or opportunities. Furthermore, it shall not be deemed a breach of any fiduciary or other duties, if any, whether express or implied, for any stockholder to permit itself or one of its Affiliates to engage in a business opportunity in preference or to the exclusion of the Corporation.

ARTICLE TEN

Except as otherwise provided herein, the Corporation reserves the right to amend or repeal any provisions contained in this Amended and Restated Certificate of Incorporation from time to time and at any time in the manner now or hereafter prescribed by the laws of the State of Delaware, and all rights conferred upon stockholders and directors are granted subject to such reservation.

ARTICLE ELEVEN

Capitalized terms used herein but not otherwise defined herein shall have the following meanings:

"Affiliate" (a) shall mean, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with, such Person or any Immediate Family Member of such Person; and (b) shall also include, with respect to any Person who is an individual, a trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only such individual and/or such individual's Immediate Family Members. For purposes of this definition, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

6

"Business Day" shall mean a day other than a Saturday, Sunday, federal or New York State holiday or other day on which commercial banks in New York City are authorized or required by law to close.

"Change of Control" shall have the meaning set forth in the Stockholders Agreement.

"Common Stock Equivalents" shall mean any warrants, rights, options or other securities exchangeable or exercisable for, or convertible into, Common Stock, including the Warrants.

"Drag-Along Transaction" shall have the meaning set forth in the Stockholders Agreement.

"Equity Interests" shall mean Common Stock, Common Stock Equivalents or any other equity securities of the Corporation, or securities exchangeable or exercisable for, or convertible into, such other equity securities of the Corporation.

"Governmental Authority" shall mean any government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Immediate Family Member" shall mean, with respect to any Person, a spouse, parent, child, grandchild or sibling of such Person.

"Person" shall mean any individual, corporation, partnership, limited liability company, trust, joint stock company, business trust, unincorporated association, joint venture, Governmental Authority or other entity of any nature whatsoever.

"Public Offering" shall mean a public offering and sale of Class A Common Stock pursuant to an effective registration statement under the Securities Act of 1933, as amended.

"Registration Rights Agreement" shall mean that certain Registration Rights Agreement, dated as of [• ], among the Corporation and the holders named therein or bound thereby, as it may be amended from time to time.

"Stockholders Agreement" shall mean that certain Stockholders Agreement, dated as of [• ], among the Corporation and the holders named therein or bound thereby, as it may be amended from time to time.

"Subsidiaries" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which fifty percent (50%) or more of the total voting power of shares of capital stock entitled (without regard to the occurrence of any contingency) to vote generally in the election of directors, managers or trustees thereof, or fifty percent (50%) or more of the equity interest therein, is at the time owned or controlled, directly or indirectly, by any Person or one or more of the other Subsidiaries of such Person or a combination thereof.

"Warrant Agreement" shall mean that certain Warrant Agreement, dated as [• ], between the Corporation and [• ], as warrant agent.

7

"Warrants" shall mean the warrants, issued pursuant to the Plan and governed by the Warrant Agreement, that are exercisable for Class A Common Stock.

IN WITNESS WHEREOF, RDA Holding Co. has caused this certificate to be signed by [ ], President and attested by [  ] its Secretary this [  ] day of [_____], 20[__].

RDA HOLDING CO.

By_____
Name:
Title:  President

ATTESTED BY:

_____
Name:
Title:  Secretary

[This Page Intentionally Left Blank]

# EXHIBIT H

### Form of the Amended and Restated Bylaws

Article IV.K of the Plan provides that, subject to Article IV.E of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan. Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Holdings shall be governed by the Amended and Restated Bylaws, substantially in the form attached hereto, subject to Court approval and entry of the Confirmation Order.

[This Page Intentionally Left Blank]

BY-LAWS

OF

RDA HOLDING CO.

A Delaware corporation
*(Adopted as of _____ __, 20[__])*

## ARTICLE I
### OFFICES

Section 1    Registered Office.  The registered office of the corporation in the State of Delaware shall be located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, County of New Castle.  The name of the corporation's registered agent at such address shall be Corporation Service Company.  The registered office and/or registered agent of the corporation may be changed from time to time by action of the board of directors.

