Christopher R. Belmonte, Esq.
Abigail Snow, Esq.
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, Suite 1130
New York, New York 10169
(212) 818-9200

*Counsel for RD Retiree Group, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE READER'S DIGEST ASSOCIATION, INC., *et al.*, | Case No. 09-23529 (RDD) |
| Debtors, | Jointly Administered |

**OBJECTION OF READER'S DIGEST RETIREE GROUP, LLC
TO CONFIRMATION OF THE PROPOSED JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF THE READER'S
DIGEST ASSOCIATION, INC. AND ITS DEBTOR AFFILIATES**

RD Retiree Group, LLC ("RDRG"), through its attorneys Satterlee Stephens Burke & Burke LLP, hereby files its objection (the "RDRG Objection") to the "Third Amended Proposed Joint Chapter 11 Plan of Reorganization of the Reader's Digest Association, Inc. and its Debtor Affiliates," dated November 30, 2009 [Docket No. 317] (the "Plan"), and in support thereof respectfully submits:

**PRELIMINARY STATEMENT**

The Plan, as proposed by the Debtors, discriminates unfairly among general unsecured creditors by impermissibly affording grossly disparate treatment to the classes of unsecured creditors in a manifestly unfair fashion. While the holders of allowed Unsecured Ongoing Operations Claims (Class 4) are to receive a 100% distribution, the Other General Unsecured Creditors (Class 5), which primarily includes participants in certain non-qualified

790158_3

retirement plans of RDA (the "Non-Qualified Plans") are to share a pro rata distribution of $4-million, which represents only a 3.3% to 3.6% recovery. The RDRG was formed by certain former employees of the Reader's Digest Association, Inc. ("RDA") to protect their interests as participants in the Non-Qualified Plans.[1] The participants in the Non-Qualified Plans number approximately 300-350 people, and although including certain former executives, officers and directors and some current employees of the Debtors, is comprised predominantly of long-serving former employees such as writers, editors, salesmen and middle managers, some of whom are quite elderly. The claims arising from benefits under the Non-Qualified Plans are classified as "Other General Unsecured Claims" (Class 5) by the Debtors, and have been variously estimated at between $75 million and $90 million.

Under the Plan, the Debtor's Prepetition Lenders (as defined therein), are to receive 100% of the reorganized Debtors' New Common Stock (subject to dilution by shares issued pursuant to exercise of the New Warrants and the Management Equity Plan) and will issue new secured loans consisting of the reinstated Euro Term Loan of approximately $105 million, and the New Second Priority Term Loan of approximately $300 million. Administrative claimants and priority claimants will be paid in full in cash, the Debtors' will assume their qualified pension plans for the benefit of their employees, and trade creditors in Class 4 will receive payment in full. Additionally, the Debtors' current management are entitled to bonuses, which potentially exceed $12 million, for meeting or exceeding financial projections and for early exit from bankruptcy. <u>See</u>, Enterprise Value Maximization Plan, Sch. A Value Creation Bonus, Sch. B Time to Exit Bonus, filed Dec. 30, 2009 [Docket No. 423]. The only unsubordinated creditors that will receive minimal recovery are those in Class 5, which includes the participants in the Non-Qualified Plans, unsecured trade creditors with whom the Debtors do

---

[1] Four members of RDRG also serve as members of the Committee, Thomas M. Kenney, Michael John Bohane, Peter Davenport and Ross Jones.

not intend to continue doing business, and holders of rejection damage claims.[2] In short, the Plan targets a small group of creditors, the large bulk of which are made up of RDA retirees who are participants in the Non-Qualified Plans, for unfair treatment while providing substantial recoveries to the Debtors' other remaining creditors, including similarly situated traded creditors. A Plan which provides such grossly disparate treatment for a discrete group of creditors cannot satisfy the requirement of section 1129(b) that a plan not discriminate unfairly, and accordingly the Debtors' Plan should not be confirmed.

## BACKGROUND

1. On August 24, 2009 (the "Petition Date"), each of the Debtors filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code. Pursuant to an order of this Court, the cases are being jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to section 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

2. On November 17, 2009, the RDRG filed the "Objection of Reader's Digest Retiree Group to Disclosure Statement for the Proposed Joint Chapter 11 Plan of Reorganization of the Reader's Digest Association, Inc. and Its Debtor Affiliates" [Docket No. 271], objecting to the approval of the Disclosure Statement in the grounds that the Plan was unconfirmable due to the massive unfair discrimination, in contravention of Bankruptcy Code section 1129(b)(1).