Section 2    Other Offices.  The corporation may also have offices at such other places, both within and without the State of Delaware, as the board of directors may from time to time determine or the business of the corporation may require.

## ARTICLE II
### MEETINGS OF STOCKHOLDERS

Section 1    Annual Meetings.  An annual meeting of the stockholders shall be held each year within one hundred fifty (150) days after the close of the immediately preceding fiscal year of the corporation for the purpose of electing directors and conducting such other proper business as may come before the meeting.  The date, time and place, if any, and/or the means of remote communication, of the annual meeting shall be determined by the board of directors of the corporation.

Section 2    Special Meetings.  Special meetings of stockholders may be called for any purpose (including, without limitation, the filling of board vacancies and newly created directorships) and may be held at such time and place, within or without the State of Delaware, and/or by means of remote communication, as shall be stated in a written notice of meeting or in a duly executed waiver of notice thereof.  Such meetings may be called at any time by the board of directors or the chief executive officer and shall be called by the chief executive officer upon the written request of holders of shares entitled to cast not less than a majority of the votes at the meeting, which written request shall state the purpose or purposes of the meeting and shall be delivered to the chief executive officer.  The date, time and place, if any, and/or remote communication, of any special meeting of stockholders called by the board of directors shall be determined by the board of directors.  On such written request, the chief executive officer shall fix a date and time for such meeting within 30 days after receipt of such written request.

Section 3    Place of Meetings.  The board of directors may designate any place, either within or without the State of Delaware, and/or by means of remote communication, as the place of meeting for any annual meeting or for any special meeting called by the board of directors.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the corporation.

Section 4    Notice.  Whenever stockholders are required or permitted to take any action at a meeting, written or printed notice stating the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each stockholder entitled to vote at such meeting not less than 10 nor more than 60 days before the date of the meeting.  All such notices shall be delivered, either personally, by mail, or by a form of electronic transmission consented to by the stockholder to whom the notice is given, by or at the direction of the board of directors, the president, the chief executive officer or the secretary, and if mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the corporation.  If given by electronic transmission, such notice shall be deemed to be delivered (a) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice; (b) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; or (c) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of such posting and the giving of such separate notice.  Any consent to receive notice by electronic transmission shall be revocable by the stockholder by written notice to the corporation.  Any such consent shall be deemed revoked if (1) the corporation is unable to deliver by electronic transmission two consecutive notices given by the corporation in accordance with such consent and (2) such inability becomes known to the secretary or an assistant secretary of the corporation or to the transfer agent.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

Section 5    Stockholders List.  The officer who has charge of the stock ledger of the corporation shall make, at least 10 days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at such meeting arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, and/or (ii) during ordinary business hours, at the principal place of business of the corporation.  In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible

2

electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Section 6    Quorum.  The holders of a majority of the votes represented by the issued and outstanding shares of capital stock, entitled to vote thereon, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders, except as otherwise provided by statute or by the Amended and Restated Certificate of Incorporation of the corporation (as it may be amended from time to time, the "Amended and Restated Certificate of Incorporation").  If a quorum is not present, the holders of a majority of the shares present in person or represented by proxy at the meeting, may adjourn the meeting to another time and/or place.  When a specified item of business requires a vote by a class or series (if the corporation shall then have outstanding shares of more than one class or series) voting as a class or series, the holders of a majority of the shares of such class or series shall constitute a quorum (as to such class or series) for the transaction of such item of business.  Once a quorum is established, it may not be broken by the subsequent withdrawal of any stockholders or their proxies.  Shares of its own stock belonging to the corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the corporation or any subsidiary of the corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

Section 7    Adjourned Meetings.  When a meeting is adjourned to another time and place, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 8    Vote Required.  When a quorum is present, the affirmative vote of the majority of votes represented by shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders, unless the question is one upon which by express provisions of an applicable law, the Amended and Restated Certificate of Incorporation or these by-laws a different vote is required, in which case such express provision shall govern and control the decision of such question.  Where a separate vote by class or series is required, the affirmative vote of the majority of shares of such class or series present in person or represented by proxy at the meeting shall be the act of such class.  Voting at meetings of stockholders need not be by written ballot.