3. On November 19, 2009, the Debtors filed the "Debtors' Omnibus Reply to Objections to the Debtors' Disclosure Statement and Solicitation Procedures Motions Related Thereto" [Docket No. 290] (the "Debtors' Response").

---

[2] Under the Plan Class 5 Claims, estimated by the Debtors to be between $110 and $120 million (with retirees' Non-Qualified Plan claims comprising nearly $83 million of that class), are to share in a $4 million distribution, for a percentage payment on claims which the Debtors estimate at between 3.3 and 3.6%.

-3-

790158_3

4. On November 24, 2009, the Debtors filed the "Third Amended Proposed Joint Chapter 11 Plan of Reorganization of the Reader's Digest Association, Inc. and its Debtor Affiliates," dated November 30, 2009 [Docket No. 310], and the "Disclosure Statement for the Third Amended Proposed Joint Chapter 11 Plan of Reorganization of the Reader's Digest Association, Inc. and its Debtor Affiliates" [Docket No. 309].

5. On November 24, 2009, the hearing on approval of the Debtor's Disclosure Statement and Solicitation Procedures was held before this Court.

6. On November 30, 2009, the "Order (i) Approving the Adequacy of the Debtors' Disclosure Statement, (ii) Fixing Dates and Deadlines Related to Confirmation of the Plan, (iii) Approving Certain Procedures for Soliciting and Tabulating the Votes on, and for Objecting to, the Plan, (iv) Authorizing the Retention of Financial Balloting Group LLC as Securities Solicitation Agent, and (v) Approving the Manner and Form of the Notices and Other Documents Related Thereto" [Docket No. 318] (the "Disclosure Order") was entered.

7. Also on November 30, 2009, the Debtors filed their third amended Plan and the "Disclosure Statement for the Third Amended Proposed Joint Chapter 11 Plan of Reorganization of the Reader's Digest Association, Inc. and its Debtor Affiliates," dated November 30, 2009 [Docket No. 316] (the "Disclosure Statement").

8. Pursuant to the Disclosure Order, objections to confirmation of the Plan are due on or before January 5, 2010, the Voting Deadline is January 8, 2010, and the Confirmation Hearing is scheduled to occur on January 15, 2010.

### THE DEBTORS' PLAN UNFAIRLY DISCRIMINATES AGAINST SIMILARLY SITUATED CREDITORS

9. Equality of distribution among creditors constitutes a vital and essential policy of the Bankruptcy Code. See, In re Combustion Eng'g, Inc., 391 F.3d 190, 239 (3d Cir.

-4-

790158_3

2004). The Bankruptcy Code advances the policy of equality of distribution among creditors by mandating that all plans of reorganization provide similar treatment for similarly situated claims. Id. As stated by the Supreme Court, courts must be "mindful that the Bankruptcy Code aims, in the main, to secure equal distribution among creditors." Howard Delivery Serv. v. Zurich American Ins. Co., 547 U.S. 561, 655 (2006)(citing Kothe v. R.C. Taylor Trust, 280 U.S. 224, 227 (1930); Kuehner v. Irving Trust Co., 299 U.S. 445, 451 (1937)).

10. The Class 5 Other General Unsecured Claims and the Class 4 Unsecured Ongoing Operations Claims are general unsecured claims that are *pari passu* in priority and otherwise have the same legal rights. Yet the Plan improperly provides widely disproportionate treatment to each of these classes, violating the Bankruptcy Code's premise of equality of treatment of similar claims. In re Sentry Operating Co. of Texas, Inc., 264 B.R. 850, 863 (Bankr. S.D. Tex. 2001)("In general, the Bankruptcy Code is premised on the rule of equality of treatment. Creditors with claims of equal rank are entitled to equal distribution.").

11. Based on communications from its members and former employees of RDA, the RDRG believes that participants in the Non-Qualified Plans, among others in Class 5, will overwhelmingly vote to reject the Plan.³ The Debtors will then be required to seek confirmation by "cram-down" pursuant to section 1129(b) of the Bankruptcy Code⁴ which states:

> Notwithstanding section 510 (a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate

---

3   The January 5, 2010 deadline to file objections to confirmation of the Plan occurs before the January 8, 2010 Voting Deadline, and accordingly, RDRG can only predict the outcome of the vote.