Section 9    Voting Rights.  Except as otherwise provided by the General Corporation Law of the State of Delaware or the Amended and Restated Certificate of Incorporation, and subject to Section 3 of Article VI hereof, every stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of common stock held by such stockholder.

3

Section 10      Proxies.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally.  A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the corporation a revocation of the proxy or a new proxy bearing a later date.  At each meeting of the stockholders, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the secretary or a person designated by the secretary, and no shares may be represented or voted under a proxy that has been found to be invalid or irregular.

Section 11      Action by Written Consent.  Unless otherwise provided in the Amended and Restated Certificate of Incorporation, any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken and bearing the dates of signature of the stockholders who signed the consent or consents, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the corporation by delivery to its registered office in the state of Delaware, or the corporation's principal place of business, or an officer or agent of the corporation having custody of the book or books in which proceedings of meetings of the stockholders are recorded.  Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested or by reputable overnight courier service.  All consents properly delivered in accordance with this section shall be deemed to be recorded when so delivered.  No written consent shall be effective to take the corporate action referred to therein unless, within 60 days after the earliest dated consent delivered to the corporation as required by this section, written consents signed by the holders of a sufficient number of shares to take such corporate action are so recorded.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.  Any action taken pursuant to such written consent or consents of the stockholders shall have the same force and effect as if taken by the stockholders at a meeting thereof.

Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used; provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

Section 12      Action by Telegram, Cablegram or Other Electronic Transmission Consent.  A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the

4

purposes of this section; provided that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the corporation can determine (A) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (B) the date on which such stockholder or proxyholder or authorized person or persons transmitted such telegram, cablegram or electronic transmission.  The date on which such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed.  No consent given by telegram, cablegram or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the board of directors of the corporation.

Section 13     Conduct of Meetings.  The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting by the person presiding over the meeting.  The board of directors may adopt by resolution such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate.  Except to the extent inconsistent with such rules and regulations as adopted by the board of directors, the person presiding over any meeting of stockholders shall have the right and authority to convene and to adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such presiding person, are appropriate for the proper conduct of the meeting.  Such rules, regulations or procedures, whether adopted by the board of directors or prescribed by the presiding person of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to stockholders of record of the corporation, their duly authorized and constituted proxies or such other persons as the presiding person of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants.  The presiding person at any meeting of stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall, if the facts warrant, determine and declare to the meeting that a matter or business was not properly brought before the meeting and if such presiding person should so determine, such presiding person shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered.  Unless and to the extent determined by the board of directors or the person presiding over the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

ARTICLE III
DIRECTORS

Section 1     General Powers.  The business and affairs of the corporation shall be managed by or under the direction of the board of directors.

5

Section 2        Number, Election and Term of Office.  The number of directors which shall constitute the first board shall be [eleven].  Thereafter, the number of directors shall be established from time to time by resolution of the board of directors, subject to compliance with the provisions of the Stockholders Agreement, dated as of [•] (as it may be amended from time to time, the "Stockholders Agreement"), by and among the corporation and the other parties named therein or bound thereby, or, after termination of the Stockholders Agreement, by resolution of the board of directors.  The directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote in the election of directors in compliance with the provisions of the Stockholders Agreement (for the avoidance of doubt, shares of  Class B Common Stock of the corporation shall not have any voting rights with respect to the election of directors).  The directors shall be elected in this manner at the annual meeting of the stockholders, except as provided in Section 4 of this Article III.  Each director elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3        Removal and Resignation.  Any director or the entire board of directors may be removed at any time, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.  Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation.

Section 4        Vacancies.  Board vacancies and newly created directorships resulting from any increase in the authorized number of directors shall be filled as provided in the Stockholders Agreement; provided, that at any time the Stockholders Agreement is no longer in effect, such vacancies and newly created directorships may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director.  Each director so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

Notwithstanding the foregoing, any such vacancy shall automatically reduce the authorized number of directors *pro tanto*, until such time as the holders of outstanding shares of capital stock who are entitled to elect the director whose office is vacant shall have exercised their right to elect a director to fill such vacancy, whereupon the authorized number of directors shall be automatically increased *pro tanto*.