4   Confirmation pursuant to "cram-down" will be required in any event because Classes 7 and 8 are deemed to reject the Plan.

-5-

790158_3

>    unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

12.  The "fair and equitable" requirement, as described in section 1129(b)(2), analyzes the treatment of classes of differing priorities against each other. "Unfair discrimination," while not defined in the Bankruptcy Code, requires an examination of the treatment of separate classes which are otherwise similarly situated, as in the case of separate classes of unsecured creditors. In re Simmons, 288 B.R. 737, 747 (Bankr. N.D. Tex. 2003) ("just as the term 'fair and equitable' establishes in chapter 11 a test of vertical fairness, so 'unfair discrimination' provides a horizontal requirement of fairness."); In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd* 78 B.R. 407 (S.D.N.Y. 1987) (no unfair discrimination where dissenting class receives 'relative value equal to the value given to all other similarly situated classes').

13.  This Court, along with others, utilizes a four-part test in determining whether unfair discrimination exists, pursuant to which the plan proponent must demonstrate that: (i) there is a reasonable basis for the discrimination, (ii) the plan cannot be consummated without the discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale. In re Buttonwood Partners, Ltd., 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990). The Debtors' proposed payment of 100% to Class 4 and 3.3 to 3.6% to Class 5 fails each element of this four-part test.

14.  A more recent test, known as the "Markell Test," is set forth in In re Quay Corporation, Inc., 372 B.R. 378, 385-386 (Bankr. N.D. Ill. 2007), In re Armstrong World Industries, Inc., 348 B.R. 111 (D. Del. 2006), and In re Dow Corning Corp., 244 B.R. 696, 701 (Bankr. E.D. Mich. 1999). Under the Markell test, a rebuttable presumption of unfair

discrimination arises when there is: "(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." In re Dow Corning, 244 B.R. at 710; see Markell, *A New Perspective on Unfair Discrimination in Chapter 11,* 72 Am. Bankr.L.J. 227, 228 (1998). The treatment of Class 5 under the Debtors' Plan also fails the Markell test.

A.   **Reasonable Basis for Discrimination**

15.   The issue of discrimination between two classes which hold otherwise identical legal rights typically arises in two ways: (i) whether discriminatory classification for voting purposes is permissible pursuant to section 1122(a); or (ii) whether discriminatory treatment of classes for purposes of distribution is unfair pursuant to section 1129(b). Courts have found that while separate classification for voting purposes is acceptable, discriminatory treatment is not. In re 222 Liberty Assoc., 108 B.R. 971 (Bankr. E.D. Pa. 1990) (confirmation denied where separate classification of deficiency claim was reasonable but treatment was unfairly discriminatory); Johns Manville, 68 B.R. at 636 ("plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes.").

16.   RDRG does not object to the separate classification of Classes 4, 5 and 6 for voting purposes, but it does object to the discriminatory treatment being given to Classes 4 and 5. RDA alleges that its "separate classification and treatment of Class 4 Claims under the Plan is *fair* and is supported by Second Circuit Law." Debtors' Response at ¶ 16 (emphasis in original). Of the ten cases cited by the Debtors in a footnote in support of this statement, six do

-7-

not even address the issue of unfair discrimination among equally situated classes under section 1129(b) because either all classes voted in favor of the Plan or there were no equally situated classes receiving disparate treatment.[5] Of the four cases in which unfairly discriminatory treatment under section 1129(b) was addressed, such discrimination was found acceptable in two and unacceptable in two:

(a) In In re Kliegl Bros. Universal Electric Stage Lighting Co., Inc., 149 B.R. 306 (Bankr. E.D.N.Y. 1992), the union (International Brotherhood of Electrical Workers) held out for separate classification and a 75% distribution for its members' claims, while other general unsecured creditors received an unspecified "smaller percentage distribution." The Court found that because of prevailing conditions in which the debtor would not even be permitted to bid on contracts if it was not a union shop, there was a reasonable basis for the discrimination. In In re FF Holdings Corp. & Farm Fresh, Inc., 1998 U.S. Dist. LEXIS 10741 (D. Del. Feb. 17, 1998), the Court held that treatment in which general unsecured claims received a distribution of just over 90% where trade claims received 100% was not "grossly disparate" and approved confirmation of the plan.