Section 5        Annual Meetings.  The annual meeting of each newly elected board of directors shall be held without notice (other than notice under these by-laws) immediately after, and at the same place, if any, as the annual meeting of stockholders.

Section 6        Other Meetings and Notice.  Regular meetings, other than the annual meeting, of the board of directors may be held without notice at such time and at such place, if any, as shall from time to time be determined by resolution of the board of directors and promptly communicated to all directors then in office.  Special meetings of the board of directors may be called by or at the request of the chief executive officer on at least 24 hours notice to each director, either personally, by telephone, by mail, telegraph, and/or by electronic transmission.  In like manner and on like notice, the chief executive officer must call a special meeting on the written request of at least two of the directors promptly after receipt of such request.

6

Section 7        Quorum, Required Vote and Adjournment.  A majority of the total number of directors then in office shall constitute a quorum for the transaction of business.  The vote of a majority of directors present at a meeting at which a quorum is present shall be the act of the board of directors.  If a quorum shall not be present at any meeting of the board of directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Each director shall be entitled to one vote.

Section 8        Committees.  The board of directors may, by resolution passed by a majority of the whole board of directors, designate one or more committees, each committee to consist of one or more of the directors of the corporation, which to the extent provided in such resolution or these by-laws shall have and may exercise the powers of the board of directors in the management and affairs of the corporation, except as otherwise limited by law.  The board of directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors.  Each committee shall keep regular minutes of its meetings and report the same to the board of directors when required.

Section 9        Committee Rules.  Each committee of the board of directors may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the board of directors designating such committee.  Unless otherwise provided in such a resolution, the presence of a majority of the members of the committee then in office shall be necessary to constitute a quorum.  In the event that a member and that member's alternate, if alternates are designated by the board of directors as provided in Section 8 of this Article III, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in place of any such absent or disqualified member.

Section 10        Communications Equipment.  Members of the board of directors or any committee thereof may participate in and act at any meeting of the board of directors or committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in the meeting pursuant to this section shall constitute presence in person at the meeting.

Section 11        Waiver of Notice and Presumption of Assent.  Any member of the board of directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting, except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Such member shall be conclusively presumed to have assented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the secretary of the corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to any member who voted in favor of such action.

7

Section 12      Action by Written Consent.  Unless otherwise restricted by the Amended and Restated Certificate of Incorporation, any action required or permitted to be taken at any meeting of the board of directors, or of any committee thereof, may be taken without a meeting if all members of the board of directors or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the board of directors or committee, as the case may be.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 13      Compensation.  The board of directors shall have the authority to fix the compensation of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the board of directors and may be paid a fixed sum for attendance at each meeting of the board of directors or a stated salary as director.  Members of special or standing committees may be allowed like compensation for attending committee meetings.

ARTICLE IV
OFFICERS; CHAIRMAN OF THE BOARD

Section 1      Number.  The officers of the corporation shall be elected by the board of directors and shall consist of a chief executive officer, a president, one or more vice-presidents, a chief financial officer, a secretary, a treasurer, and such other officers and assistant officers as may be deemed necessary or desirable by the board of directors.  Any number of offices may be held by the same person.  In its discretion, the board of directors may choose not to fill any office for any period as it may deem advisable.

Section 2      Election and Term of Office.  The officers of the corporation shall be elected annually by the board of directors at its first meeting held after each annual meeting of stockholders or as soon thereafter as conveniently may be.  Vacancies may be filled or new offices created and filled at any meeting of the board of directors.  Each officer shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3      Removal and Resignation.  Any officer or agent elected by the board of directors may be removed by the board of directors whenever in its judgment the best interests of the corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Any officer may resign at any time by giving written notice (including by electronic transmission) to the corporation. Any such resignation shall take effect upon receipt of such notice or at any later time specified therein; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 4      Vacancies.  Any vacancy occurring in any office because of death, resignation, removal, disqualification or otherwise, may be filled for the unexpired portion of the term by the board of directors.