(b) In In re 222 Liberty Assoc., 108 B.R. 971 (Bankr. E.D. Pa. 1990), where the plan provided that all unsecured creditors (classes 4A and 4B) received a 2% distribution, but that Class 4A was to receive an additional 38% in cash plus 60% by note over time personally from a general partner of the debtor, the Court found that the plan proponent "failed the test for determining whether discrimination in treatment of different claims is justified." Similarly, in In re Graphic Communications, Inc., 200 B.R. 143

---

[5] Further, while the Debtor cites these ten cases in support of its contention that "Second Circuit law" supports its statement, of the ten, three are from bankruptcy courts within the Second Circuit while the remaining seven are from bankruptcy courts in other circuits.

-8-

(Bankr. E.D. Mich. 1996), confirmation of the plan was denied where the debtor proposed payment of 100% to Class III unsecured creditors and 10% to Class IV (the lender's deficiency claim), and the plan proponent did not prove the necessity of its failure to offer Class IV a "meaningful recovery."

**B.     The Plan Cannot Be Consummated without Discrimination**

17.     The burden of proof is on the Debtors to demonstrate that the Plan cannot be confirmed in the absence of the proposed discrimination against Class 5.[6]  In re Richard Buick, Inc., 126 B.R. 840 (Bankr. E.D. Pa. 1991)(plan proponent bears burden of proving reasonable basis for the degree of discrimination in treatment contemplated by plan); 222 Liberty Assoc., 108 B.R. at 991 ("The plan proponent has the burden of proving the rationale for any proposed discrimination in treatment of creditors."); In re Graphic Communications, Inc., 200 B.R. 143 (Bankr. E.D. Mich. 1996)(confirmation denied where debtor offered no substantiation for "alleged necessity" of 100% distribution to unsecured trade debt where deficiency claim received only 10%); In re Snyders Drug Stores, Inc., 307 B.R. 889, 895 (N.D. Ohio 2004)(confirmation denied where debtor did not establish that trade creditors "would refuse to deal" with it on acceptable terms absent preferential payment, and class was not "reasonably tailored to foster only those relationships" critical to reorganized debtor's success).

18.     The Debtors have not demonstrated that the Plan cannot be consummated without the extreme discrimination they propose in their treatment of Class 5 creditors. The Debtors make no showing that the holders of Class 4 Claims, trade vendors with which they intend to continue to do business, will refuse to do business with the Debtors in the future in the

---

[6]     In the Debtors' Response, RDA describes this second factor as "the Debtors do not believe they would be able to consummate the plan without the discrimination," an arguably much easier standard than that used by courts in which the burden of proof is on a debtor to demonstrate that the plan <u>cannot</u> be consummated without the discrimination. Debtors' Response at ¶ 15.

absence of 100% payment of their prepetition claims, nor do the Debtors show that such trade vendors are the only trade vendors who can provide the goods or services required by the Debtors. A particular "widget" may be important to the Debtors' operations, but if the Debtors can buy the same widgets from numerous suppliers, then there is no basis for providing preferential treatment to the one that happens to have shipped to the Debtors on credit prior to the Petition Date.

C.     **The Discrimination Is in Good Faith**

19.    The Debtors assert that its selection of members of Class 4 is based upon "the Debtors' considered business judgment as necessary to ensure competitive, going-forward operations upon emergence." Disclosure Statement at p. 30. If the Debtors cannot prove the necessity of that determination and that there are no other vendors with whom they can do business, their classification of Unsecured Ongoing Operations Claims in Class 4, and the provision of 100% payment to such creditors, was done in bad faith.

D.     **The Degree of Discrimination Is In Direct Proportion to Its Rationale**

20.    The Debtors' Response temerariously describes the treatment of Classes 4 and 5 as "marginally disparate" (¶ 16). To the contrary, the extent of the unfair discrimination here is massive: 3.6% versus 100%, and such treatment is grossly disproportionate to its rationale, especially where the Debtors have offered no proof that such treatment is necessary. The Debtors propose to pay Class 4 "Unsecured Claims Related to Operations" in full, while paying Class 5 at approximately 3.3 to 3.6% – a difference in treatment distribution of nearly 97% . Courts have rejected confirmation on the basis of unfair discrimination where plans proposed grossly disparate treatment (50% or more) to similarly situated creditors. *See, e.g.,* In re Tucson Self-Storage, Inc., 166 B.R. 892 (9th Cir. BAP 1994) (providing for 100% for unsecured trade creditor and 10% to deficiency claim was unfair discrimination); In re Barney & Carey Co.,

170 B.R. 17 (Bankr.D.Mass.1994) (denying confirmation where deficiency claim was to receive 100% and general unsecured 15%); In re Caldwell, 76 B.R. 643, 646 (Bankr.E.D.Tenn.1987) (confirmation denied where 100% of credit card debt was proposed to be paid but only 22.7% of all other unsecured debt would be paid).