Section 5    Compensation.  Compensation of all officers shall be fixed by the board of directors, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the corporation.

Section 6    Chairman of the Board.  The chairman of the board shall be selected in accordance with the Stockholders Agreement and shall have the powers and perform the duties incident to that position.  The chairman of the board shall preside at all meetings of the board of directors and at all meetings of the stockholders and shall have such other powers and perform such other duties as may be prescribed by the board of directors or provided in these by-laws.

Section 7    Chief Executive Officer.  The chief executive officer shall be the chief executive officer of the corporation; in the absence of the chairman of the board, shall preside at all meetings of the stockholders and board of directors at which he or she is present; subject to the powers of the board of directors, shall have general charge of the business, affairs and property of the corporation, and control over its officers, agents and employees; and shall see that all orders and resolutions of the board of directors are carried into effect.  The chief executive officer shall have such other powers and perform such other duties as may be prescribed by the board of directors or as may be provided in these by-laws.

Section 8    The President.  The president shall, in the absence of a chief executive officer, be the chief executive officer of the corporation; in the absence of the chairman of the board and the chief executive officer, shall preside at all meetings of the stockholders and board of directors at which he or she is present; subject to the powers of the board of directors and the chief executive officer, shall have general charge of the business, affairs and property of the corporation, and control over its officers, agents and employees; and shall see that all orders and resolutions of the board of directors are carried into effect.  The president shall have such other powers and perform such other duties as may be prescribed by the board of directors or the chief executive officer or as may be provided in these by-laws.

Section 9    Chief Financial Officer.  The chief financial officer of the corporation shall, under the direction of the president or the chief executive officer, be responsible for all financial and accounting matters and for the direction of the offices of treasurer and controller. The chief financial officer shall have such other powers and perform such other duties as may be prescribed by the president, the chief executive officer or the board of directors or as may be provided in these by-laws.

Section 10    Vice-presidents.  The vice-president, or if there shall be more than one, the vice-presidents in the order determined by the board of directors or by the chief executive officer, shall, in the absence or disability of the president, act with all of the powers and be subject to all the restrictions of the president.  The vice-presidents shall also perform such other duties and have such other powers as the board of directors, the president, the chief executive officer or these by-laws may, from time to time, prescribe.

Section 11    Secretary and Assistant Secretaries.  The secretary shall attend all meetings of the board of directors, all meetings of the committees thereof and all meetings of the stockholders and record all the proceedings of the meetings in a book or books to be kept for that purpose.  Under the president's or the chief executive officer's supervision, the secretary shall

give, or cause to be given, all notices required to be given by these by-laws or by law, shall have such powers and perform such duties as the board of directors, the president, the chief executive officer or these by-laws may, from time to time, prescribe, and shall have custody of the corporate seal of the corporation. The secretary, or an assistant secretary, shall have authority to affix the corporate seal to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such assistant secretary. The board of directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his or her signature. The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the board of directors, shall, in the absence or disability of the secretary, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the board of directors, the president, the chief executive officer, or secretary may, from time to time, prescribe.

Section 12    Treasurer and Assistant Treasurer. The treasurer shall have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation; shall deposit all monies and other valuable effects in the name and to the credit of the corporation as may be ordered by the board of directors; shall cause the funds of the corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; and shall render to the president, the chief executive officer and the board of directors, at its regular meeting or when the board of directors or any duly authorized committee thereof so requires, an account of the corporation; shall have such powers and perform such duties as the board of directors, the president, the chief executive officer or these by-laws may, from time to time, prescribe. If required by the board of directors, the treasurer shall give the corporation a bond (which shall be rendered every six years) in such sums and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of the office of treasurer and for the restoration to the corporation, in case of death, resignation, retirement, or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in the possession or under the control of the treasurer belonging to the corporation. The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the board of directors, shall in the absence or disability of the treasurer, perform the duties and exercise the powers of the treasurer. The assistant treasurers shall perform such other duties and have such other powers as the board of directors, the president, the chief executive officer or treasurer may, from time to time, prescribe.