21.     The proposed treatment here is clearly manifestly unfair, where the Class 4 unsecured trade creditors are to receive 27 to 29 times the distribution proposed for Class 5 other unsecured creditors.

E.    **The Alleged "Gift" to Class 4 Is Property of the Debtor's Estate and Therefore The Court Must Examine the Unfair Discrimination between Classes 4 and 5**

22.     The Debtors are also likely to argue that the discrimination is permissible because the Plan is a "gift plan" and therefore not subject to section 1129(b). The gift doctrine, its validity and its permissibility in Chapter 11 plan confirmations, is unsettled. See, In re Journal Register Co., 407 B.R. 520, 529-31 (Bankr. S.D.N.Y. 2009) (reviewing case law from 1993 to present). When contested, as here, gift plans, it has been argued, work violence to the equities the Code ensures, specifically through the absolute priority rule and the protection of Section 1129(b). See, e.g., In re Sentry Operating Co. of Texas, Inc., 264 B.R. 850, 865 (Bankr. S.D.Tex. 2001). The primary issue, therefore, in assessing the validity of an objected-to gift distribution for purposes of plan confirmation, is whether the gift is subject to and, if so, violates Section 1129. In the main, courts are called upon to address a gift in context of the vertical test of the absolute priority rule, i.e., whether it is fair and equitable among classes of differing priorities. In the instant case, the issue is whether a "gift" can be given to one class of creditors such that the treatment of creditors with otherwise equal legal rights is grossly disparate, and thus violative of the horizontal test of unfair discrimination.

23. "True" gifts, when they have occurred, do not distribute property of the estate and thus are not subject to the equities of section 1129(b). A "true" gift, that is, assets that came into the possession of a bankruptcy class in a manner that set those assets apart from the bankruptcy estate, includes, for example, a secured creditor's sharing of sale proceeds with unsecured creditors *after* distribution of the estate property. In re SPM Manufacturing Corp, 984 F.2d 1305, 1312-13, discussed in Journal Register, 407 B.R. at 529-30. See, e.g., In re Union Financial Services Group, 303 B.R. 390, 422-423 (Bankr. E.D. Mo. 2003)(payments to holders of claims receiving enhanced treatment approved where they were "matter of separate negotiation and contract" with senior lenders and funds were clearly described in plan as coming from lenders' cash collateral); In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001). Such gifts from secured creditors to unsecured creditors are not subject to the absolute priority rule where the senior class is deemed to have rightful possession of the assets they share with junior classes, and such assets are not estate property.

24. Notwithstanding the identification of "true" gifts as separate from an estate, courts have routinely considered the equitable effect of gift distribution on other classes – even when not holding the distribution subject to section 1129(b) – and the absence of unfairness has been an additional factor leading to such gift plans' approval. See, e.g., In re MCorp Financial Inc., 160 B.R 941, 960 (S.D. Tex. 1993) ("The seniors may share their proceeds with creditors junior to the juniors, as long as the juniors continue to receive at least as much as what they would without the sharing.")

25. When such a gift is considered part of the estate – not the secured creditors' exclusive property and, thus, not a "true" gift – an analysis under 1129(b) must be performed in a "cram-down" context, the absolute priority rule necessarily applies, and the court must determine whether unfair discrimination exists. See, e.g., In re Iridium Operating LLC, 478

-12-

F.3d 452, 461, 463 (2d Cir 2007) (distinguishing In re SPM Mfg. Corp. and finding that "the [assets of the settlement] were contested and the money held . . . was an asset of the Estate" and that when a settlement is presented for approval as part of a plan of reorganization, because it constitutes part of the plan, [it] may only be approved if it … conform[s] to the absolute priority rule"). In all these cases, the gift distribution is analyzed as every other distribution under the proposed plan and must therefore meet the protective standards of Section 1129(b).