Section 13    Other Officers, Assistant Officers and Agents. Officers, assistant officers and agents, if any, other than those whose duties are provided for in these by-laws, shall have such authority and perform such duties as may from time to time be prescribed by the president or the chief executive officer or by resolution of the board of directors.

Section 14    Absence or Disability of Officers. In the case of the absence or disability of any officer of the corporation and of any person hereby authorized to act in such officer's place during such officer's absence or disability, the board of directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

10

## ARTICLE V
## INDEMNIFICATION OF OFFICERS, DIRECTORS AND OTHERS

Section 1    Nature of Indemnity.  Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether brought by or in the right of the corporation or any of its subsidiaries and whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), or any appeal of such proceeding, by reason of or arising out of the fact that such person, or any other person for whom such person is the legal representative, is or was a director or officer of the corporation or is or was serving at the request of the corporation as a director, officer, manager, general partner, employee, fiduciary, or agent of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise, shall be indemnified and held harmless by the corporation unless prohibited from doing so by the General Corporation Law of the State of Delaware, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the corporation to provide broader indemnification rights than said law permitted the corporation to provide prior to such amendment) against all expense, liability and loss (including attorneys' fees actually and reasonably incurred by such person in connection with such proceeding), and such indemnification shall inure to the benefit of his or her heirs, executors and administrators; provided, that, except as provided in Section 2 of this Article V, the corporation shall indemnify any such person seeking indemnification in connection with a proceeding initiated by or on behalf of such person only if such proceeding was authorized by the board of directors of the corporation.  The right to indemnification conferred in this Article V shall be a contract right and, subject to Sections 2 and 5 hereof, shall include the right to be paid by the corporation the expenses incurred in defending any such proceeding in advance of its final disposition.  The corporation may, by action of its board of directors, provide indemnification to employees and agents of the corporation with the same scope and effect as the foregoing indemnification of directors and officers.

Section 2    Procedure for Indemnification of Directors and Officers.    Any indemnification of a director or officer of the corporation provided for under Section 1 of this Article V or advance of expenses provided for under Section 5 of this Article V shall be made promptly, and in any event within 30 days, upon the written request of the director or officer.  If a determination by the corporation that the director or officer is entitled to indemnification pursuant to this Article V is required, and the corporation fails to respond within 30 days to a written request for indemnity, the corporation shall be deemed to have approved the request.  If the corporation wrongfully denies a written request for indemnification or advancing of expenses, in whole or in part, or if payment in full pursuant to such request is not made within 30 days, the right to indemnification or advances as granted by this Article V shall be enforceable by the director or officer in any court of competent jurisdiction.  Such person's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be indemnified by the corporation.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the corporation) that the claimant has not met the standards of conduct which make it permissible under the General Corporation Law of the State of Delaware for the corporation to indemnify the claimant for the amount claimed, but the burden of such defense shall be on the corporation.  Neither the failure of the corporation

11

(including its board of directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the General Corporation Law of the State of Delaware, nor an actual determination by the corporation (including its board of directors, independent legal counsel, or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

Section 3    Article Not Exclusive.  The rights to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article V shall not be exclusive of any other right which any person may have or hereafter acquire under any law, provision of the Amended and Restated Certificate of Incorporation, by-law, agreement, vote of stockholders or disinterested directors or otherwise.

Section 4    Insurance.  The corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee, fiduciary, or agent of the corporation or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, whether or not the corporation would have the power to indemnify such person against such liability under this Article V.

Section 5    Expenses.  Expenses incurred by any person described in Section 1 of this Article V in defending a proceeding shall be paid by the corporation in advance of such proceeding's final disposition unless otherwise determined by the board of directors in the specific case upon receipt of an undertaking by or on behalf of the director or officer or other person to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation.  Such expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the board of directors deems appropriate.