26.     Here, the gift from the Prepetition Lenders to the Class 4 trade creditors is not clearly demarcated as separate property of the secured lenders: the proposed "gift" is embodied in, and an element of the Plan, and the "gift" payments are to be made by the Reorganized Debtors out of the Debtors' "Cash on hand" (derived from its new capital structure) and not from a separate source. Plan at Article IV.G., p. 20. Further, it is the Debtors who decide with whom they wish to continue to do business and who negotiate the terms with the trade creditors, not the Prepetition Lenders. Accordingly, the Debtor's description of the funds used to pay Class 4 as a "gift" from its Prepetition Lenders is insufficient, in and of itself, to permit the Plan to escape examination under the standards of section 1129(b) and the Court has an obligation to examine whether the treatment of Classes 4 and 5 is unfairly discriminatory.

27.     Further, the fact that the Prepetition Lenders have liens on the Debtors' assets does not give them or the Debtors the right to unilaterally ignore section 1129(b) of the Bankruptcy Code, and to hold otherwise sends the bankruptcy process down a slippery slope. If a secured creditor and a debtor can decide between them that some provisions of the Bankruptcy Code should be "read out," then why have any confirmation requirements in cases where a debtor's assets are encumbered, other than the consent of the secured lender to the plan? As noted by the Court in Sentry:

-13-

> To accept [the] argument that a secured lender can, without any reference to fairness, decide which creditors get paid and how much those creditors get paid, is to ... read the 1129(b) requirements out of the Code. ... To accept that argument is simply to start down a slippery slope that does great violence to history and to positive law.

Sentry, 264 B.R. at 865.

28.  The circumstances here are also factually unlike those of two recent cases in this District in which the Court approved a "gift" from one class to another. The recent case In re Journal Register Co. (J. Gropper) is inapposite to both the facts and equities presented here. In that case, there was only one class of unsecured claims and that impaired class overwhelmingly approved the plan. While an objecting creditor alleged that the plan unfairly discriminated by creating a segregated account funded by the secured lenders outside of the debtors' estates to be used to pay trade vendors, Judge Gropper found that the plan did not violate § 1129(b) as there was no issue of unfair discrimination *between* classes of creditors. 407 B.R. 520, 532 (Bankr. S.D.N.Y. 2009). Another recently-decided case involving a gift from one class to another is equally distinguishable. Unlike Journal Register, in DBSD North America, Inc. (J. Gerber), the unsecured class in which the objecting creditor was placed rejected the plan. 2009 WL 3491060, No. 09-13061 (REG) (Bankr. S.D.N.Y. 2009). However, this case is also factually inapposite because all unsecured creditors (with the exception of a convenience class) received identical treatment under the DBSD plan and thus there was no issue of unfair discrimination *between* classes. Id. at *18. While the court cited Journal Register's analysis of the claim of unfair discrimination as "instructive," its analysis and ruling was based on whether the gift violated the absolute priority rule and thus the "fair and equitable" test under § 1129(b). Id. at *26.

## **CONCLUSION**

29. On its face the Plan proposed by RDA unfairly discriminates *between* classes of unsecured creditors and the facts and extreme inequities in this case call for this Court to reach a different conclusion. Indeed, it is hard to imagine how a bankruptcy court exercising its equity jurisdiction could find this massively disparate treatment between different classes of unsecured claims, which otherwise have the same legal rights and are *pari passu* in priority, to be anything but unfair discrimination. Accordingly, the Debtors' Plan is unconfirmable in the face of its rejection by Class 5 creditors, as the Debtors will be unable to show that their Plan does not unfairly discriminate.

WHEREFORE, the RD Retiree Group, LLC, respectfully requests that this Court deny confirmation of the Plan on the grounds that it is unfairly discriminatory in its treatment of the Class 5 General Unsecured Creditors in contravention of section 1129(b) of the Bankruptcy Code.

Dated: New York, New York
      January 5, 2010

                          SATTERLEE STEPHENS BURKE & BURKE LLP
                          *Counsel for RD Retiree Group, LLC*

                          By: /s/ Christopher R. Belmonte
                               Christopher R. Belmonte, Esq.
                               Abigail Snow, Esq.
                          230 Park Avenue, Suite 1130
                          New York, New York 10169
                          (212) 818-9200

790158_3