Section 6    Employees and Agents.  Persons who are not covered by the foregoing provisions of this Article V and who are or were employees or agents of the corporation, or who are or were serving at the request of the corporation as employees or agents of another corporation, partnership, joint venture, trust or other enterprise, may be indemnified, and may be advanced expenses, to the extent authorized at any time or from time to time by the board of directors.

Section 7    Contract Rights.  The provisions of this Article V shall be deemed to be a vested contract right between the corporation and each director and officer who serves in any such capacity at any time while this Article V and the relevant provisions of the General Corporation Law of the State of Delaware or other applicable law are in effect.  Such contract right shall vest for each director and officer at the time such person is elected or appointed to such position, and no repeal or modification of this Article V or any such law shall affect any such vested rights or obligations of any current or former director or officer with respect to any state of facts or proceeding regardless of when occurring.

12

Section 8        Merger or Consolidation.  For purposes of this Article V, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article V with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

Section 9        Other Sources.  The corporation's obligation, if any, to indemnify or to advance expenses to any director, officer, employee or agent who was or is serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or nonprofit entity shall be reduced by any amount such director, officer, employee or agent actually collects as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or non-profit entity.

ARTICLE VI

STOCK; RECORD DATES

Section 1        Form.  Except as otherwise provided in a resolution by the board of directors, all shares of capital stock of the corporation shall be uncertificated.  In the event the board of directors elects to provide in a resolution that certificates shall be issued to represent any shares of capital stock of the corporation, such certificates shall signed by, or in the name of the corporation by, the chairman of the board, the president, the chief executive officer or a vice president and the secretary or an assistant secretary of the corporation, certifying the number of shares of a specific class or series owned by such holder in the corporation.  If such a certificate is countersigned (1) by a transfer agent or an assistant transfer agent other than the corporation or its employee or (2) by a registrar, other than the corporation or its employee, the signature of any such chairman of the board, president, chief executive officer, vice-president, secretary, or assistant secretary may be facsimiles.  In case any officer or officers who have signed, or whose facsimile signature or signatures have been used on, any such certificate or certificates shall cease to be such officer or officers of the corporation whether because of death, resignation or otherwise before such certificate or certificates have been delivered by the corporation, such certificate or certificates may nevertheless be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures have been used thereon had not ceased to be such officer or officers of the corporation.  If the shares are certificated, all certificates shall be consecutively numbered or otherwise identified.  The name of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the books of the corporation.  Any shares of certificated stock of the corporation shall only be transferred on the books of the corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the corporation of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization, and other matters as the corporation may reasonably require, and

13

accompanied by all necessary stock transfer stamps.  In that event, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate or certificates, and record the transaction on its books.  Uncertificated shares of stock of the corporation may be transferred on the books of the corporation upon receipt of proper transfer instructions from the registered owner of the uncertificated shares, an instruction from an approved source duly authorized by such owner or from an attorney lawfully constituted.  The board of directors may appoint a bank or trust company organized under the laws of the United States or any state thereof to act as its transfer agent or registrar, or both in connection with the transfer of any class or series of securities of the corporation.

Section 2    Replacement Certificates.    Upon receipt of evidence reasonably satisfactory to the corporation (it being understood that an affidavit of the registered holder shall be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing shares of its capital stock, and in the case of any such loss, theft or destruction, upon receipt of indemnity reasonably satisfactory to the corporation (provided that if the holder is a financial institution or other institutional investor its own agreement shall be satisfactory), or, in the case of any such mutilation upon surrender of such certificate, the corporation shall (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the number of shares of such class represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.  Upon the issuance of a new certificate(s) to replace a lost, stolen, destroyed or mutilated certificate, the rights of the holder of the new certificate(s) with respect to the shares of capital stock represented thereby shall not be impacted by the act that a new certificate(s) has been issued.

Section 3    Fixing a Record Date for Stockholder Meetings.    In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which record date shall not be more than sixty nor less than ten days before the date of such meeting.  If no record date is fixed by the board of directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be the close of business on the next day preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided that the board of directors may fix a new record date for the adjourned meeting.

Section 4    Fixing a Record Date for Action by Written Consent.    In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the board of directors.  If no record date has been fixed by the board of directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the board of directors is required by statute, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered

14

office in the State of Delaware, its principal place of business, or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the board of directors and prior action by the board of directors is required by statute, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the board of directors adopts the resolution taking such prior action.

Section 5    Fixing a Record Date for Other Purposes. In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purposes of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

Section 6    Registered Stockholders. Prior to the surrender to the corporation of proper transfer documentation as provided in these by-laws, the corporation may treat the registered owner as the person entitled to receive dividends, to vote, to receive notifications, and otherwise to exercise all the rights and powers of an owner. The corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof.

ARTICLE VII
GENERAL PROVISIONS

Section 1    Dividends. Dividends upon the capital stock of the corporation, subject to the provisions of the Amended and Restated Certificate of Incorporation, may be declared by the board of directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Amended and Restated Certificate of Incorporation. Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the board of directors from time to time, in its absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or any other purpose and the board of directors may modify or abolish any such reserve in the manner in which it was created.

Section 2    Checks, Drafts or Orders. All checks, drafts, or other orders for the payment of money by or to the corporation and all notes and other evidences of indebtedness issued in the name of the corporation shall be signed by such officer or officers, agent or agents of the corporation, and in such manner, as shall be determined by resolution of the board of directors or a duly authorized committee thereof.

Section 3        Contracts.  The board of directors may authorize any officer or officers, or any agent or agents, of the corporation to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances.

Section 4        Loans.  The corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiary, including any officer or employee who is a director of the corporation or its subsidiary, whenever, in the judgment of the board of directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation.  The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured in such manner as the board of directors shall approve, including, without limitation, a pledge of shares of stock of the corporation.  Nothing in this section shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

Section 5        Fiscal Year.  The fiscal year of the corporation shall be fixed by resolution of the board of directors.

Section 6        Corporate Seal.  The board of directors shall provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the corporation and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

Section 7        Voting Securities Owned By Corporation.  Voting securities in any other corporation held by the corporation shall be voted by the chief executive officer, unless the board of directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer.  Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

Section 8        Inspection of Books and Records.  Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders, and its other books and records, and to make copies or extracts therefrom.  A proper purpose shall mean any purpose reasonably related to such person's interest as a stockholder.  In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the stockholder.  The demand under oath shall be directed to the corporation at its registered office in the State of Delaware or at its principal place of business.

Section 9        Section Headings.  Section headings in these by-laws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

Section 10        Inconsistent Provisions.  In the event that any provision of these by-laws is or becomes inconsistent with any provision of the Amended and Restated Certificate of

16

Incorporation, the Stockholders Agreement, the General Corporation Law of the State of Delaware or any other applicable law, the provision of these by-laws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

ARTICLE VIII
AMENDMENTS

These by-laws may be amended, altered, or repealed and new by-laws adopted at any meeting of the board of directors by a majority vote; provided, that these by-laws may not be amended, altered or repealed or new by-laws adopted to the extent inconsistent with the Stockholders Agreement.  The fact that the power to adopt, amend, alter, or repeal the by-laws has been conferred upon the board of directors shall not divest the stockholders of the powers to make new by-laws or amend, alter or repeal any by-laws adopted by them or otherwise, subject to the proviso in the preceding sentence.

17

[This Page Intentionally Left Blank]

# EXHIBIT I

## Form of the Enterprise Value Maximization Plan

Article V.B of the Plan provides that, subject only to the occurrence of the Effective Date, the Enterprise Value Maximization Plan, substantially in the form attached hereto, shall become effective without any further action by the Reorganized Debtors.

[This Page Intentionally Left Blank]

The form of the Enterprise Value Maximization Plan will be filed shortly with the Court.

[This Page Intentionally Left Blank]

# EXHIBIT J

### Form of the Variable Compensation Plan

Article V.B of the Plan provides that, subject only to the occurrence of the Effective Date, the Variable Compensation Plan, substantially in the form attached hereto, shall become effective without any further action by the Reorganized Debtors.

[This Page Intentionally Left Blank]

The form of the Variable Compensation Plan will be filed shortly with the Court.